To be argued by
LEON H. TRACY
(15 minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
--------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK

              Respondent,

         -against-

HAROLD GOPAUL,

             Defendant-Appellant.
--------------------------------------x

           :      HEARD ON THE
                ORIGINAL RECORD

           :      Ind. No. 2415/08

           :      Docket No. 2009-07167

           :      Nassau County

BRIEF FOR DEFENDANT-APPELLANT

LEON H. TRACY
Attorney for Appellant
366 North Broadway, Suite 410-D9
Jericho, N.Y. 11753
(516) 942-4233

TABLE OF CONTENTS

Page

STATEMENT PURSUANT TO RULE 5531...........................4

PRELIMINARY STATEMENT.......................................5

QUESTIONS PRESENTED.........................................7

STATEMENT OF FACTS

Introduction...............................................8

PRE-TRIAL PROCEEDINGS:

Huntley/Mapp Hearing, April 30, May 1, 4, 5, & 6, 2009.....8

Hearing Decision, May 6, 2009.............................21

THE TRIAL:

The People's Case.........................................21

The Defendant's Case......................................34

ARGUMENT

                          POINT ONE

    THE STATEMENTS, VIDEOTAPE, AND PROPERTY SEIZED FROM THE
    DEFENDANT SHOULD HAVE BEEN SUPPRESSED AS IT WAS
    OBTAINED, UNDER DURESS, AS THE PRODUCT OF
    CONSTITUTIONAL VIOLATIONS, AND BASED ON PATENTLY
    TAILORED TESTIMONY......................................35

                          POINT TWO

    THE COURT ERRED DENYING THE DEFENDANT'S MOTION TO LIMIT
    DIRECT AND CROSS-EXAMINATION BY THE PEOPLE TO CHARGES
    IN NASSAU COUNTY, PERMITTING THE PEOPLE TO INTRODUCE
    CHARGES OF THE DEFENDANT'S INDICTMENT IN QUEENS
    COUNTY, THE COURT COMPOUNDING THE ERROR BY GRANTING THE
    PEOPLE'S MOLINEUX APPLICATION, EFFECTIVELY DENYING THE
    DEFENDANT THE RIGHT TO TESTIFY..........................47

2

Page

### POINT THREE

BASED  AS IT WAS ON EVIDENCE THAT WAS INTRINSICALLY
INCREDIBLE AND UNRELIABLE, THE SEXUAL ABUSE VERDICT
WAS   INSUFFICIENTLY  SUPPORTED   AND IN VIOLATION OF
THE   DEFENDANT'S  CONSTITUTIONAL  RIGHTS   TO   BE
CONVICTED   ONLY   WHERE   GUILT   HAS   BEEN
ESTABLISHED BEYOND A REASONABLE DOUBT..................54

### POINT FOUR

THE   SENTENCE   IMPOSED   ON THE DEFENDANT WAS UNDULY
HARSH AND EXCESSIVE  AND   SHOULD  BE REDUCED IN THE
THE INTEREST OF JUSTICE................................61

CONCLUSION...........................................67

CERTIFICIATE OF COMPLIANCE............................68

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
----------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

        -against-

HAROLD GOPAUL,

                Defendant-Appellant.
----------------------------------------x

### STATEMENT PURSUANT TO RULE 5531

1. The Indictment Number in the Court below is 2415N/08.

2. The Appellate Division Number is 2009-07167.

3. The full names of the original parties are The People of the State of New York against Harold Gopaul. Harold Gopaul is the only party to this appeal.

4. This action was commenced in the County Court, Nassau County, by the filing of an indictment October 30, 2008.

5. This appeal is from a judgment convicting appellant, after trial by jury, to sexual abuse in the first degree (fourteen counts).

6. The judgment was rendered July 15, 2009 (McCormack, J.).

7. Appellant has been granted poor person relief and this appeal is not being perfected by the appendix method.

PRELIMINARY STATEMENT

This is an appeal from a judgment of the County Court, Nassau County, rendered on the 15th day of July 2009, after a trial by jury, convicting the defendant of 14 counts of sexual abuse in the first degree, a class D felony, P.L. §160.35 (T. 915).[1]

The defendant was sentenced for count one to a determinate sentence of seven years of incarceration with a period of five years post-release supervision (S.26)

For count two through count 13, the defendant was sentenced to a period of seven years of incarceration with a period of five years post-release supervision. This sentence is to run concurrently with the sentence imposed on count one. (S.26)

For count 14, the defendant was sentenced to a five year determinate term of incarceration with a period of five years post-release supervision. This sentence is to run consecutively to the other counts (S. 26).

There was also an Order of Protection for Sana Awan (S. 27).

----------------------------------

[1] Numerical references preceded by "H" are to the minutes of the hearing; those preceded by "T" are to the minutes of the trial; and those preceded by "S" are to the minutes of the sentence.

There was a mandatory surcharge of $250, a DNA database fee of $50, a crime victims' assistance fee of $20, a sex offense registration fee of $50, a supplemental sex offender victim of $1,000 imposed, to be collected by civil judgment (S. 26 - 27).

Timely notice of the appeal was filed. The Court granted the appellant leave to prosecute the appeal as a poor person on the original papers and typewritten briefs.

By Order, October 24, 2011, Leon H. Tracy, Esq. was assigned as counselor on appeal. Upon information and belief, no application has been made for a stay or bail pending appeal, and appellant is presently incarcerated, pursuant to the judgment herein appealed, at Clinton Correctional Facility, Dannemora, New York.

QUESTIONS PRESENTED

1. WHETHER THE STATEMENTS, VIDEOTAPE, AND PROPERTY SEIZED FROM THE DEFENDANT SHOULD HAVE BEEN SUPPRESSED AS IT WAS OBTAINED, UNDER DURESS, AS THE PRODUCT OF CONSTITUTIONAL VIOLATIONS, AND BASED ON PATENTLY TAILORED TESTIMONY.

2. WHETHER THE COURT ERRED DENYING THE DEFENDANT'S MOTION TO LIMIT DIRECT AND CROSS-EXAMINATION BY THE PEOPLE TO CHARGES IN NASSAU COUNTY, PERMITTING THE PEOPLE TO INTRODUCE CHARGES OF THE DEFENDANT'S INDICTMENT IN QUEENS COUNTY, THE COURT COMPOUNDING THE ERROR BY GRANTING THE PEOPLE'S MOLINEUX APPLICATION, EFFECTIVELY DENYING THE DEFENDANT THE RIGHT TO TESTIFY.

3. WHETHER BASED AS IT WAS ON EVIDENCE THAT WAS INTRINSICALLY INCREDIBLE AND UNRELIABLE, THE SEXUAL ABUSE VERDICT WAS INSUFFICIENTLY SUPPORTED AND IN VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL RIGHTS TO BE CONVICTED ONLY WHERE GUILT HAS BEEN ESTABLISHED BEYOND A REASONABLE DOUBT.

4. WHETHER THE SENTENCE IMPOSED ON THE DEFENDANT WAS UNDULY HARSH AND EXCESSIVE AND SHOULD BE REDUCED IN THE INTEREST OF JUSTICE.

7

STATEMENT OF FACTS

Introduction

The people maintain that the defendant, Harold Gopaul, sexually abused his stepdaughter, Sana Awan.

PRE-TRIAL PROCEEDINGS

Huntley/Mapp Hearing, April 30, May 1, 4, 5, & 6, 2009

Detective Leonard Schulman, Shield 6387, assigned to 105th Precinct, Queens (H.21), was  notified, June 24, 2008, that there was a complainant, Sana Awan, alleging that she was sexually abused by her stepfather, Harold Gopaul, the defendant. Administration for Children's Services (ACS) was involved, and an investigator was needed for the interview (H. 24).

Schulman was working as an investigator, 4:30 P.M., June 23rd until 1:00 A.M., June 24, 2012 at the 105th Precinct. As he was working on the case, he went on a day tour the 24th, 8:00 to 4:30, working from 4:40 P.M., the 23rd, until 9:33 the 24th. He went back on duty again from 9:33 P.M. to 6:06 A.M. the next morning (H. 26 & 225 - 227).

Schulman was first informed by a call, 2:30 A.M., from Sergeant O'Hagan at the precinct, of the need for an investigator. Schulman did not recall what he had been doing at the precinct between 1:00 A.M. and  2:30 A.M. and if he put in for overtime. He had not brought his memo book with him, but he

did not recall making any entries with regard to the case. Although Schulman stated that he would have to check to determine if the memo book was available, the Court directed him to bring it for his subsequent testimony (H. 181 - 185 & 193).

The defendant, had come to the precinct, to report his stepdaughter, Sana Awan, missing. It was a few hours after she had arrived to lodge a complaint against him. He was wearing his work uniform. Desk Sergeant O'Hagan initiated having the defendant taken into custody and arrested. Schulman, while speaking with the complainant, was so informed by O'Hagan, about 4:45 A.M., about a possible investigation for sexual abuse (H. 25 & 27 - 28).

Schulman claimed that he spoke with the complainant at the precinct, probably about 3:30 A.M., June 24, 2012, for about two hours, with possible breaks, and again several times in the afternoon. The interview was outside anyone's presence, Schulman taking notes afterwards. He believed that he spoke with the defendant about 5:10 A.M., two hours after initially speaking with the complainant, sometimes going back to speak with her (H. 197 - 198).

Schulman claimed that it was not to his knowledge the defendant had come to the precinct at 2:30 A.M., and it was highly unlikely that O'Hagan and eight other officers had beat

9

up the defendant, spread-eagled over a rail (H. 183).

Schulman denied that he was trained to initially be rough and then attempt to befriend a suspect (H. 206). No complaints were ever made of injuries by the defendant to Schulman. No physical inspection was made of the defendant's arms, legs or abdomen by Schulman (H. 230 - 232).

The defendant had been brought to an interview room, about eight by 10 in size, having a window, Schulman not recalling if it had been covered or not. The door having been secured from the outside, and Schulman, his gun locked away, initially encountered the uncuffed defendant, sitting in a chair near the table, about 5:10 A.M. (H. 29 - 31, 204, & 208).

The defendant was brought to a room, known as a "box," to be interviewed by an officer. To Schulman's knowledge, all interview rooms are referred to as a "box." There is a rule that a person to be interrogated and left alone is to be handcuffed, but the defendant was left uncuffed (H. 201 - 203).

When Schulman entered the "box," he read the defendant his Miranda warnings from a pre-printed form on which he wrote 5:10 A.M., and the defendant responded affirmatively to each of the six questions indicating his understanding of the warnings (H. 32 - 33 & 36).

On the affirmative response of the defendant to each of the questions, Schulman wrote "yes at each line prior to

10

proceeding to the next inquiry, noting the defendant's understanding. The defendant was given the form to review, and he initialed each of the six responses. He printed and signed his name on the back of the form, witnessed by Schulman who affixed his signature and shield number at 5:15 A.M. (H. 34 & 37 - 39).

According to Schulman, there were no threats or promises to the defendant. The defendant had been cooperative. He had not declined to speak with him, nor did he request an attorney. Schulman admittedly outweighing the defendant, denied that when he initially entered the interview room that he grabbed the defendant by the collar, throwing him against the wall, holding the collar, and dragging him back (H. 39 - 40 & 212).

Consent forms to search the defendant's home and his work vehicle, were read to the defendant, Schulman completing the blanks of the forms. The defendant gave permission for the searches, voluntarily waiving his rights. The forms noted that the defendant could refuse the searches and require warrants be obtained. They also noted that if any evidence was found, it could be used against him. The defendant put his signature, and June 24, 2008 on each form, noting the time search respectively as 5:20 A.M. and 5:30 A.M. (H. 44, 46 - 48, & 50 - 54).

No one had entered or left the interview room up until that point. Then Schulman left the room, got some more

11

information from the complainant, taking a break before going back to speak with the defendant. Leaving the complainant in her interview room, Schulman returned to the defendant's interview room, noting that it was about 6:20 A.M., the defendant still being uncuffed and alone. The complainant was unaware that her stepfather was in another interview room (H. 54 - 55 & 210).

In response to Schulman's inquiry to the defendant if he knew why he had been arrested, the defendant informed him that he had an argument with the complainant on Saturday, slapping her. The defendant agreed to provide a written statement to that effect, indicating name, address, 6:25 A.M., and June 24, 2008 on the document, and Schulman signed at the end of the statement (H. 57 - 60, 99 - 100, & 206 - 207).

During the time that the defendant provided the statement, he was cooperative. He had no conversation with Schulman asking no questions and making no requests of Schulman whose weapon was still secured. The defendant read over the statement, but he declined an opportunity to make any changes (H. 100 - 103).

After the statement was concluded, the defendant asked and was granted an opportunity to use the restroom, being handcuffed en route to and from the lavatory, and uncuffed to fulfill his need at the restroom. Schulman took a break subsequent to the defendant using the restroom, returning about

7:20 A.M. (H. 103 - 105 & 207 - 208).

Schulman informed the defendant that his stepdaughter, the complainant, had made allegations against him about activity that was inappropriate, but Schulman told the defendant he was not going to give him the details about the allegation. The defendant told Schulman that "he felt bad about it, and he wanted to make a statement." The statement was written in the defendant's own words and signed by him, Schulman signing at the end of the statement (H. 106 - 108).

The second statement was completed June 24, 2008, 8:30 A.M., the defendant still not making any request for an attorney. The detective's gun was still secured, and no physical force or threats were used to obtain the statement. The cooperative defendant reread the statement, but he declined the opportunity to make any changes (H. 112 - 114).

After the second statement was signed, Schulman asked the defendant if he had any vibrators in his house and a body massager in his car. Schulman claimed the defendant admitted to having vibrators in his house and a body massager in his vehicle for himself, but he had not used it on his daughter. Schulman memorialized his inquiry of the defendant and his reply, the defendant drawing pictures of the vibrators. The defendant signed the statement, indicating the question, reply, and drawings were accurate, declining to make changes (H. 115 &

13

121 - 122).

The defendant, in response to Schulman's inquiry, agreed to make a video statement, and Schulman contacted the Office of the Queens County District Attorney. At the 105th Precinct, a video was made in the larger interview room that had previously been used for the complainant. The defendant was interviewed by a Queens Assistant District Attorney (ADA), and videographed by someone from his office, Schulman being present. <u>Miranda</u> warnings were given on the video, the defendant not requesting to speak with an attorney. After the videotape was made, the defendant was transported to Queens Central Booking (H. 128 - 130 & 134 - 135).

During the defendant's interview, Schulman had not asked the defendant if he had eaten or if he had slept in the past 24 hours. The defendant was wearing a uniform with an Ecolab patch, but Schulman did not recall the color of the shirt or the pants, whether there was a tie, and whether the shirt was tucked in the pants. (H. 205 - 206).

On the video, the defendant's shirt was unbuttoned during the two to three hour interrogation and his shirt was "depressed" on the left and right sides, Schulman not recalling the condition of the shirt when he initially spoke with him. Schulman denied that he had held the defendant's collar at the point the shirt was distorted, grabbing the defendant's shirt

14

and pulling him (H. 227 - 230).

Detective Celica Alfaro, Shield 8865, 105th Precinct, worked a tour of duty on June 24, 2008, 11:15 P.M. to 7:50 A.M. She agreed to process an arrest, not recalling when she was called on radio patrol to do so. She came to the precinct at 4:40 A.M. Schulman directed her to process the arrest of the defendant. In addition, she assisted in doing some of the interviewing of the complainant after she processed the defendant's arrest. Alfaro handled the online booking paperwork, denying that Schulman had supplied the details. Alfaro did not recall how long it took her to process the arrest (H. 239 - 241, 254 - 255, & 264 - 266).

Alfaro was the officer who escorted the handcuffed defendant, from the upstairs room in which he was interviewed by Schulman, downstairs for the processing of his arrest. She did not recall who actually arrested the defendant, how many officers were involved, and if the defendant had been violent. Pedigree information was obtained from the cooperative defendant when he was placed in a cell behind the front desk of the precinct. Alfaro's weapon had been secured in another area within the period in which inquiry was made of the defendant for pedigree details (H. 242 - 245 & 261 -262).

Alfaro did not recall if there was any interaction with the defendant and other officers while Alfaro was with him or

15

when the defendant was placed in the cell. She did not recall if there were any other officers around when she placed the defendant in the cell, and she had not seen any officers enter the cell after he was placed there (H. 244 & 246 - 247).

The defendant had not complained of any pain or injuries to Alfaro, and he did not ask to receive any medical attention. She did not observe any bruises or scratches. Alfaro had not examined the arms, legs, and abdomen of the defendant (H. 245 - 246 & 272).

Alfaro was sitting outside the defendant's interview room for over two tours of duty, for 19 hours, while Schulman had the defendant in his custody. She received overtime for two tours explaining she was responsible for remaining with her prisoner, the defendant. Although it was her responsibility to stay with the defendant until he was lodged, she was not in the interrogation room during any of the interrogation of the defendant. She also claimed that she was asked to step outside by the ADA's during the videotaping (H. 269 -271).

Schulman contacted Alfaro, and she was informed that he had written consent from the defendant to search the defendant's vehicle and home to recover evidence, and she did so (H. 126 - 127). Alfaro escorted the complainant to the Ecolab truck, the defendant's work vehicle, which he had driven to the precinct. Alfaro recovered a cleaver and a white

16

massager, directed by the complainant to a console inside the truck.  The items recovered were invoiced and vouchered (H. 247 - 249).

On June 24, 2008, Alfaro went to the home of the defendant with a signed consent form, by the defendant, to search his home at 242-10 89th Avenue, Queens. The defendant's wife was present when Alfaro searched the master bedroom of the home in which the defendant lived with his wife, the complainant's mother. Alfaro recovered  a white and gray massager, under the bed in the master bedroom, vouchering it at the precinct (H. 250 - 252).

The defendant, Harold Gopaul, a 51 year old male, working at Ecolab as an exterminator, testified at the hearing. Prior to June 24, 2008, he had no injuries although he had a hernia operation. He had worked all of Monday, June 23, 2012 without eating due to dietary constraints, having last eaten on Sunday, June 22, 2008 at 9:00 P.M. At about 1:45 A.M., on the 23rd, he noticed that his daughter, the complainant was not home and the back door was unlocked. He believed that she had run away, and he drove to the 105th Precinct at about 2:30 A.M. (H. 276 - 279).

After the defendant reported his daughter was missing, giving his name and address, he was surrounded by nine or 10 officers. They grabbed him and slammed him into a wall and then

17

a counter, shouting "cuff him," while they physically abused and cursed him. They scratched, squeezed, and tugged him, spreading his legs as far as they would go, holding his arms behind his back, and pushing the side of his face into a wall. Although he requested a telephone call for an attorney, his request was denied in foul language (H. 280 - 282 & 306 -312).

After he was handcuffed, Detective Schulman pushed him upstairs to an interview room called "a box." On entering the room, Schulman grabbed him by the collar and pulled him around. He was never advised of his <u>Miranda</u> rights. Schulman brought papers into the room, and advised the defendant that his daughter had accused him of sexual harassment, Schulman asking the defendant, "You want to tell me something else?" The defendant replied that he had come to the precinct to report his daughter missing (H. 283 - 286 & 325).

Schulman asked the defendant what had happened at the fair, and the defendant informed Schulman that he had an argument with his daughter. Schulman, nagging, cursing and threatening him, announced that he had put people away for 20 years, and he was going to put the defendant away even longer (H. 286).

The defendant requested a call to his wife and a lawyer, but Schulman denied his request using profanity. After the defendant related what happened at the fair, Schulman gave him

a paper to initial after reading it to him.   The defendant stated that the <u>Miranda</u> sheet in evidence had the words "yes" already entered on it, and Schulman made threats to him, forcing him to initial the entries involuntarily (H. 287- 288 & 319).

The defendant acknowledged writing a true statement about what occurred at the fair with his daughter. After taking the statement about the fair out with him, Schulman returned with the complainant's statement insisting the defendant sign a confession about his daughter's allegations of abuse (H. 289).

The defendant denied having been advised of his rights when he signed consent forms agreeing to have his car and his home searched, Schulman not having read the rights to him (H.323).

Schulman threatened to put the defendant away for a long time, again refusing him calls to his wife and a lawyer. Schulman forced the defendant to sign a confession, including a description of a vibrator, with Schulman drawing its picture. The defendant claimed that he used a folding massager, not a vibrator described by his daughter (H. 288 - 292).

Schulman related details of the complainant's allegations to the defendant, and  he repeatedly pressured the defendant to sign a confession to that effect, telling him  what to write. Schulman directed the defendant to write at the end of the

19

confession that he was sorry and he made a mistake. The defendant was informed by Schulman that the confession would be taken to his supervisor who would feel sorry for him, who would indicate the defendant's need for help, and who would tell the defendant he could go home (H. 290 & 324).

Schulman told the defendant that before he went home, he wanted the defendant to make a videotape, for the ADA, regarding the written statement he had signed. The defendant's continual requests for a lawyer or to a telephone call were denied. The defendant was told that after did the videotape statement of confession and acknowledged having been advised of his <u>Miranda</u> rights for the DA, he would be going home. The defendant had not complained of pain or asked for medical attention on the videotape as he was scared of Schulman (H. 292 - 295, 326 -328).

The defendant had left for work on June 23rd at 6:00 A.M., not getting home until June 24 at about 2:00 A.M., going to the precinct at 2:30 A.M. He was deprived of sleep for over 15 hours. He was also deprived of food, being given merely a bottle of water during the videotaping, 10 to 12 hours after his arrival at the precinct. On being released from jail, the defendant went to his attorney's office and then to Long Island Jewish Hospital on June 26, 2008 for treatment of his injuries. The defendant introduced photos of his injuries sustained from

20

officers at the 105th Precinct, as well as hospital records (H. 295 - 305).

The defendant did not complain to the precinct, Internal Affairs, or any police officers about what Schulman and other officers did to him (H. 329 - 330).

Hearing Decision, May 6, 2009

Addressing the Huntley issue, the Court credited the testimony of Detective Leonard Schulman. The Court determined: that the statements of the defendant were voluntary; that the defendant made a knowing, intelligent, and voluntary waiver of his Miranda rights prior to providing written statements; that the videotaped statement was voluntary; and the Miranda warnings, given by Schulman, applied to the videotaped statements as well as the written statements. Regarding the Mapp issue, the Court found that the consent was voluntarily given by the defendant, after he was properly advised of his rights to search both his home and his vehicle (H. 434 - 436).

The Court denied the defendant's motion to suppress the written statements, videotaped statement, and any other evidence recovered (H. 236).

THE TRIAL:

The People's Case

Sana Awan, the 18 year old complainant, a high school senior, accepted to college in the fall, was the stepdaughter

of the defendant from the age of three. She lived in Queens with him, her biological mother, and two younger siblings who were born to her mother and stepfather. She had a normal father-daughter relationship with him, calling him Dad, and she got along with both her parents, helping with the housework. The entire family spent weekends together, going to museums the park, and sometimes church and shopping. Her homelife was strict, her parents, mainly the defendant, ensuring that she did her schoolwork. She was not able to socialize with friends on school nights until she finished her schoolwork (T. 401 - 402 & 404 - 409).

The defendant was the primary parental figure. The complainant's mother was frequently in the hospital, and the complainant did not feel as if she could confide in her if she had problems. As the complainant was scared, she had not discussed the case with her mother, her mother not asking her what happened or offering her counseling (T. 411).

When the complainant was 14 years old, in the ninth grade, her relationship with her stepfather changed. At the time, she was about 90 pounds. She came out the shower, and the defendant was using the toilet. He removed her towel, placing her on a hamper, and made her open her legs, putting his head between them. He told her to stop fighting when she unsuccessfully tried to push him away. He performed oral sex on her vagina

22

with his lips and his tongue, touching her breasts. He did not heed her request to stop, shushing the noises she made for her sleeping mother to hear (T. 413 - 423).

The defendant had taken the complainant to school regularly from 2005, picking her up sometimes, and the complainant looked forward to it as she loved her father. The complainant's parents made sure she attended classes, did her homework, and that school came first, and her grades kept improving from 2008 to 2009, compared to 2006 to 2007. The complainant was not allowed to go out with her friends, only being allowed to do school clubs and things of that nature (T. 502 - 503 & 505 - 507).

The complainant had never told her parents about her boyfriend during April 2008, and she denied that her mother had ever met the boy. In another proceeding, the complainant testified that her mother had met the boy when she picked her up at school during May 2008. When showed the testimony the complainant acknowledged having said it although she initially denied that her mother ever picked her up at school (T. 497 - 498 & 528).

The complainant denied that her parents had ever told her that she could not have a boyfriend and that they ever told her she could not date. She also denied that she ever said that she was afraid to bring a male into her house because her parents

23

would be afraid he would be a boyfriend. The complainant did date, but she did not have her parent's permission. She explained that she did not go out on dates, but she did spend a lot of time with her boyfriend, but not at her home. The complainant denied that her parents had forbidden her to have a boyfriend after she admitted to having one (T. 528 - 530).

When the defendant picked the complainant up at school during May 2008, he saw her with her boyfriend. On inquiry by the defendant, she admitted having a boyfriend, and he yelled at her that she was too young to date and to stop seeing him. Subsequently, although she continued her regular school activities, the defendant picked her up at school every day, instead of twice a week (T. 409 & 426 - 430).

During May 2008, after school, the complainant was picked up by the defendant's, and he drove her, in his truck, to his work at Community Drive, Nassau. Parking in a back parking lot, he forced the complainant to kiss him on the lips. She told him to stop, unsuccessfully resisting him as she was only about 95 pounds, the defendant telling her to behave. He touched her breasts, under and over her clothing, forced her head into his lap, used a vibrator on her vagina over her clothes, and touched her vagina inside her underwear, telling her how wet she was (T. 431 - 440).

When the incident occurred, the complainant was the age of

24

14, and her father was the sole supporter of the family. She was scared that if her mother had witnessed it, it would break up the family. She was also scared that her father would hurt her. When there was another incident during May 2008, she knew there was no point in fighting (T. 448 - 450).

Between May 1st and May 13th, 2008, the defendant drove the complainant on Community Drive, touching her at least one time during the period and using a vibrator in the truck. There was also a massager in the truck that had been there for a long time, but the complainant did not know if it was used on his neck or even if his neck hurt him (T. 452 - 453).

During the period of May 1st and May 13th, the defendant threatened to cut off her finger as she fought back when he was kissing her. He showed her the blade of a knife telling her that he was showing her that he was serious. She never told her mother or her best friend Christine. In public the complainant and the defendant acted normally toward each other, she, because she was too embarrassed to tell anyone (T. 457 & 461 - 462).

On May 14th, 2008, when her father picked her up, he used the vibrator on her vagina, and when she fought him, he told her to behave. He told her to pick a date to have sex with him, a week, two weeks, or in a month. Since he had previously threatened her, she agreed to do so within a month. After the

25

incidents, he offered to buy her clothes and to take her to Taco Bell, before he took her home. (T. 462 - 466).

There were also incidents between May 19th to May 23rd, May 26th to May 30th, June 2d to June 6th, and June 9th to June 13th, 2008, the complainant attempting to resist the defendant was threatened with the knife. When he got mad, he raised his voice, and the complainant was afraid that the defendant would kill her (T. 467 - 473).

Although the complainant was in school regularly, she never confided in any teacher, guidance counselor, or dean, not even her mother or her friend Christine, about the being forced to submit to sexual abuse over a three year period. She told no one because she claimed to have been embarrassed (T. 462 & 526).

On June 14th, one month after her commitment to have sex with the defendant, he took her home directly after school as there was a funeral, and her mother and siblings were home together. Between June 19th and June 20th, when the defendant picked her up, he reminded her that they were to have had sex on June 14th as she promised, and she was asked to choose a day. She chose Friday, June 27th as it was the farthest day away (T 474 - 476).

She prepared to run away, hiding clothes in a bag in her closet. During June, there was another threat, and he showed

26

her a kitchen knife, threatening to cut off her finger. On June 23rd, she called her friend Christine, telling her why she was running away, and after speaking with Denise, Christine's mother, she started walking toward their house. Denise picked her up on the street about four blocks away from her home, taking her to the precinct (T. 477 - 483).

At the precinct, Christine told Schulman about what had transpired between the defendant and herself, and she went outside with a female officer and Schulman, identifying the knife and the vibrator in the defendant's truck. An ambulance took her and her mother to the hospital to be checked. When she went back home she noticed her diary was missing. The complainant still had the same boyfriend she had during May 2008, and she claimed to be a virgin (T. 483 - 492 & 533).

The complainant testified in the grand jury that she had never told anyone about the relationship between her and the defendant as she was scared that there would be a divorce. She was worried about her brother and her sister as her mother would have financial problems (T. 574).

She had driven on Community Drive with the defendant to his customer from 2005 to 2008, about 10 times. It was believed by the complainant that the building number of the parking lot on Community Drive was "300" or "400," telling Detectives Schulman and Moran. When shown the building number was "600,"

the complainant indicated she had not seen it at the entrance that was used by her and the defendant (T. 517 - 518, & 520 - 521).

The complainant had written a poem that "her thoughts vacation to a place without worry" referring to going to work at nights with her dad and sleeping on the back seat of his van (T. 508 & 515).

The complainant took videos with her family, and she enjoyed dancing on the floor when her father did Trinidadian dancing, taking pictures and videos of him doing so. She also took pictures and videos of her father with other members of the family, including one in his Ecolab uniform, terming them "family memories." The picture of the defendant in his uniform was given to him on Father's Day (T. 532 - 537).

Schulman, a detective who had, as one of his duties, enhancing arrests, requiring him to obtain confessions. He was working 4:27P.M., June 23rd to 1:00 A.M. June 24, 2008, and he was informed that the complaining witness was at the precinct at 2:30 A.M. He interviewed her, on and off, from 3:10 to 4:45 A.M. He did not recall what he was doing when his tour ended until 2:30 A.M. As required he maintained a memo book, and nowhere was there an entry of his involvement with the defendant (T. 682 - 683, 687, 692, & 694).

Schulman was informed by Sergeant O'Hagan of the

following: that he was present when the defendant had been taken into custody by one or more officers; and that he recognized the defendant's name and uniform when he voluntarily entered the precinct. Schulman claimed he did not know why the arresting officer, who physically placed the defendant under arrest, was not credited with same and why Police Officer Alfaro was taken off radio patrol to get credit for the arrest. It was not believed by Schulman that this was to shield the officers that arrested him from charges that they assaulted and mishandled him. The defendant was not charged with resisting arrest (T. 695 - 700).

Schulman was shown a portion of the videotape that focused on the defendant, displaying the defendant's stretched open shirt. Although he was trained as an officer to make observations, Schulman did not recall if his shirt collar was open when he first met with the defendant. Schulman denied that he grabbed the shirt collar of the defendant, shoving him into the wall (T. 713 - 715).

Police Officer Alfaro was assigned on June 24, 2008 to meet with the complainant at the precinct, and she brought her to the defendant's Ecolab truck outside. The complainant identified a mini cleaver and a massager in the vehicle, and Alfaro recovered and vouchered them as evidence (T. 578 - 582).

Alfaro's tour of duty was 11:15 P.M. to 7:50 A.M., and

29

she was assigned to assist in the arrest of the defendant, doing so at 4:55 A.M. She did not recall the time or the officer who initially placed him under arrest. She claimed to have no knowledge of whether other officers were in the defendant's presence during the time he was in the precinct. Alfaro did not speak with the defendant until after she arrested him, initially claiming there had been an open complaint report. She subsequently admitted her testimony was not accurate as he was already in custody, some other officer obviously having arrested him and there no longer being an open 61 complaint report (T. 584 - 589).

Alfaro admitted getting paid "time and a half" for working on the case. Schulman already had the defendant in custody when Alfaro became the arresting officer, Alfaro not recalling how many hours she worked with Schulman. She then admitted that she had just stated that she had worked from 4:45 A.M. until 11:50 P.M. Alfaro claimed that she did not recall if Schulman had interrogated the defendant. Alfaro then admitted that that she had a conversation with Schulman on her arrival at the precinct, Schulman having interviewed the defendant and the complainant (T. 589 - 592).

Another officer filled out the complaint report of the defendant, based on information that Alfaro provided and interviewing the complainant. Alfaro had done the following:

30

prepared the arrest booking sheet, after re-interviewing the complainant; done the vouchering; and spent time, as did Schulman, awaiting the arrival of the ADA, Alfaro not recalling if the ADA arrived not much longer after her arrival. Alfaro had spent over 16 hours waiting for the ADA and preparing some forms albeit not the complaint report (T. 592 - 595).

Alfaro was outside the room of the videotaping and Schulman was inside. In response to an inquiry if the officers threw the defendant around, Alfaro claimed she was out in the field, and she never examined the defendant's arms and legs. She did not know what tine the defendant surrendered at the precinct, and she did not recall if anyone went with her and the complaint when she went to the defendant's vehicle. Alfaro did not recall how many arrests she had done for sexual abuse in the last year, not recalling if it was more than one (T. 596 - 597).

She denied that her absence of knowledge was to protect Schulman. Alfaro, an officer of eight years, had been trained to make observations, complete forms, and testify in court. She did not recall if Schulman was with her when she went to the defendant's vehicle and if she had the vehicle's keys (T. 598 - 599).

Christine Alioto was the complainant's best friend from high school (T. 334 - 335). The defendant would take them to

31

school, picking up Christine from her home a couple of times a
week (T. 344 - 345). Christine participated in clubs with the
complainant, but during May 2008, the complainant was
restricted from doing so (T. 337).

The complainant, an excellent student, had a high school
boyfriend, and her parents were concerned about, putting a rein
on her outside activities according to Christine. The
complainant's parents wanted her to concentrate on school, not
wanting her to have a boyfriend. Christine was not aware of a
21 year old relationship that the complainant had with Dude, a
21 year old male. Christine believed that the complainant loved
the defendant (T. 349 - 352).

On June 23rd, the complainant called Christine, confiding
in her that she was being sexually abused (T. 339, & 341).
Christine alerted her mother, Denise, and they picked up the
frightened complainant on 238th and 88th Avenue, Queens. The
complainant had a duffel bag with her clothes (T. 341 - 342 &
355).

Denise brought the complainant to the 105th Precinct, near
their homes in Queens (T. 343). The complainant was afraid to
enter the precinct, but she did so when after an officer came
to the car to speak with her (T. 357).

Denise became the complainant's foster mother, receiving
$23 a day, the complainant coming to live with the Aliotos (T.

32

344, 358, & 360). The complainant left that home after having problems with Denise. Although Christine was close with her mother, she did not know the basis of her mother's dispute with the complainant (T. 347 & 349). Denise denied having an argument with the complainant (T. 359 & 366).

The complainant's boyfriend was allowed to visit her at the Alioto home, Denise not concerned about the relationship. According to Denise, the complainant left that home, February 20, 2009, moving on with her life, not having been asked to leave. Denise was concerned about her daughter's safety as the defendant was close to the Alioto home, appearing near her block, and going to the complainant's workplace. Denise did not report it to the police. Denise did not know the complainant's whereabouts as it was privileged information (T. 359, 361 - 362, & 364).

Detective Edward Moran, Shield 827, Special Victim's Squad, a police officer of 13 years, interviewed the complainant, and he memorialized the statement in a two paged typed statement signed by the complainant. He took notes, as a guideline, prior to typing the statement. A material part of sexual abuse is whether or not a complainant is subject to force. Moran claimed to have been told by the complainant that she was threatened, with a knife, to have sex with the defendant, but his notes did not reflect that. The notes did

33

not reflect any fear expressed by the complainant, but the typed statement did. Moran spoke with the complainant about the period May and June 2008.

The notes do reflect that the defendant always had a knife in the truck. An investigation of the actual location at which it was claimed the sexual assault took place. It was ascertained that it was at the back parking lot of 600 Community Drive, indicated on the building in large numbers. It was not at 400, the location at which it was the alleged place of occurrence (T. 732 - 737, 742, 752, 756 - 757, & 761).

The Defendant's Case

The defendant did not testify on his own behalf, and he presented no witnesses.

34

ARGUMENT

POINT ONE

THE STATEMENTS, VIDEOTAPE, AND PROPERTY SEIZED FROM THE DEFENDANT SHOULD HAVE BEEN SUPPRESSED AS IT WAS OBTAINED, UNDER DURESS, AS THE PRODUCT OF CONSTITUTIONAL VIOLATIONS, AND BASED ON PATENTLY TAILORED TESTIMONY.

The defendant moved to suppress the statements, videotape, and the seizure of the evidence --a mini cleaver, and two massagers, and a Huntley/Mapp Hearing was held. The defendant contends that the Court erred in denying the motion as the evidence was illegally obtained and based on patently tailored testimony.

The defendant, testifying at the hearing, came to the 105th Precinct, about 2:30 A.M., June 23, 2008, to report his stepdaughter, the complainant, missing. He was unaware that she was present at the precinct, making allegations against him for sexual abuse. When the defendant identified himself, he was attacked by about 10 officers who abused and manhandled him in the guise of searching him. No doubt, the officers, rushing to judgment, believed the daughter's claims. The defendant was thrown against a wall and across a counter, sustaining scratches and bruises as the officers directed foul language and profanity at him.

En route upstairs with Detective Leonard Schulman, to be interrogated, the defendant was pushed up the steps in a manner

35

that nearly caused him to fall. Schulman brought him to an eight by 10 interview room, referred to as "the box," having a window that might have been covered. He grabbed the defendant by the collar, throwing him against the wall and pushing him about. On the videotape, it is apparent that the defendant's collar is distended and in such a condition that would support the defendant's contention about the detective handling him forcefully by the collar.

Schulman denied the defendant's requests to obtain an attorney and refused his repeated requests to call his wife to engage counsel. The defendant was subjected to Schulman's threats to have him incarcerated for more than 20 years if he did not confess to forceful, sexual abuse of his daughter.

The defendant was in custody for over 15 hours, most of the time in "the box," with only a single opportunity to use the restroom, with nothing to eat, and with merely a bottle of water, after about 12 hours. The defendant was also deprived of sleep, from 2:30 A.M., June 24th 2008 until the following night, having worked a full day that started 6:00 A.M., before coming to the precinct.

Schulman testified that the defendant never requested an opportunity to make any calls and never requested an attorney. It defies logic to believe that the defendant would not have called his wife to notify her of his whereabouts and not to

36

call an attorney under his circumstances. The defendant staunchly maintains that he made repeated requests for a lawyer, but his pleas went unheeded. As the defendant had a limited criminal history, he obviously was unaware that an attorney could be appointed for him.

Although the defendant remained in "the box," with the door secured from the outside, it is odd that he was not, as customarily done with prisoners left in interrogation rooms, handcuffed by one hand to an object to prevent him from inflicting harm on himself or attempting to escape. Indubitably, the officers believed that the defendant was sufficiently frightened, by the physical and mental abuse directed at him, not to attempt escape.

The defendant was physically and mentally abused from the time he identified himself on arrival at the precinct. He was cowed to such an extent that he initialed the Miranda form on which Detective Schulman had already entered "yes" to each of the inquiries, prior to being given the form. Then the defendant was coerced into initialing the affirmative responses that had been written by the detective. Under the circumstances, the defendant did not voluntarily waive his rights for custodial questioning.

The statement written by the defendant about the argument he had with his daughter and the statement of his so called

37

"confession," dictated to him by Schulman, were forced out of him. Clearly, these statements were illegally obtained from the defendant, being in violation of his rights.

The defendant steadfastly contends that he was not advised of his rights and under duress when he signed consent forms, agreeing to have his vehicle and his home searched. As such, the property seized by Police Officer Celica Alfaro, to wit: a mini cleaver and white massager from his truck; and a white and gray massager from his home was illegally recovered and should have been suppressed.

The demoralized defendant suffered intimidation to such a degree that he submitted to recording his so called "confession" on videotape for the Office of the District Attorney. Schulman's mere presence was an ever-present reminder of his threat to incarcerate the defendant for more than 20 years, if he insisted on a lawyer and refused to cooperate, confessing to having used force to sexually abuse the complainant.

When the people inquired, during the defendant's cross-examination at the hearing, why at the videotaping he did not lodge any protest, call for an attorney, or report the physical and emotional abuse he suffered of attacks on his person and verbal threats, he replied that he had been frightened.

Under the circumstances, it is no wonder that he was so

frightened by the experience that he agreed to the videotaping. The defendant's requests for an attorney "fell on deaf ears." Moreover, Schulman threatened the defendant by that having an attorney would result in going back to square one and not being released. Thus, the so called videotaped "confession" of the defendant, under duress, cannot be deemed to have been obtained voluntarily.

It is mandated by the Fifth Amendment privilege against self-incrimination that a suspect in custody be advised of his right to counsel. See, Miranda v. Arizona, 384 U.S.436, 86 C. Ct. 1602 (1966). The U.S. and New York State Constitution require that Miranda warnings be given to a suspect, prior to interrogation, when he is in custody.

In the instant matter, at the time that the appellant was in custodial interrogation, he was not properly administered his Miranda warnings. Detective Schulman signed "yes" on the Miranda form for each of the inquiries, prior to the defendant being given the form. Then the defendant was coerced into initialing the affirmative responses that had been written by the detective.

The Supreme Court has affirmed the proposition that the state bears the burden of establishing a valid waiver of the right to counsel. See, Michigan v. Jackson, 475 U.S.625, 106 S. Ct. 1404 (1986); See also, Kimmelman v. Morrison, 477 U.S.306,

106 S. Ct. 2574 (1986); and the seminal case, Johnson v. Zerbst, 304 U.S.458 (1938).

The Court of Appeals has held that the Court has the responsibility to satisfy itself, appropriate to the circumstances, that a waiver of a right to counsel is knowing and intelligent. See, People v. Allen, 39 N.Y.2d 916 (1976). The Court must conduct a searching inquiry to be reasonably assured that the defendant fully appreciated the "dangers and disadvantages" of giving up the fundamental right to representation by counsel. See, People v. White, 56 N.Y.2d 110, 117 (1982); People v. Sawyer, 57 N.Y.2d 12 (1982).

In the case at bar, there was a protracted delay of more than 15 hours of custodial interrogation, under duress, to extract the so called "confessions" and so called "consent" to searches of his vehicle and of his home. The defendant was subjected to physical and emotional trauma when he was taken into custody and interrogated.

The defendant went to the hospital when he was released on bail, and photographs were introduced at the hearing of his injuries. Albeit the defendant acknowledges he suffered no permanent injury, he was battered and bruised physically as well as emotionally.

The testimony adduced at the hearing demonstrates the statements and videotape of the defendant's "confessions" and

40

his "consent" to searches were obtained by coercive tactics and deprivations, indicative of the validity of defendant's claim of involuntariness. The defendant's waiver of his rights, under duress, cannot be deemed voluntary, as required to properly establish a waiver. See, People v. Marx, 305 A.D.2d 726, 727 - 728 (2003); People v. Burns, 281 A.D.2d 704, 704 - 705 (2001).

The defendant was questioned in an eight by 10 room referred to as "the box," possibly with the window covered, in every sense secluded. Further, he was interrogated, after being battered by officers on arrival at the precinct and subsequently by his interrogator, having been subject to physical force and verbal threats and taunts, underscoring the fact that there were significant factors belying that the requirement of voluntariness was established. See, People v. Marx, supra; People v. Warren, 300 A.D.2d 692, 694 (2002); People v. Anderson, 42 N.Y.2d 35 (1977).

Courts are guided by the principle that the voluntariness of statements is determined by looking at the "totality of the circumstances" under which they were obtained. See, People v. Anderson, supra; People v. Mateo, 2 N.Y.3d 383, 413, 414 (2004); People v. McLean, 59 A.D.3d 861, 863 (2009).

A series of circumstances, each alone, may be insufficient to cause a confession or a consent to be deemed involuntary. Here, the combination of circumstances have a qualitative and

41

a quantitative effect. See, People v Leyra, 302 N.Y.353, 363 (1951).

In the case at bar, the Court failed to consider the "totality of the circumstances" under which statements were obtained and the property recovered. See, Clewis v. Texas, 386 U.S.707, 708 (1967); Fikes v. Alabama, 352 U.S.191, 197 (1957).

The testimonies of Detective Schulman and Police Office Alfaro, were patently tailored, appearing to be artificially tailored to overcome the defendant's constitutional objections.

The defendant maintains that he was physically and emotionally abused to parrot a "confession," on Schulman's direction, based on the sexual allegations that Schulman had garnered from the complainant. The defendant further avers that he signed the "consent" to searches under duress. In fact, the defendant was so frightened he submitted to Schulman's demands like a puppet, having been denied his repeated requests for a lawyer.

Neither Schulman nor Alfaro, experienced officers, were responsive to inquiries: about why Alfaro was called off patrol to become the arresting officer when the defendant had already been arrested by an "unknown officer" on entering the precinct; about the state of the defendant's attire during their contact with him; and about any interaction he had with the other officers at the precinct. Indubitably, this was to shield the

42

officers who took the defendant into custody from the responsibility of physically abusing him. It should be noted that Schulman's denial of the abuse of the defendant was not unequivocal.

Schulman's memo book, which he finally produced after a myriad of counsel demands, was significantly absent of the fact that he was the defendant's interrogator. Further, Schulman was obviously not forthright about how he came to be the interrogator as his tour of duty had ended. Suspiciously, Schulman provided only deliberately vague responses to the time frame of the defendant being taken into custody and interrogated and his involvement in the case.

The "confessions" Schulman obtained were the product of <u>Miranda</u> and other constitutional violations to which he subjected the defendant for over 15 hours, including manhandling  him and shoving him, the defendant's shirt in disarray from being abused.

Alfaro's testimony did not give any cogent explanation as to: why she was called off patrol to be the arresting officer; whether Schulman accompanied her to the defendant's vehicle to recover the evidence; why, as the arresting officer, she sat outside the room during the videotaping; why Schulman was present at the videotaping, not her; and whether she observed the condition of the defendant's shirt. Her cross-examination

was disingenuous, permeated with responses of a lack of recall and of having no knowledge, acknowledging inaccuracy in some responses when the accuracies were brought to her attention.

Courts have "refused to credit testimony which had all appearances of having been patently tailored to nullify constitutional objections." See, People v. Quinones, 61 A.D.2d 765 (1978); People v. Parmiter, 55 A.D.2d 938 (1977). In the case at bar, the officers' testimony, Schulman and Alfaro, should be rejected as a matter of law. Without this proffer, the people failed to establish that the defendant's guilt of having forced the complainant to his sexual advances.  When the testimonies of officers are rejected as incredible as a matter of law, it is impossible to conclude that the events transpired in the manner asserted by those officers.

Obviously, the testimonies of the police were tailored to meet constitutional objections, and they should not be credited. In People v. Miret-Gonzalez, 159 A.D.2d 647, 650 (1990), the Court determined that reversal is warranted where the fact findings of the  Court were so plainly unjustified by the evidence that the interests of justice necessitated their nullification.

The Court in evaluating testimony should not discard common sense and common knowledge, factors to be considered, according to New York Jurisprudence, Evidence, §649 of 22.

44

Here, it is common sense to believe that the defendant, a virtual prisoner, being maltreated, would have asked for a lawyer, at least once, and probably many more times in a period of over 15 hours. It is also common knowledge that there is a reason for someone to lie. The police stooped to patently tailoring their testimonies, in the instant case, and they attempted to hide the fact that the defendant was physically abused, suffering mistreatment while in custody. Absent an unforced waiver, the defendant was forced to provide "confessions" and "consents."

The people did not sustain their burden of establishing the legality of the police conduct in recovering the mini-cleaver and massagers, after having the defendant sign the consent forms under duress. See, People v. Blinker, 80 A.D.3d 619 (2011); People v. Whitehurst, 25 N.Y.2d 389 391 (1969); People v. Hernandez, 40 A.D.3d 777, 778 (2007); People v. Thomas, 291 A.D.2d 462, 463 (2002); People v. Quinones, 61 A.D.2d 765 (1978).

"Generally, when the police have acted illegally, evidence which `has been come at by exploitation of that illegality' should be suppressed" (People v. Gethers, 86 N.Y.2d 159, 161 - 162 [1995], quoting Wong Sun v. United States, 371 U.S.471, 488 [1963]). The Court of Appeals has reiterated the principle that evidence revealed as a direct consequence of unlawful

45

police action is tainted and must be suppressed. See, People v. Boodle, 47 N.Y. 2d 403 (1979).

The defendant recognizes that a hearing court decision, given great deference on appeal, is not disturbed unless clearly unsupported by the record. Here, the defendant avers that the record demonstrates the obtained consents were the result of constitutional violations, and the court erred in not suppressing the physical evidence that was recovered unlawfully. See, People v. Blinker, supra; People v. Smith, 77 A.D.3d 980, 981 (2010); People v. Castro, 73 A.D.3d 800, 800 - 801 (2010); People v. Johnson, 79 A.D.3d 905 (2010).

The Court erred in the instant matter by denying suppression of the defendant's written and videotaped statements obtained and the property recovered from the search of the defendant's vehicle and of his home, obtained under coercive circumstances and based on patently tailored police testimony.

POINT TWO

THE COURT ERRED DENYING THE DEFENDANT'S MOTION TO LIMIT
DIRECT AND CROSS-EXAMINATION BY THE PEOPLE TO CHARGES
IN NASSAU COUNTY, PERMITTING THE PEOPLE TO INTRODUCE
CHARGES OF THE DEFENDANT'S INDICTMENT IN QUEENS
COUNTY, THE COURT COMPOUNDING THE ERROR BY GRANTING THE
PEOPLE'S MOLINEUX APPLICATION, EFFECTIVELY DENYING THE
DEFENDANT THE RIGHT TO TESTIFY.

The defense counsel submitted a motion in limine, May 1,
2009, regarding charges the defendant was facing in Queens
County for an order limiting the use of the defendant's
confessions the people intended to use on direct examination
and on cross-examination, if the defendant exercised his
constitutional right to testify (H. 82).

The people contended that the complainant's testimony and
the video statement were admissible to provide background, to
show motive and to demonstrate intent. They argued that prior
bad acts of sexual and physical abuse, including the
circumstances and the threats that are part of the situation,
are relevant and probative under Molineux (H. 361 & 385).

The defense contended, that over past decades Molineux has
been related to cases of prior uncharged crimes, and the
people's Molineux application, was based on cases of prior
uncharged crimes. The defense argued that, in addition to the
Nassau County charges, the defendant had also been charged in
Queens County with statutory and violent crimes against the
same victim (H. 386).

47

The Court ruled that it would not make any redactions from the defendant's written statements or the videotaped statement, allowing the people to introduce them. It was stated by the Court that the evidence was admissible, being more probative than prejudicial (H. 405).

The Court determined, regarding the people's <u>Molineux</u> application, that it would allow the people to elicit testimony regarding the time and circumstance when the defendant's relationship changed from being unforced to being forced. Also, the people would be allowed to elicit testimony about the time and circumstance that the defendant indicated "he wanted to be the one." (H. 386 & 406)

It was claimed by the Court that the allegations were intertwined with what occurred in Queens County and Nassau County, up until the defendant was arrested. The defense excepted to each and every aspect of the Court's ruling (H. 406 - 407).

The defense questioned whether the Court addressed the due process argument that the people should not be allowed to elicit testimony regarding Queens County charged acts as it would be a violation against self-incrimination and due process (H. 406 - 407). In an attempt to minimize the Court error, the defense had the charge to the jury altered, deleting "in Nassau County" to "commit any crime" (T. 383 - 384).

48

The Court stated that the people were not permitted to cross-examine the defendant, should he testify, regarding the pending Queens charges. Unless the defendant "opened the door" to the Queens County matters, his Fifth Amendment rights would be protected (H. 407- 408).

The counsel contended that there a reason that Molineux was restricted to uncharged crimes. If the Court allowed testimony about the charged crimes in Queens, the defendant would have to make a Hobson's choice, where there was only one option offered. If the defendant testified, in the case at bar, about the charges in Queens, then he would be incriminating himself in Queens. If he did not testify, then the Queens charges would go unrefuted to the jury (H. 386).

It was argued by counsel that the defendant's right to be protected against self-incrimination outweighed the people's showing of propensity evidence that could not be cured by limiting instructions of the Court. Since there were charges of force in Nassau County, and the defendant was charged with violent and statutory crimes in Queens, the defendant would be denied his opportunity to testify if the Queens evidence were presented (H. 388).

The Court ruling erred in allowing the people to cross-examine the defendant, if he testified in his own defense, regarding the Queens criminal charges that were pending against

49

him. The trial court's pre-trial ruling permitting cross-examination on other pending Queens County charges requires reversal of defendant's conviction and a new trial. See, People v. Bennett 79 N.Y.2d 464, 468 (1992); People v. Betts, 70 N.Y.2d 289 (1987).

In the instant case, the Court's ruling effectively precluded the defendant from testifying on his own behalf as the people would have been unfairly permitted to cross-examine him about charges in Queens County which had enormous prejudicial potential. This ruling denied the defendant a fair trial.

The defendant maintains that the Court's ruling created prejudice so severe that he was convicted by virtue of propensity evidence and his rights against self-incrimination were violated. It figuratively placed him between Scylla and Charybdis, "a rock and a hard place."

The defendant could testify, as was his right, risking being forced to testify about Queens charges on which he was not as yet tried, "opening the door," or he could remain silent, not controverting the Queens charges to the jury, acquiescing to his guilt by tacitly agreeing to the charges and keeping silent.

The Court compounded its error, denying the defendant's motion, by granting the people's Molineux application which

allowed the people to present evidence of the Queens "charged crimes," unfairly demonstrating propensity of the defendant.

People v. Molineux, 168 N.Y.264 (1901), was a landmark decision by the Court of Appeals of New York over 100 years ago which has remained hornbook law with only refinements in procedure. The Molineux decision led to the precedent that a criminal case should be tried on the facts and not on the basis of a defendant's propensity to commit the crime charged. Propensity evidence invites a jury to wrongly focus and base its verdict, on a defendant's prior crimes rather than on the evidence or lack thereof relating to the case to be decided.

The defendant Roland B. Molineux was convicted of murder but he appealed to the Court of Appeals which granted him a new trial. At the original trial, the prosecution had entered evidence to suggest that Molineux had been responsible for an earlier murder to demonstrate that he had a propensity to murder. However, Roland B. Molineux had never been convicted of that murder.

The Court ruled in the Molineux decision that the use of evidence of an unproven previous act of murder against the defendant was a violation of the basic principle of the presumption of innocence, making the evidence inadmissible.

In essence the ruling in Molineux is that the state cannot prove against a defendant any crime not alleged in the

51

indictment, either as a foundation for a separate punishment, or as aiding the proofs that he is guilty of the crime charged. Here, the Court violated the right of the defendant to the presumption of innocence by allowing the people to present evidence of the Queens charges against the defendant, which in effect demonstrated propensity.

The Court of Appeals determined that a defendant should not be forced to testify about a crime with which he has been charged, but not tried. See, People v. Rojas, 97 N.Y.2d 32 (2001). Here, as determined in Rojas, "The people cannot do indirectly what they cannot do directly." In the matter at bar, the defendant maintains that as the people cannot cross-examine him about another pending indictment, they cannot offer evidence of that indictment in their direct case.

The Court attempted to justify the granting of the people's Molineux application by making reference to People v. Leeson, 12 N.Y.3d 823 (2009). The Court stated that in cases involving sexual misconduct, relating to the same complainant and the same defendant, the prior bad acts will be admissible, on the people's direct case, if the evidence is used for material issues, not used for propensity purposes (H. 390).

However in Leeson, unlike in the case at bar, the admission of evidence was of uncharged crimes, and here, the people were granted their motion to admit evidence of the

charged crimes in Queens. Here, this indubitably underscored a criminal propensity of the defendant who was unable to testify without addressing the Queens charges or leaving them uncontroverted, being denied his due process rights and against self-incrimination.

The people have argued that under Molineux they were entitled to use evidence that included the Queens County charges to prove motive, intent, lack of mistake or accident, identity, or common scheme or plan, citing People v. Alvino 71 N.Y.2d 232 242 (1987). However, evidence that would demonstrate a defendant's criminal propensity bars admission to a defendant's prior bad acts. See, People v. Lewis, 69 N.Y. 2d 321 (1987).

Albeit the Court stated the people's Molineux application was granted for non-propensity purposes, the admission of the evidence, of the charged sexual crimes with the same victim, in Queens County, did indeed demonstrate a propensity of the defendant. The hearing court abused its discretion by admitting evidence that was more prejudicial than probative, creating unfair prejudice to the defendant. See, People v. Dorm, 2 N.Y.3d 16 (2009).

The hearing court erred in denying the defendant's motion and granting the people's Molineux application, which in effect denied him his constitutional right to testify.

POINT THREE

BASED  AS IT WAS ON EVIDENCE THAT WAS INTRINSICALLY
INCREDIBLE AND UNRELIABLE, THE SEXUAL ABUSE VERDICT
WAS   INSUFFICIENTLY   SUPPORTED   AND IN VIOLATION OF
THE    DEFENDANT'S    CONSTITUTIONAL   RIGHTS    TO   BE
CONVICTED    ONLY    WHERE    GUILT    HAS    BEEN
ESTABLISHED BEYOND A REASONABLE DOUBT.

The statements, videotape, and property seized from the
defendant should have been suppressed as it was obtained, under
duress, as the product of constitutional violations and based
on patently tailored testimony (POINT ONE).

The court erred denying the defendant's motion to limit
direct and cross-examination by the people to charges in Nassau
County, permitting the people to introduce charges of the
defendant's indictment in Queens County, the Court compounding
the error by granting the people's Molineux application,
effectively denying the defendant the right to testify. The
defendant was denied due process and his rights against self-
incrimination(POINT TWO).

At the conclusion of the case the counsel made a motion
to dismiss the indictment on the grounds that the people failed
to prove a prima facie case, not proving their case beyond a
reasonable doubt. The motion was denied by the Court (T. 767 &
769).

As the evidence adduced at trial was insufficiently
supported, as well as being incredible and unreliable, the
people failed to prove the charges of sexual abuse, and to

54

sustain their burden of proving the defendant's guilt of sexual abuse beyond a reasonable doubt. See, U.S. Const., Amend. XIV; N.Y. Const., Art. I, Sec. 6; Jackson v. Virginia, 443 U.S.307, 310 (1979). A review of the evidence supports that he is not guilty.

Detective Schulman, one of the people's principle witnesses, hid the identity of the officer who actually arrested the defendant, calling in Police Officer Alfaro, who was on patrol, to take credit for the arrest. This was to shield the arresting officer from scrutiny in the manner in which the defendant was taken into custody, no doubt suspicious. Neither Schulman nor Alfaro were candid in what transpired in terms of the time frames of their involvement and what they recalled about the events. Under the circumstances their lack of candor and responsiveness renders their proffers less than credible or reliable.

Although Schulman and Alfaro deny that the defendant was disheveled in appearance, his shirt in a condition that would support that he was physically abused, the videotape demonstrates that was no doubt the case. On the defendant's entrance into the precinct, he was manhandled by the desk sergeant and other officers, albeit the name of the arresting officer is curiously absent from the police reports.

Clearly, Schulman, whose duties as an enhancing officer to

extract confessions, placed the defendant in a confined space, a room about eight by 10, probably with the window covered, according to the detective's equivocal statement in that regard. This was to create a restrictive and dismal condition in which to coerce the defendant into providing statements of confessions. Trial counsel labeled this detective a "hatchet man" as he is supposed to employ a forceful and threatening approach to obtain a "confession."

Although Schulman claimed he never revealed the specifics of the complainant's allegations to the defendant, it is significant to note that the "confession," the defendant allegedly made, indicated the incidents occurred at 400 Community Drive, the location of the defendant's customer. The complainant was mistaken in the location.

The actual location, where the defendant's customer was located, according to Detective Moran, was 600 Community Drive. It is highly unlikely the defendant erroneously provided that information in his so-called "confession," having worked for the customer routinely. The "confession" was no doubt written or dictated by Schulman, based on erroneous information he obtained from the complainant, not drafted or written by the defendant.

The complainant testified that the knife with which the complainant was allegedly threatened, during May and June 2008,

was always in the vehicle. It is not  unlikely that the defendant had a knife in his truck for practical, non-threatening purposes. Albeit the defendant's behavior was reprehensible, he had not sexually abused the complainant, his stepdaughter, under the threat of a knife.

The people attempted to present a picture of the complainant existing in a terrifying environment since 2005, allegedly when the first incident occurred. However, the facts belie that. Her achievements at school got increasingly better, and she became an excellent student, certainly not demonstrating that she was not functioning in a state of fear.

The complainant had a boyfriend since April 2008, and she maintained that relationship, despite the defendant and her mother being unhappy about her boyfriend and not wanting her to date, merely focusing on school. She spent time with the boy without their knowledge, claiming she had not actually been out on dates with him, displaying that she could be devious and independent.

She readily admitted to enjoying her father driving her to and from  school, and she overtly expressed loving her father, this being the case substantiated by the testimony of her best friend, Christine. In fact, her poem about going to work nights with the defendant, sleeping on the back seat of the truck, revealed her positive relationship with the defendant as being

57

one of trust and no concern. She expressed that "her thoughts vacation to a place without worry."

It is also evident from the videos and pictures the complainant took with the defendant and the family and of the defendant with the family, doing Trinidadian dancing and engaging in other activities, that she had positive feelings for him and the family unit. She even photographed the defendant in his Ecolab uniform, making it part of a Father's Day card presented to him. She referred to having taken the pictures and videos as being part of "family memories." Clearly, the complainant had a desire to preserve them as part of her positive feelings for the defendant and the rest of the family.

Although the relationship with the defendant had been tenable over the years, such as it was, the defendant telling her that he wanted to actually have sex with her, brought her to the realization that she had to escape. Up until that time, the complainant had confided in no one about being unhappy in her relationship with her father, however sordid.

The complainant's claim about not crying out about the situation were not fear of the defendant, but fear of no support for the family if there was a divorce. Her claims about being forced were contrived, an excuse for her having accepted the defendant's overtures. She had not been forced, readily

58

participating in the sexual relationship with the defendant, her stepfather.

The people have not presented evidence which provides the required confidence that the appellant's guilt of sexual abuse has been established beyond a reasonable doubt. See, People v. Crudup, 100 A.D.2d 938, 939 (2d Dept. 1984); People v. Kidd, 76 A.D.2d 665, 668 (1st Dept. 1980); People v. McIntyre, 71 A.D.2d 956, 961 (2d Dept. 1979).

Proof beyond a reasonable doubt cannot rest on a free floating inference supplied by proof which is merely suggestive and which lacks the definitiveness and form necessary to extinguish the real, latent doubt which lingers in this case. See, People v. Irwin, 43 N.Y. 2d 704 (1977).

A mere scintilla, or even some proof is insufficient to create an issue of fact. See, People v. Oyola, 6 N.Y.2d 262, (1959); People v. Velella, 28 Misc.2d 579, (Sup. Ct. New York County, 1961).

C.P.L. Section 70.20 provides that no conviction of an offense by verdict is valid unless based upon trial evidence which is legally sufficient and which establishes beyond a reasonable doubt every element of such offense and the defendant's commission thereof.

The United States Supreme Court has held that the due process clause protects an accused against conviction except

upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged, <u>In re Winship</u>, 397 U.S.358, 90 Sup. Ct. 1068 (1970).

The people's case rested mainly on evidence that was incredible and unreliable, insufficiently supporting the verdict. The people clearly failed to demonstrate that the defendant was guilty of sexual abuse.

POINT FOUR

THE SENTENCE IMPOSED ON THE DEFENDANT WAS UNDULY
HARSH AND EXCESSIVE AND SHOULD BE REDUCED IN
THE INTEREST OF JUSTICE.

The defendant was sentenced as follows: to a maximum
sentence of seven years with five years post-release
supervision under count one; to a maximum sentence of seven
years with five years post-release supervision under count two
through count 13, to run concurrently with the sentence imposed
under count one; to five years with five years post-release
supervision, this sentence to run consecutively to the other
counts (S. 26).

Though this sentence is within the statutory limits, it is
unduly harsh and excessive, the defendant receiving a maximum
sentence for count one, a class D felony, and a consecutive
sentence for count 14, a class D felony. The defendant had
been given a plea offer with no incarceration, in full
satisfaction of the indictment, conditioned on probation and
the waiver of his right to appeal his plea and sentence, as
well as an Order of Protection on behalf of the complainant (T.
292 & S. 6).

The sentences he received, after going to trial, are
totally disproportional in light of the plea offer (S. 26). It
is apparent that he is being excessively punished by exercising
his constitutional right to trial by jury with what can be

61

labeled draconian sentences. A reduction of sentence is sought in the interest of justice.

The defendant expressed his lack of understanding of the plea offer, believing it had entailed jail time. However, as the defense counsel explained, he believed the defendant was referring to the Queens indictment which had remained unresolved and for which there had been no offer of probation (S. 11).

The defendant-appellant contends that the Court abused its discretion by giving him an unduly harsh and excessive sentence. It is abundantly clear that the Appellate Division may review a sentence imposed in a criminal case, and on considering the relevant facts and circumstances, it can determine, in the exercise of its discretion, that the sentence was unduly harsh and severe, reducing the sentence. See, People v. Coleman, 30 N.Y.2d 582 (1973) and People v. Zuckerman, 5 N.Y.2d 401 (1959).

Letters were submitted to the Court from his two children, Darien and Kaitlyn, expressing how much they missed their father and requesting mercy from the Court. There were also innumerable other letters attesting to the defendant's character and indicating that he had gone out of his way to do things for people in the community, that they trusted their children with him, and that they trusted him to accomplish

62

things for them which they were unable to do. The defendant had greatly extended himself to people in the community (H. 12 - 13).

Generally, there are four principles that have been accepted as objectives of criminal punishment in the Courts of this State: deterrence, rehabilitation, retribution, and isolation. See, People v. Notey, 72 A.D.2d 279, 280 (1980). Permeating, these principles of this seminal case are two other salient factors: "minimum confinement" and "personal status." It is these factors that warrant a reasonable modification downward from the sentence that the appellant is now serving.

The ABA Standards Relating to Sentencing Alternatives and Procedure, Section 2.2 (relied upon by the Court in Notey) enunciates as a general principle of judicial discretion the following:

> The sentence imposed in each case should call for the minimum amount of custody which is consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant.

Now it is not the intention of the defendant-appellant to avoid responsibility nor unduly diminish the seriousness of the matter herein. The sexual abuse offense, for which the defendant-appellant was found guilty, is not to be cavalierly condoned. However, in the realistic panoply of the penal law spectrum, the appellant's sentence was unusually harsh and

63

excessive, especially in light of the plea offer of probation and no incarceration. There should be a real focus on rehabilitation, not retribution.

The defendant-appellant denied his guilt in the matter. Although there were several counts, they were part of a single group of acts, a continuance of certain conduct to which the defendant maintains his innocence. The statements and videotape of so called "confessions" obtained from the defendant was as a result of coercion and constitutional violations (POINT ONE).

There is the urgent persuasive movement, in the appellant's favor, of the ABA's "rehabilitative needs" and of the Notey "personal status" criteria. These almost literally clamor for a reduced sentence. It is true that retribution is still a valid sentencing goal, but so too is the defendant's rehabilitative needs. See, People v. Burgh, 89 A.D.2d 672 (1982). As underscored in Notey, "We cannot ignore the personal status of the defendant as the most significant factor in the sentencing process." Id., at 950.

It is well established that it is within the Court's discretion to determine an appropriate sentence for a defendant after evaluating all the relevant circumstances, See, People v. Cwikla, 60 A.D.2d 4 (1st Dept. 1977); People v. Farrar, 52 N.Y.2d 302 (1981); People v. McConnell, 49 N.Y. 2nd 340 (1980). "The determination of an appropriate sentence requires the exercise of

64

discretion after due consideration given to, among other things, the crime charged, the particular circumstance of the individual before the court, and the purpose of a penal sanction, i.e. societal protection, rehabilitation and deterrence." People v. Farrar 52 N.Y.2d at 305.

The defendant is devoted to his family. He has expressed concern about their welfare when he is incarcerated as his wife is not well and as he is the sole breadwinner of the family. The defendant has supported and been a father to the complainant for 14 years albeit she is not his natural child. The defense informed the Court of videos and photographs, some even taken by the complainant, displaying her happiness with the defendant and with the family unit.

Since the appellant has close connections to his family, he can be expected to benefit from his relationship with them. In People v. Feliciano, 125 A.D.2d 364, 365 (1st Dept. 1987) and People v. Aquila, 121 A.D.2d 888 (1st Dept. 1986), courts have cited "strong family ties" in reducing sentences.

The defendant has been a steadfast provider to his wife, two children, and his stepdaughter, having not been involved in any significant criminal activities. "Favorable employment histories" and only "a modest history of involvement in criminal conduct" are often cited by courts as justification for reducing sentences. See, People v. Whiting, 89 A.D.2d 694 (3rd Dept. 1982); People v.

65

Feliciano, A.D.2d 364 at 365.

According to the C.P.L. 440.20 (1), "At any time after the entry of a judgment, the Court in which the judgment was entered may, upon motion of the defendant, set aside the sentence upon the ground that it was unauthorized, illegally imposed, or otherwise invalid as a matter of law." Here, the sentences imposed on the defendant, according to the facts and record of the case, were unduly harsh and excessive. In the interest of justice, the defendant should receive leniency.

The Appellate Division in the exercise of its discretion has the power to modify or reduce an excessive sentence, if legally permissible. See, People v. Brovender, 39 A.D. 2d 387 (1971); People v. Record, 51 A.D. 2d 677 (1976).

It is clear that retribution is no longer the objective of criminal law. Zett, New York Criminal Practice, 1973, Volume 6, p. 45, follows the prevalent modern philosophy of penology, "The punishment should fit the offender and not merely the crime." It is not in keeping with the policy of New York State of using prison sentences to encourage rehabilitation, and not to exact vengeance. The sentence should be modified by this Court pursuant to C.P.L. Sec. 470.15 (2) (c).

<u>CONCLUSION</u>

FOR ALL THE FOREGOING REASONS, THE JUDGMENT OF
CONVICTION SHOULD BE REVERSED AND THE INDICTMENT
DISMISSED, OR THE CONVICTION REVERSED AND THE
CASE REMANDED FOR A NEW TRIAL, OR THE SENTENCE
REDUCED.

Respectfully submitted,

Leon H. Tracy
Attorney for Appellant
366 North Broadway, Suite 410-D9
Jericho, New York 11753
(516) 942 - 4233

Dated: June 2012

67

CERTIFICATE OF COMPLIANCE WITH 22 NYCRR SEC. 670.10.3(f)

LEON H. TRACY does hereby certify as follows: This appeal brief was prepared by computer, on behalf of Harold Gopaul, the body of the brief is double-spaced and utilizes a monospaced typeface (Courier New) of 12-point size; the footnotes are single-spaced and utilize the same typeface and point size; and, according to the word count of the word processing system used, the brief contains 13,740 words, exclusive of any pages containing the table of contents, table of citations, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc.


Dated: Jericho, New York
       June 2012

                                    _____
                                    LEON H. TRACY
                                    18 B ATTORNEY