*To Be Argued by:*
Barbara Kornblau
(10 minutes)

# NEW YORK SUPREME COURT

## Appellate Division - Second Department

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

A.D. No. 07167/2009
Ind. No. 2415N/08

*- against -*

HAROLD GOPAUL,

*Defendant-Appellant.*

# RESPONDENT'S BRIEF

**KATHLEEN M. RICE**
*District Attorney, Nassau County*
*Attorney for Respondent*
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Tammy J. Smiley
Barbara Kornblau
  Assistant District Attorneys
    *of Counsel*

**CONFIDENTIAL PURSUANT TO CIVIL RIGHTS LAW § 50-b**

# T A B L E   O F   C O N T E N T S

Page

Preliminary Statement ........................................ i

Statement of Facts
        Introduction .......................................... 1
        The Pre-Trial Hearing
                The People's Case ................................... 2
                Defendant's Case ................................... 8
                The Hearing Court's Decision ........................ 13
                The Molineux Hearing ............................... 14
        The Trial
                The People's Case ................................. 14
                The Defense ...................................... 29
        The Verdict and Sentence ............................... 29

Point One
        The Hearing Court Properly Denied Defendant's
        Motion To Suppress The Evidence Recovered
        From Defendant's Car And Home And Defendant's
        Statements .............................................. 30
                A. Defendant's Statements Were Lawfully
                   Obtained ...................................... 30
                B. Police Properly Seized The Physical
                   Evidence Pursuant to Defendant's
                   Written, Voluntarily-Executed Consent .............. 37

Point Two
        The Court's Ruling Permitting Limited
        Molineux Evidence Was Proper And Did Not
        Violate Defendant's Right Against Self-
        Incrimination .......................................... 41
                A. The Court's Molineux Ruling Was Proper ............. 44
                B. The Court's Ruling Did Not Violate
                   Defendant's Fifth Amendment Privilege
                   Against Self-Incrimination ........................ 48

Point Three
        Defendant's Claim That The Evidence Was
        Legally Insufficient Is Unpreserved And
        Wholly Without Merit ................................... 52

Page

Point Four
    Defendant's Sentence Is Entirely Proper ................ 58

Conclusion .................................................. 62

Certificate of Compliance

# NEW YORK SUPREME COURT

Appellate Division - Second Department

————••꞉—••——

### THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*- against -*

### HAROLD GOPAUL,

*Defendant-Appellant.*

————•••——

## RESPONDENT'S BRIEF

———

### Preliminary Statement

Defendant appeals from a judgment of the Supreme Court,
Nassau County, rendered July 15, 2009, convicting him, following
a jury trial, of fourteen counts of sexual abuse in the first
degree (Penal Law § 130.65[1]), and sentencing him to concurrent
determinate terms of seven years' imprisonment and five years'
post-release supervision on his convictions for sexual abuse in
the first degree under the first thirteen counts, and a
consecutive determinate term of five years' imprisonment and five

years' post-release supervision on his conviction under the
fourteenth count (McCormack, J.).

Defendant is incarcerated pursuant to the judgment of
conviction.  There were no codefendants.

ii

S T A T E M E N T   O F   F A C T S

Introduction

Between May 1 and June 20, 2008, defendant sexually abused his step-daughter, beginning when she was fourteen years old. Defendant fondled her breasts and touched her vagina using his hands, his mouth, and a vibrator. Defendant threatened her with a knife when she resisted. On June 24, 2008, defendant told his step-daughter that that night he was going to engage in sexual intercourse with her. Before that could happen, the victim disclosed the abuse to her friend's mother who took her to the police precinct where she reported the abuse. Defendant admitted to police that he had abused his step-daughter and he consented to a search of his work vehicle and his home. Police recovered several vibrators, as well as the knife he used to threaten his step-daughter.

For these acts, defendant was charged, under Nassau County Indictment number 2415N/08, with fourteen counts of sexual abuse in the first degree (Penal Law § 130.65[1]).

At trial, the proof against defendant included the testimony of the victim, the testimony of the victim's best friend and the best friend's mother, to whom the victim disclosed the abuse, defendant's written statement of admission given to police, and

defendant's video-taped statement of admission. Defendant presented no evidence.

## The Pre-Trial Hearing

### The People's Case

On June 24, 2008, New York City Police Detective LEONARD SHULMAN was working at the 105th Precinct, in Queens County, New York. Shortly after midnight, he was assigned to interview, SA[1], a sixteen-year-old girl, who was present at the precinct, and was alleging that defendant, her stepfather, had been sexually abusing her (H21-24, 182). [2]

At approximately 4:45 a.m., Detective Shulman, who was still in the process of interviewing SA, was advised by the desk Sergeant that defendant had come into the precinct to report his step-daughter missing. Upon his arrival at the precinct, defendant was placed under arrest and taken into custody (H25-

---

[1] The victim will be referred to as "SA" to protect her identity.

[2] Numbers in parentheses preceded by "H" refer to the minutes of the pre-trial hearing. Numbers in parentheses preceded by "T" refer to the trial minutes and the names of the testifying witnesses precede the page numbers.

28). At about 5:10 a.m., Detective Shulman met with defendant in an interview room located in the precinct (H29).

Defendant was seated at a chair in front of a table. He was not handcuffed (H30). Detective Shulman sat at a chair on the opposite side of the table, facing defendant. He was not carrying his weapon (H29-30). Detective Shulman read defendant his Miranda rights from a pre-printed police form. Defendant was asked six questions to determine whether he understood his rights. Defendant answered each question in the affirmative, indicating that he understood his rights, agreed to waive them, and wanted to make a statement. Detective Shulman noted the word "yes" on the form next to each question he asked. Defendant signed his name to the Miranda form and affixed his initials next to each of the six affirmative responses Shulman had noted on the form (H30-34, 37; People's Exhibit 1 [Miranda form signed by defendant]).

After defendant signed the Miranda form, Detective Schulman asked him if he would consent to a search of his motor vehicle, which was parked outside the 105th Precinct, as well as a search of his home in Bellerose, Queens. Detective Shulman read defendant his rights regarding the searches, from a pre-printed form. Defendant was advised that he had the right to refuse to

3

consent to the searches and to require that a search warrant be obtained prior to any search. He was further advised that any evidence found as a result of the search could be used against him, that he had the right to consult with an attorney before or during the search, and that he had the right to withdraw his consent to the search at any time prior to its conclusion (H45-52; People's Exhibits 2 [consent form for home] and 3 [consent form for vehicle]). Defendant signed the two consent forms allowing police to conduct the searches. After defendant signed the forms, Detective Shulman left the interview room and returned to speak with SA. Defendant was left alone in the interview room. At approximately 6:20 a.m., Detective Shulman returned to the interview room (H55).

Detective Shulman asked defendant if he knew why he had been arrested. Defendant replied that he had slapped his step-daughter during an argument he had with her over the past weekend. Detective Shulman asked defendant if he wanted to make a written statement concerning that incident, and defendant stated that he did (H55-56). Shulman provided defendant with a pad and a pen. Defendant wrote and signed a statement in which he said that the previous weekend he had slapped his daughter a few times to discipline her because she was arguing with her

4

mother and defendant (H57-58; People's Exhibit 4 [defendant's first statement]).

After writing his statement, defendant was taken to the bathroom at his request, and then he was returned to the interview room (H104). Detective Shulman returned to the interview room at about 7:20 a.m., at which time he told defendant that his step-daughter had made allegations that defendant had acted inappropriately toward her. Shulman asked defendant if he wanted to talk to him about that allegation (H107-08). Defendant stated that he felt bad about what had happened and that he wanted to make another statement. At about 7:30 a.m., defendant was again given a pad and pen and, again, he wrote and signed a statement. Defendant admitted that at the end of 2006, he began engaging in sexual contact with SA, wherein he would kiss her, touch her vagina and breasts, and she would touch his penis (H108-10; People's Exhibit 5 [defendant's second statement]).

Defendant was not threatened or forced to make these written statements, nor was he given any promises of leniency. Detective Shulman was the only person present with defendant in the interview room when defendant wrote out his statements, and the detective did not have his weapon on him at the time. Defendant

5

did not invoke his right to remain silent, nor did he request to speak with a lawyer at any time (H101-03, 112-14, 205, 229-30).

After defendant completed his written statements, Detective Shulman asked defendant if he had any vibrators in his car. Defendant stated that he had a body massager in his car as well as some vibrators in his house, however, he claimed he had them for personal use, and that he never used them on his daughter. Detective Shulman wrote his question and defendant's response on a piece of paper (H116). When Shulman asked defendant to describe the vibrators, defendant suggested that it would be easier if he drew a picture. Defendant then draw a picture of a vibrator on the same piece of paper on which Shulman had noted his question and defendant's response (H124-25, People's Exhibit 6).

Detective Shulman asked defendant if he would be willing to make a videotaped statement with a representative from the Queens County District Attorney's Office, and defendant stated that he would (H128-29). Thereafter, an assistant district attorney (ADA) arrived at the precinct and met with defendant. Defendant was again advised of his Miranda rights by the ADA, and again he waived his rights and agreed to speak with the ADA. The interview was recorded on videotape (H133; People's Exhibit 7).

Police Officer CELICA ALFARO was assigned to process defendant's arrest. After defendant spoke to the ADA, Alfaro placed handcuffs on him, and brought him down stairs to the front desk where she obtained pedigree information from him. Defendant was cooperative and responsive (H243-44). Alfaro then placed defendant in a cell behind the precinct's front desk (H241-43). Once in the cell, she removed defendant's handcuffs (H246-47). During the time Alfaro was with defendant, he did not complain of any injuries or pain, nor did he request any medical attention. She observed no bruises, scratches or other marks on him and he never asked to speak with an attorney, nor did he request to make any phone calls. Alfaro did not have her weapon on her when she was with defendant (H245-46).

After processing defendant's arrest, Officer Alfaro assisted in the searches of defendant's car and home. Alfaro brought SA outside the precinct to defendant's vehicle. Once there, SA directed the officer to a compartment in the vehicle where the officer recovered a mini meat cleaver and white massager. Alfaro then went to defendant's home, where she met with defendant's wife, who is SA's mother. SA was not present. Defendant's wife allowed Officer Alfaro inside the home wherein Alfaro conducted a

search of the master bedroom, and recovered a gray and white massager under the bed (H247-52, 253).

### Defendant's Case

Defendant testified that he was fifty-one years old. He was employed by Ecolab Pest Elimination and he drove an Ecolab truck (H276). On June 23, 2008, defendant worked the entire day. When he returned home at about 1:45 a.m. on June 24, he noticed that his daughter was not home and that the back door was unlocked. At about 2:30 a.m., defendant went to the police precinct to report his daughter missing (H278-79). When he arrived at the precinct after giving his name, address and explaining why he was there, he was surrounded by about nine or ten police officers. An officer grabbed him by the hand, slammed him against the wall, and put his hand behind his back, as the other officers moved in closer. The officer then instructed the other officers to put the cuffs on defendant. As they did so, the officers pulled him, spread his legs as far as they would go, scratched, tugged and squeezed him, and emptied his pockets. Defendant asked the officers if he could telephone his wife, but they refused to allow him to do so (H280-82).

Detective Shulman introduced himself, took defendant by his hand, which was handcuffed behind his back, and proceeded to push him up a flight of stairs, causing defendant to almost fall three times.  Shulman brought defendant into a room that he referred to as "the box" (H283).  As they entered the room, Shulman grabbed defendant by his shirt collar, pushed him up against the wall and then into a chair.  Shulman took defendant's handcuffs off and left the room, shutting the door behind him (H284).  After about ten or fifteen minutes Shulman returned and asked defendant if he knew why he was there.  Defendant replied that he came to the precinct to report his daughter missing.  Shulman left the room again and returned with some papers that Shulman told defendant contained statements that defendant's step-daughter had made against him accusing him of sexual harassment.  Defendant denied the allegations.

Shulman asked defendant if anything had happened at the fair.  Defendant replied that he had an argument with SA. Shulman asked defendant if he wanted to make a statement regarding that incident.  When defendant replied that he had nothing to say, Schulman continued nagging and cursing at him and threatened to put him away for more than twenty years (H285-86). Defendant asked to make a phone call to his wife, and Shulman

9

supposedly replied, "No fucking phone call for you" (H287). Defendant testified that he then asked for a lawyer and was told that he was not going to get a lawyer.

After leaving the room again for a short period of time, Shulman returned and again asked defendant to tell him what happened. Defendant told Shulman what had happened the previous weekend at the fair (H287). Shulman then gave defendant a piece of paper which contained the word "yes" several times, which Shulman read to defendant and told defendant to initial on the side of the question. According to defendant, Shulman forced him to place his initials on the paper by threatening him (H288). Detective Shulman never read defendant his Miranda rights (H323). Shulman then gave defendant a notepad and a pen and asked defendant to write a statement as to what had occurred at the fair. Defendant wrote a truthful account of what occurred at the fair (H289).

Shulman then left the room and returned ten or fifteen minutes later. He read defendant a statement containing allegations made by defendant's daughter, and he asked defendant to sign a confession regarding the allegations. Defendant claimed that he again asked for a lawyer, and again, Shulman told him that he was not getting a lawyer, and that Shulman would be

10

putting defendant away for a long time (H288-89). Shulman then picked defendant up from the chair and pushed him against the wall. He told defendant, "[y]ou're going to sign a confession for me," after which you're going to say, "I made a mistake and I'm sorry." He told defendant that the police supervisor will then read the statement, feel sorry for you, realize you need help, and send you home (H290). Detective Shulman then made defendant write a confession stating that he touched his daughter, and made him sign it. Shulman told defendant what to write and he made defendant write the statement by using bad language, such as the word "motherfucker" (H325), and by screaming at him (H324-25). Shulman told defendant that he was going to take the statement to his supervisor and they would then let defendant go home (H291).

More than an hour and a half later, Shulman returned to the room and asked defendant to give the same statement he wrote on the paper to an ADA while being videotaped (H292). Defendant asked for a lawyer but he was told by Detective Shulman that if he got a lawyer then he would not get to go home. Shulman instructed defendant to just look at the camera, be calm, and answer the questions. Shulman also told defendant that he was going to be asked the same questions Shulman previously asked him

11

relative to his <u>Miranda</u> rights, and Shulman instructed defendant to "do the same thing and give up that right" (H294). Shulman promised defendant that if he did as Shulman instructed, that Shulman would talk to his supervisor and that defendant would be allowed to go home (H294-95).

Sometime thereafter, the ADA arrived and defendant did as Shulman had instructed (H293). Defendant further testified that prior to speaking to the ADA, defendant had not had anything to eat or drink since the prior Sunday night. Moreover, he had not slept since Monday morning at around 6:00 a.m. when he awoke to go to work (H295-96). While appearing on the videotape, defendant did not request a lawyer, he did not complain of pain or ask for medical attention, even though he was in pain, because he was afraid of Detective Shulman. Defendant was not, however, afraid of the ADA or the videographer (H326-29). Defendant has never filed a complaint with the internal affairs unit of the police department regarding the police officers' conduct toward him (H330).

On June 26, 2008, defendant was arraigned and released on bail. He then went to his attorney's office and then to Long Island Jewish Hospital for medical treatment. While he was at the hospital, defendant's niece took pictures of him

showing the injuries he sustained at the police precinct. (H297-99; Defendant's Exhibits G-J [photographs]; Defendant's Exhibit K [medical records]). Defendant testified that he sustained scratches to his legs and elbow, and pain on his abdomen (H301-03). Defendant testified that prior to June 24 2008, he had no injuries (H277).

### The Hearing Court's Decision

The hearing court denied defendant's motion to suppress his statements to the police, his videotaped statement, and the property seized from defendant's truck and home. The court credited the testimony of both Detective Shulman and Police Officer Alfaro, and found that defendant's statements were given voluntarily, and that defendant made a knowing, intelligent, and voluntary waiver of his Miranda rights prior to making his statements. Moreover, the court found that, based on the totality of the circumstances, defendant had voluntarily consented to allow the police to search his vehicle and home. Therefore, the court concluded, the property recovered both from defendant's vehicle and home was properly obtained. The court further concluded that based upon its viewing of defendant's videotaped statement, the People had satisfied its burden of

13

proof beyond a reasonable doubt that defendant's statements were made voluntarily and were the products of knowing, intelligent, and voluntary waivers of his Miranda rights (H434-36).

### The Molineux Hearing

Prior to the commencement of trial, the People made an application pursuant to People v. Molineux, 168 N.Y. 264 (1901), and the court conducted an extensive Molineux hearing (H358). All of the facts relating to that hearing that are relevant to a determination of defendant's claims are incorporated in the argument in Point II of Respondent's Brief.

### The Trial[3]

#### The People's Case

Fourteen-year-old SA[4] lived in Queens with her mother, Merlin Ali Gopaul, and defendant, her stepfather. Defendant had married SA's mother when SA was three years old. SA had two siblings who were the biological children of defendant and Merlin Ali Gopaul. Defendant was the only father figure in SA's life.

---

[3] Unless otherwise indicated, parenthetical references are to the pages of the trial transcript.

[4] The victim will be referred to as "SA" to protect her identity.

She grew up calling him "dad." She trusted him and looked up to him (SA: 404-07). Defendant worked as an exterminator for Ecolab. He drove a company truck, which was white and had the company name imprinted on it (SA: 409).

When SA was fourteen years old, her relationship with her father changed. What had previously been a normal father-daughter relationship, changed to one of a sexual nature (SA: 413). SA was a freshman in high school and she had begun to go through puberty (SA: 414). Early one morning, SA stepped out of the shower and discovered that her father was in the bathroom using the toilet. Her mother and her siblings were sleeping. SA had a towel wrapped around her. Defendant pulled the towel off of her (SA: 415-16). Defendant told SA to sit on the hamper. He then put his hands on her thighs, between her legs, and pushed her legs apart. SA was naked. She tried to close her legs, but defendant continued to push them apart (SA: 417-18). SA weighed only ninety pounds at the time and defendant was much stronger then she was (SA: 414, 419). Defendant placed his head between SA's legs. SA put her hands on defendant's head and tried to push him away, but he was stronger than she was, and she was unable to push him away.

15

Defendant told SA to stop fighting. He placed his mouth on SA's vagina and began to perform oral sex on her. SA continued to try to push defendant off of her, but he continued pushing her legs apart with his hands and pushing his face into her vagina (SA: 419-20). As defendant continued to perform oral sex on SA, he also began to touch her breasts. SA tried to cover her breasts to get him to stop, but defendant was stronger than she was. He pushed her hands away and continued touching her (SA: 420-21). While this was going on, SA continually told defendant to stop and she tried to make noise so that he would stop, but defendant told her to "shush" and to "behave" and he continued touching her (SA: 422-23).

In May 2008,[5] SA was seventeen years old, a junior in high school, and she had a boyfriend (SA: 424, 426-27). When SA told defendant that she had a boyfriend, he became upset and starting yelling at her. He told her that she was too young to date and that she should stop seeing her boyfriend. Defendant then

---

[5] Between the incident in the bathroom when SA was fourteen, and the abuse that began in Nassau County in May 2008, there was an on-going pattern of abuse. Because, however, the incidents occurred at the Gopaul residence in Queens County, these incidents were the subject of a separate prosecution in Queens County. Although the prosecution sought to introduce some of that evidence under a <u>Molineux</u> theory, the court denied the People's application to do so.

16

imposed additional rules on SA.  Prior to SA disclosing that she
had a boyfriend, defendant would pick her up from school twice
weekly.  Afterward, defendant began to drop SA off at school
every morning and pick her up after school every day.  She was
not allowed to go home by herself (SA: 428-29).

Defendant, an exterminator with Ecolab Company, would pick
SA up from school in his work vehicle, a white pickup truck
with the letters Ecolab printed on the truck (SA: 409, 430).
On May 1, 2008, defendant told SA that he would be picking her up
from school and taking her to his work because he had to go to
work immediately after picking her up from school.

Sometime between May 1st and May 13th, defendant took SA to
an office building on Community Drive after picking her up from
school (SA: 431).  He pulled his van into the parking lot and
parked all the way at the back of the lot (SA: 432).
After parking, defendant instructed SA to move to the middle of
the car between the two front seats.  He put his hands behind her
head and pulled her face close to his face and began kissing her
(SA: 433-34).  SA tried to push defendant off of her by pushing
on his chest with her two hands.  She also tried to turn her face
away from his (SA: 434).  Defendant used his superior strength to
push SA's hands off his chest and he continued placing his

tongue in her mouth and kissing her.  SA tried to close her mouth by squeezing her lips together but defendant just continued kissing her.

Defendant then began to touch SA's breasts, first over her clothing and then under her clothing.  He lifted her shirt up and moved his hands under her bra to touch her (SA: 436).  SA began hitting defendant's hand and trying to push his hands off her breasts.  Defendant told SA to behave and continued to touch her. He then instructed SA to lay with her head on his lap and put her legs up on the passenger seat.  SA was afraid of defendant and did as he instructed (SA: 437).  He then removed a vibrator from the car door compartment on his side of the car and placed it on SA's vagina over her pants.  The vibrator was white and was about four to five inches long (SA: 438, 453).  He then unbuttoned her pants, put his hand under her pants and underwear and touched her vagina commenting that she was wet between her legs (SA: 439). SA told defendant to stop.  She tried moving his hands and closing her legs, but defendant continued touching her vagina (SA: 440).

SA was afraid to tell her mother what was happening. Defendant was the sole source of income for the family and SA was afraid that if she told her mother, or if her mother saw

18

defendant assaulting her, that it would break up the family and it would be her fault (SA: 448). SA had been afraid of defendant since the incident in the bathroom when she was fourteen years old. She knew there was no point in fighting defendant and so she did what he told her to do (SA: 449-50). On one occasion between May 1, and May 13, 2008, SA fought defendant to prevent him from kissing her. Defendant took out a knife, held it about one inch from SA's finger and threatened to cut off SA's finger if she continued to resist him. While doing this, defendant told SA, "I'll show you how serious I am" (SA: 457; People's Exhibit 5 [the knife]).

On May 14, 2008, defendant picked up SA after school and drove her to the parking lot at Community Drive. He kissed her and again touched her breasts and her vagina (SA: 462). He again took a vibrator he had in his car and placed it on her vagina. She tried to push him away and to close her legs but defendant told her to stop and to behave (SA: 464). As they were leaving to go home, defendant told SA that he wanted to have sex with her. He told SA to pick a date in a week, two weeks or in a month. SA knew she could not refuse defendant, and she was afraid that if she said no, defendant would hurt her. Thus, she

told defendant that they could have sex in one month (SA: 462-63).

During the next four school weeks, from May 19 through June 13, 2008, defendant continued to pick SA up after school. On at least one occasion during each of those weeks, defendant would bring SA to the parking lot at Community Drive. While there, defendant would kiss SA, touch her breasts, touch her vagina, and place a vibrator on her vagina. SA continually tried to push defendant off of her and tell him to stop. When she did so, however, defendant would not stop. Instead, he became angry, and on several occasions took out the knife which he kept in her view in a pocket under the radio, and told SA to behave. SA was fearful that defendant might kill her (SA: 466-69, 470-71). In total, defendant brought SA to the parking lot at Community Drive and sexually assaulted her on approximately ten occasions (SA: 517).

On June 14, 2008, which would have been one month since SA had reluctantly agreed to have sexual intercourse with defendant in the future, the family had a funeral to attend, and thus, the family was together for the entire day. Defendant said nothing to SA about having sexual intercourse (SA: 474).

The following week, on June 19, 2008, defendant picked SA up from school. As they drove home, defendant reminded SA that she had promised to have sexual intercourse with him on June 14th (SA: 475). Defendant told SA that she had to keep her promise. He told her to pick another day the following week. SA chose Friday, June 27, 2008, because it was the day that was the furthest away (SA: 476). Defendant told SA that Friday was not good, and instead, he told SA that they would have sexual intercourse on Wednesday of the following week (SA: 480).

That weekend, SA packed a bag with her clothing. She hid the bag in her closet under other items on the floor. She had decided that before Wednesday, as soon as she had the opportunity to do so, she was going to run away from home. That weekend, SA was unable to leave her home because everyone was home and because SA had not yet decided where she would run to (SA: 477-78).

On Monday, June 23, 2008, defendant was working at night. SA knew she had to leave her home for good that night or she might be forced to concede to defendant's demand to have sex with her. She waited for everyone to go to sleep, removed her bag from the closet, and having nowhere to go, she called her best friend, CHRISTINE ALIOTO (SA: 480).

21

Beginning in May 2008, Christine had noticed changes in SA. SA had become very nervous and was not acting like herself (C.Alioto: 336). SA's activities also became restricted at that time. She was no longer allowed to attend the after school classes and activities she had previously attended, and instead she was required to go straight home after school every day. Christine noticed that defendant began picking SA up every day from school in his Ecolab work truck (C.Alioto: 337-38).

When Christine answered the phone that night, SA sounded very nervous. She was whispering and speaking very quickly (C.Alioto: 334-35, 339). For the first time, SA disclosed to Christine that defendant had been sexually abusing her. She told Christine that she had to run away from home (SA: 481; C.Alioto: 341). Not knowing what to do, seventeen-year-old Christine woke her mother, DENISE ALIOTO (C.Alioto: 333, 341; D.Alioto: 354). SA spoke to Denise. She told Denise about the abuse and she told her that she had to leave the house (SA: 482).

SA ran from her house toward Christine's house, as Christine and her mother drove to meet her. They drove about four blocks from their house when they saw SA, with her duffle bag in hand, running toward their car. SA was out of breath and appeared panicked, "as if she couldn't run fast enough." She was

22

distraught, and she had a "look of pure terror on her face." (C.Alioto: 342; D.Alioto: 356). Christine had never seen SA as upset as she saw her that night (C.Alioto: 342-43). SA got into the car. She was frightened but she began to open up about what defendant had been doing to her (D.Alioto: 357).

Denise Alioto drove to the 105th police precinct in Queens. SA was afraid to go in and so Denise went in and spoke with a female police officer who came outside to talk to SA. After speaking with the officer, SA agreed to go into the precinct (D.Alioto: 357).

Detective LEONARD SHULMAN was assigned to handle this matter (Shulman: 624). Detective Shulman met with SA and spoke with her regarding the sexual assault. SA was very scared and emotional (Shulman: 625). Sometime in the early morning hours, Detective Shulman was advised by his Sergeant that defendant had come into the precinct, and that he had been taken into custody. Shulman was not present when defendant was taken into custody, however, he met with defendant afterward at about 5:00 a.m. (Shulman: 627). Defendant had been brought into an interview room. He was sitting in a chair at a table. He was not handcuffed. Detective Shulman was unarmed. Shulman advised defendant that he was conducting an investigation involving his

daughter, SA, but that before they spoke, Shulman was going to read him his <u>Miranda</u> warnings. Shulman thereafter read defendant his rights from a standard <u>Miranda</u> form used by the police department. After being read his rights, defendant acknowledged that he understood his rights, and that he was willing to waive his right to an attorney and was willing to answer questions. Defendant was given the rights form which he read to himself. He then placed his initials on the form indicating that he understood his rights and was willing to waive them, and he signed his name on the form (Shulman: 632-33, 636-38; People's Exhibit 6 [signed rights form]).

Detective Shulman thereafter asked defendant if he would consent to a search of his vehicle and a search of his home. Defendant stated that he would. Detective Shulman read defendant two search consent forms, one to search his vehicle and one to search his home (Shulman: 641, 647; People's Exhibit 7 [consent form for vehicle]; People's Exhibit 8 [consent form for home]. Defendant was given the forms to read for himself and he thereafter signed his name to both forms thereby consenting to allowing police to search his vehicle and his home (Shulman: 645, 650).

24

Detective Shulman then left the interview room briefly. When he returned, he asked defendant if he knew why he was under arrest (Shulman: 652).  Defendant stated that he had a dispute with his daughter the past Saturday and that he had slapped her. Shulman asked defendant if he wished to make a statement regarding the incident, and defendant replied that he would. Defendant was given a pen and paper.  He wrote that on the past Saturday, SA was upset because defendant told her she had to leave a street fair before going on a ride she wanted to go on. When they returned home, SA began arguing.  Defendant thought that was wrong and so he gave her a few slaps to discipline her. Defendant then signed and dated the statement (Shulman: 653-58; People's Exhibit 9 [defendant's first statement]).

After writing his statement, defendant, at his request, was taken to use the restroom.  He was then taken back into the interview room (Shulman: 661).  Detective Shulman then returned to the room and told defendant that his daughter had made allegations regarding inappropriate behavior on his part. Defendant was asked if he wished to make a statement about those allegations (Shulman: 662).  Defendant stated that he felt bad about it, and that he wanted to make a written statement.  He was again provided with a notepad and a pen (Schulman: 663).

25

Defendant provided a written statement in which he admitted that at the end of 2006, he began a relationship with his daughter wherein he would touch her vagina and breasts and she would touch his penis, and they would kiss. Defendant claimed that this occurred five or six times in total and that it occurred once at 400 Community Drive. Defendant stated that he knew that what he did was very, very wrong, and that he wished it had never happened. Defendant admitted that he needed help (Shulman: 668; People's Exhibit 11 [defendant's second statement]).

Detective Shulman asked defendant if he had any vibrators in his car or his home. Defendant replied that he had two vibrators in his home and a body massager in his car. He contended that the body massager was for his own personal use and that he had never used it on his daughter. Detective Shulman wrote his question and defendant's response on a piece of paper. He then showed defendant the piece of paper and defendant drew a picture of the vibrators he kept in his house (Shulman: 670). The defendant then signed the piece of paper (People's Exhibit 13 [signed statement with picture of vibrators]).

At about 4:00 p.m. on June 24, 2008, Queens County ADA BRIAN HUGHES and ADA Jared Rosenblatt arrived at the 105 precinct. They met with defendant in an interview room at the precinct.

26

Detective Schulman and a video camera operator were also present in the room (Hughes: 368, 372, 389). ADA Hughes again advised defendant of his <u>Miranda</u> rights and again defendant agreed to waive his rights and make a video-recorded statement (Hughes: 377; People's Exhibit 1 [videotape of defendant's statement]). Defendant again signed a form waiving his <u>Miranda</u> rights (People's Exhibit 2).

Defendant stated that he had known SA for the past fourteen years, since she was three years old. Beginning at the end of 2006, when SA was sixteen years old, his relationship with SA changed from a father-daughter relationship to a more intimate relationship. At that time, defendant and SA began hugging and kissing in an intimate manner. Toward the beginning of 2007, defendant stated that the relationship progressed. Defendant began to touch SA's breasts and vagina with his hands, and on a few occasions, SA touched defendant's penis. On those occasions, defendant would take SA's hand and place it on his penis and instruct her and, by placing his hand on top of hers, guide her to move her hand up and down on his penis. Defendant denied having ever ejaculated. Defendant instructed SA to keep their relationship a secret (People's Exhibit 1).

During the time he spent with defendant, ADA Hughes observed that defendant did not appear to be injured in any way, nor did he complain of any physical injury or pain, or request medical attention.  Moreover, defendant never once asked to speak to an attorney (Hughes: 376).

New York City Police Officer CHRISTINE ALFARO was assigned to process defendant's arrest (Alfaro: 577,580).  She remained with defendant for over five and a half hours (Alfaro: 587, 590).  During that time, Officer Alfaro observed that defendant was not injured in any way.  Moreover, he never complained of any injuries or of any pain, nor did he request medical attention (Alfaro: 583-84).

Also that night, Officer Alfaro assisted with the search of defendant's vehicle to which defendant had consented.  She brought SA to defendant's vehicle, which was parked by the precinct (Alfaro: 581).  SA looked into the window of the car and saw the knife in the compartment under the radio.  She also observed a folded vibrator on the seat of the van, however, she did not see the long white vibrator that defendant had used on her (SA: 485-86). Officer Alfaro took the knife and the massager (Alfaro: 582; People's Exhibit 4 [the vibrator]; People's Exhibit 5 [the knife]).

28

The Defense

Defendant presented no evidence.

The Verdict and Sentence

Defendant was convicted of fourteen counts of sexual abuse in the first degree (Verdict: 912-14)[6]. He was sentenced to concurrent determinate terms of seven years' imprisonment and five years' post-release supervision on his convictions for sexual abuse in the first degree under the first thirteen counts, and a determinate term of five years' imprisonment which was ordered to run consecutively to the above sentences, and five years' post-release supervision on his conviction under the fourteenth count (McCormack, J.).

---

[6] The fourteen separate counts represented different sexual touching from the period May 13, 2008 through June 20, 2008, the first count representing the first instance and the fourteenth representing the last.

29

POINT ONE

THE HEARING COURT PROPERLY DENIED DEFENDANT'S MOTION TO
SUPPRESS THE EVIDENCE RECOVERED FROM DEFENDANT'S CAR AND HOME AND
DEFENDANT'S STATEMENTS (answering defendant's brief, Point One).

Defendant contends that the hearing court should have
suppressed his written and videotaped statements because he was
not advised of his Miranda rights. He further argues that his
statements were not given voluntarily because he was physically
and mentally abused by police personnel prior to making the
statements, and because the conditions of his confinement were
coercive. Moreover, defendant contends that the physical
evidence obtained as a result of consent searches of his vehicle
and home should have been suppressed because his consent was
similarly obtained under duress. Contrary to defendant's
contentions, the hearing court properly rejected defendant's
suppression claims as defendant was properly advised of his
Miranda rights, his statements were voluntary, and defendant
knowingly and voluntarily consented to the search of his home and
vehicle.

A. Defendant's Statements Were Lawfully Obtained.

It is well established that the factual determinations of a
hearing court, "resting largely upon its assessment of the

30

credibility of the testifying officers, are entitled to
deference." People v. Mateo, 2 N.Y.3d 383, 417 (2004). Indeed,
a suppression court's determination that a defendant was
properly advised of, and waived, his Miranda rights is
"entitled to great deference on appeal and will not be disturbed
unless clearly unsupported by the record." People v.
Baliukonis, 35 A.D.3d 626, 627 (2d Dept. 2006); see also People
v. Latimer, 75 A.D.3d 562 (2d Dept. 2010); People v. Guy,
47 A.D.3d 643, 644 (2d Dept. 2008). This is so because the
suppression court enjoys the "peculiar advantages of having seen
and heard the witnesses." People v. Prochilo, 41 N.Y.2d 759,
761 (1977). In evaluating testimony, the court should not
disregard common sense and common knowledge. See People v.
Garafalo, 44 A.D.2d 86, 88 (2d Dept. 1974).

The testimony at the hearing established that
Detective Shulman read defendant his Miranda rights from a pre-
printed police form. Defendant was asked six questions to
determine whether he understood his rights, and after each
question, he stated that he understood his rights and agreed to
waive them. Detective Shulman noted the word "yes" on the form
next to each of the six questions, and thereafter defendant
placed his initials next to the words "yes" to indicate the

31

accuracy of Detective Shulman's notations, and he signed his name to the form (People's Exhibit 6).   Thereafter, defendant wrote two statements and, on a third piece of paper, he drew a picture illustrating the appearance of the vibrator he told police he owned.   Defendant was subsequently advised of his Miranda rights on a second occasion by an ADA, and again he stated that he understood his rights and was willing to waive them.   On this occasion the administration of his rights was captured on videotape (People's Exhibit 2).   Defendant then made a videotaped statement.

Throughout this process, defendant never requested an attorney.   He was calm and cooperative, and he was not threatened, forced, induced or compelled in any way to speak to the police or to make a statement.   He never complained of injuries, pain or discomfort and, as reflected on the videotape, did not appear to be injured, in pain, or in distress.

Defendant, on the other hand, told a very different story at the hearing.   He complained that he was pushed, pulled, tugged, squeezed, scratched, assaulted, threatened with twenty years of incarceration, and cursed at, by as many as nine or ten different officers.   He further claimed that he was promised that if he admitted to sexually abusing his daughter, and said he was sorry,

he would go home.  He also alleged that although he was not afraid of the ADA or the videographer, both of whom were present when he made his videotaped statement, his overwhelming fear of Detective Shulman, who was also present during the videotaped statement, prevented him from asking the ADA or the videographer for help.  According to defendant, when he confessed to sexually abusing his daughter on the videotape, he was merely "parroting" a confession he was instructed to make by Detective Shulman. Likewise, his acknowledgment on the videotape that he understood his <u>Miranda</u> rights, was also something that Detective Shulman instructed him to do in return for which he would be allowed to go home.

Defendant's story is inconsistent with common sense and was entirely unsupported by all of the other entirely consistent evidence at the hearing.  Most significantly, defendant's account was contradicted by the videotape in which defendant is seen calmly explaining how and when he began abusing his daughter, how the abuse progressed, what the abuse consisted of, and where the abuse took place.  Moreover, defendant is observed answering questions willingly, and his answers were directly responsive to the questions.  As demonstrated by the videotape, defendant had no bruises or injuries notwithstanding his current claims that he

was "battered and bruised physically as well as emotionally" (defendant's brief at 40).  On the other hand, the testimony of the two police witnesses was entirely credible, and consistent with the other evidence at the hearing.

Indeed, in its decision, the hearing court fully credited the testimony of the two police witnesses and discredited defendant's testimony, finding that defendant had indeed made a knowing, intelligent, and voluntary waiver of his Miranda rights, not once, but twice, and that defendant's statements were made voluntarily.  Moreover, the court concluded that based upon its viewing of defendant's videotaped statement, the People had satisfied its burden of proof beyond a reasonable doubt that defendant's statements were made voluntarily and were the products of knowing, intelligent, and voluntary waivers of his Miranda rights (H434-36).  The record amply supported the hearing court's determinations.

Defendant further argues that the conditions and length of his confinement were coercive, thus rendering his statements involuntary.  To determine voluntariness, a court must review all of the surrounding circumstances to determine whether the defendant's will has been "overborne."  People v. Mateo, 2 N.Y.2d 383, 411 (2004).  These surrounding circumstances include the

34

duration and conditions of his detention, the conduct and demeanor of the police toward him, his age, physical state, and mental state. People v. Green, 73 A.D.3d 805, 805 (2d Dept. 2010); see also People v. Martin, 68 A.D.3d 1015, 1016 (2d Dept. 2009).

Defendant arrived at the precinct at approximately 4:45 a.m. (H25). He was advised of his Miranda rights at 5:15 a.m. (People's Exhibit 6). He consented to a search of his home at 5:20 a.m. (People's Exhibit 8), and a search of his vehicle at 5:30 a.m. (People's Exhibit 7). Defendant's first written statement was completed at 6:25 a.m. (People's Exhibit 9). His second written statement was completed at 7:20 a.m. (People's Exhibit 11). Thereafter, defendant drew the picture of the vibrator he owned at 8:30 a.m. (People's Exhibit 13). Although defendant contends that there was a "protracted delay of more than 15 hours of custodial interrogation, under duress" (defendant's brief at 40), in order to extract his confessions and his consent to search, that assertion is simply not supported by the evidence. At most, defendant had been in custody four and a half hours within which time he was given his Miranda rights, consented to searches of his home and car, and gave two written statements. Such a time period is clearly within the range of

35

time periods that have consistently been found to be a reasonable amount of time. See People v. Petronio, 34 A.D.3d 602, 603-04 (2d Dept. 2006) (defendant's confession not involuntary even though made 25 hours after Miranda warnings, based upon the totality of the circumstances surrounding his detention); People v. Miles, 276 A.D.2d 566 (2d Dept. 2000) (totality of circumstances supported hearing court's determination that statement was voluntary, even though defendant was in custody for 12 hours). Moreover, defendant's videotaped statement was immediately preceded by a second advisement of his Miranda rights.

Accordingly, the People established that defendant's waiver of his Miranda rights was knowing, intelligent, and voluntary, and defendant failed to adduce any credible evidence supporting his contention that the waiver was involuntary. Defendant's self-serving testimony, and claims before this Court, that he was physically attacked by nine or ten officers, denied a lawyer, and forced, coerced, and threatened to induce him to waive his Miranda rights and make false written and oral statements, is simply not believable and not supported by the evidence. Accordingly, there is no reasonable basis upon which this Court should overturn the hearing court's decision.

B. Police Properly Seized The Physical Evidence Pursuant To
   Defendant's Written, Voluntarily-Executed Consent.

        After defendant was advised of, and waived, his <u>Miranda</u>
rights, Detective Shulman asked defendant if he would be willing
to consent to a search of his work vehicle and his home.
Defendant stated that he would consent to those searches.
The detective read defendant two identical preprinted police
consent forms and then gave the forms to defendant to read.
Therein, defendant was advised that (1) he had the right to
refuse to consent; (2) he had the right to require that a search
warrant be obtained prior to any search; (3) any evidence found
as a result of the search, could and would be used against him in
any civil or criminal proceedings; (4) he had the right to
consult with an attorney of his choosing before or during the
search; and (5) he had the right to withdraw his consent to
the search at any time prior to its conclusion    (People's
Exhibits 7, 8).    After these rights were read to defendant,
and he read these rights to himself, defendant signed his name to
both    consent    forms    authorizing    the    police    to    conduct
the searches.

        The People have the burden of proving the voluntariness of a
defendant's consent to a search.   Voluntariness is a question of
fact that must be determined by the hearing court based upon the

                                    37

totality of the circumstances. See People v. Gonzalez, 39 N.Y.2d 122, 128 (1976); People v. Quagliata, 53 A.D.3d 670, 671 (2d Dept. 1984). In order to sustain this burden, the prosecution must "demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied" by the actions of the law enforcement authorities. Quagliata, 53 A.D.3d at 671 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 248 [1973]).

In People v. Gonzalez, 39 N.Y.2d 122, 128-30 (1976), the Court of Appeals set forth four factors to be considered in determining the voluntariness of a defendant's consent: (1) whether the defendant is in custody or under arrest, and the circumstances surrounding the custody or arrest; (2) the defendant's background; (3) whether the defendant was evasive or uncooperative with police; and (4) whether the defendant was advised of his right to refuse to consent. The Court went on to explain that custody or arrest alone does not preclude voluntariness. Rather, it is the events surrounding the arrest that must be considered. For example, the Court determined that a resisted arrest, or confrontation by a large number of police agents, or the fact that the defendant was handcuffed, are significant factors in determining whether a defendant's

"apparent consent was but a capitulation to authority."
Id. at 129.

The evidence at the hearing established that Detective Shulman was the only person in the interview room with defendant, defendant was not handcuffed, he was allowed to use the restroom, and he was cooperative with the police and did not resist arrest. Defendant, a fifty-one-year-old man who was gainfully employed, had no prior criminal history and he appeared on the videotape to be of average or higher than average intelligence and further appeared to fully understand what was occurring (H276). Indeed, defendant chose to cooperate with the police. He not only consented to the searches, but he agreed to speak with the police, he executed two written statements, and he consented to speak with an ADA and make a videotaped statement. On the videotape, defendant appeared calm, spoke in a normal tone of voice, and was again extremely cooperative. The tape further establishes that defendant was questioned in a non-confrontational manner. Most significantly, defendant was advised of his rights relative to the consent search, including his right to refuse to give consent, and, by signing the consent form, he acknowledged that he understood those rights, and agreed to waive them.

In rendering its decision, the hearing court found the People's witnesses to be credible and accepted their version of the events. Accordingly, the court determined that the consent given by defendant was done so voluntarily and not as a result of any subsequently alleged coercion. This determination was fully supported by the evidence, and is entitled to great deference by this Court. See People v. Mateo, 2 N.Y.3d at 417. Thus, the hearing court's determination should not be disturbed by this Court, and its decision to deny suppression should be upheld in all respects.

40

POINT TWO

THE COURT'S RULING PERMITTING LIMITED <u>MOLINEUX</u> EVIDENCE WAS PROPER AND DID NOT VIOLATE DEFENDANT'S RIGHT AGAINST SELF-INCRIMINATION (answering defendant's brief, Point Two ).

Prior to trial, defendant filed a Motion in Limine seeking to limit the People's direct case, and its cross-examination of defendant, solely to the allegations contained in the indictment. Defendant requested that the People be prohibited from offering any evidence, or cross-examining defendant as to incidents involved a pending Queens County indictment arising out of his abuse of SA in Queens County.[7]  Defendant further sought to have his written and videotaped statements redacted to the extent that they mentioned any incidents of sexual abuse that occurred outside of Nassau County.

Also prior to trial, the People submitted a written application pursuant to <u>People v. Molineux</u>, 168 N.Y. 264 (1901), seeking to introduce evidence of defendant's sexual and physical abuse of SA in Queens County that were the subject of the pending Queens County indictment.  Specifically, the People sought to introduce evidence that, in Queens County, defendant kissed SA,

---

[7] Defendant had been charged in Queens County with acts of sexual abuse against SA that occurred in Queens County.  At the time of the Nassau County trial, the Queens County prosecution was pending.

41

touched her breasts and vagina, placed his mouth on her vagina, and forced her to touch his penis as part of an on-going course of forced and threatened sexual abuse. The People also sought to introduce evidence of defendant's threat to SA to cut her finger off and to bury her, going so far as to tell her where she was going to be buried, all of which occurred in Queens County (H378). The People argued that this evidence was admissible to establish defendant's motive, intent, and absence of mistake, and that it constituted necessary background information and was inextricably interwoven into the narrative of events to explain why the victim disclosed when she did, to illustrate the progression and nature of defendant's relationship with the victim, and to demonstrate the victim's state of mind (H385).

Prior to trial, the court held an extensive hearing on the issues raised in the motions (H358-412). Subsequent to the hearing, and after reading the Queens County grand jury minutes, the court ruled that it would allow the People to introduce evidence of only three specific incidents: (1) when defendant forced SA to allow him to perform oral sex on her in the bathroom of the Queens home when SA was 14 years old, which marked the first time defendant sexually abused SA (H404; T300); (2) when defendant threatened to cut off SA's finger in May 2008 in Queens

42

County, however the court specifically disallowed testimony establishing that defendant threatened to show SA, or actually showed SA, places where he would bury her (H404; T301-02); and (3) when defendant forced SA to pick a date to have sexual intercourse with him, which incident led to SA's disclosure of the sexual abuse (H405; T302). The court further ruled that the People would not be required to redact any portion of the written or videotaped statements because their probative value far outweighed any potential prejudice (H405). Finally, the court ruled that the People would be prohibited from eliciting any testimony that there was a pending Queens County case or indictment (H404), and further, that the People would be prohibited from cross-examining defendant about the pending Queens case unless defendant opened the door to such questioning (H393, 403-44, 407).

Defendant argues that the court's rulings permitted the introduction of improper propensity evidence and, further, that it effectively denied him the right to testify on his own behalf because to do so would open him up to cross-examination regarding the Queens charges, thereby violating his right against self-incrimination. Defendant's arguments are without merit.

43

A. The Court's Molineux Ruling Was Proper.

"Evidence of a defendant's prior bad acts may be admissible when it is relevant to a material issue in the case other than defendant's criminal propensity . . . . Where there is a proper nonpropensity purpose, the decision whether to admit such evidence rests upon the trial court's discretionary balancing of probative value and unfair prejudice." People v. Dorm, 12 N.Y.3d 16, 19 (2009). In Dorm, a domestic violence prosecution, evidence of the defendant's uncharged misconduct against the victim both before and after the charged events, was properly admitted because it was relevant to show the defendant's motive and because it provided necessary background information regarding the couple's relationship.

In particular, and as illustrated in Dorm, where the victim and the defendant are known to each other, such evidence is essential to provide relevant background information relative to the relationship and to put the relationship in its proper context. Moreover, in cases involving sexual conduct against a child, such evidence is often permissible to "complete the victim's narrative, describe the events leading up to the charged crime and explain the relationship between defendant and the victim, (citations omitted), as well as to place the events in

44

question in a believable context and explain the victim's delay in reporting defendant's conduct." <u>People v. Haidara</u>, 65 A.D.3d 974 (1st Dept. 2009).

In addition, such evidence has been held admissible to establish the element of forcible compulsion. In <u>People v. Thompson</u>, 158 A.D.2d 563 (2d Dept. 1990), this Court held the admissible evidence pertaining to previous incidents in which the defendant sexually molested the complainant was properly admitted to show the complainant's ongoing fear of the defendant. The use of <u>Molineux</u> evidence to establish the element of forcible compulsion is especially significant due to the fact that "the element of forcible compulsion is examined through the state of mind produced in the victim." <u>People v. Sehn</u>, 295 A.D.2d 749 (3d Dept. 2002) (citations omitted); <u>see also</u> <u>People v. Thompson</u>, 72 N.Y.2d 410, 416 (1988).

Here, the incident occurring in the bathroom of defendant's Queens home represented the beginning of defendant's sexual abuse of SA, and helped to explain when, where, and how the relationship between defendant and SA changed. It is also relevant to explain the events leading up to the charged events which, without such evidence, may have appeared to have occurred in a vacuum. Moreover, because defendant used force, by pushing

45

SA's legs open and forcing his mouth onto her vagina despite her efforts to push him off, this incident is relevant to the issue of forcible compulsion. Likewise, although SA testified that defendant threatened to cut her finger off while in the car in Nassau County, the fact that he had likewise threatened her in Queens County demonstrates that this was not the only time defendant made such a threat and, as such, was relevant to the issue of forcible compulsion.

In People v. Leeson, 12 N.Y.3d 823, 826-27 (2009), a case very similar to this one, the defendant, a friend of the twelve-year-old victim's mother, was charged with sexually abusing the victim in her home in Ontario County. As in this case, other incidents of sexual abuse between the defendant and the victim took place in the defendant's vehicle in a second county, and in a building in a third county. The trial court allowed testimony regarding these other incidents pursuant to Molineux. The Court of Appeals held that the testimony was properly admitted because it provided necessary background information regarding the nature of the relationship between the defendant and the victim, and because it placed the charged conduct in its proper context. Id. at 827.

46

Likewise, in People v. Khan, 88 A.D.3d 1014 (2d Dept. 2011), the defendant was charged with sexually abusing the victim from 1997 through 2000, and raping her in 2004 in Queens County. The trial court permitted the prosecution to introduce evidence that between 2001 and 2004, while the family resided in Florida, the defendant had raped the victim on frequent occasions. This Court held that the evidence was properly admitted to demonstrate the escalation of the sexual assault, and as relevant background information to assist the jury in understanding the defendant's relationship with the victim, and to place the events in their proper context. Moreover, this Court held that the probative value and the need for the evidence outweighed any potential prejudice to the defendant, particularly in light of the trial court's limiting instructions to the jury. Id. at 1015.

Here, too, the trial court gave appropriate limiting instructions to the jurors as to the proper use of the uncharged crimes evidence, instructing the jurors both after SA's testimony, and again at the conclusion of the trial, that they may consider the testimony only as it relates to the elements of forcible compulsion and intent, and not to demonstrate that defendant had a propensity or predisposition to commit the crimes charged (T576-77, 843).

47

In sum, the testimony regarding defendant's initial sexual assault of SA and his threat in Queens County to cut off her finger, as well as the fact that defendant forced SA to pick a date to have sexual intercourse with him, was relevant for purposes other than defendant's criminal propensity, and its admission by the trial court was not an abuse of the court's discretion.  Moreover, the court properly weighed the probative value of the evidence and determined that it outweighed any potential for prejudice, and gave proper limiting instructions to the jury.  As such, the court's actions were entirely appropriate.

B. The Court's Ruling Did Not Violate Defendant's Fifth Amendment Privilege Against Self-Incrimination.

Generally, a defendant who elects to waive his Fifth Amendment privilege against self-incrimination and testify at trial, may be cross-examined regarding prior criminal or immoral acts affecting credibility.  See People v. Bennett, 79 N.Y.2d 464, 468, (1992).  People v. Betts, 70 N.Y.2d 289 (1987) however, stands for the proposition that cross-examination of a defendant on pending charges for credibility purposes only, is prohibited, except where the defendant's own assertions "open the door" to such questioning.  Id. at 295.

48

Betts is premised on a recognition that forcing a defendant to sacrifice the privilege against self-incrimination as to a pending charge in order to take the stand in one's own defense in an unrelated case exerts "an undeniable chilling effect upon a real 'choice' whether to testify." Id. at 292.   Consequently, allowing the People to attack a defendant's credibility through cross-examination regarding an unrelated pending charge unfairly compromises the defendant's right to testify with respect to the case on trial and, simultaneously, jeopardizes the "correspondingly important right not to incriminate oneself as to the pending matter." Id. at 295.

Unlike Betts, the court here never ruled that evidence pertaining to the charges that were pending in Queens could be used by the People on the issue of credibility.   Indeed, the court specifically drew a distinction between the Court of Appeals proscription against using pending charges to cross-examine a defendant for credibility purposes, as set forth in the Betts and Bennett cases, and the situation in this case.   Here, the court properly indicated that it was faced with a situation wherein it was being asked to allow the People, pursuant to Molineux, to adduce evidence pertaining to the pending Queens

49

case because the evidence was relevant to certain issues and elements of the Nassau County charges (H389-91).

Indeed the court, citing the Court of Appeals decision in Leeson, found that the acts underlying the pending charges in Queens were relevant to establish background material and to put the nature of the relationship between defendant and SA in its proper context (H399-400). The court also determined that the evidence was relevant to the issues of intent and force (H403). The court specifically stated that it would not allow the People to cross-examine defendant on the pending Queens case for credibility purposes because that would be precluded by the Betts and Bennett cases (H403). Instead, the court ruled that the People could adduce evidence pertaining to the pending Queens case as substantive evidence relative to the issues of intent and force, and to explain the nature and progression of the relationship between defendant and SA, pursuant to People v. Molineux. As such, the rule set forth in Betts and Bennett are inapplicable here inasmuch as the evidence would not be used for credibility purposes.

Indeed, two cases decided by this Court illustrate this point. In People v. Mack, 234 A.D.2d 565 (2d Dept. 1996), this Court held that the trial court's ruling allowing the People to

50

use evidence of a pending charge on the issue of identity did not run afoul of the Betts decision because the court never ruled that the evidence could be used on the issue of credibility. Similarly, in People v. Soto, 70 A.D.3d 981 (2d Dept. 2010), the defendant was charged with tampering with a witness and criminal contempt arising from threatening telephone calls he made to his wife in violation of an order of protection issued in connection with a pending assault case. The trial court ruled that, if the defendant testified, the People would be allowed to cross-examine him on the pending assault charge. This Court held that the trial court's ruling did not violate Betts because the pending assault charge was relevant to, and directly probative of, the charges at issue, and because the court appropriately determined that the probative value of the testimony outweighed this potential prejudicial effect.

Likewise here, the evidence, as the court properly determined, was relevant to the issues of intent and force, and to establish the background and nature of the relationship between defendant and SA. Moreover, the trial court appropriately found that the probative value of the evidence outweighed its potential prejudicial effect, and that determination should not be disturbed on appeal.

51

## POINT THREE

DEFENDANT'S CLAIM THAT THE EVIDENCE WAS LEGALLY INSUFFICIENT IS UNPRESERVED AND WHOLLY WITHOUT MERIT (answering defendant's brief, Point Three).

Defendant contends that the evidence was legally insufficient to establish the crime of sexual abuse in the first degree because, he argues, the evidence, in his view, was not believable. Defendant's claim is unpreserved, meritless, and does not provide a basis upon which this Court should review the sufficiency of the evidence.

Specifically, defendant alleges that Detective Shulman's testimony was not believable because he conspired with others to hide the identity of the arresting officer, he used force and threats to obtain defendant's confession, he crafted defendant's statement based upon erroneous information he received from the complainant, and that Shulman's testimony denying that defendant was beaten by numerous police officers is belied by the videotape which shows defendant's collar is askew. Defendant further contends that SA's claims about being "forced [by defendant] were contrived, [and were merely] an excuse for her having accepted the defendant's overtures" (defendant's brief at 58-59), and that her claim that she feared defendant was contradicted by family photos, as well as evidence that her grades did not suffer, and

52

that she had a boyfriend.  In essence, defendant contends that the evidence was insufficient because SA readily participated in the sexual relationship with her father, and the witnesses were not believable.

As a threshold matter, defendant's contention that the People failed to prove his guilt of first-degree sexual abuse beyond a reasonable doubt is unpreserved for appellate review because he did not advance any of his current claims before the trial court.  It is well established that the doctrine of preservation applies to claims of legal insufficiency. People v. Hines, 97 N.Y.2d 56, 62 (2001); People v. Gray, 86 N.Y.2d 10, 20-21 (1995); People v. Lawrence, 85 N.Y.2d 1002, 1004 (1995).  In order to preserve a claim of legal insufficiency for appellate review, the claim must be specifically presented to the trial court at a time when the error, if any, may be corrected.  To raise this issue as a matter of law on appeal, a defendant must have advanced his arguments concerning the sufficiency of the evidence at trial with specificity. See C.P.L. § 470.05(2); People v. Hines, 97 N.Y.2d at 62 (a motion to dismiss for insufficient evidence must be specifically directed at the alleged error to satisfy preservation requirement); People v. Gray, 86 N.Y.2d at 20-21.

53

In his motion for a trial order of dismissal, defendant simply claimed that the "People have failed to prove a prima facie case" (T766). At no time did defense counsel raise the claims that he sets forth now. Thus, defendant failed to preserve his claim, and this Court should not consider it in the interest of justice because defendant received a fair trial.

Preservation aside, defendant's claim is without merit because the evidence in this case established every element of the crime of sexual abuse in the first degree beyond a reasonable doubt. Moreover, his present claim sets forth an improper standard for the review of the legal sufficiency of the evidence. The standard for reviewing the legal sufficiency of the evidence is whether the evidence, viewed in the light most favorable to the People, could lead any rational trier of fact to conclude that the essential elements of the crime were established beyond a reasonable doubt. See People v. Contes, 60 N.Y.2d 620, 621 (1983) (citing Eleanor v. Virginia, 443 U.S. 307, 319 [1979]). Put another way, the People are entitled to every reasonable inference that can be drawn from the evidence. See People v. Bentancourt, 68 N.Y.2d 707, 709 (1986). It is a well-settled principle that in determining a claim of legal sufficiency this Court must assume that the jury credited the prosecutor's

witnesses, and gave the prosecutor's evidence the full weight that it might reasonably be accorded.  See People v. Malizia, 62 N.Y.2d 755, 757 (1984); People v. Cheatham, 153 A.D.2d 566, 569 (2d Dept. 1989).  A defendant's claim must be rejected if "there is any valid line of reasoning and permissible inference which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial."  See People v. Cahill, 2 N.Y.3d 14, 57 (2003).

Defendant's contention that the evidence was simply not believable is an improper basis upon which to make a determination that the trial evidence was insufficient.  The question for this Court is not whether the People's evidence is believable, but whether, if believed by the jury, the evidence is sufficient.  Notably, nowhere in defendant's argument does he claim that the People failed to prove a specific element of the charge; nor does he claim that the evidence, if true, was legally insufficient.  Instead, defendant's core complaint is that, in his view, the testimony of both Detective Shulman and SA was not credible.

Defendant's claim is unavailing.  Indeed, SA's testimony established that on at least ten occasions, in Nassau County, defendant fondled her breasts and touched her vagina with his hands and with a vibrator.  Moreover, her testimony established that defendant did these acts by forcible compulsion in that he threatened

55

to cut off her finger if she resisted, and indeed showed her a knife and told her that he was serious. He also told SA to stop attempting to resist him, and to be quiet, when she tried to push him off of her, or when she tried to tell him to stop touching her. SA testified that defendant had initially begun to assert physical force on her during the incident in the Queens bathroom, when defendant forcibly pushed her legs open, and despite her physical attempts to push him off of her, he forced his mouth onto her vagina (SA: 417-18). She also testified that based on defendant's threats she was fearful that defendant might kill her (SA: 466-69, 470-71). SA's best friend, Christine Alioto, and her best friend's mother, Denise Alioto, testified that when SA ran from her home and disclosed the abuse to them, she was terrified, distraught, and in a state of panic (C.Alioto: 342; D.Alioto: 356). Moreover, the proof included defendant's written statement of admission, as well as his videotaped confession of the abuse (People's Exhibits 1, 11, 13). Finally, the knife defendant used to threaten SA was located in defendant's car (People's Exhibit 5; Alfaro: 581-82; SA: 485-86).

A review of this evidence, viewed in the light most favorable to the prosecution, could lead any rational trier of fact to conclude that the essential elements of the crime of sexual abuse in the first degree were clearly established and were sufficient to support defendant's conviction. Moreover, the testimony of Detective Shulman and SA was entirely reasonable and

56

credible and was consistent with, and corroborated by, the other evidence in the case. Therefore, defendant's claim that the evidence was legally insufficient should be rejected.

POINT FOUR

DEFENDANT'S SENTENCE IS ENTIRELY PROPER (answering defendant's brief, Point Four).

Defendant was the only father SA had ever known. She called him "dad." Yet, when she was fourteen years old, "dad" forced his mouth on her vagina and touched her breasts. And, when she tried to physically push him off of her, he forced himself on her, pushing her legs apart with his superior strength, even though she tried to close them, and forcing his mouth onto her vagina even though she used her hands in a desperate attempt to push him off of her. And thus, defendant's sexual abuse of SA began.

When SA turned sixteen, and defendant learned that she had a boyfriend at school, he sought to control her every move. He isolated her from this boy, and from her friends, by driving her to school every day and then picking her up at the end of the school day. On at least ten occasions after picking her up from school, he took her to a parking lot in Nassau County where he fondled her breasts, touched her vagina with his hands and a vibrator, and had her touch his penis.

Now, defendant claims that this conduct on his part warrants minimal punishment. Contrary to defendant's contention, this conduct more than justifies the sentence he was given.

Defendant argues that, because his pre-trial plea bargain offer involved no jail, he is being punished for exercising his constitutional right to go to trial. Defendant minimizes the extent of the plea bargain offer. The plea bargain offer was not made in a vacuum. Indeed, at the time the plea bargain offer was made, defendant had cases pending in both Nassau and Queens Counties based on his abuse of SA. In an effort to maximize judicial economy, the People offered defendant an opportunity to plead guilty to one count of the sexual abuse here in Nassau County, and then proceed to trial in Queens County on what was the bulk of the allegations concerning defendant's abuse of SA. Defendant rejected that offer (T292-93).

As for defendant's claim that he did not understand that he was rejecting an offer of probation, the record demonstrates that defendant was made very well aware of the fact that a probationary offer was on the table by the prosecutor, the court, and by his own attorney, all of whom indicated on the record the terms of the plea bargain and defendant's rejection of it. Indeed, the court specifically asked defendant on the record if he was rejecting the plea bargain offer, and defendant stated he was. Before asking defendant if he was rejecting the plea offer, the court painstakingly explained to defendant that if he did not

59

accept the plea bargain offer, the court would be free to sentence defendant as it saw fit after listening to all the evidence at trial. The court specifically advised defendant that he could potentially receive maximum, consecutive sentences, and defendant clearly stated that he understood that that was a possibility. Nonetheless, defendant stood fast in his rejection of the plea bargain offer (T292-96).

After trial, the court did what it said it would. It carefully considered all of the evidence in the case, as well as letters submitted on defendant's behalf, and determined that defendant's conduct warranted consecutive terms of imprisonment of five and seven years' on two of the fourteen counts of sexual abuse, and concurrent time on the remaining counts. Contrary to defendant's claim, this was not the maximum allowable sentence, as the court could have sentenced defendant consecutively on all fourteen counts of sexual abuse.

Defendant contends that this Court should be concerned with his rehabilitative needs, his devotion to his family, his inability to support them while incarcerated, and his family's welfare. Where, however, was defendant's concern for his daughter's welfare, with her present need to have to support herself at age nineteen, and with her devotion to, and love for,

60

defendant as she grew from a young child to a teen?  Defendant had no such concern.  His only concern was for himself, and his own needs and wants.  When considering the concerns defendant asks this Court to consider, this Court should also consider the concerns defendant had for his daughter.

Defendant, while now asserting that the sexual conduct was consensual, has nonetheless sat by as his entire family, including SA's two younger step-siblings who are defendant's biological children, and SA's own mother, defendant's wife, have disowned her and supported defendant (Sentencing Minutes: 16-18).  It is reprehensible that defendant would suggest that this Court, or any court, should give him leniency.  He deserves none.  His sentence was entirely appropriate.

61

C O N C L U S I O N

THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.

Dated:   Mineola, New York
         October 22, 2012

                                Respectfully submitted,

                                KATHLEEN M. RICE
                                District Attorney, Nassau County
                                Attorney for Respondent
                                262 Old Country Road
                                Mineola, New York 11501
                                (516) 571-3800

Tammy M. Smiley
Barbara Kornblau
   Assistant District Attorneys
      of Counsel

62

### CERTIFICATE OF COMPLIANCE WITH 22 NYCRR § 670.10.3 (f)

BARBARA KORNBLAU does hereby certify as follows: This brief was prepared by computer; the body of the brief is double-spaced and utilizes a monospaced typeface (Dark Courier) of 12-point size; the footnotes are single-spaced and utilize the same typeface and point size; and, according to the word count of the word processing system used (Word 2010), the brief contains 12,727 words, exclusive of the cover, table of contents, proof of service, and certificate of compliance.

Dated: Mineola, New York
       October 22, 2012

_____
BARBARA KORNBLAU