To be argued by
LEON H. TRACY
(15 minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
---------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK

     Respondent,

    -against-

HAROLD GOPAUL,

     Defendant-Appellant.
---------------------------------------x

        HEARD ON THE
        ORIGINAL RECORD

      Ind. No. 2415/08

     Docket No. 2009-07167

      Nassau County

## REPLY BRIEF FOR DEFENDANT-APPELLANT

     LEON H. TRACY
     Attorney for Appellant
     366 North Broadway, Suite 410-D9
     Jericho, N.Y. 11753
     (516) 942-4233

TABLE OF CONTENTS

Page

ARGUMENT

POINT ONE

THE STATEMENTS, VIDEOTAPE, AND PROPERTY SEIZED FROM THE
DEFENDANT SHOULD HAVE BEEN SUPPRESSED AS IT WAS
OBTAINED, UNDER DURESS, AS THE PRODUCT OF
CONSTITUTIONAL VIOLATIONS, AND BASED ON PATENTLY
TAILORED TESTIMONY.......................................3

POINT TWO

THE COURT ERRED DENYING THE DEFENDANT'S MOTION TO LIMIT
DIRECT AND CROSS-EXAMINATION BY THE PEOPLE TO CHARGES
IN NASSAU COUNTY, PERMITTING THE PEOPLE TO INTRODUCE
CHARGES OF THE DEFENDANT'S INDICTMENT IN QUEENS
COUNTY, THE COURT COMPOUNDING THE ERROR BY GRANTING THE
PEOPLE'S MOLINEUX APPLICATION, EFFECTIVELY DENYING THE
DEFENDANT THE RIGHT TO TESTIFY..........................17

POINT THREE

BASED AS IT WAS ON EVIDENCE THAT WAS INTRINSICALLY
INCREDIBLE AND UNRELIABLE, THE SEXUAL ABUSE VERDICT
WAS INSUFFICIENTLY SUPPORTED AND IN VIOLATION OF
THE DEFENDANT'S CONSTITUTIONAL RIGHTS TO BE
CONVICTED ONLY WHERE GUILT HAS BEEN
ESTABLISHED BEYOND A REASONABLE DOUBT..................24

POINT FOUR

THE SENTENCE IMPOSED ON THE DEFENDANT WAS UNDULY
HARSH AND EXCESSIVE AND SHOULD BE REDUCED IN THE
THE INTEREST OF JUSTICE................................32

CONCLUSION.............................................34

CERTIFICIATE OF COMPLIANCE

POINT ONE

THE STATEMENTS, VIDEOTAPE, AND PROPERTY SEIZED FROM THE DEFENDANT SHOULD HAVE BEEN SUPPRESSED AS IT WAS OBTAINED, UNDER DURESS, AS THE PRODUCT OF CONSTITUTIONAL VIOLATIONS, AND BASED ON PATENTLY TAILORED TESTIMONY.

The people have argued that the hearing court properly denied the defendant's motion, claiming the defendant was given his Miranda rights. It is also claimed by the people, that the defendant's statements were voluntary and the search of his home and vehicle was conducted subsequent to a knowing and voluntary consent.

The defendant staunchly maintains that the hearing court erred in its denial of his motion to suppress his statements, videotape, and the seizure of a mini cleaver, and two massagers. The defendant avers that the evidence was illegally obtained and based on patently tailored testimony.

The people claim the defendant's statements were lawfully obtained, indicating the credibility of the testifying officers be given deference, citing People v. Mateo 2 N.Y.3d 383, 417 (2004). It is contended by the defendant that the evidence was obtained unlawfully as it was involuntarily obtained.

The people make reference to examining the surrounding circumstances in order to establish voluntariness of the defendant's provision of a statement, videotape, and consent to the searches, citing People v. Mateo, supra. The defendant

acknowledges that it is expedient to review the encompassing circumstances. The defendant avers that such an examination underscores that the defendant's will was "overborne," his so-called "confession" and "consent" to searches coerced. See, Arizona v. Fulminante, 499 U.S. 279, 285 – 288 (1991); People v. Anderson, 42 N.Y.2d 35, 38 – 39 (1977).

The defendant was attacked by about 10 officers who physically abused him, pretending to search him at the 105th Precinct when he came to report his stepdaughter, the complainant missing. The defendant was thrown against a wall and across a counter, sustaining scratches, and bruises as the officers directed foul language and profanity at him to elicit a confession of sexual abuse.

Further, the defendant was brought to an eight by 10 interrogation room, labeled "the box," by a detective pushing him up the stairs in a manner that must be deemed as threatening. The defendant avows that he was grabbed by the collar, thrown against the wall, and pushed about. The videotape reveals that the defendant's collar was distended and in a condition that would support the defendant's contention about the detective handling him forcefully by the collar, in a threatening manner.

The forceful and threatening behavior of the police demonstrate "coercive police activity," a predicate to finding

4

that the defendant's so called "confession" and "consent" to searches were not obtained voluntarily, within the meaning of the Due Process Clause of the Fourteenth Amendment. See, Colorado v Connelly, 479 U.S. 157, 167 (1986). As such, the hearing court's determination, under the circumstances, should not have relied on the credibility of the testifying officers, entitling them to any deference.

The people have argued that the suppression court has the "peculiar advantages of having seen and heard the witnesses," much weight to be accorded to its determination, citing People v. Prochilo, 41 N.Y.2d 759, 761 (1977). However, the ultimate determination of a suppression court should  depend on a balancing of the legitimate interests of the defendant as opposed to the reasonableness and appropriateness of the police action. See, People v. Oden, 36 N.Y.2d 382, 385 (1975).

The people have argued the suppression court's determination that the defendant was properly advised of his Miranda rights and entitled to great deference on appeal, indicating that it will not be disturbed unless clearly unsupported by the record, citing People v. Baliukonis, 35 A.D.3d 626, 627 (2d Dept. 2006). Here, the defendant fervently contends that the record supports that he was not properly advised of his Miranda rights, clearly demonstrated by the record as such.

5

Thus, the decision of the suppression court should not be "entitled to great deference," as proscribed in People v. Baliukonis, supra; People v. Garafolo, 44 A.D.2d 86 (1974). The record reveals that the defendant remained in "the box," with the door secured from the outside. He was physically and mentally abused, being cowed to such an extent that it cannot be construed that he voluntarily waived his rights for custodial questioning.

Courts have determined the voluntariness of statements by examining the "totality of the circumstances" under which the statements were obtained. See, People v. Anderson, supra, People v. Mateo, supra;  People v. McLean, 59 A.D.3d 861, 863 (2009). Albeit a series of single circumstances may be considered insufficient to cause a confession  or a consent to be deemed involuntary, here, the combination of circumstances have a qualitative and a quantitative effect (emphasis supplied). See, People v. Leyra, 302 N.Y.353, 363 (1951).

The people maintain that the surrounding circumstances, including the duration and conditions of the defendant's custodial interrogation, the conduct and demeanor of the police toward the defendant, his age, and his mental state, should be reviewed as a gauge of voluntariness, making reference to People v. Green, 73 A.D.3d 805 (2d Dept. 2010); People v. Martin, 68 A.D.3d 1015, 1016 (2d Dept. 2009).

6

Here, using the Green and Martin criteria, it is apparent that the defendant's statements were involuntary. The interrogation of the defendant was conducted and recorded under the following circumstances: the defendant's physical and mental condition undermined by insufficient food, drink, and sleep; threats to the defendant of a 20 year sentence if he did not "confess;" persistent and unceasing questioning over a period of 15 hours; and offers of promises to release the defendant if he confessed.

The people argue that the period of 15 hours in which the defendant was under custodial interrogation is not supported by the record to mitigate the involuntariness of his statements and consents to search his home and truck, making reference to the custodial period as being reasonable, citing People v. Petronio, 34 A.D. 3d 602, 603 - 604 (2d Dept. 2006).

Although the people indicate the need to examine the "totality of the circumstances" is vital to determine involuntariness, they ignore the totality of circumstances which underscore the involuntariness of his so-called statements and consents to search. Even prior to being taken into custody, on entering the precinct, the defendant was manhandled and physically and verbally abused. The defendant was in custody for over 15 hours, most of the time in "the box," with only a single opportunity to use the restroom, with

7

nothing to eat, and with merely one bottle of water, after about 12 hours. The defendant was also deprived of sleep, from 2:30 A.M., June 24th 2008 until the following night, having worked a full day that started 6:00 A.M., before coming to the precinct.

In the instant case, the Court failed to consider the "totality of the circumstances" under which statements were obtained and the property recovered. See, Clewis v. Texas, 386 U.S.707, 708 (1967); Fikes v. Alabama, 352 U.S.191, 197 (1957).

In determining whether a defendant's will was overborne in a particular case, the Court assesses the totality of all the surrounding circumstances, both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the age of the accused, Haley v. Ohio, 332 U.S. 596 (1948); his lack of education, Payne v. Arkansas, 356 U.S. 560, (1958); his low intelligence, Fikes v. Alabama, 352 U.S. 191, (1957); the lack of any advice to the accused of his constitutional rights, Davis v. North Carolina, 384 U.S. 737 (1966); the length of detention, Chambers v. Florida, 309 U.S. 227 (1940); the repeated and prolonged nature of the questioning, Ashcraft v. Tennessee, 322 U.S. 143 (1944); and the use of physical punishment such as the deprivation of food or sleep, Reck v. Pate, 367 U.S. 433 (1961).

8

The test of voluntariness must consider the following: if the confession is the product of a free and unconstrained choice of the defendant; if his will has not been overborne; and if his capacity for self-determination has not been critically impaired. If these factors are positive, then the confession does not offend due process. Culombe v. Connecticut, 367 U.S. 568, 602 (1961).

The Court must determine the factual circumstances surrounding the confession, assess the psychological impact on the accused, and evaluate the legal significance of how the accused reacted. Culombe v. Connecticut, supra, at 603. Here, the factual circumstances of the defendant's "confession" are negative and certainly offend due process.

The testimonies of Detective Schulman and Police Office Alfaro, were patently tailored, apparently artificially altered to overcome the defendant's constitutional objections. The defendant stalwartly claims that he was physically and emotionally abused to  such an extent to force him to proffer a "confession" against his will, based on the sexual allegations that Schulman had garnered from the complainant.

The defendant further avers that he signed the "consent" to searches under duress. The defendant repeated requests for counsel were ignored, and he was so frightened that he submitted to Schulman's demands and manipulations despite being unwilling to do so.

9

The statement written by the defendant about the argument he had with his daughter and the statement of his so called "confession," dictated to him by Schulman, were forcibly obtained. It is clear that the statement was illegally obtained from the defendant as the product of constitutional violations,

The defendant steadfastly contends that he was not advised of his rights and under duress when he signed consent forms, agreeing to have his vehicle and his home searched. The property seized by the police, a mini cleaver and white massager from his truck and a white and gray massager from his home, was illegally recovered, warranting suppression.

The dispirited defendant suffered intimidation to such an extent that he submitted, under duress, to recording his so called "confession" of using force to sexually abusing his step-daughter on videotape. At the taping, Schulman's mere presence served as an ever-present reminder of his threat to have the demoralized defendant imprisoned for more than 20 years, if he insisted on a lawyer and refused to cooperate. Under the circumstance, the videotaped "confession" of the defendant cannot be deemed to have been obtained voluntarily.

In the instant matter, at the time that the appellant was in custodial interrogation, he was not properly administered his _Miranda_ warnings. Detective Schulman signed "yes" on the Miranda form for each of the inquiries, prior to the defendant

10

being given the form. Then the defendant was coerced into initialing the affirmative responses that had been written by the detective.

The Court of Appeals has held that the Court has the responsibility to satisfy itself, appropriate to the circumstances, that a waiver of a right to counsel is knowing and intelligent. See, People v. Allen, 39 N.Y.2d 916 (1976). The Court must conduct a searching inquiry to be reasonably assured that the defendant fully appreciated the "dangers and disadvantages" of giving up the fundamental right to representation by counsel. See, People v. White, 56 N.Y.2d 110, 117 (1982); People v. Sawyer, 57 N.Y.2d 12 (1982).

The testimony adduced at the hearing demonstrates the statements and videotape of the defendant's "confessions" and his "consent" to searches were obtained by coercive tactics and deprivations, indicative of the validity of defendant's claim of involuntariness. The defendant's waiver of his rights, under duress, cannot be deemed voluntary, as required to properly establish a waiver. See, People v. Marx, 305 A.D.2d 726, 727 - 728 (2003); People v. Burns, 281 A.D.2d 704, 704 - 705 (2001).

The defendant was questioned in an eight by 10 room referred to as "the box," possibly with the window covered, in every sense secluded. Further, he was interrogated, after being battered by officers on arrival at the precinct and

subsequently by his interrogator, having been subject to physical force and verbal threats and taunts, underscoring the fact that there were significant factors belying that the requirement of voluntariness was established. See, People v. Marx, supra; People v. Warren, 300 A.D.2d 692, 694 (2002); People v. Anderson, supra.

Courts are guided by the principle that the voluntariness of statements is determined by looking at the "totality of the circumstances" under which they were obtained. See, People v. Anderson, supra; People v. Mateo, 2 N.Y.3d 383, 413, 414 (2004); People v. McLean, 59 A.D.3d 861, 863 (2009).

A series of circumstances, each alone, may be insufficient to cause a confession or a consent to be deemed involuntary. Here, the combination of circumstances have a qualitative and a quantitative effect. See, People v Leyra, 302 N.Y.353, 363 (1951).

In the case at bar, the Court failed to consider the "totality of the circumstances" under which statements were obtained and the property recovered. See, Clewis v. Texas, 386 U.S.707, 708 (1967); Fikes v. Alabama, 352 U.S.191, 197 (1957).

The testimonies of Detective Schulman and Police Office Alfaro were patently tailored, appearing to be artificially tailored to overcome the defendant's constitutional objections.

The defendant maintains that he was physically and

emotionally abused to parrot a "confession," on Schulman's direction, based on the sexual allegations that Schulman had garnered from the complainant. The defendant further avers that he signed the "consent" to searches under duress. In fact, the defendant was so frightened he submitted to Schulman's demands like a puppet, having been denied his repeated requests for a lawyer.

Neither Schulman nor Alfaro, experienced officers, were responsive to inquiries about suspicious circumstances of their involvement: why Alfaro was called off patrol to become the arresting officer when the defendant had already been arrested by an "unknown officer;" about the state of the defendant's attire during their contact with him; and about any interaction he had with the other officers at the precinct. Indubitably, this was to shield the officers who took the defendant into custody from having physically abusing him. Significantly, Schulman's denial of the abuse of the defendant was not unequivocal.

Schulman's memo book was only produced after repeated demands and it curiously absent of Schulman having been the defendant's interrogator. Further, Schulman was not candid about how he came to be the interrogator, his tour of duty having ended. Schulman offered only vague responses to his involvement in the case the time frame of the defendant being

13

taken into custody and interrogated.

Alfaro's testimony did not give any cogent explanation as to: why she was called off patrol to be the arresting officer; whether Schulman accompanied her to the defendant's vehicle to recover the evidence; why, as the arresting officer, she sat outside the room during the videotaping; why Schulman was present at the videotaping, not her; and whether she observed the condition of the defendant's shirt. Her cross-examination was disingenuous, permeated with responses of a lack of recall and of having no knowledge, acknowledging inaccuracy in some responses when the accuracies were brought to her attention.

Courts have "refused to credit testimony which had all appearances of having been patently tailored to nullify constitutional objections." See, People v. Quinones, 61 A.D.2d 765 (1978); People v. Parmiter, 55 A.D.2d 938 (1977). In the case at bar, the officers' testimony, Schulman and Alfaro, should be rejected as a matter of law. Without this proffer, the people failed to establish that the defendant's guilt of having forced the complainant to his sexual advances. When the testimonies of officers are rejected as incredible as a matter of law, it is impossible to conclude that the events transpired in the manner asserted by those officers.

Clearly, the testimonies of the police were tailored to meet constitutional objections, and they should not be

14

credited. In People v. Miret-Gonzalez, 159 A.D.2d 647, 650
(1990), the Court determined that reversal is warranted where
the fact findings of the  Court were so plainly unjustified by
the evidence that the interests of justice necessitated their
nullification.

The people did not sustain their burden of establishing
the legality of the police conduct in recovering the mini-
cleaver and massagers, after having the defendant sign the
consent forms under duress. See, People v. Blinker, 80 A.D.3d
619 (2011); People v. Whitehurst, 25 N.Y.2d 389 391 (1969);
People v. Hernandez, 40 A.D.3d 777, 778 (2007); People v.
Thomas, 291 A.D.2d 462, 463 (2002); People v. Quinones, 61
A.D.2d 765 (1978).

"Generally, when the police have acted illegally, evidence
which `has been come at by exploitation of that illegality'
should be suppressed" (People v. Gethers, 86 N.Y.2d 159, 161 -
162 [1995], quoting Wong Sun v. United States, 371 U.S.471, 488
[1963]).  The Court of Appeals has reiterated the principle
that evidence revealed as a direct consequence of unlawful
police action is tainted and must be suppressed. See, People v.
Boodle, 47 N.Y. 2d 403 (1979).

The defendant recognizes that a hearing court decision,
given great deference on appeal, is not disturbed unless
clearly unsupported by the record. Here, the defendant avers

15

that the record demonstrates the obtained consents were the result of constitutional violations, and the court erred in not suppressing the physical evidence that was recovered unlawfully. See, People v. Blinker, supra; People v. Smith, 77 A.D.3d 980, 981 (2010); People v. Castro, 73 A.D.3d 800, 800 - 801 (2010); People v. Johnson, 79 A.D.3d 905 (2010).

The Court erred in the instant matter by denying suppression of the defendant's written and videotaped statements obtained and the property recovered from the search of the defendant's vehicle and of his home, obtained under coercive circumstances and based on patently tailored police testimony.

16

POINT TWO

THE COURT ERRED DENYING THE DEFENDANT'S MOTION TO LIMIT
DIRECT AND CROSS-EXAMINATION BY THE PEOPLE TO CHARGES
IN NASSAU COUNTY, PERMITTING THE PEOPLE TO INTRODUCE
CHARGES OF THE DEFENDANT'S INDICTMENT IN QUEENS
COUNTY, THE COURT COMPOUNDING THE ERROR BY GRANTING THE
PEOPLE'S MOLINEUX APPLICATION, EFFECTIVELY DENYING THE
DEFENDANT THE RIGHT TO TESTIFY.

The Court denied the defendant's motion regarding charges

the defendant was facing in Queens County for an order limiting

the use of the defendant's confessions the people intended to

use on direct and on cross-examinations, if the defendant

exercised his constitutional right to testify.

The defendant staunchly maintains that the Court erred in

granting the people's Molineux application to present charges

against the defendant in Queens County.

The Court denied the defendant's application to make

redactions from the defendant's written statements or the

videotaped statement, allowing the people to introduce them.

The Court stated in its ruling that the evidence was

admissible, being more probative than prejudicial.

The people's Molineux application to allow the people to

elicit testimony regarding the time and circumstance when the

defendant's relationship changed from being unforced to being

forced was granted by the Court. The people were granted the

right by the Court to elicit testimony about the time and

circumstance that the defendant indicated "he wanted to be the

17

one."

The Court justified its decision by stating that the allegations were intertwined with what occurred in Queens County and Nassau County, up until the defendant was arrested. The defense declared an exception to each and every aspect of the Court's ruling.

The Court's stance, regarding the defense counsel's due process argument that the people should be barred from eliciting testimony regarding the Queens County charged acts as it would be a violation against self-incrimination and due process, resulted in the defense having the jury charge altered.

In an effort to minimize the Court error regarding what was perceived by the defense to be a violation against self-incrimination of the defendant as well as the defendant's right to due process, the defense had the charge to the jury altered, deleting "in Nassau County" to "commit any crime."

According to the Court ruling, the people were not permitted to cross-examine the defendant, should he testify, regarding the pending Queens charges. The Court stated that unless the defendant "opened the door" to the Queens County matters, his Fifth Amendment rights would be protected.

The defense counsel argued that there was a reason that Molineux was restricted to uncharged crimes. If the Court

18

allowed testimony about the charged crimes in Queens, the defendant would have to make a difficult choice, where there was only one option offered. Here, if the defendant testified, about the charges in Queens, then he would be incriminating himself in Queens. If he did not testify, then the Queens charges would go unrefuted to the jury.

It was further claimed by the defense counsel that the defendant's right to be protected against self-incrimination outweighed the people's showing of propensity evidence that could not be cured by limiting instructions of the Court. As there were charges of force in Nassau County, and the defendant was charged with violent and statutory crimes in Queens, the defendant would be denied his opportunity to testify if the Queens evidence were presented.

It is fervently contended by the defendant that the Court ruling erred in allowing the people to cross-examine the defendant, if he testified in his own defense, regarding the Queens criminal charges that were pending against him. The Court's pre-trial ruling permitting cross-examination on other pending Queens County charges requires reversal of defendant's conviction and a new trial. See, People v. Bennett 79 N.Y.2d 464, 468 (1992); People v. Betts, 70 N.Y.2d 289 (1987).

In case at bar, the Court's ruling effectively precluded the defendant from testifying on his own behalf as the people

would have been unfairly permitted to cross-examine him about charges in Queens County which had enormous prejudicial potential. This ruling denied the defendant a fair trial.

The defendant avers that the Court's ruling created prejudice so severe that he was convicted by virtue of propensity evidence and his rights against self-incrimination were violated. It figuratively placed him on the horns of a dilemma, between Scylla and Charybdis, "a rock and a hard place."

The defendant's could testify, as was his right, risking being forced to testify about Queens charges on which he was not as yet tried, "opening the door," or he could remain silent, not controverting the Queens charges to the jury, acquiescing to his guilt by tacitly agreeing to the charges and keeping silent.

The Court compounded its error, denying the defendant's motion, by granting the people's Molineux application which allowed the people to present evidence of the Queens "charged crimes," unfairly demonstrating propensity of the defendant.

Basically, ruling in Molineux is that the state cannot prove against a defendant any crime not alleged in the indictment, either as a foundation for a separate punishment, or as aiding the proofs that he is guilty of the crime charged. Here, the Court violated the right of the defendant to the

20

presumption of innocence by allowing the people to present evidence of the Queens charges against the defendant, which in effect demonstrated propensity.

The Court of Appeals determined that a defendant should not be forced to testify about a crime with which he has been charged, but not tried. See, People v. Rojas, 97 N.Y.2d 32 (2001). Here, as determined in Rojas, "The people cannot do indirectly what they cannot do directly." In the instant matter, the defendant maintains that as the people should not have the right to cross-examine him about another pending indictment, as they cannot offer evidence of that indictment in their direct case.

The Court attempted to justify the granting of the people's Molineux application by making reference to People v. Leeson, 12 N.Y.3d 823 (2009). The Court stated that in cases involving sexual misconduct, relating to the same complainant and the same defendant, the prior bad acts will be admissible, on the people's direct case, if the evidence is used for material issues, not used for propensity purposes. The people have argued that the Lesson case is similar to the case at bar.

The defendant maintains that in Leeson, unlike the case at bar, the admission of evidence was of uncharged crimes, and here, the people were granted their motion to admit evidence of the charged crimes in Queens (emphasis added). This clearly

21

underscored a criminal propensity of the defendant who was unable to testify without addressing the Queens charges or leaving them uncontroverted, being denied his due process rights and rights against self-incrimination.

The people argued in their Respondent's Brief(42) and also at the proceedings that under Molineux they were entitled to use evidence that included the Queens County charges to prove motive, intent, lack of mistake or accident, identity, or common scheme or plan, citing People v. Alvino 71 N.Y.2d 232 242 (1987) at the proceedings. However, evidence that would demonstrate a defendant's criminal propensity bars admission to a defendant's prior bad acts. See, People v. Lewis, 69 N.Y. 2d 321 (1987).

The people have argued that, "Evidence of a defendant's prior bad acts may be admissible when it is relevant to a material issue in the case other than a defendant's propensity...Where there is a proper nonpropensity purpose, the decision whether to admit such evidence rests upon the trial court's discretionary balancing of probative value and unfair prejudice," citing People v. Dorm, 2 N.Y.3d 16 (2009).

The defendant recognizes the admissibility of a defendant's prior bad acts relevant to a material issue in the case other than defendant's criminal propensity. See, People v. Lewis, 69 N.Y.2d 321 (1987); People v. Beam,57 N.Y.2d 241

22

(1982); <u>People v. Allweiss</u>, 48 N.Y.2d 40 (1979); <u>People v.</u> <u>Carmack</u>, 44 N.Y.2d 706 (1978).

However, it is stalwartly contended by that the defendant that the admission of the evidence, of the charged sexual crimes with the same victim, in Queens County, demonstrated a propensity of the defendant despite the Court claiming the people's <u>Molineux</u> application was granted for nonpropensity purposes. The Court abused its discretion by admitting evidence that was more prejudicial than probative, creating unfair prejudice to the defendant. <u>See</u>, <u>People v. Dorm</u>, <u>supra</u>.

The defendant maintains that the Court abused its discretion when it allowed evidence that must be deemed demonstrative of propensity, even if limiting instructions are given. The Court erred in denying the defendant's motion and granting the people's <u>Molineux</u> application, which in effect denied the defendant  his constitutional right to testify.

23

POINT THREE

BASED AS IT WAS ON EVIDENCE THAT WAS INTRINSICALLY INCREDIBLE AND UNRELIABLE, THE SEXUAL ABUSE VERDICT WAS INSUFFICIENTLY SUPPORTED AND IN VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL RIGHTS TO BE CONVICTED ONLY WHERE GUILT HAS BEEN ESTABLISHED BEYOND A REASONABLE DOUBT.

The people contend that the evidence was legally sufficient to establish the defendant guilty of sexual abuse in the first degree, arguing that the claim is unpreserved and meritless, not providing a basis on which this Court should review the sufficiency of the evidence.

At the conclusion of the case, the defense counsel made a motion to dismiss the indictment on the grounds that the people failed to prove a prima facie case, not proving their case beyond a reasonable doubt. See, People v. Thomas, 36 N.Y. 2d 29 (1974). The motion was denied by the Court.

In order to preserve a defendant's claim of an insufficient verdict, it is expedient for a defense counsel to make a motion and offer specific argument at the conclusion of the people's case. See, People v. Bynum, 70 N.Y. 2d 858, 859 (1987); People v. Johnson, 185 A.D. 2d 247 (2d Dept. 1992); People v. Asaro, 182 A.D. 2d 823 (2d Dept. 1992).

A trial counsel's motion and advocacy must be specific enough to preserve a defendant's right for appellate review as defined by the Courts. See, People v. Logan, 74 N.Y. 2d 859 (1990); People v. Gomez, 67 N.Y. 2d 843 (1986); People v.

24

Dekle, 56 N.Y. 2d 835 (1982); and People v. Cardona, 136 A.D. 2d 550 (2d Dept. 1988).

If it is deemed that the defense counsel, in the instant matter, failed to present specific argument to preserve the defendant's claim of an insufficiently supported verdict to prove his guilt, as his motion and argument failed to specify any such claim, the defendant is requesting this Court's review of such a claim. The defendant-appellant is entitled to obtain this Court's review of such a claim if the Court exercises its interest of justice jurisdiction as defined in C.P.L. §470.15 (6).

Although the people maintain that the defendant's claims of legal insufficiency are unpreserved for appellate review as the counsel failed to make this argument with specificity at the trial court, the defendant has respectfully asked the Court to exercise its interest of justice jurisdiction as defined in C.P.L. §470.15 (6).

A defendant can be protected from his counsel's deficiencies in failing to adequately preserve an argument in the interest of justice. C.P.L. §470.15 (6) delineates, "That the kinds of determinations of reversal or modifications deemed to be made as a matter of discretion in the interest of justice include, but are not limited to the following:

(a) That an error or defect occurring at a trial resulting

25

in a judgment, which error or defect was not duly protested at trial as prescribed in subdivision two of section 470.5 so as to present a question of law deprived the defendant of a fair trial..."

The defendant staunchly maintains that the evidence adduced at trial was insufficiently supported, as well as being incredible and unreliable, the people failed to prove the charges of sexual abuse, and to sustain their burden of proving the defendant's guilt of sexual abuse beyond a reasonable doubt. See, U.S. Const., Amend. XIV; N.Y. Const., Art. I, Sec. 6; Jackson v. Virginia, 443 U.S.307, 310 (1979). A review of the evidence supports that the defendant is not guilty of sexual abuse.

Detective Schulman concealed the identity of the officer who arrested the defendant, calling in Police Officer Alfaro from patrol, to be the arresting officer. This was to shield the arresting officer from scrutiny for the physical and verbal abuse sustained by the defendant when he was taken into custody. Neither Schulman nor Alfaro were forthright about their involvement and their recollection about the events. Their lack of candor and responsiveness renders their proffers less than credible and or reliable.

Although Schulman and Alfaro deny that the defendant was disheveled in appearance, his shirt in a condition that would

support that he was physically abused, the videotape demonstrates that was no doubt the case. On the defendant's entrance into the precinct, he was manhandled by the desk sergeant and other officers, albeit the name of the arresting officer is curiously absent from the police reports.

Clearly, Schulman, whose duties as an enhancing officer to extract confessions, placed the defendant in a confined space, a room about eight by 10, probably with the window covered, according to the detective's equivocal statement in that regard. This was to create a restrictive and dismal condition in which to coerce the defendant into providing statements of confessions. Trial counsel labeled this detective a "hatchet man" as he is supposed to employ a forceful and threatening approach to obtain a "confession."

Although Schulman claimed he never revealed the specifics of the complainant's allegations to the defendant, it is significant to note that the "confession," the defendant allegedly made, indicated the incidents occurred at 400 Community Drive, the location of the defendant's customer. The complainant was mistaken in the location.

The actual location, where the defendant's customer was located, according to Detective Moran, was 600 Community Drive. It is highly unlikely the defendant erroneously provided that information in his so-called "confession," having worked for

27

the customer routinely. The "confession" was no doubt written or dictated by Schulman, based on erroneous information he obtained from the complainant, not drafted or written by the defendant.

The complainant testified that the knife with which the complainant was allegedly threatened, during May and June 2008, was always in the vehicle. It is not unlikely that the defendant had a knife in his truck for practical, non-threatening purposes. Albeit the defendant's behavior was reprehensible, he had not sexually abused the complainant, his stepdaughter, under the threat of a knife.

The people attempted to present a picture of the complainant existing in a terrifying environment since 2005, allegedly when the first incident occurred. However, the facts belie that. Her achievements at school got increasingly better. She become an excellent student, certainly not demonstrating that she was not functioning, being in a state of fear.

The complainant had a boyfriend since April 2008, and she maintained that relationship, despite the defendant and her mother being unhappy about her boyfriend, not wanting her to date, merely focusing on school. She spent time with the boy without their knowledge, claiming she had not actually been out on dates with him, displaying that she could be devious and independent.

She readily admitted to enjoying her father driving her to and from school, and she overtly expressed loving her father, this being the case substantiated by the testimony of her best friend, Christine. In fact, her poem about going to work nights with the defendant, sleeping on the back seat of the truck, revealed her positive relationship with the defendant as being one of trust and no concern. She expressed that "her thoughts vacation to a place without worry."

It is also evident from the videos and pictures the complainant took with the defendant and the family and of the defendant with the family, doing Trinidadian dancing and engaging in other activities, that she had positive feelings for him and the family unit. She even photographed the defendant in his Ecolab uniform, making it part of a Father's Day card presented to him. She referred to having taken the pictures and videos as part of "family memories." Clearly, the complainant had a desire to preserve them as part of her positive feelings for the defendant and the rest of the family.

Although the consensual relationship with the defendant had been tenable over the years, such as it was, the defendant telling her that he wanted to actually have sex with her, brought her to the realization that she had to escape. Up until that time, the complainant had confided in no one about being unhappy in her relationship with her father, however sordid.

29

The complainant's claim about not crying out about the situation were not fear of the defendant, but fear of no support for the family if there was a divorce. Her claims about being forced were contrived, an excuse for her having accepted the defendant's overtures. She had not been forced, readily participating in the sexual relationship with the defendant.

The people have argued that the standard for reviewing the legal sufficiency of evidence in a criminal case is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" citing, People v. Contes, 60 N.Y.2d 620, 621 (1983).

Applying this standard, it can be said that the only rational inference that can be drawn is that there was no forcible compulsion in terms of sexual actions between the defendant and the step-daughter, the relationship consensual, albeit distasteful. As such, the verdict was insufficient to support the defendant's conviction.

The people have not presented evidence which provides the required confidence that the appellant's guilt of sexual abuse has been established beyond a reasonable doubt. See, People v. Crudup, 100 A.D.2d 938, 939 (2d Dept. 1984); People v. Kidd, 76 A.D.2d 665, 668 (1st Dept. 1980); People v. McIntyre, 71 A.D.2d 956, 961 (2d Dept. 1979).

30

Proof beyond a reasonable doubt cannot rest on a free floating inference supplied by proof which is merely suggestive and which lacks the definitiveness and form necessary to extinguish the real, latent doubt which lingers in this case. See, People v. Irwin, 43 N.Y. 2d 704 (1977).

C.P.L. Section 70.20 provides that no conviction of an offense by verdict is valid unless based upon trial evidence which is legally sufficient and which establishes beyond a reasonable doubt every element of such offense and the defendant's commission thereof.

The people's case rested mainly on evidence that was incredible and unreliable, insufficiently supporting the verdict. The people clearly failed to demonstrate that the defendant was guilty of sexual abuse.

Despite the people's description of the defendant forcibly subjecting his step-daughter to sexual abuse, the defendant maintains his innocence of compelling her to participate in a sexual relationship. The defendant's relationship with her was reprehensible, but her claims about being subjected to sexual abuse were contrived as she readily participated in the sexual relationship with the defendant.

POINT FOUR

THE SENTENCE IMPOSED ON THE DEFENDANT WAS UNDULY
HARSH AND EXCESSIVE AND SHOULD BE REDUCED IN
THE INTEREST OF JUSTICE.

Despite the people's description of the defendant forcibly subjecting his step-daughter to sexual abuse, the defendant maintains his innocence of compelling her to participate in a sexual relationship. The defendant's relationship with her was reprehensible, but her claims about being forcibly subjected to sexual abuse were contrived, an excuse for her having accepted the defendant's overtures. She had not been forced, readily participating in the sexual relationship with the defendant.

The sentence the defendant received, albeit within the statutory limits, is unduly harsh and excessive. The defendant had been given a plea offer with no incarceration, in full satisfaction of the indictment, conditioned on probation and the waiver of his right to appeal his plea and sentence, as well as an Order of Protection on behalf of the complainant.

The sentences he received, after going to trial, are totally disproportional in light of the plea offer. Clearly, he is being excessively punished by exercising his constitutional right to trial by jury with what can be labeled a draconian sentences. A reduction of sentence is sought in the interest of justice.

32

It is abundantly clear that the Appellate Division may review a sentence imposed in a criminal case, and on considering the relevant facts and circumstances, it can determine, in the exercise of its discretion, that the sentence was unduly harsh and severe, reducing the sentence. See, People v. Coleman, 30 N.Y.2d 582 (1973) and People v. Zuckerman, 5 N.Y.2d 401 (1959).

Letters were submitted to the Court from his two children, expressing how much they missed their father, requesting mercy from the Court. There were also innumerable other letters attesting to the defendant's character and indicating that he had gone out of his way to do things for the community, that they trusted their children with him, and that they trusted him to accomplish things which they were unable to accomplish.

In the realistic panoply of the penal law spectrum, the appellant's sentence was unusually harsh and excessive, especially in light of the plea offer of probation and no incarceration. There should be a real focus on rehabilitation, not retribution.

The defendant-appellant denied his guilt in the matter. Although there were several counts, they were part of a single group of acts, a continuance of certain conduct to which the defendant maintains his innocence. The statements and

33

videotape of so called "confessions," obtained from the defendant, were as a result of coercion and constitutional violations.

According to the C.P.L. 440.20 (1), "At any time after the entry of a judgment, the Court in which the judgment was entered may, upon motion of the defendant, set aside the sentence upon the ground that it was unauthorized, illegally imposed, or otherwise invalid as a matter of law." Here, the sentences imposed on the defendant, according to the facts and record of the case, were unduly harsh and excessive. In the interest of justice, the defendant should receive leniency.

The sentence should be modified by this Court pursuant to C.P.L. Sec. 470.15 (2) (c).

CONCLUSION

FOR ALL THE FOREGOING REASONS, THE JUDGMENT OF CONVICTION SHOULD BE REVERSED AND THE INDICTMENT DISMISSED, OR THE CONVICTION REVERSED AND THE CASE REMANDED FOR A NEW TRIAL, OR THE SENTENCE REDUCED.

Respectfully submitted,

Leon H. Tracy
Attorney for Appellant
366 North Broadway, Suite 410-D9
Jericho, New York 11753
(516) 942 - 4233

Dated: November 2012

34

CERTIFICATE OF COMPLIANCE WITH 22 NYCRR SEC. 670.10.3(f)

LEON H. TRACY does hereby certify as follows: This appeal brief was prepared by computer, on behalf of Harold Gopaul, the body of the brief is double-spaced and utilizes a monospaced typeface (Courier New) of 12-point size; the footnotes are single-spaced and utilize the same typeface and point size; and, according to the word count of the word processing system used, the brief contains 6,818 words, exclusive of any pages containing the table of contents, table of citations, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc.


Dated: Jericho, New York
       November 2012

                                          LEON H. TRACY
                                          18 B ATTORNEY