**LEON H. TRACY**
*Attorney at Law*
366 North Broadway, Suite 410-D9
Jericho, New York 11753
Telephone: (516) 942-4233
Fax: (516) 935-2011

January 9, 2014

Tammy Smiley, Bureau Chief
Barbara Kornblau, ADA
Office of Appeals
262 Old Country Road
Mineola, New York 11501

Re: People v. Harold Gopaul, Nassau County
      Ind. No. 2415/08, Docket No. 2009-07167

Dear Ms. Smiley & Ms. Kornblau:

Enclosed is a copy of a request for leave to appeal to the Court of Appeals in the above

referenced case.

Yours very truly,

Leon H. Tracy

LHT: rsf

**LEON H. TRACY**
*Attorney at Law*
366 North Broadway, Suite 410-D9
Jericho, New York 11753
Telephone: (516) 942-4233
Fax: (516) 935-2011

January 9, 2014

Hon. Judith S. Kaye
N.Y.S. Court of Appeals
20 Eagle Street
Albany, New York 12207

Re: People v. Harold Gopaul, Nassau County
    Ind. No. 2415/08, Docket No. 2009-07167

Dear Judge Kaye:

The defendant is making an application for leave to appeal to
the Court of Appeals as he contends that the issues below
merits review of his case.

THE STATEMENTS, VIDEOTAPE, AND PROPERTY SEIZED FROM THE
DEFENDANT SHOULD HAVE BEEN SUPPRESSED AS IT WAS
OBTAINED, UNDER DURESS, AS THE PRODUCT OF
CONSTITUTIONAL VIOLATIONS, AND BASED ON PATENTLY
TAILORED TESTIMONY.

The defendant moved to suppress the statements,
videotape, and the seizure of the evidence --a mini cleaver,
and two massagers, and a Huntley/Mapp Hearing was held. The
defendant contends that the Court erred in denying the motion
as the evidence was illegally obtained and based on patently
tailored testimony.

1

The defendant maintains his contention that the County Court improperly denied the branches of his omnibus motion to suppress his statements to law enforcement officials as well as specified physical evidence as a result of constitutional violations.

It is recognized by the defendant, based on innumerable case law decisions, that the credibility determinations of a hearing court are granted great deference on appeal, not to be disturbed *unless* unsupported by the record (emphasis supplied). See, People v. Tandle, 71 A.D.3rd 1176, 1178 (2010); People v. Baliukonis, 35 A.D.3d 626, 627 (2006); People v. Martinez, 58 A.D.3d 870, 870 (2009); People v. Jackson, 65 A.D.3d 1164, 1165; People v. Rivera, 59 A.D.3d 467 (2009).

Here, the County Court's determinations are clearly not supported by the record as the defendant's written and videotaped statements were obtained by coercion, the product of constitutional violations.

Contrary to the people's claims, the defendant avers that he did not voluntarily, knowingly, and intelligently waive his constitutional rights as required for the statements to be taken. See, People v. McCray, 33 A.D.3d 817, 818 (2006); People v. Robinson, 5 A.D.3d 508 (2004); People v. Leftenant, 22 A.D.3d 603 (2005).

The people have argued the suppression court's

2

determination that the defendant was properly advised of his Miranda rights and entitled to great deference on appeal, indicating that the determination should not be disturbed unless clearly unsupported by the record, citing People v. Baliukonis at 627. The defendant staunchly contends that the record clearly demonstrates that he was not properly advised of his Miranda rights.

The people claim the defendant's statements were lawfully obtained, indicating the credibility of the testifying officers be given deference citing People v. Mateo, 2 N.Y.3d 383, 417 (2004). The defendant maintains that the evidence was not obtained voluntarily from the defendant and the proffers of Detective Schulman and Police Officer Alfaro were patently tailored. Under the circumstances, the hearing court's determination, should not have relied on the credibility of the testifying officers and entitled them to any deference.

The people make reference to examining the surrounding circumstances in order to establish voluntariness of the defendant's provision of a statement, videotape, and consent to the searches pursuant to People v. Mateo, supra. Acknowledging that it is expedient to review the encompassing circumstances, the defendant concurs.

However, the defendant avers that such an examination underscores that his will was "overborne," his so-called

3

"confession" and "consent" to searches coerced. See, Arizona v. Fulminante, 499 U.S. 279, 285 - 288 (1991); People v. Anderson, 42 N.Y.2d 35, 38 - 39 (1977).

The defendant came to the 105th Precinct to report his stepdaughter missing, not being aware that she was present making allegations against him for sexual abuse. Subsequent to the defendant identifying himself, he was attacked by officers who abused and manhandled him in the guise of searching him. No doubt, the officers, rushing to judgment, believed the step-daughter's claims. The defendant suffered scratches and bruises as the officers directed foul language and profanity at him to intimidate him.

Detective Schulman, none too gently, brought the defendant to an eight by 10 interrogation room, referred to as "the box," and the defendant was grabbed by the collar and thrown about. The videotape reveals that the defendant's collar is distended and in such a condition that would support the defendant's claims about the detective handling him forcefully by the collar.

The defendant's repeated requests to obtain an attorney and to call his wife to engage counsel were denied by Schulman. The defendant was subjected to the detective's threats to have him incarcerated for more than 20 years if he did not confess to sexual abuse of his step-daughter.

4

A confession is "involuntarily made" when it is obtained by a public servant engaged in law enforcement activity by means of any promise or statement of fact which creates a substantial risk that the defendant might falsely incriminate himself pursuant to C.P.L. §60.45 (2) (b) (i). Schulman's threat of a 20 year sentence was one of the means used to coerce the defendant into a so-called "confession."

The defendant was in custody for over 15 hours, mainly in "the box," with only a single opportunity to use the restroom, with nothing to eat, and with merely a bottle of water, after about 12 hours. The defendant was also deprived of sleep, from 2:30 A.M., June 24, 2008 until the following night, having worked a full day that started 6:00 A.M., before coming to the precinct.

Astoundingly, Schulman testified that the defendant never requested an opportunity to make any calls and never requested an attorney. It defies logic to believe that the defendant would not have asked to call his wife to notify her of his whereabouts and would not have asked to call an attorney over the extended period of his custody.

The defendant staunchly maintains that he made repeated requests for a lawyer, but his pleas went unheeded. As the defendant had a limited criminal history, he obviously was unaware that it was his constitutional right to have an

5

attorney appointed for him if he so desired.

Although the defendant remained in "the box," with the door secured from the outside, he was not restrained in any way to prevent him from inflicting harm on himself or attempting to escape. As subjects in custody, left alone in interrogation rooms, are customarily restrained in some way, it is apparent that the officers believed, that they had succeeded in sufficiently frightening the defendant by physical and mental abuse, not to take any untoward action.

The defendant was physically and mentally abused from the time he identified himself on arrival at the precinct. He was cowed to such an extent that he initialed the Miranda form on which the detective had already written "yes" to each of the inquiries, prior to being given the form. The defendant was coerced into initialing the affirmative responses that had been written by the detective. Under the circumstances, the defendant did not voluntarily waive his rights for custodial questioning.

The statement written by the defendant, about the argument he had with his daughter and the statement of his so called "confession," dictated to him by Schulman, were forced out of him. Clearly, these statements were illegally obtained from the defendant, in violation of his constitutional rights.

Thus, the decision of the suppression court should not be

6

"entitled to great deference," as proscribed in People v. Baliukonis supra; People v. Garafolo, 44 A.D.2d 86 (1974). The record reveals that the defendant remained in custody for the door secured from the outside. He was physically and mentally abused, being demoralized to such an extent that it cannot be construed that he voluntarily waived his rights for custodial questioning.

The Court's obligation to weigh the evidence and determine whether the jury was justified in its conclusion, beyond a reasonable doubt, "extends to the hearing court's finding as to the voluntariness of the confessions." See, People v. Carbonaro, 21 N.Y.2d 271, 274 (1967). These findings must be reviewed "by the same standards applicable to a verdict of guilt," quoting People v. Leonti, 18 N.Y.2d 384, 389 (1966).

The forceful and threatening behavior of the police demonstrate "coercive police activity," a predicate to finding that the defendant's so called "confession" and "consent" to searches were not obtained voluntarily, within the meaning of the Due Process Clause of the Fourteenth Amendment. See, Colorado v Connelly, 479 U.S. 157, 167 (1986).

The browbeaten defendant suffered intimidation to such a degree that he submitted to recording his so-called "confession" on videotape for the Office of the District Attorney. The detective's mere presence was an ever-present

7

reminder of his threat to incarcerate the defendant for more than 20 years if the defendant insisted on a lawyer and refused to cooperate by confessing to having used force to sexually abuse the complainant.

When the people inquired, during the defendant's cross-examination at the hearing, why at the videotaping he did not lodge any protest at the videotaping, call for an attorney, or report the physical and emotional abuse he suffered of attacks on his person as well as the verbal threats, he replied that he had been frightened.

Under the circumstances, it is no wonder that he was so frightened by the experience that he agreed to the videotaping. The defendant's requests for an attorney "fell on deaf ears." Moreover, Schulman threatened the defendant that having an attorney would result in going back to square one and not being released. Thus, the so-called videotaped "confession" of the defendant, under duress, cannot be deemed to have been obtained voluntarily.

The Supreme Court has affirmed the proposition that the state bears the burden of establishing a valid waiver of the right to counsel. See, Michigan v. Jackson, 475 U.S. 625, 106 S. Ct. 1404 (1986); See also, Kimmelman v. Morrison, 477 U.S. 306, 106 S. Ct. 2574 (1986); and the seminal case, Johnson v. Zerbst, 304 U.S. 458 (1938).

8

The Court of Appeals has held that the Court has the responsibility to satisfy itself, appropriate to the circumstances, that a waiver of a right to counsel is knowing and intelligent. See, People v. Allen, 39 N.Y.2d 916 (1976).

The Court must conduct a searching inquiry to be reasonably assured that the defendant fully appreciated the "dangers and disadvantages" of giving up the fundamental right to representation by counsel. See, People v. White, 56 N.Y.2d 110, 117 (1982); People v. Sawyer, 57 N.Y.2d 12 (1982).

The defendant maintains his statements to the police were improperly admitted into evidence. His inculpatory statements to law enforcement, under extreme duress, were not made after an intelligent, knowing, and voluntary waiver of his Miranda rights. See, Miranda v. Arizona, 384 U.S. 436 (1966). Those statements should have been suppressed as the product of coercion. See, People v. Liles, 243 A.D.2d 729, 730 (1997); Lyles v. New York, 525 U.S. 857 (1998).

The defendant steadfastly contends that he was not advised of his rights and under duress when he signed consent forms, agreeing to have his vehicle and his home searched. As such, the property seized by Police Officer Celica Alfaro, to wit: a mini cleaver and white massager from his truck; and a white and gray massager from his home was illegally recovered and should have been suppressed.

9

In the case at bar, there was a protracted delay of more than 15 hours of custodial interrogation, under duress, to extract the so called "confessions" and so called "consent" to searches of his vehicle and of his home. The defendant was subjected to physical and emotional trauma when he was taken into custody and interrogated.

The defendant went to the hospital when he was released on bail, and photographs were introduced at the hearing of his injuries. Albeit the defendant acknowledges he suffered no permanent injury, he was battered and bruised physically as well as emotionally.

The testimony adduced at the hearing demonstrates the statements and videotape of the defendant's "confessions" and his "consent" to searches were obtained by coercive tactics and deprivations, indicative of the validity of defendant's claim of involuntariness. The defendant's waiver of his rights, under duress, cannot be deemed voluntary, as required to properly establish a waiver. See, People v. Marx, 305 A.D.2d 726, 727 - 728

The defendant was interrogated, after being battered by officers on arrival at the precinct and subsequently by his interrogator, having been subject to physical force, verbal threats, and taunts, underscoring the fact that there were significant factors, belying that the requirement of

10

voluntariness was established. See, People v. Marx, supra; People v. Warren, 300 A.D.2d 692, 694 (2002); People v. Anderson at 35.

Courts are guided by the principle that the voluntariness of statements is determined by looking at the "totality of the circumstances" under which they were obtained. The due process test must take into consideration the totality of all the surrounding circumstances, the characteristics of the accused and the details of the interrogation. See, People v. Anderson at 38; People v. Mateo, supra; People v. McLean, 59 A.D.3d 861, 863 (2009).

In the case at bar, the Court failed to consider the "totality of the circumstances" under which statements were obtained and the property recovered. See, Clewis v. Texas, 386 U.S. 707, 708 (1967); Fikes v. Alabama, 352 U.S. 191, 197 (1957). Dickerson v. United States, 530 U.S. 428, 434 (2000).

A series of circumstances, each alone, may be insufficient to cause a confession or a consent to be deemed involuntary. Here, the combination of circumstances have a qualitative and a quantitative effect. See, People v Leyra, 302 N.Y.353, 363 (1951).

The defendant maintains that he was physically and emotionally abused to parrot a "confession," on Schulman's direction, based on the sexual allegations that Schulman had

11

garnered from the complainant. Further, the physical evidence was obtained as the result of an involuntary consent of the defendant, under coercion. The defendant avers that he signed the "consent" to searches under duress. In fact, the defendant was so frightened he submitted to Schulman's demands like a puppet, having been denied his repeated requests for a lawyer.

The testimonies of Detective Schulman and Police Office Alfaro, were patently tailored, appearing to be artificially tailored to overcome the defendant's constitutional objections.

Neither Schulman nor Alfaro, experienced officers, were responsive to inquiries: about why Alfaro was called off patrol to become the arresting officer when the defendant had already been arrested by an "unknown officer" on entering the precinct; about the state of the defendant's attire during their contact with him; and about any interaction he had with the other officers at the precinct. Indubitably, this was to shield the officers, who took the defendant into custody, from the responsibility of physically abusing him. It should be noted that Schulman's denial of the abuse of the defendant was not unequivocal.

Schulman's memo book, which he finally produced after a myriad of counsel demands, was significantly absent of the fact that he was the defendant's interrogator. Further, Schulman was obviously not forthright about how he came to be the

12

interrogator as his tour of duty had ended. Suspiciously, Schulman provided only deliberately vague responses to the time frame of the defendant being taken into custody and interrogated and his involvement in the case.

The "confessions" Schulman obtained were the product of Miranda and other constitutional violations to which he subjected the defendant for over 15 hours, including manhandling him and shoving him, the defendant's shirt in disarray from being abused.

Alfaro's testimony did not give any cogent explanation as to: why she was called off patrol to be the arresting officer; whether Schulman accompanied her to the defendant's vehicle to recover the evidence; why, as the arresting officer, she sat outside the room during the videotaping; why Schulman was present at the videotaping, not she; and whether she observed the condition of the defendant's shirt. Her cross-examination was disingenuous, permeated with responses of a lack of recall and of having no knowledge, merely acknowledging inaccuracy in some responses when the accuracies were brought to her attention.

Courts have "refused to credit testimony which had all appearances of having been patently tailored to nullify constitutional objections." See, People v. Quinones, 61 A.D.2d 765 (1978); People v. Parmiter, 55 A.D.2d 938 (1977).

13

In the case at bar, the officers' testimony, Schulman and Alfaro, should be rejected as a matter of law. Without this proffer, the people failed to establish that the defendant's guilt of having forced the complainant to his sexual advances. When the testimonies of officers are rejected as incredible as a matter of law, it is impossible to conclude that the events transpired in the manner asserted by those officers.

Obviously, the testimonies of the police were tailored to meet constitutional objections, and they should not be credited. In People v. Miret-Gonzalez, 159 A.D.2d 647, 650 (1990), the Court determined that reversal is warranted where the fact findings of the Court were so plainly unjustified by the evidence that the interests of justice necessitated their nullification.

The Court in evaluating testimony should not discard common sense and common knowledge, factors to be considered, according to New York Jurisprudence, Evidence, §649 of 22. Here, it is common sense to believe that the defendant, a virtual prisoner, being maltreated, would have asked for a lawyer, at least once, and probably many more times in a period of over 15 hours.

The police stooped to patently tailoring their testimonies, in the instant case, and they attempted to hide the fact that the defendant was physically abused, suffering

14

mistreatment while in custody. Absent an unforced waiver, the defendant was forced to provide "confessions" and "consents."

The people did not sustain their burden of establishing the legality of the police conduct in recovering the mini-cleaver and massagers, after having the defendant sign the consent forms under duress. See, People v. Blinker, 80 A.D.3d 619 (2011); People v. Whitehurst, 25 N.Y.2d 389 391 (1969); People v. Hernandez, 40 A.D.3d 777, 778 (2007); People v. Thomas, 291 A.D.2d 462, 463 (2002); People v. Quinones, 61 A.D.2d 765 (1978).

"Generally, when the police have acted illegally, evidence which 'has been come at by exploitation of that illegality' should be suppressed" (People v. Gethers, 86 N.Y.2d 159, 161 - 162 [1995], quoting Wong Sun v. United States, 371 U.S.471, 488 [1963]). The Court of Appeals has reiterated the principle that evidence revealed as a direct consequence of unlawful police action is tainted and must be suppressed. See, People v. Boodle, 47 N.Y. 2d 403 (1979).

Here, the defendant avers that the record demonstrates the obtained consents were the result of constitutional violations, the Court failing to suppress the physical evidence that was recovered unlawfully. See, People v. Blinker, supra; People v. Smith, 77 A.D.3d 980, 981 (2010); People v. Castro, 73 A.D.3d 800, 800 - 801 (2010); People v. Johnson, 79 A.D.3d 905 (2010).

15

The hearing court erred in the instant matter by denying suppression of the defendant's written and videotaped statements obtained and the property recovered from the search of the defendant's vehicle and of his home, obtained as the product of constitutional violations and based on patently tailored police testimony.

THE COURT ERRED DENYING THE DEFENDANT'S MOTION TO LIMIT DIRECT AND CROSS-EXAMINATION BY THE PEOPLE TO CHARGES IN NASSAU COUNTY, PERMITTING THE PEOPLE TO INTRODUCE CHARGES OF THE DEFENDANT'S INDICTMENT IN QUEENS COUNTY, THE COURT COMPOUNDING THE ERROR BY GRANTING THE PEOPLE'S MOLINEUX APPLICATION, EFFECTIVELY DENYING THE DEFENDANT THE RIGHT TO TESTIFY.

The defendant staunchly maintains that the County Court erred in denying the defendant's motion in limine. The motion was for an order limiting the use of the defendant's confessions the people intended to use on direct examination and on cross-examination, regarding charges the defendant was facing in Queens County, if the defendant exercised his constitutional right to testify in the instant case.

The defendant further maintains that the County Court compounded the error of the denial of the defendant's motion in limine by granting the people's Molineux application to present charges against the defendant in Queens County during the case at bar in Nassau County.

The defendant contends that he was severely prejudiced by

16

the County Court's denial of his application to make
redactions from the his written statements or the videotaped
statement, allowing the people to introduce them. The County
Court stated in its ruling that the evidence was admissible,
being more probative than prejudicial.

The defendant maintains that the people should have been
barred from eliciting testimony, regarding the Queens County
acts for which he had been charged, as it would be a violation
against self-incrimination and due process. The defendant
further maintains that his Fifth Amendment privilege to be
protected against self-incrimination outweighs the people's
showing of propensity evidence, not curable by limiting
instructions of the Court.

The County Court ruled that should he testify the people
were not permitted to cross-examine him regarding the pending
Queens charges. The Court stated that unless the defendant
"opened the door" to the Queens County matters, his Fifth
Amendment rights would be protected.

The defendant maintains that if the County Court allowed
testimony about the charged crimes in Queens, he would have to
make a difficult choice, where there was only one option
offered. Here (in the Nassau County case at bar), if he
testified, about the charges in Queens, then he would be
incriminating himself in Queens. If he did not testify, then

17

the Queens charges would go unrefuted to the jury.

It is fervently contended by the defendant that the County Court ruling erred in allowing the people to cross-examine him, if he testified in his own defense, regarding the Queens criminal charges that were pending against him. The County Court's pre-trial ruling, permitting cross-examination on other pending Queens County charges, requires reversal of the defendant's conviction and a new trial. See, People v. Bennett 79 N.Y.2d 464, 468 (1992); People v. Betts, 70 N.Y.2d 289 (1987).

In the instant case, the defendant maintains that the Court's ruling effectively precluded him from testifying on his own behalf as the people would have been unfairly permitted to cross-examine him about charges in Queens County which had enormous prejudicial potential. This ruling denied him a fair trial.

The defendant avers that the Court's ruling created prejudice so severe that he was convicted by virtue of propensity evidence, denying him due process. Moreover, his rights against self-incrimination were violated. It figuratively placed him on the horns of a dilemma, between Scylla and Charybdis, "a rock and a hard place."

It is maintained by the defendant that albeit he could testify, as was his right, he risked being forced to testify

18

about Queens charges on which he was not as yet tried, "opening the door," or he could remain silent, not controverting the Queens charges to the jury, acquiescing to his guilt by tacitly agreeing to the charges and keeping silent.

The Court compounded its error, denying the defendant's motion, by granting the people's Molineux application which allowed the people to present evidence of the Queens "charged crimes," unfairly demonstrating propensity of the defendant.

Basically, the ruling in Molineux is that the state cannot prove against a defendant any crime not alleged in the indictment, either as a foundation for a separate punishment, or as aiding the proofs that he is guilty of the crime charged. Here, the Court violated the right of the defendant to the presumption of innocence by allowing the people to present evidence of the Queens charges against the defendant, which in effect demonstrated propensity.

The Court of Appeals determined that a defendant should not be forced to testify about a crime with which he has been charged, but not tried. See, People v. Rojas, 97 N.Y.2d 32 (2001). Here, as determined in Rojas, "The people cannot do indirectly what they cannot do directly." In the instant matter, the defendant maintains that as the people should not have the right to cross-examine him about another pending indictment, as they cannot offer evidence of that indictment in

19

their direct case.

The County Court attempted to justify the granting of the people's Molineux application by making reference to People v. Leeson, 12 N.Y.3d 823 (2009). The Court stated that in cases involving sexual misconduct, relating to the same complainant and the same defendant, the prior bad acts will be admissible, on the people's direct case, if the evidence is used for material issues, not used for propensity purposes. The people have argued that the Lesson case is similar to the case at bar.

The defendant maintains that in Leeson, unlike the case at bar, the admission of evidence was of uncharged crimes, and here, the people were granted their motion to admit evidence of the charged crimes in Queens (emphasis added). This clearly underscored a criminal propensity of the defendant who was unable to testify without addressing the Queens charges or leaving them uncontroverted, being denied his due process rights and rights against self-incrimination.

The people argued in their Respondent's Brief(42) and also at the proceedings that under Molineux they were entitled to use evidence that included the Queens County charges to prove motive, intent, lack of mistake or accident, identity, or common scheme or plan, citing People v. Alvino 71 N.Y.2d 232 242 (1987) at the proceedings. However, evidence that would demonstrate a defendant's criminal propensity bars admission to

20

a defendant's prior bad acts. See, People v. Lewis, 69 N.Y. 2d 321 (1987).

The people have argued that, "Evidence of a defendant's prior bad acts may be admissible when it is relevant to a material issue in the case other than a defendant's propensity...Where there is a proper non-propensity purpose, the decision whether to admit such evidence rests upon the trial court's discretionary balancing of probative value and unfair prejudice," citing People v. Dorm, 2 N.Y.3d 16 (2009).

The defendant recognizes the admissibility of a defendant's prior bad acts relevant to a material issue in the case other than defendant's criminal propensity. See, People v. Lewis, 69 N.Y.2d 321 (1987); People v. Beam, 57 N.Y.2d 241 (1982); People v. Allweiss, 48 N.Y.2d 40 (1979); People v. Carmack, 44 N.Y.2d 706 (1978).

However, it is stalwartly contended by that the defendant that the admission of the evidence, of the charged sexual crimes with the same victim, in Queens County, demonstrated a propensity of the defendant despite the Court claiming the people's Molineux application was granted for non-propensity purposes. The Court abused its discretion by admitting evidence that was more prejudicial than probative, creating unfair prejudice to the defendant. See, People v. Dorm, supra.

21

The defendant maintains that the Court abused its discretion when it allowed evidence that must be deemed demonstrative of propensity, even if limiting instructions are given. The Court erred in denying the defendant's motion and granting the people's Molineux application, which in effect denied the defendant his constitutional right to testify.

BASED AS IT WAS ON EVIDENCE THAT WAS INTRINSICALLY INCREDIBLE AND UNRELIABLE, THE SEXUAL ABUSE VERDICT WAS INSUFFICIENTLY SUPPORTED AND IN VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL RIGHTS TO BE CONVICTED ONLY WHERE GUILT HAS BEEN ESTABLISHED BEYOND A REASONABLE DOUBT.

At the conclusion of the case, the defense counsel made a motion to dismiss the indictment on the grounds that the people failed to prove a prima facie case, not proving their case beyond a reasonable doubt. The motion was denied by the Court.

In order to preserve a defendant's claim of an insufficient verdict, it is expedient for a defense counsel to make a motion and offer specific argument at the conclusion of the people's case. See, People v. Bynum, 70 N.Y. 2d 858, 859 (1987); People v. Johnson, 185 A.D. 2d 247 (2d Dept. 1992); People v. Asaro, 182 A.D. 2d 823 (2d Dept. 1992).

A trial counsel's motion and advocacy must be specific enough to preserve a defendant's right for appellate review as defined by the Courts. See, People v. Logan, 74 N.Y. 2d 859

(1990); People v. Gomez, 67 N.Y. 2d 843 (1986); People v. Dekle, 56 N.Y. 2d 835 (1982); and People v. Cardona, 136 A.D. 2d 550 (2d Dept. 1988).

If it is deemed that the defense counsel, in the instant matter, failed to present specific argument to preserve the defendant's claim of an insufficiently supported verdict to prove his guilt, as his motion and argument failed to specify any such claim, the defendant is requesting this Court's review of such a claim. The defendant-appellant is entitled to obtain this Court's review of such a claim if the Court exercises its interest of justice jurisdiction as defined in C.P.L. §470.15 (6).

Although the people maintain and the Appellate Court decided that the defendant's claims of legal insufficiency are unpreserved for appellate review as the counsel failed to make this argument with specificity at the trial court, the defendant has respectfully asked the Court to exercise its interest of justice jurisdiction as defined in C.P.L. §470.15 (6).

A defendant can be protected from his counsel's deficiencies in failing to adequately preserve an argument in the interest of justice. C.P.L. §470.15 (6) delineates, "That the kinds of determinations of reversal or modifications deemed to be made as a matter of discretion in the interest of justice

23

include, but are not limited to the following:

(a) That an error or defect occurring at a trial resulting in a judgment, which error or defect was not duly protested at trial as prescribed in subdivision two of section 470.5 so as to present a question of law deprived the defendant of a fair trial..."

The defendant staunchly maintains that the evidence adduced at trial was insufficiently supported, as well as being incredible and unreliable, the people failed to prove the charges of sexual abuse, and to sustain their burden of proving the defendant's guilt of sexual abuse beyond a reasonable doubt. See, U.S. Const., Amend. XIV; N.Y. Const., Art. I, Sec. 6; Jackson v. Virginia, 443 U.S.307, 310 (1979). A review of the evidence supports that the defendant is not guilty of sexual abuse.

One of the people's key witnesses, Detective Schulman hid the identity of the officer who actually arrested the defendant, calling in Police Officer Alfaro, who was on patrol, to take credit for the arrest. This was to shield the unknown officer from the abusive manner in which the defendant was taken into custody.

Schulman, the interrogating officer, and the Alfaro, who became the arresting office after the fact, were not forthright about the events during the defendant's custody: being nebulous

24

about what transpired in terms of the time frames of their involvement; and being unable to recalled about any specifics despite inquiries. Under the circumstances, their lack of candor and responsiveness renders their proffers less than credible or reliable.

Although Schulman and Alfaro deny that the defendant was disheveled in appearance, his shirt was in a condition that would support that he was physically abused, the videotape demonstrating that was no doubt the case. On the defendant's entrance into the precinct, he was manhandled by the desk sergeant and other officers, albeit the name of the actual arresting officer is curiously absent from the police reports.

Schulman, acting as an enhancing officer to extract a confessions, placed the defendant in a confined eight by 10 space, probably with the window covered, according to the detective's equivocal statement in that regard. This created a restrictive and dismal condition in which to coerce the defendant into providing statements of confessions. Trial counsel labeled this detective a "hatchet man" as he was supposed to employ a forceful and threatening approach to obtain a "confession."

The sexual abuse was supposedly to have taken place at the Great Neck location of a customer of the defendant, the defendant confessing to same. However, the location provide in

25

the defendant's so-called was not a veritable location of his Great Neck customer. It is highly unlikely the defendant erroneously provided that information in his so-called "confession," having worked for the customer routinely. The "confession" was no doubt written or dictated by Schulman, basedon erroneous information the officer obtained from the complainant, not drafted or written by the defendant.

The complainant testified that the knife with which the complainant was allegedly threatened, during May and June 2008, was always in the vehicle. It is not unlikely that the defendant had a knife in his truck for practical, non-threatening purposes. Albeit the defendant's behavior was reprehensible, he vehemently denies having sexually abused the complainant, his stepdaughter, under the threat of a knife.

The people attempted to present a picture of the complainant existing in a terrifying environment since 2005, allegedly when the first incident occurred. However, the facts belie that was the case as her achievements at school got increasingly better. In fact, she became an excellent student, certainly demonstrating that she was functioning well, not in a state of fear.

The complainant had a boyfriend commencing about April 2008, and she maintained that relationship, despite the defendant and the complainant's mother being unhappy about her

26

boyfriend. They had wanted the complainant to merely focus on succeeding at school, and as such, not wanting her to date. The complainant spent time with the boy without their knowledge, and she claimed that she had not actually been out on dates with him, displaying that she could be devious and independent.

She readily admitted to enjoying the defendant, her step-father, driving her to and from school, and she overtly expressed loving him. This was substantiated by the testimony of her best friend, Christine. In fact, her poem about going to work nights with the defendant, sleeping on the back seat of the truck, revealed her positive relationship with the defendant as being one of trust and no concern. She expressed that "her thoughts vacation to a place without worry."

It is also evident from the videos and pictures the complainant took with the defendant and the family doing Trinidadian dancing and engaging in other activities, that she had positive feelings for him and the family unit. She even photographed the defendant in his Ecolab uniform, making it part of a Father's Day card presented to him. She referred to having taken the pictures and videos as being part of "family memories." Clearly, the complainant had a desire to preserve them as part of her positive feelings for the defendant and the rest of the family.

Although the relationship with the defendant had been tenable over the years, such as it was, the defendant telling her that he wanted to actually have sex with her, brought her to the realization that she had to escape. Up until that time, the complainant had confided in no one about being unhappy in her relationship with her father, however sordid.

The complainant's claim about not crying out about the situation were not fear of the defendant, but fear of no support for the family if there was a divorce. Her claims about being forced were contrived, an excuse for her having accepted the defendant's overtures. She had not been forced, readily participating in the sexual relationship with the defendant, her step-father.

The people have not presented evidence which provides the required confidence that the appellant's guilt of sexual abuse has been established beyond a reasonable doubt. See, People v. Crudup, 100 A.D.2d 938, 939 (2d Dept. 1984); People v. Kidd, 76 A.D.2d 665, 668 (1st Dept. 1980); People v. McIntyre, 71 A.D.2d 956, 961 (2d Dept. 1979).

Proof beyond a reasonable doubt cannot rest on a free floating inference supplied by proof which is merely suggestive and which lacks the definitiveness and form necessary to extinguish the real, latent doubt which lingers in this case. See, People v. Irwin, 43 N.Y. 2d 704 (1977).

28

A mere scintilla, or even some proof is insufficient to create an issue of fact. See, People v. Oyola, 6 N.Y.2d 262, (1959); People v. Velella, 28 Misc.2d 579, (Sup. Ct. New York County, 1961).

C.P.L. Section 70.20 provides that no conviction of an offense by verdict is valid unless based upon trial evidence which is legally sufficient and which establishes beyond a reasonable doubt every element of such offense and the defendant's commission thereof.

The United States Supreme Court has held that the due process clause protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime of sexual abuse for which he is charged, In re Winship, 397 U.S.358, 90 Sup. Ct. 1068 (1970).

The people's case rested mainly on evidence that was incredible and unreliable, insufficiently supporting the verdict. The people clearly failed to demonstrate that the defendant was guilty of sexual abuse.

On the basis of the aforementioned issues, the defendant-appellant is respectfully requesting leave to appeal to the Court of Appeals.

29

Yours very truly,

Leon H. Tracy

LHT: rsf


cc: Tammy Smiley, Bureau Chief
    Barbara Kornblau, ADA
    Office of Appeals
    Kathleen M. Rice, Nassau County DA
    262 Old Country Road
    Mineola, New York 11501

    Mr. Harold Gopaul, #09-A-3978
    Clinton Correctional Facility
    P.O. Box 2002
    Dannemora, New York 12929-2002