1

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NASSAU : CRIMINAL TERM PART 80

3    ------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,    :   Indictment
4                                            :   No. 2415N/08
              -against-                      :
5                                            :
     HAROLD GOPAUL,                          :   Sex Abuse 1
6                                            :
                      Defendant.             :   Huntley/Mapp
7    ------------------------------------------X   Hearings

8                                  April 30, 2009

9                                  252 Old Country Road
                                   Mineola, New York
10

11   B E F O R E:

12              HONORABLE JAMES P. McCORMACK,
                      Acting Supreme Court Justice
13

14
     A P P E A R A N C E S:
15

16         HON. KATHLEEN M. RICE
           Nassau County District Attorney
17         For the People
           BY:  JAMIE JOHNSON, ESQ.,
18                      Assistant District Attorney
                        of Counsel.
19
           DONALD R. SCHECHTER, ESQ.
20         Attorney for Defendant
           80-02 Kew Gardens Road - Suite 1030
21         Kew Gardens, New York  11415

22              *          *          *

23
                            WENDY SILAS
24                          Senior Court Reporter

25

Proceedings                    2

1           THE CLERK:  Case is on for hearing, People of

2    the State of New York against Harold Gopaul,

3    Indictment 2415N of 2008.

4           Counsel?

5           MS. JOHNSON:  Good afternoon, Judge.

6           For the People, Jamie Johnson.

7           MR. SCHECHTER:  On behalf of the defendant,

8    Harold Gopaul, Donald R. Schechter, 80-02 Kew Gardens

9    Road, Kew Gardens, New York.

10          THE COURT:  Good afternoon.

11          This matter has been sent to me by

12   Judge Donnino for purposes of hearing and I think

13   ultimately trial.

14          I see that as a result of the decision by

15   Judge Calabrese this is a Mapp/Huntley Hearing?

16          MS. JOHNSON:  Correct, Judge.

17          THE COURT:  Mr. Schechter, that's your

18   understanding as well.

19          MR. SCHECHTER:  Combined Mapp/Huntley, yes,

20   Judge.

21          THE COURT:  All right, now, People you

22   indicate that you have some witnesses, police

23   personnel, from New York City?

24          MS. JOHNSON:  Yes, Judge.  The hearing for

25   the Huntley/Mapp issues involves two witnesses.

                                                    ws

Proceedings                    3

1              The first is Detective Schulman of the NYPD,

2    he is here today.

3              And, second, is a uniformed police officer,

4    Officer Alfaro.  She was unavailable for today.  I do

5    not anticipate, as it is now 3:15, finishing with

6    Detective Schulman today.

7              I did step outside to speak with him.  There

8    are some issues with having NYPD officers come here on

9    their days off.  He does have child care issues

10   tomorrow, your Honor.  I asked him if he would be

11   available, come tomorrow, for continuation.  He said

12   due to personal child care issues he would not be.

13             THE COURT:  Who is this that we're referring

14   to?

15             MS. JOHNSON:  Detective Schulman, who is here

16   today.

17             I did send a teletype already for tomorrow

18   for the uniformed officer, so if we have to finish with

19   Detective Schulman another day and go a little bit out

20   of order and continue with the uniformed officer

21   tomorrow, I anticipate being able to do that.

22             I have not heard anything from the 105

23   command that the uniform officer would be unable to

24   come tomorrow.  Last I heard she would be available and

25   she has been teletyped for 9 o'clock tomorrow morning.

                                                      ws

Proceedings                    4

1           THE COURT:  So there's two witnesses for the
2     hearing?
3           MS. JOHNSON:  Yes.
4           THE COURT:  Detective Schulman and a --
5           MS. JOHNSON:  Officer Alfaro.
6           THE COURT:  And Schulman has an issue with
7     regard to child care tomorrow and the other officer has
8     been teletyped to be here for tomorrow.
9           MS. JOHNSON:  She's been teletyped for
10    9 o'clock tomorrow and I haven't -- we confirmed that
11    the 105 received the teletype.  I haven't heard any
12    problems or conflicts and this was as of this morning.
13          THE COURT:  Okay.
14          MR. SCHECHTER:  If it please the Court, there
15    are a few issues I have of my own.
16          Firstly, I understand that counsel is
17    indicating that my client allegedly executed a consent
18    to search document.
19          I had made discovery application requesting
20    any and all such information and I never received
21    copies of consent to search whatsoever.
22          As a matter of fact, in the discovery
23    applications counsel claimed that the search was an
24    open view, did not claim in the discovery materials
25    that my client executed a consent to search.

                                                    ws

Proceedings                    5

1           If the Court will peruse the District

2       Attorney's answer, I think it's devoid of any mention

3       my client executed a consent to search form, unless I'm

4       mistaken.

5               That's the first initial issue, Judge.

6               (Pause in the proceedings.)

7               THE COURT:  All right, how many consent forms

8       are there?

9               MS. JOHNSON:  Two, Judge, one with regard to

10      searching of the residence and one with regard to

11      searching of the vehicle.

12              So your Honor knows, today was the first time

13      I had been provided that paperwork as it was with city

14      detective's case jacket.  So I did provide that in the

15      Rosario material.

16              MR. SCHECHTER:  I don't think, really, that's

17      an issue for a Rosario matter, I think that's a

18      discovery matter, so I respectfully --

19              THE COURT:  Now that you have the consent

20      form, is there some way in which you've been prejudiced

21      by receiving it today as opposed to having received it

22      at some other point?

23              MR. SCHECHTER:  Certainly, your Honor.

24              That belies the People's bill of particulars.

25      I respectfully submit if the People, in the bill of

                                                    ws

1     particulars, allege that the issue at this hearing is

2     whether or not the officer acted and seized the

3     information -- seized the alleged evidence in plain

4     view, that was what was prepared for this hearing.

5                 As a matter of fact, I submit that's the

6     purpose of a bill of particulars; for the People to

7     specify the particulars of the case that we are dealing

8     with and that is how defense counsel prepares the case.

9                 Now, on the eve of the hearing, for the first

10    time, I am given these consent documents which I had

11    absolutely no knowledge of from the District Attorney

12    and I submit that she should be confined to the

13    parameters of the four corners of her bill of

14    particulars, which is what she sent me, which is that

15    the issue here is whether or not the items seized by

16    the officer, not this officer, another officer, a

17    female officer who will be testifying, I guess,

18    tomorrow, whether, in fact, that evidence was seized

19    because it was in open view.

20                I direct your Honor's attention to counsel's

21    bill of particulars and her response to discovery,

22    namely Page 5.

23                THE COURT:   Page 5 of what?

24                MR. SCHECHTER:   Of affirmation in opposition

25    to defendant's omnibus motion dated February 5, 2009.

                                                        ws

Proceedings                    7

1    All counsel spoke about was her opposition to the

2    motion because standing was not alleged.

3          Then she says on Page 6, "In the alternative,

4    the People submit that the seizure of the physical

5    evidence from the car without a search warrant was

6    justified because the property was in plain view of the

7    officers as follows:  Police Officer Celica Alfaro

8    observed the defendant's vehicle and inside said

9    vehicle the officer observed the meat clever/knife and

10   a massager.  Police Officer Alfaro recovered said items

11   from the vehicle."

12         There is absolutely no mention or no setting

13   forth here that the basis that she is claiming the

14   legality of the search is a signed consent to search.

15   There's nothing in her pleadings to say that, Judge,

16   and that's the purpose of a bill of particulars.

17         Does the Court have --

18         THE COURT:  I have your -- I have the

19   People's response to the discovery demand, which I take

20   it there was another attorney prior to yourself,

21   Mr. Schechter?

22         MR. SCHECHTER:  Your Honor, there was a prior

23   attorney which made motions which were insufficient and

24   I was given the right to make my own omnibus motions

25   which I, in fact, did.

                                              ws

Proceedings                    8

1          However, the response of the People

2     replicates the same allocations concerning the bill of

3     particulars as to the justification of the search.

4          THE COURT:  All right, so, People, there was

5     a search of the defendant's vehicle?

6          MR. SCHECHTER:  And home.

7          MS. JOHNSON:  There was a search of the

8     vehicle and a search of the home, which I believe -- as

9     to notice, I believe that counsel was provided them

10    from the Queens District Attorney's Office, Judge, and

11    I believe a copy of the property vouchers were turned

12    over in discovery to both attorneys.

13         So I'm just looking for those now because I

14    believe --

15         MR. SCHECHTER:  No, never got the vouchers

16    and I was never given a justification for the search

17    with respect to this.

18         This is counsel's bill of particulars in

19    Nassau County.  Queens and Nassau are not contiguous.

20    What the DA in Nassau -- in Queens does not bind with

21    the District Attorney in Nassau.

22         MS. JOHNSON:  Since we are prior to the trial

23    and start of any hearing, we would make a motion to

24    amend our bill of particulars orally and in our

25    continuing duty to disclose any property or anything

                                                    ws

Proceedings                    9

1    under 240.20, we are not only relying upon the consent
2    form, but we are also relying on the property that was
3    recovered in plain view.
4              Obviously, you know, it's up to your Honor if
5    counsel is going to be given the right to re-argue
6    whether or not his client has standing, but, either
7    way, we are prepared to litigate all aspects of not
8    only the consent, but the plain view part of the
9    search.
10             MR. SCHECHTER:  People can't have it both
11   ways, your Honor.
12             They said that they were ready.  They claimed
13   they were ready.  They made this application telling
14   the judge they are ready.  As such, the bill of
15   particulars becomes fixed.
16             There are time constraints on the defendant
17   as well.  The time constraints -- there are time
18   constraints on the defendant as well.
19             THE COURT:  I don't have your papers.
20   There's a lot of papers in front of me between your
21   papers, the prior attorney's papers, the People's
22   responses.
23             As to whether or not you had demanded copies
24   of any consent searches --
25             MR. SCHECHTER:  Any what?

                                                    ws

Proceedings                    10

1         THE COURT:  Consent search forms?

2         MR. SCHECHTER:  Your Honor, you're presuming

3    I would know about them.

4              It's part of their duty to provide me that in

5    discovery.

6         THE COURT:  It gets back to my initial

7    question.

8              How are you and your client prejudiced at

9    this point since we're only conducting a pretrial

10   hearing with regard to these suppression issues?

11        MR. SCHECHTER:  Because, your Honor, we are

12   required under the law to provide our motions within a

13   certain period of time and the People --

14        THE COURT:  I understand.

15             You've now been apprised of the consent

16   searches, the manner in which these searches were

17   conducted.  You're now about to begin the hearings in

18   this matter.

19             Could you articulate to me as to how you

20   would be prejudiced or foreclosed from litigating the

21   issue as to whether or not your client validly executed

22   a consent to search for his vehicle or for his car?

23             What's the remedy?

24             What are you asking me to do?

25        MR. SCHECHTER:  Preclude.  I'm asking the

                                              ws

Proceedings                    11

1      Court to direct that the District Attorney proceed on
2      the basis of plain view; that, in fact, that the theory
3      that she proffered and the justification for the search
4      proffered in her bill of particulars is what she's
5      bound by.
6              That's the purpose of a bill of particulars.
7      Otherwise, it would render a bill of particulars
8      virtually meaningless and I ask that the People be held
9      to the proof that they claimed that they had, namely --
10             THE COURT:  Could you show me your bill of
11     particulars?
12             I am looking at your discovery demand, which
13     didn't ask for any of the items you're claiming you
14     want to have precluded now, or at least the consent
15     searches.
16             MR. SCHECHTER:  Let me get a copy of my
17     demand, Judge.
18             Your Honor, the motions were made in response
19     to the People's representations with respect to how the
20     search occurred.  They never, ever gave us any notice
21     that there was a consent form, never in any of the
22     VDFs, nothing.
23             THE COURT:  All right, so you've gotten the
24     hearing, you've now been apprised as to the manner in
25     which the property was recovered.

Proceedings                    12

1          MR. SCHECHTER:  And I'm respectfully asking

2     that the Court make a determination.

3          THE COURT:  Well, you first asked to have the

4     items precluded.

5          Now it seems to be that you're acknowledging

6     that you didn't ask for those items in your demand.

7          MR. SCHECHTER:  Well, I'm asking for a

8     hearing --

9          THE COURT:  Now you're shifting your argument

10    to, well, now, because they didn't mention it in their

11    motion papers, that therefore they should be precluded

12    as well?

13          MR. SCHECHTER:  What I'm saying, your Honor,

14    is the District Attorney, in their response to my

15    motion papers, specified a theory, specified the basis,

16    the justification, for the search.  They did that.

17    They did that sua sponte.

18          As such, they proffered the theory that they

19    were proceeding under and that is an open view theory,

20    okay?

21          Now, right before we start the hearing, they

22    say, "No, I'm changing the theory.  Now I'm going to

23    claim it was consensual."

24          I'm saying, of course, it's a surprise, but

25    not only is it a surprise, they posited what they did

                                                        ws

Proceedings                    13

1      in a bill of particulars and I'm saying they're

2      required to present the theory specified in the bill of

3      particulars.

4              That's my application, judge.

5              THE COURT:  All right, I'll reserve decision

6      on your application at this time.

7              Anything else we need to address?

8              MR. SCHECHTER:  Yes, Judge.

9              I've provided counsel with a list of forms

10     that I noticed was not included in the Rosario

11     material.

12             For example, there are prepared, to my

13     understanding in the normal course of police arrests,

14     documents that have not been provided and I will list

15     them the same as I gave the District Attorney.

16             One is an activity log.

17             Two might be provided, I haven't had a chance

18     to look through the documentation, is a complaint

19     report.  The document is PD 313-152.  That's a

20     complaint report.

21             The other document I did not receive is a

22     New York State standardized domestic incident report

23     with the form numbers DCJS 3221 and a report of

24     suspected child abuse PD 377-1544.

25             He is a mandatory reporter.  He was supposed

                                                    ws

Proceedings                    14

1    to make those -- do those documents.

2              His report to his patrol supervisor, I did

3    not get that.

4              The domestic report incident log, I did not

5    get that either.

6              Now, I don't know if there was an on-line

7    booking system arrest work sheet, but, if there was,

8    I'm entitled to that.

9              And, lastly - I have asked for this on

10   several occasions and it has been granted because it's

11   required - the commanding officer of the precinct,

12   under certain circumstances, makes a request for a

13   recommendation for commendation which contains within

14   that request the statements and comments of the

15   arresting officer as to the incidents.

16             I am requesting that a copy of that

17   recommendation for a commendation, if such form exists.

18             THE COURT:  All right, Ms. Johnson?

19             MS. JOHNSON:  Your Honor, with regards to

20   most of those documents that counsel had requested, a

21   lot of it is not Rosario material for hearing purposes.

22             Let me start -- I mean, the complaint report

23   is a narrative of the detective's conversation with the

24   victim.

25             It has nothing to do with the defendant's

                                                    ws

Proceedings                    15

1      statement.  It has nothing to do with any of the

2      property.  It has nothing to do with any conversations

3      that a detective had with the defendant.

4                It's similar to our 32Bs here, except they

5      don't do actual 32Bs in the city.

6                As to the domestic incident report, again,

7      that is certainly Rosario for trial, but is not a

8      written recorded statement about the detective's

9      conversation with the defendant.

10               Same thing with the domestic report incident

11     log, the report of suspected child abuse.

12               I have protective services reports here and

13     I've gone through them.  I'm happy to show your Honor

14     what I have.  Everything that is listed in this

15     paperwork that is in the detective's case jacket is not

16     about the substance of his testimony at this hearing.

17               What I've turned over is everything that the

18     defendant (sic) has memorialized in regards to his

19     contact with the defendant, his conversations with the

20     defendant, nothing about his contact with the

21     complainant as there is no Dunaway or probable cause

22     aspect to the hearing.

23               But I'm happy -- if your Honor would like to

24     review any of this in camera, I have it to review.

25               THE COURT:  I'll take a look at the material

                                                        ws

Proceedings                16

1       in camera, Mr. Schechter.

2                    Whatever you want to explore for purposes of

3       cross-examination as to these documents, as to whether

4       or not they have some bearing or would be considered

5       Rosario for purposes of the hearing, I'll certainly

6       give you leeway to do that.

7                    MR. SCHECHTER:  Thank you, Judge.

8                    THE COURT:  All right, anything else?

9                    MR. SCHECHTER:  Well, I have no problem with

10      the People beginning their direct examination, your

11      Honor.

12                   However, since, as -- it seems to be the law

13      and the inclination of most prosecutors, I have just

14      been given a pile of papers which are alleged to be

15      Rosario material.

16                   Therefore, I would like my cross-examination

17      of the detective to be reserved for when I have an

18      opportunity to peruse them, which would be, if not

19      tomorrow, then I guess Monday.

20                   MS. JOHNSON:  Judge, considering the video is

21      20 minutes to a half hour, I don't think we're getting

22      there anyway.

23                   THE COURT:  It will appear you'll get your

24      request.

25                   MR. SCHECHTER:  Thank you, Judge.

                                                          ws

Proceedings                    17

1       MS. JOHNSON:   There were two packets turned

2   over to the Court and counsel, one with a Rosario cover

3   sheet and the other one is the grand jury minutes of

4   the detective, so I just want to make counsel

5   acknowledges receipt of both of those.

6       MR. SCHECHTER:   Let me hear this again,

7   please?

8       MS. JOHNSON:   Other than the packet, there

9   was a separate packet that was the detective's Queens

10  County grand jury testimony.

11          I want to make sure you got both of them.

12      MR. SCHECHTER:   I have the grand jury

13  testimony regarding -- part of what I was given was

14  crossed out, so I don't know what that relates to.

15      So with respect to the grand jury testimony,

16  absent what was contained that was crossed out on one

17  of the -- on one, two, three -- three pages, I was

18  given what appears to be the grand jury testimony from

19  Queens.

20      MS. JOHNSON:   Your Honor, what's crossed out

21  is colloquy between a question from the grand jury and

22  the Queens ADA.  All the testimony is there.

23      So if your Honor would like to see what was

24  redacted, I have that for the Court as well.

25      MR. SCHECHTER:   Your Honor, I've been doing

                                                    ws

Proceedings                    18

1    this a long time.  It's the first time I've ever seen

2    colloquy in a grand jury redacted from grand jury

3    minutes.

4              THE COURT:  Can I ask you what we're talking

5    about, because you people have been dealing with this

6    case for the last umpteen months.  I got it a half hour

7    ago, so -- this is grand jury testimony of whom?

8              MS. JOHNSON:  Detective Schulman.

9              THE COURT:  In the Queens grand jury?

10             MS. JOHNSON:  Yes, Judge.

11             That is an original marked-out copy, so you

12   can actually see through the black ink what was written

13   there.  It's on the last couple of pages.

14             (Shown to Court.)

15             THE COURT:  And this is what pertains to the

16   detective's interactions with the complainant?

17             MS. JOHNSON:  No, it's not his testimony.

18             It's a question posed by the grand jury to

19   the prosecutor which the prosecutor then asked.  The

20   actual part redacted is a grand juror's testimony.

21             THE COURT:  In other words, it's colloquy

22   between the DA in Queens and the grand juror?

23             MS. JOHNSON:  Correct.

24             THE COURT:  All right, Mr. Schechter, that

25   does seem to be the case.

1        MR. SCHECHTER:   I understand that, your

2    Honor.           However, I respectfully submit,

3    notwithstanding that, I don't believe counsel has a

4    right to redact any part of those grand jury minutes,

5    regardless of what they are.

6        If it's colloquy, I'm entitled to look at it.

7        Maybe grand jury had a question with respect

8    to the officer's appearance, what the officer said or

9    what the law was.  Maybe he or she was confused.  There

10    are a lot of issues there that counsel is blocking me

11    from considering.

12        I have never -- when I was in the District

13    Attorney's Office I gave the grand jury testimony.

14    It's what they're entitled to.  I never redacted

15    anything unless it dealt with matters that were going

16    to be dealt with on trial and then I would give them a

17    separate grand jury minutes at trial containing the

18    whole grand jury minutes, but I've never seen them

19    redacted like that.

20        MS. JOHNSON:   Judge, Judge Calabrese already

21    reviewed the minutes, indicated that portions were not

22    to be disclosed to defense attorney.

23        As the prosecutor, I have an obligation to

24    keep those matters secret that are not Rosario and

25    that's exactly what I've done.

1          MR. SCHECHTER:  I don't recall such a

2     direction from Judge Calabrese.  Certainly, it wasn't

3     reduced to a writing.

4          THE COURT:  Well, it doesn't appear,

5     Mr. Schechter, to be -- it's certainly not statements

6     made by any witness that would testify in this case.

7          It's clearly between a grand juror and the DA

8     who, I assume, is Mr. Rosenblatt?

9          MR. SCHECHTER:  Yes.

10          MS. JOHNSON:  Yes, Judge.

11          THE COURT:  So I don't see any reason at this

12     time to unredact it, if you will, so I'm going to leave

13     it as such over your objection.

14          MR. SCHECHTER:  Thank you, Judge.

15          All right, People, you want to call your

16     first witness?

17          MS. JOHNSON:  Yes.  Detective Leonard

18     Schulman.

19     L E O N A R D  S H U L M A N, a witness called on behalf of

20     the People, having been first duly sworn by the clerk

21     of the Court, was examined and testified under oath as

22     follows:

23          COURT OFFICER:  For the record, state your

24     name, spell your last name, shield number, rank and

25     command?

1              THE WITNESS:  Detective Leonard Schulman,

2        last name is, S-c-h-u-l-m-a-n, Shield 6387, assigned to

3        the 105 Precinct detective squad in Queens, New York of

4        the New York City Police Department.

5    DIRECT EXAMINATION

6    MS. JOHNSON:

7         Q.    Good afternoon, detective.

8         A.    Good afternoon.

9         Q.    Detective, how long have you been employed by the

10   New York City Police Department?

11        A.    About 15 and a half years.

12        Q.    How long have you been a detective?

13        A.    Almost ten years.

14        Q.    Can you take us through the assignments that

15   you've worked at through your -- the course of your career?

16        A.    Obviously, initially the Police Academy.

17             From there I was assigned as a patrol officer in

18   the 105 Precinct in Queens, New York.  I was then assigned

19   to the -- a citywide anti-crime unit for about five years

20   and for the last seven years I've been assigned as a

21   detective in the 105 Precinct detective squad.

22        Q.    What area of Queens County does the 105 cover?

23        A.    It's southeast Queens.  It covers many different

24   communities.  It ranges all the way from the Queens side of

25   Floral Park, all the way down to Rosedale.

1         Q.    I'm going to direct your attention to June 23rd

2    into the 4th of 2008.

3              Were you working on that day?

4         A.    Yes, I was.

5         Q.    Were you working as a detective in the 105?

6         A.    Yes, I was.

7         Q.    What was your tour of duty that day?

8         A.    I believe I was probably working a 4:30 p.m. from

9    the night of the 23rd to 1 o'clock in the morning the

10   morning of the 24th.

11              MR. SCHECHTER:  Objection.  Not probably, I

12        would like to know what the officer's tour of duty was,

13        Judge.

14              THE COURT:  All right, detective, is that

15        your recollection as to --

16              THE WITNESS:  Yes, your Honor.

17              THE COURT:  The objection is overruled.

18              MR. SCHECHTER:  Is this June 23rd?

19              THE COURT:  Yes, into the early morning of

20        June 24th.

21              MR. SCHECHTER:  Your Honor, did I hear the

22        hours.

23              I'm sorry.

24              THE COURT:  4:30 p.m. on the 23rd to 1 a.m.

25        the morning of the 24th.

ws

Schulman - People - direct        23

1      Q.   On June 23rd, 2008 during the course of your tour

2   did there come a time when an investigation was assigned to

3   you?

4      A.   There did.  I believe it was actually probably

5   about 12:30 in the morning of the morning of the 24th.

6                MR. SCHECHTER:  Your Honor, once again, if

7          the officer says approximately I have no problem, but

8          when he says probably, then he's guessing.

9                THE COURT:  All right, let me make the

10         following suggestion.

11               Detective, I notice you're looking at some

12         paperwork that's there.

13               Do you need to look at that to refresh your

14         recollection?

15               THE WITNESS:  Only on a couple of minor

16         things.  I mean, we're talking almost a year ago.

17               THE COURT:  If you're going to look at any

18         paperwork, whether it's the DA or defense counsel,

19         indicate you need to look at it and what it is you're

20         looking at.

21               MR. SCHECHTER:  Your Honor --

22               THE WITNESS:  All right.

23               MR. SCHECHTER:  Your Honor, I respectfully

24         ask the officer be asked if he has to refresh his

25         recollection then, if he does, we know he's testifying

ws

1       from a refreshed recollection.

2                    THE COURT:  I'll let you and Ms. Johnson

3            figure out how you're going to ask that.

4                    Go ahead, Ms. Johnson, do you want to re-ask

5            that?

6                    MS. JOHNSON:  Yes.

7            Q.   On June 23rd, 2008, during the course of your

8       tour, did there come a time that you received an assignment?

9            A.   Yes.

10           Q.   And what was the nature of the investigation that

11      you were assigned to on June 23rd of 2008?

12           A.   On the early morning hours of the 24th, where I

13      was still on duty from my tour, I was notified that there

14      was a complainant in the 105 Precinct that was alleging that

15      she was a victim of a crime involving her stepfather as a

16      perpetrator and that it was of a sexual nature and that both

17      that complainant and ACS were involved in the case and that

18      an investigator was being asked to assist in the interviews.

19                   THE COURT:  Please lower the window?

20                   Thank you.

21           Q.   What was the name, not of the victim, of the

22      subject of the investigation?

23           A.   I learned that the subject in the investigation's

24      name was Harold Gopaul.

25           Q.   Can you tell us the circumstances of your first

Case 1:15-cv-01782-NGG  Document 8-11  Filed 08/31/15  Page 25 of 440 PageID #: 375

1    encounter with Harold Gopaul?

2        A.    I was advised by a Sergeant O'Hagan of the

3    105 Precinct, the desk officer, that he told me that

4    Mr. Gopaul had come into the precinct and based on --

5    Sergeant O'Hagan said to me based on his knowledge of this

6    particular case, that he recognized that Mr. Gopaul was the

7    subject of the investigation and he initiated to have

8    Mr. Gopaul taken into custody and arrested downstairs in the

9    precinct.

10       Q.    When were you advised Mr. Gopaul came into the

11   105 Precinct?

12       A.    About 4:45 in the morning on the morning of the

13   24th.

14       Q.    What were you doing at approximately 4:45 in the

15   morning on June 24th?

16       A.    I was still speaking to the victim, Sana Awan.

17                   THE COURT:  All right, let me just step back

18       for a minute.

19                   Go back to you said Officer O'Hagan --

20                   THE WITNESS:  Sergeant O'Hagan.

21                   THE COURT:  Sergeant O'Hagan.

22                   He's a sergeant where?

23                   THE WITNESS:  The 105 Precinct.

24                   THE COURT:  Which is your precinct?

25                   THE WITNESS:  Yes.  My office is upstairs on

1      the second floor and the patrol desk is on the first

2      floor.

3                  THE COURT:  And he tells you that the

4      defendant has come in to indicate that he is engaged in

5      what?

6                  Can you give us the time when this happens,

7      the date?

8                  THE WITNESS:  I'm -- I think I understand

9      you're question.

10                 Sergeant O'Hagan --

11                 THE COURT:  Just so you understand, I'm

12     trying to get a time context of when -- you say that

13     you get notified in the early morning hours of an

14     assignment concerning a possible investigation of

15     sexual abuse.

16                 THE WITNESS:  That's correct.

17                 THE COURT:  And that comes from O'Hagan?

18                 THE WITNESS:  I get a call from a detective

19     at the detective bureau, Queens, alerting me there was

20     a situation downstairs in the precinct.

21                 THE COURT:  In your own precinct?

22                 THE WITNESS:  In my precinct.

23                 I then contacted the sergeant downstairs who

24     provided me with some additional information and

25     enabled me to then be able to speak to the victim and

Schulman - People - direct          27

1   the ACS worker that was in the building interviewing

2   the complainant.

3              THE COURT:  Now, the victim in the building

4   at the time?

5              THE WITNESS:  Yes.

6              THE COURT:  And where is the defendant at

7   that time?

8              THE WITNESS:  When I'm alerted?

9              He's not in the building.  He comes in a few

10  hours later on his own and he walks into the precinct

11  and says who he is and that he's there looking for his

12  daughter.

13             THE COURT:  Okay, go ahead.

14  Q.   And do you learn this information from Sergeant --

15  from the sergeant?

16  A.   Yes, I do.

17  Q.   And what's his last name?

18  A.   O'Hagan.

19  Q.   Where -- are you still with the victim when you

20  actually hear this information from Sergeant O'Hagan?

21  A.   I had stepped out from speaking to the victim.  I

22  was alerted that the sergeant had something to tell me.

23             I came out of interviewing the victim and I had a

24  conversation that Mr. Gopaul had come into the precinct

25  wearing an Ecolab uniform, which is the company he, at the

                                                    ws

1     time, we were told, he worked for.  Sergeant O'Hagan had

2     indicated that he had been informed of that information

3     earlier so when he saw the Ecolab uniform and Mr. Gopaul

4     came in and said whatever he said, that they recognized that

5     he was going to be the subject in regards to the

6     investigation that was going on at that moment.

7         Q.    Did you learn from the sergeant what it was that

8     the -- that Harold Gopaul was coming to the precinct for?

9         A.    Sergeant O'Hagan told me that -- based on what he

10    was telling me, that Mr. Gopaul was coming in and he was

11    looking to report his daughter Sana Awan missing, that he

12    didn't know where she was, and at that point in time once

13    they knew who he was they had -- they took him into custody

14    and arrested him.

15        Q.    And do you see the person you referred to as

16    Harold Gopaul in the courtroom?

17        A.    Yes, I do.

18        Q.    Can you point to that person and identify an item

19    of clothing that they're wearing?

20        A.    A dark-skinned male wearing, it looks like,

21    possibly a blue striped suit with a red, blue-and-white-type

22    tie at the table.

23              MS. JOHNSON:    Your Honor, let the record

24         indicate the witness has identified the defendant.

25              THE COURT:    Yes.

1    Q.   Where was the defendant when you came into your

2   first contact with him?

3    A.   He was in an interview room in my office where I

4   had instructed one of the uniformed officers to bring him so

5   I can speak to him.

6    Q.   Can you describe for us what that interview room

7   looks like?

8    A.   It's -- there's a door leading into a room and the

9   room is probably ten by eight.  I would speculate as to the

10   measurements, without never having measured it myself.

11        When you first walk in there is a chair in front

12   of you, there's a table that's maybe two by three feet in

13   front of the chair and then there's another chair on the

14   other side of the table.

15        THE COURT:  All right, what time,

16    approximately when you meet him for the first time?

17        THE WITNESS:  It's about 5:10 in the morning.

18        THE COURT:  And this is in the --

19        THE WITNESS:  Morning of June 24th.

20        THE COURT:  In an interview room in the

21    105 Squad.

22        THE WITNESS:  That's correct, Judge.

23    Q.   Are there any windows in that interview room?

24    A.   There's a small window on the door, maybe 14 by 14

25   or 12 by 12 right, you know, like eye level on the door.

ws

Schulman - People - direct          30

1       Q.   Who was in the room with the defendant when you

2   first got there?

3       A.   He was in there by himself.  And the door had been

4   secured from the outside and I opened the door and walked

5   in.

6       Q.   Who was outside of the door?

7       A.   I don't recall specifically.  I don't want to

8   speculate.  It would have been whoever the sergeant had sent

9   Mr. Gopaul up with.

10              MR. SCHECHTER:  Objection as to what was

11         probable.

12              THE COURT:  Yes, don't guess.  If you don't

13         know just tell us.

14              THE WITNESS:  Yes, I don't know specifically.

15      Q.   Was it a police officer or civilian?

16      A.   Police officer.

17      Q.   What was the defendant doing inside that room when

18   you first entered?

19      A.   He was sitting in a chair at a table.

20      Q.   Was he handcuffed?

21      A.   No.

22      Q.   Where were his handcuffs, if you know?

23      A.   Pardon me?

24      Q.   Where were his handcuffs if you know?

25      A.   I don't know.

ws

Schulman - People - direct          31

1       Q.    Where was your gun when you entered the room?

2       A.    It was locked up outside in my office.

3       Q.    When had you locked your gun up?

4       A.    When I was first apprised that Mr. Gopaul had been

5   taken into custody and was going to be brought up to be

6   interviewed in my office.

7       Q.    Was the defendant sitting or standing when you

8   came -- when you went into the interview room?

9       A.    Sitting.

10      Q.    Was he sleeping?

11      A.    No.

12            MR. SCHECHTER:  Objection to the leading.

13      Q.    What was he doing?

14      A.    He was awake and conscious and he was just sitting

15  at the table.

16      Q.    Where did you go upon entering the interview room?

17      A.    I sat at the first chair on the opposite side of

18  the table of Mr. Gopaul facing him.

19            THE COURT:  Okay, let me just interrupt you.

20            Could I just see both counsel?

21            (Discussion held at the bench, off the

22       record.)

23            (Pause in the proceedings.)

24            THE COURT:  All right, Ms. Johnson, whenever

25       you're ready.

1    Q.   What did you say to defendant when you entered the

2    interview room?

3    A.   I introduced myself, something to the effect of,

4    "I'm Detective Schulman.  I'm conducting an investigation.

5    Before I can speak to you about the investigation I need to

6    read you what's called Miranda warnings before I can proceed

7    with having any other conversation with you."

8    Q.   What was the defendant's response to you, if any

9    response?

10   A.   I don't know initially that he said anything.  I

11   think he might have just nodded his head in an okay-type

12   motion.

13        I then went on to -- you know, I had a pre-printed

14   Miranda warning form that I went on to -- you know, I

15   explained to him, "I'm going to read you these questions.  I

16   need a clear and concise answer, yes or no, if you

17   understand what I'm reading to you."

18        He said okay.

19        I read him the first question of the Miranda

20   warning.

21        Mr. Gopaul acknowledged that his answer was yes,

22   that he understood.

23        I proceeded -- I mean, should -- I proceeded

24   likewise for all six questions on the Miranda form and

25   Mr. Gopaul's responses to each question was yes, he

Schulman - People - direct        33

1    understood.

2         Q.   What language were you having this conversation

3    in?

4         A.   In English.

5         Q.   And what language were the defendant's responses

6    in?

7         A.   In English.

8              MS. JOHNSON:  I'm going to ask that this be

9         marked as People's Exhibit Number 1 for identification,

10        please?

11             THE COURT:  People's 1.

12             (People's Exhibit 1 marked for

13        identification.)

14             MS. JOHNSON:  May I have that shown to the

15        witness, please?

16             (Shown to witness.)

17        Q.   Detective Schulman, if you could take a look at

18   People's 1 for identification?

19             Do you recognize that document?

20        A.   Yes, I do.

21        Q.   What do you recognize that to be?

22        A.   It's a photocopy of the Miranda warning sheet that

23   was used and read to Mr. Gopaul and prepared on the morning

24   of June 24th of 2008.

25        Q.   How is it that you know that it was the form that

                                                          ws

Case 1:15-cv-01782-NGG  Document 8-11  Filed 08/31/15  Page 34 of 440 PageID #: 384

1    was prepared with regards to this case?

2         A.   The spots on the form that were prepared by me are

3    in my handwriting.  I was present when Mr. Gopaul signed it

4    and I affixed my own signature as well.

5         Q.   Is that a fair and accurate copy of the original?

6         A.   Yes, it is.

7              MR. SCHECHTER:  May I have a voir dire?

8              THE COURT:  Well, could you wait until she

9         offers it?

10             MR. SCHECHTER:  Yes, Judge.

11             MS. JOHNSON:  I would now offer what's been

12        marked as People's 1 for identification into evidence

13        for purposes of the hearing.

14             THE COURT:  You want a voir dire,

15        Mr. Schechter?

16             MR. SCHECHTER:  Yes, Judge.  I jumped the gun

17        a little bit.

18   VOIR DIRE EXAMINATION

19   BY MR. SCHECHTER:

20        Q.   Detective Schulman, where is the original of this

21   document?

22        A.   In my case folder.

23        Q.   May I see it, please?

24             THE COURT:  Yeah, if you have it.

25             THE WITNESS:  Should I leave it in the folder

Schulman - People - direct          35

1       or take it out?

2                    THE COURT:  Can you take it out without

3            having papers fly all over the place?

4                    THE WITNESS:  I'll do my best.

5                    (Shown to counsel.)

6            Q.   Now, officer, how many of these documents do you

7       have with you when you go into the room to speak to an

8       accused?

9            A.   Just one.

10           Q.   And when -- where did this document come from?

11           A.   Can you be more specific?

12           Q.   Yes, where did you get this document from?

13           A.   There's a file drawer in my office where there is

14      assorted documents that we might need on any given day.

15           Q.   And all those documents are the same?

16           A.   Depending which drawer you look at.

17           Q.   All the Miranda warning documents are the same?

18           A.   To my knowledge, yes.

19           Q.   They're in your drawer, correct?

20           A.   Pardon me?

21           Q.   They're in your drawer?

22           A.   It's not my drawer, it's an office drawer.

23           Q.   Office drawer, I see.

24                When you took this document out, was this document

25      blank or did it have any writing on it?

                                                              ws

Schulman - People - direct          36

1          A.   It was blank.

2          Q.   And who put the notation of 0510 on the top right

3     of the document?

4          A.   When I sat down with Mr. Gopaul I did.

5          Q.   So that wasn't there when you got the document?

6          A.   No.

7          Q.   Were there anything -- was there anything else

8     written on this document when you came into the room?

9          A.   Other than the typed pre-printed information, no.

10              MR. SCHECHTER:   Judge, I'm finished with voir

11         dire.

12              THE COURT:   Okay, any objection?

13              MR. SCHECHTER:   Not for purposes of the

14         hearing.

15              THE COURT:   All right, People's 1 to be

16         received in evidence.

17              (People's Exhibit 1 received in evidence.)

18    DIRECT EXAMINATION CONT'D

19    BY MS. JOHNSON:

20         Q.   Detective Schulman, can you please read for us how

21    you read the defendant his Miranda warnings on June 24th,

22    2008?

23         A.   Well, as I was just describing, I initially wrote

24    0510 as to note the time that I was starting to read them.

25              I then said, "You have the right to remain silent

                                                            ws

1    and refuse to answer questions.  Do you understand?"

2              Mr. Gopaul clearly stated yes, that he understood.

3              "Anything you do say may be used against you in a

4    court of law.  Do you understand?"

5              Mr. Gopaul replied yes.

6              "You have the right to consult an attorney before

7    speaking to the police and to have an attorney present

8    during any questioning, now or in the future.  Do you

9    understand?"

10             Mr. Gopaul responded yes.

11             If I could just backtrack, as Mr. Gopaul was

12   responding yes to each question I was writing his answer

13   down at each line before I proceeded to the next question.

14             THE COURT:  So the yes that appears after

15        each question is your handwriting?

16             THE WITNESS:  That is correct.

17        Q.   And whose initials appear next to yes?

18        A.   Mr. Gopaul's.

19        Q.   And who wrote those initials down?

20        A.   Mr. Gopaul, after the complete -- should I

21   continue reading all six questions or no?

22        Q.   Yes, please.

23        A.   As I was saying, I read Question 1.  I asked, "Do

24   you understand?"

25             Mr. Gopaul replied yes.  I wrote yes in my

1    handwriting.

2              I read Question 2 and, again, after he responded

3    yes I wrote yes.

4              And I think I was up to Question 4, is that

5    accurate?

6         Q.   Yes.

7         A.   Okay, "If you cannot afford an attorney one will

8    be provided for you without cost.  Do you understand?"

9              Mr. Gopaul replied yes.  I wrote the answer yes.

10             "If you do not have an attorney available you have

11   the right to remain silent until you have had an opportunity

12   to consult with one.  Do you understand?"

13             Mr. Gopaul responded yes.  I wrote the answer yes.

14             "Now that I have advised you of your writes are

15   you willing to answer questions?"

16             Mr. Gopaul answered yes and I wrote the answer

17   yes.

18        Q.   And after you marked yes who was it that initialed

19   after each question?

20        A.   Well, I then said to Mr. Gopaul, "I would like you

21   to read each question yourself, make sure you understand

22   what I read to you and affirm that the yes answers you gave

23   to me are still your answers to these questions."

24        Q.   Did you hand him the piece of paper?

25        A.   I handed him the piece of paper, took it and

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 39 of 440 PageID #: 389

1    looked at it, read each question and he said to me that, "My

2    yes answers to each question are still correct."

3              I asked Mr. Gopaul, "If you would, please place

4    your initials next to each yes answer you responded to me

5    and also if you would print and sign your name on the lower

6    portion of the form to indicate that you understand these

7    rights."

8              He did, he did in each place, printed and signed

9    his name on the back, handed it back.

10             I signed and affixed my shield number and then I

11   wrote the date and time that was complete.

12        Q.   And is that the June 24th 2008 at 5:15 a.m.?

13        A.   That is correct.

14        Q.   Were any threats made to the defendant prior to

15   him signing that Miranda warning sheet?

16        A.   No.

17        Q.   Were any promises made to him?

18        A.   No.

19        Q.   Where was your gun while those Miranda warnings

20.  were issued?

21        A.   It was locked up outside in my office.

22        Q.   At any time during the issuance of these Miranda

23   warnings did defendant ask to speak to an attorney?

24        A.   No.

25        Q.   At any time during the issuance of these Miranda

Schulman - People - direct        40

1    warnings did defendant indicate he no longer wished to speak

2    to you?

3         A.   No, he did not.

4         Q.   Was the defendant cooperative with you?

5         A.   Yes.

6         Q.   Did you actually -- did you personally observe him

7    sign and print his name where it's marked defendant?

8         A.   Yes, I did.

9         Q.   Did he ever ask -- did he ever indicate to you he

10   had any questions for you?

11        A.   No, he did not.

12        Q.   After the defendant signed the Miranda warning

13   form what did you do next?

14             THE WITNESS:  I'm just going to refer to my

15        notes so I have the correct order of the next form.

16             THE COURT:  Do you need to look at them to

17        refresh your recollection?

18             THE WITNESS:  I do, your Honor.

19             THE COURT:  Could you please indicate what

20        you're referring to?

21             THE WITNESS:  Absolutely, your Honor.

22             Okay, I'm referring to a complaint follow-up

23        report that I prepared.

24             THE COURT:  Does it got a number?

25             THE WITNESS:  It's labeled follow-up

ws

Schulman - People - direct          41

1           Number 3.

2                     THE COURT:  Do you have that, Mr. Schechter?

3                     MR. SCHECHTER:  As I said, your Honor, I was

4           just given these documents and I have not had a chance

5           to review them.

6                     If counsel could refer them to me, then it

7           certainly will be helpful.

8           Q.    Detective Schulman, are you referring to the

9     complaint follow-up informational report unapproved under

10    summary of investigation?

11          A.    I'm referring to an approved copy.

12          Q.    With a summary of investigation, Paragraph 1, on

13    June 24th, 2008 at approximately 4:45 hours?

14          A.    That would be the report that I'm referring to.

15                    MS. JOHNSON:  That would be in the Rosario

16          material.

17                    MR. SCHECHTER:  I don't believe I have it,

18          Judge.

19                    MS. JOHNSON:  Page --

20                    MR. SCHECHTER:  Can I see the report please?

21                    MS. JOHNSON:  Sure.

22                    (Shown to counsel.)

23                    MR. SCHECHTER:  I don't have that.  At least

24          I don't see it.

25                    If I could be given just one minute?

                                                        ws

Schulman - People - direct          42

1    A.    I don't want to speak out of turn.

2              MS. JOHNSON:  It's towards the end.

3              (Pause in the proceedings.)

4              THE WITNESS:  Is it okay if I leave this

5      here?

6              THE COURT:  Yes.

7              Okay, Ms. Johnson, did you have a question?

8              MS. JOHNSON:  Can I continue?

9              THE COURT:  Yes.

10   Q.    Detective Schulman, what happened after you issued

11   the Miranda warnings to the defendant and he signed them?

12             MR. SCHECHTER:  Your Honor, I'm a little

13     confused.  Counsel asked the officer a question about

14     the complaint follow-up report and she said it's marked

15     unapproved and the officer answered that, no, it's

16     approved.  I only got an unapproved copy so I don't

17     know what the officer is referring to here.

18             THE COURT:  All right.

19             THE WITNESS:  Can I explain why that is, your

20     Honor?

21             THE COURT:  Yeah, could you?

22             THE WITNESS:  And it's based on my

23     understanding.  The computer system that the Police

24     Department was using at the time allows for us to,

25     using the computer program, type our complaint

                                                    WS

Schulman - People - direct          43

1    follow-up reports and then they're submitted to the
2    supervisor for approval.
3              After the supervisor approves it it no longer
4    shows the unapproved marking on it.
5              So I have the completed version which is
6    going to be consistent with the unapproved one with the
7    exception of the unapproved no longer appears.
8              THE COURT:  Let me ask you this.  Is it
9    identical of the unapproved one.
10             MR. SCHECHTER:  I don't have a copy of the --
11             THE COURT:  Mr. Schechter, would you mind if
12   I got some answers before you start interrupting me?
13             MR. SCHECHTER:  I'm sorry and I do apologize.
14             THE COURT:  Would it be identical to the
15   unapproved?
16             THE WITNESS:  The unapproved would no longer
17   appear and the supervisor that approved this
18   information would then be tagged in.
19             THE COURT:  People, what I'm going to direct
20   you to do is whatever he's referring to, make a copy of
21   it before Mr. Schechter cross-examines the detective.
22             MS. JOHNSON:  That's fine, your Honor.
23             MR. SCHECHTER:  Thank you, your Honor.
24   Q.   Detective Schulman, is the summary of the
25   investigation in the unapproved the same as that of the

1    approved?

2         A.    It is.

3         Q.    And is that what you're refreshing your

4    recollection with, the summary of the investigation?

5         A.    Yes.

6         Q.    Can you now tell us what happened after the

7    defendant signed that Miranda form?

8         A.    Okay, I then stated to Mr. Gopaul that before I

9    could proceed that I would like to gather his consent to

10   search his work vehicle that he was in possession of and his

11   home.

12             I said, "In order for me to do that I'm going to

13   read to you a consent form that I have in order to get your

14   permission."

15             I then -- you know, while I was sitting in front

16   of Mr. Gopaul I wrote his name in the blank on the consent

17   search of the home form and I wrote in the home address and

18   who he would be authorizing if he consented to this search.

19             I then --

20        Q.    I'm sorry, just to interrupt you there, was this

21   still all going on in the interview room?

22        A.    Yes.

23        Q.    Had anybody else come into the room at this point?

24        A.    No, they had not.

25        Q.    Was defendant still unhandcuffed?

Schulman - People - direct          45

1      A.   Yes, he was.

2      Q.   Were you still at the same desk with him?

3      A.   Yes, I was.

4      Q.   And was your weapon still secured?

5      A.   Yes, it was.

6      Q.   At that point had the defendant indicated he no

7  longer wished to speak to you?

8      A.   No, he had not.

9      Q.   Did he ask any questions of you?

10     A.   No, he had not.

11     Q.   Did he ask to speak to an attorney?

12     A.   No, he had not.

13               MS. JOHNSON:   I'm going to ask that this be

14     marked as People's Exhibit Number 2 for identification.

15               (People's Exhibit 2 marked for

16     identification.)

17               (Shown to witness.)

18               MS. JOHNSON:   If I could have that shown to

19     the witness, please?

20               THE COURT:   He's got it.

21     Q.   Detective, if you could take a look at People's 2

22  for identification?

23         Do you recognize that?

24     A.   Yes, I do.

25     Q.   What do you recognize that to be?

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 46 of 440 PageID #: 396

1          A.    It is a photocopy of the consent search

2    pre-printed form that I had filled in a couple of blanks and

3    then read to Mr. Gopaul, to which he had given his consent

4    to search his home.

5          Q.    Is that the form you were just referring to prior

6    to me marking that for identification purposes?

7          A.    Yes, it is.

8          Q.    And can you explain to us what the conversation

9    was with the defendant prior to him signing this consent

10   form?

11         A.    I read to Mr. Gopaul the substance of the form

12   which at that point, after I had filled in a couple of

13   blanks, "That I, Harold Gopaul, having been requested to

14   consent to a search of my home located at 242-10 89th

15   Avenue, Bellerose, New York, 11426, and having been duly

16   advised of my Constitutional rights to, A, refuse such

17   consent; B, to require that a search warrant be obtained

18   prior to any search; C, that if I do consent to a search,

19   any evidence found as a result of such search can and will

20   be used against me in any civil or criminal proceedings; D,

21   that I may consult with an attorney of my choosing before or

22   during the search; and, that, E, I may withdraw my consent

23   to a search at any time prior to its conclusion.

24              I then read, "After having been advised of my

25   Constitutional rights I hereby knowingly, intelligently and

                                                        ws

Schulman - People - direct          47

1    voluntarily waive my above rights and consent to search.  I

2    authorize Detective Schulman or authorized representative of

3    the NYPD to conduct a complete search of the above-described

4    location, premise, residence/location apartment."

5         Q.   And is People's 2 for identification a fair and

6    accurate copy of the form you read to the defendant?

7         A.   Yes, it is.

8                   MS. JOHNSON:  Your honor, I would ask that

9         for hearing purposes People's Exhibit 2 be marked into

10        evidence.

11                  MR. SCHECHTER:  May I see the original

12        document, your Honor, before?

13                  THE COURT:  Yes.

14                  MR. SCHECHTER:  It might obviate the

15        necessity for voir dire.

16                  (Shown to counsel.)

17                  THE COURT:  Any objection?

18                  MR. SCHECHTER:  Not for the purposes of the

19        hearing, your Honor.

20                  THE COURT:  All right, so without objection

21        for the hearing, People's 2 will be received in

22        evidence.

23                  (People's Exhibit 2 received in evidence.)

24                  (Shown to witness.)

25        Q.   Detective Schulman, what you just read to us, was

                                                            ws

Schulman - People - direct          48

1    that how you read it to the detective in the interview room?

2         A.   Yes, it was.

3         Q.   And what was his response to you reading that

4    consent search form?

5         A.   Mr. Gopaul stated yes, he would consent.

6              I then said to him, "Well, again, I would like to

7    you read this to yourself."

8              He read it to himself and then he signed his name

9    and he put the date and time and our location on the bottom

10   of the form and handed it back to me.

11        Q.   Did you observe the defendant put his signature on

12   that form?

13        A.   Yes, I did.

14        Q.   And who was it that actually wrote the location,

15   the date and the time?

16        A.   Mr. Gopaul.

17        Q.   And by that are you indicating that the defendant

18   wrote 5:20 a.m., June 24th, 2008, 105 detective squad?

19        A.   Yes, I am.

20        Q.   Did you observe him read this form?

21        A.   Yes, I did.

22        Q.   Did he have any questions for you after reading

23   it?

24        A.   He did not.

25        Q.   Did he ask to speak to an attorney after he read

Schulman - People - direct          49

1    it and before he signed it?

2         A.   He did not.

3         Q.   Were any threats made to him prior to signing it?

4         A.   No, there were not.

5         Q.   Were any promises made?

6         A.   No.

7         Q.   Had anybody entered or left the room during the

8    time this consent form was read to the defendant?

9         A.   No.

10        Q.   And where was your weapon at that point?

11        A.   It was still locked up outside in my office.

12        Q.   Following the defendant's signing this consent

13   form marked as People's 2, what was the next conversation

14   you had with the defendant?

15        A.   Well, after he signed it I signed it and then the

16   next thing I did is I said to him that, as I had priorly

17   (sic) said to him, I was going to read to him a consent to

18   search his vehicle.

19              MS. JOHNSON:   Your Honor, I'll ask this be

20         marked as People's Exhibit 3 for identification.

21              (People's Exhibit 3 marked for

22         identification.)

23              (Shown to witness.)

24        Q.   Detective, if you could please take a look at what

25   has been marked as People's Exhibit 3 for identification

                                                            ws

1    purposes?

2            Do you recognize that?

3        A.    Yes, I do.

4        Q.    What do you recognize that to be?

5        A.    This is the pre-printed consent form that I used

6    to ask Mr. Gopaul for consent to search the vehicle that he

7    was the legal custodian of at the time.

8        Q.    How do you know that that's the one you used in

9    this case with this defendant?

10       A.    The handwriting of the items that I filled in are

11   in my handwriting, I witnessed when it was signed and I also

12   affixed my own signature on the bottom of the form.

13       Q.    Is that a fair and accurate copy of the original

14   form?

15       A.    Yes, it is.

16            MS. JOHNSON:   Your Honor, we would ask that

17        this be marked as People's 3 in evidence for purposes

18        of this hearing.

19            THE COURT:   You're getting the original right

20        now, Mr. Schechter.

21            MR. SCHECHTER:   Thank you, Judge.

22            (Shown to counsel.)

23            MR. SCHECHTER:   No objection for purposes of

24        the hearing.

25            THE COURT:   Without objection, People's 3 in

                                                      ws

Schulman - People - direct          51

1    evidence.

2              (People's Exhibit 3 received in evidence.)

3              THE COURT:  Okay, Ms. Johnson.

4              (Shown to witness.)

5    Q.   Detective, if you could take a look at that

6    document?

7              Could you tell us how it was that you read that

8    document to Mr. Gopaul on June 24th, 2008?

9    A.   While I was sitting with Mr. Gopaul I was filling

10   in the top captions that would need to be filled in for me

11   to read it to him.

12             After that was complete I then read, "I Harold

13   Gopaul am the owner/legal custodian of a 2006 Dodge Ram

14   bearing license plate number 22726JV and VIN number

15   1D7HA16NX6J220067, which is currently located at side of the

16   105 Precinct.

17             "I have been duly advised of my rights to:  One,

18   refuse such consent; two, require that a search warrant be

19   obtained prior to any search; three, that if I do consent to

20   a search, any evidence found as a result of such search can

21   and will be used against me in any criminal proceeding;

22   four, that I may withdraw my consent to search any time

23   prior to its conclusion.

24             "I knowingly, intelligently and voluntarily waive

25   my above rights and consent and authorize Detective Schulman

                                                        ws

Case 1:15-cv-01782-NGG  Document 8-11  Filed 08/31/15  Page 52 of 440 PageID #: 402

1   or his duly authorized agent of the New York City Police
2   Department to conduct said search."
3          Q.   And who signed this document?
4          A.   After Mr. Gopaul indicated that he would consent
5   he again he read the form to himself and agreed that he
6   would consent.  He then affixed in his own handwriting, the
7   date and time and he printed his name and he signed his name
8   and then I signed my name below as witness.
9          Q.   Where it says date June 24th, 2008, time 5:30
10  a.m., is that your handwriting or the defendant's
11  handwriting?
12         A.   That is Mr. Gopaul's handwriting.
13         Q.   And next to the word subject where it is a printed
14  name of Harold Gopaul and then a signature, who marked that
15  printed name?
16         A.   Mr. Gopaul.
17         Q.   And did you observe him sign that document?
18         A.   Yes, I did.
19         Q.   Prior to defendant signing this were any promises
20  made to him?
21         A.   No, there were not.
22         Q.   Were there any threats made to him?
23         A.   No.
24         Q.   Any physical force used upon him?
25         A.   No.

ws

Schulman - People - direct            53

1          Q.    Was he still unhandcuffed?

2          A.    Yes, he was.

3          Q.    Had anybody -- any member of law enforcement

4     entered or left the room up until that point?

5          A.    No.

6          Q.    Did he indicate he wanted to speak to an attorney

7     at the time?

8          A.    No, he did not.

9          Q.    Did he have any questions for you?

10         A.    No, did he not.

11         Q.    And he indicated orally prior to signing this that

12    he wished to waive his rights and consent to this?

13         A.    Yes.

14         Q.    Did you observe him read over the documents?

15         A.    Yes.

16              THE COURT:   Detective, just to kind of put

17         this -- put some context to this, are these forms being

18         presented to him after you've now read him his Miranda

19         warnings, as you've testified?

20              THE WITNESS:   That's correct.

21              THE COURT:   Is there any time that's on the

22         forms or that you noted anywhere as to when these

23         events are taking place at all?

24              THE WITNESS:   Yes, your Honor.

25              THE COURT:   On the forms themselves?

Case 1:15-cv-01782-NGG  Document 8-11  Filed 08/31/15  Page 54 of 440 PageID #: 404

1          THE WITNESS:  Yes.

2      Q.   With regards to the -- I'm sorry, do you have both

3  of the documents up there for you?

4      A.   Yes.

5      Q.   With regards to the consent search that's been

6  marked into evidence of the home, that 5:20 a.m. time, is

7  that the time that the consent was read or the time the

8  defendant signed it?

9      A.   The time that he's signing it.

10     Q.   And on the consent form for the vehicle, the 5:30

11  a.m., what time does that represent, that 5:30 time?

12     A.   That, again, represents the time that he is

13  signing it.

14     Q.   And --

15     A.   Which he actually wrote in his own handwriting

16  just prior to signing it.

17     Q.   And those were both signed after the Miranda

18  warnings were issued?

19     A.   That is correct.

20     Q.   And after the defendant signed the Miranda form?

21     A.   That's correct.

22     Q.   After both of those consent forms were signed what

23  did you do?

24     A.   At that moment I stepped out and took a break for

25  a little while.  I had to go back and speak to the victim

ws

Schulman - People - direct          55

1    and get some other information.

2         Q.   Did there come a time when you came back into the

3    interview room to speak with the defendant?

4         A.   There did.

5         Q.   Approximately what time was that?

6              THE WITNESS:  Again, I'm going to refer to

7         that same report, your Honor.

8              THE COURT:  Okay.

9         A.   It was approximately 6:20 on the morning of

10   June 24th.

11        Q.   What was the defendant doing at 6:20 when you went

12   into the interview room?

13        A.   He was sitting awake, and appeared coherent, in

14   the same chair that he had been sitting in with his eyes

15   open.

16        Q.   Same interview room as before?

17        A.   Same interview room.

18        Q.   Was he handcuffed?

19        A.   No, he was not.

20        Q.   Was your weapon still secured?

21        A.   Yes, it was.

22        Q.   Was anybody else in the room?

23        A.   No, they were not.

24        Q.   What did you do when you went into the interview

25   room?

Schulman - People - direct          56

1       A.    Okay, I went in and asked Mr. Gopaul if he knew

2   why he was in custody and under arrest.

3             And he stated that, you know, on Saturday, prior,

4   he had an argument and he had to slap Sana.

5             So I asked him if he wished to, you know, to make

6   a written statement in regards to what had happened Saturday

7   and he indicated yes.

8       Q.    When you say Sana you're referring to Sana Awan,

9   the complainant in this matter?

10      A.    That's correct.

11      Q.    Where was the victim while you were having this

12  conversation with the defendant?

13      A.    She was in another interview room in my office.

14      Q.    What did the defendant say to you after you asked

15  him if he would like to talk about what happened on that

16  Saturday?

17      A.    Well, he then --

18            MR. SCHECHTER:    Your Honor, I'm sorry to

19      interrupt the witness, your Honor, but the witness has

20      been continually reading from his documents.  I'm going

21      to object because instead of it being his testimony,

22      he's reading from documents and they're not in

23      evidence.

24            THE COURT:    There's times when I'm making my

25      own notes and I may not see that myself.

1              Detective, if you're going to look at the

2         documents just indicate you need to look at them and

3         just tell Ms. Johnson and just identify -- I'm

4         assuming, unless I hear from you differently, the

5         document -- you're referring to the document that you

6         have as approved, but our copies say unapproved?

7                   THE WITNESS:  Yes.

8                   THE COURT:  Is that what you're referring to?

9                   THE WITNESS:  Sometimes I'm just looking

10        down, I'm not actually look looking at it.

11                  THE COURT:  Okay, if you're referring to any

12        document just tell us you need to do that.

13                  THE WITNESS:  Yes, your Honor.

14        Q.   What did the defendant say to you after you asked

15   him if he would like to talk to you about what happened on

16   Saturday?

17        A.   He made that initial comment that he had an

18   argument with her on Saturday and slapped her.

19             I asked him if he would like to make a written

20   statement about that and he said yes.  I then gave him a pad

21   and a pen and he was allowed to write out a statement.

22        Q.   What did you say to him when you gave him the pad

23   and the pen?

24        A.   Write down what happened, or something to that

25   effect, very similar to that.

Schulman - People - direct          58

1    Q.   And you provided him with the pad and the pen?

2    A.   That's correct.

3    Q.   And what did defendant do with the pad and pen?

4    A.   He wrote out a statement.

5              MS. JOHNSON:   I'm going to ask this be marked

6    as People's Exhibit 4 for identification.

7              THE COURT: People's 4.

8              (People's Exhibit 4 marked for

9    identification.)

10             THE COURT:  Okay, Ms. Johnson?

11             MR. SCHECHTER:   Can I see the original?

12             THE COURT:  Are you going to be offering this

13   in evidence?

14             MS. JOHNSON:  Yes, your Honor.

15             THE COURT:  So why don't you give the

16   original to my officer?

17             (Shown to counsel.)

18             MR. SCHECHTER:   May I have a moment, your

19   Honor?

20             THE COURT:  Yes.

21             (Pause in the proceedings.)

22             MS. JOHNSON:  Your Honor, there's another

23   statement I'm going to be offering, so if we could just

24   have the detective pull that out now.

25             THE COURT:  Well, I'm looking at MY clock.

ws

Schulman - People - direct          59

1      Let's just deal with this one statement.

2                   MS. JOHNSON:  Okay.

3                   (Pause in the proceedings.)

4                   MR. SCHECHTER:  Your Honor, I would just

5      like to say parenthetically, the copy of that statement

6      that was given to me does not contain a second page and

7      leaves out at least three or four lines on the bottom.

8      This is the first I've noticed the second page as well

9      as the bottom of that first page.

10                  THE COURT:  You're talking about the second

11     page?

12                  MR. SCHECHTER:  Of this statement.

13                  THE COURT:  It's a two-page statement, yes?

14                  MR. SCHECHTER:  Yes.  I only have one page.

15                  THE COURT:  In terms of the Rosario material?

16                  MR. SCHECHTER:  In terms of my discovery

17     material, Judge.

18                  THE COURT:  Okay.  Well, let me ask you this,

19     before we get to the parenthetical material, do you

20     have any objection to this coming into evidence?

21                  MR. SCHECHTER:  Not for purposes of the

22     hearing.

23                  THE COURT:  For purposes of the hearing.

24                  MS. JOHNSON:  We're talking about the

25     June 24th, 2008 statement first that was timed 6: --

                                                    ws

Proceedings                    60

1              MR. SCHECHTER:   30.

2              MS. JOHNSON:   -- 25 a.m.?

3              MR. SCHECHTER:   Yes, that statement.

4              THE COURT:   Detective, would you do me a

5     favor, just so the record is clear, look at what's been

6     marked People's 4 for identification and could you tell

7     us what time that statement is?

8              THE WITNESS:   6:25 a.m. on June 24th of 2008.

9              THE COURT:   And how many pages is it?

10             MS. JOHNSON:   It is two pages.

11             THE WITNESS:   It is two pages, your Honor.

12             THE COURT:   So at this point I'm going to

13    interrupt Ms. Johnson, we're going to break until

14    tomorrow.

15             MS. JOHNSON:   For the uniformed officer.

16             THE COURT:   For the uniformed officer.

17             MR. SCHECHTER:   What is the officer's

18    commitments with respect to his return for purposes of

19    completion of the record?

20             THE COURT:   I'm going to get that in a

21    minute.

22             Let me ask you this, detective, are you

23    unavailable tomorrow?

24             THE WITNESS:   I am -- your Honor, actually, I

25    only got notified last minute last night about today

                                                    ws

1    and I didn't get home until 4 o'clock from working last
2    time and then out of courtesy for the Court I made it a
3    point of changing my schedule today, so I actually have
4    my children in the morning tomorrow.
5               THE COURT:  Can you be here Monday morning?
6               THE WITNESS:  Again, I'll have my children.
7    It will be a little difficult.
8               THE COURT:  I don't mean to be difficult
9    myself and I understand.
10              THE WITNESS:  Is there a chance we can do
11   Monday afternoon?
12              I want to work with the Court.
13              THE COURT:  All right, what I'm going to do
14   is plan on being here Monday, regardless.  I'll let
15   Ms. Johnson know as to whether or not I definitely need
16   you here Monday morning or afternoon.
17              MR. SCHECHTER:  May I have a sidebar when
18   the officer is off the stand?
19              THE COURT:  For now you are excused until
20   Monday.  Make sure you take your file with you.
21              MR. SCHECHTER:  Maybe you could hold him for
22   one brief second while I have a sidebar with the Court,
23   please?
24              THE COURT:  Yeah, why don't you just gather
25   your stuff, detective, have a seat in the back of the

ws

Proceedings                    62

1       courtroom.

2                   (Witness steps down.)

3                   (Discussion held at the bench, off the

4       record.)

5                   THE COURT:  Mr. Schechter, I'm going to ask

6       your client some questions relative to this application

7       for daily copy.

8                   Mr. Gopaul, I'm showing you a document that I

9       believe your attorney went over with you earlier.  It

10      appears to have your signature in there and it deals

11      with certain financial matters regarding your request

12      for minutes to be provided to your attorney on a daily

13      basis.

14                  Is that your signature that appears there?

15                  THE DEFENDANT:  Yes, your Honor.

16                  THE COURT:  And you went over this with your

17      attorney before signing it?

18                  THE DEFENDANT:  Yes, sir.

19                  THE COURT:  And everything that you -- all

20      the answers that are contained in there are true?

21                  THE DEFENDANT:  Yes, your Honor.

22                  MR. SCHECHTER:  Just so that the record is

23      clear and your Honor understands, your Honor, this

24      document -- it's his wife -- he has a business, an

25      extermination business, that's in his wife's name.  He

                                                          ws

Proceedings                    63

1    is the worker for his company and paid a salary, but

2    the wife is the owner of the company and the money that

3    is alleged there in that document is money that is in

4    the wife's name and the wife's bank accounts.

5              THE COURT:  Okay, all right, so I've signed

6    it.  I'll direct my reporter to provide you with daily

7    copy.

8              MR. SCHECHTER:    Thank you, Judge.

9              THE COURT:  Mr. Gopaul, listen to my clerk

10   for a moment.

11             THE CLERK:  Mr. Gopaul, you have to appear

12   tomorrow morning.

13             If you fail to appear a warrant can be issued

14   for your arrest, you will be subject to the charge of

15   bail jumping and the case will proceed in your absence.

16             Do you understand?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Detective, we need you to be here

19   9:30 Monday.

20             THE WITNESS:  Okay.

21             THE COURT:  And, you know, I was told that

22   this matter was ready to go.  It's got to go from day

23   to day.  Everybody has certain scheduling orders that

24   they have to follow, including myself, so we're going

25   to need you here 9:30 on Monday, okay?

                                                      ws

Proceedings                    64

1              (Proceedings adjourned to Friday, March 1st,

2     2009 at 9:30 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                      ws

65

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NASSAU : CRIMINAL TERM PART 80

3    ----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,     :   Indictment
4                                             :   No. 2415N/08
                  -against-                   :
5                                             :
     HAROLD GOPAUL,                           :   Sex Abuse 1
6                                             :
                         Defendant.           :   Huntley/Mapp
7    ----------------------------------------X   Hearings

8                              May 1, 2009

9                              252 Old Country Road
                               Mineola, New York
10

11   B E F O R E:

12              HONORABLE JAMES P. McCORMACK,
                        Acting Supreme Court Justice
13

14   A P P E A R A N C E S:

15              (As previously noted.)

16
                *      *      *      *      *
17

18              THE CLERK:  The People against Harold Gopaul,

19        Indictment 2415N of 2008

20              MS. JOHNSON:  For the People, Jamie Johnson.

21              MR. SCHECHTER:  On behalf of the defendant,

22        Harold Gopaul, Donald R. Schechter, 80-02 Kew Gardens

23        Road, Kew Gardens, New York.

24              I'm ready to proceed.

25              THE COURT:  People?

                                                    ws

Proceedings                    66

1          MS. JOHNSON:  Your Honor, yesterday we had

2     sent a subpoena yesterday early morning for -- and, in

3     fact, it was sent also while I wasn't at work on

4     Wednesday for Police Officer Alfaro, A-l-f-a-r-o, to

5     appear for the hearing.  We had sent one subpoena for

6     her to appear at the hearing yesterday and we sent

7     another one for her to appear today.

8          I have spoken personally with police liaison

9     from the NYPD and I've spoken to police liaison from

10    Nassau County.

11         Subpoenas were sent for Officer Alfaro for

12    yesterday.  They were also sent for today.  I confirmed

13    this morning at 9:30 in the morning with a sergeant at

14    the 105 Precinct that they did, in fact, receive an

15    appropriate and an accurate subpoena for

16    Police Officer Alfaro.

17         However, the sergeant indicated to me that it

18    was what they call RDO, Officer Alfaro's regular day

19    off.  They called her on her personal cell phone and

20    did attempt to notify her to be here not only

21    yesterday, but today.

22         She had not responded to their calls or their

23    messages when they advised her that she would be need

24    ed in court.

25         When I spoke to the sergeant this morning he

                                              ws

Proceedings                    67

1    said that despite even contacting her, there may have

2    been an issue with overtime through the city.

3              Be that as it may, I asked about having her

4    possibly for this afternoon and then definitely for

5    Monday.

6              He advised me her next regular scheduled tour

7    is Tuesday.  I told him I would be sending a subpoena

8    either way for Monday for hearing and for Tuesday as

9    well.

10             His response to me was that even if I send it

11   and they receive it, just as they had with the other

12   subpoena, most likely they would not be sending the

13   officer until Tuesday, her regularly scheduled tour

14   back.

15             They advised me they would notify her about

16   Monday once we sent the subpoena and once they received

17   it, but due to the fact that it is her scheduled day

18   off if she does not personally respond to it and for

19   overtime constraints they cannot promise me they would

20   send her before Tuesday morning.

21             THE COURT:  What does the New York City

22   jurisdictions do with their cases when one of their

23   officers is off?

24             Do they just refuse to acknowledge the

25   subpoenas and not come to court or is it just because

Proceedings                    68

1       it's coming out of Nassau County?

2                  MS. JOHNSON:  I actually asked the sergeant

3       what their procedures were for notification.

4                  He said they require 24 hours notice, which

5       we did give, but 24 hours notice from their last

6       scheduled tour.  So because she has not been at the

7       precinct and she has been consistently on days off,

8       they haven't seen her to actually give her the notice.

9                  THE COURT:  So when did she last work?

10                 MS. JOHNSON:  She wasn't working yesterday to

11      receive the notice.

12                 THE COURT:  You said you sent a subpoena on

13      Wednesday for yesterday.

14                 MS. JOHNSON:  It was sent Wednesday, your

15      Honor.  I was not at work on Wednesday, but police

16      liaison in my office through my paralegal received it

17      and the NYPD did receive it on Wednesday for Thursday.

18                 So they have not been able to get in personal

19      contact with her to advise her, since she hasn't

20      been --

21                 THE COURT:  I have a hard time thinking that

22      if the New York City Police Department needs to reach

23      one of their members that they're unable to reach them.

24                 MS. JOHNSON:  And the sergeant advised me

25      they contacted her on her cell phone.  She has not

                                                    ws

Proceedings                    69

1      answered it and she has not responded.

2                     And they further indicated that other than

3      that, due to overtime constraints, they would not be

4      able to guarantee that they would, in fact, be able to

5      send her.

6                     But they did say either way they have not

7      been able to reach her.

8                     THE COURT:  So what do you suggest?

9                     MS. JOHNSON:  My suggestion to your Honor

10     is --

11                    THE COURT:  Does the New York City Police

12     Department honor court orders any more or they don't

13     honor subpoenas?

14                    Did you ask them if that would be something

15     that they would recognize?

16                    MS. JOHNSON:  I spoke to the sergeant who was

17     in charge of their scheduling and I asked him, I said,

18     can you continue to follow up with her?

19                    He said yes, he would give her a call, but at

20     this point whatever your Honor suggests -- I would

21     absolutely make another phone call, advise them that

22     the Court has requested her presence, not just the DA's

23     Office, that this is a continued hearing in a criminal

24     case.

25                    They've been aware of this, but at this point

                                                            ws

Proceedings                                70

1      I'm at the whim of, unfortunately, the 105th Precinct

2      and the New York City Police Department.

3                    THE COURT:  Mr. Schechter?

4                    MR. SCHECHTER:  If it please the Court, the

5      105 Precinct had been informed earlier by Judge Donnino

6      in a nice way to cooperate with my investigator so my

7      investigator could get pictures of the room, the

8      interrogation room, where my client was interrogated.

9                    They, for lack of a better term, jerked my

10     investigator around for the better part of a week

11     claiming that the room could not be used because the

12     room was in constant use.  All we needed was three

13     minutes just to snap photographs.  They refused to

14     cooperate.

15                   Judge Donnino then made another call asking

16     when this could happen and they did it in a nice way

17     and just short of an order and finally last, I

18     believe -- a few days ago my investigator was finally

19     able to get access to that room called the box and got

20     pictures.

21                   They have been stonewalling and I think one

22     of the reasons for stonewalling is a question of

23     jurisdiction.  The point of view of the city, and I've

24     dealt with this for years already, New York City Police

25     Department says taxpayers of New York City pay their

                                                         ws

Proceedings                    71

1        salary, that this is out of county, therefore they do

2        not want to utilize the services of the New York City

3        Police Department for out-of-county work and that is

4        why they would not be cooperating.

5                    If this were a New York City case I am pretty

6        certain that the police officer, over time or not,

7        would be here.

8                    My question to your Honor is, what if we were

9        on trial and we had a jury in the box and continuity --

10                   THE COURT:  That's my question.

11                   I understand, Ms. Johnson, you're here on

12       behalf of the District Attorney of this county,

13       normally you're used to dealing with the Police

14       Department for Nassau County, but that's, quite

15       frankly, what my question is to you.

16                   Would they -- have they indicated to you that

17       if the officers are not working that they will not come

18       to court even on matters that involve their own

19       jurisdiction?

20                   MS. JOHNSON:  They have not indicated

21       anything about that, your Honor.

22                   What I would intend to do, then, is --

23       obviously we know that these witnesses are going to be

24       necessary for trial.  I will advise the commanding

25       officer of what the situation is and if I have to have

                                                          ws

Proceedings                72

1    something in writing from them that they're going to

2    send them to give to the Court, then that's what I'll

3    do, but nobody has indicated to me that because it's a

4    Nassau County case that that's not why they're sending

5    them.

6              And, in fact, I've been in constant

7    communication with the Queen's DA and I know

8    overtime -- just as overtime is a problem out here,

9    it's no different in the city.

10             THE COURT:  I understand all of the

11   jurisdictions are under, you know, budgetary

12   constraints and I'm sure New York City is not immune to

13   it either.

14             I'm just rather shocked that they would get

15   subpoenas two days in a row -- do they even give you,

16   if you will, a heads up to say don't expect this

17   officer to be here?

18             MS. JOHNSON:  In fact, yesterday when we were

19   at a bench conference at the hearing I advised the

20   Court that yesterday, while I was here doing the

21   hearing, my paralegal called the city to confirm that

22   they received it and they did and there were no

23   problems.  I guess we had -- them receiving it and them

24   actually having the officer here are two different

25   things for the city.

                                                    ws

Proceedings                        73

1              But we had no indication, no phone calls,

2      that there was any problem and, in fact, this morning

3      the sergeant confirmed with me that the teletype was

4      sent appropriately, it was received within the

5      appropriate amount of time, but just that they couldn't

6      reach out to her.

7              THE COURT:  All right, who is -- the sergeant

8      that you're referring to is the sergeant at the 105?

9              MS. JOHNSON:  He is a sergeant at the 105

10     that when I spoke to -- when I called the precinct I

11     asked who would be in charge of speaking to somebody in

12     regard to a subpoena for an officer that's supposed to

13     come no Nassau County.  I didn't catch his last name,

14     but he was in charge of, I guess, the scheduling for

15     them.

16             THE COURT:  Okay, do you have a number and a

17     name that if my chambers staff should call I would be

18     able to do so?

19             MS. JOHNSON:  I have it on an e-mail in my

20     office, so I do have the number you would be able to

21     contact.

22             THE COURT:  All right, I'll try to see what I

23     can do.

24             MR. SCHECHTER:  I understand, your Honor.

25             I'm going to respectfully ask, your Honor,

                                                      ws

Proceedings                    74

1      that henceforth, since it appears the New York City

2      Police Department is not being cooperative here, that

3      the Court so order every subpoena with respect to the

4      New York City Police Department and make it a Court

5      order because unless your Honor threatens these people

6      with contempt, they're going to hold this court in

7      contempt, which is what they're doing now.

8                  Now, I would normally be criticizing my

9      adversary for not having seen this and done this for a

10     week in advance.

11                 However, counsel has been on trial up until

12     Tuesday last and needed Wednesday to basically

13     re-charge her batteries and still sent messages to her

14     paralegal to take care of this while she wasn't here.

15     So it wasn't as if there was a hiatus from her point of

16     view in terms of bad faith.  So I'm not claiming bad

17     faith on the part of counsel.

18                 However, because the New York City Police

19     Department appears to be contumacious in this

20     situation, I have a man here accused of a very serious

21     crime, and because they seem to be flouting the

22     subpoenas of the prosecutors of Nassau County, I don't

23     see any other basis or any other means of compelling

24     them to be here unless you threaten them with jail.

25     There's no other way to do it.

Proceedings                    75

1        THE COURT:  Before we go from A to Z,

2    Mr. Schechter and start throwing adjectives around like

3    contumacious and flouting Court orders, which they

4    haven't up until now other than the DA's subpoena, I

5    would like to speak to the people in New York City to

6    find out whether or not there is any sort of budgetary

7    issue that will keep on arising during the course of

8    this case and I'll deal with it as I think appropriate.

9        MR. SCHECHTER:  I appreciate the Court's

10   intercession in this matter.

11        My only concern is I remember when I was a

12   prosecutor we didn't have it as bad as it is today, but

13   certainly in situations such as this I would ask the

14   Court to so order the subpoena and tell the precinct or

15   the location if this officer doesn't come here, and the

16   courts will do that, then they suffer the penalty of me

17   considering a sanction of contempt because the New York

18   City Police Department, as most police departments,

19   it's even worse in the federal government, of course,

20   but the New York City Police Department believes many

21   times that they are above the law and that they don't

22   have to obey the orders of the Court and I'm asking the

23   Court to do that.

24        THE COURT:  Mr. Schechter, your past

25   experience is of no moment to me and I'm not going to

                                                      ws

Proceedings                          76

1    sit here and get into a bashing session of the New York

2    City Police Department because of your prior

3    experiences, whether they're justified or not, and let

4    me deal with it the way I think it's appropriate to

5    deal with.  I appreciate your suggestions, but at this

6    point they're just suggestions.

7              MS. JOHNSON:  Your Honor, one thing that the

8    sergeant did say to me, I don't quite know what it

9    means because I don't know what their lingo is, but I

10   did ask him if the officer was notified and you spoke

11   with her and then she failed to come to Nassau what

12   would happen.  He said she would be given a CD.  I

13   don't know what a CD means in NYPD terms, but obviously

14   there would have been ramifications to the officer had

15   she actually spoken to the precinct.

16             THE COURT:  Let's just move on for a moment.

17             I take it that with respect to Schulman, I

18   would ask you to be in contact with him today or this

19   afternoon.  I don't know whether he's working this

20   morning.  It sounded like he wasn't available this

21   morning.

22             MS. JOHNSON:  No, he's not working.  I have

23   his cell phone number and I --

24             THE COURT:  I would ask you to be in contact

25   with him, be here on Monday.

                                              ws

Proceedings                    77

1           My understanding is that Judge Donnino had

2       indicated to you, the DA, that after the hearing he was

3       going to give or had agreed to, if you will, a one or

4       two-day period where the case was not going to be -- in

5       other words, it wasn't going to go straight into trial.

6       It was going to be a one or two-day period, I guess,

7       for you to prepare, whatever.

8               I think in light of what's going on you may

9       have used your one or two-day period between today and

10      Monday.

11              So I would tell both of you to prepare that

12      at the conclusion of the hearing, whether it's Tuesday

13      or Wednesday morning, that we're going to be picking a

14      jury by the afternoon.

15              MR. SCHECHTER:  Thank you, your Honor.

16              One other suggestion, if I might.

17              I think that the videotaped confession is

18      something -- since the Court has no familiarity with

19      this case whatsoever, the videotaped confession is

20      about a half hour.

21              Counsel, I don't believe, has done anything

22      with respect to the Miranda warnings on the video

23      confession.

24              However, if we could somehow have a mechanism

25      where that the predicate -- the predicates to the

                                                        ws

Proceedings                    78

1      introduction of that are done, perhaps we could allow

2      the Court to see the videotape so we can get on with

3      this.

4              Because, your Honor, the videotape has within

5      it some of the things that I'm going to be talking

6      about on cross-examination.  I don't know if counsel

7      has the ability today of getting any people here with

8      respect to the video confession.

9              Maybe the District Attorney in Queens County

10     can come out here and -- he was present on the video

11     and I think he is -- was present, at least, if not

12     administered the rights to my client on the video.

13             So if he can come here perhaps we could at

14     least get that done?

15             MS. JOHNSON:  He's on trial.  I already tried

16     that.  ADA Rosenblatt actually was picking a jury

17     yesterday and I was going to have him here as a backup.

18     So he's actually on trial.

19             THE COURT:  I thought you were only calling

20     two witnesses.

21             MS. JOHNSON:  I am.

22             Because what counsel was saying was instead

23     of continuing with Detective Schulman for purposes of

24     the video, I could have called the Queens ADA who

25     actually is on the video, but I can't, he's on trial.

                                                      ws

1    I tried that already.

2              THE COURT:  So you plan on calling the Queens

3    DA at all for the purpose of the hearing?

4              MS. JOHNSON:  No, not at all.

5              MR. SCHECHTER:  There was two, not only Jared

6    Rosenblatt, but there was another DA that --

7              MS. JOHNSON:  I was going to do it if

8    Detective Schulman was completely unavailable, but he's

9    coming back.

10             THE COURT:  Is Officer Schulman present in

11   the videotape?

12             MS. JOHNSON:  Yes, it's two ADAs the video

13   person and the detective.  So the detective is there

14   throughout the whole video.

15             THE COURT:  Mr. Schechter, what I ask you to

16   do before you leave here today, give my clerk both your

17   office phone and cell phone in the event that -- we're

18   going to have Schulman here on Monday.

19             MS. JOHNSON:  Correct.

20             THE COURT:  Assume you're going to be here on

21   Monday.

22             MR. SCHECHTER:  If that's the case, I suppose

23   we ready and pass until Monday rather than doing this

24   torturous kind of --

25             THE COURT:  There's nothing we can do.

Proceedings                    80

1           The last bit of advice I'm going to give both

2      of you is whatever pretrial issues you want me to

3      decide prior to jury selection, you better get it to me

4      in writing with whatever case law you feel is

5      appropriate to back it up.  I'm not going to have a

6      whole day's worth of banter back and forth about oral

7      applications because it sounded like that's what was

8      going to start happening yesterday, even though we're

9      only doing the hearing.  You better get it to me in

10     writing, you better have it backed up with case law,

11     you better get it to my secretary a day or two ahead of

12     time.

13           MS. JOHNSON:  I'll start working on that.

14           MR. SCHECHTER:  Yes, Judge.

15           THE COURT:  We'll see you -- you'll back here

16     Monday morning at 9:30.

17           MR. SCHECHTER:  Yes, Judge.

18           (Proceedings adjourned to Monday, May 4th,

19     2009 at 9:30 a.m.)

20

21

22

23

24

25

                                                        ws

81

1    SUPREME COURT OF THE STATE OF NEW YORK.

2    COUNTY OF NASSAU : CRIMINAL TERM PART 80

3    --------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,     : Indictment
4                                             : No. 2415N/08
              -against-                       :
5                                             :
     HAROLD GOPAUL,                           : Sex Abuse 1
6                                             :
                        Defendant.            : Huntley/Mapp
7    --------------------------------------------X  Hearings

8                                May 4, 2009

9                                252 Old Country Road
                                 Mineola, New York
10

11   B E F O R E:

12             HONORABLE JAMES P. McCORMACK,
                   Acting Supreme Court Justice
13

14   A P P E A R A N C E S:

15             (As Previously Noted)

16
                    *      *      *      *      *
17

18             THE CLERK:  Continued hearing, People of the

19        State of New York against Harold Gopaul,

20        Indictment 2415N of 2008.

21             MS. JOHNSON:  Good morning, Judge.

22             For the People, Jamie Johnson.

23             THE COURT:  Mr. Schechter, do you want to put

24        your appearance on the record?

25             MR. SCHECHTER:  On behalf of Harold Gopaul,

                                                        ws

Proceedings                    82

1    Donald R. Schechter, 80-02 Kew Gardens Road, Kew
2    Gardens, New York.
3              Your Honor, I would like the record to
4    reflect I have made a motion in limine, a courtesy copy
5    which I gave to the Court.  Since time is pressing I
6    had served the District Attorney myself in person with
7    her copy.
8              It relates to what we were discussing
9    regarding the use of any pending charged materials,
10   namely the information or charges that my client is
11   charged with in Queens County.
12             The Court of Appeals, in fact, proscribes
13   that conduct.
14             I submitted my motion to the Court and, as I
15   said, my copies to the DA and that would include a
16   redaction of the confession which the People have
17   indicated they intend to use on direct examination.
18             So those are the -- that is my motion in
19   limine.
20             The Court had asked me for case support, case
21   material, and I have supplied the Court's request.
22             THE COURT:  I appreciate that.  Thank you.
23             MS. JOHNSON:  Your Honor, I did receive a
24   copy of this.
25             I will have a written response in response to

                                                    ws

Proceedings                    83

1    his motion in limine along with any Molineaux by the

2    People.  I'll have it filed with the clerk's office

3    today and I'll just fax over a courtesy copy to the

4    Court because I know it takes some time to get there.

5           I did also provide, I gave it to your clerk,

6    a copy of the grand jury minutes.  Your Honor had

7    requested a copy of those.

8           THE COURT:  Yes.

9           MS. JOHNSON:  And this morning I turned over

10   additional Rosario material.  I provided a copy to the

11   Court as well as counsel.

12          I haven't had a chance to put a cover on it

13   so let me, for the record -- the packet includes a

14   property clerk's invoice for a two-speed massager

15   white/gray, a property voucher for a white body

16   massager, Officer Alfaro's memo book, the actual date

17   of June 24th, 2008, along with the outside cover of the

18   memo book, the unapproved complaint report related to

19   the recovery of the property, prisoner movement slip,

20   the arrest paperwork from the NYPD, two pages, the

21   on-line booking system arrest work sheet, that's

22   several pages, some of them are double-sided, so I just

23   direct the Court's attention to that, the complaint

24   follow-up information system index sheet, the

25   detective's bureau investigation review work sheet,

Proceedings                    84

1        and, your Honor, there was testimony regarding

2        unapproved versus approved reports.

3                    THE COURT:  Yes.

4                    MS. JOHNSON:  The last three pages of this

5        are identical to the unapproved.  The only difference

6        is that this is the approved version and I'll note what

7        the difference is.

8                    On the last page it indicates the

9        supervisor's name, Sergeant Hanrahan, and the word

10       unapproved is missing.  Other than that, the contents

11       of it is identical to what was provided last week.

12                   THE COURT:  And you've received that,

13       Mr. Schechter?

14                   MR. SCHECHTER:  Your Honor, I haven't had an

15       opportunity to peruse what she's given me nor to read

16       it.  I mean, I just got it in court today.

17                   One other thing, your Honor.  I submitted two

18       subpoenas for the Court to sign.  My investigator is

19       waiting for those.  I request that those be signed

20       forthwith so I can get her out to serve them.

21                   THE COURT:  Right.  Actually, I was going to

22       go over that next.

23                   MR. SCHECHTER:  I believe, your Honor, those

24       are ex parte applications.  I don't think that -- since

25       the District Attorney is able to serve her subpoenas

                                                            ws

Proceedings                    85

1    without notifying me --

2            THE COURT:  I understand, but I do think that

3    there may be matters that -- in these documents that

4    may very well have some privilege or confidentiality

5    that may attach to it.

6            So I'm going to sign the subpoenas, the only

7    question -- the only direction I'm going to ask, and

8    I'll have my law secretary just make a notation on the

9    subpoena, that they get brought to my chambers so I can

10   review them in camera.

11           MS. JOHNSON:  Your Honor, can I -- I don't

12   know if the Court is willing to disclose, but I would

13   just like to know what they're for.

14           MR. SCHECHTER:  That's the purpose of their

15   being ex parte.

16           THE COURT:  At this time I'm going to sign

17   the subpoenas.

18           MS. JOHNSON:  Just so your Honor knows,

19   counsel had provided Judge Donnino, when we were before

20   him, with various subpoenas, including My Space or

21   Facebook and New York City Board of Education.  I don't

22   know if those are returned to Judge Donnino as part of

23   the file, so --

24           THE COURT:  I'm hearing that for the first

25   time.  I'm not in possession of anything from Judge

                                                    ws

Proceedings                86

1    Donnino other than the court file.

2              MR. SCHECHTER:   I respectfully request an

3    opportunity to review what counsel says she has given

4    me so I can respond adequately to the Court's inquiry,

5    your Honor.  She's indicated she's given me some new

6    Rosario material and I haven't had, really, a chance to

7    look at it.  I'm trying to arrange my file on the desk

8    and -- however, the other materials that I had

9    requested, your Honor, from counsel and from -- I asked

10   the Court direct they provide me have not been provided

11   me based upon what she said and on that basis I -- you

12   know, I have an issue with the Rosario material that

13   was requested and one of them is a mandatory report

14   that the police officer is required to submit with

15   respect to allegations of child abuse and those

16   documents I have not been given and unless he did not

17   do so, which means he violated the law, I request a

18   copy of those reports.

19              That's just one of them, Judge.  There was

20   several others that I requested as well.

21              MS. JOHNSON:   Well, as to first that, Judge,

22   I don't have a problem turning them over at trial, but

23   I don't see how they're Rosario for purposes of a

24   Huntley Hearing or for purposes of a Mapp Hearing.

25              One other request was there was an issue

Proceedings                    87

1     about the second page of the written statements.

2                 THE COURT:  Yes.

3                 MS. JOHNSON:  I have a copy of that and

4     unfortunately the paper that the Police Department uses

5     is bigger than 11 by 14, so the part that was missing

6     on the first page when it was Xeroxed just says to be

7     continued on the other page so I'll have copies of that

8     for counsel right now.

9                 THE COURT:  All right, could you also, at

10    some point, give copies for the Court because --

11                MS. JOHNSON:  I will, Judge.

12                THE COURT:  These are the defendants

13    so-called written statements, yes?

14                MS. JOHNSON:  Yes, your Honor.

15                THE COURT:  And I take it there's one page

16    from June 24th, '08 at 7:30 a.m. and that's just a

17    single page?

18                MS. JOHNSON:  Yes.

19                THE COURT:  And then there's a second one or

20    actually the first one from June 24th of '08 at

21    6:25 a.m.?

22                MS. JOHNSON:  Yes.

23                THE COURT:  And that's the two-page one?

24                MS. JOHNSON:  Correct.

25                THE COURT:  Which I also don't have, other

                                                           ws

Proceedings                    88

1        than the first page.

2                    MS. JOHNSON:  And then there is 8:30 on June

3        24th.  That is a question/answer page.

4                    THE COURT:  Yes, that I have.

5                    MS. JOHNSON:  I'm giving counsel and the

6        Court the copy of the second page.

7                    Judge, when I made a copy of the first page

8        to show the bottom of it, it cuts off the top of it so

9        I'm going to use one to mark it.  I'll show it to

10       counsel and if he wants me to copy it as two pages, the

11       problem is the Xerox paper just isn't big enough.

12                   THE COURT:  All right, could I just take a

13       look at what you have in your hand?

14                   MS. JOHNSON:  Sure.

15                   (Shown to Court.)

16                   MS. JOHNSON:  Your Honor, I'll show

17       Mr. Schechter the bottom of the page.  It just seems to

18       get cut off every time we copy it.

19                   THE COURT:  All right, Mr. Schechter, I don't

20       see any reason why we can't proceed with Detective

21       Shulman at this point.  We're still in, I take it, the

22       middle of his direct or coming at the end of his

23       direct.

24                   The additional Rosario material here, in

25       large part, seems to pertain to Officer Alfaro.

                                                          ws

Proceedings                    89

1          MR. SCHECHTER:  Well, I would like the

2     opportunity, prior to beginning my cross-examination of

3     Detective Shulman to review this material, your Honor.

4          THE COURT:  And I intend to give that to you.

5          MR. SCHECHTER:  Thank you.

6          And the other issue is the Rosario material

7     that I had named earlier on the record that I have not

8     been supplied with.  I don't think we've really dealt

9     with that, Judge.

10          Now, counsel has indicated to me she was

11     going to contact the Queens District Attorney's Office

12     with respect to materials contained by him in his file

13     and I submit that's inadequate.

14          As the prosecutor in this case it is her

15     obligation to provide me with those Rosario materials

16     that I am entitled to under the law, whether or not

17     Jared Rosenblatt has them or not.

18          MS. JOHNSON:  Your Honor, I spoke to the ADA

19     in Queens.  He faxed me over on Thursday and Friday a

20     copy of his file that he had not yet provided to us.

21          There is handwritten notes in the file.  I

22     showed them this morning to Police Officer Alfaro and

23     to Detective Shulman.  They are neither of their notes.

24     They are actually the DA's work product and his

25     information and Rosario material and at this point,

Proceedings                    90

1    from what I can read from it, most of it has to do with

2    conversations with the complainant and his work product

3    with regards to the file.

4              THE COURT:  When you say his, you're

5    referring to --

6              MS. JOHNSON:  The DA in Queens.  Yes, Judge.

7              MR. SCHECHTER:  I would ask the Court to

8    examine the documents, your Honor, to make the

9    determination if there's Rosario issues there.

10             Additionally, it's my experience that

11   District Attorneys routinely, when they speak to

12   arresting officer or complainants, make notes on their

13   file concerning the conversations and therefore if the

14   materials are copied from Mr. Rosenblatt's file

15   regarding conversations he had with the officer who is

16   testifying now, I certainly am entitled to those.

17             So if counsel is making some representation

18   as to work product, I would like the Court to make sua

19   sponte.

20             THE COURT:  Well, is this -- I thought I

21   understood you to say that these are notes that the DA

22   had with the complainant, no?

23             MS. JOHNSON:  The first page, Judge, is notes

24   about the complainant and notes -- the ones that refer

25   to the detective, it appears to be work product with

Proceedings                                91

1       regard to his review of the file.

2               I'm happy to show them to the Court.    Two

3       pages are completely about -- it says interview with

4       the complainant.   I'll provide them to the Court now,

5       and the rest of it, other than grand jury testimony

6       that he has already provided to me, is the domestic

7       incident report, which wouldn't -- has nothing to do

8       with the Huntley or the Mapp portion, I would submit to

9       the Court, and the actual DA's -- their version -- we

10      have yellow cards in our files for notes, their version

11      of the yellow card and their ECAB paperwork that

12      references bail information, nothing about the

13      detective, but I'll happily hand that up to the Court.

14              THE COURT:   One other item I think

15      Mr. Schechter had referenced last week is is there any

16      reports that got generated by anybody with regard to

17      the detective requesting any kind of commendation or

18      recognition with regard to the case itself?

19              MR. SCHECHTER:   No.   It would be the

20      commanding officer, after speaking to the detective,

21      would then make a recommendation.

22              THE COURT:   Right, I understand.

23              MS. JOHNSON:   I didn't see anything in his

24      file.   I can step out, ask him and double check.

25              THE COURT:   Why don't you do that?

Proceedings                          92

1              Why don't you hand me up that material so I

2      can at least take a look at that?

3                   (Shown to Court.)

4                   (Pause in the proceedings.)

5                   THE COURT:  And the answer is?

6                   He doesn't know.

7                   MS. JOHNSON:  There was no request for

8      departmental recognition made in this case by the

9      officer or the detective.

10                  THE COURT:  Okay.

11                  (Pause in the proceedings.)

12                  MR. SCHECHTER:  We also have that request for

13     the report he was supposed to mandatorily (sic) make to

14     the --

15                  THE COURT:  Let's see.

16                  I take it, Ms. Johnson, that you don't have

17     the report that Mr. Schechter is referring to or you're

18     not aware of its existence.

19                  MS. JOHNSON:  I do.  I believe I said there's

20     nothing in it that's relevant for purposes of the

21     hearing.

22                  MR. SCHECHTER:  Your Honor, I, for the life

23     of me, don't understand why prosecutors do this.

24     Rosario material, it's sort of like trial by ambush,

25     they give it to you at the last minute --

Proceedings                    93

1           THE COURT:  Mr. Schechter, before we get on

2     soap boxes and give speeches can I look at the material

3     before --

4               (Paused in the proceedings.)

5           THE COURT:  Ms. Johnson, this -- the

6     documents that you handed to me, this is from the

7     Queen's Assistant DA?

8               MS. JOHNSON:  Yes.

9           THE COURT:  The first page, is this his notes

10    of his interview with the complainant?

11              MS. JOHNSON:  I don't have another copy of

12    it, Judge, so I would have to take a look at what the

13    Court is looking at.

14              Your Honor, I'm just going to step out and

15    ask the detective to show me which is the ACS work

16    sheet because they all look alike to me.

17              THE COURT:  Okay.

18              (Pause in the proceedings.)

19          THE COURT:  All right, just to try to address

20    some of these Rosario materials, Mr. Schechter, the

21    packet or material Ms. Johnson gave me from the Queen's

22    Assistant DA would appear to me, for the most part to,

23    be his interview with the complainant in this case.

24              There doesn't appear to be any material, at

25    least at this time, at this stage of the hearing, that

Proceedings                        94

1       would be considered Rosario material.  That may be

2       different as far as the trial is concerned as far as

3       the complainant is concerned.  I don't see anything

4       really here that would touch upon the issues that are

5       going to be addressed at this hearing.

6                   People, do you want to -- what's the other

7       material?

8                   MS. JOHNSON:  Yes, as to the adult and child

9       protective child services information, there was part

10      of, in one of the complaint reports, our version of a

11      crime report, there was reference to it.

12                  I just stepped outside and spoke to Detective

13      Shulman.  He never spoke to adult protective services.

14      In fact, he said by the time he met with the victim

15      adult protective service was already at the precinct

16      meeting with the victim, so another officer, not

17      testifying at this hearing, would have prepared that

18      paperwork and contacted ACS.

19                  He did indicate he did speak with them, but

20      no paperwork was generated from him and they were

21      already there when he got there, so --

22                  THE COURT:  All right, and I think, having

23      myself reviewed the portion of our testimony that we've

24      had so far, he does state when the complainant does

25      come to the precinct I think an ACS worker is there, as

                                                        ws

Proceedings                    95

1    a matter of fact?

2              MR. SCHECHTER:  I'm sorry, your Honor?

3              THE COURT:  I think in his direct testimony

4    so far Detective Shulman has testified that there was

5    an ACS worker that was present at the 105 Precinct

6    interviewing the complainant.

7              Anything else, Mr. Schechter?

8              MR. SCHECHTER: Not at this time, your Honor.

9              THE COURT:  All right, so, if we could --

10             MS. JOHNSON:  Let me just rev up, make sure

11   this is working.

12             THE COURT:  I think, Ms. Johnson, we were at

13   People's 4?

14             MS. JOHNSON:  Yes, I have that, your Honor.

15             And I believe only one page was marked, so

16   I'll put it on the record.

17             (The witness, Detective Leonard Shulman,

18   having previously been sworn, resumed the witness

19   stand.)

20             THE CLERK:  Detective, you're reminded that

21   you're still under oath.

22             THE WITNESS:  Yes.

23             MS. JOHNSON:  May I, Judge?

24             THE COURT:  Yes.

25             MS. JOHNSON:  Your Honor, when we left off on

Shulman - People - direct          96

1        Thursday I had asked for the June 24th, 6:25 statement
2        to be marked.  It is two pages.  One page was marked.
3        I just want the record to note that it is a two-page
4        document.  I don't know if the Court reporter has to
5        change it on the sticker to say it's actually two
6        pages.
7                      MR. SCHECHTER:  May I see the document,
8        please?
9                      (Shown to counsel.)
10                     MS. JOHNSON:  If I could have it shown to the
11       witness, please?
12                     (Shown to witness.)
13   DIRECT EXAMINATION CONT'D
14   BY MS. JOHNSON:
15       Q.    Detective Shulman, if you could take a look at
16   People's 4, the two-page document for identification
17   purposes, please?
18             Do you recognize that?
19       A.    Yes, I do.
20       Q.    What do you recognize it to be?
21       A.    It is a photocopy of a two-page statement that was
22   written by Mr. Gopaul in my presence.
23       Q.    Is that a fair and accurate copy of the original
24   statement that you took on June 24th, 2008?
25       A.    Yes, it is.

                                                      ws

MS. JOHNSON: Your Honor, I would ask that that be marked into evidence for purposes of the hearing.

MR. SCHECHTER: May I have a voir dire, your Honor?

THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. SCHECHTER:

Q. Detective Shulman, that isn't a fair and accurate copy of the original, is it?

A. Pardon me?

Q. That is not a fair and accurate copy of the original, is it?

A. It's a photocopy, but it represents what the original looks like.

Q. Did you tell the grand jury that the -- there's a little scribble that happened to get written on the paper?

MR. SCHECHTER: I don't have a page number, Judge, so I cannot refer to the page number.

Q. Did you tell them there's a little scribble that just happened to get written on the original that's not on the copy?

MS. JOHNSON: Which page?

MR. SCHECHTER: Counsel, you did not give me a cover page, so I can't tell you what date it is. I

1       can't tell you what page number it is because there's

2       no page numbers on here.

3               Let me just say, in the copies on the top you

4       may want to look on the right top -- you might want to

5       look up 66.  If you look in the right corner on the

6       top, 66.

7       A.   I'm not sure what document you're referring me to

8    look at.

9               MR. SCHECHTER:  May I approach the witness,

10       your Honor?

11               THE COURT:  Yes.

12       Q.   Detective Shulman, did you tell the grand jury

13    that the original had some scribble that happened to get

14    written on the paper of the original that's not on the copy.

15               Did you tell them that?

16       A.   I might have, but I don't believe -- I wasn't

17    referring to the statement.  There's more than one statement

18    in this case.

19       Q.   Which statement were you referring to there?

20       A.   Well, I believe I was speaking in regards to a

21    statement that we haven't yet come to.

22       Q.   May I see the statement you've got there?

23               THE COURT:  You're talking about the one

24       that's been marked?

25               MR. SCHECHTER:  The one before the Court,

1      yeah.

2                      (Shown to counsel.)

3                      MR. SCHECHTER:  I stand corrected.  Thank

4      you, Judge.  I have no more questions at this time of

5      the witness on voir dire.

6                      THE COURT:  Any objection for the purposes of

7      the hearing for this statement being received?

8                      MR. SCHECHTER:  None for the purpose of the

9      hearing, Judge.

10                     THE COURT:  So marked.

11                     MS. JOHNSON:  If I could have that marked,

12     please, your Honor?

13                     (People's Exhibit 4 received in evidence.)

14                     MS. JOHNSON:  If I could have it shown to the

15     witness?

16                     (Shown to witness.)

17     DIRECT EXAMINATION CONT'D

18     BY MS. JOHNSON:

19         Q.    Detective Shulman, if you could take a look at

20     People's 4 in evidence, that two-page statement?

21               Who provided the name, address, date and time that

22     appears on that document?

23         A.    Mr. Gopaul.

24         Q.    Is there any part of any page of that document

25     that is in your handwriting?

                                                                    ws

1        A.    On Page 2 I affixed my signature indicating my

2    shield number and then I noted a date and time at the

3    conclusion of this written statement.

4        Q.    Can you explain to us how it was that it came

5    about that the defendant, after being given a piece of paper

6    and a pen, wrote this statement?

7             What happened in the room?

8        A.    I had explained to Mr. Gopaul that, you know, his

9    daughter had made some allegations and I got to the point I

10   asked him if he wanted to make a statement, if he wanted to

11   make a written statement.

12            He indicated he did.

13            I gave him a pad and a pen.  I said, you know, "If

14   you can indicate your name, address, phone number and

15   today's date and time on the top and then if you could write

16   what your story is."

17       Q.    What information did you give the defendant about

18   what his daughter had said?

19                 THE WITNESS:  I'm just going to refer back to

20            my complaint follow-up, your Honor, just to

21            refresh my memory?

22       A.    Okay, I had asked him if he knew why he was under

23   arrest and in custody a few moments prior to this statement

24   and he said on the Saturday before he had an argument with

25   his daughter an he slapped her.

1          So I then asked him if he would like to make a

2     written statement about it and upon indicating yes is when I

3     gave him an opportunity to make a written statement about

4     what had occurred.

5          Q.   Did you explain to the defendant what type of

6     information should be put into this two-page document?

7          A.   Other than his words about what had transpired

8     with his daughter.

9          Q.   Did you watch him sign this and did you watch him

10    write it?

11         A.   Yes, I did.

12         Q.   Did you ask him if he wanted to make any changes?

13         A.   Yes, I did.

14         Q.   What did he say?

15         A.   He said no.

16         Q.   At any time while he was writing the statement did

17    he ask to speak to an attorney?

18         A.   No, he did not.

19         Q.   If you could take a look at the first page, the

20    first line of the first paragraph, where it indicates

21    Saturday, June 21st, 2008?

22          Do you see the date where it says June 21st?

23         A.   Yes, I do.

24         Q.   And do you see that there is a one marked over the

25    two on the 22nd?

1      A.   Yes, I do.

2      Q.   Who made that marking?

3      A.   Mr. Gopaul.

4      Q.   Detective, can you read for us what has been

5   marked into evidence as People's 4?

6                THE COURT:  Is that really necessary?

7                MS. JOHNSON:  If your Honor --

8                THE COURT:  No.

9                MS. JOHNSON:  Even better.  Thank you, Judge.

10     Q.   At any time during the time the defendant was

11  writing the statement did he ask to speak to an attorney?

12     A.   No, he did not.

13     Q.   At any time did he tell you he no longer wished to

14  speak to you?

15     A.   No, he did not.

16     Q.   At any time did he indicate he had any questions

17  for you?

18     A.   No, he did not.

19     Q.   Was he cooperative with you?

20     A.   Yes, he was.

21     Q.   Was he handcuffed at the time?

22     A.   No, he was not.

23     Q.   Was your weapon still secured?

24     A.   Yes, it was.

25     Q.   And other than telling the defendant -- other than

ws

1    asking him if he wanted to make any statement was there any
2    conversation between the defendant and yourself while he was
3    actually writing?
4         A.   No.
5         Q.   And you observed him sign it?
6         A.   Yes, I did.
7         Q.   Okay.  Was that the end of your contact with
8    Harold Gopaul?
9         A.   No, it was not.
10        Q.   What happened -- excuse me, let me step back for
11   one second.
12             Did you ask the defendant to read his statement
13   after he wrote it out?
14        A.   I did.
15        Q.   And was that the time you asked him if he wanted
16   to make any changes?
17        A.   Yes.
18        Q.   Did you observe him read the statement over?
19        A.   Yes.
20        Q.   Okay.  What did defendant ask of you following
21   signing the statement?
22        A.   He asked if he could use the restroom.  I ceased
23   the interview and I brought him to the restroom.
24        Q.   The restroom is outside of the interview room?
25        A.   Yes, it is.

ws

1           Q.   Was he handcuffed when he was brought to the
2     restroom?
3           A.   Yes, he was.
4           Q.   And where did you bring him after the restroom?
5           A.   He was brought to the restroom.  He was
6     unhandcuffed so he could do what he needed to do in the
7     restroom.  He was then rehandcuffed and brought back to my
8     office to the interview room where the handcuffs were taken
9     off him.
10          Q.   And what happened in the interview room when you
11    came back from the restroom?
12          A.   Initially, I just had Mr. Gopaul sit in the
13    interview room and I took a little break from speaking to
14    him.
15          Q.   Where did you go?
16          A.   I believe I went to speak to the victim.  I
17    probably went to my desk.
18                    MR. SCHECHTER:  Objection to what the officer
19               probably did, Judge.
20                    THE COURT:  Yeah, if you recall what you did,
21               detective -- if you're not sure just tell us.
22                    THE WITNESS:  I'm not 100 percent sure.  I
23               know I did other things.
24          Q.   You left the interview room?
25          A.   Yes, I did.

1    Q.   Who was with the defendant when you left the

2    interview room?

3    A.   He was by himself.

4    Q.   Was there an officer outside the room?

5    A.   I don't recall, but the interview room was

6    secured.

7    Q.   When you left was he handcuffed?

8    A.   No, he was not.

9    Q.   Did he ask you for anything before you left?

10   A.   No, he did not.

11   Q.   Did you have any conversation with him before you

12   left?

13   A.   I believe I said, "I'll be back with you in a

14   little while," or something similar to that nature.

15   Q.   Did there come a time when you went back to the

16   interview room?

17   A.   There did.

18   Q.   Approximately what time was that?

19   A.   I think it was about 7:20 or 7:25.

20   Q.   What was your purpose in going back to the

21   interview room?

22   A.   To continue speaking to Mr. Gopaul in regards to

23   the allegations made against him.

24   Q.   What was the defendant doing when you went back

25   into the interview room?

Case 1:15-cv-01782-NGG Document 8-11 Filed 08/31/15 Page 107 of 440 PageID #: 457

1      A.    He was sitting in a chair facing the table in the

2   room.

3      Q.    Did you sit down at the table?

4      A.    Yes, I did.

5      Q.    What happened?

6      A.    I sat down across from Mr. Gopaul, the first chair

7   when you walk in the room again.  I indicated to him that

8   his step daughter, Sana Awan, had made some allegations

9   against him that there was some activity of an inappropriate

10  nature and if he wanted to talk to me about it.

11     Q.    Did you give the defendant the details of the

12  allegation?

13     A.    I did not.

14     Q.    Did you advise him that it was of a sexual nature?

15                THE WITNESS:  If I could just refer to my

16          complaint follow-up again, your Honor?

17                THE COURT:  Yes.

18                MR. SCHECHTER:  Your Honor, please note my

19          objection.

20                THE COURT:  I will note your objection.  He

21          can look at it.

22                Go ahead.

23     A.    Okay, I believe my words were that the allegation

24  was he was acting inappropriately towards her and that I was

25  not going to tell him exactly what the allegation was, but

1    that I would give him an opportunity to discuss things if he

2    wanted to.

3         Q.    Did you actually tell him you were not going to

4    give him the details of the allegation?

5         A.    Yes, I did.

6         Q.    What was his response to that?

7         A.    That he would like to say something about it.

8         Q.    What did you do after the defendant told you he

9    wanted to say something about it?

10        A.    Again, I'm just referring to my notes again here

11   in the complaint follow-up.

12              MR. SCHECHTER:  Excuse me, your Honor, I'm

13         sorry to interrupt, however I'm constrained to object

14         simply because the officer is not testifying from

15         memory.

16              What he is doing is parroting information he

17         plugged into a document almost a year ago, so he's

18         really not testifying, all he's doing is reading from a

19         document not in evidence, can't be in evidence and he's

20         only reading from -- this is not his testimony, this is

21         his document.

22              THE COURT:  Ms. Johnson, would you like to

23         ask the officer some questions with regard to the

24         document?

25              MS. JOHNSON:  Yes.

ws

1      Q.   Detective, you can not read from a document not in

2   evidence.

3           If you wish to refresh your memory you must say so

4   and once you're done refreshing your memory with your notes

5   please look up and don't read from any documents.  You must

6   testify as to what your recollection is after having your

7   memory refreshed.

8           When you went back into the room what did you do

9   after the defendant indicated he wanted to talk to you?

10     A.   He said something of the nature he felt bad about

11  it and he wanted to make a statement.

12          I then gave him a note pad and a pen and again

13  said, "Here," you know, "if you could right write your name,

14  address, the date and time and you could write your

15  statement."

16     Q.   Similar to the notepad you had given to him

17  before?

18     A.   I believe it was the same notepad, but the

19  previous statement had been removed from the top of the

20  notepad.

21     Q.   Were the pages blank?

22     A.   Yes.

23     Q.   What did you say to the defendant when you gave

24  him the pad and the pen?

25     A.   Something of the effect of, "If you could write

                                                      ws

Shulman - People - direct          109

1    your name, address and phone number and the date and time on

2    the top and then write," you know, "your statement in your

3    words as to what you want to say about this."

4                    MS. JOHNSON:  Your Honor, I'm going to ask

5            that this be marked as People's Exhibit 5 for

6            identification purposes?

7                    THE COURT:  People's 5.

8                    (People's Exhibit 5 marked for

9            identification.)

10                   MS. JOHNSON:  Can I have People's 4 back?

11                   (Shown to counsel.)

12           Q.   Detective, if you could take a look at People's 5

13   for identification purposes?

14           Do you recognize that?

15           A.   I do.

16           Q.   What do you recognize it to be?

17           A.   It is a photocopy of a statement written by

18   Mr. Gopaul.

19           Q.   How do you know that?

20           A.   I observed it being written and after its

21   completion I did sign my name and placed my shield number

22   and I did note the date and time on the bottom of said

23   statement.

24           Q.   Is that a fair and accurate copy of the original

25   that was taken on June 24th, 2008?

                                                              ws

Shulman - People - direct          110

1      A.    Yes.

2            MS. JOHNSON:  Your Honor, we would offer

3      People's 5 in evidence for purposes of the hearing.

4            MR. SCHECHTER:  Voir dire, your Honor?

5            THE COURT:  Yes.

6  VOIR DIRE EXAMINATION

7  BY MR. SCHECHTER:

8      Q.    I redirect your attention to your grand jury

9  testimony, detective, where you indicated at Page 66 that

10  there was some scribble written on the original that was not

11  on the copy.

12            Would you please show us where the scribble that's

13  written on the original that's not on the copy, then?

14      A.    And, again, that's not -- I don't believe that's

15  pertinent to this particular one page.

16            THE COURT:  Well, let me ask you this.

17            THE WITNESS:  There is another page, your

18      Honor, that Ms. Johnson has not introduced yet.

19            THE COURT:  But it's not People's 5?

20            THE WITNESS:  It's not that page right there.

21            MR. SCHECHTER:  Okay.  May I have the paper,

22      please?

23            (Shown to counsel.)

24      Q.    Officer, on this copy there seems to be something

25  written on the very top above Harold Gopaul's name.

                                                        ws

Shulman - People - direct          111

1        Could you please tell the Court what, if any --
2   what that is?
3              It's on the copy.
4                   MS. JOHNSON:  I think it's the staple when I
5        Xeroxed it.
6                   (Shown to witness.)
7        A.   It looks like a staple loop.
8        Q.   Do you see the original?
9              Do you have the original there?
10       A.   Yes, I have the original.
11       Q.   Could you please look at the original and let me
12  know if that's on there?
13       A.    It's not on the original.  It's either a flaw in
14  the photocopy or the copier this was copied from had a
15  staple in it.
16                  MR. SCHECHTER:  May I see the original,
17       please?
18                  THE COURT:  Yes.
19                  (Shown to counsel.)
20                  MR. SCHECHTER:  Thank you.
21                  No more questions, Judge.
22                  THE COURT:  Any objection?
23                  MR. SCHECHTER:  Not for the purposes of the
24       hearing.
25                  THE COURT:  All right, so we'll receive

                                                            ws

Shulman - People - direct          112

1        People's 5 in evidence.

2                  (People's Exhibit 5 received in evidence.)

3                  MS. JOHNSON:  If I could have it shown to the

4        witness, please?

5                  (Shown to witness.)

6    DIRECT EXAMINATION CONT'D

7    BY MS. JOHNSON:

8        Q.    Detective, if you could take a look at People's 5

9    in evidence?

10            Whose handwriting appears on that document?

11       A.    With the exception of my signature and shield and

12   date and time across the bottom, Mr. Gopaul's handwriting is

13   affixed on this paper.

14       Q.    On the top right-hand side where it says the date

15   and time, who provided that information?

16       A.    Mr. Gopaul.

17       Q.    Did you observe him write this statement?

18       A.    Yes, I did.

19       Q.    Was this after you had issued Miranda warnings to

20   him?

21       A.    Yes, it was.

22       Q.    And at this time was your gun still secured?

23       A.    Yes, it was.

24       Q.    Was this after the defendant went to the bathroom?

25       A.    Yes, it was.

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 114 of 440 PageID #: 464

1     Q.    Was any physical force used on the defendant prior
2     to him writing this statement?
3     A.    No, it was not.
4     Q.    Were any threats made to the defendant prior to
5     him writing this statement?
6     A.    No, there were not.
7     Q.    Did you ask the defendant if he wanted to make any
8     changes to the statement?
9     A.    Upon his completion of writing the statement I
10    asked him to read it over to himself and make sure it was
11    what he wanted to say and if there were any changes he
12    wanted to make he was able to.
13             THE COURT:  Does that mean he did make
14          changes or he didn't make changes?
15             THE WITNESS:  He didn't make changes, but he
16          was afforded an opportunity if he wanted to.
17    Q.    Did you observe him reread the statement?
18    A.    Yes, I did.
19    Q.    Did you observe him sign it?
20    A.    Yes, I did.
21    Q.    And the June 24th, 2008 at 8:30 hours, what does
22    that indicate?
23    A.    That was the time I was signing it as this
24    particular statement was complete.
25    Q.    Was that after you observed the defendant read the

                                                              ws

1    statement over?

2         A.   Yes, it was.

3         Q.   Was that after you asked him if he wanted to make

4    any changes?

5         A.   Yes.

6         Q.   At any time while he was writing the statement did

7    he ask to speak to an attorney?

8         A.   No, he did not.

9         Q.   At any time did he indicate he no longer wished to

10   speak to you?

11        A.   No, he did not.

12        Q.   Was the defendant cooperative with you at this

13   time in the interview room?

14        A.   Yes, he was.

15        Q.   Did he ask to go to the bathroom while he was

16   signing this?

17        A.   No, he did not.

18             MS. JOHNSON:  I can take back People's 5.

19             (Shown to counsel.)

20        Q.   After you affixed your signature to the bottom of

21   that document was that the end of your conversation with the

22   defendant?

23        A.   No, it was not.

24        Q.   What happened next?

25        A.   Immediately after I signed the document and dated

Case 1:15-cv-01782-NGG Document 8-11 Filed 08/31/15 Page 116 of 440 PageID #: 466

1   and timed on the bottom I asked him if he had any vibrators
2   in his car.
3        Q.   Did you memorialize that conversation in any way?
4        A.   After the question was answered.
5        Q.   Can you walk us through how that conversation
6   happened?
7        A.   Right after I finished that other written
8   statement I asked him if he had any vibrators in the car.
9             I believe he said that he had some vibrators in
10  his house and that he had a body massager in his car that
11  was, you know, for himself, but that he had never -- hadn't
12  used it on his daughter.
13       Q.   What did you do after this conversation?
14       A.   I took off the previous statement off the notepad
15  and I had another notepad.  I wrote the date and time that I
16  was asking the question.  I then memorialized the question I
17  had asked him and the answer he had given in reply.
18             MS. JOHNSON:  Your Honor, I'll ask that this
19        be marked as People's Exhibit 6 for identification.
20             THE COURT:  People's 6.
21             (People's Exhibit 6 marked for
22        identification.)
23             MS. JOHNSON:  If I could have that shown to
24        the witness, please?
25             (Shown to witness.)

ws

Shulman - People - direct          116

1        Q.    Detective Shulman, take a look at People's 6 for

2    identification purposes, please.

3              Do you recognize that?

4        A.    Yes, I do.

5        Q.    What do you recognize it to be?

6        A.    It is the -- a photocopy of the question and

7    answers that I memorialized when I was speaking to

8    Mr. Gopaul on June 24th of 2008.

9        Q.    How do you know that?

10       A.    It's in my handwriting and my signature appears on

11   the bottom as I had placed it.

12       Q.    And is that a fair and accurate copy of the

13   original?

14       A.    I mean, other than the confidential stamp that I'm

15   assuming that somebody in the DA's Office or somebody must

16   have --

17                   MR. SCHECHTER:   Objection to what the officer

18        assumes, please.

19       Q.    Do you have the original with you, detective?

20       A.    Yes, I do.

21       Q.    If you could just take that out of your case

22   jacket, please?

23                   MS. JOHNSON:   I'll have that marked as

24        People's 6A.

25                   THE COURT:   Fine.

Shulman - People - direct          117

1                 MS. JOHNSON:  For the hearing.

2                 MR. SCHECHTER:  What is 6A, now?

3                 MS. JOHNSON:  The original.

4                 THE COURT:  It's the original without the

5         stamp on it.

6                 (People's Exhibit 6A marked for

7         identification.)

8         Q.    Detective, if you could take a look at People's 6

9    and 6A for identification purposes?

10                (Shown to witness.)

11        Q.    Is People's 6 a fair and accurate copy other than

12   the stamp from the original 6A that you just took from your

13   case jacket?

14        A.    Yes, it is.

15        Q.    Is there anything missing from the Xerox copy that

16   is on the original?

17        A.    No.

18        Q.    Or vice versa, other than the stamp?

19        A.    No.

20        Q.    Are there any scribbles on that page that counsel

21   is referring to before?

22        A.    Yes, there is.

23        Q.    And is that on the original or on the copy?

24        A.    It is on the original.

25        Q.    Is it on the copy?

                                                      ws

Shulman - People - direct          118

1          A.    It is on this particular copy, yes.

2          Q.    And so it's a fair and accurate copy other than

3    the stamp?

4          A.    Yes.

5                MS. JOHNSON:  Your Honor, we would ask that

6          People's 6 be marked into evidence for purposes of the

7          hearing.

8                THE COURT:  And that's the copy?

9                MS. JOHNSON:  The copy, Judge.

10               MR. SCHECHTER:  Voir dire, if I may, Judge?

11               THE COURT:  Yes.

12   VOIR DIRE EXAMINATION

13   BY MR. SCHECHTER:

14         Q.    Officer do you not recall testifying a short time

15   ago that every time I asked you a question concerning the

16   scribbles on the original that were not on the copy you had

17   stated there were other papers that -- other statements that

18   were made that had not yet been shown to you?

19               Do you recall that question and your answer?

20         A.    Yes.

21         Q.    Now you tell us that you -- you testified in the

22   grand jury that there was scribble on the original, but not

23   on the copy -- I'm sorry -- what are you referring to?

24               What scribble is not on the original that's on the

25   copy?

                                                              ws

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 120 of 440 PageID #: 470

1          A.    I don't know the specific context of that

2     testimony, but I believe on the lower portion of this, I

3     guess it's number 6A, and 6, that there's a Q with a couple

4     of lines through it, that after I had completed my

5     questioning of Mr. Gopaul and had signed it, that subsequent

6     to that is when that Q and the dash had gotten written.

7               MR. SCHECHTER:  I respectfully object to this

8          exhibit.  I don't think this exhibit is in the same

9          condition at the time it was made.

10              THE COURT:  And the basis for that is?

11              MR. SCHECHTER:  Basis is his grand jury

12         testimony where he indicated that there is, and I'll

13         quote it, Judge, "I think there's a little scribble

14         that just happened to get written on the paper of the

15         original that's not on the copy."

16              I can show you the grand jury testimony if

17         the Court wishes.

18              THE COURT:  I have the grand jury testimony.

19              MR. SCHECHTER:  Now the officer testifies, in

20         fact, that it's on both.

21              What is he referring to?

22              THE WITNESS:  I mean, if I could, your Honor?

23              MR. SCHECHTER:  He said it's not on the first

24         statement, it's not on the second statement.

25              Now we got the third and it's not on there.

Shulman - People - direct          120

1          THE COURT:  All right, do you have any

2      questions, Ms. Johnson, of the detective?

3          MS. JOHNSON:  I'm not done with the

4      statement.

5          THE COURT:  Okay.

6  DIRECT EXAMINATION CONT'D

7  BY MS. JOHNSON:

8      Q.   Detective, that scribble, the Q that's indicated

9  on that document, does that appear on your original copy?

10     A.   Yes.

11     Q.   Your original?

12     A.   Yes.

13     Q.   Can you tell us when that was put on the piece of

14 paper?

15     A.   Subsequent to my completion of my interview with

16 Mr. Gopaul while I was still in my office that day.

17     Q.   And what was the reason or why did you put that Q

18 on the piece of paper?

19     A.   I don't know specifically.  I mean -- can I say

20 what I believe I was thinking at the time?

21         MR. SCHECHTER:  Objection.

22         THE COURT:  Yeah, if you don't know exactly

23      why it was there, just tell us that.

24     A.   I don't recall specifically why it's there.

25     Q.   Was this Q on the bottom of the page marked on

                                                    ws

1    that piece of paper while you were in the interview room or

2    after?

3                MR. SCHECHTER:   Objection, it's been asked

4          and answered.   The officer already testified when he

5          put that on the paper, after the interview.

6                THE COURT:   I'll allow it.

7                You can answer that.

8          A.   After the interview was completed.

9          Q.   While in the room with the defendant or after?

10         A.   I don't recall, specifically.

11         Q.   Does the top of the page on top of that scribbled

12   Q, is that part of your -- of what's marked as

13   People's Exhibit 6 and 6A, is that a fair and accurate copy

14   of your memorialization of your interview with the

15   defendant?

16         A.   Absolutely.

17         Q.   And which part of People's 6 or 6A was written by

18   you and which part was written by the defendant?

19         A.   There's a drawing that Mr. Gopaul drew of what he

20   was describing as the vibrators that he was saying was in

21   his house, that is in his handwriting, and other than his

22   signature, the rest of the statement is in my handwriting.

23         Q.   Under the picture where it narrates what the

24   picture is of, who wrote that?

25         A.   I wrote that.

ws

Shulman - People - direct        122

1       Q.    Was that in the defendant's presence?

2       A.    Yes, it was.

3       Q.    Did you show that to the defendant after you wrote

4    what the narrative of that picture is?

5       A.    Yes, I did.

6       Q.    And did you show the defendant the question and

7    answer that appeared on that document?

8       A.    Yes, I did.

9       Q.    And when you showed it to him did he sign

10   People's 6 or 6A?

11      A.    He indicated to me that it was accurate as to the

12   question I had asked him and what his answer was and to what

13   he had drawn and what I was labelling as his drawing and

14   then he affixed his signature as him saying it was accurate.

15      Q.    And did he indicate he wanted to make any changes

16   to either the question, answer or the picture?

17      A.    No, he did not.

18      Q.    And did you watch him sign it?

19      A.    Yes, I did.

20      Q.    Did you explain to the defendant how to draw the

21   picture?

22      A.    No, I did not.

23      Q.    What did you say to him?

24      A.    He made a comment about having vibrators in the

25   house and I think I said something, "Well, can you describe

                                                            ws

1   what it looked like?"

2             And I think he said something similar to, "It will

3   be easier if I just draw it for you."

4             MR. SCHECHTER:  Objection to what the officer

5        thinks.

6             THE COURT:  Yeah, if you don't know exactly

7        what it is that he said just tell us that.

8             THE WITNESS:  In sum and substance.

9   A.   I don't know verbatim, but it was very similar to

10  that which is what prompted me to give him the paper and pen

11  and say, "If you want to draw it you can draw it."

12  Q.   And everything that appears above your signature

13  and above the defendant's signature, was that all

14  memorialized in the defendant's presence?

15  A.   Yes, it was.

16  Q.   And was that all in the -- memorialized in the

17  interview room?

18  A.   Yes, it was.

19            MS. JOHNSON:  Your Honor, for purposes of the

20       hearing we would ask to offer that part of the

21       statement into evidence as that is the fair and

22       accurate copy as the detective testified.

23            MR. SCHECHTER:  I'm still objecting, Judge,

24       on the grounds that it was altered upon the signature.

25            THE COURT:  No, I'll -- I'm going to allow

1     the entire statement over objection in evidence,

2     People's 6.

3              MR. SCHECHTER:  Your Honor, would the Court

4     please note that my objection to the offer of this

5     material is continuous even throughout the trial,

6     rather than my making continual objections to it?

7              THE COURT:  Yes.

8              MR. SCHECHTER: Thank you, Judge.

9              (People's Exhibit 6 received in evidence.)

10             THE COURT:  You're not offering 6A in?

11             MS. JOHNSON:  No.

12             MR. SCHECHTER:  6 is in evidence?

13             THE COURT:  Yes, that's the copy.

14             MR. SCHECHTER:  6A is not.

15             MS. JOHNSON:  Can the detective leave that in

16     his case jacket or is the Court going to need it?

17             It's marked for ID.

18             THE COURT:  No, it's not being offered at

19     this time.  He can leave it in his case jacket.

20     Q.    Detective, who wrote the date and time on

21     People's 6 on the top right-hand corner of the document?

22     A.    I did.  I wrote that.

23     Q.    And is that your handwriting, the question and the

24     answer?

25     A.    Yes, it is.

ws

1            THE COURT:  Just if I could interrupt,
2       detective, just with regard to if you could take out 6A
3       again and compare it to 6?
4            Is 6A a photocopy of 6?
5            THE WITNESS:  Yes, it is, your Honor.
6            THE COURT:  Is there anything on 6A or -- I
7       should say on 6A that is not on 6, other than the
8       stamp, the confidential stamp?
9            THE WITNESS:  No, other than that they're
10      accurate.
11      Q.   Detective, at any time when defendant was making
12   that drawing did he ask to speak to an attorney?
13      A.   No, he did not.
14      Q.   And at any time did he indicate he no longer
15   wished to speak with you?
16      A.   No, did he not.
17      Q.   Was he still cooperative?
18      A.   Yes, he was.
19      Q.   Was any forced used upon this defendant prior to
20   him making that drawing?
21      A.   No, there was not.
22      Q.   And were any threats made upon him prior to him
23   making that drawing?
24      A.   No.
25      Q.   Was that the end of your contact with the

                                                        ws

1    defendant -- and, I'm sorry, let me just step back.

2          Had anybody walked in and out of the interview

3    room during this time?

4          A.   No.

5          Q.   Was that the end of your contact with the

6    defendant after People's 6 was memorialized?

7          A.   I believe I interacted with him further during the

8    course of the day, but not of any substantive matter.

9          Q.   What did you do next?

10          Who did you contact?

11          A.   At some point in time I spoke to Police

12    Officer Alfaro.  I indicated to her what the -- what the

13    statements Mr. Gopaul had made were.

14          I indicated to her that I believe there was

15    evidence in his home or his vehicle that were pertinent to

16    the case.  I indicated to her that Mr. Gopaul had given me

17    written consent to search both the vehicle that he was a

18    legal custodian of and his home to recover items.

19          Q.   To your knowledge, was that done?

20          A.   Yes.

21          Q.   And was it you or Officer Alfaro that recovered

22    the property in this matter?

23          A.   Officer Alfaro recovered the evidence in this

24    case.

25                    MR. SCHECHTER:  Objection.

ws

1     Q.    Well, you didn't recover the evidence, right?

2     A.    I was present --

3              THE COURT:  Objection sustained.

4              Go ahead.  You got a new question.

5     Q.    Did you recover any evidence in this case?

6     A.    I did not.

7     Q.    Did there come a time when you contacted the

8  Queens DA's Office?

9     A.    There did.

10    Q.    Tell us how that happened?

11             MR. SCHECHTER:  Objection.

12             Did he say they did?

13             THE WITNESS:  I said I did.

14             THE COURT:  All right, you contacted the DA's

15    Office.

16             Go ahead Ms. Johnson.

17    Q.    What was your purpose for contacting the DA's

18  Office?

19    A.    Mr. Gopaul had made statements to me.  I had -- at

20  some point in time I asked him if he would be willing to

21  make a videotaped statement with the Queens District

22  Attorney's Office.

23    Q.    If I could just stop you there for one moment.

24             Was it before or after the written statements were

25  given that you asked Mr. Gopaul if he wanted to make a video

                                                            ws

1    statement?

2         A.    After.

3         Q.    Was it after Miranda warnings had been issued?

4         A.    Yes.

5         Q.    Was it after People's 1, 2, 3, 4, 5, and 6 that

6    have been marked into evidence, was it after that time

7    frame?

8         A.    Yes.

9         Q.    Was it in the interview room that that

10   conversation took place?

11        A.    Yes.

12        Q.    Can you tell us how that came about?

13              What did you actually ask him?

14        A.    I indicated to Mr. Gopaul that, if he would like,

15   that the Queens District Attorney's Office might be

16   interested in coming and speaking to him and interviewing

17   him on videotape and if that was something that he would be

18   willing to do, that I would called the District Attorney's

19   Office and make an inquiry if he was interested in doing

20   that.

21        Q.    What did he say when you asked him that?

22        A.    He said he would be willing to make a video

23   statement.

24              I left the interview room, leaving Mr. Gopaul in

25   the interview room, and I contacted the Queens District

Shulman - People - direct          129

1   Attorney's Office.

2        Q.   Was a video subsequently made?

3        A.   Yes, it was.

4        Q.   Were you present for that?

5        A.   Yes, I was.

6        Q.   Where was the video made?

7        A.   In an interview room in my office.

8        Q.   In the 105?

9        A.   The 105 Precinct detective squad.

10       Q.   Was it the same room that you were interviewing

11  the defendant in before?

12       A.   No, it was not.

13       Q.   How come?

14       A.   The room that's used to make this particular video

15  at the initial time of speaking to the defendant, the victim

16  in this case, Miss Sana Awan, was in that other interview

17  room, so Mr. Gopaul was spoken to in the second interview

18  room.

19            At the time that we were going to make the video

20  Miss Sana Awan was no longer in that room, I had access to

21  that room, which also has the ability to plug in the video

22  cassette recorders and is a slightly bigger room to allow

23  room for the District Attorney, the defendant, myself and

24  the videographer.

25       Q.   Can you tell us how it came about that the

                                                        ws

1  defendant was brought from the smaller interview room to the
2  video room?
3      A.   I took Mr. Gopaul out of the smaller interview
4  room and walked him to the other interview room and asked
5  him to have a seat in the chair in the room.
6      Q.   Was that before or after the DA's -- the Assistant
7  District Attorneys and the videographer had arrived at the
8  precinct?
9      A.   After.
10     Q.   At any time did the defendant indicate he no
11  longer wished to make a video statement?
12     A.   No, he did not.
13     Q.   At any time before or when the Queens DAs arrived
14  did he indicate that he wants to speak with an attorney?
15     A.   No, he did not.
16     Q.   Were any other officers or detectives in the video
17  room prior to the Queens DA's arriving?
18     A.   No, there were not.
19     Q.   Was the defendant handcuffed in the video room?
20     A.   No, he was not.
21     Q.   What was -- where was the defendant brought in the
22  room for when the DAs arrived?
23          Was he sitting at the table?
24          MR. SCHECHTER:  Objection, multiple question
25      and she's leading, your Honor.

ws

Shulman - People - direct                131

1                    THE COURT:  Yeah, sustained.

2          Q.   What was the defendant's position when the Queens

3     ADAs arrived?

4          A.   He was sitting in a chair at a table in the

5     interview room.

6          Q.   Who was in the room?

7          A.   I was in the room and the videographer was in the

8     room.

9          Q.   Is the videographer a civilian or a police

10    officer?

11         A.   I believe in this case it was a police officer.

12                   MR. SCHECHTER:  Objection as to what the

13             officer believes, again, Judge.

14                   THE COURT:  Do you remember, have a

15             recollection, as to --

16                   THE WITNESS:  I'm pretty sure it was a

17             detective, your Honor.

18         Q.   Is it a detective with your precinct?

19         A.   No.

20         Q.   Somebody with the DA's Office?

21         A.   Yes.

22         Q.   Where was your weapon when you went into that

23    room?

24         A.   It was still secured in my office in my --

25         Q.   To your knowledge, did the videographer have any

                                                              ws

Shulman - People - direct          132

1   weapons with him?

2        A.   His were also secured upon his arrival prior to

3   him going into the interview room.

4        Q.   Is that Police Department policy?

5        A.   Yes.

6        Q.   Have you had the opportunity to review that video,

7   detective, since that date?

8        A.   Yes, I have.

9             MS. JOHNSON:   I'm going to ask that this be

10       marked as People's Exhibit 7 for identification

11       purposes.

12            THE COURT:   People's 7.

13            (People's Exhibit 7 marked for

14       identification.)

15       Q.   Detective, if you could take a look at People's 7

16   for ID?

17            (Shown to witness.)

18       Q.   Do you recognize that tape?

19       A.   Yes, I do.

20       Q.   What do you recognize it to be?

21       A.   It's a videotape that I reviewed that contains a

22   substance of a video interview with Mr. Gopaul back on

23   June 24th of 2008.

24       Q.   Is that a fair and accurate copy of the entire

25   interview with Mr. Gopaul in that room?

ws

Shulman - People - direct          133

1     A.   Yes.

2               MS. JOHNSON:  Your Honor, I would ask that

3     this be marked into evidence.

4               MR. SCHECHTER:  May I have a voir dire?

5               THE COURT:  Yes.

6   VOIR DIRE EXAMINATION

7   BY MR. SCHECHTER:

8     Q.   Detective, is this a copy of the original or is

9   this the original tape that was made?

10    A.   I believe it's a copy.

11              MR. SCHECHTER:  Objection to what he

12    believes, your Honor.

13              THE COURT:  Do you know for a fact whether

14    it's a copy or the original?

15              THE WITNESS:  I didn't take the video, I

16    didn't operate the camera, so I couldn't say

17    specifically.

18    Q.   How do you know that this is a videotape of the

19  interview of Mr. Gopaul?

20    A.   I viewed the videotape on two occasions and

21  watched the substance of what's on the tape and it is myself

22  present in a room when Mr. Gopaul is being interviewed by

23  the Queen's District Attorney's Office.

24    Q.   But you don't have that -- that tape is not on for

25  view now, so you don't know if this tape is the interview of

ws

1    Mr. Gopaul of your own knowledge?

2         A.   Well, I believe in October of '08 when I watched

3    the video I believe in the grand jury and prior to that I

4    affixed my signature on the white tape on the side.

5         Q.   Is your signature on this tape?

6         A.   Yes.

7              MR. SCHECHTER:   May I approach the witness,

8         Judge?

9              THE COURT:   Yes.

10        Q.   Please show us where your signature is on the

11   tape?

12             (Shown to witness.)

13        A.   (Indicating).

14             MR. SCHECHTER:   Then I have no objection for

15        the purposes of this hearing, Judge.

16             MS. JOHNSON:   Your Honor, before I play

17        that --

18             THE COURT:   Mark it.

19             (People's Exhibit 7 received in evidence.)

20        Q.   Detective, I'm going to play what's been marked as

21   People's Exhibit 7.

22             Were Miranda warnings issued again on this tape?

23        A.   Yes, they were.

24        Q.   And was that done in your presence?

25        A.   Yes, it was.

ws

1        THE COURT:  Are you going to play it now?

2        MS. JOHNSON:  I am, Judge, yes.

3        (Witness steps down.)

4        MS. JOHNSON:  Can I have a minute, Judge?

5        THE COURT:  Yes.

6        (Pause in the proceedings.)

7        (People's Exhibit 7 published at this time.)

8        (Witness resumes the stand.)

9    Q.    Detective Shulman, where was the defendant brought

10   at the conclusion of that video?

11   A.    Initially, I believe he stayed in that interview

12   room and at some point in time Officer Alfaro, I believe,

13   brought him downstairs and he was subsequently transported

14   to the Queens Central Booking facility.

15   Q.    Was your contact with the defendant over at the

16   end of this video?

17   A.    Pretty much, yes.

18   Q.    At any time during the totality of your contact

19   with the defendant on June 24th, 2008 did he ever ask to

20   speak with an attorney?

21   A.    No, he did not.

22   Q.    Did he ever indicate to you that he did not want

23   to speak with you?

24   A.    No, he did not.

25   Q.    Was there ever a language barrier?

                                                    ws

Shulman - People - direct                136

1        A.   No, there was not.

2        Q.   Was there ever any force used upon him in your

3   presence?

4        A.   No, there was not.

5        Q.   Any threats made upon him?

6        A.   No.

7        Q.   Any promises made of him?

8        A.   No.

9        Q.   I have no other questions of Detective Shulman.

10              MR. SCHECHTER:  May I have about five to

11       seven minutes to look at the Rosario material, Judge?

12              THE COURT:  Actually, you can have a little

13       bit longer than that, I have to break by 12:20.

14              So why don't we pick it up at 2:15?

15              MR. SCHECHTER:  2:15?

16              Okay.

17              THE COURT:  I take it by then you will have

18       had enough time to review the material?

19              MR. SCHECHTER:  Yes.

20              MS. JOHNSON:  Can I leave everything here,

21       Judge?

22              THE COURT:  Yes.

23              We'll see everybody at 2:15.

24              (The luncheon recess was taken at this time.)

25              *      *      *      *      *

                                                        ws

1           A F T E R N O O N   S E S S I O N
2                MR. SCHECHTER:  I have Pages 2 and 3 of the
3           arrest report -- of the complaint report, but not
4           Page 1 of the complaint report.  I would like to know
5           why not.
6                MS. JOHNSON:  Your Honor, Page 1 of the
7           complaint report is similar to our narrative and our
8           crime reports.  It reflects conversations with the
9           victim along with personal information of the victim.
10          It has nothing to do with the Huntley or Mapp.
11                   If the Court would like to see it?
12                   (Shown to Court.)
13                   (Pause in the proceedings.)
14                   THE COURT:  Who is, People -- who would CV
15          stand for in this report here?
16                   There's a reference to a TPO, I'm assuming
17          that's time and place of occurrence, CV walked inside?
18                   MS. JOHNSON:  Crime victim.
19                   THE COURT:  I mean, it appears,
20          Mr. Schechter, that this Page 1, the narrative portion
21          which is the only portion that is of any significance
22          at least in terms of what's said, essentially is
23          statements that the complainant, crime victim, stated
24          to, I'm assuming, police personnel.
25                   MR. SCHECHTER:  Well, if we can mark that a

                                                        ws

Proceedings                    138

1      court exhibit?

2                   As long as I get that in Rosario material

3      when she testifies.

4                   THE COURT:  Absolutely.  I would think you

5      would be absolutely entitled to it.

6                   MS. JOHNSON:  I agree.

7                   MR. SCHECHTER:  Your Honor, the other thin kg

8      is on the arrest report I have one of three and I have

9      two of three, but I don't have three of three.

10                  THE COURT:  Is that the arrest work sheet?

11                  MR. SCHECHTER:  Arrest report it says here,

12     your Honor.

13                  THE COURT:  Is that what was handed over to

14     you this morning?

15                  MR. SCHECHTER:  Either this morning or on

16     Friday.

17                  MS. JOHNSON:  Your Honor, there is one page

18     that I showed counsel of a Page 3, it's completely

19     blank, and another page on an arrest report.

20                  I don't have a Page 3 of three.  I don't

21     believe one exists.  I can have Detective Schulman

22     double check his case jacket.  I don't have a three of

23     three.  It could have been blank.  I have one of three,

24     I have two of three and then when I -- next page I have

25     is the defendant's mugshot.

                                                      ws

Proceedings                    139

1              MR. SCHECHTER:  It says three pages, Judge --
2         that's one of the reasons --
3              THE COURT:  I'm at somewhat of a disadvantage
4         because it's been awhile since I dealt with Rosario
5         material that gets generated, if you will, by Police
6         Department, so --
7              MS. JOHNSON:  I can double check.  He's right
8         outside.
9              THE COURT:  Is this the online systems
10        arrest?
11             Is that what you're referring to?
12             MR. SCHECHTER:  This says omni form system
13        arrest.
14             THE COURT:  Right.
15             MR. SCHECHTER:  On the top is written arrest
16        report, one of three.
17             THE COURT:  I see that.
18             MR. SCHECHTER:  And the next one also says
19        arrest report on the top and then it has my client's
20        home and cell numbers and then some information
21        underneath with Officer Alfaro's information, but it
22        says then three of three which there's no three of
23        three.  I just don't know where three of three.
24             MS. JOHNSON:  In fact, at the bottom of
25        Page 2 it says end of arrest report.

                                                    ws

Proceedings                    140

1          MR. SCHECHTER:  No, your Honor, if you look

2     at the other pages, if you look at the complaint

3     report, what they mean by end of complaint report they

4     mean end of complaint report for that page because in

5     the complaint report there's two of three and three of

6     three and not one of three.  One of three we already

7     discussed has the complainants information, but it says

8     on the bottom end of complaint report, so I suppose no

9     one could say something was written below it, but it

10    doesn't mean it's the end of the entire report,

11    apparently.  That's why it's confusing.

12         MS. JOHNSON:  The opposite is true for the

13    arrest report.  Bottom of Page 1 of the arrest report

14    is information and then the bottom of Page 2 says end

15    of arrest report.

16         MR. SCHECHTER:  Again, same thing with Page 2

17    and 3 of the complaint report.  On the bottom of Page 2

18    of the complaint report is end of complaint report and

19    the bottom of Page 3 it says end of complaint report.

20              What I'm saying to you --

21              THE COURT:  Why don't we do this?

22              Let's get him on the stand.  You ask him --

23    present these things to him because otherwise you're

24    asking me to figure out what this detective may have

25    generated in the way of Rosario material.

1    MR. SCHECHTER:  There's one additional one

2    and I only have two of three and I have no idea what

3    this is.

4         (Shown to counsel.)

5         MS. JOHNSON:  What does it say on the cover

6    page of your Rosario packet?

7         Where did you pull that out of?

8         MR. SCHECHTER:  I got it from the group of

9    papers you gave me.

10        MS. JOHNSON:  Because the cover page had a

11   list of what everything was, so let me just take a look

12   at mine.

13        (Pause in the proceedings.)

14        It's part of a complaint report that wasn't

15   part of the narrative, which is why what was turned

16   over, is the defendant's information and the part that

17   was redacted was the personal information of the

18   complainant.

19        MR. SCHECHTER:  Well, certainly I'm entitled

20   to that on Rosario with respect to the complainant, but

21   we should have some kind of Court follow-up on this,

22   maybe make these Court exhibits, to make sure I get

23   these papers and there are other documents I did not

24   get and I would like to give reference to them, if I

25   may.

                                          ws

Proceedings                           142

1                   MS. JOHNSON:  I agree, they are absolutely

2         Rosario for purposes of the trial.

3                   THE COURT:  I'm a little confused,

4         Mr. Schechter, as to what you're asking me.

5                   MR. SCHECHTER:  I could have this marked as a

6         Court exhibit, if the Court wishes, and ask her why --

7         there are three papers.  I only have two of three.

8         There's not one of three I don't have and three of

9         three I don't have.  I have no idea what that document

10        is.

11                  MS. JOHNSON:  It's part of a complaint

12        report, your Honor, and the part that was not provided

13        was narrative about the complainant, information

14        involving the complainant.

15                  The part that was disclosed for hearing

16        purposes is what was relevant not only to the testimony

17        of both witnesses here, but the defendant.

18                  THE COURT:  Let me ask you this.

19                  Did you provide -- I'm looking at something

20        that's a document that says Page 2 of three.

21                  Did you provide Page 1 and page 3?

22                  MS. JOHNSON:  I would not have, Judge, if it

23        was part of the victim's narrative.

24                  MR. SCHECHTER:  No, I did not get it.

25                  MS. JOHNSON:  And Page 3, I believe, is the

                                                         ws

Proceedings                    143

 1    one I showed counsel that's blank.

 2                 MR. SCHECHTER:  That's a different report,

 3    Judge.   That Page 3 that was blank was the arrest

 4    report.

 5                 THE COURT:  Well, I have no idea what I'm

 6    looking at.

 7                 MR. SCHECHTER:  I don't either, Judge, and

 8    that's why I'm raising this to the Court.

 9                 THE COURT:  Do you see what he's handed up to

10    the Court, Ms. Johnson?

11                 MR. SCHECHTER:  I showed it to her, I

12    believe, Judge.

13                 MS. JOHNSON:  I'm pulling out -- I have a

14    full copy of the detective's case jacket, so let me

15    take a look.

16                 (Pause in the proceedings.)

17                 MS. JOHNSON:  What he just handed up to the

18    Court was Page 2 of the complaint report, Page 1 being

19    what your Honor had looked at where it said at

20    time/place of occurrence, crime victim walked inside of

21    105th Precinct.

22                 So here is Page 2 of that three-page

23    complaint report.  Page 3 already being provided to

24    counsel which indicates the defendant's information and

25    a portion where it says crime data and details.  So

                                                      ws

Proceedings                    144

1       this is Page 2 of the complaint report.

2                    MR. SCHECHTER:  I think -- may I see that,

3       please?

4                    (Shown to counsel.)

5                    MR. SCHECHTER:  I believe counsel is mistaken

6       and I would like to show you why.

7                    She had alluded to the fact Page 1 of three

8       is that narrative.  She's referring to the complaint

9       report.

10                   This is another complaint report.  If you

11      look at Page 2 of three, which is the one I have here,

12      it's completely different.

13                   MS. JOHNSON:  There's more than one complaint

14      report, that's why.

15                   MR. SCHECHTER:  It's not the same first page

16      for both reports, counsel, is what I'm saying.

17      page 1 is different for each one.  And there's no

18      Page 3 here either.  All I have is two of three on this

19      particular item.

20                   Just so that the record is clear, the

21      document I'm referring to has information concerning

22      the complainant which is blacked out on the top and in

23      one of the boxes it says reporter, colon, a number

24      sign, one of one and then again it appears to be

25      information about the complainant which is blacked out

                                                              ws

Proceedings                    145

1      and then underneath that, wanted number, one of one, it

2      refers to a male, five feet nine inches tall, my

3      client's name, but that's all there is on this document

4      and I have no idea what it relates to.

5              Certainly, the Page 1 alluded to by counsel

6      cannot possibly relate to the same complaint report.

7              MS. JOHNSON:  Judge, I have them both in

8      front of me.

9              THE COURT:  This is part of what was handed

10     over, I think, last week.

11             I've got Page -- it starts off with -- it's a

12     legal size copy.  It says Page 2 of three.

13             MR. SCHECHTER:  Is that the one that's

14     blacked out on the top and the sex box?

15             THE COURT:  No, it's not blacked out.

16             MR. SCHECHTER:  Two of three I have --

17             THE COURT:  But then at the bottom of the

18     first it says end of complaint report.

19             MR. SCHECHTER:  Is your Honor referring to --

20             THE COURT:  Excuse me.

21             MR. SCHECHTER:  I'm sorry.

22             THE COURT:  So then I go to the next page,

23     there's another two of three.

24             MR. SCHECHTER:  Yes.

25             THE COURT:  That has -- at the top it says --

```
1     there starts to be some blacked out items.  Then it
2     says reporter, one of one.
3                 MR. SCHECHTER:  Right.
4                 THE COURT:  There's a name that's blacked out
5     next to that.
6                 MR. SCHECHTER:  Yes.
7                 THE COURT:  Then it refers to a male, which
8     I'm assuming is the defendant.
9                 MR. SCHECHTER:  My client's name is there,
10    Judge.
11                But I'm saying I don't have anything --
12                THE COURT:  Then it goes to Page 3 of three
13    and then it says end of complaint report.
14                So you've got --
15                MS. JOHNSON:  Because there was two complaint
16    reports generated, your Honor, one that was printed
17    probably from the PD website and one that was printed
18    from the internal computer which is why he has two
19    copies.
20                One of them -- both of them begin the same
21    way.  One has more information than the other, but the
22    information as to the defendant has all been provided.
23                If your Honor wants to take a look I'll show
24    you both of the reports, but everything that's --
25                THE COURT:  Let me just tell you this.
```

ws

1           The Page 2, if you will, of two of three, as

2    I indicated, I have two of them.

3                MS. JOHNSON:  Yes.

4                MR. SCHECHTER:  Right.

5                THE COURT:  They're two different pages.

6                MS. JOHNSON:  Yes, because there's two

7    complaint reports, so both were turned over.

8                THE COURT:  So both were what?

9                MS. JOHNSON:  Both were put in the packet

10   because there was two complaint reports that were

11   generated.

12               MR. SCHECHTER:  Well, I only have, as I said,

13   two of the three of them on one and only one of the

14   three on the other, the second page.

15           I have nothing regarding Page 1 and 3 of the

16   one we're talking about now, Judge.

17               THE COURT:  Where is the Page 1 of -- where

18   is Page 1 of -- you're telling me that there's two

19   complaint reports that get generated?

20               MS. JOHNSON:  I'm looking at them right here,

21   Judge.

22           Both of the complaint reports, both Page 1,

23   have the narrative involving the complainant.  Both of

24   them start the same, have the same information, the

25   occurrence location, occurrence from, classification

                                                          ws

1    and the narrative.

2              THE COURT:  Now, that hasn't been provided as

3    part of the Rosario, yes?

4              MR. SCHECHTER:  Has not.

5              MS. JOHNSON:  That has not.  There was no

6    information in there other than the victim's

7    information and the narrative.

8              THE COURT:  Is that what I just looked at a

9    moment ago?

10             MS. JOHNSON:  Yes, Judge.

11             THE COURT:  So I ruled that that appeared,

12   from my standpoint, to be dealing just with statements

13   the complainant may have made.

14             MS. JOHNSON:  Page 2 with regards to both

15   complaint reports has the reporter information and the

16   wanted information and the defendant's personal

17   information that counsel has in his hands right now, in

18   his left hand.

19             MR. SCHECHTER:  Right.  That's the first one.

20   We already disposed of that.

21             I'm talking about the second one with the

22   blackened out material Page 2 of three.  I don't know

23   what three of three is on that.

24             MS. JOHNSON:  Page 3 is exactly the same as

25   Page 2 of the other report.

ws

Proceedings                    149

1              THE COURT:  Well, there's a three of three

2       that I have and that's where it says end of complaint

3       report.

4              MS. JOHNSON:  Yes, Judge.  That is the same.

5       In fact, it has less information than Page 2 of 3.

6              If counsel wants to just take a look at it, I

7       mean, I'll show it to him, but he has it.

8              THE COURT:  Let me ask you this.

9              Why was there two Page 2s, if you will,

10      generated out of a complaint report?

11             MS. JOHNSON:  I believe it's because when

12      they generate the reports, once the supervisor approves

13      them more information is put at the bottom, which is

14      why Page 2 of the other report has all the supervisor's

15      information.  It's sort of like the unauthorized versus

16      authorized.

17             So they both have all the exact same

18      information, it's just lined up on the page differently

19      and the final report has the sergeant's name.

20             THE COURT:  Can I just see these?

21             MS. JOHNSON:  Sure.

22             THE COURT:  Because you make it very, very

23      difficult when you start, you know, extracting, you

24      know, pages out because it becomes apparent that there

25      looks like there are things that are missing.

                                                    ws

Proceedings                         150

1            I'm not claiming anyone is doing it

2      intentionally.

3            MS. JOHNSON:  What I should have done was

4      give all the pages with redactions instead of pulling

5      the pages out.

6            THE COURT:  Right.

7            MS. JOHNSON:  So I'm going to give the Court

8      all of the complaint reports that I have.

9            MR. SCHECHTER:  I have a few other issues,

10     Judge, but let's get through this first.

11           MS. JOHNSON:  I'm sorry, here is the first

12     page that your Honor already looked at.

13           (Shown to Court.)

14           THE COURT:  All right, this I've seen.

15           (Pause in the proceedings.)

16           THE COURT:  Well, you know what I'm going to

17     direct the People to do because, quite frankly, this

18     shouldn't be me doing this, I'm going to direct the

19     People to put together whatever these complaint reports

20     are, whatever order they were in in terms of the pages.

21           MS. JOHNSON:  Of course.

22           THE COURT:  Whatever you feel you need to

23     redact, I want you to indicate that to me.

24           MS. JOHNSON:  Okay.

25           MR. SCHECHTER:  Your Honor, I'm truly

                                                        ws

Proceedings                    149

1         THE COURT:  Well, there's a three of three
2    that I have and that's where it says end of complaint
3    report.
4         MS. JOHNSON:  Yes, Judge.  That is the same.
5    In fact, it has less information than Page 2 of 3.
6         If counsel wants to just take a look at it, I
7    mean, I'll show it to him, but he has it.
8         THE COURT:  Let me ask you this.
9         Why was there two Page 2s, if you will,
10   generated out of a complaint report?
11        MS. JOHNSON:  I believe it's because when
12   they generate the reports, once the supervisor approves
13   them more information is put at the bottom, which is
14   why Page 2 of the other report has all the supervisor's
15   information.  It's sort of like the unauthorized versus
16   authorized.
17        So they both have all the exact same
18   information, it's just lined up on the page differently
19   and the final report has the sergeant's name.
20        THE COURT:  Can I just see these?
21        MS. JOHNSON:  Sure.
22        THE COURT:  Because you make it very, very
23   difficult when you start, you know, extracting, you
24   know, pages out because it becomes apparent that there
25   looks like there are things that are missing.

                                                    ws

Proceedings                    151

1   cognizant and I appreciate the Court's direction,

2   however, for the life of me, I don't understand why

3   counsel just, since I'm going to require them

4   eventually anyway, provide me with the Rosario material

5   for the witnesses so we could avoid all this.

6              THE COURT:  That would seem to be the easiest

7   way of dealing with it, which I recognize.

8              I'm not going to force the People -- having

9   said that, I'm not going to force them to give over

10  Rosario, at least with respect to the first page.

11             In all fairness, I don't think they're

12  entitled -- or required, at this point, to provide to

13  you.

14             I understand your point.

15             MR. SCHECHTER:  All I'm saying, your Honor,

16  is all this does is exacerbate the length of time and

17  the delay in this case because I then have to look at

18  this stuff.

19             MS. JOHNSON:  I'll give him everything.  I'll

20  just redact the narrative, that's what I'll do, if I

21  could use the copy machine I'll make copies for

22  everyone.

23             THE COURT:  Yes.

24             MR. SCHECHTER:  Before she goes, there's

25  more.

                                              ws

Proceedings                    152

```
 1                THE COURT:  What else is there,
 2       Mr. Schechter?
 3                MR. SCHECHTER:  The complaint follow-up
 4       reports, I was given two of them.
 5                Now, I would direct the Court's attention to
 6       the right side of the top of the page, the second box
 7       down, it says follow-up number.
 8                I have follow-up Number 3 and I have
 9       follow-up complaint report Number 4.
10                I do not have follow-up Number 1 or Number 2.
11                MS. JOHNSON:  Can I take a look at that?
12                MR. SCHECHTER:  Sure.
13                (Shown to counsel.)
14                MS. JOHNSON:  Which ones are you missing?
15                MR. SCHECHTER:  I don't have follow-up report
16       Number 2 or 1, complaint follow-up reports Number 1 and
17       2.
18                MS. JOHNSON:  I have those.  They're exactly
19       the same.
20                If he wants I'll give him a copy -- and you
21       don't have   4?
22                MR. SCHECHTER:  Number 1, I don't have.
23                MS. JOHNSON:  I'll give them to him.  They're
24       the same.  If anything, they're missing information
25       that was provided to him in the other ones.
```

Proceedings                    153

1              THE COURT:  So give it to him.

2              MS. JOHNSON:  That's fine.

3              THE COURT:  What else Mr. Schechter?

4              MR. SCHECHTER:  If the Court please, I do not

5    have a copy of the activity log which, in my

6    understanding, is routinely filled out by the police

7    officer, including the desk sergeant's note of entries

8    as to when my client came into the precinct, which is

9    required when someone comes into the precinct and

10   arrested.  There's always a log entry made of it.  I

11   don't have that.  It's very important in the context of

12   this case.

13             I did not see complaint report entitled

14   Police Department PD 313-152, which is a complaint

15   report.  Now, Police Department documents are normally

16   numbered in that kind of way.  I did not see that

17   document.

18             I did not see the New York State standardized

19   domestic incident report.  That is called DCJS 3221.

20   That is mandated by Police Department regulations

21   procedure Number 208-36.

22             Counsel had indicated, I think, that report

23   of suspected child abuse form was not filled out

24   because ACS was at the precinct.

25             However, Police Department regulations

                                                      ws

Proceedings                    154

1    require that PD 377-154, which is report of suspected

2    child abuse, if same is done, must be prepared.

3             Additionally, the report to the patrol

4    supervisor, I have not gotten that.

5             The domestic report incident log, I did not

6    get that.

7             Now, I don't know if an online booking system

8    arrest work sheet was done.  If so, I have not gotten

9    that.

10            And I think we've ascertained, and I'm going

11   to ask the police officer if he knows, whether the

12   commander had, in fact, told him he was going to make a

13   recommendation for a commendation in his record.  That

14   we have to ascertain on the witness stand.

15            But those other documents I haven't gotten,

16   Judge.

17            MS. JOHNSON:  Judge, the DIR and the

18   complaint reports will be disclosed at trial.  It's all

19   narrative with regards to the complainant.

20            I'm looking now at some of the documents

21   counsel had requested, including the complaint

22   follow-up report Number 1.

23            Judge, this I'm going to ask the Court, if

24   the Court wants to review it, that I not turn it over.

25   It's Detective Schulman 's follow-up report.  It is all

                                                     ws

Proceedings                    155

1    about the contact with ACS and conversations with the

2    complainant and his conversations with a detective.  It

3    has nothing to do with the defendant's statements.

4    It's all about conversations with the victim and

5    adult -- I don't know if it's CPS or --

6              THE COURT:  Can I see it?

7              MS. JOHNSON:  Of course.

8              THE COURT:  What about the activity log

9    Mr. Schechter spoke about first?

10             MS. JOHNSON:  Detective Schulman does not

11   generate information into that activity log.  I had

12   asked him before, in fact, if there was, like a time

13   log, like the PD has here?

14             THE COURT:  Right.

15             MS. JOHNSON:  He says that if it does get

16   generated it gets done by either the desk sergeant --

17   it was not done by the officer and it was not done by

18   this detective.

19             He said there is no formal log like we have.

20   Sometimes there's a card that gets filled out, but he

21   did not prepare one and, according to my conversations

22   with Officer Alfaro, she did not prepare one either.

23             MR. SCHECHTER:  Here's the problem.

24   Detective Schulman was not the arresting officer nor

25   was he the first one on the scene when my client came

ws

1    into the precinct.

2            The time when my client came into the

3    precinct is an important issue in this matter.  It is

4    my understanding that Sergeant O'Hagan being the desk

5    sergeant who participated in the arrest, according to

6    this complaint follow-up sheet, had to complete this

7    documentation and put down the time that my client came

8    into the precinct and when the arrest took place.

9            Short of subpoenaing Sergeant O'Hagan, I want

10   that desk log -- desk book.  Any time someone comes

11   into the precinct there's a desk entry made of it.

12   There has to be by New York City police regulation.  I

13   need the time when that happened.

14           THE COURT:  All right, is Detective Schulman,

15   Ms. Johnson, saying that there was no recording of when

16   the defendant came into the precinct?

17           MS. JOHNSON:  He doesn't have any -- he

18   didn't prepare anything and he didn't generate anything

19   into a logbook.

20           The way he knows the time is based on, like

21   when he testified the sergeant came to him to tell him

22   that the defendant had walked into the precinct.  So

23   whether or not the sergeant generated one, I don't

24   know.  I haven't spoke to the sergeant.

25           THE COURT:  Well, it would seem to me,

ws

1      particularly since we've just now watched the videotape

2      that was taken of the defendant, that appears to be

3      done sometime, I think, in the late 5 afternoon on the,

4      I think, the 24th of June.

5              It sounded as though, you know, in our

6      conference when the case initially came over, that

7      there's going to be some claim made, I'm assuming, that

8      these statements were somehow involuntarily made or the

9      product of some type of coercion, duress, etcetera.

10              MR. SCHECHTER:  Yes.

11              MS. JOHNSON:  Which is why I was going to say

12      to your Honor that I anticipate now, based on counsel's

13      arguments, if I have to call the sergeant as a witness

14      at the hearing I will advise him to bring any log that

15      exists.

16              THE COURT:  Well, I think whether or not you

17      call the sergeant or not, it would be my position that

18      Mr. Schechter is entitled to that activity log,

19      particularly given the fact that we're talking about at

20      least a 12-hour time period that the defendant is in

21      the custody of the police department or 105th Precinct

22      and I would direct the People provide that.

23              MS. JOHNSON:  Yes, Judge.

24              MR. SCHECHTER:  Thank you, Judge.

25              MS. JOHNSON:  As to the complaint follow-up,

Proceedings                    158

1    follow up Number 2 --
2                MR. SCHECHTER:   1 and 2.  I believe you
3    said --
4                MS. JOHNSON:   I believe your Honor has 1 in
5    his hands.
6                THE COURT:   I have complaint follow-up
7    Number 1, yes.  I have follow-up Number 1.
8                MS. JOHNSON:   Follow-up Number 2 I have is
9    all regarding contact with the complainant conversation
10   with the complainant, narrative about the interview
11   with the complainant, nothing about contact with the
12   defendant.
13               I'll provide that to your Honor as well.
14               (Shown to Court.)
15               MS. JOHNSON:   Would your Honor like me to go
16   and make copies of the arrest reports?
17               THE COURT:   Yes, please.
18               (Pause in the proceedings.)
19               MS. JOHNSON:   Your Honor, I gave counsel, I
20   handed up a copy to the Court, I didn't even bother
21   redacting -- he now has all the complaint reports and
22   arrest reports.  I now have Detective Schulman outside
23   calling the 105 command pulling the log for that day.
24   He has my fax number.  If he has it before the end of
25   the hearing today he will fax that over.

Proceedings                    159

1           MR. SCHECHTER:  While we're on it, now that

2    we have this material - I thank counsel for providing

3    me this material - did she ascertain whether or not a

4    domestic incident report was done as per the procedure

5    regulation that I outlined or whether a --

6           THE COURT:  Was there a DIR report done?

7           MS. JOHNSON:  Yes, Judge, it's in my file.

8    It's the narrative of the complainant -- it's her 32B.

9           THE COURT:  Do you want to hand it up to me?

10           MS. JOHNSON:  Sure.

11           THE COURT:  Insofar as the complaint

12   follow-up reports, I've had an opportunity to look at

13   them, Mr. Schechter.  They are, for the most part,

14   interviews with the complainant and the ACS worker or

15   investigator, I should say, and hospital -- someone at

16   a hospital that the complainant treated at on

17   June 24th.

18           They would not appear to me, at this point,

19   to be Rosario for any of these witnesses.

20           (Shown to Court.)

21           THE COURT:  Can you just give this back to

22   the DA?

23           (Shown to counsel.)

24           THE COURT:  Now, what did you hand up to me

25   now?

                                                        ws

Proceedings                    160

1          MS. JOHNSON:  The four-page DIR, your Honor.

2     I believe it's four pages.

3          THE COURT:  And, likewise, Mr. Schechter,

4     with the domestic incident report, it appears as though

5     that it is, as the People represent, a 32B of the

6     complainant in this case as well as another police

7     officer that actually generated the narrative report on

8     the front of it.

9          It's not Detective Schulman or

10    Detective Alfaro, so -- and I would not consider it to

11    be Rosario at this time.

12         Anything else?

13         MR. SCHECHTER:  Not at this time, your Honor.

14         I believe the officer is checking out the

15    activity log.

16         Is that what we're waiting on?

17         THE COURT:  Well, we're not waiting on it.

18    He's going -- I believe he called the 105 Precinct.  If

19    you need him back for further cross, I'll certainly

20    direct the People to do that.

21         MR. SCHECHTER:  Okay.

22         THE COURT:  Can I just ask the People one

23    question?

24         And I appreciate, Ms. Johnson, you were on

25    trial for, I think it was, close to a month.

                                                    ws

Proceedings                161

1          MS. JOHNSON:  April 1st to the 30th.

2          THE COURT:  Was there any indication or

3    representation made before this case came to this part

4    that you had or had not had an opportunity to gather

5    this Rosario material in this case and go over it with

6    the police officers?

7          MS. JOHNSON:  Could we go off the record for

8    a minute?

9          THE COURT:  No, I would like to have it on

10   the record.

11         MS. JOHNSON:  Judge, my --

12         THE COURT:  Because at this point it appears

13   to me that, you know, this matter is not ready for

14   hearing in the sense that we're now spending more time

15   going over Rosario material than we are going over

16   testimony at this point.

17         MS. JOHNSON:  Your Honor, my verdict came in

18   on Tuesday, April 28th.

19         On the 29th my case was on before

20   Judge Donnino for a conference.  I was not at work on

21   the 29th.

22         When I came into work on the 30th I was

23   advised I was having a hearing and police officers and

24   detectives were going to be in my office at 2 o'clock

25   in the afternoon for purposes of hearing.

ws

Proceedings                     162

1          THE COURT:  And prior to that time is the

2     first time you started gathering Rosario material in

3     the case or somebody from your office gathered Rosario

4     material --

5          MS. JOHNSON:  I had some of the Rosario

6     material at the time of grand jury, but obviously

7     because there was another DA's Office that was handling

8     the other matter I did not have a complete detective's

9     jacket at the time of grand jury.

10          What I had was some of the complaint reports,

11     some of the arrest reports.  I did not have everything

12     at the time.  That's why I had the DA's Office from

13     Queens faxing over stuff to my office yesterday

14     because --

15          THE COURT:  So that is actually -- some of

16     this Rosario material is coming from the Queens DA's

17     Office, not necessarily the Police Department.

18          MS. JOHNSON:  Oh, yes.  I did not have all of

19     it.  Whatever was in Shulman's case jacket I had almost

20     all of it at the time of grand jury and all of that was

21     turned over last week when we came here for the

22     hearing.

23          But the stuff that was turned over today,

24     such as some of the property invoices, I got that from

25     the from the arresting officer this morning.

                                               ws

Proceedings                    163

1           Apparently, the way the NYPD handles their

2      paperwork, is unlike Nassau.  Everything isn't in the

3      case jacket.  The arresting officers have their own

4      files, which is why this morning, I apologize for not

5      being here at 9:30, a lot of this online booking

6      information I got this morning.  I had never seen or

7      spoken to the arresting officer.

8           THE COURT:  Well, when the matter was sent

9      out for hearing on the -- was it the 28th or the 29th?

10          MS. JOHNSON:  It had been sent out before

11     then, but I was on trial so we were sent back to

12     Judge Donnino on the 29th when I was out of the office

13     that day.

14          THE COURT:  All right, Mr. Schechter,

15     obviously you may have been more privy to what was

16     going on before this matter went out.

17          Was there any discussions during the

18     conferencing of this case that -- about the Rosario

19     material and whether or not all this material was going

20     to be available prior to the hearing being started

21     instead of it being doled out, as it is now, by

22     piecemeal?

23          MR. SCHECHTER:  I was directed by

24     Judge Donnino to make this application before your

25     Honor.

Proceedings                     164

1                  THE COURT:  What application?

2                  MR. SCHECHTER:  Any Rosario issues were to be

3         made before your Honor.

4                  MS. JOHNSON:  When I was on trial there was

5         one day in the middle of my trial when I met with

6         Mr. Schechter in Judge Donnino's chambers and there was

7         issues coming up about the Rosario.

8                  I had advised Judge Donnino in

9         Mr. Schechter's presence I had not yet received a

10        complete Queens DA's file that had Rosario material.

11                 Mr. Schechter raised the issue and said he

12        believed it was Rosario and I agreed with Mr. Schechter

13        that not only was it Rosario, but obviously for trial I

14        would want a complete file.

15                 This conversation happened, I believe, two

16        weeks ago while -- or maybe a week ago while I was on

17        the trial with the other matter.

18                 MR. SCHECHTER:  Several -- counsel is

19        correct.  Several of these issues were raised before

20        Judge Donnino while counsel was in the middle of trial

21        and came by to try to, at least, answer on behalf of

22        her office, you know, when this case was called.

23                 But since she was in the middle of a trial

24        she just had no means of securing all of this

25        documentation at this point.

                                                          ws

Proceedings                    165

1           THE COURT:  And when it was, on the 28th, you

2     were, what, still on trial?

3           MS. JOHNSON:  My verdict came in on the 28th

4     around 4:30, I believe.  It was way after lunch.

5           MR. SCHECHTER:  My issue is not with counsel,

6     your Honor, my issue is with her office.  Her office

7     should have done everything possible to have this

8     material available for her.

9           MS. JOHNSON:  Your Honor, we had --

10    Judge Donnino knew that I was on trial.  When we were

11    on in his part we were told we were going from hearing

12    directly into trial --

13          THE COURT:  Let me ask you this.

14          The two weeks you said before -- when you

15    were in Judge Donnino's part two weeks before this case

16    got sent out, did he or somebody from his office tell

17    you at that time that on April 29th this thing is going

18    out for hearing and trial?

19          MS. JOHNSON:  He actually told me that on

20    April 27th because he assumed I was going to have a

21    verdict that day and while I was in chambers in the

22    presence of counsel my exact words were, "Judge, I

23    would like to have a day to catch my breath," and I

24    took off the next day and I came back and we were

25    scheduled for hearings.

Proceedings                    166

1            THE COURT:  So when was the first time you

2       found out that this thing was going to hearings and

3       trial?

4            MS. JOHNSON:  Sometime in April.

5            THE COURT:  You have to narrow it down a

6       little bit.

7            MS. JOHNSON:  I don't know because I was on

8       trial the whole month of April and when I had indicated

9       that I didn't know at that time what my witnesses'

10      availability was, Judge Donnino insisted it was going

11      from hearing to trial.

12           When we had this conversation, I didn't have

13      all the Rosario material, I didn't have all the

14      paperwork and I was on trial, I couldn't get it all at

15      that time.

16           THE COURT:  Well, you know, as I indicated,

17      we're now spending more time trying to figure out what

18      Rosario material has been generated, what Rosario

19      material has been turned over, all of which I would

20      think, to a certain extent -- I understand there's

21      going to be Rosario material that may come available as

22      you're speaking to witnesses, I mean, that's to be

23      expected.

24           I mean at this point, since I understand and

25      I'm not finding fault with you, necessarily, that

                                                         ws

1        there's another jurisdiction that's involved, you may

2        not be familiar with the type of paperwork and material

3        that they generate, but, you know, certainly your

4        supervisors, who I have enormous amount of respect for,

5        both came out of the Queens DA's office, I would think

6        more than anybody, they would be familiar with the fact

7        that, look it, this material is going to have to be

8        gathered and ready to be distributed, there's going to

9        be applications to have it redacted.

10               MS. JOHNSON:  And, in defense of them, when I

11       was out on Wednesday they did contact and arrange for

12       the detective, the officer, to come, which is how it

13       was that I knew that they were subpoenaed before.  They

14       contacted the Queens DA, but --

15               THE COURT:  Let me ask you, did you know

16       during the course of your trial that as soon as you got

17       off trial in your other case your you were going to be

18       going into hearings and trial?

19               When did you find that out?

20               You still haven't answered that.

21               MS. JOHNSON:  We were told by Judge Donnino

22       we were going from hearings into trial.

23               However --

24               THE COURT:  When?

25               MS. JOHNSON:  I don't know when it was.

ws

Proceedings                    168

1          However, as your Honor knows, I was in the

2     middle of pretrial in another matter, People versus

3     Mark Hercules.

4          When Judge Donnino put me on trial with the

5     last trial I was on, I reminded the Court that I had

6     back-to-back trials that were scheduled with an

7     incarcerated defendant and this matter had been sent

8     there.

9          His honor, Judge Donnino, had indicated to

10    me, "You're going to try that other case first," and

11    trials got backed up.

12         Because of that, Mark Hercules was assigned

13    to another prosecutor in anticipation of, per Judge

14    Donnino, this case going to trial first.

15         When we were -- when he advised we were going

16    directly from hearing into trial, I believe the first

17    time that happened was in April while I was on trial.

18         THE COURT:  And what did you do when he told

19    you that?

20         MS. JOHNSON:  I had advised him, Judge, going

21    hearing into trial, I said, "Judge, I don't know if

22    personally I am going to be ready.  I don't know if

23    myself I could be ready," but I was on trial and, in

24    fact, we had another control date which on -- because I

25    did take notes of this because I was concerned that

                                                   ws

Proceedings                    169

1      something would happen.

2                    THE COURT:  Like this would happen?

3                    MS. JOHNSON:  On April 16th we conferenced

4      the case with Judge Donnino and counsel in chambers and

5      was marked control for trial April 22nd.

6                    The Court also indicated the Court wanted an

7      April 28th trial as his Honor had indicated I would

8      probably have a verdict by then, which I did not.

9                    In fact, I was still on trial that full day

10     of the 28th.

11                   On April 27th we were back in chambers and I

12     advised the Court that I needed to check the

13     availability of the New York City police officers and

14     the Court indicated -- actually, while we were in

15     chambers the Court indicated we were going directly

16     from hearing to trial.

17                   Then when we went on the record I advised the

18     Court I did not know my witnesses' availability as I

19     did not have control over them because they were

20     New York City police officers.  The Court had forgotten

21     about that.  This was all before my verdict came in.

22                   Then the Court put it on, I believe, for

23     control on the 29th --

24                   THE COURT:  And on the 28th you got your

25     verdict.

                                                        ws

Proceedings                    170

1       MS. JOHNSON:  I think at 4:30 or late in the

2  afternoon and, in fact, while counsel was in chambers I

3  had said to the Court, and the Court didn't have a

4  problem with the fact, that I was going to ask for a

5  couple of days to get everything together.

6       I don't know if the Court meant a couple of

7  days for the hearing or a couple of days from hearing

8  into trial, but I believe counsel was also there when

9  my exact words were, "Judge, I want a couple of days to

10  catch my breath to get everything together because,

11  again, I don't know my witnesses' availability."

12       THE COURT:  Well, then when did you start

13  gathering the Rosario material?

14       MS. JOHNSON:  I had some stuff at the time of

15  grand jury.  Everything else I got on Thursday the

16  30th, when the detective came in with his case jacket

17  on that same day.

18       THE COURT:  At that point you had been sent

19  out for hearings at that point because we started this

20  on the 30th.

21       MS. JOHNSON:  Yes, Judge.  The detective was

22  subpoenaed, came to my office around 1 o'clock, I

23  copied his case jacket and we began the hearings in

24  that afternoon.

25       Today was the first day I met with

Proceedings                          171

1      Officer Alfaro to gather her Rosario material that I

2      provided to counsel.

3                  Friday as well, I believe, whatever the time

4      of the fax is, was the first time I received the

5      Rosario that was from the Queens DA's Office.

6                  I had requested a day or two adjournment

7      through my office, if it would be possible, and I don't

8      know what conversation transpired between my bosses and

9      Judge Donnino, but apparently an adjournment was not a

10     possibility.

11                 THE COURT:  Okay.

12                 Mr. Schechter, does that square with what --

13     I know you're more concerned, and justifiably so, about

14     making sure you get everything you're entitled to.

15                 MR. SCHECHTER:  The minutia of our

16     conversation with Judge Donnino, I don't recall every

17     one, but I do know Judge Donnino was very, very

18     strongly pushing this matter forward for trial and was

19     not really sympathetic with any adjournments and kept

20     this matter on a very tight leash, adjournments no more

21     than a week at a time, so that we could monitor

22     counsel's trial and what was happening.

23                 So I do know that Judge Donnino was pushing

24     this very strongly for trial.

25                 I do not have -- there's a few other things I

                                                    ws

1    have here from counsel (sic).

2              I don't have external photos of subject's

3    vehicle which apparently were taken, meaning my

4    client's car, which is relevant to this hearing.

5              And Shulman has memo book entries, I have

6    those, but I don't know if these are the same as the

7    handwritten notes because they make reference to

8    Shulman's handwritten notes.  I don't know if they're

9    the same thing or not, but certainly I would be

10   entitled to those things as well.

11             MS. JOHNSON:  Judge, one other thing that

12   occurred during our conferencing was that there was

13   significant -- I don't want to speak for counsel, but

14   there was significant agreement on both my part and

15   counsel's part that it would be more appropriate for

16   the Queens matter to occur first and obviously

17   Mr. Schechter, correct me if I'm wrong, that was

18   certainly not a possibility.

19             THE COURT:  Well, you know, look it, I can

20   appreciate being on trial for the length of time that

21   you were, but unlike perhaps, Mr. Schechter, and I

22   don't even know whether he is or is not, you're not a

23   solo practitioner, you have an office, you have staff.

24             It sounds as though, to me, that the alarm

25   bells were being run while you were in the middle of

Proceedings                    173

1      that other trial and, you know, certainly to be now in

2      the middle of this hearing and be getting stuff while

3      witnesses are on the witness stand, and I'm not talking

4      about a page here or a page there, I'm talking about in

5      excess of ten or 15 pages that you handed over this

6      morning, you know, really shouldn't be happening and,

7      you know, at this point, the way things are going, I

8      figure we'll be doing this hearing for the rest of this

9      week.

10             So I'll try to move it along, but to me the

11     way this thing is -- as I said, more discussion about

12     Rosario material and we haven't even gotten to the

13     cross-examination of one witness yet.

14             You're now indicating you may be wanting to

15     call a third witness in the case.  You don't know

16     whether or not he or she has generated Rosario

17     material.

18             We'll have to deal with the schedule as

19     things go on, but I'm just a little bit perplexed about

20     how ready this thing really is, quite frankly.

21             MR. SCHECHTER:  There's another interesting

22     issue, I find it interesting anyway, and that is the

23     issue as to if my client does testify in this matter,

24     the extent and parameters of the cross-examination.

25             My client has a prior disorderly conduct and

Proceedings                    174

1    that is -- a Sandoval application has to be made before
2    your Honor with respect to that one prior.  It's a
3    disorderly conduct.  I think it was on a shoplift
4    several years ago, which has nothing to do with this
5    case.
6              Additionally, if the Court recalls, the
7    motion in limine that I submitted to the Court citing,
8    I think, two Court of Appeals opinions and a lower
9    court opinion with respect to the use of
10   currently-charged allegations, which are proscribed by
11   the Court of Appeals, would also affect what elements
12   of the confession should be -- were the Court to
13   consider that the confessions were legally obtained,
14   what parts of the confessions would be utilized because
15   the Court -- because counsel can't do indirectly what
16   she can't do directly; namely, she can't cross-examine
17   him about pending cases and therefore she can't put in
18   on her direct examination the information concerning
19   pending cases.
20             So what we're going to need to do is an in
21   limine hearing or conference to determine what, if any,
22   parts of that confession could be introduced.
23             THE COURT:  And I'm aware of it, I'm
24   sensitive to it.  My law secretary is looking at the
25   material.  Obviously, you gave it to me this morning

                                              ws

1      and I haven't even had a chance to look at it.

2                  Insofar as your client testifying at the

3      hearing, I'm not of a mind-set to allow some type of

4      freewheeling cross-examination that's going to go

5      beyond the parameters of what you elicited on your

6      direct examination and you can be guided accordingly

7      with that.

8                  MR. SCHECHTER:  Okay.

9                  THE COURT:  So, in the meantime, let's get

10     Detective Shulman up here.

11                 (Witness resumes the stand.)

12                 MS. JOHNSON:  Your Honor, Detective Shulman

13     just advised me the logbook is being faxed over to my

14     office.

15                 THE COURT:  Okay, great.

16                 THE WITNESS:  Good afternoon, your Honor.

17                 THE COURT:  Good afternoon.

18                 All right, Mr. Schechter, whenever you're

19     ready.

20                 MR. SCHECHTER:  May it please the Court,

21     counsel.

22     CROSS-EXAMINATION

23     BY MR. SCHECHTER:

24         Q.   Detective Shulman, good afternoon.

25              Detective Shulman, what is your age?

1          How old are you?

2     A.    Thirty-seven.

3     Q.    And you indicated that you were a police officer

4   for 15 years?

5     A.    A little over that, yes.

6     Q.    Did you have any occupation before you were a

7   police officer?

8     A.    Part-time work.  I wouldn't say career.

9     Q.    What did you do before you became a police

10  officer?

11    A.    I was a security guard in Maryland.

12    Q.    How long did you have that job?

13    A.    Year and a half, maybe.

14    Q.    Are you a native New Yorker or do you come from

15  Maryland?

16    A.    I'm a native New Yorker.

17    Q.    Okay, and you've indicated you had some training

18  at the academy with respect to interrogation of prisoners

19  and interviews of complainants and things of that nature,

20  would that be fair to say?

21    A.    I don't know if I've indicated to that, but that

22  would be accurate, though.

23    Q.    Did you -- were you taught the Reid method of

24  interrogation, R-e-i-d?

25    A.    Not that I can specifically say.

ws

1          Q.    You spent how many years in anti-crime?

2          A.    Almost five in a citywide anti-crime unit.

3          Q.    Was that any specific detail, narcotics related or

4     street muggings?

5                What, specifically, were your assignments there?

6          A.    Violent street crimes.

7          Q.    And in the times that you were an anti-crime

8     officer were you working under a silver shield or a gold

9     shield?

10                    MS. JOHNSON:   Objection.

11                    THE COURT:   Yes.

12                    MR. SCHECHTER:   I'll rephrase.

13          Q.    Were you a detective or patrolman?

14          A.    I was both at varying different times.

15          Q.    Well, were you first a patrolman and then a

16     detective or were you a patrolman, detective, patrolman?

17                How did that work?

18          A.    I was a patrolman and then I was promoted to

19     detective.

20          Q.    While on the anti-crime unit?

21          A.    Yes.

22          Q.    And in your duties as an anti-crime officer did

23     you have occasion to utilize informants?

24                    MS. JOHNSON:   Objection.

25                    THE COURT:   Yeah, sustained.

ws

Shulman - People - cross          178

1        Q.   Did you become accustomed to being able to turn
2    people into informants by virtue of your experience and your
3    training?
4              MS. JOHNSON:  Objection.
5              THE COURT:  Yeah, sustained.
6        Q.   Approximately what percentage of your arrests
7    generated confessions and inculpatory statements, detective?
8              MS. JOHNSON:  Objection.
9              THE COURT:  As?
10       Q.   As an anti-crime officer?
11             THE COURT:  If you know.
12       A.   I don't know that I could answer that.
13       Q.   Would it be more than 10 percent?
14             THE WITNESS:  I honestly don't know that I
15        could put a number on it, your Honor?
16             THE COURT:  Okay.
17       Q.   How many times have you testified in court?
18             MS. JOHNSON:  Objection.
19             THE COURT:  I'll allow that.
20             You can answer that.
21       A.   Again, I don't know that I could put a number on
22   it, but, you know, over the course of 15 and a half years,
23   many times.
24       Q.   Many times.
25             It would be more than 20?

                                                    ws

1      A.   Probably.

2      Q.   More than 30?

3      A.   Probably.

4      Q.   And what percentage of those involved your taking

5   of statements?

6              MS. JOHNSON:  Objection.

7              THE COURT:  Yeah, sustained.

8              MR. SCHECHTER:  I'll except to that one,

9      Judge.

10             THE COURT:  Yes.

11     Q.   Did you -- now, on the day in question you

12  indicated, I believe, on direct examination you were working

13  a 4:30 to 1 o'clock tour?

14     A.   Yes, I did.

15     Q.   Had you made an arrest prior to the end of your

16  tour besides -- not including Mr. Gopaul?

17     A.   I had not, no.

18     Q.   So that your tour of duty was scheduled to expire

19  at 1 a.m. in the morning, would that be correct?

20     A.   Yes.

21     Q.   And you were working what detail?

22          Was that anti-crime you were working that night?

23     A.   On the night of Mr. Gopaul's case?

24     Q.   Yes, yes.

25     A.   No, I was assigned to the 105 Precinct detective

1    squad as an investigator.

2         Q.   And, basically, you were there to pick up whatever

3    came in, would that be fair to say?

4         A.   I don't know that I would use those words.

5         Q.   Now, you've indicated that your tour ended at

6    1 o'clock, correct?

7         A.   My scheduled tour would have been over at

8    1 o'clock.

9         Q.   Scheduled tour.

10             And there came a time when you were informed that

11   Mr. Gopaul came into the precinct, is that correct, yes or

12   no?

13        A.   That's correct.

14        Q.   And who informed you of that?

15        A.   Sergeant O'Hagan, the 105 Precinct desk officer.

16        Q.   Where is the desk officer in relation to the squad

17   within the 105 Precinct?

18        A.   They're on the first floor, I'm on the second

19   floor.

20        Q.   And were you present during Mr. Gopaul's arrest?

21        A.   No.

22        Q.   And do you know who was present during

23   Mr. Gopaul's arrest?

24        A.   I don't know, aside from Sergeant O'Hagan.

25        Q.   Well, when you first met Mr. Gopaul where was he?

Shulman - People - cross              181

1      A.    He was in one of my interview rooms in the

2   detective squad office.

3      Q.    To your knowledge, had he been fingerprinted and

4   had his mugshot taken?

5      A.    No, he had not.

6      Q.    Was he under arrest?

7      A.    Yes, he was.

8      Q.    What time did you first see Mr. Gopaul, if you can

9   recall?

10     A.    Right about 5:10 a.m. on the morning of the 24th

11  of June.

12     Q.    Officer, if your tour of duty ended at 1 o'clock,

13  what were you doing between 1 a.m. and 5:10 a.m.?

14     A.    I don't know what I was initially doing after

15  1 o'clock in the morning, to my recollection, but at some

16  point in time I had been notified by a detective at the

17  detective bureau in Queens that there was an incident being

18  investigated by patrol in the 105 Precinct and that

19  Administration for Children's Services known as ACS --

20          MR. SCHECHTER:   Objection, Judge, that's not

21      responsive to my question.

22     Q.    My question was, what were you doing between

23  1 a.m., end of your tour of duty, and 5:10 a.m.?

24          What were you doing?

25          THE COURT:   I think he was telling us.

                                                        ws

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 184 of 440 PageID #: 534

1          The objection is overruled.

2          Go ahead.

3     A.   Okay, initially, I don't know what I was doing at

4    exactly 1 o'clock, but at some point in time I was notified

5    that an ACS worker was in the precinct interviewing a victim

6    that was alleging some sort of sexual complaint involving

7    her stepfather and that an investigator should assist in the

8    investigation.

9     Q.   What time were you informed of that?

10          THE WITNESS:   I would have to refer to my

11          report, your Honor.

12    Q.   Would you please look at your notes and I would

13   like to see what it is you're looking at as well?

14    A.   Sure, absolutely.   Okay, just referring to my

15   complaint follow-up report labeled as follow-up Number 1 and

16   I had noted the time at about 0230 in the morning that I was

17   informed.

18    Q.   So at 2:30 a.m. you were first informed of ACS

19   investigating suspected child abuse or something like that,

20   would that be fair to say?

21    A.   A complaint involving a sexual complaint that

22   involved ACS also.

23    Q.   Okay, so what were you doing from 1 a.m. to 2:30

24   at the precinct?

25    A.   I don't recall specifically.

Shulman - People - cross          183

1    Q.   When you put in for your overtime did you put in

2    for your overtime from 1 a.m. or from 2:30 p.m.?

3    A.   I would imagine it would have been from 1 a.m.

4    Q.   So that you put in for overtime for what, from 1

5    to 2:30 a.m.?

6    A.   I don't recall specifically.  I would have to

7    check into it.

8    Q.   Isn't it a fact that Harold Gopaul came into the

9    precinct at 2:30 a.m.?

10            Isn't that a fact?

11   A.   Not to my knowledge.

12   Q.   Isn't it a fact that Sergeant O'Hagan, together

13   with eight other officers, pummeled Mr. Gopaul in the

14   precinct, spread-eagled him over a rail and beat him up?

15            Is that a fact?

16   A.   Not to my knowledge and I would find it highly

17   unlikely.

18            MR. SCHECHTER:  May I have this marked,

19       please, as Defendant's A?

20            (Defendant's Exhibit A marked for

21       identification.)

22            MR. SCHECHTER:  May I have that?

23            (Shown to counsel.)

24   Q.   Now, officer, you keep a memo book as part of your

25   required record keeping consistent with your duties as a

ws

Shulman - People - cross                184

1   police officer, correct?

2        A.   At various points in my career, yes.

3        Q.   Do you still keep a memo book?

4        A.   Yes.

5        Q.   You have it with you?

6        A.   No.

7        Q.   Were you told to bring it today?

8        A.   Not specifically, no.

9        Q.   Now, you've testified over 20 times in a court of

10  law, have you not?

11       A.   Yes.

12       Q.   And during those times you testified in a court of

13  law weren't you directed to bring your memo book with you by

14  the District Attorney?

15       A.   Not always.

16       Q.   Let me show you what's being marked as Defendant's

17  A for identification.

18                 (Shown to witness.)

19       Q.   Is this a copy of your memo entry?

20       A.   No, it's not.

21       Q.   It's not?

22       A.   No.

23       Q.   Did you provide this information to the District

24  Attorney's Office?

25       A.   No, I did not.

Shulman - People - cross          185

1     Q.   Do you know who provided that to the District

2     Attorney's Office?

3     A.   I don't know specifically who provided it to the

4     District Attorney's Office.

5     Q.   Is that first page?

6          Is that your memo book?

7     A.   This is not my memo book, no.

8               MR. SCHECHTER:   May I show it to the District

9          Attorney?

10              MS. JOHNSON:   It's probably Officer Alfaro's,

11         Judge.

12              MR. SCHECHTER:   May I have it, please?

13              (Shown to counsel.)

14    Q.   Did you keep a memo book in connection with this

15    case?

16    A.   I don't recall making any entries other than my

17    tour of duty in regards to this case.

18              MR. SCHECHTER:   I would like this to be

19         marked, please, as Defendant's B for identification?

20              (Defendant's Exhibit B marked for

21         identification.)

22              MR. SCHECHTER:   May I have that also?

23              (Shown  to counsel.)

24    Q.   Do you recall preparing or having prepared at your

25    direction a 105 Squad complaint follow-up index sheet?

1      A.    Yes.

2                  MR. SCHECHTER:   May I approach the witness,

3      your Honor?

4                  THE COURT:   Just give it to my officer.

5                  MR. SCHECHTER:   Officer, please show this to

6      the witness.

7                  (Shown to witness.)

8      Q.    Is that a document you prepared as part of your

9      duties as a detective at the 105 Precinct?

10     A.    Yes.

11     Q.    Now, you'll -- is that document kept in the

12     ordinary course of business of the New York City Police

13     Department?

14     A.    On some occasions, yes.

15     Q.    Is it the ordinary course of business of the

16     Police Department to keep that document?

17     A.    Again, on some occasions, yes.

18     Q.    And were you under a duty to maintain that

19     document?

20     A.    Pardon me?

21     Q.    Were you under a business duty to maintain that

22     document on behalf of the Police Department?

23     A.    I don't know if I was under a business duty, but I

24     did prepare it.

25     Q.    Is it -- as part of your duties?

                                                          ws

1        A.    As part of my documentation of my case, yes.

2        Q.    And are the entries that are on that piece of

3   paper, were they made basically at the same time as the

4   incidents for which you made up those documents?

5              You made up that paper about the same time you

6   rendered all the other paperwork in this case, did you not?

7        A.    Probably not at the exact same time.

8              At some point in time I take my cumulative case

9   and I organize it and I package it in a case folder and I

10  document what I'm including in my case folder.

11       Q.    This is within at least one or two days from the

12  time that you did all your paperwork, would that be fair to

13  say?

14       A.    Probably.

15       Q.    Okay.

16              MR. SCHECHTER:  I offer this as -- in

17       evidence, your Honor, as Defendant's B.

18              THE COURT:  People?

19              (Shown to counsel.)

20              MS. JOHNSON:  No objection.

21              THE COURT:  Okay, so B will be received in

22       evidence.

23              (Defendant's Exhibit B received in evidence.)

24              MR. SCHECHTER:  Please show it to the

25       witness.

Shulman - People - cross          188

1          (Shown to witness.)
2     Q.   I direct your attention to the entry marked M, as
3     in Mary.
4          What does that say?
5     A.   It says M and then it says Shulman's handwritten
6     notes.
7     Q.   I call for the production of your handwritten
8     nets, Detective Shulman.
9               MS. JOHNSON:  I have them, Judge.
10              Prior to Detective Shulman testifying I
11         reviewed them with him.  They're conversations he had
12         with the complainant.
13              In fact, Judge, there is one page in the
14         Rosario material that was relevant for the hearing that
15         counsel was provided that's indicated, Number 13,
16         Shulman's notes.
17              Does the Court wish to see the other notes?
18              THE COURT:  Are you asking me to look at
19         them, Mr. Schechter?
20              MR. SCHECHTER:  I would like to see the note
21         counsel is referring to at the very least anyway,
22         Judge.  I don't recall seeing any other handwritten
23         entries.  If she could show me what she says relates to
24         this I would appreciate it.
25              MS. JOHNSON:  It's itemized in the Rosario

Shulman - People - cross          189

1    material turned over on October -- August -- excuse me,

2    April 30th and it says Shulman's handwritten notes --

3    Detective Shulman notes.

4              MR. SCHECHTER:  If I might see this I might

5    be able to obviate that.  All of this could have been

6    avoided if all the Rosario was turned over.

7              MS. JOHNSON:  It looks like this -- like a

8    memo book.

9              MR. SCHECHTER:  I don't recall getting that

10   document.

11             (Shown to Court.)

12             THE COURT:  What are you handing me now,

13   Shulman's entire notes?

14             MS. JOHNSON:  Yes, including the

15   conversations with the complainant, his handwritten

16   notes with regards to that.

17             THE COURT:  All right, have you shown

18   Mr. Schechter the one -- the page that you did provide?

19             MS. JOHNSON:  I'm looking for it in here,

20   Judge.

21             Your Honor, it is a page that says contacted

22   June 30th, 2008.  It has Mr. Schechter's name on it.

23   It's actually handwriting.

24             MR. SCHECHTER:  I didn't know.  It was just

25   nondescript.

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 192 of 440 PageID #: 542

1                THE COURT:  I'm sorry.

2                MR. SCHECHTER:  I did not know that that was

3        the officer's handwriting.  There was nothing to

4        indicate where this came from.

5                MS. JOHNSON:  That's why there's a cover page

6        and it says Shulman's note.

7                MR. SCHECHTER:  Your Honor, I respectfully

8        call for the production of the officer's memo book in

9        this matter.  I don't -- he says he didn't bring it, no

10       one told him to bring it.

11               I think it strains credulity that an

12       experienced police officer doesn't know he needs his

13       memo book when he's testifying, however I will require

14       the memo book to continue my cross-examination after I

15       finish today with the officer.

16               THE COURT:  Well, is the -- is what you've

17       shown me, People, the copy of his memo book?

18               MS. JOHNSON:  That's what was taken out of

19       his file, Judge, but I believe he said that he doesn't

20       always keep a memo book for all cases so, I don't think

21       we've crossed the bridge whether or not he actually

22       made notations in a memo book on this case.

23               THE WITNESS:  There would have been no

24       notations in a memo book on the date in question

25       involving the case other than my possible work

ws

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 193 of 440 PageID #: 543

1    schedule.

2            MR. SCHECHTER:  See, your Honor, the memo

3    book also has a chronology of what he did on his tour

4    and I want to see that.

5            THE COURT:  Well, why don't you ask him that.

6            MR. SCHECHTER:  Because, your Honor, I don't

7    have any means of impeaching him in the event he does

8    not - with all due respect, officer - testify

9    truthfully during the times everything happened in this

10   case and I certainly would be entitled, before I ask

11   him those questions, to have that material before me so

12   I could use it for impeachment material.

13           I would ask him other questions, however I

14   would still reserve my right to cross-examine him about

15   his memo book and I request he be directed to bring it

16   tomorrow.

17           THE COURT:  What is it you expect to find it

18   in the memo book?

19           He said there was no entries related to this

20   investigation on that particular date.

21           Am I correct, detective?

22           THE WITNESS:  Yes.

23           MR. SCHECHTER:  With all due respect to the

24   detective I am not constrained to accept anything he

25   says with respect to what there is or there isn't.

                                                        ws

Shulman - People - cross          192

1          Under People v. Rosario I am entitled to have
2     that information.  If that information is of no
3     moment --
4          THE COURT:  You want me to inspect his memo
5     book on that particular day to see whether or not his
6     entries that pertain to what he's testified to --
7          MR. SCHECHTER:  Even if the entries do not
8     pertain specifically to this case, the chronology based
9     upon his testimony here is important in this case and
10    I'm entitled to question him about the chronology of
11    events preceding this incident up to and including this
12    incident.
13         THE COURT:  Let me ask you this, detective.
14         Did you have a memo book -- do you have --
15    did you have a memo book with you on that day -- on
16    this date, the 24th or the 23rd of June?
17         THE WITNESS:  Again, your Honor, the only
18    thing I would have put in, if I had filled it out that
19    day, would have been my tour of duty, present for duty
20    and end of tour.
21         Everything else is documented on my
22    complaint follow-ups indicating times that I'm doing
23    different things.
24         Unlike a patrol officer,  I'm not required
25    every time I get a radio run to make a memo book entry.

                                                      ws

Shulman - People - cross          193

1            THE COURT:  I understand that.

2            Now, do you still have that memo book

3      available?

4            THE WITNESS:  I would have to check to

5      determine.

6            THE COURT:  All right, I'm going to ask that

7      you bring it with you tomorrow.

8            MR. SCHECHTER:  Thank you, Judge.

9      Q.   Now, detective, at what time did you first begin

10     speaking to the complainant?

11           MS. JOHNSON:  Objection.

12           THE COURT:  Yeah, sustained.

13           MR. SCHECHTER:  Your Honor, may I have -- I'm

14     not asking what he asked her and what she asked him.

15           I'm asking a chronology of time when he first

16     spoke to her.

17           THE COURT:  And what bearing would that have

18     on the issues that we have to address here?

19           MR. SCHECHTER:  If the Court wants me to have

20     an offer of proof I would be delighted to give it,

21     absent the officer being on the witness stand.

22           THE COURT:  All right, officer, you want to

23     step out -- detective, I should say?

24           (Witness steps down.)

25           MR. SCHECHTER:  I have reason to believe that

ws

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 196 of 440 PageID #: 546

1    the events that the officer is testifying to occurred

2    hours before he said they occurred.

3          As such, the memo book entries are crucial,

4    when he started speaking to the complainant is crucial,

5    because my client, when he testifies, will interlock

6    with that and I'm entitled to go into that simply -- I

7    know what happened.  She went to the precinct.  She

8    went to the precinct with two other people and she made

9    a statement to him as did possibly the two other

10   people.

11         I am entitled to know, your Honor, and I

12   apologize for pointing with a pen, I am entitled to

13   know when that happened.  I am entitled to develop a

14   chronology of events and not be so restricted doing so,

15   so I can find out exactly what the time picture is

16   here.  This is very important.

17         THE COURT:  And there's nothing in the

18   Rosario material that reflects when he spoke to her?

19         MR. SCHECHTER:  That involves his talking to

20   the complainant.  They don't give me that stuff.

21         MS. JOHNSON:  Your Honor, what does his -- I

22   still don't see what his offer of proof -- any

23   conversations Detective Shulman had with the

24   complainant prior to any contact with the defendant is

25   irrelevant for purposes of Huntley or for purposes of

1    Mapp.  It would be before any contact with the

2    defendant.

3              MR. SCHECHTER:  That is --

4              THE COURT:  All right, let me ask you this,

5    Mr. Schechter.

6              Other than the time when he initially spoke

7    or met with the complainant, what other questions, just

8    so we can anticipate this while he's outside, do you

9    expect to ask him with regard to chronology?

10             MR. SCHECHTER:  I'm going to ask him how many

11   times he spoke to him.

12             THE COURT:  Him?

13             MR. SCHECHTER:  To her, thank you, and how

14   many times he spoke to my client and thereafter spoke

15   to the complaint and thereafter spoke to my client.  I

16   want to get this chronology, Judge.

17             THE COURT:  All right, let's bring him back

18   in.  I'll allow you to ask those questions.

19             MR. SCHECHTER:  Thank you.

20             (Witness resumes the stand.)

21             THE COURT:  Okay.

22   Q.   Officer, when for the first time did you speak to

23   the complaining witness that evening?

24   A.   I believe it's probably about 3:20 in the morning,

25   to my recollection, on the morning of the 24th.

ws

1      Q.    And when you spoke to her who was present?

2      A.    Just myself and the victim.

3      Q.    And after speaking to her you took notes of what

4   she was saying, yes or no?

5      A.    Yes.

6      Q.    And there came a time when you spoke to my client

7   after you spoke to her, sometime thereafter, is that

8   correct?

9      A.    Yes.

10     Q.    Do you recall when you first spoke to my client?

11     A.    Again, I believe it was about 5:10 in the morning.

12     Q.    So that would be about two hours after you spoke

13  to the complaining witness?

14     A.    Well, almost two hours from the time I initially

15  started speaking to the complainant.

16     Q.    How -- for what -- how long of a period of time

17  were you speaking to her, that first time?

18     A.    I spoke to her pretty substantially that first

19  time before I interrupted to speak to your client.

20     Q.    So it would be fair to say you spent two hours

21  speaking to her the first time you spoke to her?

22     A.    I may have taken a couple of little breaks in

23  between, but a considerable amount of time during that wo

24  hours, yes.

25     Q.    After speaking to her -- withdrawn.

1       After speaking to my client the first time did you

2   go back and speak to her again?

3       A.   Yes, I spoke to her several times during the

4   course of the day.

5       Q.   So it would be fair to say that you were speaking

6   to the complainant from approximately 3:10 in the morning

7   until about 8:30 in the morning?

8       A.   I don't understand your question.

9       Q.   Were you speaking to the complainant from 3:30 in

10  the morning, off and on, until approximately 8:30 in the

11  morning?

12      A.   Over the course of the day I spoke to her several

13  different times.

14      Q.   When is the last time you spoke to her, if you can

15  recall?

16      A.   Again, I spoke to her on and off at various points

17  during the -- all day, well into the evening.

18      Q.   Are you saying we're in the evening?

19           Are we not at --

20      A.   Into the next afternoon.

21      Q.   Was she always in the precinct when you spoke to

22  her?

23      A.   When I spoke to her, but she had left the precinct

24  at some point in time during the day.

25      Q.   And did she come back to the precinct to speak to

Shulman - People - cross        198

1    you again?

2         A.    Yes.

3         Q.    Now, each time you spoke to Mr. Gopaul did you go

4    back and speak to the complainant?

5         A.    Not each time, no.

6         Q.    There came a time when you first spoke to

7    Mr. Gopaul, you said, at approximately 5:10, is that

8    correct?

9         A.    That's correct.

10             MR. SCHECHTER:    Now, before we get to that, I

11        would like these photographs marked Defendant's C, D, E

12        and F, your Honor.

13             THE COURT:    C,D,E and F.

14             (Defendant's Exhibits C,D,E and F marked for

15        identification.)

16        Q.    Now, officer, would you please look at Defendant's

17   Exhibits C, D, E and F?

18             (Shown to witness.)

19        Q.    Please keep them in the order.

20        A.    Okay.

21        Q.    Now, I direct your attention first to Exhibit C.

22             Does that photograph fairly and accurately

23   represent the outside of the 105 Precinct?

24        A.    Part of it.

25        Q.    Part of it, the front entrance, right?

Shulman - People - cross          199

1    A.   Yes.

2              MR. SCHECHTER:  Okay, I ask that be marked in

3    evidence as Defendant's C.

4              THE COURT:  All right, to kind of move things

5    along, I take it, Mr. Schechter, you're going to be

6    moving all of these in.

7              MR. SCHECHTER:  All of them, yes.

8              THE COURT:  Are you going to have any

9    objection to them, Ms. Johnson?

10             MS. JOHNSON:  As long as they're fair and

11   accurate as to how it looked on June 24th, 2008.

12             Let me see it again because this is the first

13   time I'm seeing them.  If that's the case, I have no

14   objection for purposes of the hearing.

15             (Shown to counsel.)

16             THE COURT:  And, detective, those

17   photographs, whatever they depict there, fairly and

18   accurately represent what those areas or places looked

19   like on June 24th, 2008?

20             THE WITNESS:  I would believe so.

21             I mean, the only thing is, E and F, you know,

22   don't show the full capacity of the room, I mean, just

23   because of the nature of the picture being taken from

24   outside of the doorway.

25             MR. SCHECHTER:  I'll get to that.

ws

Shulman - People - cross          200

1          THE COURT:  Other than that- -

2          THE WITNESS:  Yeah, other than that I would

3     imagine it's fairly close.

4          THE COURT:  You're offering them?

5          MR. SCHECHTER:  Yes, Judge, I am.

6          THE COURT:  Would you mark them, please?

7          (Defendant's Exhibits C,D,E and F received in

8     evidence.)

9          MR. SCHECHTER:  May I have them, please?

10          (Shown to counsel.)

11     Q.    Officer, let me direct your attention to

12     Defendant's Exhibit D in evidence.

13          (Shown to witness.)

14     Q.    Is that the outside door to what is commonly

15     called at the 105 Precinct the box?

16     A.    Well, I mean it's a door to an interview room.

17     Q.    Is it known in the 105 Precinct as the box?

18     A.    Not this room per se.  Interview rooms in general

19     are referred to that.

20     Q.    All interview rooms are known as the box?

21     A.    To my knowledge.

22     Q.    So -- now, looking at that picture could you

23     please read what's on the door there?

24     A.    221 for the room number.  There's a sticker that

25     says proper tactics saves lives.

Shulman - People - cross                 201

1          Q.    On the door?

2          A.    That's on the door.

3                And at the time of this picture there's a sign

4     that says interview room, complainants only.

5          Q.    Was that sign on that room when you spoke to

6     Mr. Gopaul in June?

7          A.    I don't know.  Could have been, I don't know.

8          Q.    What is the purpose of having a room saying

9     complainants only?

10         A.    Don't know.  I didn't put the sign up.

11         Q.    But you brought Mr. Gopaul into that room, would

12    that be fair to say?

13         A.    No, I didn't.

14         Q.    Who brought him up into that room?

15         A.    One of the patrol officer officers.

16         Q.    What's his name?

17         A.    I don't know which officer brought him up.

18         Q.    A uniform officer or a detective?

19         A.    Would have been a uniform officer.

20         Q.    And at whose direction would he have brought

21    Mr. Gopaul up?

22         A.    I had spoken to Sergeant O'Hagan and asked

23    Mr. Gopaul be brought upstairs and whoever he directed to

24    bring him upstairs would have brought him upstairs.

25         Q.    So at the time Mr. Gopaul was placed in that room

Shulman - People - cross                    202

1    you were not there, is that correct?

2         A.   No, I was in the other interview room with the

3    victim.

4         Q.   That's correct.

5              So, for the purposes of the record, at the time

6    that Mr. Gopaul was brought up to that room you were not in

7    that room, is that correct?

8         A.   I think I just answered that.

9         Q.   No, you really didn't, officer.

10             The question is, at the time Mr. Gopaul was

11   brought into that room were you in that room, yes or no?

12        A.   No.

13        Q.   Now, does Police Department procedure mandate that

14   a prisoner who is left in a room be handcuffed to a rail or

15   some fixed object?

16        A.   Depends on the circumstances.

17        Q.   Well, isn't that done so that the person who is in

18   that room to be interrogated will not do harm either to

19   himself or the interrogating officer?

20        A.   Pardon me?

21        Q.   Isn't that rule in effect so that the person being

22   interrogated does not do physical harm either to himself or

23   the officer who is interrogating him?

24        A.   That could be one interpretation of that rule,

25   yes.

                                                          ws

Shulman - People - cross                203

1        Q.   Yet you said Mr. Gopaul was not handcuffed, is
2   that correct?
3        A.   Correct.
4        Q.   Where were you sitting in relation to the back
5   wall when you were interviewing Mr. Gopaul?
6             You may look at the picture, please, to aid you if
7   you need it.
8        A.   I have the picture with the closed door.
9        Q.   Okay, I'm sorry, I'm wrong.
10             MR. SCHECHTER:  Let me have this marked as
11   Defendant's G.
12             THE COURT:  It's already marked, in evidence.
13             MR. SCHECHTER:  I'm sorry, Defendant's F.
14   I'm sorry, let me show the officer Defendant's F.
15             (Shown to witness.)
16        A.   Okay, could you repeat your question, please?
17        Q.   Yes.
18             My question is where were you sitting in relation
19   to Mr. Gopaul?
20             Let me make it easier for you.  Where were you
21   sitting -- withdraw the question.
22             Where were you sitting and where was Mr. Gopaul
23   sitting at the time you interviewed him?
24        A.   I don't know if these are the exact chairs that
25   were in the room on that day, but relative to this picture,

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 206 of 440 PageID #: 556

1   the red and black chair would have been the position that

2   Mr. Gopaul was seated in and then the black and gray chair

3   on the opposite side of the table would have been where I

4   was sitting.

5          Q.   So that your back would be towards the door and

6   Mr. Gopaul would be facing the door, would that be fair to

7   say?

8          A.   That would be accurate, yes.

9               (Shown to Court.)

10         Q.   Were you the only officer in the room?

11         A.   Yes.

12         Q.   Now, there is a window into that room, with a

13  cover on the window, is that correct?

14         A.   Sometimes it's covered, sometimes it's not.

15         Q.   Well, was it covered at the time that you spoke to

16  Mr. Gopaul?

17         A.   I don't recall.

18         Q.   And when you came in to see Mr. Gopaul you say you

19  locked your weapon in your office?

20         A.   Yes.

21         Q.   Where is your office?

22         A.   The area that my weapon is secured is out -- I

23  can't really describe it from, I don't think, from this

24  picture, but there's another doorway right here and then

25  there's a half wall that comes all the way across separating

                                                        ws

Shulman - People - cross          205

1    this whole section of the office from a whole another part

2    of our office and on the opposite end of that larger office

3    is where I have my desk.

4          It's probably, you know, I don't want to swear to

5    it, a measurement that I haven't measured, but probably a

6    good 12, 15, feet outside of that door entranceway locked up

7    in my desk.

8          Q.   Did you place the weapon inside the holster inside

9    your desk or was the weapon placed inside the desk and you

10   still held the holster?

11         A.   I don't recall.

12         I probably, just not to take my whole belt off,

13   probably would have just taken the weapon out and put it in

14   the desk.

15         Q.   Now, when you first came into the room how was

16   Mr. Gopaul dressed?

17         A.   He was wearing some sort of uniform.  I believe it

18   had a Ecolab patch on the arms.

19         Q.   What color was the shirt?

20         A.   I don't recall specifically.

21         Q.   And was there a tie with that shirt?

22         A.   I don't recall.

23         Q.   And do you recall the color of his pants?

24         A.   I don't recall.

25         Q.   Do you recall whether the shirt went into the

1    pants or not?

2         A.    Mr. Gopaul was seated, so I don't remember

3    noticing if his shirt was tucked in or not.

4         Q.    When you saw Mr. Gopaul had you asked him whether

5    he had eaten?

6         A.    I don't believe I had that conversation with him.

7         Q.    Did you ask him whether he had slept within the

8    past 24 hours?

9         A.    I hadn't had that conversation with him.

10        Q.    As part of your training are you not told in the

11   academy that the first thing you do when you when you're

12   questioning a suspect is to get rough with him and then,

13   after you're rough with him, try to make him your friend?

14              Is that part of your training at the Police

15   Academy?

16                   MS. JOHNSON:   Objection.

17                   THE COURT:   I'll allow it.

18                   You can answer.

19        A.    No, it's not.

20        Q.    The first time that you spoke to Mr. Gopaul

21   Mr. Gopaul freely told you that he had this incident with

22   his daughter at a park, I think you indicated, is that

23   correct?

24        A.    Pardon me?

25        Q.    The first time you interviewed Mr. Gopaul he

                                                              ws

1    explained to you that he had an incident involving his

2    daughter Sana at an amusement park, would that be correct?

3        A.   He indicates they had an argument and that he

4    slapped her and then I believe in his written statement he

5    spells out that it was revolving around an incident that had

6    occurred at some sort of fair or festive park event.

7        Q.   And he gave you that statement, is that correct,

8    written?

9        A.   Yes.

10       Q.   And that statement is already in evidence.  We've

11   seen it introduced in evidence in this courtroom, correct?

12       A.   Yes.

13       Q.   Now, after you received that statement where did

14   you go?

15       A.   At Mr. Gopaul's request I took him to the restroom

16   and allowed him to use the facilities.  I then brought him

17   back to the interview room and then he stayed in the

18   interview room for a short while while I did other duties.

19       Q.   When you took him to -- you personally took him to

20   the restroom?

21       A.   Yes.

22       Q.   Where was the officer who brought him to the

23   interview room?

24       A.   I don't know.

25       Q.   By Police Department regulation was he required to

1   be handcuffed when he went to the -- was brought to the

2   interview room within the precinct?

3        A.   When he was brought to where?

4        Q.   When he was placed from -- withdrawn.

5             Where was Mr. Gopaul prior to being brought into

6   the interview room?

7        A.   Somewhere downstairs.

8        Q.   Are there holding pens downstairs?

9        A.   There are.

10       Q.   Where are they located?

11       A.   Behind the desk.

12       Q.   Behind the sergeant's desk?

13       A.   Yes.

14       Q.   And were there any prisoners in there besides

15   Mr. Gopaul?

16       A.   I don't know that Mr. Gopaul was in there or not

17   prior to coming up to my office.

18       Q.   You don't know where he was, then, would that be

19   fair to say?

20       A.   No.

21             THE COURT:  Is that no?

22             THE WITNESS:  No, once I was informed that he

23        was in custody I directed that he be brought up to my

24        office and within a short time thereafter he was

25        brought up into my office.

                                                    ws

1   Q.   When you made this direction was this by

2   telephone?

3   A.   Yes.

4   Q.   And you were sitting by your desk?

5   A.   I was at one of the desks in my office.

6   Q.   And when Mr. Gopaul was brought up was he brought

7   up in handcuffs or was he brought up without handcuffs?

8   A.   Again, I didn't see him brought up, but when I

9   first saw him he was not handcuffed, but he was in a secure

10  interview room.

11  Q.   Is there a key to that room?

12  A.   No.

13  Q.   So that room could be opened and closed freely, is

14  that what you're saying?

15  A.   Well, no, if you're securing somebody in there, as

16  you can see in the picture, there is a clasp on the door so

17  you can secure the door.

18  Q.   From the outside?

19  A.   From the outside.

20  Q.   Did you have your handcuffs with you when you

21  interviewed Mr. Gopaul?

22  A.   Yes.

23  Q.   Did you have to take the handcuffs off of

24  Mr. Gopaul?

25  A.   No.

ws

Shulman - People - cross          210

1    Q.   All right, so you order Mr. Gopaul to be brought
2    up from downstairs.
3         How long after you made that telephone call was
4    Mr. Gopaul brought to the room?
5    A.   Not too long.  I mean, I don't know exact time
6    frame because I went back in to speak to the victim.
7    Q.   Is it your testimony that after you asked
8    Mr. Gopaul to be brought back to the room you went back to
9    speak to the victim again?
10   A.   Yes.
11   Q.   What was your purpose in speaking to the victim
12   again?
13   A.   I was still speaking to the victim.  I hadn't
14   concluded speaking to the victim.
15   Q.   Did the victim know Mr. Gopaul was in that room?
16   A.   Not at that time, no.
17        MR. SCHECHTER:  May I show the witness
18   Exhibit E?
19        MS. JOHNSON:  Can I see which one it is?
20        (Shown to counsel.)
21        (Shown to witness.)
22   Q.   Now, officer, Exhibit E fairly represents the
23   other part of the room that were not in the photographs, the
24   other half of the room width-wise, would that be fair to
25   say?

                                                        ws

1        A.   The back portion.

2             The front corner is cut off, again, by the angle

3    of the picture, but it shows the back right corner.

4        Q.   How tall are you, officer?

5        A.   About five ten.

6        Q.   How much do you weigh?

7        A.   250, 260.

8        Q.   Now, as a police officer you're trained to

9    recognize the heights and weights of various witnesses or

10   defendants, isn't that correct?

11       A.   Well, I don't know that you can train that.

12       Q.   Did you make a determination how tall and how much

13   Mr. Gopaul weighs?

14             MS. JOHNSON:  Objection.

15             THE COURT:  Did he make a determination as to

16        how much Mr. Gopaul weighed?

17             Is that the question?

18             MR. SCHECHTER:  Yes.

19             THE COURT:  Did you make that determination?

20             THE WITNESS:  I don't think I had to think

21        about that at the moment.

22       Q.   Would it be fair to say that you -- on June 8th

23   you outweighed Mr. Gopaul by, easily, 70 pounds?

24       A.   On what date?

25       Q.   On June -- I'm sorry, on June 24th, 2008?

1     A.    I don't know how much I outweighed him by, but I

2    would imagine I outweighed him.

3          Q.    Isn't it a fact when you first got Mr. Gopaul in

4    the room you grabbed him by his collar and threw him against

5    the wall, holding on to the collar, and then grabbing,

6    maintaining holding on to the collar, you dragged him back

7    towards you?

8               Isn't that a fact when you first saw him in the

9    room --

10              MS. JOHNSON:  Objection.

11              THE COURT:  I'll allow it.

12         A.    Absolutely not.

13              MR. SCHECHTER:  Your Honor, can I please play

14         the tape, first part of the tape, videotape, for the

15         officer?

16              THE COURT:  You can play it tomorrow because

17         we're going to break at this point.

18              MR. SCHECHTER:  Okay, I just wanted the

19         officer to look at the tape.

20              All right, we're breaking now?

21              THE COURT:  Because I have a prisoner I have

22         to deal with, so I want to give my officers enough time

23         to get her downstairs.

24              MR. SCHECHTER:  Would the Court kindly direct

25         the officer not to discuss his testimony with

                                                      ws

Proceedings                              213

1    Officer Alfaro?
2                I did notice there was conversation, but I
3    don't know what it was about.
4                THE COURT:  Detective, you can speak to
5    Officer Alfaro, just not about your testimony.
6                We'll see you back here tomorrow morning.
7                MS. JOHNSON:  At the Court's direction, I
8    sent subpoenas for Officer Alfaro and Detective Shulman
9    tomorrow.
10               Officer Alfaro has already been subpoenaed
11   for two other matters, one being a Queens County
12   Criminal Court case and another being a traffic court
13   case.
14               I advised her this is an ongoing hearing and
15   my position was that this matter took precedence.
16               She indicated that traffic court is from 8:30
17   until 10 o'clock in the morning anyway, and I had
18   indicated to her that she would have to come here after
19   that, but I believe she has personal appointments
20   scheduled for tomorrow that she already did -- that she
21   had already had scheduled.
22               THE COURT:  All right, look it, she's under
23   subpoena.  I expect her to be here.
24               MS. JOHNSON:  And I would inform the
25   precinct, as I did yesterday, this is an on going

                                                      ws

Proceedings                    214

1          hearing, this takes precedence to other matters and I

2          thank the Court for the Court's phone call to assist

3          with witnesses.

4                         THE COURT:  All right, thank you.

5                         Detective, we'll see you tomorrow.

6                         (Witness steps down.)

7                         (Proceedings adjourned to Tuesday, May 5th,

8          2009 at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          ws

215

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NASSAU : CRIMINAL TERM PART 80

3    ------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,    :   Indictment
4                                            :   No. 2415N/08
              -against-                      :
5                                            :
     HAROLD GOPAUL,                          :   Sex Abuse 1
6                                            :
                        Defendant.           :   Huntley/Mapp
7    ------------------------------------------X   Hearings

8                            May 5, 2009

9                            252 Old Country Road
                             Mineola, New York
10

11   B E F O R E:

12              HONORABLE JAMES P. McCORMACK,
                     Acting Supreme Court Justice
13

14   A P P E A R A N C E S:

15              (As Previously Noted.)

16
                *     *     *     *     *
17

18              THE CLERK:  This is a continued hearing of

19       Harold Gopaul, Indictment 2415N of 2008.

20              Are the People ready?

21              MS. JOHNSON:  Yes.

22              Can I place a couple of things on the record?

23              THE COURT:  Yes.

24              MS. JOHNSON:  I handed counsel a copy of

25       Detective Shulman's memo book from the date of

ws

Proceedings                    216

1    incident. It's two pages. It's the cover page of his

2    actual book and the entries.

3            I've also handed counsel a Xerox copy of

4    photographs as part of the People's continuing

5    discovery. I indicated to him that we were not even

6    sure if we were going to be using them on our direct

7    case.

8            I've also handed a copy of a fax that I

9    received regarding the logbook from the command dated

10   Tuesday, June 24th, 2008. That's what was faxed over

11   to my office yesterday.

12           I don't know if your Honor wants to deal with

13   the other issues now with the uniformed officer or just

14   get this going and we can do it after the detective is

15   done.

16           THE COURT: Mr. Schechter, you received those

17   items, I take it?

18           MR. SCHECHTER: Your Honor, I received what

19   appears to be the portion of Detective Shulman's memo

20   pad for June 24, 2008 and I received a portion of the

21   logbook for June 24th, 2008.

22           Unfortunately, it's missing a very crucial

23   time period of midnight to 5:57 p.m. -- a.m. and

24   therefore it's incomplete.

25           As I explained earlier, I requested the

                                                      ws

Proceedings                    217

1    entire logbook for June 24th, including the early

2    morning hours, which is where all the activities we're

3    dealing with here took place.

4            THE COURT:  All right, People, I think that's

5    a pretty fair assessment of the logbook.  It does

6    appear that there's a page that's missing.  The page I

7    have begins at 0558 hours, which is approximately

8    6 a.m., and ends at 8:45, so --

9            MS. JOHNSON:  Yes, Judge.

10           THE COURT:  I'm going to ask you, at some

11   point during the break, if you want to have

12   Detective Schulman contact the 105 and fax that page to

13   your office?

14           MS. JOHNSON:  Absolutely, your Honor.

15           And yesterday when I had asked them to fax it

16   over I asked for June 24th and this is what they sent,

17   but I will absolutely ask to have that faxed over.

18           THE COURT:  It seems at this point there is a

19   great deal of miscommunication between your office,

20   yourself, and the -- these officers in this case.

21           I've been sitting here since 9:30.  Is --

22   this detective doesn't understand that he's supposed to

23   be here at 9:30 or is he being told to come at some

24   other time?

25           MS. JOHNSON:  Your Honor, the teletypes

                                                      ws

Proceedings                  218

1    which, in fact, I provided a copy to the Court, are for

2    continuation for the hearings at 9:30.

3              The detective, when he finished his tour last

4    night, responded back to the precinct to pick up his

5    case jacket.  It's my understanding, I guess, that 9:30

6    was for him to be at the command for him to pick up his

7    case jacket and then to come to court.

8              I did advise him that hearings begin as soon

9    as he gets here at 9:30.  The Court is ready to proceed

10   at 9:30.  I believe your Honor knows I was obviously

11   here at 9:30 -- in my office at 9:30.

12             I am at the mercy of the Court to at least

13   have the Court advise --

14             THE COURT:  I plan to, but before I open my

15   mouth, if you will, I want to be sure he's not going to

16   tell me he's being told to come here at some other

17   time.

18             MS. JOHNSON:  Your Honor, he advised me that

19   he was going to get here as soon as he could.  I told

20   him, "We continue as soon as you get here at 9:30.  The

21   subpoena is for 9:30."

22             He says he has to go from his home to Queens

23   to pick up the case jacket.  I even called him on his

24   cell phone when he was running late.

25             THE COURT:  All right, I'll speak to him when

                                                  ws

Proceedings                        219

1       he comes in.

2                   What's the issue with this other officer?

3                   Are we going to have her today?

4                   MS. JOHNSON:  Your Honor, what the Court has

5       before the Court is a copy of the teletype that was

6       sent on May 1st for Officer Alfaro to appear here for

7       continuation of hearing, today being May 5th.

8                   I spoke to police liaison.  They faxed me

9       that information.  A copy of the teletype that your

10      Honor has confirms that the NYPD received

11      communication.

12                  However, as I indicated yesterday,

13      Officer Alfaro had already been subpoenaed for traffic

14      court and for another criminal case in Queens County.

15                  I advised her that it was my belief that a

16      pending hearing took precedence to both of those

17      matters.

18                  When I called the 105 Command they advised me

19      that traffic court takes precedence to all other

20      matters because if the officer does not show, the

21      ticket --

22                  THE COURT:  What traffic court are we

23      referring to?

24                  I mean, not that I -- in my mind, I can't

25      imagine traffic court taking any precedence over a

Proceedings                    220

1    County Court matter.

2              MS. JOHNSON:  I agree with your Honor and

3    that was the PD's policy.  They said traffic court

4    takes precedence over other matters.  I asked them if

5    that was the policy.  They said yes.

6              Either way, your Honor, the officer informed

7    me that she was never notified by the command to appear

8    here for today, despite that subpoena that clearly

9    indicates that she was notified five days ago and that

10   the command received the notification.

11             THE COURT:  Is there somebody -- when you say

12   command, are you talking about the 105th Precinct?

13             MS. JOHNSON:  That is correct, Judge.  Their

14   actual notification goes through a records bureau and

15   goes through another channel.

16             We were told that they need 24 hours notice.

17   Here they've had four days notice that we were going to

18   need her.

19             Even if she knew that we were going to need

20   her for today, which I had advised her of, she is

21   ordered to go to the traffic court and go to the other

22   matters which she is officially notified through the

23   official channels.  So even though she knew about

24   this --

25             THE COURT:  Well, she was here yesterday.

ws

Proceedings                    221

1           MS. JOHNSON:  Yes.

2           THE COURT:  Obviously, she wouldn't have come

3      here if she didn't have a subpoena to come here.

4           MS. JOHNSON:  Absolutely.  And the precinct's

5      position and the PD's position is that she was already

6      notified for traffic court and for Criminal Court and

7      although we sent these, she was not officially notified

8      to come today.

9           She was working last night.  She was working

10     at the precinct because she's a night officer and we

11     complied with their 24-hour notification four days ago.

12           I don't know why their records bureau or

13     whoever is in charge of it there never actually said to

14     her, "Here is your subpoena from four days ago.  You

15     must come either after traffic court or after Criminal

16     Court to Nassau County."

17           THE COURT:  She's in traffic court where,

18     Nassau County, Queens?

19           MS. JOHNSON:  I believe it's the city, Judge.

20     I don't know.

21           The other issue is that because she is a

22     night officer and her official notification is for --

23     that she was notified from the command for traffic

24     court and Criminal Court, she is not permitted to come

25     here without the official notification, even though she

                                              ws

Proceedings                    ·              222

1    actually knew about it, because the command didn't

2    officially tell her she must appear in court.

3              MR. SCHECHTER:  Judge, may I be heard?

4              THE COURT:  Yeah.

5              MR. SCHECHTER:  The system of traffic court

6    in New York City is that the traffic court is separate

7    from the Criminal Court unless they're dealing with

8    matters involving driving with a suspended license or

9    driving while intoxicated.

10             Any unclassified VTL misdemeanor is done in

11   Criminal Court.  All of the regular traffic

12   infractions, speeding, going through a red light, that

13   is done in traffic court which is completely the lowest

14   end of the criminal spectrum.

15             Additionally, Criminal Court never takes

16   precedence over County or Supreme Court, Judge.

17             I'm beginning to smell a rat here with the

18   superstructure of the 105 Precinct.  They only supplied

19   part of the documentation that was supposed to be

20   supplied to us, Judge, they've been stone walling us,

21   there are inconsistencies that will manifest itself

22   with respect to this officer's tours and I think

23   there's something in the nature of, I don't want to say

24   cover-up, but certainly I'm beginning to smell a rat

25   with respect to the 105 Precinct.  They are not

Proceedings                    223

1    cooperating with this Court and I don't understand why.

2            Which is why normally I respectfully ask the

3    Courts to direct witnesses to be here the next day so

4    the witness has no squeaking room because if he

5    violates that it's a contempt of court.

6            MS. JOHNSON:  Your Honor, I even went so far

7    as we already sent a subpoena for Officer Alfaro for

8    tomorrow.  I didn't know what the Court's or

9    Mr. Schechter's schedule was, but to avoid any problem,

10   that was done over an hour and a half ago to make

11   sure --

12           THE COURT:  All right, well, let me --

13           MS. JOHNSON:  While your Honor steps off the

14   bench can I have Detective Schulman call the precinct

15   to have that other page faxed?

16           THE COURT:  Yes.

17           (Pause in the proceedings.)

18           (The witness, Leonard Schulman, having

19   previously been sworn, resumed the witness stand.)

20           THE COURT:  Detective, I need you here at

21   9:30.

22           I understand you work at nights?

23           THE WITNESS:  Yes, your Honor.

24           THE COURT:  All right, I can't lose an hour

25   and a half or an hour.  Like I said to you a couple of

Proceedings                    224

1    days ago, we're under a tight schedule and I need you

2    here -- I don't know where your other officer is.

3            If there's an emergency, I understand.  If

4    something comes up, you have the DA's cell phone, call

5    her.  I'm sitting here for an hour and a half doing

6    nothing.

7            THE WITNESS:  I was here at 9:30 yesterday

8    morning, your Honor, and this morning I believe I was

9    able to park the car about 10:15.  I apologize.  I was

10   a little bit late.  There was a little bit of traffic

11   with the rain and all.

12           THE COURT:  Ms. Johnson, when was this

13   subpoena for Officer Alfaro sent because my law

14   secretary is being told --

15           MS. JOHNSON:  This is the fax.  This 9:12 --

16           LAW SECRETARY:  Back to you?

17           MS. JOHNSON:  Back to me from the liaison for

18   the Court.

19           Right here, your Honor, it says May 1st, 2009

20   up here.  That top fax is them faxing it over to me

21   this morning.

22           LAW SECRETARY:  It's a subpoena or a

23   teletype?

24           MS. JOHNSON:  It's a teletype.

25           LAW SECRETARY:  They're saying they don't

                                                        ws

Shulman - People - cross          225

1     have a subpoena and no record of her needing to be here

2     today.

3             MS. JOHNSON:  That's the receipt of it on

4         top.

5             THE COURT:  Ask them what they need and we'll

6         make sure they get it.

7             THE CLERK:  Detective, you're reminded that

8         you're still under oath.

9             THE WITNESS:  Yes.

10            MR. SCHECHTER:  Shall I proceed, your Honor?

11            THE COURT:  Yes.

12            MR. SCHECHTER:  If the Court pleases, I'm

13        just trying to find my last question and answer.

14    CROSS-EXAMINATION CONT'D

15    BY MR. SCHECHTER:

16        Q.   Now, Detective Schulman, you recall testifying

17    yesterday that on June 24th you were working a 4:30-to-1

18    tour?

19             Do you recall testifying to that?

20        A.   From the night of the 23rd into the morning of the

21    24th.

22        Q.   Right, 23rd into 0100 a.m.

23             On the 24th you say you were working an 8 to 4:30

24    tour?

25        A.   Due to the fact that I was still working on the

ws

Shulman - People - cross          226

1    Gopaul case and the Awan case at 8 o'clock in the morning, I

2    went back on a day tour.

3         Q.   Were you in court at 8 a.m. in the morning?

4         A.   No.

5         Q.   Where were you?

6         A.   I was in my office.

7         Q.   Was anybody with you?

8         A.   Probably.

9         Q.   Who was with you?

10        A.   I don't know specifically who was working.

11        Q.   Was it an officer or was it any of the witnesses?

12        A.   Mr. Gopaul was in my office.

13        Q.   At 8 a.m.?

14        A.   Yes.

15        Q.   And he was in your office or in the interrogation

16   room?

17        A.   He's in the interview room which is in my office.

18        Q.   Oh, I see.

19             So it would be fair to say you worked straight

20   through from 4:30 through 4:30 the next day?

21        A.   I worked through the next afternoon into the

22   evening.  I would have to look at the memo book to see

23   exactly what time I finished that day.

24        Q.   Okay, please do.

25        A.   I actually worked until 9:33 p.m. Tuesday evening

                                                              ws

Shulman - People - cross          227

1    and then I went back on duty again from 9:33 p.m. to 6:06

2    the next morning.

3         Q.   Is that all overtime?

4         A.   No.

5         Q.   What part was overtime, officer?

6                   MS. JOHNSON:   Objection.

7                   THE COURT:   Yeah, sustained.

8                   MR. SCHECHTER:   Now, I would like if the

9         officer -- would I be able to ask the officer to sit in

10        the jury box so that he could view the videotape,

11        Judge?

12                  THE COURT:   Yes.

13                  Detective, if you would just have a seat

14        where you were yesterday for a moment?

15                  (Witness steps down.)

16                  MR. SCHECHTER:   Now, your Honor, I

17        respectfully ask counsel to turn the videotape on right

18        now.

19                  Now, could you freeze that, please?

20        Q.   Now, officer, I draw your attention to

21   Mr. Gopaul's image in that videotape.

22             Can you see him clearly?

23        A.   Pretty much.

24        Q.   Would you need to go closer?

25        A.   No.

                                                      ws

Shulman - People - cross        228

1        Q.   I direct your attention --

2             MR. SCHECHTER:  I ask the Court to also,

3        please.

4        Q.   I direct your attention to the collar of his

5   shirt.

6             Now, is the collar of his shirt closed or is it

7   spaced widely?

8        A.   It appears to be unbuttoned on the top.

9        Q.   And would you say that the distance between the

10  two sides of his shirt is not what normally that shirt would

11  look like were it closed?

12       A.   Again, it appears unbuttoned, so it doesn't look

13  the same as it looks when it's buttoned.

14       Q.   Was the shirt the same way when he came into the

15  room with you -- withdrawn.

16            Was his shirt in that same condition when you

17  first came into the room and observed him in that room?

18       A.   I don't recall if his shirt was unbuttoned or not

19  when I first came into the room.

20       Q.   Well, there came a point of time when you were

21  questioning him over a two or three-hour period, is that

22  correct?

23       A.   Yes.

24       Q.   Did his shirt always appear like that during the

25  two or three-hour period that you were questioning him?

Shulman - People - cross        229

1        A.   Again, I don't recall if his shirt was buttoned or
2    unbuttoned.
3        Q.   Now, you'll notice that the two lower parts of the
4    shirt --
5             MR. SCHECHTER:  I'm asking the Court to take
6        judicial notice of this, and I'm referring to this area
7        (indicating).
8        Q.   And I'm referring to this area here and this area
9    here is distorted downward.
10            Do you notice that?
11            THE COURT:  Do you want to, just for the
12       record, indicate what it is that you're point at?
13            MR. SCHECHTER:  Yes, I'm pointing to the area
14       on the videotape on a point on the lower right center
15       part of the video which shows the bottom left portion
16       of Mr. Gopaul's shirt and also the right lower portion.
17            All of this is basically in the center of the
18       video showing that the shirt is depressed down on the
19       left side and down on the right side.
20       Q.   Now, was Mr. Gopaul's shirt in that condition when
21   you first saw him?
22       A.   Again, I don't know if his shirt was buttoned or
23   unbuttoned when I first came in to speak to him.
24       Q.   When you -- withdrawn.
25            Have you any physical contact with Mr. Gopaul

                                                        ws

1    whatsoever?

2          A.    I might have shook his hand when I introduced

3    myself, but other than that, no.

4          Q.    Isn't it a fact that you took your hand right by

5    his collar, right where that distortion of his shirt is, you

6    grabbed his shirt with your hand, indicating a hand with a

7    palm down, grabbing his shirt, pulling him towards you, then

8    pulling him away.

9                Isn't that what you did?

10         A.    Absolutely not.

11               MR. SCHECHTER:   Your Honor, I have no more

12               questions of the officer.

13               THE COURT:   Okay, sure.

14               If you would, detective, just resume your

15         seat back in the witness box?

16               (Witness resumes the stand.)

17   REDIRECT EXAMINATION

18   BY MS. JOHNSON:

19         Q.    Detective Schulman, during the time you were with

20   the defendant on June 24th, 2008 did he ever complain of any

21   injuries?

22         A.    No, he did not.

23         Q.    Did he ever ask for any medical attention?

24         A.    No, he did not.

25         Q.    Did you ever observe any injuries on him?

1    A.    No, I did not.

2              MS. JOHNSON:  Nothing further.

3              THE COURT:  All right, detective, if I could

4    just ask a couple of follow-up questions?

5              As I looked at the video of Mr. Gopaul seated

6    in the interview room there during the videotape it

7    appears as though -- was he wearing two shirts?

8              In other words, it looked to be a T-shirt or

9    some underlying shirt and then a shirt over it, if you

10   recall?

11             THE WITNESS:  I don't know if he had an

12   undershirt on or not, your Honor.  I mean, I didn't

13   have any contact with his clothing.

14             THE COURT:  Any other questions,

15   Mr. Schechter?

16             MR. SCHECHTER:  I have no questions of the

17   officer.

18             THE COURT:  All right, detective, thank you

19   very much, you're excused.

20             MR. SCHECHTER:  Wait, yes, I do.

21   RECROSS-EXAMINATION

22   BY MR. SCHECHTER:

23   Q.    Officer, did you have to do a physical inspection

24   of Mr. Gopaul's arms and legs at any time?

25   A.    Not that I recall specifically, no.

                                                    ws

1     Q.   Or his abdomen?

2     A.   No.

3               MR. SCHECHTER:  Thank you.  No more

4     questions.

5               THE COURT:  You're excused, detective, thank

6     you.

7               Could I just see the both of you?

8               (Discussion held at the bench, off the

9     record.)

10              (The luncheon recess was taken at this time.)

11                   *     *     *     *     *

12              A F T E R N O O N  S E S S I O N

13              THE COURT:  Mr. Schechter, I indicated

14    earlier that this morning there was an individual who

15    my law secretary dealt with.  I don't know from what

16    facility one of those two subpoenas were directed to.

17    I think they were both two different facilities?

18              MR. SCHECHTER:  My investigator was informed,

19    your Honor, that they had to deliver everything through

20    the Manhattan facility, which they did.

21              As your Honor could tell from my subpoena,

22    there's one specific bit of information that I really

23    require out of that -- those materials and it's that

24    that I'm most interested in.

25              THE COURT:  All right, there was -- what took

                                                    ws

Proceedings                    233

1     place this morning is that subpoena came from one of

2     the facilities with printed out material that was from

3     a computer that they accessed.

4              What we were told is that there's a box of

5     materials that I believe comes from Manhattan that

6     we've directed them to send FedEx.

7              I take it that you're not, at least at this

8     point, expecting any witnesses to testify with regard

9     to the documents.

10              MR. SCHECHTER:  No.

11              THE COURT:  So what I asked them to do is

12    send those materials to chambers FedEx.

13              The materials that we did receive this

14    morning, I don't know how many pages there were, my law

15    secretary has gone over them.

16              In essence, there's really not any statements

17    by or attributable to her or attributable to these

18    incidents in terms of her talking about these

19    allegations.

20              A lot of them has to deal with her placement,

21    if you will.

22              MR. SCHECHTER:  That's what I'm most

23    interested --

24              THE COURT:  And that would be relevant in

25    what sense?

ws

Proceedings                    234

1              MR. SCHECHTER:  I wish not to, with all due

2       respect, to disclose that information, your Honor,

3       especially in the presence of the prosecutor since this

4       is part of the theory of my case.

5              THE COURT:  Let me say this.

6              It's my intention, depending on what material

7       I find to be appropriate for disclosure, that it's

8       going to be disclosed to both sides.

9              MR. SCHECHTER:  Your Honor, I, with all due

10      respect, I do not understand how if I -- the whole

11      purpose of a subpoena, as it is with the People's

12      subpoena because they don't notify counsel when they

13      subpoena something, and I don't get any --

14             THE COURT:  As a matter of practice, if the

15      People were to subpoena things to my chambers and I

16      release them I would release them to the defendant as

17      well as the People.

18             MR. SCHECHTER:  They don't have to.  They can

19      routinely subpoena information and the Police

20      Department routinely gives them the information they

21      subpoena without us knowing a thing about it.

22             There's a reason that I have those things

23      subpoenaed and there's a reason why the subpoenas were

24      done ex parte, your Honor.

25             I do not want to, in any way, telegraph

                                                      ws

Proceedings                    235

1    counsel my intentions and the reasons for my doing

2    anything here.   I have my own theory of the case and it

3    entails getting certain information.   The specific

4    information is outlined in the first request part of my

5    subpoena.

6              THE COURT:   Well, as I indicated, I haven't

7    looked at the materials myself yet.

8              As I indicated to you, there may be some

9    materials that -- although I should preface my comments

10   by saying nobody from these facilities, as of yet, is

11   claiming any type of confidentiality or privilege

12   attached to these documents.

13             In thinking about it, if no one is going to

14   raise that, then I may just release them, again, as I

15   said, to both sides.

16             But, again, I haven't gone through them.   My

17   law secretary just handed me one document that does

18   appear to talk about the incident itself, so what I've

19   asked my law secretary to do is make copies of what we

20   received today.

21             As I indicated, there's apparently other

22   material we're expecting to get in the next -- I would

23   hope by tomorrow.

24             MR. SCHECHTER:   Okay, Judge, but, as I said,

25   just without specifying what it is, that first one or

                                              ws

Proceedings                236

1    two sentences of my subpoena pretty much outlines what

2    I really -- what I'm interested in, at least at this

3    juncture.

4              THE COURT:  All right.  Well, I'm going to

5    obviously provide what I do receive, absent somebody

6    claiming some type of privilege or confidentiality to

7    it.

8              I don't know whether it's going to be in

9    response to your subpoena.  Only you could say that,

10   obviously.

11             MR. SCHECHTER:  Okay.  All right --

12             MS. JOHNSON:  Your Honor, the logbook had not

13   yet been received by my office.

14             When I spoke to Detective Schulman he

15   indicated to me that although his detective squad is

16   housed at the 105 Precinct, it is a patrol division

17   log.  He has requested that the patrol supervisor, one

18   of the only people that can actually access the book,

19   immediately, upon getting it, fax it over to my office,

20   but I have not yet received that yet.

21             I also indicated to counsel -- I mean,

22   obviously Officer Alfaro is outside, we can proceed

23   with the hearing, with her testimony, but I had asked

24   for the Court's indulgence with a day to begin the

25   trial at least a day from now, but I just want

                                                     ws

1       your Honor to know there is conflict and issues

2       concerning witness availability on Monday and Tuesday.

3              My suggestion to your Honor, and, of course,

4       this is -- I'm at the whim of the Court, is if we can

5       do pretrial tomorrow and start picking on Monday and

6       the reason why I ask that is because I have confirmed

7       with the officer and I've confirmed with the detective

8       that they are not available for personal reasons on

9       Monday and Tuesday of next week.

10             If we were to pick on Thursday and Friday I

11      would not have witnesses available for Monday and

12      Tuesday, that being May 12th -- May 11th and May 12th.

13             I did confirm with them they are both

14      available on Wednesday, Thursday and Friday.

15             THE COURT:   And that leaves us with one week

16      left for -- assuming all goes well and you get your

17      case in from Wednesday to Friday next week, that leaves

18      us with the week of the 18th for the defendant's case

19      to go in, which it appears as though there is going to

20      be somewhat of a defense case, you know, jury charge,

21      deliberations, and I've got Mr. Schechter looking to

22      get on a plane on the 27th.

23             MS. JOHNSON:   And I understand that, Judge.

24      That's why I'm bringing it to the Court's attention,

25      that the detective and the police officer are not

                                                        ws

1    available on Monday or Tuesday.

2              MR. SCHECHTER:  The complainant is.

3              THE COURT:  At this point I really loathe to

4    entertain any applications from any of these officers

5    regarding their availability.  It seems as though

6    they've had issues with regard to their availability

7    since this case began.

8              You know, barring some type of medical

9    emergency, as far as I'm concerned, depending on what

10   we cover today, I would be inclined to order a panel

11   for tomorrow afternoon and start picking tomorrow

12   afternoon.

13             If that becomes not feasible, then we'll

14   start on Thursday morning.  I mean, obviously you'll

15   have your complainant.

16             MS. JOHNSON:  Yes, Judge.

17             THE COURT:  She is available.

18             MS. JOHNSON:  She is, your Honor.

19             THE COURT:  So -- I can't at this point, with

20   the history that's gone on so far -- and, believe me,

21   nobody wants to accommodate an attorney more than

22   myself, but at this point I can't run the risk of

23   picking on Monday.

24             Quite frankly, although there's only ten

25   peremptories for each side, I think given the nature of

                                                        ws

Alfaro - People - direct            239

1       the case it's not going to be a jury selection that's

2       not going to be necessarily that quick, particularly

3       when jurors hear the nature of the allegations.

4               So I think the sooner we get this going the

5       better off we're all going to be.

6               I just want to give this back to my law

7       secretary so we could start making copies.

8               Do you want to call Ms. -- Officer Alfaro?

9               MS. JOHNSON:  People call Police Officer

10      Celica Alfaro.

11      C E L I C A  A L F A R O, a witness called on behalf of the

12      People, having been first duly sworn by the clerk of

13      the Court, was examined and testified under oath as

14      follows:

15              COURT OFFICER:  Take a seat.

16              For the record, state your name, spell your

17      last name, shield number, rank and command?

18              THE WITNESS:  Celica -- PO Celica Alfaro,

19      A-l-f-a-r-o, shield number is 8865, from 105 Precinct,

20      Queens South.

21              THE COURT:  Okay, Ms. Johnson.

22              MS. JOHNSON:  Thank you, your Honor.

23      DIRECT EXAMINATION

24      BY JOHNSON:

25      Q.   Good afternoon, Officer Alfaro.

                                                            ws

Alfaro - People - direct          240

1          How long have you been employed by the New York

2    City Police Department?

3          A.    Approximately eight years.

4                MR. SCHECHTER:  How many years?

5                THE WITNESS:  Eight years.

6          Q.    You may just want to push the microphone over.

7                Have you been assigned to the 105 the entire time?

8          A.    Yes.

9          Q.    What are your general duties as an officer with

10   the 105th Precinct?

11         A.    Patrol.

12         Q.    I'm going to direct your attention to June 24th,

13   2008.

14               Were you working that day?

15         A.    Yes.

16         Q.    Where were you working?

17         A.    I don't recall.  A sector.

18         Q.    Were you assigned to the 105 Precinct?

19         A.    Yes.

20         Q.    What was your tour?

21         A.    12 to 8.

22         Q.    P.m. or a.m.?

23         A.    2315 by 0750.

24         Q.    That's 11:15 p.m. to 7:50 a.m.?

25         A.    Yes.

Alfaro - People - direct                241

1        Q.   Would that be the 23rd going into the 24th?

2        A.   Yes.

3        Q.   Did there come a time when a Detective Schulman

4    asked you to assist in a case?

5        A.   Yes.

6        Q.   Can you tell us what happened?

7             What was it that Detective Schulman asked of you?

8        A.   To process an arrest.

9        Q.   What was the name of the suspect?

10       A.   Mr. Gopaul.

11       Q.   What --

12       A.   Howard.

13       Q.   What specifically was your job and your assignment

14   with regard to the arrest?

15       A.   Be an assigned officer and assist in processing

16   the arrest.

17       Q.   What did processing entail?

18       A.   Doing the online and interviewing the complainant.

19       Q.   When you say online, what does that mean?

20       A.   The booking sheet.

21       Q.   Would that be preparing the arrest paperwork?

22       A.   Yes.

23       Q.   Did you have any contact with the suspect,

24   Harold Gopaul, on June 24th, 2008?

25       A.   Yes.

Alfaro - People - direct                242

1      Q.    Do you see that individual in the courtroom today?

2      A.    Yes.

3      Q.    Can you point to that person and identify an item

4   of clothing that that person is wearing?

5      A.    He's wearing a gray suit.

6      Q.    Can you point to the individual you're referring

7   to?

8      A.    Yes (indicating).

9            THE COURT:   Indicating the defendant.

10     Q.    Officer Alfaro, can you tell us what was your

11  first contact with the defendant on June 24th, 2008?

12     A.    When I was bringing him down to the first floor

13  from the detective squad.

14     Q.    What was the defendant doing in the detective

15  squad when you first encountered him?

16     A.    Sitting down.

17     Q.    Where?

18     A.    In the interview room.

19     Q.    Was he handcuffed?

20     A.    No.

21     Q.    Was he with anybody?

22     A.    No.

23     Q.    What did you say to him when you first encountered

24  the defendant in the interview room?

25     A.    Saying that I was going to process his arrest and

Alfaro - People - direct          243

1    I was going to take him downstairs.

2          Q.    What was his response to you?

3          A.    Okay.

4          Q.    Was he cooperative?

5          A.    Yes.

6          Q.    What did you do to get him from the interview room

7    to the processing?

8          A.    I put the cuffs on him and took him downstairs and

9    put him in a cell.

10         Q.    Was there any conversation between you and the

11   defendant on the way from the interview room to the cell?

12         A.    Yes, I got his pedigree information in front of

13   the desk.

14         Q.    What type of pedigree information are you

15   referring to?

16         A.    His name, again, his address and his date of

17   birth.

18         Q.    Did the defendant provide that information to you?

19         A.    Yes.

20         Q.    What language was he speaking?

21         A.    English.

22         Q.    Were his answers responsive to your questions?

23         A.    Yes.

24         Q.    Was he cooperative?

25         A.    Yes.

ws

Alfaro - People - direct          244

1        Q.   Did he ask you any questions?

2        A.   No.

3        Q.   Other than pedigree information what was the

4    extent of your conversation with the defendant at the desk?

5        A.   That was it.

6        Q.   Where did you go after that?

7        A.   To the cell area.

8        Q.   Where is that located compared to the desk?

9             MR. SCHECHTER:   Which area was that?

10            MS. JOHNSON:   The cell area.

11       Q.   Is that what you said?

12            MR. SCHECHTER:   Cell area.

13       A.   Yeah, the cell area.

14       Q.   Where is the cell area in relation to the desk?

15       A.   Behind the desk.

16       Q.   Did you personally bring the defendant to the cell

17   area?

18       A.   Yes.

19       Q.   Who else was around?

20       A.   I don't recall.

21       Q.   Were there other officers around?

22       A.   I don't recall.

23       Q.   Did any other officers have any conversation with

24   you or the defendant in route to the cell area?

25       A.   I don't recall.

ws

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 247 of 440 PageID #: 597

1        Q.   Did you observe any officers exert any physical

2   force upon the defendant?

3        A.   No.

4        Q.   Did you observe any officers or hear any officers

5   threaten the defendant?

6        A.   No.

7        Q.   Where was your weapon while transporting the

8   defendant from the interview room down to the desk?

9        A.   It was in a locked control -- a locked, I guess,

10  locker.

11       Q.   When did you put your weapon in the locker?

12       A.   Prior to me taking him to the cell area.

13       Q.   Was that Police Department procedure?

14       A.   Yes.

15       Q.   How did you get the defendant from the desk to the

16  cell?

17       A.   Walked him.

18       Q.   Did he walk on his own?

19       A.   No, I walked -- he walked in front of me and I

20  walked behind him.

21       Q.   Was he handcuffed?

22       A.   Yes.

23       Q.   Was he able to walk on his own?

24       A.   Yes.

25       Q.   Did he complain of any pain to you?

                                                      ws

Alfaro - People - direct          246

1      A.   No.

2      Q.   Did he ask to receive any medical attention?

3      A.   No.

4      Q.   Did you observe any bruises on him?

5      A.   No.

6      Q.   Did you observe any scratches on him?

7      A.   No.

8      Q.   Did he ever ask to speak with an attorney?

9      A.   No.

10     Q.   Did he ever ask to make any phone calls?

11     A.   No.

12     Q.   Other than yourself, to your knowledge, as best as

13  you remember, do you remember any other officers interacting

14  with you and the defendant upon him entering the cell?

15     A.   No.

16     Q.   What did you say to defendant once he was brought

17  into the cell?

18     A.   That I was going to process the paperwork.

19     Q.   Did you have any other conversation with him?

20     A.   No.

21     Q.   Was the defendant still handcuffed once he was

22  placed into the cell?

23     A.   No, I took the cuffs off.

24     Q.   When was it that you took the cuffs off?

25     A.   Once he was in the cell.

ws

Alfaro - People - direct          247

1      Q.   After the door was closed?

2      A.   Before the door was closed.

3      Q.   Was your weapon still secured at that point?

4      A.   Yes.

5      Q.   Did you see any other members of law enforcement

6   go into the cell once the defendant was in there?

7      A.   No.

8      Q.   Did you have any conversation after -- with the

9   defendant after he was placed in the cell?

10     A.   No.

11     Q.   Did there come a time when Detective Schulman

12  asked you to further assist with recovering property in this

13  case?

14     A.   Yes.

15     Q.   What were you told to do?

16     A.   To take the complainant down and to show me where

17  the property was in the vehicle, where she pointed it out

18  to.

19     Q.   Where did you go with the complainant?

20     A.   On the side of the precinct where the vehicle was.

21     Q.   What type of vehicle was it?

22     A.   An Ecolab truck, work vehicle.

23     Q.   Do you recall what the defendant was wearing on

24  June 24th, 2008?

25     A.   Work uniform.

Alfaro - People - direct                    248

1      Q.   How was it that you identified it as a work
2   uniform?
3      A.   Because it was all blue and it had, I believe, an
4   Ecolab sign on the side.
5      Q.   What happened when you went to the vehicle outside
6   the 105th Precinct?
7      A.   Excuse me?
8      Q.   What did you do once you got to the vehicle that
9   was parked outside the 105?
10     A.   I took the complainant there.  She showed me what
11  was --
12              THE COURT:   Let me just interrupt.
13              Did you take the complainant or the
14         defendant?
15              THE WITNESS:   The complainant.
16              THE COURT:   Okay.
17     A.   I took the complainant to the vehicle where she
18  showed me where a mini meat clever was in a middle console.
19     Q.   Did you recover that meat clever?
20     A.   Yes.
21     Q.   Where did you recover it from?
22     A.   The vehicle.
23     Q.   Where in the vehicle?
24     A.   The middle console.
25     Q.   What else did you recover from the vehicle?

                                                            ws

Alfaro - People - direct                    249

1        A.    A massager.

2        Q.    What did the massager look like?

3        A.    A cordless white massager.

4        Q.    Where was that recovered from?

5        A.    The vehicle.

6        Q.    Where in the vehicle?

7        A.    I don't recall.

8        Q.    Inside or outside?

9        A.    Inside.

10       Q.    What did you do with the white massager and the

11   meat clever after you recovered it?

12       A.    I vouchered it.

13       Q.    What does that mean?

14       A.    I basically took it into police custody for arrest

15   evidence.

16       Q.    Was that brought to a property bureau?

17       A.    It was placed in our property cell until the

18   property clerk picks it up and takes it.

19       Q.    Did you prepare vouchers --

20       A.    Yes.

21       Q.    -- with regard to the both of those items?

22       A.    Yes.

23       Q.    Was that the only evidence that you recovered in

24   this case?

25       A.    No.

                              Alfaro - People - direct          250

1        Q.   Where else did you go?

2        A.   To the house.

3        Q.   Whose house?

4        A.   The defendant's house.

5        Q.   Where was that located?

6             THE WITNESS:  Can I refresh my memory?

7        I have to go back and look at the address.

8             THE COURT:  All right, just indicate to us

9     what it is that you're referring to.  You can look at

10    it, just tell us what it is that you're looking at.

11            THE WITNESS:  Oh, okay.

12            I'm looking at the complaint report?

13            THE COURT:  Okay.

14       A.   I went to 242-10, 89 Avenue.

15       Q.   In Queens?

16       A.   In Queens.

17       Q.   What did you do when you went to that location?

18       A.   I was met by the mother of the complainant.

19       Q.   Did she identify herself to you?

20       A.   Yes.

21       Q.   Who did you go with?

22       A.   I went with two other officers.

23       Q.   Do you recall what day it was that you went?

24       A.   Same day as the 24th.

25       Q.   What did you say to the victim's mother?

                                                          ws

1       A.   If it's possible, I can come inside.

2            She let me in.

3       Q.   Was she cooperative?

4       A.   Yes.

5       Q.   What did you do once inside the home?

6       A.   I asked if I can go upstairs to retrieve a

7    massager and she said yes.

8       Q.   Where did you go?

9       A.   To the bedroom.

10      Q.   Whose bedroom?

11      A.   The defendant's bedroom.

12      Q.   Did it appear to you to be a master bedroom?

13      A.   Yes.

14      Q.   What did you recover from the bedroom?

15      A.   A massager.

16      Q.   Where did you recover it from?

17      A.   Under the bed.

18      Q.   Under the bed of the defendant's bedroom?

19      A.   Yes.

20      Q.   What color was it?

21           THE WITNESS:  I would have to refresh my

22    memory again, your Honor.

23           THE COURT:  Yes.

24      A.   I'm looking at Voucher P240076 and it's a -- was a

25    two-speed massager, white and gray.

                                                    ws

Alfaro - People - cross          252

1       Q.   Is that the one you're referring to that you

2    recovered from the defendant's bedroom?

3       A.   Yes.

4       Q.   What did you do with that massager upon recovering

5    it?

6       A.   I took it back to the station house and vouchered

7    it.

8       Q.   Similar to your vouchering of the other property?

9       A.   Yes.

10      Q.   Did you prepare a property receipt with regards to

11   that massager?

12      A.   Yes.

13      Q.   Once the defendant was placed into the cell behind

14   the desk was that your last contact with him?

15      A.   Yes.

16           MS. JOHNSON:   I have no other questions for

17      Officer Alfaro.

18           THE COURT:   Okay, Mr. Schechter?

19   CROSS-EXAMINATION

20   BY MR. SCHECHTER:

21      Q.   Officer Alfaro, prior to going to the defendant's

22   work vehicle did you have any conversation with

23   Detective Schulman?

24      A.   Yes.

25      Q.   And were you given anything by Detective Schulman?

ws

Alfaro - People - cross                253

1          A.   A consent form.

2          Q.   And with that consent form, what did you do with

3     it?

4          A.   I read it.

5          Q.   And what did you do with it after you read it?

6          A.   I went with the complainant down to the vehicle.

7          Q.   And you already had the keys with you?

8          A.   I don't recall.

9          Q.   Where did you get the keys from?

10         A.   I don't recall.

11         Q.   Were you present in the courtroom yesterday with

12    Detective Schulman?

13         A.   Was I present in the courtroom?

14         Q.   No, on the outside of the courtroom?

15         A.   Yes.

16         Q.   And did Detective Schulman take you to the window

17    of this door behind me to the courtroom while the courtroom

18    was either in session or my client, Mr. Gopaul, was sitting

19    at the counsel table?

20         A.   Not that I recall.

21         Q.   Is it your testimony that he did not take you to

22    the window to view my client, Mr. Gopaul, and point him out

23    to you?

24              Is that your testimony?

25         A.   No.

ws

Alfaro - People - cross                254

1       Q.    Did he do that?

2       A.    No.

3       Q.    Now, you indicated that you were doing a 11:15 to

4    7:50 tour on Tuesday, June 24th, is that correct?

5       A.    Yes.

6       Q.    And part of your tour you were on radio motor

7    patrol?

8       A.    Yes.

9       Q.    Were you the operator or the recorder?

10      A.    I have to refresh my memory.

11                  THE WITNESS:  Can I get my memo book?

12                  THE COURT:  Yes, just tell us -- you're

13            looking at a memo book?

14                  THE WITNESS:  Yes.

15      A.    I don't have it written down.

16      Q.    Do you recall if you were the operator or the

17   recorder?

18      A.    I don't recall.

19      Q.    Who was your partner?

20      A.    Officer Magor (ph).

21      Q.    And was he one of the individuals you went to the

22   house to search with?

23      A.    No.

24      Q.    What are the other names of the other police

25   officers who accompanied you to the house to search?

                                                          ws

1        A.    Officer Morris and Officer Ingracia (ph).

2        Q.    And when were you given this -- withdrawn.

3              When did you return to the station house after

4    your initial patrol, do you recall?

5        A.    Referring back to my memo book, approximately

6    0440 hours.

7        Q.    That would be would be -- 440 hours would be in

8    the morning, 4:40 a.m., correct?

9        A.    Yes.

10       Q.    And approximately what time did the sergeant

11   supervising your patrol sign your memo book?

12       A.    Prior to that at 0412 hours.

13       Q.    And where did that take place?

14       A.    Out on patrol.

15       Q.    Do you recall where when you were on patrol?

16       A.    No.

17       Q.    Now, you had -- when you were on patrol did you

18   make an arrest?

19       A.    I was asked if I wanted an arrest.  I said yes.

20       Q.    I'm sorry?

21       A.    I was asked if I wanted an arrest.  I said yes.

22       Q.    Who asked you that?

23       A.    The sergeant.

24       Q.    Approximately what time did he ask you that?

25       A.    Don't recall.

Q. And did you go to the property clerk with some property during your patrol?

A. No.

Q. I direct your attention to your memo book, officer. Your notation for 2337. You notice where it says borrow with property?

What does that mean?

A. That's taking property from the day before. I took property down from the day before of everything that was vouchered as to -- that had to go to the lab.

Q. You made a narcotics arrest?

A. No, I was just assigned to go there. It was a station house assignment.

Q. And the property that you took to the -- is that to the property clerk?

A. No, to the 107 Precinct.

Q. Oh, you took property from the 105 to the 107?

A. Yes.

Q. Do you recall what property that was?

MS. JOHNSON: Objection.

THE COURT: I'll allow it.

If you remember.

A. No.

Q. Now, this communication with respect to whether you want an arrest, was that from Sergeant O'Hagan?

Alfaro - People - cross                257

1       A.   No.

2       Q.   Who was that from?

3       A.   I believe it was Goodman.

4       Q.   Who?

5       A.   Sergeant Goodman.

6       Q.   Spell that name, please?

7       A.   G-o-o-d-m-a-n.

8       Q.   And Sergeant Goodman was working the desk that

9  night?

10      A.   No.

11      Q.   Who was working the desk, if you can recall?

12      A.   I don't recall.

13      Q.   Was it Sergeant O'Hagan?

14      A.   I don't recall.

15      Q.   Now, there came a point where you returned to the

16  precinct.

17           Do you remember when you returned to the precinct

18  after your initial motor patrol?

19      A.   Yeah.

20      Q.   What time?

21      A.   Approximately 0440.

22      Q.   Now, there's a notation in your memo book 10.2.

23           What does that mean?

24      A.   That means return to station house.

25      Q.   Now, I direct your attention to the third line

ws

1   down from the top.  It says one yellow, 8.20.08.

2          What does that mean?

3     A.    That is the color of the day and the return date.

4     Q.    That is the color of what?

5     A.    The color of the day and the return date.

6     Q.    What does that mean?

7     A.    That means for the officers to know if there's

8   plainclothes that there's a color that we don't mistake with

9   somebody else and if you're doing a Criminal Court summons

10  that's the date that they're supposed to put down on the

11  summons to return to court for the defendants.

12    Q.    Got it.

13         Now, would it be fair to say that you received a

14  communication from Sergeant Goodman between -- withdrawn.

15         Sergeant Goodman signed your memo book on 0412,

16  didn't he?

17    A.    Yes.

18    Q.    And that was in the field, was it not?

19    A.    Yes.

20    Q.    Do you recall where you were when he signed your

21  memo book?

22    A.    No.

23    Q.    Now, did you know where Detective Schulman was at

24  that time?

25    A.    No.

1        Q.   Did you have any communication with Detective
2   Schulman?
3        A.   Yes.
4        Q.   And did that communication take place between 4:12
5   in the morning and 4:40 in the morning?
6        A.   No.
7        Q.   When did that communication take place?
8        A.   After 0445 hours.
9        Q.   And when you returned to the station house do you
10  recall who you saw behind the desk?
11       A.   No.
12       Q.   Did you observe Mr. Gopaul?
13       A.   No.
14       Q.   Had you been informed by the sergeant that there
15  was someone under arrest?
16       A.   Yes.
17       Q.   And that was Sergeant O'Hagan?
18       A.   I don't recall.
19       Q.   Now, did you take the -- you said you processed
20  Mr. Gopaul's arrest, is that correct?
21       A.   Yes.
22       Q.   Did you take the mugshot?
23       A.   Yes.
24       Q.   And where did you take that?
25       A.   In the cell area.

ws

1    Q.    In point of fact, Mr. Gopaul was already under

2    arrest, was he not, Officer Alfaro?

3         A.    From my understanding, yes.

4         Q.    And he had been under arrest for a considerable

5    period of time, isn't that true?

6         A.    Can you rephrase the question?

7         Q.    Yes.  Mr. Gopaul, prior to your coming back to the

8    station house, had already been placed under arrest, isn't

9    that a fact?

10        A.    I don't know.  I was out in the field.  I

11   didn't --

12        Q.    Well, weren't you told to come back to the station

13   house to take an arrest?

14        A.    Yes.

15        Q.    Well, had you been informed when you got back to

16   the station house that Mr. Gopaul had already been placed

17   under arrest?

18        A.    Yes.

19        Q.    And who placed him under arrest?

20        A.    I wasn't there.

21        Q.    Who was the actual arresting officer of

22   Mr. Gopaul, Officer Alfaro?

23        A.    I am.

24        Q.    Well, I'm not talking about the processing

25   officer, Officer Alfaro, I'm talking about the arresting

ws

Alfaro - People - cross          261

1    officer.

2              Who first placed Mr. Gopaul under arrest?

3                   MS. JOHNSON:  Objection, asked and answered

4         already.  She doesn't know.

5                   MR. SCHECHTER:  Oh, no, no, no, no.

6                   THE COURT:  I'll allow it.

7                   Can you answer that, officer?

8                   THE WITNESS:  I was out in the field.  I

9         can't answer that question.

10        Q.   Well, when you got back to the station house, were

11   you told who took credit for the collar?

12        A.   I took credit for the collar.

13        Q.   You took credit for the collar even though you had

14   nothing whatsoever to do with the arrest, is that what

15   you're saying?

16        A.   I placed -- I processed his arrest.  I'm the

17   arresting officer.

18        Q.   Well, obviously he was already under arrest when

19   you got back to the station house, that's what you just told

20   us a minute ago.

21             My question is, who placed him under arrest?

22        A.   I don't recall.

23        Q.   Did Sergeant O'Hagan tell you that he and other

24   officers placed him under arrest?

25        A.   I don't recall.

                                                      ws

1      Q.   Were you told that Mr. Gopaul resisted arrest in
2   any way?
3      A.   I don't recall.
4      Q.   Officer, wouldn't you recall if an officer told
5   you that Mr. Gopaul was violent because he resisted arrest?
6           Wouldn't you recall that?
7      A.   I would have to look at my paperwork to see the
8   charges.
9      Q.   Do you have anything on you which would indicate
10  whether or not Mr. Gopaul had been violent at the time he
11  was placed under arrest?
12     A.   No.
13     Q.   Did you know whether Sergeant O'Hagan placed
14  Mr. Gopaul under arrest together with other officers?
15     A.   I don't recall.
16     Q.   Do you know how many offers certificates placed
17  him under arrest?
18     A.   Don't recall.
19     Q.   When you came back to the station house where was
20  Detective Schulman, if you know?
21     A.   When I returned?
22     Q.   Yes.
23     A.   Up in the squad.
24     Q.   Well, the squad is on the second floor of the
25  station house, correct?

                                                          ws

Alfaro - People - cross                263

1      A.   Yes.

2      Q.   And was he with anyone or was he alone?

3      A.   I don't recall.

4      Q.   Well, did he have any conversation with you when

5   you returned to the station house?

6      A.   Yes, I went upstairs to the squad.

7      Q.   And what did he tell you?

8      A.   He told me the basics of the complaint report, of

9   an open 61.

10     Q.   Did you do a 61 in this?

11     A.   No.

12     Q.   Did you fill out any other police work, police

13  paperwork?

14     A.   Yes, the online.

15     Q.   The online booking sheet?

16     A.   Yes.

17     Q.   Do you have a copy of that with you?

18     A.   Yes.

19     Q.   Can I see it, please?

20               (Shown to counsel.)

21               THE COURT:  Just off the record one minute.

22               (Discussion held off the record.)

23     Q.   May I have the document, please?

24               MS. JOHNSON:  Judge, I just want to make sure

25       there's nothing in it that he's not entitled to.

                                                    ws

Alfaro - People - cross          264

1                 (Shown to counsel.)

2                 MS. JOHNSON:  I think he has this already.

3                 (Shown to counsel.)

4      Q.   Now, officer, was Sergeant Manolingus (ph) on duty

5  at that time as well?

6           Sergeant Manolingus?

7      A.   I don't recall.

8      Q.   Do you know who that is?

9      A.   Sergeant Manolingus?

10     Q.   Yes.

11     A.   Yeah, supervisor.

12     Q.   And how many sergeants were on duty when you got

13  to the precinct?

14     A.   I don't recall.

15     Q.   Now, when you filled out the details of the

16  arrest, this wasn't as a result of your conversations with

17  the complainant, was it?

18     A.   Yes, I interviewed her first.

19     Q.   Oh, you interviewed her as well -- you interviewed

20  her before Detective Schulman did?

21                MS. JOHNSON:  Objection to this line of

22            questioning, your Honor.

23                THE COURT:  No, I'll allow it.

24     A.   I interviewed her after I made the arrest.

25     Q.   You interviewed her after you made the arrest?

                                                          ws

1    A.    I interviewed -- because it was an open 61.

2    Q.    Do you know whether Detective Schulman had

3    interviewed her?

4    A.    I don't recall.

5    Q.    Isn't it a fact, Officer Alfaro, that Detective

6    Schulman interviewed the complainant and you, in order to

7    get credit for the arrest, basically filled out this online

8    booking sheet to recite what Schulman told you?

9    A.    Can you rephrase the question?

10   Q.    Isn't it a fact that it was Schulman who

11   interviewed the complainant and that the information on this

12   online booking sheet was not your -- the product of your

13   interviewing the complainant, but what Schulman told you?

14   A.    No.

15              MS. JOHNSON:  Your Honor, counsel was

16        provided copies.

17              Can we give that back to the officer?

18              MR. SCHECHTER:  Yes, when I'm finished with

19        it.

20   Q.    Now, she told you that Mr. Gopaul punched her in

21   the face?

22              MS. JOHNSON:  Objection.  Your Honor, this is

23        totally outside the scope of the hearing, any

24        conversations with the complainant.

25              MR. SCHECHTER:  Withdraw the question, Judge.

Alfaro - People - cross                    266

1                      I would like to return this to the o officer.

2                      (Shown to witness.)

3          Q.    Now, officer, how long did it take you to process

4     Mr. Gopaul's arrest?

5          A.    I don't recall.

6          Q.    Was it one hour, two hours, three hours?

7                How long was it?

8          A.    I don't recall.

9          Q.    Well, what did you do when you processed

10    Mr. Gopaul's arrest?

11               Tell the Court what you did.

12         A.    When I processed it?

13         Q.    Yeah, what did you do?

14         A.    I processed him, fingerprinted, took his picture.

15         Q.    You fingerprinted him and you took his picture.

16               You took the picture or did a separate officer

17    take the picture?

18         A.    I took the picture.

19         Q.    And after you took the picture, that's just a

20    regular mugshot, it's like a Polaroid, right?

21         A.    It's a -- like a sheet that gets printed out

22    through a printer?

23         Q.    Well, how do you take the picture, with a camera

24    or through a computer?

25         A.    Through a camera.

1        Q.   And what kind of camera was it you took the

2    picture with?

3        A.   Digital.

4        Q.   And that comes through the computer, then?

5        A.   Yes.

6        Q.   And you put some information together with the

7    photograph, is that correct?

8        A.   Yes.

9        Q.   And you took his fingerprints?

10       A.   Yes.

11       Q.   And you filled out some paperwork?

12       A.   Yes.

13       Q.   How many papers did you do, if you can recall?

14            The normal processing?

15       A.   I would have to look at my paperwork.

16       Q.   Well, let's see.

17            You got the online booking sheet?

18       A.   Um-hum.

19       Q.   You don't do 61s?

20       A.   I didn't do the 61.

21       Q.   And you're not a detective so you don't do the

22   DD5?

23       A.   I didn't do the DD5.

24       Q.   You did the vouchers, but that's later, after you

25   recover the material?

1     A.   Yes.

2     Q.   Prior to the search, how long were you at the

3  precinct?

4     A.   Don't recall.

5     Q.   When did you do the search, do you recall that?

6     A.   For the vehicle, it was still daylight.

7     Q.   And when you -- did you take the vehicle into your

8  custody or did you leave it where it was?

9     A.   I left it where it was.

10    Q.   And that was at the precinct, correct?

11    A.   Yes.

12    Q.   Okay.  And how long did it take -- how far is

13  Mr. Gopaul's home from the precinct, if you can recall?

14    A.   About two minutes.

15    Q.   Okay.  Now, you say you arrested Mr. Gopaul at

16  4:45 a.m., is that correct?

17    A.   Yes.

18    Q.   Then the next log entry you have is 2124,

19  returning the Ecolab to a representative, I suppose, of

20  Ecolab company, would that be correct?

21    A.   Yes.

22    Q.   Please tell the Court what you did for

23  approximately 12 hours, or more?

24    A.   Waited for the Ecolab guys to come, waited for the

25  riding ADAs to come down to the precinct.

Alfaro - People - cross          269

1        Q.   Now, hold on.

2             Who was -- is that for a statement to be taken of

3    Mr. Gopaul?

4        A.   I don't recall.

5        Q.   Well, what was the purpose of waiting for the DAs

6    to come to the precinct?

7        A.   Because it was a sensitive case.

8        Q.   Detective Schulman was there with Mr. Gopaul at

9    that point, was he not?

10       A.   Yes.

11       Q.   Well, what was the need for you to be there

12   waiting for the DAs if Detective Schulman was there?

13       A.   Because I was still the arresting officer.

14       Q.   Detective Schulman had Mr. Gopaul in his custody,

15   did he not?

16       A.   Yes, but he's still my prisoner.

17       Q.   Oh, so he's your prisoner.

18            So, in other words, what you're saying --

19       A.   I'm still responsible.

20       Q.   So from 4:45 a.m. until 9 o'clock at night the

21   following night, the 25th, that would be, let's see, that's

22   19 hours.

23            So what you're saying is you were with Mr. Gopaul

24   for 19 hours, is that correct?

25       A.   Just outside the interview room in the detective

1    squad.

2        Q.   So you were sitting there for three tours, over

3    two tours?

4        A.   Yes.

5        Q.   And you received overtime for two tours, is that

6    correct?

7        A.   Yes.

8                  MS. JOHNSON:   Objection.

9                  THE COURT:   All right, overruled.

10       A.   Yes.

11       Q.   Now, what if I told you that the statements

12   obtained from Mr. Gopaul finished about a quarter to 9.

13              What were you doing from a quarter to 9 to 2124?

14                  MS. JOHNSON:   Objection.

15                  THE COURT:   Yeah, I'm just -- I'm going to

16          sustain it as to form.

17                  Could you just be a little bit clearer?

18                  MR. SCHECHTER:   Withdrawn.

19       Q.   Is it your obligation to stay with the prisoner

20   all the time until he is lodged?

21       A.   Yes.

22       Q.   Were you in the room at the time of the

23   interrogation?

24       A.   No.

25       Q.   Why?

                                                          ws

1      A.   Because I was asked to step outside.

2      Q.   Why, it was your prisoner?

3      A.   Because --

4           MS. JOHNSON:  Objection.

5           Which interrogation are we talking about.

6           THE COURT:  Well --

7      Q.   The video statement?

8      A.   The ADAs asked me to stay outside while they did

9  the videotaping.

10     Q.   Did you transfer custody back to

11 Detective Schulman?

12     A.   Yes.  But I was still in the squad at the time.

13     Q.   What time, can you recall, did you receive the

14 call from the sergeant telling you that he wanted you to

15 take an arrest?

16     A.   I don't recall.

17     Q.   Was it during your radio motor patrol?

18     A.   Yes.

19     Q.   At any time were you present during any

20 interrogation of Mr. Gopaul?

21     A.   No.

22          MR. SCHECHTER:  No more questions of the

23     witness, Judge.

24          THE COURT:  Anything, Ms. Johnson?

25          MS. JOHNSON:  Just quickly.

                                              ws

1    REDIRECT EXAMINATION

2    BY MS. JOHNSON:

3         Q.   Officer Alfaro, did you have opportunity to

4    observe the defendant after he was interviewed by

5    Detective Schulman?

6         A.   Yes.

7         Q.   Did you observe any injuries on his body?

8         A.   No.

9         Q.   Did he complain of any injuries?

10        A.   No.

11        Q.   Did he ask for -- to receive any medical

12   attention?

13        A.   No.

14             MS. JOHNSON:   Nothing else, Judge.

15   RECROSS-EXAMINATION

16   BY MR. SCHECHTER:

17        Q.   Did you examine the defendant's arms and legs?

18        A.   No.

19        Q.   Did you examine his abdomen?

20        A.   No.

21             MR. SCHECHTER:   Thank you.

22             THE COURT:   Okay, thank you very much.

23             Step down.

24             (Witness excused.)

25             THE COURT:   People, you rest?

ws

Proceedings                273

1          MS. JOHNSON:  I rest.

2          Can I just officially excuse her?

3          THE COURT:  Yes.

4          While you're doing that --

5          MS. JOHNSON:  Make a call?

6          THE COURT:  Yeah, make a call and tell her to

7     expect to see her next week early.

8          MR. SCHECHTER:  Your Honor, I'm respectfully

9     asking the Court to direct the witness to be available

10    for trial so that we don't have a repeat of today where

11    she ignored this Court's -- the DA's subpoena.

12         MS. JOHNSON:  Your Honor, I had a

13    conversation with Officer Alfaro about what occurred

14    today.

15         I think it's important that she addresses

16    your Honor as to what it is that happened because she

17    did speak with her command and they advised her to go

18    to traffic court.

19         So I don't want to be in a position where the

20    officer is leaving the witness stand shirking the Court

21    and any impression that she wasn't abiding by any

22    subpoenas.

23         THE COURT:  Just bring her in, please.

24         (Witness enters the courtroom.)

25         THE COURT:  Officer Alfaro, just have a seat

                                                        ws

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 276 of 440 PageID #: 626

1    here for a moment.

2              I understand -- and I don't know whether

3    there's some miscommunication with your presence being

4    here, I understand from the People that they subpoenaed

5    you last week to be here today.

6              I expect a subpoena to be sent out sometime

7    in the next couple of days.

8              I'm assuming you're going to be calling

9    Officer Alfaro for the trial.

10             MS. JOHNSON:  That is correct, your Honor.

11             THE COURT:  So obviously I would direct you

12   to be here for any subpoena in the future with respect

13   to this case.

14             If there's any question whatsoever about what

15   takes priority, as far as this case is concerned, I

16   would ask you to call the assistant.

17             And if there's any question, Ms. Johnson, or

18   any confusion --

19             MS. JOHNSON:  Of course, Judge.

20             THE COURT:  -- please speak to my chambers,

21   but as far as I'm concerned, just by way of example, a

22   Criminal Court case, County Court case, is going to

23   take precedence over any traffic court matter.

24             I understand you may have been directed by

25   your command to go to traffic court.  Why they would

ws

Proceedings                                275

1      think that that is more important or takes precedence
2      over a County Court felony case, escapes me, but if
3      there's any question or any doubt in your mind about
4      where you should be, I would expect you to be here next
5      week.
6                  THE WITNESS:  Yes.  I do apologize for taking
7      up the Court's time on that.
8                  THE COURT:  Okay, we'll see you here next
9      week.
10                 THE WITNESS:  I'm not going to be needed for
11     tomorrow?
12                 THE COURT:  No.
13                 MS. JOHNSON:  And the officer has my personal
14     cell phone number.
15                 THE WITNESS:  Yes.
16                 MS. JOHNSON:  So if there's any problems
17     obviously she knows where to contact me.
18                 THE COURT:  See you next week.
19                 COURT OFFICER:  She can go, right?
20                 MS. JOHNSON:  Yes.
21                 (Witness excused.)
22                 THE COURT:  People, I think you said you're
23     resting?
24                 MS. JOHNSON:  We do, your Honor.
25                 THE COURT:  Mr. Schechter?

                                                        ws

Gopaul - Defendant - direct          276

1           MR. SCHECHTER:  I call the defendant.

2           THE COURT:  All right, Mr. Gopaul, if you

3       would, please, step forward?

4    H A R O L D   G O P A U L, Defendant, having been first duly

5       sworn by the clerk of the Court, was examined and

6       testified under oath as follows:

7           COURT OFFICER:  Take a seat.

8    DIRECT EXAMINATION

9    BY MR. SCHECHTER:

10      Q.   Mr. Gopaul --

11          COURT OFFICER:  Hold on.

12          For the record, state your name, spell your

13      last name?

14          THE WITNESS:  Harold Gopaul, G-o-p-a-u-l.

15          MR. SCHECHTER:  May I proceed?

16          THE COURT:  Yes.

17      Q.   Mr. Gopaul, how old are you?

18      A.   Now, I'm 51.

19      Q.   Fifty-one years of age?

20      A.   Yes.

21      Q.   On June 24th, by whom are you employed?

22      A.   Ecolab Pest Elimination.

23      Q.   Ecolab?

24      A.   Pest Elimination.

25      Q.   And what was your position with Ecolab pest

                                                    ws

Gopaul - Defendant - direct          277

1    extermination?

2         A.    Service specialist.

3         Q.    Now, were you given a vehicle as part of your

4    duties?

5         A.    Yes.

6         Q.    And were you the principal occupant and driver of

7    that vehicle?

8         A.    Yes.

9         Q.    Anyone have permission to drive that vehicle but

10   you?

11        A.    No.

12        Q.    Now, did you suffer any injuries to your person

13   prior to June 24th, 2008?

14        A.    No.

15        Q.    Did you have any operations prior to June 24th,

16   2008?

17        A.    Yes, I did.

18        Q.    And where was that operation?

19        A.    I had a hernia on my naval, on my belly button, a

20   few years ago.

21        Q.    How many years ago, if you recall?

22        A.    Give or take, could be four years.

23        Q.    Do you suffer any lingering discomfort from that

24   operation?

25        A.    Off and on, I have pains in my belly.

ws

Gopaul - Defendant - direct        278

1      Q.    Now, on June 24th, when for the last time --
2    withdrawn.
3            When for the last time prior to June 24th had you
4    had anything to eat?
5      A.    Sunday before at 9 p.m.
6      Q.    Now, Sunday would be what, June 2 --
7      A.    22nd.
8      Q.    And why was that?
9      A.    Because I don't eat too late.  We went to a fair
10   and we came back.  I had some work done in the yard and then
11   I had dinner and we went to bed.
12     Q.    Why wasn't it you hadn't had anything to eat
13   between Sunday June 22nd and June 24?
14     A.    The reason why, I don't really eat outside.  If I
15   do buy food outside I take it home to the family.  At that
16   point in time I was working all day Monday straight through
17   Tuesday morning and I don't eat meat, I don't drink alcohol,
18   so the reason why I don't eat outside, because of the meat.
19     Q.    When you came home from work on the evening of
20   June 24th, was it, what, if anything, did you observe?
21     A.    Well, I --
22     Q.    You can answer the question.
23     A.    My regular duties as a parent, I check for my
24   kids, check for my wife, make sure everybody is in bed, I
25   cover them if it's cold, I put a fan on, I'll take it off.

Gopaul - Defendant - direct          279

1       Q.   Did you notice if anyone was missing?

2       A.   Sana Awan was missing.

3       Q.   Approximately what time was that?

4       A.   Around a quarter to 2 in the morning.

5       Q.   Where, if at all, did you go?

6       A.   I told my wife -- we look in the garage, we looked

7   downstairs in the basement, we looked up in the attic to see

8   if she was there.

9            And then I noticed that the back door was unlocked

10  so I told my wife, apparently Sana ran away.

11      Q.   So where did you go?

12      A.   I decided to go to the police to make a report.

13      Q.   How far away is the precinct from your house?

14      A.   A little more than a quarter mile.

15      Q.   And how did you get there?

16      A.   I drove the service vehicle that I had.

17      Q.   And approximately what time did you get to the

18  precinct?

19      A.   About 2:30.

20      Q.   And when you got to the precinct where did you go?

21      A.   I stood by the door and one officer asked me, "Can

22  I help you?"

23      Q.   Describe the officer?

24      A.   Tall, male, big in size.

25      Q.   About how much taller -- was he taller than you?

Gopaul - Defendant - direct          280

1      A.   Yes.

2      Q.   How much taller than you?

3      A.   I would say about probably six to eight inches

4   taller than me, give or take.

5      Q.   And how much did he weigh, approximately?

6      A.   Over 200 pounds.

7      Q.   And what, if anything, occurred between you and

8   the officer?

9      A.   He came up to me and asked me, he said, "Can I

10  help you?"

11          And I said, "I came to report my daughter is

12  missing."

13          And he asked my name and address.  He asked me

14  where -- I told him where I lived and my name and address

15  and he asked me why am I looking for my daughter.

16          I say, "I don't know.  I just came home and I went

17  looking for my kids in the bed and she was missing, so I

18  decide to come and make a report."

19          About -- at that time there were a few officers

20  there, give or take, nine or ten of them, they just came

21  around where I was standing close to me and they all stood

22  by me there.

23      Q.   Could you please describe some of the officers?

24      A.   They had a lot of white guys, they had a black guy

25  and a -- I don't know what race they was.  I know the white

                                                    ws

Gopaul - Defendant - direct          281

1   skin and black guy.

2        Q.   What, if anything, occurred at that time that they

3   surrounded you?

4        A.   After they asked me the questions, the officer who

5   asked me the question, he grabbed me by my hand and slammed

6   me to the wall next to the front door.

7        Q.   Please describe how he did that?

8             Describe to the Court how that happened?

9        A.   Should I stand up or --

10            MR. SCHECHTER:  May he demonstrate, Judge?

11            THE COURT:  Yeah, go ahead.

12       A.   This is the front door here.  The officer was

13   standing here.  The rest of the officers was around him,

14   close to me, and they were like moving closer.

15            When I finished answering the question he hold me

16   by my hand and slammed me into the wall like this and put my

17   hand behind my back.

18       Q.   Go ahead.

19       A.   And then he -- the cop said, "Put the cuff on

20   him," and then one of the guy put the cuff on.

21            While they were putting the cuff on me they

22   arrested me, they were pulling me, they ws spreading my legs

23   as far as they can go.  They were scratching and squeezing

24   and tugging.

25       Q.   Where did they scratch you?

ws

1       A.   On my legs and on my hand.

2       Q.   In what position did you wind up?

3       A.   Well, after that they took me by my hand, with my

4   hand up in the hair, I was like this (indicating).

5       Q.   Indicating the arms displayed to the rear up in

6   the air in reverse fashion?

7       A.   Then they took me to the front of the counter and

8   they slammed me into the counter with -- I don't know how

9   many of them was pulling and tugging on me, the same thing

10  they did at the front door.

11           And then they put a hand on my neck and was

12  squeezing me on the counter.

13           I said, "Can I make a phone call to my wife?  Can

14  I tell her what's happening."

15           They said, "No fucking phone call for you," and

16  they started using a lot of nasty languages, MF.  They were

17  using a lot of languages.  No phone call.

18           While they were squeezing and pushing they went

19  into my pockets and took everything I had on my body.

20      Q.   Do you recall if any of those officers were

21  wearing sergeant stripes?

22      A.   In the midst of all this incident I didn't have

23  time to even look around.  They didn't want me to raise my

24  head.

25      Q.   Now, I would like to show you -- withdrawn.

ws

Gopaul - Defendant - direct          283

1          Did there come a time after you were finally
2     released -- withdrawn.  I withdraw that question.
3          Did there come a time when you -- another officer
4     came to see you?
5          A.   Yeah, a few minutes after a gentleman came and he
6     introduced himself to me as Detective Shulman.
7          Q.   And is that the same Detective Shulman who
8     testified here today?
9          A.   Yes.
10         Q.   And what, if anything, did Detective Shulman do?
11         A.   He took me by my hand and he took me upstairs and
12    while he was taking me upstairs he keep pushing me up the
13    stairs.  I almost fell like three times.
14         Q.   Where was your hands?
15         A.   Handcuffed behind my back.
16         Q.   And did you fall?
17         A.   No.
18         Q.   And where did he bring you?
19         A.   He bring me to a room that they call the box.
20         Q.   Did you see those photographs that we put in
21    evidence before?
22         A.   Yes.
23         Q.   Was that the room that he took you to?
24         A.   That's the room.
25         Q.   And where did he put himself relative to you?

                                                      ws

Case 1:15-cv-01782-NGG   Document 8-11   Filed 08/31/15   Page 286 of 440 PageID #: 636

1          A.    Sitting on a chair with -- when he took me to the
2     room he slammed me to the wall.
3          Q.    How did he slam you to the wall?
4          A.    He hold me by my shirt and push me to the wall.
5          Q.    Show the Judge how he grabbed you by your shirt?
6                THE WITNESS:   May I stand up again?
7                THE COURT:   Yes.
8          Q.    As if Shulman were in front of you, show him how
9     he grabbed your shirt.
10               Show the Court please?
11         A.    He grabbed me like this and pushed me into it
12    wall.  Then he pulled me back up and pushed me onto the
13    chair.
14               MR. SCHECHTER:   Indicating both hands on the
15          sides of the collar pushing front, pulling back.
16         A.    Yes.
17         Q.    And then what did he -- did he say anything after
18    he did that?
19         A.    No, he took the handcuff off and he left.  He left
20    the room, he shut the door.
21         Q.    And how long did he leave you there like that?
22         A.    A couple -- a few minutes, about 15, 20, minutes I
23    average.  I didn't have anything on me to see the time.
24         Q.    Would it be fair say this all occurred -- the time
25    you came to the precinct to the time Detective Shulman got

                                                              ws

1    you, how much time elapsed, if you recall?

2        A.   Until he got me, about 20 minutes.

3        Q.   So it would be about between 2:30 and 3 o'clock,

4    would that be fair to say?

5        A.   Yes.

6        Q.   In the morning?

7        A.   Yes.

8        Q.   And how long did he leave you in the room before

9    he came back?

10       A.   Give or take, about ten or 15 minutes.  I don't

11   recall the time.

12       Q.   And when he came back what, if anything, did he

13   say to you?

14       A.   He asked me if I know why I'm here.

15            I say, "Yes I came to make a report, my daughter

16   is missing."

17            He said, "Is there anything else you want to tell

18   me?"

19            I said, "No, there's nothing I want to tell you.

20   I just came to report that she's missing."

21       Q.   Did he advise you of his rights -- your rights at

22   that time?

23       A.   No.

24       Q.   So what happened then?

25       A.   He left the room and he came back with some papers

Gopaul - Defendant - direct        286

1    in his hands.

2         Q.   And were those the papers that you observed your

3    signature on?

4         A.   No, it's some papers that had statement that he

5    told me that my step daughter made, accusation against me.

6         Q.   Did he show you the papers?

7         A.   No, he read it for me.

8         Q.   What did he say to you?

9         A.   She -- he read some of it and he said that my

10   daughter accused me of sexual harassment.

11        Q.   And what did you say to him?

12        A.   I said, "Well, this is not true."

13        Q.   What happened then?

14        A.   He said -- well, he started to read some more.  He

15   said, "Anything happen at the fair, morning of the fair?"

16             I said, "No, the only thing happened at the fair,

17   we had an argument."

18             Then he said, "Is there anything you want to tell

19   me?"

20             I said, "No, I don't want to tell you anything

21   else.  I just want to make a report that my daughter is

22   missing."

23             But he keep nagging me and cursing at me and then

24   he picked me up again.  He said, "I put away people for 20

25   years.  I'm going to put you away for a longer time if you

Gopaul - Defendant - direct          287

1    don't tell me what's going on."

2        Q.   Did you ask for anything at that point?

3        A.   I asked to make a phone call to my wife again.

4             They said, "No fucking phone call for you," again.

5             I said, "Can I speak to a lawyer?"

6             He say, "You're not going to get no lawyer.  At

7    this time you're not going to get no lawyer."

8        Q.   What happened then?

9        A.   He left the room and he came back.

10       Q.   And when he came back what, if anything, occurred?

11       A.   He sit and he was talking again and asking me

12   question on what my daughter was -- the statement she was

13   making.  And he asked me again, "You want to tell me what

14   happened?"

15            And I gave him the story about the fair, what

16   happened at the fair.

17       Q.   Did there come a time when he asked you to sign a

18   waiver of rights?

19       A.   When he finished talking about the fair he went

20   back outside and he bring this other piece of paper with

21   him.

22       Q.   And what was that paper?

23       A.   He said it was a memorandum or some paper he

24   mentioned to me.

25       Q.   Did you read the paper?

ws

Gopaul - Defendant - direct        288

1        A.    He read the paper.

2        Q.    And after he read it what did you do, if anything?

3        A.    He put yes on the side of it and he told me to

4    initial on the side of it.  I didn't answer any of the

5    question.

6              I asked him for a lawyer at the time again and he

7    said, "You're not going to get no lawyer."

8        Q.    When -- now, who wrote down the word yes?

9        A.    He did, the officer did.

10       Q.    And was that written before you were asked

11   questions or after?

12       A.    It came in the room with yes on the side of it, on

13   the side of question.

14       Q.    And what did you do?

15       A.    Well, he made me initial them.  He force -- he

16   started to use threats at me and made me initial them.

17       Q.    Did he make any threats or promises at that time?

18       A.    At that time, no.

19       Q.    All right.  Did you sign that paper?

20       A.    Yes, I did.

21       Q.    Did you sign that paper voluntarily?

22       A.    No.

23       Q.    What happened after that?

24       A.    He took the paper outside and he came back with a

25   notepad and a pen.

ws

1       Q.    How long did that transpire?

2       A.    I would say about ten minutes again.

3       Q.    And did you then -- what, if anything, did you do?

4       A.    He asked me to write a statement on what happened

5    at the fair, so I did write a statement on what happened at

6    the fair.

7       Q.    And was that a true account of what happened at

8    the fair?

9       A.    Yes.

10      Q.    And after you wrote that account what, if

11   anything, did he do?

12      A.    He took the statement outside and then he came

13   back again.  He left the pen and the pad with me.  He took

14   the statement out and he came back.  About ten or 15 minutes

15   after he came back.

16      Q.    What transpired then?

17      A.    He asked me -- he told me what my daughter said.

18   He told me -- he read from a paper that what she said and he

19   asked me if I'm going to have to sign a confession paper on

20   what she said.

21            I said, "Why are you doing this to me?"  I said

22   can I have a lawyer?"

23            He said, "No, you're not going to have no lawyer."

24   He said, "I'm going to put you away for a long time," using

25   bad words.

ws

Gopaul - Defendant - direct          290

1          So he picked me up on the chair and he pushed me

2     from the chair -- I was facing the door, on the back wall,

3     and he said, "You're going to sign a confession for me."

4          So I -- he said, "If you sign this confession I'm

5     going to take this paper down to my supervisor.  He's going

6     to read it.  At the end of the paper you're going to put,

7     'I'm sorry and I made a mistake and I'm sorry,' and the

8     supervisor is going to read the paper, going to feel sorry

9     and say, 'This man need help,' and send me home."

10     Q.     Did he discuss with you what your daughter told

11    him?

12     A.     Yes.

13     Q.     How long did that discussion take, please?

14     A.     Almost 20 minutes.

15     Q.     And did you sign that paper?

16     A.     The paper --

17     Q.     Did you sign another paper?

18     A.     Yes, I did sign another paper.

19     Q.     And was that the second confession that we

20    observed in court earlier today?

21     A.     Yes.

22     Q.     And did that include a description of a vibrator?

23     A.     Yes.

24     Q.     Who drew the picture?

25     A.     He drew the picture.

ws

1       Q.   And what did he say, if anything, at the time he
2   drew the picture?
3       A.   He told me that my daughter accused me of using a
4   vibrator on her and she described some -- he said she
5   described a vibrator to him and that's the one he draw on
6   the paper.
7       Q.   And what did you say with respect to the vibrator?
8       A.   I said this is no description of the vibrator that
9   I have or massager.  I use a massager, a folding massager.
10      Q.   Now, after that, what happened?
11      A.   He took the paper outside and then he came back
12  and he had me sign a confession that I touched my daughter.
13      Q.   And how long after -- how long did it take from
14  the time he left until the time he came back?
15      A.   Well, every time he go it's like 20 minutes, 15,
16  20 minutes, ten, give or take.  I didn't have a watch with
17  me.
18      Q.   And what is the next thing that happened, if
19  anything?
20      A.   He made me sign a paper, write with my own
21  handwriting, this confession that I touched my daughter.
22      Q.   And after you signed that confession what happened
23  then?
24      A.   I signed it.  He said he going to take it to his
25  supervisor and I'm going to soon be going home.

                                                    ws

Gopaul - Defendant - direct          292

1          I asked him for a lawyer again, I asked him for my

2    phone call to my wife, and he said no.

3          Q.   All right, and then what happened?

4          A.   He took the paper outside and he never came back

5    for a long time after.

6          Q.   How long?

7          A.   A long while.  I --

8          Q.   More than an hour?

9          A.   It could be.

10         Q.   More than two hours?

11         A.   I don't know.  It could be hour and a half or two

12   hour.  I don't know.

13         Q.   Did he tell you anything before he left?

14         A.   No.

15         Q.   Did he come back?

16         A.   He came back awhile, long while after.

17         Q.   And then what did he say, if anything?

18         A.   He said just, "Before you go home I want you to do

19   one thing for me.  The same statement you gave on the paper,

20   I want you to give testimony on video camera."  He said,

21   "The Assistant District Attorney is going to come in here

22   and they're going to do a video camera on you."

23         Q.   And did you ask him when?

24         A.   No.

25         Q.   All right, after he came and told you the

Gopaul - Defendant - direct          293

1   District Attorney is going to come and take a statement from
2   you, what happened?
3          A.   I asked him for a lawyer again.
4          Q.   And what happened then?
5          A.   He said, "If you get a lawyer now then we start
6   all over again.  You're not going to go home.  You're not
7   going to go home."  He said, "So you're not going to get no
8   lawyer."  He said, "When you come in, look at the camera.
9   Look at the people who asked the question.  Just try to be
10  calm and answer questions."
11         Q.   Did there come a time when the District Attorneys
12  did come to the precinct?
13         A.   Yeah, they came a long time after, very long time.
14         Q.   Incidentally, you saw Officer Alfaro in this
15  courtroom about ten minutes ago?
16         A.   Yes.
17         Q.   And she testified that she took you from the room
18  downstairs.
19              Is that true?
20         A.   No.
21         Q.   Tell the Court what happened?
22         A.   Ms. Alfaro came in.  I don't know what time it
23  was, but it was a long time after the videotape.  It was a
24  long time upstairs.  She came and she came with
25  Detective Shulman and he introduced her to me and then he

1    give me a lecture about I'm a horrible person and a lot of

2    nasty things he was saying to me in front of her.

3            And he said, "She's going to take you downstairs

4    and process you and then you're going to go to the court in

5    Queens."

6        Q.   Now, there came a time after you made -- we saw

7    the video statement you made in court?

8        A.   Yes.

9        Q.   Now, on that video statement you were read your

10   rights on camera, is that correct?

11       A.   Yes.

12       Q.   You were also read the paper on camera and signed

13   it on camera, is that correct?

14       A.   Yes.

15       Q.   Was that done freely or voluntarily?

16       A.   At that point in time it was, but I was prompt by

17   Mr. Shulman to do the same thing I did in the room.

18       Q.   Well, did he say anything prior to you signing

19   that confession or signing the waiver of rights?

20       A.   In the room.

21       Q.   What did he say?

22       A.   He said, "The same paper you sign in here is the

23   same question they're going to ask you outside.  You do the

24   same thing and give up that right."

25       Q.   Did he promise you anything if you signed that

ws

Gopaul - Defendant - direct          295

1    waiver?

2         A.   With the District Attorney he said they're going

3    to go and talk to the supervisors downstairs and I'm going

4    to be going home.  He said that's the last thing he wanted

5    me to do before I go home.

6         Q.   So prior to your waiving your rights

7    Detective Shulman promised you that if you signed that

8    waiver and made statements to the District Attorney you

9    would be leaving and going home, is that correct?

10        A.   Yes.

11        Q.   Okay.  Now, there came a time when you were

12   brought -- let me ask you this.

13             When for the last time did you get any sleep prior

14   to making any statements to Detective Shulman?

15        A.   Sunday night.

16        Q.   So how long have you been awake at the time that

17   you went to the precinct?

18        A.   Well, I left my house on Monday day around 6

19   o'clock in the morning and I didn't go home until just

20   before 2 o'clock Tuesday morning.

21        Q.   So Tuesday morning at 2 o'clock you went home, but

22   did you sleep at the time you went home?

23        A.   No.

24        Q.   And then you went to the precinct?

25        A.   I did not sleep there either.

Gopaul - Defendant - direct          296

1        Q.   So you had not slept from Sunday at 6 o'clock

2    through the time the statements were taken by the

3    District Attorney, would that be fair to say?

4        A.   Yes, no sleep.

5        Q.   Were you offered anything to eat or drink by

6    either Detective Shulman or the District Attorney?

7        A.   I was offered something to drink in the evening of

8    when the District Attorney came.  They give me a bottle of

9    water.

10       Q.   And prior to that District Attorney giving you a

11   bottle of water, which was over ten hours or 12 hours from

12   the time you went to the precinct, did you have anything to

13   eat?

14       A.   No.

15       Q.   Or drink?

16       A.   No.

17       Q.   Now, Detective Shulman testified that he gave you

18   an opportunity to go to the bathroom.

19            Is that true?

20       A.   Yes.

21       Q.   When did that occur?

22       A.   Sometime in the day.  I was in the room.  I don't

23   know if it's daylight or night, so I would say it was that

24   day.

25       Q.   Aside from going to the bathroom did you have

                                                        ws

Gopaul - Defendant - direct          297

1   anything to eat or drink or did you get any sleep for over

2   15 hours?

3        A.   No.

4        Q.   Now, there came a time when you were -- when you

5   went to court, is that correct?

6        A.   Yes.

7        Q.   And there was a time when bail was set?

8             MS. JOHNSON:  Objection.

9             THE COURT:  I'll allow it.

10       Q.   And bail was set for you, correct?

11       A.   Yes.

12       Q.   And there came a time when you made bail and you

13   left the court?

14       A.   No, I didn't make bail.

15       Q.   Well, there came a time sometime afterwards that

16   you were released from court after bail was made for you, is

17   that correct?

18       A.   I made bail from the jail.

19       Q.   From the jail, okay.

20            Do you remember when that was?

21       A.   I think it was Thursday the 27th.

22       Q.   Thursday?

23       A.   Yeah.

24       Q.   And after left jail where did you go?

25       A.   I came to your office.

Gopaul - Defendant - direct          298

1     Q.    And after my office where did you go?

2     A.    To the hospital.

3     Q.    Which hospital did you go to?

4     A.    Long Island Jewish hospital.

5     Q.    And when you went to the hospital what, if

6     anything, did you say?

7     A.    I went to the emergency and I told them that --

8     what happened to me and I needed to get a physical check.

9     Q.    And while you were at the hospital were any

10    pictures taken of you?

11    A.    Yes.

12    Q.    And who took those pictures?

13    A.    My niece.

14    Q.    What's her name?

15    A.    Roxanne Seunarine, S-e-u-n-a-r-i-n-e.

16              MS. JOHNSON:  Your Honor, if counsel is

17        planning on showing pictures now, we haven't been privy

18        to anything and it was part of a reciprocal demand

19        months ago.

20              MR. SCHECHTER:  I did not have an opportunity

21        to give these pictures.

22              I also did not know until now that I would

23        either be using them or not using them, but they are

24        pictures of the injuries that my client has, in fact,

25        sustained.

ws

Gopaul - Defendant - direct          299

1              THE COURT:  Okay, Mr. -- I have no problem
2       with you using the pictures.
3              I just have one question.
4              Did you ask him if he went to a hospital
5       after leaving your office?
6              MR. SCHECHTER:  Yes.
7              THE COURT:  And the answer was?
8              THE WITNESS:  Yes.
9              MR. SCHECHTER:  Yes, Long Island Jewish
10      Hospital.
11      Q.   Now, I would like to show you a series of
12      photographs.
13             MR. SCHECHTER:  I believe this is -- would be
14      Defendant's G for identification.
15             Is that what we're up to?
16             THE COURT:  Defendant's G.
17             MR. SCHECHTER:  G,H,I,J.
18             (Defendant's Exhibits G, H,I and J so marked
19      for identification.)
20      Q.   Mr. Gopaul, I show you Defendant's G,H,I and J for
21      identification.
22             Do you recognize those photographs?
23             (Shown to witness.)
24      A.   Yes.
25      Q.   Except for the fact that some of the wounds are

                                                        ws

Gopaul - Defendant - direct          300

1    clotted, do those photographs fairly and accurately reflect

2    how you appeared upon leaving the police precinct on

3    June 24th, 2008 -- 2008?

4        A.   Yes.

5        Q.   And --

6                   MR. SHECHTER:  I ask that those be marked

7          into evidence as Defendant's G, H,I and J?

8                   THE COURT:  Ms. Johnson?

9    VOIR DIRE EXAMINATION

10   BY MS. JOHNSON:

11       Q.   Mr. Gopaul, who took those photos?

12                  MR. SCHECHTER:  Is this voir dire?

13                  MS. JOHNSON:  I'm sorry, if I may, Judge?

14                  THE COURT:  Yes.

15       Q.   Who took those photos?

16       A.   My niece.

17       Q.   Where?

18       A.   In Long Island Jewish Hospital.

19       Q.   What date?

20       A.   The night of the 27th, Thursday.

21       Q.   June 27th, 2008?

22       A.   Yeah, going into the morning time.  I didn't check

23   the time.

24                  MS. JOHNSON:  I have no objection.

25                  THE COURT:  Okay, so without objection

Gopaul - Defendant - direct          301

1    they'll be received in evidence.

2                 (Defendant's Exhibits G,H,I and J received in

3         evidence.)

4                 MR. SCHECHTER:  For the record, your Honor, I

5         will try to obtain duplicate copies of those for

6         counsel.  If I can't, I'll make photocopies for her.

7                 THE COURT:  Okay.

8                 MS. JOHNSON:  Thanks.

9    DIRECT EXAMINATION CONT'D

10   BY MR. SCHECHTER:

11        Q.   All right, now, Mr. Gopaul, I direct your

12   attention to those photographs.

13                 Could you please look at them?

14                 (Shown to witness.)

15        Q.   Now, the first photograph that you're looking at,

16   that's Defendant's G, what is that a photograph of?

17        A.   Photo of my leg.

18        Q.   And do you recall when you received those -- the

19   injury?

20        A.   The morning of the arrest.  The morning of

21   Tuesday, the 24th.

22        Q.   And how did you receive that injury?

23        A.   With the police officers pulling at me and

24   scratching.

25        Q.   All right, thank you.

                                                      ws

Gopaul - Defendant - direct          302

1              I direct your attention to Exhibit H.

2              What is that?

3         A.   L.

4         Q.   Make sure that you looked at the right photo.

5    Look at the back.

6                   COURT OFFICER:  The last one was J.

7                   MR. SCHECHTER:  I apologize.  Make that

8         Exhibit J, the scratch on the leg.  I stand corrected.

9         Q.   Mr. Gopaul, please look on the back of the photo

10   for the exhibit?

11        A.   All right, this is H.

12        Q.   What exhibit are you looking at now?

13        A.   H.

14        Q.   What does Exhibit H show?

15        A.   This is my belly.

16        Q.   And what is it a picture of?

17        A.   The surgery that I had a few years ago.

18        Q.   And what, if anything, happened at the precinct

19   with respect to that area?

20        A.   I had a lot of pain on my abdomen at that time.

21        Q.   What was that pain from?

22        A.   From the slamming on the counter.

23        Q.   Okay, thank you.

24        A.   From the police officers.

25        Q.   And what are you looking at now?

Gopaul - Defendant - direct          303

1      A.   I.

2      Q.   I'm sorry?

3      A.   I.

4      Q.   And what is I a picture of?

5      A.   My elbow.

6      Q.   Sorry?

7      A.   My arm.

8      Q.   And do you see any injuries on that photograph?

9      A.   Scratches, yeah.

10     Q.   And what are those scratches from?

11     A.   The police officers.

12     Q.   And how were they incurred?

13     A.   By pulling at me and scratching at me.

14     Q.   And the last photograph, what number is that?

15     A.   G.

16     Q.   All right, what is that a photograph of?

17     A.   It's my abdomen again.

18     Q.   Sorry?

19     A.   My belly.

20     Q.   And that is the same injury that you had described

21   before, the hernia operation?

22     A.   Yes.

23     Q.   And -- what -- when you struck the counter what

24   part of your body came in contact with the counter?

25     A.   Well, my belly hit the counter and then they

ws

1   pushed my head, neck and everything down and they were

2   holding it down on the counter.

3       Q.  Now, you indicated you went to Long Island Jewish

4   Hospital, correct?

5       A.  Yes.

6       Q.  And when you went to Long Island Jewish Hospital

7   what were your complaints?

8       A.  The bruises, the scratches I had and the pain on

9   my neck and my belly.

10      Q.  I show you this document --

11              (Shown to counsel.)

12      Q.  -- from Long Island Jewish Hospital.

13              MR. SCHECHTER: Let the record reflect I am

14      showing it now to the District Attorney.

15              (Shown to counsel.)

16      Q.  Now, Mr. Gopaul, can you identify this document?

17              MR. SCHECHTER:  Please have it marked as, I

18      think it's, K?

19              THE COURT:  We'll mark it.

20              (Defendant's Exhibit K marked for

21      identification.)

22      Q.  Now, Mr. Gopaul, is that the medical record that

23  you obtained from the hospital that you went to for

24  treatment?

25      A.  Yes:

Gopaul - Defendant - cross          305

1              MR. SCHECHTER:  I'll offer that in evidence,

2       your Honor, as Exhibit K.

3              THE COURT:  Ms. Johnson?

4              MS. JOHNSON:  For the hearing, I have no

5       objection.

6              THE COURT:  Marked Defendant's K in evidence.

7              (Defendant's Exhibit K received in evidence.)

8              MR. SCHECHTER:  I have no more questions,

9       Judge.

10             (Shown to Court.)

11             THE COURT:  Just give me a second.

12             (Pause in the proceedings.)

13             THE COURT:  Okay, Ms. Johnson.

14      CROSS-EXAMINATION

15      BY MS. JOHNSON:

16         Q.   Mr. Gopaul, do you read English?

17         A.   Yes.

18         Q.   Do you write English?

19         A.   Yes.

20         Q.   Do you have a high school diploma?

21         A.   Nope.

22         Q.   What's the highest level of school you completed?

23         A.   Elementary, seven standard.  Not here, in my

24      country.

25         Q.   And what country would that be?

                                                              ws

Case 1:15-cv-01782-NGG  Document 8-11  Filed 08/31/15  Page 308 of 440 PageID #: 658

1          A.    Trinidad and Tobago.

2          Q.    When you first walked into the precinct on

3     June 24th, 2008 to report your daughter was missing, was it

4     a police officer that you met with to speak to?

5          A.    Yes.

6          Q.    How many police officers did you end up speaking

7     to while in the entranceway of the 105th Precinct?

8          A.    One.

9          Q.    One?

10         A.    Yes.

11         Q.    Then you tell us that other officers came around?

12         A.    Yes.

13         Q.    How many?

14         A.    Eight or nine.  Could be ten, give or take.

15         Q.    Men and women?

16         A.    No, only men.

17         Q.    Were they in uniform?

18         A.    Yes.

19         Q.    What did they do?

20               Tell us exactly what they did to you?

21         A.    When the officer -- the one officer came up to me

22    and asked me what I came here for and I told him -- I give

23    him my name and address, I give him my step-daughter name

24    and address.

25               Then he took my hand --

Gopaul - Defendant - cross          307

1      Q.   Okay, I'm going to stop you for one second.

2           How did he take your hands?

3      A.   He hold it with his hand.

4      Q.   Your left hand or right?

5      A.   My left hand first and he slammed me into the

6   wall.

7      Q.   How was he grabbing onto your left arm?

8      A.   With his hand.

9      Q.   Tight?

10     A.   Yes.

11     Q.   What was he saying?

12     A.   When he hold me and slam me to the wall, at that

13  time he tell the to guys cuff me.

14     Q.   Before he slammed you to the wall what did he say

15  before he grabbed your arm?

16     A.   Nothing.  He asked me that question and grabbed me

17  and slammed me to the wall.

18     Q.   What were the other officers doing when he grabbed

19  your hand?

20     A.   They were all using words and saying, "Cuff him."

21     Q.   What were the words they were using?

22     A.   They said, "Fucking cuff him.  Cuff him."

23     Q.   What else did they say?

24     A.   They said, "Take him up to the box."

25     Q.   All nine of them were saying that?

Gopaul - Defendant - cross        308

1        A.    Well, I didn't count, you know.

2        Q.    Were you able to see the officers?

3        A.    No, they had my head down.  They don't want me to

4    look around.

5        Q.    How were they holding your head down?

6        A.    Well, I was against the wall, they had me against

7    the wall.

8        Q.    How did they slam you against the wall?

9        A.    They hold my hand and turned me and pushed me into

10   the wall.

11       Q.    How many of them slammed you against the wall?

12       A.    One.   The first time it was one.

13       Q.    And the first time being when you were at the

14   entrance to the 105th Precinct?

15       A.    Yes.

16       Q.    What were the other officers doing while the one

17   officer slammed you to the wall?

18       A.    They start to pull and tug on me.

19       Q.    And how long how were they pulling and tugging on

20   you?

21       A.    They had my hand behind my back, spread my legs,

22   searching my pockets, squeeze my chest, my legs.

23       Q.    All nine of them?

24       A.    Well, as far as -- a lot of hands on me.  I don't

25   know if it was all nine, but all nine of them was around me.

ws

Gopaul - Defendant - cross                309

1        Q.    How many hands did you feel on you?

2        A.    A lot of hands.

3        Q.    More than one?

4        A.    Yes.

5        Q.    More man five?

6        A.    Yes.

7        Q.    How many voices did you hear?

8        A.    There were many voices.  I didn't count the

9   voices, but there was more than one voice.

10        Q.    Where on your body were the hands grabbing you?

11        A.    All over my legs, my hands, my back, my belly.

12        Q.    What about your face?

13        A.    My face was against the wall.

14        Q.    How did your face get against the wall?

15        A.    With the officer slamming me to the wall.

16        Q.    Did your face smack against the wall?

17        A.    No.  When he pushed me, my head was off the wall,

18   but when they start to push me my head went into the wall.

19        Q.    What's the wall made out of?

20              MR. SCHECHTER:  Objection.

21              How does he know?

22              THE COURT:  Presumably, he was there.  Maybe

23        he does know.

24              Do you recall what the wall was made of?

25              THE WITNESS:  It could be sheetrock, it could

ws

Gopaul - Defendant - cross          310

1     be concrete.  I don't know.

2          Q.   Was it padded?

3          A.   I don't know.

4          Q.   You don't know if it was a padded wall?

5          A.   No.

6          Q.   Do you know if it was a concrete wall?

7          A.   Not for sure, no.

8          Q.   Was it hard?

9          A.   It was hard.

10         Q.   What did it feel like when your face slammed

11    against the wall?

12         A.   I don't know, it was with so many people around me

13    I didn't have time to think what wall it was.

14         Q.   How did it feel, though?

15         A.   Well, it feel like a wall.

16         Q.   Did it hurt?

17         A.   Yeah.

18         Q.   What type of pain did you feel?

19         A.   Pain.

20         Q.   Yes.  What type of pain did you feel?

21         A.   I feel pain when they was pulling my legs open.

22         Q.   On your face where did you feel pain?

23         A.   I didn't feel pain on my face.

24         Q.   Your face made contact with the wall, but you

25    didn't feel pain?

                                                    ws

1      A.   They didn't slam my face to the wall, they just

2    slammed me into the wall.  My head was away from the wall at

3    the time.  Then they pushed my face into the wall.

4      Q.   Well, when they pushed your face into the wall

5    what part of your face made contact with the wall?

6      A.   The side of my face.

7      Q.   Which side?

8      A.   The right side.

9      Q.   Which part of the right side, your check?

10     A.   Yeah, the whole side of my face.

11     Q.   And when you say the whole side of the face does

12   that mean your eye also?

13     A.   No.

14     Q.   Your cheek?

15     A.   My cheek.

16     Q.   Your jaw?

17     A.   Well, my jaw is in front, so the side of my face.

18     Q.   The side of your jaw?

19     A.   Yes.

20     Q.   That made contact with the wall as well?

21     A.   Yes.

22     Q.   And the wall was hard?

23     A.   Yes.

24     Q.   And your face was pushed against that hard wall?

25     A.   Yes.

Gopaul - Defendant - cross          312

1      Q.    And what happened once your face was against the

2   wall?

3      A.    They put the handcuff on me.

4      Q.    Who is they?

5      A.    One of the officers put the handcuff on me.

6      Q.    Were the other officers still around you?

7      A.    Yes.

8      Q.    What did they say to you once your face was

9   against the wall?

10     A.    They were using nasty languages.

11     Q.    What were they saying?

12     A.    They were saying, "Cuff the fucking guy," you

13  know, "We're going to take him up.  The chicken came home to

14  roost."

15     Q.    Who said the chicken --

16     A.    One of the officers.

17     Q.    Did you forget that on direct examination?

18     A.    At that time, yeah.

19     Q.    What position were your legs in when your face

20  made contact with the wall?

21     A.    It was spread apart.

22     Q.    Who spread them out?

23     A.    The officers.

24     Q.    How many?

25                MR. SCHECHTER:  Objection, been asked and

ws

1          answered about three times already, Judge.

2                    THE COURT:  Yeah, sustained.

3          Q.   How far were your legs spread open?

4          A.   As far as they can go.

5          Q.   Were you on the ground or were you standing?

6          A.   Standing.

7          Q.   And what part of your legs were being touched?

8          A.   My whole leg.  From my calves, come all the way up

9     to my groins.

10         Q.   Did one of the officers touch your groin?

11         A.   One of them touch.  They were squeezing me.

12         Q.   Where were they squeezing you?

13         A.   All over, my legs, my hands, my belly, my groins,

14    my back.  They were squeezing me.

15         Q.   Were you wearing long sleeves or short sleeves?

16         A.   Long sleeve.

17         Q.   A T-shirt under the long sleeve?

18         A.   No.

19         Q.   You weren't wearing a T-shirt under the long

20    sleeve?

21         A.   No.

22         Q.   Did you have a chance to see the video that was

23    played here?

24         A.   Yes.

25         Q.   You saw that before you came to court today?

Gopaul - Defendant - cross          314

1        A.    Yes.

2        Q.    So that saw that in your attorney's office?

3        A.    Yes.

4        Q.    And it's your testimony you weren't wearing a

5    T-shirt underneath the long-sleeved shirt?

6        A.    No.

7        Q.    Were you wearing pants or shorts?

8        A.    Long pants.

9        Q.    Jeans or pants?

10       A.    Cintas working pants.  The brand-name pants.  It's

11   a working pants.  Blue pants.

12       Q.    Like a uniform pants?

13       A.    Uniform pants.

14       Q.    You drove the Ecolab vehicle to the precinct that

15   day, right?

16       A.    Yes.

17       Q.    No one else had keys to it?

18       A.    No.

19       Q.    No one else was in it to your knowledge?

20       A.    No, that I know.

21       Q.    You hadn't given anybody else a key?

22       A.    No.

23       Q.    You hadn't seen anybody else drive it?

24       A.    No.

25       Q.    After your legs were spread what were the officers

ws

1    doing?

2         A.    They took me by my hand, as I showed before, and

3    they pulled me into the front of the counter on the other

4    side of the building.

5         Q.    Tell us how they took your hands.

6               What did they actually do?

7         A.    They put my hands above my head on my back and my

8    head was like bending to the floor.

9         Q.    Did your head make contact with anything?

10        A.    No, not at that time.

11        Q.    Did your head eventually make contact with

12   something?

13        A.    Yes, when they pushed me into the counter.

14        Q.    When they pushed you into the counter what part of

15   your body made contact with the counter?

16        A.    My belly and my chest and shoulder part and they

17   were pushing me down.

18        Q.    What about your head?

19        A.    My head was on the counter.

20        Q.    How did your head come into contact with the

21   counter?

22        A.    By them pushing me down.

23        Q.    Who is they?

24        A.    The officers.

25        Q.    And when you say that they pushed you into the

                                                              ws

Gopaul - Defendant - cross          316

1    counter, what part of your head did they push into the

2    counter?

3                    MR. SCHECHTER:  Objection, this is ad

4         nauseam.  I think she's gone through this four or five

5         times already.

6                    THE COURT:  Yeah, sustained.

7                    MS. JOHNSON:  Can I see the pictures, Judge?

8                    THE COURT:  Which ones?

9                    MS. JOHNSON:  The ones that are in evidence.

10        I don't think he has them.

11                   THE COURT:  I gave them back to somebody.

12                   MR. SCHECHTER:  Gee, I'm sorry, my bad.

13                   (Shown to counsel.)

14        Q.    Would you agree -- it's your testimony there was

15   more than one officer that slammed your head into the

16   counter?

17        A.    Yes.

18        Q.    I'm going to show you Defendant's Exhibit G.

19                   (Shown to witness.)

20        Q.    Can you show us on Defendant's Exhibit G where

21   your -- where it was that your head made contact with the

22   counter and with the wall in the precinct?

23        A.    When they pushed me down my head turned on the

24   side, the same right side when they pushing my shoulder.

25                   I couldn't keep it down because the counter was

                                                            ws

Gopaul - Defendant - cross          317

1   hard.  I had to turning to the side.

2        Q.   I'm asking you where it was on that picture?

3        A.   On this side.

4        Q.   And can you tell us where the injury is on your

5   face that you sustained as a result of being pushed into the

6   wall?

7        A.   I didn't get injuries on my face.

8        Q.   And you didn't get any injuries on your face when

9   you were slammed into the counter?

10       A.   They didn't slam my head on the counter, they

11  slammed my chest and then they pushed my head down.

12       Q.   I'm going to show you -- did you take a picture of

13  your chest?

14       A.   I didn't take any.  My niece took the photos.

15       Q.   Did anybody take a picture of your chest?

16       A.   That, I can't recall.  I don't know.

17       Q.   Did you go to Mr. Schechter's office before or

18  after you went to the hospital?

19       A.   I went to his office before.

20       Q.   So you went to Mr. Schechter's office first and

21  then you went to Long Island Jewish?

22       A.   Yes.

23       Q.   And after you went to Mr. Schechter's office those

24  pictures were taken?

25       A.   Yes.

ws

Gopaul - Defendant - cross                318

1      Q.   I'm going to show you what's been marked as

2   People's Exhibit 1 in evidence.

3           If you could take a look at that?

4           (Shown to witness.)

5      Q.   Whose name appears on the bottom of that form?

6      A.   This is my name.

7      Q.   You wrote your name on there, correct?

8      A.   Yes.

9      Q.   You signed your name, correct?

10     A.   Yes.

11     Q.   You initialed your name, correct?

12     A.   Yes.

13     Q.   You initialed it on June 24th, 2008, correct?

14     A.   Yes.

15     Q.   In the presence of Detective Shulman, right?

16     A.   Yes.

17     Q.   His gun was not present, right?

18     A.   Yes.

19     Q.   His gun was present?

20     A.   Yes.

21     Q.   And what was he doing with his gun?

22     A.   I don't know.  He had it on his holster.

23     Q.   Did he take it out?

24     A.   No.

25     Q.   But you saw it?

                                                    ws

1      A.   Yes.

2      Q.   And that gun was -- you saw that gun in the

3   interview room?

4      A.   Yes.

5      Q.   Okay.  Detective Shulman, read you the rights that

6   appear in People's 1, correct?

7      A.   He didn't read this to me.  He bring it -- already

8   had yes on it in the room.

9      Q.   So by the time you saw that, yes was already

10  written on the form?

11     A.   Already on it.

12     Q.   What about on the video?

13          You were provided almost the exact -- in fact, the

14  exact same form on the video, correct?

15     A.   Yes.

16     Q.   Was yes on that document or --

17     A.   No, the District Attorney put the yes on there.

18     Q.   In your presence?

19     A.   Yes.

20     Q.   But Detective Shulman put yes before you got that?

21     A.   Yes.

22     Q.   And you initialed next to it after you read the

23  paperwork?

24     A.   I didn't read the paper.

25     Q.   You weren't given that paper?

Gopaul - Defendant - cross          320

1       A.      I didn't get it to read.

2       Q.      So when was it that you put your initials next to

3    it?

4       A.      After -- when he bring it to me he said -- I asked

5    him for a lawyer and I asked him for the phone call.

6               He said no.  He said, "Right now you're going to

7    sign me a confession," and he give me this to put my

8    initials on the side of it.

9       Q.      He handed you the piece of paper?

10      A.      Yes.

11      Q.      He handed you a pen?

12      A.      Yes.

13      Q.      You had that piece of paper in your hand, correct?

14      A.      It was on the desk.

15      Q.      And nobody else was in the room, right?

16      A.      No.

17      Q.      And you put your initials next to each one of

18   those questions?

19      A.      Yes.

20      Q.      And nothing was covering that piece of paper,

21   correct?

22      A.      No.

23      Q.      You were able to read it?

24      A.      No.

25      Q.      Why weren't you able to read it?

Gopaul - Defendant - cross          321

1      A.    I didn't have my glasses.  I had to go down to
2   read and I couldn't go down to read.
3      Q.    What does the first line say?
4      A.    You have the right to remain silent.
5      Q.    Are you wearing your glasses now?
6      A.    No.
7                   MS. JOHNSON:  Can I have that back, please?
8                   (Shown to counsel.)
9                   THE COURT:  Are you all right, Mr. Schechter?
10                  MR. SCHECHTER:  Yeah, I just banged my leg,
11   Judge.  It's okay.
12                  MS. JOHNSON:  Are you all right?
13                  MR. SCHECHTER:  Yeah, I'm fine.
14     Q.    When you asked Detective Shulman if you can call
15   your attorney, who was it that you were planning on calling?
16     A.    I didn't ask him to call my attorney.  I asked him
17   to call my wife.
18     Q.    Well, you said you asked Detective Shulman if you
19   could speak to an attorney, correct?
20     A.    And I wanted a lawyer.
21     Q.    And who was it that you were going to call?
22     A.    I was going to call my wife to call a lawyer.  I
23   didn't have a lawyer at the time.
24     Q.    I'm going to show you what's been marked as
25   People's Exhibit 2 in evidence.

                                                         ws

Gopaul - Defendant - cross                 322

1                      (Shown to witness.)

2        Q.   Do you recognize that?

3        A.   Yes.

4        Q.   Whose signature appears on the bottom of that?

5        A.   Mines.

6        Q.   Whose name appears on the bottom of that?

7        A.   My name.

8        Q.   You signed your name on that?

9        A.   Yes.

10       Q.   You signed that in the presence of

11   Detective Shulman, correct?

12       A.   Yes.

13       Q.   You read that form, right?

14       A.   He read it for me.

15       Q.   He read it out loud to you?

16       A.   Yes.

17       Q.   And then he gave it to you, correct?

18       A.   Yes.

19       Q.   Who signed and dated it?

20            Who put the date on it?

21       A.   I put the date.

22       Q.   You put the time as well, correct?

23       A.   Yes, he told me the time, I put it on.

24       Q.   You knew the date, right?

25       A.   Until he told me, yes.

Gopaul - Defendant - cross                323

1    Q.    Did you read that before you signed it?

2    A.    Detective Shulman read it for me.

3    Q.    So you just signed it?

4    A.    Yes.

5    Q.    I'm going to show you People's 3.

6          (Shown to witness.)

7    Q.    You signed the bottom of People's 3, correct?

8    A.    Yes.

9    Q.    You dated it, correct?

10   A.    Yes.

11   Q.    You wrote your name on it, correct?

12   A.    Yes.

13   Q.    That was read to you, correct?

14   A.    Yes.

15   Q.    That was provided to you?

16   A.    Yes.

17          MS. JOHNSON:  I'm sorry.

18          (Shown to counsel.)

19   Q.    And both of those consent forms were given to you

20   after Detective Shulman read you those Miranda rights,

21   correct?

22   A.    He didn't read the rights to me.

23   Q.    Those two consent forms were signed after he read

24   you those rights, correct?

25   A.    He didn't read the rights to me.

ws

Gopaul - Defendant - cross          324

1          Q.   Okay.  I'm going to show you the first statement
2    that you gave Detective Shulman, People's 4.
3                    (Shown to witness.)
4          Q.   Is it fair to say Detective Shulman provided you
5    with a blank pad and pen?
6          A.   Yes.
7          Q.   That was after he read your Miranda rights,
8    correct?
9          A.   He didn't read the right.
10         Q.   The pad was blank when it was given to you,
11   correct?
12         A.   Yes.
13         Q.   Now, you testified before on direct that he
14   prompted you to write that statement, correct?
15         A.   He had his notes with him and he was telling me
16   what to write on the paper.  Most of it is what he made me,
17   from his notes.  He asked me question from his notes.  He
18   told me what my stepdaughter said on his notes and then he
19   had me do this paper.
20         Q.   Tell us how it is that he made you write that
21   piece of paper?
22         A.   Well, by using languages, bad languages, to me and
23   screaming at me.
24         Q.   What was that bad language that he was using?
25         A.   He was saying if I don't sign this fucking thing

                                                              ws

Gopaul - Defendant - cross          325

1      I'm not going to go home.  He was using the MF word.

2              Q.    What's an MF word?

3              A.    Motherfucker.  He was using those words at me.

4                    He was over me on the table.  He was like leaning

5      like almost want to grab me.

6              Q.    When you say he was leaning almost like he was

7      going to grab you, he didn't grab you, right?

8              A.    No, he didn't grab me, but his hand was out.

9              Q.    And what was his hand doing?

10             A.    His hand was in my face.

11             Q.    What was his hand doing in your face?

12                   What do you mean by that?

13             A.    Talking and waiving at me.

14             Q.    Talking with his hands?

15             A.    Just wavering, yeah.

16             Q.    Did his hands ever make contact with your body?

17             A.    When he slammed me to the walls, yeah.

18             Q.    So when he slammed you to the wall how does it

19     come about that his hands are on your body?

20             A.    He hold me by my shirt.

21             Q.    How was he holding you by your shirt?

22             A.    Grabbed my shirt and pushing me to the wall, slam

23     me to the wall.

24             Q.    What part of your body made contact with the wall?

25             A.    My back.

1      Q.   Your entire back?

2      A.   Yes.

3      Q.   Did you have pain?

4      A.   Yes.

5      Q.   Where did you have the pain?

6      A.   On my neck and shoulders.

7      Q.   Did you have trouble sitting after that?

8      A.   I was uneasy with it.

9      Q.   You had the opportunity to see the video, right?

10     A.   Yes.

11     Q.   You were able to move your arms in the video,

12   correct?

13     A.   Yes.

14     Q.   You lifted your arms, right?

15     A.   Yes.

16     Q.   You moved your arms, correct?

17     A.   Yes.

18     Q.   You were able to describe how you were touching

19   your daughter by using your arm movements, correct?

20     A.   Yes.

21     Q.   Did you ever complain of any pain on that video?

22     A.   No.

23     Q.   Did you ever ask for medical attention on the

24   video?

25     A.   No.

ws

1       Q.   Did you ever see any weapons drawn on that video?

2       A.   No.

3       Q.   Did you ever get threatened by any of the DAs on

4    that video?

5       A.   No.

6       Q.   Anybody lay a hand on you on that video?

7       A.   No.

8       Q.   Did you ever ask to speak to a lawyer on that

9    video?

10      A.   They asked me if I wanted to speak to a lawyer,

11   but the detective told me if I ask for a lawyer I'm not

12   going to go home, it going to be worse for me, it's going to

13   be worse, so just do the same thing, sign the Miranda that I

14   did in the room and they going to take it up to the

15   supervisor downstairs and they going to have an agreement to

16   send me home.

17      Q.   Nobody told you on that video what to say,

18   correct?

19      A.   No.

20      Q.   You were free to answer questions, correct?

21      A.   Well, I was free to answer question, but I was

22   scared of the detective.

23      Q.   And what do you mean by you were scared of him?

24           What were you afraid he was going to do?

25      A.   Probably going to take me back to the room and do

1    something to me again.  I don't know.

2        Q.   What were you afraid he was going to do?

3        A.   Slam me to the wall, hit me or something.

4        Q.   Were you afraid of the prosecutor?

5        A.   No.

6        Q.   Were you afraid of the videographer?

7        A.   No.

8        Q.   And what was it about the detective's presence in

9    that video that you were concerned about?

10       A.   After the interview, what they going to do to

11   me -- what he going to do to me.

12       Q.   What did he say he was going to do to you?

13       A.   He didn't say nothing at the time.

14       Q.   He didn't tell you he was going to beat you up

15   after the video?

16       A.   No.

17       Q.   He didn't show his gun to you during the video?

18       A.   No.

19       Q.   You had the opportunity while that video was being

20   taped to ask for an attorney, correct?

21       A.   Yes.

22       Q.   You had the opportunity to stop that video,

23   correct?

24       A.   Yes.

25       Q.   You had the opportunity to say you no longer

ws

1    wanted to answer any questions, correct?

2         A.   Yes.

3         Q.   You had the opportunity to tell the DA that this

4    video was over, correct?

5         A.   Yes.

6         Q.   You didn't have any trouble moving your arms on

7    the video, correct?

8         A.   No.

9         Q.   Did you ever make a complaint with Internal

10   Affairs about what Detective Shulman allegedly did to you?

11             MR. SCHECHTER:   I'm going to object.

12             He has two pending indictments against him.

13        Making a complaint to Internal Affairs with another

14        statement when he has counsel is not exactly the

15        appropriate thing to do.

16             It's an improper question.

17             MS. JOHNSON:   Judge, he's saying that police

18        officers beat him up.

19             Obviously, if there's any merit to it I have

20        the right to inquire as to whether or not he made a

21        complaint about it.

22             MR. SCHECHTER:   If he makes a complaint with

23        another statement he's further incriminating himself,

24        Judge.  He has a right to counsel.

25             THE COURT:   I'm going to overrule the

                                                        ws

Gopaul - Defendant - cross          330

1           objection.

2           Q.    Did you make a complaint to Internal Affairs about

3     Detective Shulman?

4           A.    No.

5           Q.    Did you make a complaint to Internal Affairs about

6     any of the officers?

7           A.    No.

8           Q.    Did you make a complaint to the precinct about any

9     of the officers?

10          A.    No.

11          Q.    Did you make a phone call to the precinct about

12    what they did to you?

13          A.    No.

14          Q.    Did you tell the detective in Nassau County what

15    Detective Shulman did to you?

16          A.    I don't recall.

17                MS. JOHNSON:   I'm going to ask that this be

18          marked as People's 8 and 9 for identification.

19                MR. SCHECHTER:   Can I see them, please?

20                (Shown to counsel.)

21                MR. SCHECHTER:   Your Honor, I'm going to

22          object.

23                Counsel intends to show the witness something

24          that happened well -- over one month after the incident

25          and it's an interview sheet regarding his present

                                                           ws

1      condition after he was arrested in Nassau County.  It

2      has no relevance here.

3              THE COURT:  I have, obviously, no idea what

4      she's marking and what the exhibit is.

5              Do you want to make an offer?

6              MS. JOHNSON:  Yes, Judge.

7              It's the 79, physical condition

8      questionnaire, taken in Nassau County where -- my offer

9      of proof is the defendant is asked is he in good

10     health, does he have any injuries --

11             THE COURT:  And when is he asked those

12     questions?

13             MS. JOHNSON:  July 31st, 2008.

14             THE COURT:  So what bearing would that have

15     on what took place from June 24th to June 27th?

16             MS. JOHNSON:  Because defendant is saying he

17     had an injury from a hernia that was exacerbated by

18     these police officers.  That would have been in the

19     paperwork.

20             MR. SCHECHTER:  He just said he's in pain.

21             THE COURT:  If that's your offer, the

22     objection is sustained.

23             MR. SCHECHTER:  Thank you, Judge.

24             MS. JOHNSON:  Sustained as to the questions

25     or the offering of the documents, your Honor?

Gopaul - Defendant - cross          332

1              THE COURT:  It's sustained as to the document

2         and any questions relating to what he may have been

3         asked a month later.

4         Q.   Mr. Gopaul, the statement -- the first statement

5    that you gave to Detective Shulman regarding what happened

6    at the fair, was that statement true or false?

7         A.   It's true.

8              MR. SCHECHTER:  Objection, that's improper.

9         Thirty years that's been an improper question, to ask

10        the truth or falsity of the statements.

11             THE COURT:  Would you just read back the

12        question, please?

13             (Record read.)

14             MR. SCHECHTER:  Withdraw the objection.

15             THE COURT:  And you answered that,

16        Mr. Gopaul?

17        A.   Yes.

18        Q.   Yes, it's true?

19        A.   Yes.

20        Q.   And it's your testimony that you were forced into

21    giving a true statement?

22        A.   No, I gave the truth on that statement.

23        Q.   After you were issued Miranda warnings?

24        A.   Yes.

25        Q.   Okay.  And as to the second statement that you

                                                              ws

Gopaul - Defendant - cross          333

1   gave to Detective Shulman, was that an accurate --

2        A.   Can you repeat?

3              MR. SCHECHTER:  Now I'm going to object to

4        that statement.

5              The law is, Judge, that it's improper at a

6        Huntley Hearing to ask the witness, the defendant,

7        whether or not the statement made was true.

8              I think it's been the law for 30 years.  I

9        had the case.  I read it yesterday.  Unfortunately, I

10       can't find it, but I looked at that possibility.

11             THE COURT:  I'm going to sustain the

12       objection.

13             MS. JOHNSON:  I didn't ask him if it was the

14       truth, I asked him if it was accurate.

15             MR. SCHECHTER:  Same idea.

16             THE COURT:  Truth, accuracy.  Quite frankly,

17       I think they're interchangeable under these

18       circumstances.

19             I also would think, Ms. Johnson, you could

20       anticipate what the answer will be to that question.

21             MS. JOHNSON:  As would I, most likely (sic).

22       Q.   Mr. Gopaul, you also indicated on direct that that

23  was Detective Shulman who drew the picture of the vibrator?

24       A.   Yes.

25       Q.   Was that following a conversation that you had

                                                          ws

Gopaul - Defendant - cross                334

1    with him?

2         A.   Yes.

3         Q.   And was that following a conversation about a

4    vibrator?

5         A.   Yes.

6         Q.   You signed that piece of paper, correct?

7         A.   Yes.

8         Q.   You signed it underneath the question and answer,

9    is that fair to say?

10        A.   If I see the paper I'll know.  I think so.

11        Q.   Sure.

12             MS. JOHNSON:  Give me one second.

13             (Pause in the proceedings.)

14        Q.   Well, let me ask you this.

15             Was there already a picture of a vibrator on the

16   piece of paper when you signed that paper?

17        A.   No.

18        Q.   So the picture of the vibrator was put after you

19   signed it?

20        A.   No, it was before.  No, it was put before I signed

21   the paper.

22        Q.   So the vibrator was on the piece of paper before

23   you signed it?

24        A.   Yes.

25        Q.   After a conversation you had with

ws

Gopaul - Defendant - cross          335

1    Detective Shulman about vibrators that you had?

2         A.   Yes.

3         Q.   And you indicated that you were provided with a

4    bottle of water?

5         A.   Yes, from the ADA.

6         Q.   And you were permitted to go to the bathroom?

7         A.   Not at that time.

8         Q.   Well, you were permitted to go to the bathroom,

9    correct?

10        A.   Yeah, but I didn't have to use the bathroom at

11   that time.

12        Q.   You saw the video yesterday?

13        A.   No, I was on the back of it.

14        Q.   You've seen the video before?

15        A.   I saw it before.

16        Q.   Do you see any injuries on your face?

17        A.   No.

18        Q.   Do you see any injuries on your hands?

19        A.   No.

20             MR. SCHECHTER:   I'm going to object.

21             He never claimed there were injuries to his

22        face or hands, Judge.

23             The injuries were to his neck, his belly, his

24        arms and his legs.

25             He never said anything about his hands.

1           THE COURT:  The record will speak for itself.

2           MS. JOHNSON:  I have nothing else.

3           MR. SCHECHTER:  No redirect.

4           THE COURT:  Mr. Gopaul, you testified before

5      that you were released from jail.

6           In other words, you were brought to court,

7      you were arraigned and then you bailed out, am I right?

8           THE WITNESS:  When they set the bail for me

9      my wife didn't reach in time or I think she didn't have

10     the money at the time, so the time ran out on the court

11     and they had to put me in the Bronx.

12          THE COURT:  So you were transferred to --

13          THE WITNESS:  To the Bronx.

14          THE COURT:  -- to a correctional facility in

15     the Bronx?

16          THE WITNESS:  The boat?

17          I think they call it the boat.

18          THE COURT:  The what?

19          THE WITNESS:  The boat.

20          THE COURT:  And when you went over to that

21     facility was there any type of medical screening given

22     to you at that point --

23          THE WITNESS:  Yes.

24          THE COURT:  -- by people at the New York City

25     Correctional Department?

1                    THE WITNESS:  Yes.

2                    THE COURT:  And did they ask you if you had

3        any injuries?

4                    THE WITNESS:  Yes.

5                    THE COURT:  Did you say whether or not you

6        had any injuries similar to what you said in

7        Defendant's K in evidence?

8                    THE WITNESS:  No, no.

9                    THE COURT:  All right.

10                   Anybody have any questions as a result of

11       mine?

12                   MS. JOHNSON:  I was just going to ask -- I'm

13       assuming those are not the complete medical records

14       from LIJ.

15                   If counsel is planning on offering them --

16                   MR. SCHECHTER:  It's an emergency room.  He's

17       only in the emergency room.

18                   THE COURT:  Okay.  Thank you very much.

19                   MS. JOHNSON:  Can I actually ask just a

20       couple of questions?

21                   THE COURT:  Yes.

22                   MS. JOHNSON:  Just briefly.

23       Q.   Mr. Gopaul, were you housed with other inmates in

24       the Bronx?

25       A.   Yes.

Gopaul - Defendant - redirect          338

1        Q.   Were you housed with other inmates at the
2    105 Precinct?
3        A.   No.
4        Q.   Were you housed with other inmates at
5    arraignments?
6        A.   Yes.
7        Q.   In one big cell?
8        A.   Yes.
9              MS. JOHNSON:   I have nothing else.
10   REDIRECT EXAMINATION
11   BY MR. SCHECHTER:
12       Q.   Mr. Gopaul, did you have any scuffles with any
13   other inmates while you were in jail?
14       A.   No.
15             THE COURT:   Okay, you can have a seat.
16             (Witness excused.)
17             THE COURT:   Mr. Schechter --
18             MR. SCHECHTER:   May it please the Court, your
19        Honor, I understand the reason for your Honor's
20        questions regarding the outcry of Mr. Gopaul when he
21        was at the facility in the Bronx.
22             The question really -- with all due respect,
23        your Honor, no allegation has been made that Mr. Gopaul
24        suffered lasting or permanent injuries.
25             Rather, the proffer has been made that the

                                                      ws

Proceedings                           339

1        police officers set upon him and at the time they set

2        upon him he was pulled, prodded, scratched, bruised,

3        bent and suffered these injuries and under compulsion

4        made these -- waived his rights and made these

5        statements.

6                    There's never been any allegation that the

7        injuries he sustained were permanent.  It doesn't have

8        to be permanent.

9                    As a matter of fact, the police are very

10       well-schooled in how to utilize physical force to

11       extract confessions or to extract what they want to

12       extract without causing observable injuries.

13                   THE COURT:  If I could just interrupt you.

14                   My question to you was, and maybe I wasn't

15       clear, are you resting?

16                   MR. SCHECHTER:  I rest.

17                   THE COURT:  Okay.  So now you're making

18       closing arguments?

19                   MR. SCHECHTER:  I am.

20                   THE COURT:   Go ahead.

21                   MR. SCHECHTER:  If it please the Court, your

22       Honor, it is respectfully submitted that the statements

23       that were extracted from my client were extracted from

24       him after protracted, protracted, delays.

25                   As a matter of fact, I still haven't

                                                              ws

Proceedings                    340

1        gotten -- and I ask the Court to draw an unfavorable

2        inference against the prosecution because of the

3        failure to provide the required discovery material,

4        namely the early entries of that log that we had

5        already requested and based upon what counsel said

6        there has been no equivocation about us wanting that

7        log.

8                    They have been stonewalling us with officers,

9        stonewalling us with information, stonewalling us with

10       discovery information from the Police Department.

11                   Your Honor, my client testified he was at

12       that precinct approximately 2:30, that when he got to

13       the precinct he was set upon by approximately nine to

14       ten officers who manhandled him, threw him against the

15       rail, threw him against the wall, scratched him in the

16       course of having him handcuffed and searched and then,

17       shortly thereafter, Detective Shulman came and took him

18       upstairs, threw him up the steps, he almost fell, but

19       he did not fall, went into the room.  Detective Shulman

20       grabbed him by the collar, threw him against the wall

21       and pushed him back.

22                   If your Honor looks at that, as I'm sure you

23       did because I drew your Honor 's attention to it in the

24       video, my client's collar is quite distended and it's

25       very consistent that the distension of his collar is

                                                            ws

Proceedings                    341

1    consistent with someone who grabs someone, spreads the

2    collar, throws him and pushes him back.  There's no

3    reason for his collar to look like that absent somebody

4    using that kind of force against him.

5              It is apparent, your Honor, that my client

6    was the victim of force.  Police officers, for their

7    own particular reasons or prejudices, felt that they

8    needed to act forcefully against my client.

9              It was in that atmosphere that Detective

10   Shulman, who also acted forcibly against my client,

11   attempted to extract a confession from him.

12             After he then physically abuses him he then

13   gives him the life preserver.  This is the technique

14   called the Reid technique that is used by the police

15   departments, even though he denied its use.  You first

16   act violently, make the person desperate, then you

17   throw out the life preserver.  The life preserver is

18   you make a confession, you're going home.

19             Everybody, especially those who are not

20   familiar with the criminal justice system, everyone

21   grabs for that life preserver.  They'll say anything

22   they want them to say thinking they're going home.

23   That's what Detective Shulman did to my client.

24             Thereafter, with that in mind,

25   Detective Shulman wanted to keep that going so that

ws

1     when my client was about to give the video statement

2     Detective Shulman promised him, "Look, all you got to

3     do is tell that same thing to the DA you told me."

4              You get a cop -- rather, "You get an

5     attorney, then we're going back to square one and

6     you're not getting out of here.  I'm just warning you

7     right now before you go and speak to the District

8     Attorney."

9              So that force, those actions by the

10    detective, were not in any way ameliorated or had any

11    kind of separation from the initial physical abuse that

12    my client suffered.  There's not been any attenuation

13    of that because Detective Shulman saw that there was

14    not going to be an attenuation by continuing the abuse

15    and the threats and the life preserver, namely that my

16    client, if he makes a statement to the District

17    Attorney, will be released.

18             That was the atmosphere under which he gave

19    the statements.  They were statements which were forced

20    out of him.  They were extracted out of him at pointed

21    fists, not by reason, not by an intelligent waiver.

22             He had requested an attorney.  Those requests

23    were completely tossed aside by Detective Shulman.  My

24    client, as he said, was going to call his wife to get

25    an attorney.

Proceedings                     343

1           He did not, at that point, know he had -- an

2     attorney would be appointed for him because by that

3     time Detective Shulman said, "You're not getting any

4     attorney," so he had no expectation of getting an

5     attorney and for that reason he, at that time, felt

6     isolated, he felt alone, which is what they want to do.

7           He was kept, your Honor, from 2:30 in the

8     morning on June 24th until the following night, until

9     around a quarter to 9.  That's a long time to be in

10    custody, Judge, especially with no sleep, no food and

11    one bathroom break.

12          Now, under those circumstances the

13    confessions that were extracted from him were done

14    absent a reasonable and thoughtful and unforced waiver.

15          The consents obtained to search his vehicle

16    were extracted in the same methodology.  He gave those

17    with the same abuse in his mind.

18          Therefore, the consents to search were also

19    not done properly and they were extracted violently and

20    for those reasons I'm respectfully asking that the

21    Court suppress the statements that were made by my

22    client, suppress the evidence seized from his vehicle

23    and from his house, and for those reasons I

24    respectfully ask the Court grant that relief.

25          THE COURT:  People, before you begin, I am

                                                    ws

Proceedings                    344

1   directing you -- because I had my law secretary check

2   to see if, perhaps, somebody faxed over the first sheet

3   of that log sheet.

4           I am asking to you produce that for

5   Mr. Schechter.

6           And, Mr. Schechter, if need be, if you need

7   to make whatever application you feel you need to make

8   upon reviewing it, I'll let you.

9           He's entitled to it and, quite frankly, I

10  think he should have had it already.

11          Do you want to say anything?

12          MS. JOHNSON:  I do.  I don't know if you

13  wanted me to make a phone call.

14          THE COURT:  You can do it after, because

15  obviously we're not going to get it before 4:35.

16          MS. JOHNSON:  And if I have it after the

17  close of business of court, I'll fax it to Court and

18  counsel.

19          Your Honor, it's our position, and the

20  evidence has shown beyond a reasonable doubt, that not

21  only did the defendant knowingly, voluntarily and

22  intelligently waive his Miranda rights, his right to

23  counsel, but he also was adequately advised of his

24  Miranda rights.

25          I'll first address counsel's arguments.

                                                    ws

Proceedings                345

1          Your Honor, this is an issue of credibility

2     as to whether or not the Court is going to believe what

3     the defendant says or whether or not the Court is going

4     to believe what the detective says.

5          In order to believe what the defendant says,

6     that he was roughed up by nine police officers, that

7     they slammed him against the wall, they slammed him in

8     the interview room, they slammed him against the

9     counter, it belies logic.

10          When the court looks at the very photographs

11     that the defendant has submitted, there is no injury on

12     the defendant's face.

13          There is a scratch on his body and there's a

14     bruised belly button from a previous hernia surgery.

15          Not only did the defendant's own pictures not

16     comport with his own testimony, but the very video that

17     was played in court, the defendant is lifting his arms,

18     moving his arms, making hand gestures, able to answer

19     questions, no injury on his face.  The defendant even

20     admits there's no injury on his hands.

21          The defendant's own video, the capturing of

22     his own image, both by himself and by the videographer,

23     let's just say, doesn't even comport with his own

24     testimony as to what happened.

25          In fact, Judge, he never made any complaints

Proceedings                                    346

1       to anybody about any injury.  He never made any

2       complaints on the video, never asked to speak to an

3       attorney on the video.

4                    I think that the very tone of how the video

5       was taken, the conversational aspect of it between the

6       defendant and the DAs and the defendant and even

7       Detective Shulman, it belies logic that the defendant

8       was even laid a hand on by any members, much less nine

9       officers or Detective Shulman.

10                   Be that as it may, Judge, the Court has seen

11      the Miranda form signed by the defendant on 5:15 -- at

12      a 5:15.  Detective Shulman testified he read it to the

13      defendant, he himself indicated yes and the defendant

14      signed, initialed, this document.

15                   It was dated.  It was timed.

16                   Detective Shulman's testimony should be

17      deemed by the Court as credible that the defendant not

18      only wrote his name, but signed his name after the

19      Miranda warnings were issued.

20                   We submit to the Court that this is an

21      adequate issuance of Miranda rights.  The defendant

22      knowingly waived it.  He was read these rights.  He was

23      provided the copy of it.  He signed it.

24                   There was no indication, no testimony from

25      Detective Shulman, that at any time was his gun

                                                            ws

Proceedings                         347

1       present, that the defendant asked to speak to an

2       attorney, that the defendant asked to cease the

3       interview.

4               In fact, Detective Shulman indicated the

5       defendant was quite cooperative with him.  He was not

6       handcuffed.  There was no force used upon him nor any

7       threats.

8               In fact, Judge, the defendant was provided --

9       as far as the written statements go, the defendant was

10      provided a blank piece of paper to make two statements

11      to Detective Shulman in his own handwriting where the

12      defendant himself provided his own information, the

13      date, the time.

14              It belies logic that Detective Shulman, who

15      testified that his gun was fully secured,

16      Officer Alfaro, who corroborated Detective Shulman that

17      it's Police Department police to secure their weapon --

18      none of the People's witnesses indicated that any

19      threats any force or any coercion was used upon this

20      defendant to sign a true statement in the defendant's

21      own words as to what happened with his daughter at the

22      fair.

23              Detective Shulman indicated unequivocally

24      that at no time did the defendant have any questions.

25              In fact, the defendant made his own changes

Proceedings                        348

1       on one of the documents when he changed the date.  He
2       changed the date from the 22nd to the 21st.

3                   At no time did he ask to speak to an
4       attorney, did he indicate he wanted to cease the
5       interview or that he had any questions.

6                   There was no language barrier.  There was a
7       conversation and, in fact, a tone of cooperativeness
8       with Detective Shulman that continued onto the video.

9                   After the Miranda was issued, after the first
10      statement was signed, after both consent forms were
11      signed by the defendant -- which I'll actually note,
12      your Honor, not one question out of defense counsel's
13      mouth to Detective Shulman was about the consent forms
14      signed by the defendant.  Nothing was questioned of
15      Detective Shulman about the defendant being provided
16      the consent forms, being read the consent form or even
17      signing it.

18                  The second statement, we submit to the Court,
19      just like the first one, was a knowing, voluntarily,
20      intelligently-obtained statement.

21                  This defendant again was provided a pen and a
22      piece of paper.

23                  Detective Shulman indicated no threats were
24      made to the defendant, no promises were made, no gun
25      was present, no coercion was used and, again, the

                                                            ws

Proceedings                    349

1    defendant was handcuffed -- the defendant was

2    handcuffed, in fact, brought to the restroom at the

3    defendant's own request.

4            As to the question and answer and the

5    photograph that was drawn by the defendant after

6    Miranda was issued, after Miranda was waived, again,

7    Detective Shulman indicated that the defendant drew

8    this picture, never asked to speak to an attorney,

9    never asked to cease the interview, that there was, in

10   fact, a rapport between the two of them and the

11   defendant was willing to speak to him.

12           I think, your Honor, the video speaks for

13   itself.  At no time during the video were any weapons

14   present.  At no time were any physical force, threats

15   coercion or any physical tactics used upon the

16   defendant.

17           In fact, counsel said and the defendant said

18   that the detective told the defendant that all he had

19   to do was repeat what he told Detective Shulman in the

20   video.

21           If the Court looks at the video, that's not

22   even what happened.  The defendant gave more

23   information, more details and expanded his statement,

24   so obviously it belies logic that the detective would

25   have told the defendant that he must repeat what he

Proceedings                    350

1    gave the detective when the defendant himself gives

2    more information on the video.

3            Your Honor, we have the luxury of having an

4    actual videotaped statement here rather than simply

5    relying on what I do submit to the Court is credible

6    testimony by the detective.

7            At no point does the defendant complain of

8    any injury, ask to cease the interview, ask to speak to

9    an attorney.  He's provided Miranda warnings again,

10   he's read them by the District attorney.

11           In fact, he continues his conversation with

12   Detective Shulman on the video when Detective Shulman

13   asks him questions in the presence of the District

14   Attorney -- in fact, both Assistant District Attorneys.

15           We would submit to the Court, your Honor,

16   that based on the fact that the Miranda warnings were

17   knowingly, voluntarily, intelligently waived,

18   adequately supplied, adequately read, the defendant not

19   only orally waived them, but waived them in writing and

20   at no time invoked his right to counsel.

21           We would submit to the Court that the

22   statements, the two written statements, the question

23   and answer, as well as the video that was subsequent to

24   another Miranda warning, as well as the property that

25   was received, we submit that all of that should be

                                             ws

Proceedings                    351

1    permitted to be introduced by the People on our direct

2    case.

3                THE COURT:  All right, speaking of the video,

4    is the waiver form that was signed in that video, I'm

5    assuming that's separate and distinct from the one that

6    Detective Shulman referred to at the -- when he

7    initially met the defendant?

8                MS. JOHNSON:  That is what my understanding

9    is by looking at the video, your Honor, because when

10   the Assistant District Attorney gives the video to --

11   gives the Miranda form to the defendant, I believe he

12   addresses again that, "This is a Miranda form similar

13   to the one that had been provided to you before," and

14   the defendant is observed on the video signing it yet

15   again.

16               MR. SCHECHTER:  I don't think it was offered

17   in evidence, Judge.

18               THE COURT:  That's my point.  I've only seen

19   one Miranda waiver form that's allegedly signed by the

20   defendant.

21               In other words, my question is, there appears

22   to be a separate Miranda form that was produced during

23   the beginning -- during the videotaped confession

24   that's referred to by the assistant DAs from Queens, is

25   there not?

                                                        ws

1          MS. JOHNSON:  There is, your Honor, and the

2     substance of that video that is read again to the

3     defendant and the defendant orally, on the video,

4     waives those rights yet again and is observed on the

5     video signing that document again.

6          THE COURT:  Right, but do we know where that

7     document is?

8          MS. JOHNSON:  I believe it was already

9     provided.

10          THE COURT:  Well, in any event, Ms. Johnson,

11     you're relying upon the video and -- with respect to

12     the waiver insofar as the videotaped confession is

13     concerned.

14          MS. JOHNSON:  I am relying on both the

15     Miranda warnings that were issued by Detective Shulman

16     that continued and I'm also relying on the additional,

17     sort of like a belts and suspenders, that was issued to

18     the defendant on the video.

19          It's our position, your Honor, that the

20     waiver that was signed by the defendant in the presence

21     of Detective Shulman was still sufficient on the video.

22     We rely on that and we also rely on the additional

23     Miranda given on the video by the prosecutor.

24          MR. SCHECHTER:  The best evidence of the

25     waiver is the document itself, Judge, which was never

Proceedings                    353

1    produced or admitted.

2                THE COURT:  Well, that's why I asked if the

3    People are relying upon what -- I mean, obviously the

4    videotape is in evidence and I assume that that's what

5    they're relying upon.

6                All right, I'm going to reserve decision

7    until tomorrow at this point.  It's getting a little

8    late.

9                Just a couple of matters before we go.

10               I have ordered a panel for tomorrow

11   afternoon.  It's my hope that we'll begin jury

12   selection at some point tomorrow afternoon.

13               After my decision tomorrow we need to

14   address, counsel, your motion in limine.

15               MR. SCHECHTER:  Yes.

16               THE COURT:  People, I've not received any,

17   although -- and I trust that you'll have case law for

18   the Court as well as counsel.

19               MS. JOHNSON:  Yes, Judge.

20               THE COURT:  That you provide it to us as soon

21   as possible because I want to get that out of the way

22   before, obviously, jury selection starts.

23               Mr. Schechter, I know my law secretary has

24   been looking at some of these documents I indicated

25   that we received in response to the subpoenas.

                                                       ws

Proceedings                    354

1           I would like to take a look at them myself.

2     Hopefully, I'll be able to do it this evening.  I

3     haven't had a chance, obviously, today, and as soon as

4     I can I will provide them to you.

5                MR. SCHECHTER:  Thank you, Judge.

6                THE COURT:  Just in terms of as you leave, in

7     terms of jury selection, Mr. Schechter, I know you

8     haven't tried a case in front of me.

9           I don't know, Ms. Johnson, if you have.

10                MS. JOHNSON:  We were in the midst of it last

11    time.

12                THE COURT:  So you are somewhat familiar.

13           I don't use a questionnaire, Mr. Schechter.

14    I do cover topics with the jurors myself about

15    background, law enforcement, victim of a crime,

16    testifying in the grand jury or criminal/civil

17    proceeding.

18           I do cover rather extensively beyond a

19    reasonable doubt in my pre-charge, police witnesses,

20    that they should be treated like anybody else, burden

21    of proof as well as presumption of innocence.

22           I mean, there may be something I may be

23    missing from here.

24           If you want me to charge that no inference,

25    adverse inference, is to be drawn with respect to your

                                                           ws

Proceedings                              355

1   client should he choose not to testify, please remind

2   me of that tomorrow.

3             MR. SCHECHTER:  I do, your Honor.

4             As a matter of fact, if my client doesn't

5   testify I do request that that be charged to the jury.

6             THE COURT:  Just let me know before we begin,

7   this way I'm alerted to it.

8             MS. JOHNSON:  Are we reporting here tomorrow?

9             THE COURT:  You're going to be reporting here

10  at least in the morning.  Where I'll be in the

11  afternoon is anybody's guess.

12            Twenty minutes the first round, 15 minutes

13  each succeeding round.

14            What we usually do is get about 75 people in

15  so, you know, by the time the second round is done

16  everybody has kind of heard each of your respective

17  voir dires.

18            MR. SCHECHTER:  My concern, your Honor, I

19  respect that kind of analysis, however under the facts

20  of this case, because of the nature of the charges and

21  because of the type of community we have here out in

22  Nassau County, the predispositions or the possible

23  prejudices of the individual jurors vis-a-vis the

24  allegations, which based upon what I know about the

25  case, could result in some inflammatory testimony on

                                                      ws

Proceedings                          356

1        the part of the complainant, I need to try to ascertain

2        from the individual jurors whether the fact of the

3        allegations of a case are such that they would not be

4        able to be fair and impartial and that's a subjective

5        issue.

6                THE COURT:  Well, of course it's a subjective

7        issue what I generally do is I usually -- I should have

8        prefaced my comments with regard to jury selection

9        saying I generally pre-charge -- not pre-charge, I

10       pre-screen.

11               I'm going to tell the jurors to expect to be

12       here for at least two weeks, that if anybody has a

13       planned vacation, medical procedure, business trip, any

14       issue with health care or elder care, that they can't

15       sit, that we get rid of them, if you will.  So the

16       panel of people that we have are people that we know at

17       least can sit.

18               And I generally will ask the jurors -- I'll

19       tell them a little bit about the case.  Obviously, I'm

20       not going to say too much and essentially say is there

21       anybody here, because of the nature of the charges,

22       feels that they cannot be fair and impartial.

23               I mean, obviously you can explore that in

24       your jury selection.

25               MR. SCHECHTER:  Okay.

                                                              ws

Proceedings                              357

1              THE COURT:  I'm not going to do an individual

2         questioning of the 14 prospective jurors as to their

3         subjective beliefs.  I think we'll know pretty quickly

4         who's willing to sit on this kind of case and who's

5         not.

6              All right, Ms. Johnson, please call this

7         detective.

8              MS. JOHNSON:  I will, Judge.  I have his cell

9         phone number, I'll call him.

10             THE COURT:  And get this time log here and

11        I'll see all of you here tomorrow about 10 o'clock.

12             MR. SCHECHTER:  Thank you, Judge.

13             (Proceedings adjourned to Wednesday, May 6th,

14        2009 at 10 o'clock a.m.)

15

16

17

18

19

20

21

22

23

24

25

                                                        ws

358

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NASSAU : CRIMINAL TERM PART 80

3    ------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,      :   Indictment
4                                              :   No. 2415N/08
                    -against-                  :
5                                              :
     HAROLD GOPAUL,                            :   Sex Abuse 1
6                                              :
                            Defendant.         :   Huntley/Mapp
7    ------------------------------------------X   Hearings

8                                   May 6, 2009

9                                   252 Old Country Road
                                    Mineola, New York
10

11   B E F O R E:

12                  HONORABLE JAMES P. McCORMACK,
                            Acting Supreme Court Justice
13

14   A P P E A R A N C E S:

15                  (As previously noted.)

16
                    *       *       *       *       *
17

18                  THE CLERK:   This is the continued hearing,

19       the People against Harold Gopaul, Indictment 2415N of

20       2008.

21                  MS. JOHNSON:   For the People, Jamie Johnson.

22                  MR. SCHECHTER:   On behalf of the defendant,

23       Harold Gopaul, Donald R. Schechter, 80-02 Kew Gardens

24       Road, Kew Gardens, New York.

25                  THE COURT:   As I indicated at our bench

                                                          ws

Proceedings                    360

1          MS. JOHNSON:  Yes, Judge.

2          With regards to the People's Molineaux

3     application, the People seek to introduce on our direct

4     case evidence surrounding the physical and sexual abuse

5     of the victim in this matter by this defendant that

6     occurred in Queens County that involves not only

7     slapping and hitting the victim, but particularly with

8     regards to the sexual abuse involving touching of her

9     vagina, touching --

10         THE COURT:  I'm sorry to interrupt you, just

11    give me one minute.

12         MS. JOHNSON:  Sure.

13         (Pause in the proceedings.)

14         THE COURT:  I'm sorry, go ahead.

15         MS. JOHNSON:  Your Honor, with regards to the

16    sexual abuse allegations the People seek to admit

17    evidence on our direct case regarding particular

18    instances of sexual abuse and the general course of

19    abuse between this defendant and the victim;

20    specifically, touching of her breasts, touching of her

21    vagina, instances of force, including threats, force

22    including physical abuse, as well as displaying of

23    weapons to the complainant.

24         Your Honor, it is our position, and the case

25    law we believe supports us, that this -- these prior

ws

Proceedings                361

1   bad acts of sexual abuse and physical abuse, not only
2   the circumstances surrounding them, but the threats
3   that accompany them, are relevant and probative and
4   permissible under Molineaux.
5           With regards to motive, intent, absence of
6   mistake by the defendant, we submit that it is
7   admissible to explain all those factors.
8           It is also admissible to show the narrative
9   of the events that occurred in Nassau County as well as
10  why the victim disclosed the abuse when she did, how
11  she disclosed it, who she disclosed it to, the timing
12  of her disclosure and to explain the relationship she
13  had with this defendant.
14          As the Court's aware, the 14 counts in the
15  indictment all have an element of force that the People
16  have to prove beyond a reasonable doubt, the element of
17  force being in the mind of the victim, how she felt and
18  her state of mind regarding why she feared the
19  defendant.  Not only why she feared him at the time of
20  each instance, but how that fear progressed.
21          So, first, with regards to motive and intent,
22  I provided counsel and the Court with two cases,
23  People v. Jackson and People versus Brown, where
24  particularly in sex abuse cases - and you'll excuse me,
25  I'm just going to pull that out now - in

Proceedings                    362

1    People v. Jackson the court held that in sex crimes

2    where there is prior sexual abuse against a particular

3    victim, when a defendant expresses his desire to engage

4    in future sexual misconduct with that same victim, it

5    is evidence of that -- such as that to establish the

6    defendant's motive and the defendant's intent.

7             Here, the defendant himself on video and the

8    victim herself will testify that the defendant

9    expressed to her that he wished for her to -- that he

10   wished that he be the one and that he wished to

11   escalate their relationship to future sexual contacts,

12   particularly sexual intercourse.

13            We submit that People v. Jackson and

14   People versus Brown supports our introduction of that

15   statement and the testimony surrounding his future

16   intent to engage in additional sex abuse with her.

17            People v. Jackson is a Court of Appeals case

18   from 2007 where, in a rape prosecution, evidence of

19   prior uncharged sexual assaults against even another

20   person was admitted appropriately to demonstrate

21   defendant's future intent to rape the victim in that

22   particular trial.

23            There was a statement that the witness was

24   able to testify to where the defendant expressed his

25   future intent to her for his intent to engage in a sex

                                                      ws

Proceedings                        363

1    crime against her.

2              That's exactly the situation we have here.

3    We don't even have speculation as to whether or not the

4    victim knew about that intent. The defendant himself

5    on the video and the victim herself heard the

6    defendant's statement of the future intent as he

7    expressed it directly to her.

8              With regards to People versus Brown, that is

9    a Third Department case from 2007.  In

10   People versus Brown the court held where there was

11   statements of future intent by the defendant against

12   the very same victim, the court ruled, and the

13   Appellate Division upheld, that this was probative and

14   admissible to establish a future intent to have sexual

15   contact with the victim as well as to show the threat

16   of the defendant's future desires.

17             Not only did the court rule that it was

18   probative and admissible for intent, but the court also

19   indicated that it was relevant background information

20   to explain the events that were the subject of the

21   trial.

22             Your Honor, even more importantly, not only

23   the statement of his future intent, but it is the

24   circumstances surrounding it that the jury must be made

25   to understand.

Proceedings                    364

1           None of the defendant's statements of future

2      intent or his threats to her or the force occurred in a

3      vacuum.  They all occurred during other instances of

4      sexual conduct and sexual abuse.

5           It is not as though the defendant simply

6      pulled her to the side during dinner and said, "You're

7      going to be the one and we're going to have sex on a

8      particular date."

9           It was during other instances of abuse where

10     he was touching her vagina, placing his mouth on her

11     vagina, touching her breasts and having her touch his

12     penis that these conversations took place.

13          As to absence of mistake, your Honor,

14     People versus Young, which is a case from 1984, touches

15     upon not only in sex crimes why this type of testimony

16     is evidence to show lack of mistake, but the court even

17     goes so far to explain that in situations where there

18     is an intimate relationship, and I don't mean a sexual

19     relationship, a relationship of trust and a

20     relationship of authority, the trier of fact must

21     understand how it is that the defendant, when there's

22     an element of force, exerted his control and exerted

23     his authority to engage in the sexual abuse.

24          In People versus Young, that's a

25     Fourth Department case from 1984, the court goes

ws

Proceedings                    365

1       through all the elements of Molineaux and goes so far

2       as to say, "Where evidence of the prior uncharged

3       sexual contacts between the defendant and his daughter

4       was directly probative of the crime charged and was

5       necessary to aid the fact finder in determining the

6       defendant's intent, it was admissible."

7               The court even says that in situations to

8       convict a father of an intimate caressing touch, even

9       of a sexual part, the court must be careful to have

10      clear and convincing evidence beyond a reasonable doubt

11      of the defendant's intent.

12              And it was because of the court's concern

13      about the intimate authority relationship and

14      father-figure relationship in Young that the court

15      allowed evidence of the defendant's prior touching to

16      show that it wasn't simply a mistake of a

17      father-daughter relationship, it was actually to show

18      the motive and to show the intent and to show the lack

19      of mistake because of the prior abuse.

20              THE COURT:  Wait, let me just interrupt you

21      for a moment.

22              You started off by saying that you're looking

23      to show prior instances of sexual abuse as well as a

24      course of history of sexual abuse between the defendant

25      and the complainant.

                                                              ws

Proceedings                366

1          Obviously, there comes a point, I think you

2    would agree with me, that in terms of the number of

3    instances you're looking to elicit that are not part of

4    your indictment, there's going to come a point where

5    the scale is going to tip to the point where the

6    evidence is going to become more prejudicial than its

7    probative value for the reasons that you're looking to

8    introduce.

9          You've mentioned on a number of occasions an

10   incident where you claim that your complainant said

11   that the defendant here told her, "I want to be the

12   one," and had spoke of a future date in which he was

13   going to have sexual intercourse with the complainant.

14         And I think if I understand your theory of

15   your case, that's what prompted her to go to the police

16   or leave the house, whatever the circumstances may be.

17         I would hope that you're not looking to

18   introduce every prior act that he's charged with in

19   Queens County.  I don't know how many there are.  From

20   speaking to both you and Mr. Schechter it's obvious

21   that there's more instances -- and maybe I'm wrong, but

22   it sounded as though there's more instances he's

23   currently facing charges on in Queens as opposed to

24   this court.

25              MS. JOHNSON:  That's correct.  We are not

                                                      ws

Proceedings                    367

1        looking to introduce every single instance in Queens,

2        we're looking for the appropriate balance so the jury

3        can understand.

4                     THE COURT:   I know what you're espousing

5        here, but for me to be able to give a ruling and for

6        Mr. Schechter, obviously, to be able to respond, what

7        instances are you -- instead of telling me

8        generalities, what is it are you looking to elicit?

9                     MS. JOHNSON:   We're looking to elicit when it

10       was that the abuse began.

11                    THE COURT:   In terms of the time?

12                    MS. JOHNSON:   Correct.

13                    The nature of the progress of it without even

14       particularizing dates, your Honor.  If she can even

15       say, "While I was a certain age," or over the course of

16       a year it progressed from a touching to a kissing to

17       more invasive touching, that type of conduct.

18                    We're not looking for the victim to take the

19       witness stand and make out, beyond a reasonable doubt,

20       all the elements of the Queens indictment.  That's not

21       what the purpose of this is.

22                    The purpose is so that the jury is not seeing

23       a girl on the witness stand saying that her step-father

24       or father abused her without understanding that this is

25       not just something that happened in a vacuum.

                                                           ws

Proceedings                    368

1              In fact, there was a grooming process in

2     Queens County and a grooming process where this

3     behavior not only escalated, but the threats escalated,

4     the abuse escalated and the relationship changed.

5              I think it's important that the jury

6     understand --

7              THE COURT:  Well, relationship changed in

8     what sense?

9              From father-daughter to sexual encounters

10    that did not have the element of force, then at some

11    point -- I don't know.

12             MS. JOHNSON:  Yes, Judge.

13             THE COURT:  At some point there was an

14    element of force that was introduced into it?

15             MS. JOHNSON:  Yes, Judge.  At first there was

16    not an element of force and the touching was, I hate to

17    say, as a statutory, but there was no threat, there was

18    no coercive environment.  It was not a threat as we

19    have in this environment, but a threat in the course of

20    environment simply based on the father figure

21    relationship and where it occurred and how it occurred.

22             The defendant would say to this girl, to his

23    daughter, don't tell anybody.  Whether that would rise

24    to the level of force is certainly an argument, but

25    that type of coercive environment was how the

                                                    ws

Proceedings                    369

1    relationship began and how it progressed into actual

2    force, both expressed and implied, and it is because it

3    started out as don't tell anybody, happening in

4    private, happening in their own home, in the safety of

5    her home, which is why she didn't disclose and she

6    trusted him and why the relationship was able to

7    escalate.

8              There is a specific instance that occurs in

9    the bathroom, for example, in Queens County where they

10   were in the bathroom together.  The defendant is making

11   comments about her breasts, making comments about her

12   body, picks her up, puts her on the sink and puts his

13   mouth on her vagina and begins performing oral sex on

14   her while her own mother is in the home.

15             We're not here to litigate those instances,

16   we're here to have the victim explain that it is this

17   type of behavior that put in her mind a fear to even

18   tell her mother what was going on because it was during

19   that type of abuse that the defendant said to her,

20   "Don't tell anybody.  You have to be quiet.  Nobody is

21   allowed to know about this."

22             It's very difficult --

23             THE COURT:  Is that coupled with some overt,

24   or perhaps not overt, threat of force?

25             MS. JOHNSON:  That particular instance was

ws

1     not a direct threat of force, but there were instances

2     in Queens where the defendant did threaten her with a

3     knife and threatened to cut her finger off.

4              That force that occurred that is part of a

5     charge in Queens is certainly relevant and probative to

6     establish the force elements that we have in these

7     charges because, we may cross county lines, but the

8     threat in her mind began in Queens and the threats of

9     him cutting her finger off began in Queens during other

10    sexual abuse.

11             As to the narrative aspects of how the abuse

12    took place, certainly it's relevant and probative to

13    explain how her relationship with the defendant

14    escalated, how he escalated the abuse, how it was that

15    he was able to progress the relationship from touching

16    to kissing, to touching under the clothes, to touching

17    with force.

18             That escalation is necessary for the jury to

19    explain that one day he just doesn't pick her up, drive

20    her to Nassau County and start touching her vagina.

21    That's not what happened here and we're unfortunately

22    in a position here -- and I believe it is unfortunate

23    that we are trying to case before the Queens case is

24    being tried and we're in a position where, because

25    we're trying this case first, it's even more important

Proceedings                    371

1     for the jury to understand what happened preceding what
2     happened in Nassau County.
3            THE COURT:  Well, quite frankly, I think that
4     if you were trying -- the Queens case had already been
5     tried, obviously -- or the incidents here had predated
6     the Queens case, I don't think I would be entertaining
7     your application at this point.
8            MS. JOHNSON:  If the Queens incidents
9     occurred after this case I agree with your Honor, it
10    might not be relevant and probative to her state of
11    mind because her state of mind wouldn't have had -- she
12    wouldn't have known about the force and she wouldn't
13    have known about the threats because it happened after.
14           THE COURT:  Because obviously I'm thinking,
15    should I grant your application, that I have to
16    obviously limit the number of instances.
17           MS. JOHNSON:  I agree with your Honor.
18           THE COURT:  So what is it that you're
19    proposing?
20           MS. JOHNSON:  We would ask that the victim be
21    able to testify as to when the abuse began, what type
22    of touching and what type of contact occurred in Queens
23    County, what type of threats and how the threats
24    occurred, under what circumstances.
25           Obviously, if I was to ask her on the witness

                                                    ws

Proceedings                    372

1    stand, "When was the first -- how did the relationship

2    change," I would obviously prepare my witness not to

3    get up on the witness stand saying on this date and

4    this date this is how it began.

5              It would be a narrative of, "He began

6    touching me when I was 13 or 14 in my home and the

7    touching escalated to kissing, it escalated to under

8    the clothing."

9              And I would ask her, similar to how the

10   questions were sort of posed to her in the grand jury,

11   "And were you in fear of him," an element which I must

12   prove.

13             "Why was it that you were in fear of him?"

14             "Because he had threatened me before.  And he

15   had threatened me before when he was touching me.  He

16   threatened to cut my fingers during other instances

17   when he was touching me," that type of questioning,

18   your Honor, because that is how the background

19   information should come in and, obviously, as your

20   Honor has the ability to, which most of the cases

21   reference, the Court has the ability to fashion a

22   curative instruction to the jury as to how they are to

23   consider this evidence, be it as narrative, be it as

24   motive, be it as intent.

25             And we would agree with the Court that the

Proceedings                    373

1    Court should fashion for the jury so that they do

2    understand why the information is being offered.  I

3    would agree and I'm assuming Mr. Schechter would make

4    this argument, the Court has the ability to give the

5    curative to the jury, not only before the witness

6    testifies, but after she testifies and even during the

7    jury charge.

8              But we're in a situation here where, as an

9    element we must prove being force, the prosecution

10   should not be hampered because that force occurred

11   during other bad acts that are charged in another

12   indictment.

13             It is the very reason that it is probative,

14   because it occurred during other sexual abuse, during

15   other instances for which he's charged.

16             Your Honor, the Court had provided -- and I'm

17   going to get to the Leeson case in a moment, but also

18   with regard to prompt outcry and the timing of her

19   disclosure, I don't believe it's in question at this

20   point that the victim did not disclose the abuse for

21   several years.  It began and it escalated and finally

22   at the point where the defendant had said to her that

23   she was going to be the one -- that he was going to

24   have sexual intercourse with her, that she decided to

25   run away from home.

Proceedings                    374

1          In People versus Archibald, which is a 2007

2    case I provided to the Court, that is a

3    First Department case, the court held that evidence of

4    prior sexual abuse is relevant to explain the timing of

5    the victim's reporting and why she waited more than a

6    year to report.

7          Here she not only waits to report because

8    she's in fear, but because there was a relationship of

9    trust and she was afraid to tell anybody what, not a

10   stranger, but what her own father was doing to her.

11         THE ATTORNEY:  Objection, that's a

12   mischaracterization of the relationship.

13         MS. JOHNSON:  Stepfather, that he's raised

14   her since three years old, which the defendant on the

15   video refers to her as his daughter anyway, but not

16   blood, a stepfather.

17         Here, where the abuse takes place over years

18   and the threats occur during other instances, that is

19   relevant to why she disclosed and when she disclosed

20   because certainly she's going to be able to testify

21   that she didn't outcry to her best friend, she didn't

22   outcry to her mother and she didn't feel safe outcrying

23   to either one of them for quite a long period of time.

24         THE COURT:  Let me ask you, when does she --

25   when you talk about the allegation that the defendant

                                                      ws

Proceedings                    375

1    claimed he wanted to be the one, is that -- in terms of
2    context, does that also happen when he allegedly says
3    to her, "We're going to have sexual intercourse on a
4    particular date?"
5                I mean, I may be incorrect in my knowledge,
6    but I thought that he had, according to your
7    allegations, picked a certain date that he was going to
8    have these -- have this sexual intercourse with her and
9    that's what prompted her to leave the house.
10               MS. JOHNSON:  He did, Judge, he did.  He gave
11   her a date and he gave her a specific date that they
12   were going to have intercourse and I believe days
13   before that was going to happen, or if not a day
14   before, that she packs her bags and runs away.  But it
15   is that progression up to that point of where he
16   threatens that they're going to have intercourse that
17   all those acts occur in Queens County during other
18   instances of sexual abuse.
19               But, more importantly, even more so with the
20   element of force, as the jury charge reads, it is the
21   state of mind of the victim that controls.
22               It is not whether or not the defendant was
23   going to have sex with her or even really planned on
24   having sex with her, which we believe he was, but,
25   either way, People versus Thompson, which I've provided

Proceedings                    376

1    to the Court, outlines -- that's a Court of Appeals

2    case from 1988, outlines what it is that must be

3    established in order to establish this element of force

4    and as the court says, "Whether threats amount to

5    forcible compulsion or not is not what the defendant

6    would or could have done, but it is the victim

7    observing the defendant's conduct, fearing he would or

8    might -- "  " -- what he might do if she did not comply

9    with his demands."

10            It is exactly that fear and exactly the

11   defendant's conduct that is relevant here and that

12   conduct occurred in Queens during other instances of

13   sexual abuse.

14            In fact, the court in Thompson says that

15   where the defendant is -- was more than twice the

16   victim's age and was in a position of power, this

17   evidence was even more so relevant and probative.

18            Here there is no question there was an

19   authority figure in possession of power.  It was her

20   stepfather, somebody who has raised her since she's

21   three years old.

22            People versus Thompson also says that these

23   prior instances are relevant and probative to show what

24   the victim believes and what her fear was and what her

25   state of mind was at the time that she not only

ws

Proceedings                          377

1     disclosed, but how it was that that fear escalated and
2     how that fear came to be.
3              People versus Sehn, a case I provided to the
4     court as well, very similar to the situation we have
5     here, your Honor, where the defendant and the victim --
6     defendant was a caregiver of the victim and an element
7     the People had to prove beyond a reasonable doubt was
8     forcible compulsion.  The court says, this is a
9     Third Department case from 2002, "In this case it is
10    undisputed that the defendant was substantially older
11    and larger than the victims and they looked up to him
12    as an authority figure and a caregiver."
13             And it was because of that intimate
14    relationship that the court held that the state of mind
15    produced in the victim to establish the elements of
16    force was even more so relevant because of the nature
17    of the relationship between the parties.
18             THE COURT:  Ms. Johnson, let me ask you, what
19    instance in Queens that you can make a good-faith
20    argument for with respect to an allegation of force are
21    you looking to put forward?
22             MS. JOHNSON:  The defendant threatens to cut
23    her fingers off if she tells and while he's abusing
24    her.
25             THE COURT:  All right, my law secretary has

                                              ws

Proceedings                    378

1       given me the grand jury minutes.

2                   MS. JOHNSON:  Which, the Queens or Nassau?

3                   THE COURT:  October -- Nassau, it appears.

4                   MS. JOHNSON:  Okay.

5                   THE COURT:  And it's on Page 24 of October

6       15th, 2008.

7                   MS. JOHNSON:  Your Honor, I'm going to just

8       ask the Court -- I have the Rosario being copied so I

9       don't have the minutes with me.

10                  THE COURT:  From looking at it here it

11      appears as though there's questions being asked of her

12      of times that she was threatened in Nassau County and

13      in that, in one of her responses, she talks about

14      having her -- that he was going to cut her finger off.

15                  Now, that's Nassau County.

16                  MS. JOHNSON:  Yes.

17                  THE COURT:  So you're saying there's

18      something in Queens?

19                  MS. JOHNSON:  Yes, Judge, he had threatened

20      her in Queens as well.  I do not have the grand jury

21      minutes from Queens County for your Honor, they're

22      being copied, but the force began in Queens, him

23      threatening to cut her fingers off, threatening to bury

24      her and tell her where she was going to be buried, that

25      all happens in Queens as an ongoing pattern of sexual

                                                    ws

Proceedings                379

1     abuse.

2                There are instances charged in this

3     indictment --

4                THE COURT:  Let me ask you this.

5                How -- in terms of recency, how soon or how

6     close in time, should I say, is the incident that

7     you're looking to elicit in Queens to the incidents in

8     Nassau County?

9                MS. JOHNSON:  You know what, I would have to

10    take a look -- are you talking about the specific

11    instance where he threatens to cut her fingers off?

12                THE COURT:  I'm talking about whatever

13    incident of force that you alleged has occurred in

14    Queens County that you're looking to elicit as part of

15    your Molineaux application.

16                MS. JOHNSON:  Well, there is force in the

17    expressed threat, your Honor, and there's force in the

18    coercive aspect.

19                The force in the coercive aspect is the times

20    where he tells her, "Do not tell anybody.  Let's keep

21    this a secret," and he tells her to shh (ph), in those

22    exact words, and what that's what her testimony in

23    Queens is.

24                The incidents of actual force, physical force

25    with the threat of cutting her finger, occurs, I

                                                              ws

Proceedings                    380

1      believe, a year before.  It's at least while she's in

2      high school and it occurs, I believe, in their kitchen

3      in their home in Queens.

4                   But what --

5                   THE COURT:  A year before the incident in

6      Nassau County?

7                   MS. JOHNSON:  I would have to take a look at

8      the grand jury minutes, your Honor.  I'm sorry, I don't

9      have them, I have them being copied, the Queens County

10     grand jury minutes, because I specifically --

11                  THE COURT:  I mean -- off the record.

12                  (Discussion held off the record.)

13                  THE COURT:  Back on the record.

14                  MS. JOHNSON:  But with regards to the force,

15     it's not just -- and when you read the charge of force

16     it's not just the expressed threat it's also the

17     implied threat and an implied threat is not something

18     that just happens on a one-time event.

19                  An implied threat is the progression of him

20     telling her, "Do not tell anybody.  Do not tell your

21     mother.  Do not tell anybody what's going on."

22                  In fact, the defendant admits it himself on

23     the video that he told her not to tell anybody and he

24     says he did it in private so nobody would see.

25                  I think it's even more relevant in this case,

                                                            ws

Proceedings                    381

1     Judge, because none of the crimes charged in the
2     indictment of statutory, none of them have to do with
3     age.
4              Every single crime, every single charge in
5     the indictment requires us to prove that element of
6     forcible compulsion.
7              It would hamper the People and it would
8     hamper the prosecution and misguide the jury to believe
9     that the force just occurred in Nassau on these
10    particular dates.  They need to be made to understand
11    that this force, both expressed and implied that was in
12    her mind in Nassau, occurred during particular
13    instances of abuse in Queens.
14             THE COURT:  Well, in the counts of the
15    indictment in this case is it a question of express
16    force that you've alleged?
17             MS. JOHNSON:  In certain instances there was
18    express force with the weapon.  In other instances it
19    was the implied force, which is why she testifies in
20    the grand jury that he had threatened her before and
21    that fear continued during the abuse in Nassau County.
22             It is not during each instance and the way
23    the indictment is charged, there's particular dates and
24    there's time frames.
25             More importantly, during those time frames we

ws

Proceedings                382

1    are not alleging that on each date he threatened her

2    with a knife.

3         What we are alleging and what we have pled is

4    that during those time frames where she admits that

5    there wasn't always a knife and he didn't always

6    threaten her with a knife, it was her mind and her fear

7    that had begun in Queens that was the force that she

8    felt and the threat that she felt in Nassau during the

9    periods of the abuse.

10        THE COURT:  And your example of implied force

11   that occurred in Queens was allegations that he told

12   her don't tell anybody?

13        MS. JOHNSON:  Even more than that, when he

14   threatens to cut her --

15        THE COURT:  That's express, I would say,

16   threat of force, would you agree?

17        MS. JOHNSON:  I would agree with that, Judge.

18        But as to the implied, I believe that it's

19   implied in the nature of their relationship.  When a

20   father tells his daughter during a course of abuse,

21   course of sexual abuse, not to tell anybody and that

22   he's going to either bury her or show her where he's

23   (sic) buried or this is their secret, that is certainly

24   implied force, based on not only what he says and

25   implies to her, but based on their relationship.

                                              ws

Proceedings                     383

1           Even the fact that he tells her that she is

2      going to be the one and he wants to take the

3      relationship further, that, I would submit to the

4      Court, is also implied force and implied coercion

5      because it is an authority figure in a position of

6      power that's saying this to her.

7           THE COURT:  All right, anything else you want

8      to tell me?

9           MS. JOHNSON:  There was two other cases I

10     handed to the Court, People versus Chaffee and

11     People versus Cooke.

12           Your Honor, in anticipation of what the

13     defense is going to be, I would venture to guess it's

14     going to be one of two things; it either didn't happen

15     and, if it did, it was consensual.  I can't, in my

16     mind, think of another avenue that they would go, but

17     I'm obviously not -- that's my best guess.

18           People versus Chaffee and People versus

19     Cooke, the court held that prior convictions for

20     sexually abusing the same very victim, admissibility of

21     that, outweighed any prejudice, particularly when the

22     defense was that it never occurred or the allegation is

23     a lie.

24           Here, where we anticipate that one of those

25     two things is going to be the defense, certainly it

                                              ws

Proceedings                    384

1    would be admissible.

2               Your Honor, we seek to admit this evidence on

3    our direct case both through her testimony and through

4    the video, through the defendant's own statements on

5    the video.

6               I don't know if the Court wants to address

7    the issue of the video now because we haven't heard

8    your Honor's decision on the hearing, but one factor

9    that the Court, I believe, needs to consider is that

10   assuming your Honor allows the video to come into

11   evidence, we would argue to your Honor that the

12   entirety of the video would be admissible to show his

13   motive, to show his intent, not just from her mouth,

14   but it's certainly relevant and probative out of his

15   own mouth.

16               And one of the things that -- one of the

17   burdens that the People have is to prove the

18   voluntariness of a confession to the jury, to the fact

19   finder, beyond a reasonable doubt.

20               The entirety of that video, we submit to the

21   Court, shows the voluntariness of his statement.  It

22   would certainly hamper the People, and I believe it

23   would be patently unfair, for the Court to allow part

24   of a video to come in whereas the totality of the video

25   is what the jury must look at to determine the

                                              ws

Proceedings                    385

1    voluntariness of his statements.  They can see him with

2    his own eyes (sic) and determine for themselves that he

3    wasn't coerced, an issue that the jury has to consider

4    on their own.

5              So --

6              THE COURT:  For all those reasons.

7              MS. JOHNSON:  -- in sum, Judge, we would

8    submit that both the victim's testimony and the video

9    are admissible under Molineaux to show not only his

10   motive, his intent, but it's absolutely necessary

11   background material, it is imperative to the issue of

12   force that we have to prove beyond a reasonable doubt

13   and this jury must be made to understand that these

14   actions did not occur in a vacuum, there was a grooming

15   process going on here, there was additional abuse that

16   caused her the fear and it goes directly to her

17   credibility because it goes directly to why she

18   outcried, who she outcried to and what her state of

19   mind was.

20             THE COURT:  Mr. Schechter?

21             THE ATTORNEY:  May it please the Court, your

22   Honor, I think that counsel has, in fact, put the cart

23   before the horse simply because all of her Molineaux

24   application relates to what the cases have showed from

25   the last hundred years or 80 years since Molineaux has

                                                      ws

Proceedings                    386

1    been decided and that is prior uncharged crimes.

2              My client is currently being charged in

3    Queens County with not only forcible crimes, but

4    statutory crimes against the same victim.

5              As such, your Honor, the cases hold -- and I

6    cited Bennett and Betts in my motion in limine.  The

7    cases hold that you cannot place an accused person in

8    the position of having to make a Hobson's choice.

9              In the event this material comes into

10   evidence, he's in the impossible position of having to

11   decide, "If I testify to defend myself of what I'm

12   being accused of her, including the things I'm being

13   accused of in Queens, then I'm going to be

14   incriminating myself in Queens County."

15             "However, if I do not testify, then the

16   allegations of the complainant regarding what happened

17   in Queens County go unchallenged and go unexplained,"

18   and  therefore I am hamstrung and he is hamstrung

19   because he can't -- there's no way to make a decision

20   here.  It's between whether you're going to get eaten

21   by a tiger eaten by a lion and the law protects him

22   from that.  That's why Molineaux is restricted to prior

23   uncharged crimes.

24             So everything counsel said, and I'm going to

25   get to the applicability of Molineaux in a second, is

Proceedings                    387

1    completely in opposite because the defendant's right to

2    be protected against self-incrimination outweighs the

3    desire of the People to basically show propensity

4    evidence.

5          What they're trying to do, they make all

6    these nice pronouncements; a limiting instruction could

7    be made from the Court to the jury.

8          Your Honor, and I have been around a long

9    time, you cannot get a jury to ignore, "I've been

10   abused for four years.  I've been -- he's taken his

11   mouth on me and by force.  He threatened me with this

12   in Queens.  He did this in the house in front of the

13   kids.  He did this -- " how are you going to ask a jury

14   to disregard the nitty-gritty of those statements, only

15   to be utilized to determine his intent here?

16         My client made a confession and on the

17   confession - which we haven't gotten a determination

18   yet, but assuming, arguendo, that the Court grants the

19   People the right that that confession is admissible -

20   my client made statements on that tape concerning these

21   instances and Queens, they overlap, although he did on

22   one instance say, "400 Community Drive we did this,"

23   and so on and so forth, denied the force.

24         However, the People have represented that the

25   complainant is going to testify that in Nassau County

                                                      ws

Proceedings                                388

1    force was utilized.  They went out of their way to get

2    this knife, supposedly that was in the car.  They

3    allege that he said, "I'm going to bury you here,"

4    whatever, that these threats were made, they were in

5    her head.

6              The fact is, he is being charged in

7    Queens County with violent and statutory crimes.

8              How can I, as his lawyer, put him on the

9    witness stand and incriminate him in a case for which

10   he stands to get 25 years consecutively with this?

11             How is he going to defend himself?

12             THE COURT:  Let me ask you this.

13             Who says or why do you pose it as though he

14   has to defend himself from those Queens charges in this

15   case?

16             MR. SCHECHTER:  Because if the People --

17             THE COURT:  That's a decision that you and

18   him --

19             MR. SCHECHTER:  No, your Honor, with all due

20   respect --

21             THE COURT:  No, it's a decision,

22   Mr. Schechter, that you and him will have to make.

23             Obviously, if I allow the People to introduce

24   this evidence in their direct case and should your

25   client testify, I'm certainly not going to allow the

                                                        ws

Proceedings                    389

1       People to cross-examine your client with regard to the

2       Queens incidents unless he makes a choice that he's

3       going to refute those charges here.  This jury is not

4       going to be considering whether he's guilty or not

5       guilty of the Queens charges.

6                   MR SCHECHTER:  With all due respect, your

7       Honor, it renders the proscriptions of Bennett and

8       Betts moot.

9                   THE COURT:  Well, let's get to that because

10      I'm glad you bring that up.

11                  If you take a look, Mr. Schechter, and I have

12      looked at these cases, one thing that you'll notice

13      that with respect to the decisions both in Bennett and

14      Betts, in the context of how the Court of Appeals ruled

15      in those cases, it deals with the proscription of

16      cross-examining a defendant regarding pending charges

17      for credibility purposes only.

18                  In other words, it comes up in the context of

19      a Sandoval ruling, would you agree?

20                  MR SCHECHTER:  Yes.

21                  THE COURT:  As opposed to a Molineaux ruling.

22                  MR SCHECHTER:  They touch on that, but please

23      proceed, your Honor.

24                  THE COURT:  Now, if you see in the case that

25      came out just this week, and I gave it to both counsel

Proceedings                390

1     a day or two ago, People versus Leeson, it's clear that

2     in these types of cases - and when I say these types of

3     cases, cases involving allegations of sexual

4     misconduct - particularly as here where it relates to

5     the same complainant and the same defendant, the

6     Court of Appeals has said that so long as the evidence

7     is not for propensity purposes, that the prior bad acts

8     will be admissible for purposes that bear -- for

9     purposes that are material to the issues that a jury is

10    going to consider.

11              So obviously the Court of Appeals is saying

12    that even these prior bad acts is admissible on the

13    People's direct case, so long as it's not for

14    propensity purposes.

15              My question to you is how, then, do you

16    reconcile the fact that the Court of Appeals is saying

17    this type of evidence is admissible with the Betts and

18    the Bennett cases?

19              Because in the Betts and Bennett cases it

20    talks about, unless I'm misreading the cases, where a

21    DA is looking to cross-examine the defendant regarding

22    pending criminal charges for credibility purposes as

23    opposed to Molineaux issues.

24              So, while the Betts and Bennett cases are

25    instructive with regard to some of the things that you

                                                          ws

Proceedings                    391

1   bring up, there is, in my view, a rather significant

2   distinction in the way those cases are decided as

3   opposed to what we're dealing with here.

4            MR SCHECHTER:   I respectfully take --

5   disagree with the Court in this sense.

6            The court dealt with the uncharged crimes in

7   those two cases with respect to cross-examination of a

8   defendant on the witness stand in order to prevent him,

9   basically, from incriminating himself.

10           The same issue goes -- relates in this case

11  under a Molineaux theory because it would take all of

12  the steam and protections out of that ruling to permit

13  the District Attorney to go backdoor here and offer on

14  her direct case evidence of those crimes.

15           We would be, then, in a position to have to

16  defend those crimes here as well as Queens County, your

17  Honor, because the jury, and with all due respect, no

18  matter what limiting instruction the Court gives, no

19  matter what the Court says, this jury is going to then

20  be shown by the District Attorney, through the

21  testimony of the complaining witness and through this

22  admission, that the complaining witness has been -- my

23  client is being charged, rather, with crimes in

24  Queens County for which he's indicted, crimes for which

25  he is not charged here and I respectfully submit it's a

Proceedings                              392

1       68 count indictment in Queens County, there's no other

2       reasonable view of this evidence other than the

3       People's desire to show propensity here.

4               The defendant would then have to take the

5       witness stand or elect not to take the witness stand

6       because he then has to face B felonies in

7       Queens County, he takes the witness stand regardless of

8       any desire to -- or limitation of the Court's --

9       limiting the People to cross-examining my client, the

10      other material comes in.  It's going to come in

11      regardless.

12              So whether he takes the stand here or doesn't

13      take the stand here, he either incriminates himself in

14      Queens County or he's going to incriminate himself in

15      this case and it just makes no sense, Judge.

16              THE COURT:  Your concern, and that's what the

17      concern of the Court of Appeals was in the Betts and

18      Bennett cases, is a defendant waiving his

19      self-incrimination rights regarding a pending criminal

20      charge and, again, and it bears repeating, that in that

21      particular case the People were looking to

22      cross-examine the defendant regarding pending charges

23      in another county for credibility purposes.

24              I can assure you, and that's what your

25      concern is, that your client, by testifying here in

                                                        ws

1    this case, is going to be giving up or foregoing his

2    Fifth Amendment right to not testify with regard to the

3    Queens charges, but I say to you that the only way that

4    that would happen would be if he decided to testify in

5    this case regarding the criminal charges or the acts

6    that are pending in Queens because certainly I'm not

7    going to allow the People to cross-examine him about

8    those Queens instances, should he take the stand here,

9    unless, again, unless he brings -- he opens the door,

10   if you will, as we all know, to that.

11            MR SCHECHTER:  Your Honor, hypothetically --

12            THE COURT:  And I think that protects your

13   client's Fifth Amendment rights with regard to the

14   Queens case and it preserves his right to refute, if

15   you will, the charges that this jury is going to

16   consider here.

17            MR SCHECHTER:  With all due respect, it does

18   not, your Honor, because.

19            THE COURT:  How does it not?

20            MR SCHECHTER:  Because if he's not going to

21   be cross-examined, if he's not going to be examined

22   about the cases in Queens County, then the jury is

23   going to hear the complainant's testimony

24   uncontradicted, he will be then -- they will assume he

25   will have to, if he's on the witness stand, refute

                                                    ws

Proceedings                    394

1    those charges, because if he doesn't refute the charges

2    they're going to absolutely draw an inference that he

3    must be guilty of those charges and we're going to be

4    in the same position.

5           It's a backdoor desire by the prosecution to

6    get un -- inadmissible, rather, evidence before this

7    jury which is in the nature of proclivity evidence,

8    that he is predisposed to commit this crime.

9           THE COURT:  That's a different argument in

10   itself.  That's an argument against a Molineaux

11   application.

12          MR SCHECHTER:  But what I'm saying is,

13   they're related.

14          Utilizing this vehicle to get this evidence

15   before this jury is a backdoor way of violating Betts

16   and Bennett.  That's what they're trying to do.

17          The fact that Betts and Bennett spoke of

18   cross-examination of a defendant taking the witness

19   stand does not, in any way, limit the prejudice to my

20   client in the event this material comes in because then

21   he's faced with this -- still going to be faced with

22   this obstacle and he has to make a decision, "Do I get

23   on that witness stand and risk incriminating myself in

24   Queens or do I keep quiet and risk that the jury hears

25   this material and it's unrefuted?"

Proceedings                    395

1              That is not a choice, I respectfully submit,

2        that the Court of Appeals says a defendant should make.

3              I would also like to quote from some of the

4        cases that counsel has, in fact, cited.

5              And the Molineaux issue, obviously, overlaps

6        to some degree, Judge.

7              Firstly, your Honor, she cites - when I say

8        she I mean Ms. Johnson - People v. Alvino.  It's the

9        first case that she cites here.

10             Now, on Page 17 in the dissent, which also

11       reiterates some of the theory that the majority

12       utilized, the dissent says, that's Page 17, the second

13       paragraph on the left two-thirds down the page, "The

14       suggestion that evidence could not be received to show

15       that the same man picked the pocket of the same person

16       on several successive occasions here together does not

17       apply to this case," meaning this particular case, "but

18       implicit is the fact that the court does not permit

19       this kind of inquiry," and they justify it by saying

20       the pickpocket knows when he steals, there could be no

21       mistake about it, whereas here there could have been a

22       mistake.  There's no allegation of a mistake.

23             How is it going to be a mistake?

24             Is there a mistake whether you sexually

25       abused another person?

                                                          ws

Proceedings                    396

1              No, either you did or didn't, period.

2              Now, that's one.

3              She also cites People versus Marji.

4              There is nothing here with respect to the

5       relationship.  The relationship is conceded.  They know

6       about the relationship.  She says she wants to show a

7       relationship between the two of them.  That's already

8       conceded.  He concedes it in his statement and she's

9       going to testify to that.

10             The only real difference is was forced used,

11      assuming that statement comes in, and I'm going to ask,

12      again, that be limited as part of my application.

13             She also cites People v. Jackson as she

14      indicated before.

15             Jackson again says in a rape prosecution

16      evidence of a prior uncharged sexual assault,

17      uncharged, Judge.

18             And the court says in that case, "The

19      uncharged rape in itself was inadmissible under

20      People v. Molineaux, but I conclude that the trial

21      court had discretion to admit evidence of the rape to

22      give meaning to the statement."

23             The statement was made, basically, in the

24      course of the current rape.  When he was raping her he

25      says, "Well, I did this, this and the other thing."

Proceedings                    397

1          Yeah, that's a res gestae statement.  That's
2     completely different.
3          So the statements -- the cases that counsel
4     is citing in support of her Molineaux application are
5     in apposite, Judge.
6          Here the most important right is my client's
7     right against self-incrimination.
8          They have a witness that's going to testify
9     as to the specifics of the sexual abuse.  The Court has
10    already been given a brief photocopy from counsel's
11    statements of how she intends to prove the force
12    occurred.
13         There is no reason whatsoever, short of
14    trying to show propensity, for counsel to be able to
15    elicit information concerning charged -- a charged
16    indictment in Queens County, even with the same
17    complainant.
18         I believe that the courts over this century
19    have purposefully stayed away from that red elephant in
20    the room and that is charged crimes because they were
21    jealously (sic) trying to protect defendant's right
22    against self-incrimination.
23         And to permit the People to go into these
24    charged crimes in Queens puts him in the situation
25    where he's unable to defend himself.

Proceedings                    398

1            I respectfully submit it violates due

2       process, it violates equal protection, it violates the

3       law.

4            THE COURT:  Let me propose this to you,

5       Mr. Schechter.

6            What if I am of the opinion that the words

7       charged or the fact that your client is facing charges

8       in Queens is not brought out in front of this jury, but

9       rather the underlying acts for which form the basis of

10      the charges because, quite frankly, I'm not going to

11      allow the People in this case to talk about a pending

12      Queens indictment with regard to your client --

13           MR SCHECHTER:  It's not only --

14           THE COURT:  -- does that mollify your

15      concern?

16           MR SCHECHTER:  No, because it's not only that

17      the jury will hear that he's charged in another body, a

18      grand jury indicted him, whoops, for a crime.  That's

19      not the real prejudice here.

20           The prejudice here is due process; that

21      these, are, in fact, in fact, charges he's facing in

22      Queens County and the decision -- the determination

23      will have to be made by him to either incriminate

24      himself in Queens County or to try to ameliorate the

25      prejudice that the People have caused by these alleged

                                                        ws

Proceedings                     399

1    prior acts being introduced.

2              That prejudice, that issue, will never go

3    away, Judge.

4              THE COURT:  I'm listening to you.

5              MR SCHECHTER:  Additionally, your Honor, with

6    respect to the statement, the statement itself contains

7    overlaps, contains sexual acts that were alleged to

8    have occurred in Queens.

9              So the statement itself would also have to be

10   redacted to some degree so that prejudice doesn't

11   eventuate to here.

12             The People knew when they charged my client

13   in Nassau County -- they knew he had been indicted

14   Queens.  They knew that he was charged in Queens

15   because some of the same because some of the same acts

16   he's charged with here.  They knew that.

17             As such, they elected to bring this

18   prosecution.  They cannot be permitted a benefit from

19   trying to get two shots at him for the same acts,

20   Judge, and that's what they're trying to do.

21             THE COURT:  All right, it would appear to

22   this Court that the -- and, again, as recently as this

23   week the Court of Appeals has indicated that in these

24   types of cases, specifically when it deals with courses

25   of conduct or periods of time when there's allegations

                                                    ws

1       of sexual misconduct between the same complainant and

2       the same defendant and as recently as in the Leeson

3       case that came out this week similar to the situation

4       here in this case, the Court of Appeals there

5       essentially said that prior bad acts, if you will, in

6       an adjoining county, not the county for which the

7       defendant was on trial for, were admissible in that

8       particular case since it had a bearing on the nature of

9       the -- and background, if you will, the relationship

10      between the complainant and the defendant and placed,

11      and I'm quoting from the Leeson case, "placed the

12      charged conduct in context."

13              Obviously, these decisions are decisions of

14      discretion as far as the trial court is concerned.

15              MR SCHECHTER:   May I please interrupt the

16      Court for a second?

17              THE COURT:   Yes.

18              MR SCHECHTER:   I think the determination is

19      one of law with respect to Molineaux.   I think the

20      courts held that it's a question of law and not fact or

21      discretion.

22              The other thing is, because I don't think I

23      fully addressed ed the Molineaux issue and I would like

24      to do that so the record is complete, I do not believe

25      based on the proffers of Ms. Johnson that she has

                                                           ws

Proceedings                          401

1       demonstrated sufficient, under Molineaux, to offer on

2       direct examination or through other -- direct testimony

3       or through any other evidence, including videotape,

4       that the prejudice that will be -- that will result

5       from the introduction of this material would outweigh

6       its probative value.

7               I further don't think that she came in under

8       any of the exceptions listed under Molineaux, mistake,

9       intent -- there's no mistake.

10              Intent is a question of fact for the jury

11      that the complainant will testify to and that's

12      something that will be resolved by them after they hear

13      the evidence.

14              Mistake, identity, is not an issue and common

15      plan and scheme is not an issue because this is not a

16      larceny crime or some kind of guesswork puzzle.

17          There's only one real issue, did he forcefully

18      have sex with her, that's the issue.

19              As such, it's not rocket science and the only

20      purpose for her doing this is for propensity purposes,

21      Judge.

22              So she has failed, I respectfully submit, to

23      come in with any exceptions to Molineaux.

24              Additionally, the prejudice will outweigh its

25      probative value and for those reasons, in addition, I

                                                     ws

Proceedings                               402

1    respectfully ask the Court deny the application, both

2    because of my client's violation of his right against

3    self-incrimination, due process, and because Molineaux

4    has not fully been complied with.

5             THE COURT:  As I was saying, the Court of

6    Appeals, on this particular issue, has directed trial

7    courts, in its discretion, to balance the probative

8    value of these uncharged or charged acts as to whether

9    or not their probative value outweighs any prejudicial

10   effect.

11            And, as you indicated, Mr. Schechter, there

12   are certain enumerated areas for which the court has

13   indicated that these items of uncharged prior acts or

14   criminal acts, bad acts, if you will, may be relevant

15   in a particular prosecution.

16            And, as I was indicating to you a moment ago,

17   in this particular type of setting what the -- not only

18   the Court of Appeals, but certainly many cases out of

19   the Second Department involving either sexual

20   allegation -- allegations of sexual conduct between the

21   same defendant -- between the same complainant and

22   defendant and it's certainly been seen in domestic

23   violence cases as well, that in terms of the

24   admissibility of these particular prior uncharged

25   criminal acts, one of the areas that the courts,

ws

Proceedings                                    403

1          including the Leeson Court of Appeals case, indicated

2          is that such evidence can be relevant to provide

3          necessary background information on the nature of the

4          relationship and I think for that reason, perhaps more

5          than any other, I think some of the incidents in Queens

6          are relevant.

7                       I would agree that they're not relevant for

8          purposes or for absence of mistake, I would agree with

9          you with respect to that, but I certainly think they

10         are relevant with respect to explaining the nature of

11         the relationship between the defendant and the

12         complainant, the background of the relationship.

13                      It certainly appears, as well, to have some

14         bearing on intent, particularly as it deals with the

15         issue of the element of force that's charged in this

16         particular case.

17                      Insofar as your argument that your client's

18         Fifth Amendment or self-incrimination rights would be

19         compromised, as I indicated to you during the course of

20         our discussion, that only becomes an issue if -- should

21         he take the stand and discuss and, if you will, open

22         the door to those Queens acts.

23                      It's certainly my intention not to allow the

24         DA to cross-examine, for example, for credibility

25         purposes, on the pending criminal acts, certainly that

                                                              ws

Proceedings                        404

1    would be precluded by the Betts and Bennett cases that

2    you've given.

3              But, again, the Betts and Bennett cases deal

4    with an issue that was posed in terms of a Sandoval

5    application and, again, as I indicated, the Court of

6    Appeals has quite clearly said that this type of

7    evidence in these circumstances, provided that if it's

8    not unduly prejudicial, can be admissible and is

9    relevant and for that reason, for those reasons, I

10   should say, I'm going to grant the People's application

11   to this extent.

12             First and foremost, I'm going to direct the

13   People not to elicit anything from any of the -- from

14   the complainant or, for that matter, any of their

15   witnesses regarding any pending Queens charges or the

16   reference to a Queens indictment, number one.

17             Number two, I am going to allow them to

18   elicit from the complainant when this -- the nature of

19   this, if you will, sexual relationship began with the

20   defendant.

21             I am going to elicit -- allow the People to

22   elicit when the, in terms of an instance, if you will,

23   when the complain -- when the relationship went from

24   what appeared to sound as though -- with the absence of

25   force to the use of force by the defendant.

1          And I will allow the People to elicit

2     testimony with respect to the alleged statement by the

3     defendant that he wanted to be the one, and I'm

4     assuming that this is what the testimony will be, that

5     there was some indication by the defendant that he

6     wanted -- or he picked, chose, if you will, a certain

7     date that he was to have sexual intercourse with the

8     complainant.

9          I see no reason to make any redactions from

10    the defendant's written statements -- well, let me take

11    that back.

12          I haven't made a ruling with respect to both

13    the written and the videotaped statement.  Should I

14    allow those items to be introduced by the People, I

15    would not -- I would not redact any portions of either

16    the written or the videotaped statement.  I think that

17    insofar as particularly the videotaped statement is

18    concerned, I think that my ruling with respect to what

19    the People will be allowed to elicit is consistent with

20    what the defendant is alleged to say on the -- on that

21    videotaped statement.

22          And I think that, quite frankly, in those

23    limited circumstances I think that this evidence would

24    be admissible.  I don't think that its probative value

25    is outweighed by any prejudice.

                                                        ws

Proceedings                        406

1           MS. JOHNSON:  May I ask the Court a question?

2           THE COURT:  Yes.

3           MS. JOHNSON:  With regards to the Court's

4    ruling about admitting -- allowing the People to elicit

5    testimony regarding when the sexual relationship began,

6    is the Court allowing the People to elicit testimony

7    regarding the time or is it the circumstance?

8           THE COURT:  I would indicate the time and

9    circumstance and, as I indicated, when the relationship

10   changed from an unforced, if you will, relationship to

11   one of force.

12          MS. JOHNSON:  And that also includes the time

13   and the circumstance?

14          THE COURT:  Time and circumstance, a

15   circumstance.

16          MS. JOHNSON:  The particular circumstance.

17          THE COURT:  Yes.

18          MS. JOHNSON:  And with regards to when the

19   defendant indicates he wants to be the one, is the

20   Court saying the victim would be able to testify that

21   it occurred during a period of sexual abuse, without

22   specific instance of it, but during sexual abuse that

23   that statement was uttered?

24          THE COURT:  Yes.  And I think that critically

25   in this case, most of these allegations are obviously

                                                    ws

Proceedings                407

1    intertwined with each other, both what occurred in

2    Queens and Nassau, and obviously the instances that I

3    am allowing all, if you will, lead up to the instances

4    in Queens -- instances in Nassau, I should say, right

5    up until the time the defendant is arrested.

6              So that's my ruling with respect to the

7    Molineaux application.

8              People, have you -- I assume, Mr. Schechter,

9    you're excepting to my ruling.

10             MR SCHECHTER:  I do except to each and every

11   aspect of your Honor's ruling and I don't believe your

12   Honor addressed the due process argument I made

13   concerning -- that the District Attorney is not

14   permitted to go into charged acts by virtue of

15   violating my client's due process and violation against

16   self-incrimination.

17             THE COURT:  I thought I had, but if I didn't,

18   just so both of you are clear, the People are not

19   permitted to cross-examine the defendant with regard to

20   the pending Queens charges, should he testify, unless

21   he opens the door to that and I will assiduously

22   protect, Mr. Schechter, your client's Fifth Amendment

23   rights with regard to that Queens matter, but bear in

24   mind I can only do so to the extent that your client

25   himself does not open the door, if you will, and

Proceedings                          408

1     testify to these Queens matters.

2              MR SCHECHTER:  Your Honor, the Queens matters

3     would already have been coming into evidence so he

4     would have no choice but to testify to the Queens

5     matters because the People are going to be bringing

6     them in and that's the very nature of my argument

7     against self-incrimination and due process.

8              So if he testifies and will be opening the

9     door if he goes into what's already been offered, it's

10    academic.

11             THE COURT:  His Fifth Amendment rights are

12    protected insofar as the Queens case is concerned,

13    provided that he doesn't himself, as a witness -- he

14    can't, to be -- I don't want to be simplistic about it,

15    but it is somewhat of a two-way street; if he doesn't

16    open the door to that obviously his Fifth Amendment

17    rights are protected.

18             This jury is not going to be considering

19    those Queens matters, they're not going to be hearing

20    about a Queens indictment or Queens charges, so this

21    jury, obviously, is not concerned about the matters in

22    Queens and certainly if he doesn't testify to the

23    matters in Queens then his Fifth Amendment  rights with

24    respect to those charges are protected.

25             MR SCHECHTER:  May I ask a hypothetical

Proceedings                              409

1      question to the Court?

2              Let's say the complainant gets on the witness

3      stand and testifies contrary to the way she testified

4      in Queens County.  Of necessity and in order to

5      authenticate the inconsistency I would have to refer to

6      the grand jury minutes in Queens County.

7              As such, how now am I going to do that

8      without letting the cat out of the bag, basically

9      prejudicing my client because in order to defend him I

10     have to go into the Queens matters?

11             THE COURT:  Well, one might say to the

12     complainant, "Do you remember testifying at a prior

13     proceeding on this particular day?  And did you -- were

14     you asked this question and did you give this answer?"

15             MR SCHECHTER:  Let's proceed.

16             "I don't recall.  What proceeding?  I don't

17     recall that.  Oh, and that was when it was in Queens?

18             I mean, that's the problem with these kinds

19     of things, Judge.  That's my concern.  It can come out

20     even indirectly from the complaining witness.

21             THE COURT:  The only thing I can tell you,

22     Mr. Schechter, and, believe me, I can appreciate your

23     position, I will do my best to preserve your client's

24     Fifth Amendment rights to the extent that I can and,

25     again, as I said, it would appear that based upon the

Proceedings                    410

1     case law that's in its current state, that this

2     evidence is admissible and I will do my best to make

3     sure that your client's right, not only in this trial

4     but with respect to any future rights he may have in

5     Queens are protected.

6              MS. JOHNSON:  And, your Honor, I've never

7     tried a full case before the Court, but I will give the

8     Court my representation that during preparation of

9     testimony with the victim and with any other witnesses

10    that testified in the grand jury I will make it very

11    clear to them that in no uncertain terms are they to

12    mention any of this information and to be very

13    conscious of the fact that if testimony comes up about

14    what they testified to in Queens, that they are not to

15    make reference to it at the peril of their own trial,

16    your Honor, and this is important to everybody,

17    including the victim, and she is a smart intelligent

18    girl, your Honor.  I truly believe that my cautionary

19    warnings to her and to the other victims (sic) will be

20    certainly honored before the jury -- witnesses.

21             THE COURT:  I would hope that that's the case

22    but certainly there's been many, many, many an instance

23    where, notwithstanding the best of intentions, things

24    sometimes happen.

25             MS. JOHNSON:  Absolutely.

                                                    ws

Proceedings                    411

1              MR SCHECHTER:  Please let the record reflect

2       that I have an exception to the -- to your Honor's

3       entire ruling.

4              THE COURT:  People, it would be -- I would

5       love to hear that this logbook has managed to make its

6       way to your office.  I've asked my law secretary to

7       call your office.

8              MS. JOHNSON:  Okay.

9              Can I make a call?

10             THE COURT:  Yes.

11             MS. JOHNSON:  I'm assuming she was

12      unsuccessful?

13             THE COURT:  I haven't heard from her.

14             (Brief recess in the proceedings.)

15             MS. JOHNSON:  I would like the record to be

16      complete, your Honor.

17             THE COURT:  Yes.

18             MS. JOHNSON:  Can I see that first?

19             Can I just see it?

20             MR SCHECHTER:  Sure.

21             (Shown to counsel.)

22             MR SCHECHTER:  Based upon my review of the

23      log that we requested from the police, which does

24      contain the entries from midnight through the time my

25      client is allegedly placed under arrest, there's

Proceedings                                      412

1       material -- I don't see any material that would be

2       useful for cross-examination on the -- of the officers.

3                       THE COURT:  Anything you want to add to your

4       argument in light of that, that you haven't made?

5                       MR SCHECHTER:  No.

6                       THE COURT:  One -- just before we get to the

7       decision after hearing, one thing, Mr. Schechter, I

8       neglected to add.

9                       Obviously, with respect to any of this

10      Molineaux evidence, it would be my intent to give a

11      curative instruction to the jury, both before, after

12      and during my closing remarks, during my charge.

13                      If there's anything you want me to consider

14      in terms of that charge, by all means, please give it

15      to us well enough in advance that I can review it with

16      my law secretary and obviously I trust you will give a

17      copy to the DA.

18                      MR SCHECHTER:  Well, I should like to say

19      parenthetically, your Honor, in my view there could be

20      no curative charge that would overcome the immense

21      prejudice that would result from the jury hearing about

22      all of these prior instances that have no relation to

23      this whatsoever, as I indicated before, so I don't

24      believe there can be any curative instruction that

25      would overcome that prejudice.

Proceedings                    413

1          THE COURT:  All right.

2              And I take it by that you're not asking for

3     one?

4          MR SCHECHTER:  No.

5          THE COURT:  If you change your mind,

6     obviously, please do so before the complainant should

7     testify.

8          MR. SCHECHTER:  With that in mind, I call

9     for all Rosario material concerning the complainant's

10    testimony in Queens County.

11         THE COURT:  I see Ms. Johnson shaking her

12    head in the affirmative.

13         MS. JOHNSON:  Yes, Judge, I would have turned

14    over her grand jury minutes anyway.

15             Actually, hopefully to expedite things for

16    Mr. Schechter to have the Rosario by tomorrow, it's

17    being photocopied as we speak by my parallel.

18             And any handwritten notes between the

19    prosecutor in Queens and the victim, I had requested

20    everything, so I don't believe that there's anything

21    from the Queens case that he wouldn't have as Rosario

22    in this matter.

23         MR SCHECHTER:  Additionally, I neglected,

24    unfortunately, to ask this, did Officer Alfaro testify

25    in the grand jury, either in Queens County or in

Proceedings                          414

1      Nassau County?

2                    MS. JOHNSON:  She did not in Nassau.

3                    I have already obtained copies of all the

4      witnesses' grand jury testimony in Queens, including

5      Officer Alfaro.  That's being copied as we speak.

6                    MR SCHECHTER:  I did not have

7      officer Alfaro's grand jury testimony when she

8      testified.  I will examine it to see if there's any

9      material that I find pertinent and if that's the case I

10     will seek permission from the Court.

11                   THE COURT:  It seems as though the beat goes

12     on.

13                   Anything else we need to take up?

14                   MS. JOHNSON:  Just scheduling.

15                   THE COURT:  We will deal with that later.

16                   Can I have the exhibits from the hearing?

17                   MS. JOHNSON:  Sure.

18                   MR SCHECHTER:  Mine, too?

19                   THE COURT:  Yes.

20                   MS. JOHNSON:  Do you want the video?

21                   THE COURT:  No.

22                   MS. JOHNSON:  Your Honor, can I keep a copy

23     of that logbook so I have it for the file and I'll give

24     Mr. Schechter a copy this afternoon?

25                   THE COURT:  Yes.

ws

Proceedings                    415

1              (Shown to counsel.)

2              MS. JOHNSON:   Your Honor, when we do discuss

3       scheduling I will have so-ordered subpoenas for your

4       Honor, if the Court would assist the People for

5       witnesses for trial?

6              MR SCHECHTER:   Would the Court check to see

7       if it has the photographs?

8              Because I looked in the file where I normally

9       keep them and the photographs I have here, which are

10      basically duplicative, I don't see, as well as the

11      medical record.

12             MS. JOHNSON:   I'll double check my file, but

13      I know I don't have them.

14             MR SCHECHTER:   No, wait, here it is, I have

15      the medical record.

16             (Pause in the proceedings.)

17             THE COURT:   All right, with respect to

18      People versus Harold Gopaul, this matter was sent to

19      this Court to conduct a Mapp/Huntley Hearing.  I think

20      this hearing was directed as a result of a decision and

21      order by Judge Calabrese of this court.

22             It does bear noting that there was not any

23      type of Dunaway or probable cause portion of the

24      hearing.

25             The hearing began on April 30th, continued to

                                                        ws

Proceedings                    416

1     May 1st, May 4th, May 5th and concluded today, May 6th.

2                    The People produced two witnesses, a

3     Detective Shulman from the 105th Squad, if you will,

4     and a Police Officer Alfaro from the 105th Precinct as

5     well.

6                    The defendant also, in addition to

7     introducing a number of exhibits, predominantly

8     photographs, defendant's medical records, the defendant

9     himself testified with respect to issues that are

10    pertinent to the hearing.

11                   The Court credits the People's -- testimony

12    of the People's witnesses and makes the following

13    findings of facts and conclusions of law.

14                   On or about June 23rd into June 24th, 2008

15    Detective Leonard Shulman of the 105th Precinct, a

16    ten-year police officer and five-year detective, was

17    working a 4:30 p.m., June 23rd, 2008 to 1 a.m. tour in

18    the early morning hours of June 24th, 2008.

19                   At some point before his tour was to end

20    between midnight and 1 a.m. he was assigned to

21    investigate a sex abuse allegation.  He was notified

22    that a female complainant was physically in the

23    105th Precinct being interviewed by police officers as

24    well as a representative, I believe, of the ACS, New

25    York City ACS or in Nassau County what I would think

ws

Proceedings                    417

1      would be the equivalent of the Child Protective

2      Services Bureau.

3                He was -- he interviewed -- or

4      Detective Shulman, I should say, had interviewed the

5      complainant in an interview room at the 105th Precinct.

6                At one point at approximately, according to

7      the detective, 4:45 a.m. he was advised by

8      Sergeant O'Hagan that the defendant had arrived at the

9      105th Precinct, that he was there to report his

10     daughter was missing.

11               The defendant, it would appear to this Court,

12     was at some point placed in custody prior to

13     Detective Shulman seeing him at approximately 5:10 in

14     the morning, according to Detective Shulman, in one of

15     the interview rooms at the 105th Squad.

16               Prior to going into that room the detective

17     indicated that he had secured his gun in a desk drawer

18     where his office was outside of the interview room.

19               He indicated that he came into the interview

20     room.  The defendant had already been placed in that

21     room by another officer.  Detective Shulman indicated

22     that he introduced himself to him as a detective with

23     the 105th Precinct and he told him that prior to

24     speaking to him he would be required to read him what's

25     referred to as his Miranda warnings.

                                                       ws

1           Detective Shulman indicated that he had

2     obtained a Miranda -- a preprinted Miranda warning form

3     from his desk drawer.  It's been marked, or a copy of

4     the one used, was marked as People's Exhibit Number 1

5     in evidence.  It's referred to as a PD 244-149A form.

6           He -- Detective Shulman indicated that he

7     began to read aloud the questions that were contained

8     in that form which contained the six rights and

9     admonitions with regard to a suspect's Miranda

10    warnings.  He read them aloud.

11          After each one -- each warning, if you will,

12    is followed by a question mark according to the form

13    that's in evidence.  The detective read these -- each

14    of these warnings and rights to the defendant.  He

15    indicated that the defendant answered yes to each of

16    them.  He indicated that the defendant spoke and

17    understood the English language.

18          After the defendant answered yes to each of

19    the six rights or warnings contained in the form

20    Detective Shulman had affixed or wrote the word yes

21    after each question.  He then gave the form to the

22    defendant and -- well, actually, prior to that the

23    detective had the defendant sign his name, print his

24    name and Detective Shulman had wrote the location and

25    date that the Miranda warnings were administered, which

Proceedings                    419

1    were approximately 5:15 a.m. on June 24, 2008. He gave

2    the form to the defendant, according to the detective,

3    indicated to him to read the rights and warnings, asked

4    if his answers to those questions that had been -- he

5    had verbally indicated yes to a few moments earlier

6    were still the same, at which point the defendant,

7    according to the detective, said yes.

8              He then asked the defendant then to affix his

9    initials after the word yes on the six different --

10   after the six different questions that were posed.

11             The defendant then wrote his initials,

12   according to the -- according to Detective Shulman,

13   after the words yes six times. As I indicated

14   previously, the defendant signed his name and the form

15   itself is signed by Detective Shulman with his -- with

16   his shield number as well.

17             Subsequently, subsequent to this,

18   Detective Shulman then indicated that he asked the

19   defendant to -- if he would be willing to consent to a

20   search of his motor vehicle which detective indicated

21   was -- had been -- was at the 105th Precinct parked

22   outside the 105th Precinct.

23             According to Detective Shulman defendant

24   indicated that he did -- he would consent to that.

25             Again a preprinted consent search form was

ws

Proceedings                                    420

1       then produced by Detective Shulman.  Detective Shulman

2       then indicated he read from the form, which has been

3       entered into evidence as People's Number 2, and this is

4       with respect to his home at 242-10 89th Avenue in

5       Bellerose, Queens County.  He read the form to the

6       defendant.  He then gave the defendant the form to

7       read.

8               He indicated if the defendant was willing to

9       consent to that form, to sign in the space provided

10      which, according to Detective Shulman, the defendant

11      did affix his signature as the person giving consent.

12      That form was signed, according to Detective Shulman,

13      approximately 5:20 a.m. on the morning of June 24th,

14      2008.

15              According to Detective Shulman, in addition

16      to the defendant signing or affixing his signature on

17      the form, it was the defendant that had placed the time

18      and date on the form itself.

19              The next form that was given to the defendant

20      or was -- there was a conversation between the

21      detective and the defendant, was a consent form to

22      search his vehicle.  Again, that is the vehicle that

23      was parked at the side of the 105th Precinct.

24              The detective went over the consent form,

25      read the consent form aloud to the defendant.

                                                        ws

1         The defendant indicated to Detective Shulman
2    that he, likewise with the house, would be willing to
3    consent to the search of his vehicle.  This form was
4    received in evidence as People's Number 3.
5         According to Detective Shulman, the defendant
6    signed his name on the form, affixed the date and time
7    on the form.  This form also has the signature of
8    Detective Shulman as well as a shield number that's on
9    the form and the form identifies the VIN number as well
10   as the license plate of the vehicle that the defendant
11   had driven to the 105th Precinct that morning.
12        After the forms were then signed
13   Detective Shulman indicated he took a break.  He left
14   the defendant inside the interview room.
15        It bears noting that during this time the
16   only police personnel that was inside the interview
17   room with the defendant was Detective Shulman.
18        He indicated he went back --
19   Detective Shulman indicated he went back and spoke to
20   the complainant further, who was in another room within
21   the 105th Squad during this time.
22        At approximately 6:20 a.m. Detective Shulman
23   re-entered the room where the defendant was located.
24   During this time or throughout this time he indicated
25   that the defendant was not handcuffed.

1            The defendant then -- or the detective,

2       actually, asked the defendant if he knew what he was

3       under arrest for and the defendant replied to him that

4       he had slapped his daughter regarding -- as a result of

5       a previous argument that he had had with her at an

6       amusement park, I believe the weekend before.

7            Detective Shulman asked the defendant if he

8       would be willing to make a written statement concerning

9       what he had just said.  Defendant indicated that he

10      would.

11           He gave the defendant a -- what would appear

12      to be, although this is a photocopy, and this is

13      People's 5 in evidence, a yellow pad, a blank yellow

14      pad, in which the defendant wrote out his name, his

15      address, the date, which was June 24th, 2008, the time,

16      which was approximately 7:30 a.m.

17           According to Detective Shulman the defendant

18      then -- strike that.

19           Actually, the first -- is there -- this first

20      statement was actually People's 4 in evidence.  The

21      reference to Number 5 is incorrect.  The first

22      statement that the defendant wrote was People's

23      Number 4 in evidence.

24           Again, he gave this blank piece of paper to

25      the defendant.  The defendant then wrote out a written

                                                           ws

Proceedings                    423

1       statement in his own words, in his own handwriting, as

2       to what he had just told Detective Shulman.

3              Indeed, according to Detective Shulman,

4       defendant had corrected the date initially where it

5       said Saturday 6/21 or 6/22, the defendant changed that

6       date.

7              That statement was done at 6:25.  As I

8       indicated, it is approximately a one and one-quarter

9       page statement on a yellow legal pad.

10              The detective testified that he then

11      confronted the defendant with allegations that his

12      stepdaughter had claimed that there was a -- there had

13      been some inappropriate sexual conduct between him and

14      his stepdaughter.

15              Prior to that, actually, the defendant was

16      allowed to use the restroom -- was then handcuffed,

17      taken to a restroom and then returned back to the

18      interview room.

19              As I indicated, at approximately 7:25 a.m.

20      the detective went back into the interview room and sat

21      across from the defendant in the interview room and

22      that -- indicated to the defendant that the

23      stepdaughter had made allegations of an inappropriate

24      nature.

25              Detective Shulman wouldn't indicate to the

                                                    ws

Proceedings                    424

1    defendant the details of the allegations that were

2    being made at that time by the stepdaughter in a

3    separate room.

4              He then asked if he would like to make a

5    second statement.  According to Detective Shulman the

6    defendant stated that he felt bad about it and would

7    like to make a statement.

8              Again the defendant was offered a blank

9    yellow pad and a piece -- and a pen at which time the

10   defendant then, in his own handwriting, wrote a second

11   statement - and, again, this is now People's 5 in

12   evidence - dated June 24th, 2008, the time is

13   approximately 7:30 a.m., in which the defendant then

14   wrote a second statement in response to the allegations

15   that had been made by the complainant as told to him by

16   the detective.

17             On both of these statements the defendant's

18   signature appears on the statement, the date and time.

19             The second statement was -- it appears was

20   begun at 7:30 a.m. and was completed, according to the

21   bottom portion, at 8:30, approximately one hour later.

22             Both statements bear the defendant's

23   signature as well as Detective Shulman's signature as

24   well.

25             During the course of this period of time

                                                      ws

1     Detective Shulman testified that no threats or force or
2     promises of leniency were made to the defendant, that
3     he did not have his weapon with him.

4                 According to Detective Shulman, he was the
5     only one present in the interview room during the
6     course of these two statements.  In both instances,
7     according to Detective Shulman, the defendant was
8     offered the opportunity to read the statements after he
9     wrote them out and asked if he wanted to make any
10    changes that he could.  According to Detective Shulman,
11    the defendant did not make any changes.

12                Throughout the course of these two statements
13    Detective Shulman indicated that the defendant at no
14    time wished to invoke his right to remain silent or to
15    speak with a lawyer.

16                At one point during the course of the
17    interview after these statements the defendant was
18    asked by Detective Shulman if he had any vibrators in
19    his car.  According to the detective, defendant said he
20    had a body massager in the car and a vibrator in the
21    house.

22                At that point -- just off the record one
23    moment.

24                (Discussion held off the record.)

25                THE COURT:  According to Detective Shulman,

ws

Proceedings                              426

1        after speaking to the defendant as to his possession of

2        any vibrators, Detective Shulman indicated that --

3        Detective Shulman then wrote down -- as opposed to the

4        two other statements, Detective Shulman then wrote down

5        his question to the defendant and the defendant's

6        answer, it's in Detective Shulman's handwriting, in

7        which the defendant indicated to him that there were

8        multiple vibrators in the house.  They are white and

9        looked the same, they are in a cabinet in the bedroom

10       in the house, and he has a white fold-up massager in

11       the car that he uses for his neck.  He claims to have

12       never have used it on his daughter.

13              That oral conversation was reduced to writing

14       by Detective Shulman.  There's also -- and this is,

15       again, People's 6 in evidence that was introduced

16       during the hearing.

17              According to Detective Shulman, the defendant

18       then drew a picture in his own handwriting of what

19       appears -- what appeared to Detective Shulman to be the

20       vibrator that the defendant was referring to in terms

21       of its dimension and its shape.

22              After this had taken place, according to

23       Detective Shulman, he then spoke to Police Officer

24       Alfaro who told her that there was some, what he

25       believed to be, items of evidence in the home and in

                                                    ws

Proceedings                    427

1      the defendant's car that was pertinent and related to

2      this case.

3               Detective Shulman then contacted the DA's

4      Office.  He had asked the defendant if he would be

5      willing to make a videotaped statement.  That statement

6      was introduced into evidence as People's Exhibit 7.

7               The videotaped statement was played for the

8      jury.  The video -- for the Court.  The videotaped

9      statement was played for the Court.  The videotaped

10     statement was taken at the Queens -- at the

11     105th Precinct in a different room than that which the

12     defendant was -- had been questioned by Detective

13     Shulman.

14              The videotaped statement that was entered

15     into evidence both audibly and visually depicted two

16     Assistant District Attorneys from Queens, the

17     defendant, the videographer and Detective Shulman in

18     the -- in this second interview room.

19              Preliminarily, the defendant's Miranda

20     warnings were then administered to him at now a second

21     time by one of the Assistant DAs on the videotape.

22              On the videotape the defendant is clearly

23     seen to be acknowledging his Miranda warnings, waiving

24     his rights with respect to his Miranda warnings and

25     affixing his initials similarly to the way he did in

1    front of -- with Detective Shulman after the

2    Assistant DA wrote the words yes to each of the six

3    questions that were posed to him.

4            During the course of the videotaped statement

5    the defendant did not indicate that he wished to no

6    longer give a statement or speak to a lawyer or, for

7    that matter, invoke his right to remain silent. In the

8    videotaped statement the defendant is shown without

9    handcuffs in the interview room.

10           After the videotaped statement was played

11   defendant was then bought -- brought, I should say, for

12   booking at central booking in Queens.

13           In looking at the videotaped statement it

14   appeared to be done on the afternoon, late afternoon,

15   of June 24th, 2008, somewhere between the hours, I

16   believe, of 4 and 5 in the afternoon.  The videotaped

17   statement is approximately 30 to 40 minutes in length.

18           Detective Alfaro from the 105th precinct

19   testified that she was -- worked a tour of duty on

20   June 24th, 2009 from 11:15 to 5:40 p.m. -- 11:15 a.m.

21   to 5:40 p.m.; that she was asked if she wanted an

22   arrest -- she was asked by one of her supervisors if

23   she wanted an arrest, which she agreed to; that

24   Detective Shulman had then directed her to process the

25   arrest.

Proceedings                                429

1           She assisted in the processing of the arrest,

2     including the interviewing -- some interviewing of the

3     complainant and doing an online booking paperwork.

4           According to Police Officer Alfaro she took

5     the defendant downstairs from the upstairs area where

6     defendant had been in the squad room with

7     Detective Shulman.  He was brought downstairs

8     handcuffed where his arrest was processing.

9           He was then placed in a cell area behind the

10    front desk of the 105th Precinct where pedigree

11    information was taken from him.

12          According to Officer Alfaro, her weapon was

13    locked in a locked area throughout this time.

14          During the course of her interaction with the

15    defendant, which was now in the early morning or

16    mid-morning hours of June 24th, the defendant did not

17    make any complaints of pain or request any medical

18    attention.

19          While officer Alfaro was with the defendant

20    the defendant did not interact with any other police

21    officers she did not see any other police officers go

22    into the cell after the defendant was placed in the

23    cell by Officer Alfaro.

24          At one point she was asked by

25    Detective Shulman to take the complainant in this case

ws

1        to the vehicle where -- that the defendant had brought

2        to the 105th Precinct in an effort to secure certain

3        property that was, according to the defendant, located

4        in the car.   This was an Ecolab truck that the

5        defendant used for work purposes that was parked next

6        to the 105th Precinct.

7                     According to Officer Alfaro, the complaining

8        witness took her to a vehicle and directed her to a

9        compartment inside the vehicle, I believe, where a meat

10        clever was recovered as well as a white massager.

11                     Those items of property were then invoiced

12        and vouchers were prepared and also Officer Alfaro went

13        to the defendant's home on June 24th, 2008 where she, I

14        believe, met the mother of the complainant, the wife of

15        the defendant, at 242-10 89th Avenue in Queens and

16        indicated to her to search the home.   Officer Alfaro

17        indicated she had the consent search form which had

18        previously been signed by defendant with her.

19                     She indicated defendant's wife allowed her

20        inside the home and that a search was done of the

21        master bedroom in the home that the defendant shared

22        with his wife and according to Officer Alfaro she

23        recovered a white and gray massager that was under the

24        bed in the defendant's master bedroom.

25                     The defendant himself testified in this

                                                              ws

Proceedings                    431

1    hearing.  He indicated that he's 51 years of age,

2    worked as an Ecolab worker involved in pest

3    elimination.  He testified that he had no injuries

4    prior to June 24th, 2008.  He made reference to a prior

5    hernia operation.

6              He testified that he had last eaten on June

7    22nd, 2008, which, I believe, was a Sunday, and worked

8    the entire day on Monday day and at approximately 1:45

9    a.m. on June 24th, 2008 he noticed that his daughter

10   was not -- the complainant in this case was not home,

11   noticed the back door unlocked, thought that his

12   daughter had ran away or was missing, drove to the

13   105th Precinct at approximately 2:30 a.m.

14             He indicated that when he went into the

15   precinct he was met by an officer and he told that

16   officer he came to report his daughter was missing.

17             He indicated that nine or ten officers

18   surrounded him, that they then began to grab him by his

19   hand or his arm and slammed him into a wall, that

20   officers were -- surrounding officers were shouting for

21   another officer to cuff him, put a cuff on him.  He

22   indicated that officers were pushing him, grabbing him,

23   in essence, physically throwing him around.

24             He indicated at some point that he began to

25   ask if he could be allowed to have a phone call for his

                                                    ws

Proceedings                     432

1    wife.  He was told that he was not going to get a phone

2    call, that he was then eventually handcuffed and pushed

3    up a flight of stairs by Detective Shulman, taken to a

4    location, the interview room that he referred to as the

5    box.

6              He indicated that Detective Shulman

7    initially, when entering the room, grabbed him by his

8    collar and pushed and pulled him around throughout the

9    course of this, using language that he described as

10   foul.

11             He indicated that he was never advised of his

12   Miranda rights.

13             He indicated at one point

14   Detective Shulman came in with papers saying that it

15   contained statements by his daughter accusing him of

16   inappropriate sexual activity.

17             The detective said, "You want me to tell --

18   you want to tell me anything else?"

19             Defendant requested he wanted to speak to his

20   wife and, alternatively, a lawyer.  Detective Shulman

21   indicated he was not going to get either.

22             He indicated that the Miranda sheet that's

23   been entered into evidence had the words yes already

24   written on it, that the detective had made threats for

25   him to place initials on it, that the detective came

ws

Proceedings                      433

1    back with the notepad, pen and paper.

2              The defendant wrote what had occurred at the

3    fair.  He acknowledged writing what occurred at the

4    fair.

5              Detective Shulman told him that he was going

6    to be put away for a long time, made him sign a

7    confession that he abused his daughter.  He told --

8    according to the defendant, Detective Shulman told him

9    that he was going to take it to his supervisor and that

10   once he does that that he would be going home soon.

11             The defendant also said that the detective

12   asked him to do a videotape.  He said he kept on asking

13   for a lawyer, was denied access to a lawyer, denied

14   access to a phone call.  He said that after he signed

15   his Miranda rights for the DA he would then be going

16   home.

17             He says he did not, was deprived of sleep

18   from Sunday through Tuesday afternoon with the

19   exception of a bottle of water given to him by the DA

20   during the course of the videotape, that he had nothing

21   to eat or sleep for approximately 15 hours.

22             Upon his release from jail after being

23   arraigned he went to his attorney's office and then

24   thereafter went to Long Island Jewish Hospital on

25   June 26th, 2008 for treatment of his injuries.

                                                    ws

Proceedings                    434

1            He introduced photographs in evidence,

2       People's G through J that he indicates --

3            MR SCHECHTER:  Defendant's G through J.  I

4       think you said People.

5            THE COURT:  Defendant's G through J,

6       indicating what he described as injuries that were

7       inflicted -- or healing injuries that were inflicted at

8       the hands of the police officers at the 105th Precinct

9       as well as the hospital records from Long Island Jewish

10      that were entered into evidence in which he complained

11      of pain, body aches, abdominal pain that he, according

12      to the records, indicated -- was inflicted at the hands

13      of the police officers.

14            I should also indicate that the defendant

15      also introduced photographs into evidence depicting the

16      outside of the 105th Precinct, C,D,E and F in evidence,

17      as well as the interrogation area that was acknowledged

18      by Detective Shulman as the location where the

19      interviewing of the defendant took place.

20            The Court makes the following conclusions of

21      law:

22            With respect to the Huntley issues, as I

23      indicated, the Court does credit the testimony of the

24      police officers, Detective Shulman in this particular

25      case.

Proceedings                    435

1        The Court finds that in the first instance

2    that the statements were voluntarily given under oath,

3    CPL 60.45, that these statements were voluntarily made,

4    that the defendant made a knowing, intelligent and -- a

5    knowing, intelligent and voluntary waiver of his

6    Miranda rights both prior to giving the written

7    statements to the police officer, or the detective, I

8    should say.

9        Court also finds that the People have met

10   their burden with respect to the consent searches that

11   were executed by the defendant; that based on the

12   totality of the circumstances here that these consent

13   searches -- or consent forms allowing the search of

14   both his vehicle and his home, again, were voluntarily

15   made after the defendant was advised orally by

16   Detective Shulman of his rights and with respect to

17   both of these consent searches, as well as being given

18   the opportunity to read both of these consent search

19   forms prior to signing them, and therefore the property

20   that was recovered, both in the car and the home, as a

21   result of these search forms was properly obtained.

22        Insofar as the statements are concerned,

23   Court finds that contrary to the defendant's

24   assertions -- primarily when viewing the videotape that

25   was seen by the Court in this case, the Court,

Proceedings                    436

1       notwithstanding the defendant's assertions in this

2       case, would credit the evidence that was presented

3       during the course of this case to the degree that the

4       People, in this Court's view, have satisfied beyond a

5       reasonable doubt that these statements were voluntarily

6       made and that they were the product of knowing,

7       intelligent and voluntary waivers of the defendant's

8       Miranda rights and, accordingly, the defendant's motion

9       to suppress both the statements -- written statements,

10      videotaped statements, as well as any other evidence

11      that was recovered is hereby denied.

12                   MR SCHECHTER:  Respectfully except.

13                   THE COURT:  Yes.

14                   MR SCHECHTER:  Question, your Honor?

15                   With respect to the videotape, is the Court

16      making a determination that the warnings given ab

17      initio by the detective were the warnings that were

18      allocable, the Miranda warnings, allocable to my

19      client's statement or is the Court determining that the

20      verbal warnings given by, I believe, either the

21      District Attorney at the video statement, that those

22      were, in fact, the proper Miranda warnings because no

23      waiver -- notwithstanding a waiver form was signed on

24      the videotape, there was none that was put into

25      evidence.

Proceedings                    437

1          So I would like to know which Miranda waiver

2     the Court is determining with respect to the videotape

3     and its admissibility.

4          THE COURT:  Well, at a minimum, I think that

5     the Miranda warning that was executed by the defendant

6     during his interaction with Detective Shulman clearly

7     applied not only to the written statements, but later

8     to the videotaped statement.

9          There was no evidence in the record to

10    suggest that there was any invocation by your client or

11    by the defendant of his right to remain silent or his

12    right to speak with an attorney at any point in time

13    during the course of his interaction with the police.

14    Although the -- and I would say that applies to the

15    videotaped statement as well.

16         I would just also add that I think an

17    inference secondarily could be drawn from the

18    videotaped statement that it would appear from --

19    although the form wasn't introduced, that the defendant

20    was advised of his Miranda warnings a second time

21    during the course of that videotape and that clearly in

22    that instance he also made an intelligent, knowing and

23    voluntary waiver of his rights during the prior --

24    immediately prior to the videotape.

25         MR SCHECHTER:  The oral administration of the

ws

Proceedings                    438

1      rights.

2                  THE COURT:  Yes.

3                  All right, obviously I went a little bit

4      longer than I anticipated.  I'm going to ask everybody

5      to come back at 2:30.  I would ask you to come here.  I

6      don't even know, as I sit here now, whether or not --

7      we can't be here to begin jury selection.  We're going

8      to have to be somewhere else.  I don't know where that

9      is.

10                 THE CLERK:  Judge Sullivan.

11                 THE COURT:  My clerk is telling me we're

12     going to be right down the hall in Judge Sullivan.

13     He's on the courtroom on the left.  Report there at

14     2:30.

15                 MR SCHECHTER:  Should we leave our stuff or

16     take it?

17                 THE COURT:  Take it.  We won't be here this

18     afternoon.

19                 MS. JOHNSON:  I'll have a witness list at

20     2 o'clock for the prospective panel.

21                 (The luncheon recess was taken at this time.)

22                      *    *    *    *

23

24

25

                                                          ws

439

I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

People's Witnesses:

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| 1. Det. Leonard Schulman | 22/ 96 | 175/ 255 | 230 | 231 |
| 2. P.O. Celica Alfaro | 239 | 252 | 272 | 272 |

Defendant's Witnesses:

| | DIRECT | CROSS | REDIRECT | |
|---|---|---|---|---|
| 1. Harold Gopaul | 276 | 305 | 338 | |


E X H I B I T S

| | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|

People's Exhibits:

| | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 1. Miranda warnings | 33 | 36 |
| 2. Consent to search home | 45 | 47 |
| 3. Consent to search vehicle | 49 | 51 |
| 4. Defendant's statement (6:30) | 58 | 99 |
| 5. Defendant's statement (8:30) | 109 | 112 |
| 6. Defendant's statement | 115 | 124 |
| 6A.Original of Exhibit 6 | 117 | |
| 7. Videotaped statement | 117 | 132 |

Defendant's Exhibits:

| | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| A. Memo book (Alfaro) | 183 | |
| B. Follow-up index sheet | 185 | 187 |
| C. Photo | 198 | 200 |
| D. Photo | 198 | 200 |
| E. Photo | 198 | 200 |
| F. Photo | 198 | 200 |
| G. Photo | 299 | 301 |
| H. Photo | 299 | 301 |
| I. Photo | 299 | 301 |
| J. Photo | 299 | 301 |
| K. LIJH records | 304 | 305 |

ws