Proceedings                    190

1            PROSPECTIVE JUROR:  Not at the time.

2            THE COURT:  Mr. O'Shea, what about you?

3            PROSPECTIVE JUROR:  I agree.

4            MR. SCHECHTER:  Now, Mr. Daniel, you're a

5       colleague.  You're a sole practitioner.  I do

6       sympathize with you.

7                As lawyers we have a certain training, do we

8       not?

9            PROSPECTIVE JUROR:  We do.

10            MR. SCHECHTER:  I have already made comments

11       to the jury concerning reasonable doubt or things that

12       might come up in the trial and I appreciate your

13       telling me two weeks away from your practice - and,

14       believe me, I understand that - would be devastating

15       because the paperwork piles up, mail piles up, calls

16       come in, clients call, "Why aren't you listening to me.

17       I don't care you have jury service, I'm paying you,"

18       that sort of thing.

19            PROSPECTIVE JUROR:  That's correct.

20            MR. SCHECHTER:  Do you feel that kind of

21       pressure might be detrimental to your being able to

22       focus on this case?

23            PROSPECTIVE JUROR:  I would hope not, but the

24       truth of the matter is every night I would go back to

25       my office and see things piling up.  I'm not sure

                                                        ws

Proceedings                          191

1     exactly if I will be able to do it for two weeks.

2     That's my only concern, really, although I don't see

3     why I would not be able to focus.

4                 MR. SCHECHTER:  I want to make sure everybody

5     is giving something.  That's part of your jury system.

6     This is what I do and this is what you do.

7                 Would you be able to set aside whatever

8     pressures you have and be able to sit here and not be

9     diverted --

10                PROSPECTIVE JUROR:  If I'm here, I'm here.

11                MR. SCHECHTER:  Thank you.

12                THE COURT:  About two minutes, Mr. Schechter.

13                MR. SCHECHTER:  Mr. Saladino, what about you?

14                PROSPECTIVE JUROR:  No problem.

15                MR. SCHECHTER:  Anything that occurred in the

16    jury trial in your criminal case?

17                Did that make any impression on you such that

18    you would be predisposed towards the prosecution in

19    this matter?

20                PROSPECTIVE JUROR:  No.

21                MR. SCHECHTER:  Ms. Striffolino?

22                PROSPECTIVE JUROR:  No problem.

23                MR. SCHECHTER:  Ms. Doughty, I learned my

24    lesson.

25                You're a teacher's aide?

                                                    ws

Proceedings                   192

1              PROSPECTIVE JUROR:  Right.

2              MR. SCHECHTER:  And I think you've got

3     relatives and a handicapped daughter?

4              PROSPECTIVE JUROR:  Right.

5              MR. SCHECHTER:  You could see my great

6     concern.  The possible empathy is huge.

7              Would you possibly identify with that girl on

8     the stand?

9              PROSPECTIVE JUROR:  I would try not to.

10             MR. SCHECHTER:  But you can't promise that

11    you --

12             PROSPECTIVE JUROR:  I would try.

13             THE COURT:  You can't give us your assurance?

14             PROSPECTIVE JUROR:  Promise is hard.

15             MR. SCHECHTER:  How about you, Mr. Sklar?

16             PROSPECTIVE JUROR:  I'm a pretty analytical

17    person.

18             THE COURT:  Mr. Toro?

19             PROSPECTIVE JUROR:  I wouldn't have any

20    issues.

21             THE COURT:  What about your pressures that

22    you indicated you would have?

23             PROSPECTIVE JUROR:  I would be fair,

24    definitely objective.

25             Would I be 100 percent focused?

                                                    ws

1           I cannot promise that.

2           MR. SCHECHTER:  Thank you.

3           Mr. Casesa?

4           PROSPECTIVE JUROR:  I hope I can be fair.

5           THE COURT:  You say you hope.

6           From what you've heard so far is there any

7     reason you cannot be fair?

8           PROSPECTIVE JUROR:  I have a daughter myself

9     and, you know, it's a little hard for me to go through

10    this, but, you know, I will give you my 100 percent, if

11    I can.

12          MR. SCHECHTER:  If you can?

13          PROSPECTIVE JUROR:  Right.

14          MR. SCHECHTER:  Can you assure us that you

15    can?

16          PROSPECTIVE JUROR:  I'll say yes, you know,

17    but then when you see the young girl there, you

18    might -- I might feel a little.

19          MR. SCHECHTER:  Sympathetic?

20          PROSPECTIVE JUROR:  Right.

21          MR. SCHECHTER:  What I need here is people to

22    be analytical, meaning that, look, I know she's upset,

23    I know she's testifying and she's crying or not crying,

24    telling this terrible thing, but there are more parts

25    to this case.

                                                    ws

Proceedings                    194

1           Do you think that because she would be
2       testifying and perhaps be emotional that that would, in
3       some way, make you unable to hear the rest of the
4       evidence?
5           PROSPECTIVE JUROR:  Probably be
6       uncomfortable.
7           THE COURT:  Let me ask you, at the end of the
8       case I'm going to tell not only yourself if you're
9       selected as a juror but all the jurors you have to put
10      aside any type of emotion, bias, prejudice, sympathy
11      and look at this case and evaluate the evidence based
12      upon what you hear in the courtroom.  It's not unusual
13      for people to income into criminal trials, civil
14      trials, and be emotional on occasion.
15          What we're asking you is at the end of this
16      case when it comes time to deliberate can you judge the
17      case based on the evidence that you hear here in the
18      courtroom as opposed to any kind of emotional reaction?
19          PROSPECTIVE JUROR:  I would be able to.
20          THE COURT:  Okay.
21          MR. SCHECHTER:  Thank you.
22          Mr. Lynch, congratulations on having a marine
23      in your family.  Sempa fi.
24          Where is he stationed?
25          PROSPECTIVE JUROR:  Two-part answer.  Two

Proceedings                    195

1    years ago he was a captain in Falucia, Iraq.  Next

2    month, as a major, he's going to Afghanistan.  Please

3    keep him in your prayers.

4              MR. SCHECHTER:  I, as we all, Mr. Lynch, and

5    please accept my congratulations and my pride about

6    your son and my prayers that he will be okay.

7              PROSPECTIVE JUROR:  Thank you.

8              MR. SCHECHTER:  Now, you have another son who

9    is a paramedic lieutenant in the Fire Department.

10             Now, if I recall correctly, those folks

11   pretty much come into regular contact with police

12   officers, no?

13             PROSPECTIVE JUROR:  It's a fair statement.

14             MR. SCHECHTER:  As such, would you be more

15   favorably disposed towards a police officer testifying

16   as opposed to a civilian witness?

17             PROSPECTIVE JUROR:  Absolutely not.

18             MR. SCHECHTER:  Now, you've also heard my

19   question regarding sympathy for the complainant, which

20   could be natural.  She's a young woman testifying about

21   what she says occurred to her.

22             Would you think that because she testifies to

23   this situation - which, I'm going tell you, she's going

24   to testify to things that are probably very

25   distasteful, it doesn't mean they're true, it doesn't

Proceedings                              196

1        mean they're accurate, but she's going to testify to

2        those things - are you going to, by virtue of that,

3        turn the switch off and just not listen to any of the

4        other testimony?

5                    Is there a danger of that?

6                    PROSPECTIVE JUROR:  No, I have an open mind.

7        I can be very fair and accurate.

8                    MR. SCHECHTER:  Thank you, sir.

9                    THE COURT:  Thank you, Mr. Schechter.

10                    Prospective members of the jury, what I'm

11        going to ask you to do, since obviously we've exhausted

12        the remainder of the people that came over with you, if

13        you all just want to get up, if you need to use the

14        facilities to just stretch out, just stay, if you

15        would, kind of outside in the hallway here, I want to

16        try to cover the attorney's selections as quickly as

17        possible and then you'll either be serving with us

18        starting Monday or be on your way.

19                    So if you just want to step outside.  We'll

20        have you back here in a few minutes.

21                    (Prospective jurors exit.)

22                    THE COURT:  Are we ready to go?

23                    MS. JOHNSON:  Yes.

24                    MR. SCHECHTER:  Yes.

25                    THE COURT:  People have used three

ws

1     peremptories, defendant has used four.

2            People you've got seven left, defendant six.

3            We've got four sworn, so we're going to

4     consider the first eight.  That's Mr. Saladino through

5     Mr. Asche.

6            People, cause?

7            MS. JOHNSON:  First challenge for cause is

8     Juror Number 2, Ms. Troy.

9            MR. SCHECHTER:  Agreed.

10           THE COURT:  That's granted.

11           Any other challenges for cause, 1 through 8?

12           MS. JOHNSON:  Yes, second challenge for cause

13    is Juror Number 3, Mr. Daniel, based on his comments

14    that he hopes that he can focus and he's not sure if

15    two weeks away -- as it will be difficult for his

16    practice.

17           MR. SCHECHTER:  Agreed.

18           MS. JOHNSON:  Next challenge for cause, Juror

19    Number 8, Mr. Asche.

20           MR. SCHECHTER:  Agreed.

21           MS. JOHNSON:  That's it for cause for 1

22    through 8.

23           THE COURT:  So those challenges will be

24    consented to.

25           MR. SCHECHTER:  I have one.

Proceedings                    198

1              THE COURT:  Hold on one second.

2              All right, defendant, cause?

3              MR. SCHECHTER:  Yes, Juror Number 6.

4              MS. JOHNSON:  Consent.  I missed that.

5              THE COURT:  Ms. Cioffi?

6              MR. SCHECHTER:  Yes.

7              THE COURT:  That's granted.

8              Any other challenges for cause, defendant?

9              MR. SCHECHTER:  One through 8?

10             THE COURT:  One through 8.

11             MR. SCHECHTER:  No.

12             THE COURT:  People, peremptory, one through

13        eight?

14             MS. JOHNSON:  Juror Number 5, Mr. Fowler.

15             THE COURT:  Mr. Fowler, peremptory.

16             Any other challenges, People?

17             MS. JOHNSON:  No other perempts, 1 through 8.

18             THE COURT:  Defendant, peremptory, 1 through

19        8?

20             MR. SCHECHTER:  Juror Number 4.

21             THE COURT:  Mr. O'Shea.

22             Any other challenges?

23             MR. SCHECHTER:  May I have a moment, please?

24             THE COURT:  Sure.

25             (Pause in the proceedings.)

                                                    ws

Proceedings                          199

```
 1              THE COURT:  That leaves Mr. Saladino and
 2      Mr. Meyers.
 3              MR. SCHECHTER:  No other challenges on the
 4      first eight, Judge.
 5              THE COURT:  Mr. Saladino will be Juror Number
 6      5 --
 7              MR. SCHECHTER:  I'm sorry, I withdraw that.
 8              Juror Number 1, Mr. Saladino, I'm going to
 9      perempt him, Judge.
10              THE COURT:  All right, so that means Juror
11      Number 7, Mr. Meyers, will be Juror -- Seat Number 7
12      will be Juror Number 5, Mr. Meyers.
13              Mr. Schechter, you excised two peremptories
14      this round -- these first through eight, I should say?
15              MR. SCHECHTER:  I did, Jurors Number 1 and 4.
16              THE COURT:  Mr. Saladino and Mr. O'Shea?
17              MR. SCHECHTER:  Yes.
18              THE COURT:  All right, so we have five.
19      We're considering the rest of the board.
20              Cause, People, 9 through 14?
21              MS. JOHNSON:  People challenge for cause --
22      nothing.
23              THE COURT:  Defendant?
24              MR. SCHECHTER:  Yes, I challenge Juror
25      Number 10 ten for cause.  She said -- she equivocated
```

Proceedings                    200

1      about whether she could be fair and impartial and be

2      objective in light of the fact she has a handicapped

3      daughter and might emphasize with the alleged plight of

4      the complainant.

5                     THE COURT:  People?

6                     MS. JOHNSON:  I'll agree.

7                     THE COURT:  Okay, so Ms. Doughty for cause.

8                     MR. SCHECHTER:  Additionally, Mr. Casesa also

9      indicated a certain sympathy for the victim.  In light

10     of fact that he has a daughter, he might be more

11     inclined to be sympathetic with the victim and not be

12     able to focus on the other parts of the proof.

13                    THE COURT:  People?

14                    MS. JOHNSON:  Your Honor, he then indicated

15     that he would give 100 percent after your Honor had

16     questioned him.

17                    THE COURT:  Right, and that's my recollection

18     as well.  That's denied.

19                    Any other challenges for cause, defendant?

20                    MR. SCHECHTER:  No, not for cause.

21                    THE COURT:  People, peremptory, the remainder

22     of the board?

23                    One second.  Off the record.

24                    (Discussion held off the record.)

25                    THE COURT:  Any peremptories, People?

                                                              ws

1            MS. JOHNSON:  No.

2            THE COURT:  Defendant, peremptory?

3            MR. SCHECHTER:  Yes, Juror Number 9,

4     Ms. Striffolino.

5            How many is that for me?

6            THE COURT:  You've used three this round, a

7     total of seven.  Correct me if I'm wrong.

8            THE CLERK:  That's correct.

9            MR. SCHECHTER:  That's it for me.

10           THE COURT:  All right, so that means

11    Mr. Sklar will be Juror Number 6, Mr. Toro will be

12    Juror Number 7, eight will be Mr. Casesa and nine will

13    be Mr. Lynch.

14           Defendant, you've used seven, you've got

15    three left.

16           People you've used four, you got six left.

17           MS. JOHNSON:  Judge, I have a question for

18    the Court.

19           THE COURT:  Yes.

20           MS. JOHNSON:  I don't know -- could we go off

21    the record for a second?

22           THE COURT:  Yes.

23           (Discussion held off the record.)

24           THE COURT:  All right, let's bring these

25    people in and let's excuse them, swear them.  Got a new

Proceedings                    202

1    batch coming over this afternoon.

2              (Prospective jurors enter.)

3              THE COURT:  All right, everybody, if you

4    would, please, give your attention to my clerk.

5              THE CLERK:  Following jurors whose names I

6    call have been selected to be on this jury:

7              Juror Number 5 is Frederick Meyers, Juror

8    Number 6 is Neil Sklar, Juror Number 7 is Adam Toro,

9    Juror Number 8 is Antonio Casesa, and Juror Number 9 is

10   John Lynch.

11             If your name has been called please remain in

12   your seat.

13             If your name has not been called you're

14   excused from this case and must return to central jury.

15             THE COURT:  All right, for those of you that

16   are being excused, again, with my thanks.  Please take

17   all your belongings and watch your step as you step

18   out, okay?

19             THE CLERK:  Are the remaining jurors

20   satisfactory to the People?

21             MS. JOHNSON:  Yes.

22             THE COURT:  To the defense?

23             MR. SCHECHTER:  Yes.

24             (Jurors duly sworn.)

25             THE COURT:  All right, gentlemen, thank you

                                                      ws

Proceedings                          203

1       again and welcome as our newly sworn jurors in this

2       case.

3                    As I indicated to the sworn jurors in our

4       first round, the good news is you're going to be

5       excused for the balance of the day.  You do not have to

6       report back tomorrow.  We're going to hopefully be done

7       with jury selection by some point tomorrow and we're

8       going to pick it up on Monday with opening statements,

9       as I indicated, and the calling of witnesses.

10                   At this point I'm going to excuse you.

11                   My officer, Chris, will give you some further

12      instructions regarding parking and whatnot and then

13      we'll see you all here Monday morning 9:30.  Enjoy the

14      rest of the weekend.  We'll see you here Monday

15      morning.

16                   (Sworn jurors exit.)

17              *      *      *      *      *

18              A F T E R N O O N   S E S S I O N

19                   THE COURT:  All right, Mr. Schechter, we're

20      on the record.

21                   MR. SCHECHTER:  If it please the Court I've

22      had a brief opportunity to review the Rosario material

23      given to me by counsel.

24                   It appears there are parts of the grand jury

25      testimony that are blacked out and on other statements

                                                        ws

Proceedings                    204

1       and I respectfully submit that that's not Rosario

2       compliance.

3                   I don't know what is deleted.  I certainly

4       would like the Court to review them so that we make a

5       record of it.  I don't understand why they're deleted,

6       but they are.

7                   Additionally, I understand that the

8       complaining witness has gone to the hospital -- had

9       gone to the hospital shortly after she went to the

10      precinct and I have not gotten any examination from the

11      hospital.  I submit that that might be in the nature of

12      Brady material and I haven't gotten that.

13                  Additionally, again, that in limine motion

14      where it's a bifurcated hearing (sic) and since counsel

15      intends to call Jarred Rosenblatt, my perusal of the

16      grand jury minutes indicates that there might be

17      certain contradictions in the grand jury testimony of

18      the complainant in Queens County and other statements

19      she made.

20                  If that is, in fact, so I might have need to

21      question Jarred Rosenblatt about those issues.

22                  THE COURT:  About the complainant's testimony

23      in the Queens grand jury?

24                  MR. SCHECHTER:  Right, which again brings

25      into issue this whole Queens situation.

Proceedings                    205

1          I would like to know how that can be handled.
2          THE COURT:  Well, my initial reaction is
3    you're looking -- it's testimony by the complainant.  I
4    mean, certainly you could ask her questions related to
5    her grand jury testimony to the extent they may be
6    inconsistent with what she testifies to here during the
7    trial.
8          MR. SCHECHTER:  Yes, your Honor, however --
9          THE COURT:  What's your theory as to how you
10   would ask a third party about things the complainant
11   said in the grand jury?
12          I'm assuming Mr. Rosenblatt was the
13   presenting DA?
14          MR. SCHECHTER:  Yes.
15          There are things omitted from that grand jury
16   testimony, I believe, that were in other parts of this
17   case and I might have need to cross-examine
18   Mr. Rosenblatt regarding whether or not at the time
19   that the complainant testified whether or not she said
20   A, B, C, D, E to him and why that wasn't in the grand
21   jury minutes or why they weren't -- those things were
22   not put in the grand jury minutes, or words to that
23   effect, once again bringing up to these jurors that my
24   client has been charged in Queens County with a crime
25   that the DA is going to be asking him about and thereby

ws

Proceedings                    206

1      unintentionally may be opening the door, or not opening

2      the door as the case may be, because I'm at peril with

3      regard to that.

4              THE COURT:  I'm still unclear as to what it

5      is you're saying you need to ask Mr. Rosen -- I'm

6      having a hard time figuring what type of scenario you

7      would ask him questions about what the complainant

8      said.

9              MR. SCHECHTER:  Well, your Honor, I believe

10     there are certain things that were omitted from her

11     grand jury testimony that were told to Mr. Rosenblatt

12     in other places and it might prove beneficial to the

13     defendant since the complainant omitted mentioning

14     certain things in the grand jury.

15             THE COURT:  In other words, if I could

16     just -- in other words, there's things that you feel

17     the complainant said to Rosenblatt based upon --

18             MR. SCHECHTER:  Before he put her in the

19     grand jury that she did not say in the grand jury.

20             "And, Mr. Rosenblatt, did you have a full and

21     complete opportunity to prepare the complaining witness

22     before she testified in the grand jury?"

23             "Yes."

24             "Did you get a full and complete recitation

25     of the facts as you knew them?"

Proceedings                    207

1              "Yes."

2              "How long a period of time did you speak to

3       the complainant," etcetera, etcetera.

4              THE COURT:  Now, these are items -- these are

5       things that she testified to not about the charges

6       here, but about what happened in Queens?

7              MR. SCHECHTER:  Yes.  And since your Honor is

8       going to be letting that in over my objection, I now

9       have to consider whether or not to cross-examine the DA

10      in Queens about that.

11             If I do that, not only is it possibly

12      creating a conflict situation for him as a witness, but

13      it would also raise the additional specter that my

14      client is charged in Queens County with these offenses.

15      So I'm like in a Catch 22.

16             I don't care about making him a witness as

17      far as his having been conflicted out as the

18      prosecuting attorney.

19             I am, however, concerned about, once again,

20      raising the issue of my client being charged in Queens

21      County.

22             THE COURT:  I don't know how you would be

23      able to question Mr. Rosenblatt about somebody else's

24      testimony.

25             MR. SCHECHTER:  He's the examining DA.

                                                    ws

Proceedings                              208

1              THE COURT:  That's fine, but if there's

2      something that you felt that she said to Mr. Rosenblatt

3      that she did not say in the grand jury, if I'm

4      following you --

5              MR. SCHECHTER:  I believe that there are

6      parts to that, yes.

7              THE COURT:  Is that based upon Rosario

8      material you've now since received?

9              In other words, I'm thinking that is there

10     something in Mr. Rosenblatt's notes based upon his

11     interview with her where she said certain things to him

12     that she did not say in the grand jury?

13             MR. SCHECHTER:  Well, I have not yet received

14     Mr. Rosenblatt's notes.

15             All I've received are grand jury minutes,

16     what appear to be some 61s and online booking reports,

17     although, again, I've just briefly looked at them over

18     lunch and I have not thoroughly examined them.

19             But a cursory examination seems to indicate

20     that there was contradictory indication there and

21     Mr. Rosenblatt, being the interviewer and being the

22     presenting attorney in the grand jury, might thereby be

23     made a witness, if that's the case.

24             THE COURT:  It's your choice to make as to

25     what you wish to cross-examine on.

                                                        ws

Proceedings                    209

1              To the extent that there's material in

2       Mr. Rosenblatt's notes of his interview of the

3       complainant prior to him putting her in the grand jury,

4       that's, perhaps, inconsistent with what she testifies

5       to here concerning the limited incidents that I told

6       the DA about that they would be able to use in their

7       Molineaux application, I think the first issue we have

8       to address is, one, are they material to her testimony

9       here or are they merely collateral?

10              MR. SCHECHTER:  Your Honor --

11              THE COURT:  At this point it sounds to me we

12      don't know.

13              MR. SCHECHTER:  Unless I misunderstood your

14      ruling, you're basically allowing the District Attorney

15      to go into the allegations made from 2005 to 2008 prior

16      to May 2008.  All of those allegations were made in

17      Queens County.

18              THE COURT:  No, what I think I said, and

19      Wendy, if you would, before -- by tomorrow, I might as

20      well put it on the record now, I want you to give me a

21      copy of yesterday morning --

22              MR. SCHECHTER:  I need those, too, please.

23              THE COURT:  What I believe I indicated is I

24      would allow the DA to elicit from the complainant as to

25      when the relationship initially began, the nature of

Proceedings                    210

1    the relationship.

2              I would allow them to go into when the

3    relationship, in terms of the sexual nature of it, the

4    element of force was entered into it, and I thought I

5    was pretty specific in saying it's going to be

6    incident -- in other words, not -- they're not going to

7    cover -- I'm not going to allow them to cover what's

8    contained in a 75-count indictment in Queens.

9              If that's your understanding you

10   misunderstood my ruling.

11             And I also said I would allow them to elicit

12   what they're claiming is the complainant being told

13   that she was going to, if you will, consummate her

14   relationship with the defendant on a particular date

15   and I think that's what I said.  I mean, I may have

16   said it in different words.

17             MR. SCHECHTER:  I do not specifically recall.

18             However, as I reiterated, at that time the

19   jury basically will be informed that my client,

20   according to the complainant, has committed a crime for

21   which he is charged in Queens County, whether or not

22   they're told --

23             THE COURT:  I have to disagree with you on

24   that.

25             The only way they're going to be advised that

ws

Proceedings                    211

1    he's charged with a crime -- I've directed the People

2    not to elicit any of that type of testimony that he's

3    currently facing charges in Queens and I thought I was

4    pretty clear about that.

5              If you're going to open the door to it

6    there's nothing I could do to stop you.

7              MR. SCHECHTER:  Well, what I'm saying, your

8    Honor, it might leave me with no choice in order to

9    defend my client and those are some of the things that

10   I raised before.  He's going to be accused by

11   indirection by the District Attorney's questions, so I

12   cannot let that testimony go unchallenged.

13             THE COURT:  I understand.

14             MR. SCHECHTER:  As such, you're putting

15   defendant in a position of not having any choice but to

16   open the door if, in fact, those questions are asked

17   and I don't know how far that door is going to be

18   opened, but certainly it gives us a Hobson's choice and

19   a Catch 22, as I indicated before, but your Honor's

20   ruling is your ruling and, of course, I'll abide by it,

21   excepting to it, of course.

22             MS. JOHNSON:  Your Honor, just so the Court

23   knows, my intention of calling Jarred Rosenblatt is for

24   authentication of the video.

25             Based on your Honor's ruling we cannot get

ws

1      into any of the facts of the Queens indictment.  My

2      understanding is I wouldn't be allowed to elicit from

3      him that he even meet met with the victim because that

4      would certainly open the door.

5                 THE COURT:  Right.

6                 Again, and in that context, Mr. Schechter,

7      you may be bound by what's elicited on direct

8      examination.

9                 MR. SCHECHTER:  Unless, of course, I decide

10     to make him my witness.

11                THE COURT:  Unless you decide to make him

12     your witness.

13                People, I'd ask that you put an end to this

14     redacting of Rosario material.  Unless there's some

15     overriding need to protect a witness or some

16     confidentiality or something that would otherwise

17     qualify for a protective order, I'm going to ask you to

18     please provide unredacted Rosario to the defendant and

19     his counsel to avoid me having to review -- I've

20     already had to review other subpoenaed materials.  I

21     don't need to start reviewing your idea of what should

22     be redacted or not redacted.

23                MS. JOHNSON:  Yes, Judge.

24                The only thing that I anticipate now that

25     would need any redaction is if there's any work product

Proceedings                213

1      from the Queen's DA's Office because part of that is

2      part of the file they sent me.

3                  THE COURT:  Before you decide to redact

4      anything, if you think there's something that's work

5      product and you want me to review in camera, I'll do

6      that.

7                  MS. JOHNSON:  Very well.

8                  THE COURT:  Let me decide whether or not it's

9      work product or not work product.

10                 MS. JOHNSON:  With regards to materials I

11     believe Mr. Schechter may have subpoenaed, obviously I

12     don't know what he subpoenaed, but I think the Court

13     needs to know that the victim's personal information

14     now, where she's living and what she's doing, is

15     confidential.  The defendant is unaware of that.  Her

16     whereabouts, her location and whether or not she's in

17     school or working or any of that information must

18     remain confidential and I don't believe he's entitled

19     to that.

20                 MR. SCHECHTER:  I have no problem with that.

21                 THE COURT:  Right.

22                 And my intention, as I said to you from the

23     beginning, is that whatever material I do feel the

24     defendant is entitled to I intend to give it to both of

25     you, copies.

Proceedings                    214

1            MR. SCHECHTER:  Your Honor, there's one other

2       item.

3            I had, during the course of oral argument and

4       so forth, directed my client's wife to remain out of

5       the courtroom.

6            However, there were times when she was in the

7       courtroom because I did not believe I would need her as

8       a witness.

9            However, in the event certain material that I

10      anticipate being able to introduce cannot have a

11      foundation laid, I will need her to lay the foundation.

12      That's the only purpose that I would be calling her,

13      not for any other subjective reason, so I just wanted

14      you to know that I will then require her to wait

15      outside on all future proceedings.

16            THE COURT:  Okay, so you're telling me she's

17      going to be waiting outside?

18            MR. SCHECHTER:  Yes, she will be waiting

19      outside just to assure that the witness exclusion rule

20      is complied with.

21            The only reason I had not ask her to wait

22      outside the previous occasion because I did not intend

23      to call her as a witness in this case.

24            THE COURT:  You mean during the hearing?

25            MR. SCHECHTER:  During the hearing.

                                                      ws

1           However, I do have the possibility I might

2    need to call her as a witness to authenticate other

3    information that I'm going to try to put before the

4    Court.

5           THE COURT:  All right.

6           MR. SCHECHTER:  Thank you.

7           (Panel of prospective jurors enters.)

8           THE COURT:  Okay, do we have everybody?

9           Good afternoon, everyone.  Welcome to the

10   Nassau County Court.  My name is Judge McCormack.  We

11   are in the process of selecting a jury in a criminal

12   case of which I am going to tell you about in a moment,

13   give you a little bit of an idea of the nature of the

14   case, how long we expect the trial to last, and then

15   I'm going to begin conducting a pre-screening.

16           For those of you that are seated in the jury

17   box, do not be overly concerned.  The fact that you're

18   there does not mean that you've been selected already.

19   We're just trying to accommodate everybody, make sure

20   everybody has a seat.

21           For those of you standing in the hallway, my

22   apologies.  Hopefully in the next few minutes we'll

23   have some seats available to you once we do our

24   pre-screening.

25           At this time I'm going to ask that you all

ws

Proceedings                    216

1       please kindly rise while my clerk swears you all in.

2                   (Prospective jurors sworn as to their

3       qualifications.)

4                   THE COURT:  Have a seat, everybody.

5                   Okay, now, as I said, we are selecting a jury

6       in a criminal case.  At this particular time I'm going

7       to introduce the parties that are going to be trying

8       this case and then I'm going to speak to you a little

9       bit more about the nature of the charges.

10                  Seated to my immediate right at the first

11      table is the Assistant District Attorney, Ms. Jamie

12      Johnson.

13                  MS. JOHNSON:  Good afternoon, everyone.

14                  THE COURT:  Seated at the second table to my

15      far right is the defendant, Mr. Harold Gopaul.

16                  THE DEFENDANT:  Hello.

17                  THE COURT:  And seated next to his right is

18      his attorney, Mr. Donald Schechter.

19                  MR. SCHECHTER:  Hello, jurors.

20                  THE COURT:  As I indicated, this is a

21      criminal case.  The charge in this case is sexual abuse

22      in the first degree.  The allegations are on or about

23      May 1st of 2008 through June of 2008 that the defendant

24      did subject an individual by the name of as Sana Awan

25      to sexual contact by forcible compulsion.

ws

1            The document that I'm reading from is an

2     indictment.  The fact that I'm reading from an

3     indictment should be of no moment to you.  It has no

4     evidentiary value.  It doesn't mean the fact that an

5     indictment has been filed that the defendant is guilty

6     or not guilty.  It's the means by which a criminal

7     charge is brought -- any felony charge, I should say,

8     is brought in the State of New York.

9            We anticipate that the trial -- I'm looking

10     at my calendar to my left.  We anticipate the trial is

11     going to last approximately two weeks.  By that I mean

12     that we anticipate that it will conclude by May 22nd,

13     which is two weeks from tomorrow.  So we anticipate

14     that the trial is going to open on Monday with opening

15     statements, taking of witness testimony and we

16     anticipate that, at the far end, if you will, that the

17     case will go to the 22nd.  It may end a few days early,

18     but we hope that it should be done by the 22nd.

19            So, with that in mind, what I want to do is

20     conduct a pre-screening, if you will, and I'm going to

21     ask only, only, the following people who meet the

22     following criteria; that if you have a planned vacation

23     between now and the 22nd of this month, any type of

24     planned business trip between now and the 22nd, any

25     type of medical procedure that you cannot reschedule

Proceedings                218

1    between now and the end of this month or any issue with

2    regard to either child care or elder care.

3                And, just to give you an idea, we generally

4    begin the trial usually about 10 o'clock.  Typically,

5    we'll break between 12:30 or 12:40 to 2 o'clock and

6    then we try or I try to wrap things up every day by

7    4:30 in order to allow the jurors to get out of here

8    and get out of the Mineola traffic and get home in

9    time.

10               There is no sequestration so you do not have

11   to be concerned about having to be held overnight in

12   any type of hotel during the jury deliberations.

13               Two other things that I just want to say

14   before we begin the pre-screening.

15               One, I cannot excuse you for financial

16   reasons unless it's an undue hardship, number one.

17               Number two, if you're excused from this case

18   that does not mean you're excused from jury duty.  I do

19   have to send you back to central jury from where you

20   came.

21               So what I'm going to do at this time is start

22   with the people in the jury box in the first row.  What

23   I would ask you to do is that if you meet, and only

24   those that meet, that criteria if you could come up,

25   just tell us your name as you come up, both of the

Proceedings                    219

1     attorneys will be standing next to me here at the

2     front, and just come up, tell us your name and your

3     reason for why you would not be able to sit.

4                    Okay?

5                    (Discussion held at the bench, off the

6     record.)

7                    THE COURT:  The few, the proud, the hardy.

8                    At this time, those of you that are

9     remaining, we're going to call 14 names at random.  If

10    you hear your name get called, just kindly take your

11    belongings, step up to the jury box.  We're going to

12    fill the jury box going from the first row to the

13    second.  Just go all the way to the end when you come

14    in and watch your step.

15                   THE CLERK:  Eric Paulin, Paulin; seat two,

16    Larry Cowden, C-o-w-d-e-n; seat three, Joseph Butler,

17    B-u-t-l-e-r; seat four, Brenda Williams-Jacks; seat

18    five, Michele Torres, T-o-r-r-e-s; seat six, Alexis

19    O'Connell, O-'-C-o-n-n-e-l-l; seat seven, Laurie

20    Schulman, S-c-h-u-l-m-a-n.

21                   PROSPECTIVE JUROR:  It's O'Donnell, not

22    O'Connell.

23                   THE CLERK:  Seat eight, Jane Yoon, Y-o-o-n;

24    seat nine, Anna DiMaggio, D-i-M-a-g-g-i-o; seat ten,

25    Maria Taorminagiresi, T-a-o-r-m-i-n-a-g-i-r-e-s-i; seat

Proceedings                          220

1        11, Robert Manfro, M-a-n-f-r-o; seat 12, Kathleen

2        Quilty, Q-u-i-l-t-y; seat 13, Monica Hladky,

3        H-l-a-d-k-y ; seat 14, Dennis Hearn, H-e-a-r-n.

4                THE COURT:  Okay, all right, so those of you

5        whose names have been called, again, welcome.

6                To those of you that are remaining in the

7        audience, I would ask you to please pay close attention

8        to what I'm going to say, what's going to be asked by

9        not only by myself, but also by both attorneys.

10       There's a very good chance that some, if not all, of

11       you will find yourself seated with the fellow 14

12       prospective jurors at this point.

13               As I indicated, this is a criminal case, a

14       trial, that's about to begin.  We have began jury

15       selection earlier today.

16               In the first instance, let me just ask, does

17       anybody recognize either any of the participants in the

18       trial, the Assistant DA, defense attorney, the

19       defendant?

20               Okay, there's names of people who are not

21       here today, but who may -- people who actually will,

22       perhaps, appear and testify during the course of this

23       trial, names of individuals who may be called as

24       prospective witnesses.

25               What I would like to do at this point is just

                                                      ws

Proceedings                    221

1     read those names to you, identify their occupations, if
2     you will, to the extent that that's relevant and
3     necessary, and, again, ask you the same question as to
4     whether or not anybody recognizes anybody.
5                Sana Awan, A-w-a-n, Denise Alioto,
6     A-l-i-o-t-o, Christine Alioto, same spelling, a
7     Detective Leonard Shulman from the New York City Police
8     Department 105th detective division, Police Officer
9     Cecelia (sic) Alfaro, A-l-f-a-r-o, again, 105th
10    Precinct, New York City Police Department, Assistant
11    District Attorney from Queens County, Brian Hughes and
12    Assistant District Attorney Jarred Rosenblatt, also
13    from Queens County.
14                Does anybody recognize any of those names for
15    any reason?
16                And when I ask you that just raise your hand
17    if there's -- for any reason you recognize the names.
18                What I'm going to do at this point is
19    basically -- let me just, by way of a show of hands,
20    has anybody gone through a jury selection process yet
21    since you've been in central jury?
22                So this is the first time -- in either a
23    civil or criminal case?
24                All right, what I'm going to do is basically
25    explain what your function is going to be as a juror if

                                                    ws

Proceedings                     222

1      you're selected.  I'm going to tell you what your role
2      is going to be, what my role is in the case.
3                I'm then going to explain, to varying degrees
4      of detail, certain basic fundamental principles that
5      apply in any criminal case.
6                And then I'm going to ask all of you
7      collectively if you could follow those rules as I give
8      them to you.
9                At that point I'm then going to ask each of
10     you a certain series of questions, basically about your
11     personal background, where you live, if you're married,
12     in a committed relationship, your occupation, your
13     children's occupation, if it's relevant.
14                And one thing I just want to emphasize at
15     this point, if there's anything that you feel in both
16     in speaking to me or the attorneys that you feel is
17     important and bears on your qualifications to serve as
18     a juror and it's something that you feel uncomfortable
19     with, you don't want to mention it out loud in a public
20     courtroom, please, don't -- I don't want anybody to
21     think that they can't ask to approach and be accorded
22     the privacy that you're entitled to to discuss whatever
23     it is you may feel that we need to know about something
24     with respect to your background.
25                So, with that, let me just explain to you

                                                    ws

Proceedings                223

1      that a trial is the process which determines if a

2      defendant is guilty or not guilty of the charges that I

3      have read.

4              In that process, those of you who are

5      selected as jurors and I as the judge perform separate

6      functions.

7              As jurors you're going to be called upon to

8      determine whether or not the evidence which you shall

9      hear and see in this case establishes the defendant's

10     guilt beyond a reasonable doubt.

11             In order to do this, at the end of the trial

12     you will have to evaluate all the evidence and

13     determine what evidence you have heard from the

14     witnesses and seen as exhibits is credible and what it

15     means.

16             This is called finding the facts.  That will

17     be your function alone.  I will not find facts in this

18     trial.

19             Your ultimate decision is called a verdict.

20     Your verdict will either be guilty or not guilty.

21             The attorneys will present evidence, usually

22     by calling witnesses, and may suggest in their closing

23     arguments that you draw certain conclusions from the

24     evidence.

25             You are not bound by what the attorneys say.

ws

Proceedings                    224

1      Only you can decide what really happened and the

2      verdict as to each of the counts will remain your

3      decision alone.

4              As judge I make no determination of guilt or

5      lack of guilt.  My role at trial is to insure that you

6      reach your verdict in accordance with the applicable

7      law as I will explain it to you.

8              In order for the People and the defendant to

9      receive a fair trial I may have to rule on questions

10     concerning the conduct of the trial.  Those rulings

11     have nothing to do with whether the defendant is guilty

12     or not guilty.

13             I may also rule on questions concerning what

14     evidence you may consider and for what purpose.

15             When I make a ruling concerning whether you

16     may hear some testimony or see an exhibit which is

17     offered as evidence I will be making a ruling on

18     whether or not you are permitted to hear or see it as a

19     matter of law.

20             Likewise, if I instruct you to disregard

21     something you might have heard I will do so because

22     that is the law.

23             None of my rulings should be taken by you as

24     any indication at all of whether you should believe all

25     or part of what is offered as evidence or that the

                                                      ws

Proceedings                     225

1       defendant is guilty or not guilty.  That is solely for

2       you to determine.

3               You must accept the law as I give it to you

4       if the defendant and the People are to have the fair

5       trial to which they are entitled.

6               You have heard reference by myself a few

7       moments ago to the fact that the defendant was indicted

8       by a grand jury.  That, too, is not and must not be

9       taken as any evidence of guilt.  An indictment is

10      simply a piece of paper by which a defendant is accused

11      of a crime.

12              Remember, the defendant is presumed innocent.

13      Only you, as members of the trial jury, will determine

14      whether the defendant is guilty or not guilty.

15              Serving on a jury is a vital function for

16      citizens under our system of law.  It is also a very

17      great responsibility.

18              To accord the defendant and the People a fair

19      trial you must, as a juror, be free from any

20      preconceived notions, sympathies or prejudices that

21      might prevent you from returning a fair and just

22      verdict based solely on the evidence or lack of

23      evidence.

24              A number of you will not be selected, but

25      that is not a reflection on you, either as a citizen or

                                                        ws

Proceedings                226

1    a person.  It's simply a decision that's reached during

2    the selection process that you are not to sit on this

3    particular case.

4         Should there be a verdict of guilty it is

5    my -- will be my responsibility to impose an

6    appropriate sentence.  Thus, in deciding whether the

7    defendant is guilty or not guilty you must not consider

8    or speculate about matters relating to sentence.

9         To decide the facts of this case the jury

10   must consider only evidence presented in this case and

11   in this courtroom.  So it is important that you

12   understand what evidence is because it is what you base

13   your decision on.

14        It is important to understand some things

15   that you will hear about that are not evidence because

16   you do not base your decision on those things.

17        First, what is evidence?

18        There are three types of evidence.

19        One, there is evidence that comes from a

20   stipulation of the parties.  A stipulation is

21   information both parties agree to present to the jury

22   as evidence without anybody testifying to the

23   information.

24        Two, there is evidence that comes in as

25   physical objects such as documents, clothing or a

                                                    ws

1       chart.

2              And, finally, as you know, the most common

3       form of evidence is the testimony of people based on

4       questions asked by the lawyer and occasionally by the

5       Court.

6              What is not evidence?

7              First, the charges in this case as set forth

8       in the indictment is not evidence.  The indictment,

9       again, is simply a piece of paper that states the

10      charges.  Neither the indictment itself nor the fact

11      that an indictment is filed constitutes evidence.

12             Defendant has pleaded not guilty to the

13      charges contained in the indictment and the trial is to

14      decide whether the defendant is guilty or not guilty.

15             Second, what the lawyers say at any time is

16      not evidence.  The lawyers are not witnesses.

17             What I say, for that matter, is not evidence.

18      I am not a witness.

19             Third, a question of a witness by a lawyer or

20      by the Court by itself is not evidence.  It is the

21      question with the answer that is the evidence.

22             So you are not to conclude from a question

23      alone that anything assumed in the question to be true

24      is true, no matter how detailed or specific the

25      question may be, nor are you to draw any inference,

                                                          ws

1     either favorable or unfavorable, to either side from

2     the content of the question alone.

3               You must consider the question with the

4     witness's answer and decide whether you find the answer

5     believable and accurate because, again, it is the

6     question and the answer that is the evidence.

7               We're now -- we now turn to the fundamental

8     principles of law that apply to all criminal trials;

9     the presumption of innocence, the burden of proof and

10    the requirement of proof beyond a reasonable doubt.

11              Throughout these proceedings the defendant is

12    presumed to be innocent.  As a result, you must find

13    the defendant not guilty unless on the evidence

14    presented at this trial you conclude that the People

15    have proven the defendant guilty beyond a reasonable

16    doubt.

17              That a defendant does not testify as a

18    witness is not a factor from which any inference

19    unfavorable to the defendant may be drawn.  The

20    defendant is not required to prove that he is not

21    guilty.  In fact, the a defendant is not required to

22    prove or disprove anything.

23              To the contrary, the People have the burden

24    of proving the defendant guilty beyond a reasonable

25    doubt.  That means, before you can find the defendant

Proceedings                    229

1       guilty of a crime the People must prove beyond a

2       reasonable doubt every element of the crime, including

3       that the defendant is the person who committed the

4       crime.

5               The burden of proof never shifts from the

6       People to the defendant.  If the People fail to satisfy

7       their burden of proof you must find the defendant not

8       guilty.

9               If the People satisfy their burden of proof

10      you must find the defendant guilty.

11              What does our law mean when it requires proof

12      of guilt beyond a reasonable doubt?

13              The law uses the term proof beyond a

14      reasonable doubt to tell you how convincing the

15      evidence of guilt must be to permit a verdict of

16      guilty.

17              The law recognizes that in dealing with human

18      affairs there are very few things in this world that we

19      know with absolute certainty.  Therefore, the law does

20      not require the People to prove the defendant guilty

21      beyond all possible doubt.

22              On the other hand, it is not sufficient to

23      prove that the defendant is probably guilty.  In a

24      criminal case the proof of guilt must be stronger than

25      that and must be beyond a reasonable doubt.

                                                        ws

Proceedings                    230

1           A reasonable doubt is an honest doubt of a

2    defendant's guilt for which a reason exists based upon

3    the nature and quality of the evidence.  It is an

4    actual doubt, not an imaginary doubt.  It is a doubt

5    that a reasonable person acting in a matter of this

6    importance would be likely to entertain because of the

7    evidence that was presented or because of the lack of

8    convincing evidence.

9           Proof of guilt beyond a reasonable doubt is

10   proof that leaves you so firmly convinced of the

11   defendant's guilt that you have no reasonable doubt of

12   existence of any element of the crime or of a

13   defendant's identity as the person who committed the

14   crime.

15           In determining whether or not the People have

16   proven the defendant's guilt beyond a reasonable doubt

17   you should be guided by a full and fair evaluation of

18   the evidence.

19           After carefully evaluating the evidence each

20   of you must decide whether or not that evidence

21   convinces you beyond a reasonable doubt of the

22   defendant's guilt.

23           Whatever your verdict may be, it must not

24   rest upon baseless speculations nor may it be

25   influenced in any way by bias, prejudice, sympathy or

                                                    ws

1    by a desire to bring an end to your deliberations or to

2    avoid an unpleasant duty.

3              If you are not convinced beyond a reasonable

4    doubt that the defendant is guilty of a charged crime

5    you must find the defendant not guilty of that crime.

6              If you are convinced beyond a reasonable

7    doubt that the defendant is guilty of a charged crime

8    you must find the defendant guilty of that crime.

9              As judges of the facts you alone determine

10   the truthfulness and accuracy of the testimony of each

11   witness.  You must decide whether a witness told the

12   truth and was accurate or, instead, testified falsely

13   or was mistaken.

14             You must also decide what importance to give

15   to the testimony you accept as truthful and accurate.

16   It is the quality of the testimony that is controlling,

17   not the number of witnesses who testified.

18             There is no particular formula for evaluating

19   the truthfulness and accuracy of another person's

20   statements or testimony.  You bring to this process all

21   of your varied life experiences.

22             In life you frequently decide the

23   truthfulness and accuracy of statements made to you by

24   other people.  The same factors used to make those

25   decisions should be used in this case when evaluating

Proceedings                    232

1    the testimony.

2                    At the end of the trial I will give you some

3    examples of those factors.

4                    In this case you will hear testimony of

5    either police officers or detectives.

6                    The testimony of a witness should not be

7    believed solely and simply because the witness is a

8    police officer or a detective.

9                    At the same time, a witness's testimony

10   should not be disbelieved solely and simply because the

11   witness is a police officer.

12                   In other words, ladies and gentlemen, you

13   must not believe or disbelieve a police officer or

14   detective just because he or she is a police officer or

15   detective.  You must listen to a police officer's

16   testimony or detective's testimony just like you would

17   listen to any other witness.  And you must evaluate a

18   police officer's testimony for truthfulness and

19   accuracy the same way you would evaluate the testimony

20   of any other witness.

21                   Addressing myself at this time to the people

22   in the first row, does anybody here, for any reason,

23   would not be able to follow those basic principles of

24   law?

25                   Anybody in the first row?

ws

1            How about anybody in the second row?

2            Anybody have any problem with those

3    principles of law or, as you sit here, you say to

4    yourself, "I wouldn't be able to follow that.  I

5    couldn't do that."

6            Anybody?

7            Okay, in the first row let me just ask all of

8    you this.

9            As I indicated, in a criminal trial, the

10   jury, if it can, is asked to render a verdict of either

11   guilty or not guilty.

12           Is there anybody here in the first row who

13   feels, for either personal or religious reasons, that

14   he or she would not be able to do that?

15           Anybody in the first row?

16           How about the second row?

17           Nobody?

18           Okay, what I'm going to do at this point is

19   I'm going to ask you some questions, give you an

20   opportunity to tell us about yourself.

21           If there's anything, like I said, that you

22   need to or want to speak privately about, just please

23   indicate that to us.

24           I'm going to speak to you in the manner in

25   which you were seated.

ws

Proceedings                  234

1           Mr. Paulin, sir, town in which you live?

2           PROSPECTIVE JUROR:  Elmont, New York.

3           THE COURT:  Okay, and are you married or in a

4    committed relationship?

5           PROSPECTIVE JUROR:  Married.

6           THE COURT:  Are you currently working?

7           PROSPECTIVE JUROR:  Yes, sir.

8           THE COURT:  What kind of work did you do?

9           PROSPECTIVE JUROR:  I work for DHS.

10           THE COURT:  Is your wife employed?

11           PROSPECTIVE JUROR:  Yes, sir.

12           THE COURT:  What kind of work does she do?

13           PROSPECTIVE JUROR:  She works in a hospital,

14    HHC.

15           THE COURT:  Do you have children?

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  How many?

18           PROSPECTIVE JUROR:  Five.

19           THE COURT:  Can you give me their ages?

20           PROSPECTIVE JUROR:  Oldest one is 25,

21    youngest one is 15.

22           THE COURT:  Is the oldest one working?

23           PROSPECTIVE JUROR:  Yes, mechanic.

24           THE COURT:  Mr. Cowden, town in which you

25    live?

Proceedings                    235

1            PROSPECTIVE JUROR:  I reside in South

2       Hempstead.

3            THE COURT:  Married or committed

4       relationship?

5            PROSPECTIVE JUROR:  Married.

6            THE COURT:  Are you currently working?

7            PROSPECTIVE JUROR:  No, I am not.

8            THE COURT:  Okay, when you were working what

9       type of work did you do?

10           PROSPECTIVE JUROR:  Photographer.

11           THE COURT:  You said you were married, yes?

12           PROSPECTIVE JUROR:  Yes.

13           THE COURT:  Is your wife currently working?

14           PROSPECTIVE JUROR:  Yes, she works for the

15      State Department of Mental Health and Retardation at

16      the Bernard Feinstein center in Queens.

17           THE COURT:  And in what capacity, if I may

18      ask?

19           PROSPECTIVE JUROR:  She's a supervisor, MSC.

20           THE COURT:  Children?

21           PROSPECTIVE JUROR:  She has two, I have

22      three.

23           THE COURT:  And their approximate ages?

24           PROSPECTIVE JUROR:  I have a daughter that's

25      36, son that's 25, another daughter that's 21 and her

                                                    ws

Proceedings                    236

1     two are 21 and 20.

2               THE COURT:  Mr. Butler, sir, the town in

3     which you live?

4               PROSPECTIVE JUROR:  Woodbury.

5               THE COURT:  Married or committed

6     relationship?

7               PROSPECTIVE JUROR:  Single.

8               THE COURT:  Are you currently working?

9               PROSPECTIVE JUROR:  I'm retired from the

10    government.  I work part time.  I was a computer

11    specialist.  I worked for the FBI, the army and the

12    Department of Defense.

13              THE COURT:  And what type of work did you do?

14              PROSPECTIVE JUROR:  I was a computer

15    specialist, I worked on computers, and now I work part

16    time as a librarian archivist.

17              THE COURT:  Thank you.

18              Ms. Williams-Jacks, married or committed

19    relationship?

20              PROSPECTIVE JUROR:  No.

21              THE COURT:  Town in which you live?

22              PROSPECTIVE JUROR:  Uniondale.

23              THE COURT:  Are you currently working?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  What kind of work?

Proceedings                    237

1           PROSPECTIVE JUROR:  Elementary school

2     principal.

3           THE COURT:  Ms. Torres, town in which you

4     live?

5           PROSPECTIVE JUROR:  Uniondale.

6           THE COURT:  Married or committed

7     relationship?

8           PROSPECTIVE JUROR:  Single.

9           THE COURT:  Are you currently working?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  What kind of work do you do?

12          PROSPECTIVE JUROR:  I'm a purchasing agent

13    for the Mental Health Association of Nassau County.

14          THE COURT:  Okay, great.

15          Ms. O'Donnell?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Town in which you live?

18          PROSPECTIVE JUROR:  Bellmore.

19          THE COURT:  Married or committed

20    relationship?

21          PROSPECTIVE JUROR:  Divorced.

22          THE COURT:  Any children?

23          PROSPECTIVE JUROR:  Yes, I have a

24    two-year-old daughter.

25          THE COURT:  And are you currently working?

ws

1            PROSPECTIVE JUROR:  Yes, I'm a hotel manager.

2            THE COURT:  And Ms. Schulman, town in which

3       you live?

4            PROSPECTIVE JUROR:  New Hyde Park.

5            THE COURT:  Married or committed

6       relationship?

7            PROSPECTIVE JUROR:  Single.

8            THE COURT:  Are you currently employed?

9            PROSPECTIVE JUROR:  Yes.

10           THE COURT:  What kind of work do you do?

11           PROSPECTIVE JUROR:  I work for Publishers

12      Clearing House in the contest department.

13           THE COURT:  Moving to the back, Ms. Yoon, can

14      you hear me back there?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Town in which you live?

17           PROSPECTIVE JUROR:  New Hyde Park.

18           THE COURT:  Married or committed

19      relationship?

20           PROSPECTIVE JUROR:  Single.

21           THE COURT:  And are you currently working?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  What kind of work do you do?

24           PROSPECTIVE JUROR:  I'm an estimator for an

25      architectural hardware firm.

Proceedings                    239

1          THE COURT:  And, Ms. DiMaggio, town in which

2     you live?

3          PROSPECTIVE JUROR:  Syosset.

4          THE COURT:  Married or committed

5     relationship?

6          PROSPECTIVE JUROR:  In a relationship.

7          THE COURT:  And are you currently working?

8          PROSPECTIVE JUROR:  Yeah, part time.

9          THE COURT:  What type of work?

10         PROSPECTIVE JUROR:  As a bookkeeper.

11         THE COURT:  Okay, are you going to school at

12     this time?

13         PROSPECTIVE JUROR:  Yeah.

14         THE COURT:  Where did you go and what kind of

15     studies are you doing?

16         PROSPECTIVE JUROR:  CW Post, early childhood

17     education.

18         Would it be possible to speak in private?

19         THE COURT:  Yes.  If you would, just let me

20     get through everybody and then I'm going to get back to

21     you.

22         Ms. --

23         PROSPECTIVE JUROR:  It's actually my maiden

24     name and last name combined.  It's Giresi.

25         THE COURT:  Town in which you live?

                                                    ws

Proceedings                240

1              PROSPECTIVE JUROR:  Hicksville.

2              THE COURT:  Married or committed

3       relationship?

4              PROSPECTIVE JUROR:  I'm married.

5              THE COURT:  Are you currently working?

6              PROSPECTIVE JUROR:  Yes, I am.

7              THE COURT:  What type of work do you do?

8              PROSPECTIVE JUROR:  Payroll billing

9       specialist.

10             THE COURT:  How about your husband?

11             PROSPECTIVE JUROR:  He's a deli manager.

12             THE COURT:  And are you -- any children?

13             PROSPECTIVE JUROR:  No, no kids.

14             THE COURT:  All right, thank you.

15             Mr. Manfro, town in which you live, sir?

16             PROSPECTIVE JUROR:  Glen Head.

17             THE COURT:  Married or committed

18      relationship?

19             PROSPECTIVE JUROR:  Married.

20             THE COURT:  Working?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  What kind of work?

23             PROSPECTIVE JUROR:  Well, I used to be a

24      financial consultant on Wall Street, but for the last

25      five years I work for the federal government.

ws

Proceedings                    241

1           THE COURT:  In what capacity do you work for

2       the federal government?

3               PROSPECTIVE JUROR:  Treasury, IRS, for

4       investments.

5               THE COURT:  Children?

6               PROSPECTIVE JUROR:  Yes.

7               THE COURT:  How many?

8               PROSPECTIVE JUROR:  Four.

9               THE COURT:  Their ages?

10              PROSPECTIVE JUROR:  My eldest, she just

11      passed the bar yesterday, so she's 26, my youngest is

12      11.  I have two girls and two boys.

13              THE COURT:  Okay, great.

14              Ms. Guilty (sic)?

15              PROSPECTIVE JUROR:  Quilty.  That's the

16      verdict.

17              THE COURT:  Town in which you live?

18              PROSPECTIVE JUROR:  I live in Bellmore.

19              THE COURT:  Married or committed

20      relationship?

21              PROSPECTIVE JUROR:  I'm married, two

22      children, one and three.

23              THE COURT:  Did I ask you if you were

24      working?

25              PROSPECTIVE JUROR:  No.  I'm a bookkeeper.

                                                        ws

Proceedings                    242

1               THE COURT:  And your husband?

2               PROSPECTIVE JUROR:  He's a police officer.

3               THE COURT:  Okay, and in what -- where?

4               PROSPECTIVE JUROR:  He's in the 3-2, a

5      detective in the domestic violence unit.

6               THE COURT:  Ms. Hladsky, the H is silent,

7      yes?

8               PROSPECTIVE JUROR:  Yes.

9               THE COURT:  Town in which you live?

10              PROSPECTIVE JUROR:  Freeport.

11              THE COURT:  Married or committed

12     relationship?

13              PROSPECTIVE JUROR:  Divorced.

14              THE COURT:  Are you currently working?

15              PROSPECTIVE JUROR:  Yes.

16              THE COURT:  What type of work do you do?

17              PROSPECTIVE JUROR:  Special ed teacher.

18              THE COURT:  In what particular school

19     district?

20              PROSPECTIVE JUROR:  United Cerebral Palsy.

21              THE COURT:  Children?

22              PROSPECTIVE JUROR:  Yes.

23              THE COURT:  How many?

24              PROSPECTIVE JUROR:  One.

25              THE COURT:  How old?

ws

Proceedings                    243

1                PROSPECTIVE JUROR:  Twenty-four.

2                THE COURT:  Is she working?

3                PROSPECTIVE JUROR:  Yes, she works in retail

4        and a student.

5                THE COURT:  Finally, Mr. Hearn, town in which

6        you live?

7                PROSPECTIVE JUROR:  Massapequa Park.

8                THE COURT:  Married or committed

9        relationship?

10               PROSPECTIVE JUROR:  Married.

11               THE COURT:  Are you currently working?

12               PROSPECTIVE JUROR:  Yes.

13               THE COURT:  What type of work do you do?

14               PROSPECTIVE JUROR:  I work for Watkins

15       Pharmaceuticals.

16               THE COURT:  Is your wife currently working?

17               PROSPECTIVE JUROR:  No, she's retired.

18               THE COURT:  And children?

19               PROSPECTIVE JUROR:  None.

20               THE COURT:  At this point what I'm going to

21       do is ask -- I'm going to go row by row; first row and

22       then moving to the second row.

23               My first questions, just by way of show of

24       hands, have any of you served in the past on a jury as

25       a juror, in either a civil or criminal trial, either in

                                                          ws

Proceedings                    244

1       state court, federal court or if you ever served on a

2       grand jury in either state or federal court?

3                   Anybody in the first row?

4                   No hands.

5                   How about the second row?

6                   All right, Mr. Manfro?

7                   PROSPECTIVE JUROR:  I was an alternate in a

8       civil proceeding.

9                   THE COURT:  Okay, so, you didn't deliberate?

10                  PROSPECTIVE JUROR:  No, I was dismissed.

11                  THE COURT:  Okay, anybody else, second row?

12                  All right, the second thing I want to ask is,

13      again, going back to the first row, any of you have any

14      close family members or personal relationship with

15      anybody affiliated with law enforcement, either in

16      police, District Attorney's Office or the court system?

17                  Ms. Torres?

18                  PROSPECTIVE JUROR:  My mom is a probation

19      officer for Nassau County.

20                  THE COURT:  And, Ms. O'Donnell?

21                  PROSPECTIVE JUROR:  My father is a police

22      officer.

23                  THE COURT:  Where?

24                  PROSPECTIVE JUROR:  He worked on the highway

25      patrol here and he is actually a deputy in Florida now.

                                                              ws

Proceedings                    245

1          MR. SCHECHTER:  Highway 1?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Okay, you heard me,

4    Ms. O'Donnell, talk before about how police officers

5    are to be given no greater or lesser credibility than

6    anybody else, including detectives.

7          Any reason that you would not be able to

8    follow that?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  You could treat a police officer

11   just like anybody else?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Anybody else in that first row?

14          Mr. Paulin?

15          PROSPECTIVE JUROR:  I'm a retired police

16   officer.

17          THE COURT:  And in what particular

18   jurisdiction did you work?

19          PROSPECTIVE JUROR:  NYPD, transit.

20          THE COURT:  For how many years?

21          PROSPECTIVE JUROR:  Twenty years.

22          THE COURT:  All right, my question, as I just

23   asked Ms. O'Donnell, would you have any problems in

24   evaluating a police officer like anybody else?

25          PROSPECTIVE JUROR:  No.

                                                    ws

Proceedings                    246

1          THE COURT:  None?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  You can give me that assurance?

4          PROSPECTIVE JUROR:  Oh, yes.

5          THE COURT:  Some police officers will tell

6     the truth, a police officer can be mistaken, and

7     occasionally a police officer can lie.

8               No problems with that?

9          PROSPECTIVE JUROR:  Not at all.

10         THE COURT:  How about the second row, law

11    enforcement, DA's Office.

12              Mr. Manfro, again?

13         PROSPECTIVE JUROR:  Yeah, my father was the

14    captain of the court officers at 111 Center Street and

15    then he was chief in Queens of the court officers.

16         THE COURT:  Okay.  Anything about his job

17    that you feel that you would not be able to --

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  -- evaluate a police officer like

20    anybody else?

21              All right, Ms. Quilty?

22         PROSPECTIVE JUROR:  Besides my husband, two

23    of my brothers and my father are current and/or retired

24    police officers.

25         THE COURT:  Out here or in the city?

Proceedings                    247

1           PROSPECTIVE JUROR:  City, all of them.

2           THE COURT:  You've heard -- obviously you

3    heard me say that there is going to be police officers

4    from the city and a detective, potentially, testifying.

5           We need to have an assurance that you're not

6    going to give them any greater or lesser credibility

7    than anybody else just because of their job.

8           Would you be of a mind --

9           PROSPECTIVE JUROR:  I think so.  I think so.

10          THE COURT:  You would be able to judge them

11   like anybody else?

12          PROSPECTIVE JUROR:  I think so.

13          THE COURT:  Anybody else in that second row,

14   law enforcement?

15          Okay, seeing no hands, next question I would

16   like to ask is, again going back to the first row,

17   anybody been a victim of a crime, yourself or close

18   loved one, family member, in the first row?

19          PROSPECTIVE JUROR:  I have a question.

20          If you've been cheated by somebody is that --

21   like in real estate or something like that, is that

22   considered --

23          THE COURT:  If you think it's something we

24   should know, Mr. Butler.

25          PROSPECTIVE JUROR:  Well, it may not apply,

                                                         ws

Proceedings                         248

1    but I bought a townhouse and basically we were -- the

2    people that built the place kind of did a deal on the

3    people in there.  We didn't get what we paid for and

4    that type of thing.

5                And the other thing is that I was cheated by

6    a car dealership for -- I paid for work that was never

7    done.

8                THE COURT:  How long ago were both of these

9    incidents?

10               PROSPECTIVE JUROR:  Let me see.  The car

11   dealership was the most recent and that was probably

12   maybe ten years ago, I guess.

13               THE COURT:  Okay.

14               PROSPECTIVE JUROR:  Somewhere around ten.

15               THE COURT:  Anybody else in that first row?

16               Mr. Cowden?

17               PROSPECTIVE JUROR:  Between '74 and '78 while

18   married to my first wife and serving in the United

19   States Navy, Charleston, South Carolina, we were

20   stalked for approximately three and a half years by

21   somebody that would occasionally break in, would watch

22   the house, death threats.  A couple of times I was shot

23   at.

24               THE COURT:  All right.  Is there anything

25   about those experiences that would have an impact on

1    your ability here if you were selected as a juror?

2                   PROSPECTIVE JUROR:  None that I could think

3    of.

4                   THE COURT:  Okay.

5                   Anybody else in the first row, victim of a

6    crime?

7                   How about the second row?

8                   Anybody, family member?

9                   I'm sorry.

10                  PROSPECTIVE JUROR:  My father got shot.

11   That's how he died.

12                  THE COURT:  I missed the first part.

13                  How long ago was that?

14                  PROSPECTIVE JUROR:  That was over 20 years

15   ago.

16                  THE COURT:  Was there an arrest and a

17   prosecution as a result of that?

18                  PROSPECTIVE JUROR:  Yes, there was.

19                  THE COURT:  And did that happen out here?

20                  PROSPECTIVE JUROR:  No, that was in Brooklyn.

21                  THE COURT:  All right.  Would that experience

22   affect your ability to be a juror in this case?

23                  PROSPECTIVE JUROR:  No, no.

24                  THE COURT:  All right, the second row, I

25   think I asked anybody, I didn't see any hands.

Proceedings                    250

1                    And, finally, has anyone in your family

2        either been accused -- accused or convicted of a crime?

3                    Anybody in the first row?

4                    Ms. Torres?

5                    PROSPECTIVE JUROR:  My brother, he was

6        convicted of felony drug sale.

7                    THE COURT:  And how long ago was that?

8                    PROSPECTIVE JUROR:  Three years ago.

9                    THE COURT:  Did that happen out here or

10       somewhere else?

11                   PROSPECTIVE JUROR:  Here.

12                   THE COURT:  Obviously -- it's your brother?

13                   PROSPECTIVE JUROR:  Yes.

14                   THE COURT:  He was prosecuted by the DA's

15       Office out here.

16                   Is there any reason for the Assistant that's

17       sitting here in this courtroom to think that because

18       her office may have prosecuted your brother that you

19       would somehow be biased against her or not be able to

20       listen to what she said or what her witnesses said?

21                   PROSPECTIVE JUROR:  No.

22                   THE COURT:  That wouldn't affect your ability

23       at all?

24                   PROSPECTIVE JUROR:  No.

25                   THE COURT:  You feel he was treated fairly?

                                                          ws

Proceedings                    251

1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  Okay.

3              Somebody else?

4              Mr. Butler?

5              PROSPECTIVE JUROR:  My brother, when I was

6      very young, I must have been probably about under 12

7      years old, he was arrested for being in a stolen car.

8      Somebody stole the car and the police picked him up and

9      he was in like a juvenile prison or jail for a little

10     bit, but I don't know much about it.

11             THE COURT:  And, Mr. Cowden?

12             PROSPECTIVE JUROR:  My son was party to a

13     break in several years ago and he got a sealed record,

14     he did probation, no jail time.

15             THE COURT:  How about the second row -- oh,

16     Mr. Paulin?

17             PROSPECTIVE JUROR:  My brother was convicted

18     of something to do with drugs in Queens.

19             THE COURT:  That was in Queens?

20             PROSPECTIVE JUROR:  Um-hum.

21             THE COURT:  Do you know how long ago it was?

22             PROSPECTIVE JUROR:  Definitely over ten

23     years.

24             THE COURT:  Second row?

25             Mr. Hearn?

                                                    ws

Proceedings                    252

1           PROSPECTIVE JUROR:  My brother was convicted

2     of a drug felony, but that was back in the '50s.  I

3     don't think that would affect me.

4           THE COURT:  Anybody else in the second row?

5           All right, before I turn it over to the

6     attorneys, Ms. DiMaggio, you wanted to speak to me

7     privately right?

8           Come on up.

9           (Sidebar conference held as follows:)

10          PROSPECTIVE JUROR:  I just don't think I

11    would be able to sit in a criminal trial.  I don't

12    think I'm ready for this.

13          THE COURT:  Do you think it would be too

14    difficult for you to pass judgment on somebody?

15          PROSPECTIVE JUROR:  Yes, since it's a sexual

16    abuse, I don't think I could sit in it.

17          MR. SCHECHTER:  I have no questions, Judge.

18          MS. JOHNSON:  No questions.

19          THE COURT:  Tell my clerk your name.

20          (Sidebar conference concludes.)

21          THE COURT:  All right, Ms. Johnson.

22          MS. JOHNSON:  Thank you, Judge.

23          Good afternoon, everybody.  Welcome to jury

24    duty.

25          I am, as the Judge told you, Assistant

Proceedings                    253

1    District Attorney Jamie Johnson.  It's my privilege to
2    stand here before you on behalf of the Honorable
3    Kathleen Rice, District Attorney of this county, in
4    this criminal case.
5              I'm going to be asking most of you, if not
6    all of you, some questions.  I would just ask that you
7    be honest and open.
8              If there's anything you want to talk about in
9    private, please don't hesitate to state so.
10             It's very important that you're honest with
11   both of the attorneys so that we can make sure that
12   both the People and the defendant receive a fair trial.
13   Now is the time to speak up, not later when you're
14   sworn in as a juror.
15             Now, you heard the Judge explain to you that
16   this case involves allegations of sexual abuse.
17             Does that fact alone -- would that fact alone
18   prevent anybody here from being a fair and impartial
19   juror in this particular case?
20             Mr. Cowden, how about you?
21             Would that fact alone prevent you from being
22   fair and impartial?
23             PROSPECTIVE JUROR:  No, I don't think so.
24             MS. JOHNSON:  Can you give us your assurance
25   that it would not?

                                            ws

Proceedings                          254

1                PROSPECTIVE JUROR:  I believe I can.

2                MS. JOHNSON:  You believe you can be fair?

3                PROSPECTIVE JUROR:  Yes.

4                MS. JOHNSON:  Ms. Hladsky?

5                PROSPECTIVE JUROR:  Can I ask you a question?

6                MS. JOHNSON:  Of course.

7                PROSPECTIVE JUROR:  Is this involving a

8        child?

9                MS. JOHNSON:  One of the witnesses you're

10       going to hear, the victim in this case, is now 18 years

11       old.  You will hear about allegations that occurred

12       when she was younger than 18 years old, so I will ask

13       you this, then.

14                Would that fact alone prevent you from being

15       fair and impartial in this particular case?

16                PROSPECTIVE JUROR:  Probably, yeah.

17                MS. JOHNSON:  Thank you for your honesty.

18                Anybody else that feels that way?

19                I'll start in the first row.

20                Ms. Schulman, what are your concerns?

21                Would you not be able to be fair in this case

22       because of the nature of it and age of the victim?

23                PROSPECTIVE JUROR:  I think so.  I couldn't

24       be 100 percent sure.

25                MS. JOHNSON:  Thank you for your honesty.

Proceedings                    255

1           Anybody else that feels that way?

2      Ms. Giresi?

3           PROSPECTIVE JUROR:  It would be a sensitive

4      topic because a friend of mine was in that situation.

5           MS. JOHNSON:  And would the fact that your

6      friend was in that situation, would that be something

7      that would prevent you from being objective and

8      listening to the evidence in this case?

9           PROSPECTIVE JUROR:  No, but I guess it

10     depends on the situation.

11          THE COURT:  Let me ask you this, Ms. Giresi,

12     and I say this to every jury before they deliberate.

13          You know, we all come in here with certain

14     life experiences, sometimes certain biases, sometimes

15     certain prejudices.  That's part of human nature and I

16     don't expect you to come in here with a clean slate, if

17     you will.

18          What we really need to know is can you put

19     those aside, whatever may have happened with regard to

20     your friend or loved one, and just, you know, decide

21     this case in this courtroom based upon what you hear

22     here?

23          PROSPECTIVE JUROR:  I hope so.  I mean, I

24     guess -- I won't know until, I guess, the situation

25     occurs.  I don't know what my judgment is going to be

                                                    ws

Proceedings                    256

1    that day, to be quite honest.

2                   THE COURT:  Go ahead.

3                   MS. JOHNSON:  Ms. Hladsky, will you be able

4    to give us the assurance that you can keep an open mind

5    and be objective and not come to a conclusion until you

6    heard all the evidence in the case?

7                   PROSPECTIVE JUROR:  Honestly, no.

8                   MS. JOHNSON:  Ms. Schulman, how about you?

9                   PROSPECTIVE JUROR:  No.

10                  MS. JOHNSON:  Anybody else that feels that

11   way?

12                  Now, you're also going to hear evidence that

13   the defendant and the victim are members of the same

14   family, so I ask you would that fact alone prevent

15   anybody from being fair and impartial in this

16   particular case?

17                  By a show of hands?

18                  Ms. O'Donnell, would you be able to still be

19   fair and impartial knowing that?

20                  PROSPECTIVE JUROR:  Yes.

21                  MS. JOHNSON:  Ms. Torres, how about you?

22                  PROSPECTIVE JUROR:  Yes.

23                  MS. JOHNSON:  Ms. Williams, how about you?

24                  PROSPECTIVE JUROR:  Yes.

25                  MS. JOHNSON:  Can you give us that assurance?

Proceedings                    257

1           PROSPECTIVE JUROR:  Yes.

2           MS. JOHNSON:  Mr. Manfro, can you give us

3      that assurance?

4           PROSPECTIVE JUROR:  I can because indictment,

5      as you know, means in vitre (ph), to say.  There's the

6      old expression you can indict a ham sandwich.  I'm

7      looking to the evidence to see if it's correct.

8           MS. JOHNSON:  Will you promise you will

9      listen to the evidence and not come to any conclusion

10     until the close of the case and until you've been

11     instructed on the law?

12          PROSPECTIVE JUROR:  Yes.

13          MS. JOHNSON:  Ms. Yoon, can you give us that

14     assurance as well?

15          PROSPECTIVE JUROR:  Yes.

16          MS. JOHNSON:  Will the fact the defendant and

17     victim in this case are members of the same family

18     prevent you from being a fair juror in case?

19          PROSPECTIVE JUROR:  No.

20          MS. JOHNSON:  Ms. Yoon, you'll hear that the

21     victim in this case -- you'll hear some evidence that

22     the victim did not immediately report the allegations

23     of sexual abuse immediately after the first instance.

24          Can you tell me what factors you would think

25     would be reasonable to you as to why a victim may not

                                                         ws

Proceedings                          258

1        report a crime immediately?

2                    PROSPECTIVE JUROR:  Probably young, didn't

3        know where to turn to.

4                    MS. JOHNSON:  Mr. Paulsin (sic), would you

5        agree with that?

6                    PROSPECTIVE JUROR:  Paulin.  Yeah.

7                    MS. JOHNSON:  What factors do you think would

8        be reasonable as to why somebody would not report a

9        crime immediately?

10                   PROSPECTIVE JUROR:  Probably not knowing it

11       was a crime at the time, probably scared, scared if

12       they report it something might happen to them.

13                   MS. JOHNSON:  Mr. Cowden, do you agree with

14       what Mr. Paulin just said?

15                   Does that make sense to you?

16                   PROSPECTIVE JUROR:  That would be reasonable,

17       fear of retaliation, fear of the parent themselves, not

18       knowing it was a crime.

19                   MS. JOHNSON:  Would you agree with me that

20       the relationship between the victim and the person that

21       the victim is alleging committed a crime against them,

22       that would be factor as well?

23                   Do you believe that's reasonable?

24                   PROSPECTIVE JUROR:  That's a reasonable

25       assumption, yes.

                                                          ws

Proceedings                    259

1              MS. JOHNSON:  Ms. Yoon, would you agree with

2        that?

3              PROSPECTIVE JUROR:  Yes.

4              MS. JOHNSON:  Ms. Williams, how about you?

5              PROSPECTIVE JUROR:  Yes.

6              MS. JOHNSON:  Anybody here that doesn't agree

7        with that?

8              Ms. Torres, how about you?

9              PROSPECTIVE JUROR:  I agree.  I think fear,

10       yeah.

11             MS. JOHNSON:  I believe you were the first

12       one, Mr. Paulin, that mentioned fear and I'm going to

13       ask you would you agree with me that fear is something

14       that is not just something that happened at a moment in

15       time?

16             Does that make sense to you?

17             Would you agree with me that fear could be

18       something that stays with you?

19             PROSPECTIVE JUROR:  Yes.

20             MS. JOHNSON:  And, Ms. Yoon, I saw you

21       shaking your head.

22             Would you agree you could be fearful of

23       something for a period of time?

24             PROSPECTIVE JUROR:  Yes.

25             MS. JOHNSON:  Anybody here afraid of dogs or

ws

Proceedings                    260

1        know anybody who is afraid of dogs?

2                    Ms. Quilty, do you have a doing?

3                    PROSPECTIVE JUROR:  No.

4                    MS. JOHNSON:  Do you ever move to the other

5        side of the street when you see a dog coming?

6                    PROSPECTIVE JUROR:  Yes.

7                    MS. JOHNSON:  Is your husband afraid of dogs?

8                    PROSPECTIVE JUROR:  No.

9                    MS. JOHNSON:  Does he think you're

10       unreasonable for being afraid of doings?

11                   PROSPECTIVE JUROR:  Yeah, he wants a dog, but

12       he ain't getting one.

13                   MS. JOHNSON:  And have you made the choice

14       not to get a dog because of your fear?

15                   PROSPECTIVE JUROR:  Yes.

16                   MS. JOHNSON:  Did something happen?

17                   You don't have to tell us what it was.

18                   PROSPECTIVE JUROR:  Nothing big, barked at.

19       Just childhood fear I never quite got over.

20                   MS. JOHNSON:  And it stayed with you.

21                   Now some of us are not afraid of dogs.

22                   Ms. Torres, are you afraid of dogs?

23                   PROSPECTIVE JUROR:  No.

24                   MS. JOHNSON:  You may not agree with Ms.

25       Quilty's fear, but can you accept the fact that it's

                                                              ws

Proceedings                  261

1    reasonable and understandable if something happened to
2    her?
3                    PROSPECTIVE JUROR:  Yes.
4                    MS. JOHNSON:  Ms. Williams-Jacks, how about
5    you?
6                    Does that make sense to you?
7                    PROSPECTIVE JUROR:  Yes.
8                    MS. JOHNSON:  Can you also accept the fact
9    that fear is something that just doesn't go away, it
10   can stay with us?
11                   PROSPECTIVE JUROR:  Definitely.
12                   MS. JOHNSON:  Mr. Butler, how about you?
13                   PROSPECTIVE JUROR:  Depends on the dog,
14   whether I'm afraid of him or not.  I'm cautious.  I'm
15   not afraid of dogs.  I was a dog handler at one time.
16                   MS. JOHNSON:  Big dogs or little dogs?
17                   PROSPECTIVE JUROR:  Well, they were pretty
18   big.
19                   MS. JOHNSON:  Mr. Paulin, can you appreciate
20   how difficult it would be for a witness to come into a
21   room of strangers and talk about something personal?
22                   PROSPECTIVE JUROR:  Yes.
23                   MS. JOHNSON:  And what type of emotional
24   reaction do you think a witness would have to
25   discussing something intimate in front of a room full

                                                        ws

Proceedings                           262

1    of strangers?

2              Do you think the witness might be scared?

3              PROSPECTIVE JUROR:  Scared is one of them and

4    I can't find the exact word for it.  I would say

5    scared, because to really talk in front of people

6    about --

7              MS. JOHNSON:  It's difficult to talk in front

8    of people about anything, right?

9              PROSPECTIVE JUROR:  Yeah.

10             MS. JOHNSON:  Mr. Cowden, do you agree with

11   that?

12             PROSPECTIVE JUROR:  Yes, also humiliation,

13   shame, besides the initial fear.  I think it could be

14   very traumatizing to them.

15             MS. JOHNSON:  Ms. Williams-Jacks, do you

16   agree with Mr. Cowden?

17             PROSPECTIVE JUROR:  Yes.

18             MS. JOHNSON:  What emotional reactions you

19   think a witness would have to coming into a group of

20   strangers and talking about something personal?

21             PROSPECTIVE JUROR:  They may be withdrawn and

22   not be able to really express everything they feel

23   happened.

24             MS. JOHNSON:  And would you agree that it's

25   reasonable that somebody's age could affect how they

                                              ws

Proceedings                    263

1        talk about something personal?

2                    PROSPECTIVE JUROR:  Yes.

3                    MS. JOHNSON:  And some people may cry, some

4        people may not cry?

5                    Is that reasonable to you?

6                    PROSPECTIVE JUROR:  Yes.

7                    MS. JOHNSON:  Ms. Torres, I see you shaking

8        your head.

9                    Would you agree with that?

10                   PROSPECTIVE JUROR:  Yes.

11                   MS. JOHNSON:  Ms. Quilty how about you?

12                   Do you agree with that?

13                   PROSPECTIVE JUROR:  Yes.

14                   MS. JOHNSON:  Ms. O'Donnell, how about you?

15                   PROSPECTIVE JUROR:  Yes.

16                   MS. JOHNSON:  Does that make sense to you?

17                   PROSPECTIVE JUROR:  Yes.

18                   MS. JOHNSON:  Now, Ms. O'Donnell, have you

19       ever met Ms. Torres before?

20                   PROSPECTIVE JUROR:  No.

21                   MS. JOHNSON:  Let's say she told you she just

22       saw a car accident on the corner of Old Country Road.

23       You've never met her before, you've never spoken to her

24       before.

25                   What skill would you use in your everyday

                                                              ws

Proceedings                     264

1       life to determine whether or not Ms. Torres is being

2       honest and truthful with you when she tells you that

3       she saw a car accident on the corner?

4              PROSPECTIVE JUROR:  Go see for myself.

5              MS. JOHNSON:  What if the accident already

6       happened?

7              Would you agree with me that if there was,

8       perhaps, glass on the floor --

9              PROSPECTIVE JUROR:  Yes.

10             MS. JOHNSON:  -- that would be something that

11      would support what Ms. Torres told you?

12             PROSPECTIVE JUROR:  Yes.

13             MS. JOHNSON:  Would you agree with that?

14             Ms. Quilty, what things would you look for to

15      determine whether or not Ms. Torres was being honest

16      and open with you?

17             PROSPECTIVE JUROR:  Without physical evidence

18      I think you just have to base on your trust in the

19      person or if you really don't know them, honestly, I

20      don't know.  I think you have to go on your instincts.

21             MS. JOHNSON:  And if Ms. Torres was making

22      eye contact with you and was consistent with what she

23      told you, would that be a factor that you would

24      consider?

25             PROSPECTIVE JUROR:  Yes, body language.

Proceedings                    265

1              MS. JOHNSON:  Mr. Paulin?

2              PROSPECTIVE JUROR:  Body language.

3              MS. JOHNSON:  Ms. Yoon, would you agree with

4      Mr. Paulin about body language?

5              PROSPECTIVE JUROR:  Yes.

6              MS. JOHNSON:  Those types of things, that

7      physical evidence you talked about, that's something we

8      call corroboration and it would support when Ms. Torres

9      would tell you about a car accident or something that

10     she saw.

11             Mr. Manfro, would you agree with me that not

12     only physical evidence, but testimony of somebody else

13     that saw a car accident, would also be a type of

14     corroboration that would assist you, believing and

15     giving credibility to what Ms. Torres would tell you?

16             PROSPECTIVE JUROR:  Sure.

17             MS. JOHNSON:  Ms. Giresi, would you agree

18     with that?

19             PROSPECTIVE JUROR:  Yes.

20             MS. JOHNSON:  Ms. Yoon, how about you?

21             PROSPECTIVE JUROR:  Yes.

22             MS. JOHNSON:  The People have the burden, as

23     the Court instructed you, to prove the case beyond a

24     reasonable doubt to you.

25             Is there anybody here, if we proved our case

                                                        ws

Proceedings                    266

1    to you beyond a reasonable doubt, that would not be

2    able to find the defendant guilty of the charged

3    crimes?

4                Mr. Paulin, how about you?

5                PROSPECTIVE JUROR:  I would.

6                MS. JOHNSON:  Mr. Cowden?

7                PROSPECTIVE JUROR:  I would be able to.

8                MS. JOHNSON:  Mr. Butler?

9                PROSPECTIVE JUROR:  Yes, I would.

10               PROSPECTIVE JUROR:  Yes.

11               PROSPECTIVE JUROR:  Yes.

12               PROSPECTIVE JUROR:  Yes.

13               MS. JOHNSON:  Ms. Yoon?

14               PROSPECTIVE JUROR:  Yes.

15               MS. JOHNSON:  Ms. Giresi?

16               PROSPECTIVE JUROR:  Yes.

17               PROSPECTIVE JUROR:  Yes.

18               PROSPECTIVE JUROR:  Yes.

19               PROSPECTIVE JUROR:  Yes.

20               MS. JOHNSON:  Is there anybody here who

21   wouldn't be able to?

22               Is there anything we talked about so far that

23   they feel they would add to or knowing the nature of

24   the case -- yes, Mr. Butler?

25               PROSPECTIVE JUROR:  It probably doesn't

                                                        ws

Proceedings                267

1       apply, the thing with the eyes or body language, I read
2       somewhere that liars actually do look you straight in
3       the face.  People are good who are good at it are good
4       at it, I guess.
5                    THE COURT:  Anything else, Ms. Johnson?
6                    MS. JOHNSON:  That's it.  Thank you, your
7       Honor.
8                    Thank you everyone.
9                    THE COURT:  Mr. Schechter?
10                   MR. SCHECHTER:  Good afternoon, ladies and
11      gentlemen.
12                   It' my turn to ask a few questions.  I'm
13      going to try to concentrate on those folks who
14      indicated that -- that did not indicate that they
15      cannot be fair and impartial.
16                   In other words, some of you already admitted
17      under the facts or situations of this case, as you've
18      heard, you cannot be impartial because of your own
19      experiences or feelings and I appreciate that.
20                   So if I don't talk to you it's not because I
21      want to ignore you or be impolite, it's because the
22      other people here who have -- made answers to the
23      District Attorney's questions and responses from the
24      Judge, I want to dedicate more attention to them to see
25      how they perceive this case, too.

Proceedings                    268

1             Now, Mr. Paulin, I notice you also have a

2      shield ring.

3             Is that when you were on the job?

4             PROSPECTIVE JUROR:  No, that's when I

5      retired.

6             MR. SCHECHTER:  What house were you in?

7             PROSPECTIVE JUROR:  Transit.

8             MR. SCHECHTER:  Did you work in Queens?

9             PROSPECTIVE JUROR:  Brooklyn.

10            MR. SCHECHTER:  And did you make any arrests?

11            PROSPECTIVE JUROR:  Yes.

12            MR. SCHECHTER:  When you made the arrests,

13     did you testify in court?

14            PROSPECTIVE JUROR:  Once.

15            MR. SCHECHTER:  How did that go?

16            PROSPECTIVE JUROR:  He got convicted.

17            MR. SCHECHTER:  Now, there's going to be one

18     or two police officers testifying here and I might not

19     be very kind to them.  I might be cross-examining them.

20     I don't know how I'm going to -- what they're -- I have

21     an idea what they're going to say, but I do not know --

22     I might question the voracity of what they're saying.

23            Are you going to hold that against me?

24            PROSPECTIVE JUROR:  Oh, no.

25            MR. SCHECHTER:  May I ask what was the

Proceedings                    269

1       arrest --

2                   PROSPECTIVE JUROR:  Robbery.

3                   MR. SCHECHTER:  Did you ever participate in

4          any sex arrests in the subway?

5                   PROSPECTIVE JUROR:  No.

6                   MR. SCHECHTER:  Did you ever interview any

7          complainant who alleged sexual abuse or harassment?

8                   PROSPECTIVE JUROR:  No.

9                   MR. SCHECHTER:  You indicated your dad was

10         the victim of a crime and shot.

11                  PROSPECTIVE JUROR:  Yes.

12                  MR. SCHECHTER:  Do you harbor any grievances

13         as a result of that?

14                  PROSPECTIVE JUROR:  No.

15                  MR. SCHECHTER:  Now I'm going to address

16         everybody because I have to confront something which I

17         know that you're going to see and I need to know your

18         reactions to it and, Ms. O'Donnell, I think this might

19         relate to you specifically because the complaining

20         witness is now 18 years of age and I think you told us

21         you have an 18-year-old daughter?

22                  PROSPECTIVE JUROR:  Two.

23                  MR. SCHECHTER:  Are you 18?

24                  PROSPECTIVE JUROR:  No, 26.

25                  MR. SCHECHTER:  I have that somebody has an

                                                         ws

Proceedings                        270

1        18-year-old-daughter.

2                Did I miss that?

3                Sorry.

4                Well, you do have a two-year-old daughter.

5                Now, the complaining witness is going to get

6        on this witness stand.  She's an 18-year-old girl now.

7        The allegations, as counsel indicated, will be that she

8        was allegedly sexually abused before her 18th birthday.

9                Now, when she testifies she's going to be

10       testifying -- I am telling you straight out, she's

11       going to be testifying to very, very difficult things,

12       probably, for some of you to hear.  She's going to make

13       allegations.  She's going to make allegations that her

14       stepfather -- not her father, her stepfather, so when

15       counsel referred to the family, you refer to her as the

16       stepdaughter.

17               Now, do any of you believe that because she's

18       going to get on that witness stand, a young girl, young

19       woman, and testify that she was allegedly sexually

20       abused by my client, that there would be a danger that

21       that would influence you to such degree that your mind

22       would snap shut and not listen to the rest of the case?

23               Any of you feel that way?

24               Your daughter graduated from law school.

25               PROSPECTIVE JUROR:  She did, um-hum.

                                                          ws

Proceedings                    271

1              MR. SCHECHTER:  So did mine.

2              Do you think maybe you might harbor some kind

3      of sympathy for the complaining witness because she is

4      a young woman testifying that she was the victim of a

5      crime?

6              PROSPECTIVE JUROR:  Not in the least because

7      she may, hypothetically we're speaking, maybe she

8      didn't like her stepfather and liked her father and

9      made up the story.  That's a for instance.  I don't

10     know.  So I'm not predisposed either way.

11             I love my daughter, I love my father, but

12     that has nothing to do with this particular case.

13             MR. SCHECHTER:  Mr. Manfro, you work for the

14     Treasury, IRS?

15             PROSPECTIVE JUROR:  Right.

16             MR. SCHECHTER:  Criminal division?

17             PROSPECTIVE JUROR:  No, SBSE, small business

18     self-employed.

19             MR. SCHECHTER:  Do you have an accounting

20     background?

21             PROSPECTIVE JUROR:  Not really.  I'm a

22     certified financial planner and I was in the brokerage

23     business.

24             MR. SCHECHTER:  Does your work put you in

25     touch with federal agents?

Proceedings                    272

1           PROSPECTIVE JUROR:  Rarely.

2           MR. SCHECHTER:  Have you worked with federal

3      agents.

4           PROSPECTIVE JUROR:  Not usually.  I just

5      recommend and then it goes somewhere else and then it

6      goes up the chain, but I don't really deal with that.

7           MR. SCHECHTER:  I have to confess, everybody,

8      I happen to love dogs and, no offense, ma'am.

9           PROSPECTIVE JUROR:  It's all right.

10          MR. SCHECHTER:  But we're not dealing with

11     dogs here we're dealing with people and you understand

12     that the law, and the Judge has already told you, the

13     law presumes everyone innocent.

14          The reason -- one of the reasons the law does

15     that is because it's almost impossible to prove the

16     negative.

17          I gave an example, for example, to one of the

18     other jurors who was a school bus operator and a school

19     bus operator may drop off the kids one at a time and he

20     drops off Johnny, the last student he drops off, and

21     the next thing you know he gets a call from his

22     supervisor in the school, "Johnny said you hit him,

23     screamed at him and smacked him."

24          Now, there was Johnny on the bus and him on

25     the bus.

                                                      ws

Proceedings                          273

1            The reason the law gives us the right to be

2      presumed innocent is because it's virtually impossible

3      to overcome a one-on-one situation like that, to prove

4      a negative.

5            Do any of have you an issue with that

6      principle of law?

7            Mr. Paulin?

8            PROSPECTIVE JUROR:  No.

9            MR. SCHECHTER:  Mr. Cowden?

10           PROSPECTIVE JUROR:  No.

11           MR. SCHECHTER:  Mr. Butler?

12           PROSPECTIVE JUROR:  No.

13           MR. SCHECHTER:  Ms. Brenda Williams-Jacks?

14           PROSPECTIVE JUROR:  No.

15           MR. SCHECHTER:  Ms. Torres?

16           PROSPECTIVE JUROR:  No.

17           MR. SCHECHTER:  Ms. O'Donnell.

18           PROSPECTIVE JUROR:  No.

19           MR. SCHECHTER:  Ms. Schulman?

20           PROSPECTIVE JUROR:  No.

21           MR. SCHECHTER:  Mr. Hearn?

22           PROSPECTIVE JUROR:  No.

23           MR. SCHECHTER:  Ms. Hladsky?

24           PROSPECTIVE JUROR:  No.

25           MR. SCHECHTER:  Ms. Quilty?

ws

Proceedings                    274

1            PROSPECTIVE JUROR:  No.

2            PROSPECTIVE JUROR:  No.

3            PROSPECTIVE JUROR:  No.

4            MR. SCHECHTER:  Now, Ms. Quilty, when I was

5     listening to you most of what I heard from you was,

6     basically, "My husband is a police officer, my father,

7     my uncle, my cousin," and the whole world, "are police

8     officers."

9            Obviously, you heard to what I said to

10    Mr. Paulin.

11           Now, two police officers are going to testify

12    and I think in your earlier remarks to the Judge you

13    said that you would try to be fair and impartial.

14           Is there any question in your mind whether

15    you could be, especially when those officers get on the

16    witness stand?

17           PROSPECTIVE JUROR:  I mean, I would like to

18    think I could be impartial.

19           MR. SCHECHTER:  I need more than like to

20    think.

21           Do you believe that with all of your heart?

22           Do you believe that you would not harbor some

23    partiality towards a police officer testifying?

24           PROSPECTIVE JUROR:  I can't say that I would

25    not.

Proceedings                    275

1              MR. SCHECHTER:  Which means you would, in

2    other words?

3              PROSPECTIVE JUROR:  I can't say that I would

4    not be completely 100 percent partial.

5              MR. SCHECHTER:  Impartial.

6              PROSPECTIVE JUROR:  Impartial.

7              MR. SCHECHTER:  Mr. Hearn, now, you're

8    married and you live in Massapequa Park.

9              What do you do for a pharmaceutical company?

10             PROSPECTIVE JUROR:  I just operate a machine

11   that puts nicotine gum in blister packs.  I used to

12   have a printing business.  I just took this after I

13   retired.

14             MR. SCHECHTER:  I thank you.

15             I'm going to have to explore this a little

16   bit with Mr. Butler.

17             Mr. Butler, it came up that you had a

18   personal problem.

19             Do you believe that that personal problem you

20   indicated to us at the bench might interfere with your

21   deliberation or your hearing of the evidence or

22   concentration?

23             PROSPECTIVE JUROR:  You mean about being

24   cheated?

25             MR. SCHECHTER:  No, we'll get into that in a

                                                    ws

1          second.

2                    When you stepped up.

3                    PROSPECTIVE JUROR:  The problem is, I don't

4          mind saying it, I'm going to be -- I'm in the process

5          of trying to pack my things to move and I'm not getting

6          very far with it.  The concern I have is it would be

7          the amount of time that I would be locked up,

8          you know --

9                    MR. SCHECHTER:  Locked up?

10                   PROSPECTIVE JUROR:  Prevented from --

11                   MR. SCHECHTER:  G-d forbid.

12                   PROSPECTIVE JUROR:  Prevented from getting my

13         stuff packed.  I'll be losing time -- everybody day

14         we're on the jury is one day I can't spend packing my

15         stuff and I work on weekends, so it means I'll probably

16         be trying to do it at night, depending on how long it

17         goes on for.

18                   MR. SCHECHTER:  Would that be -- or situation

19         be such a problem for you that you believe it would

20         interfere with your deliberations or being here?

21                   PROSPECTIVE JUROR:  It might be on my mind.

22         I can't say I wouldn't be worried about how long the

23         thing is going to take.  I would be anxious to get it

24         over.

25                   MR. SCHECHTER:  And this cheating thing, was

                                                              ws

Proceedings                    277

1    a lawyer part of this?

2                You know why I asked that question, don't

3    you?

4                PROSPECTIVE JUROR:  I think that my lawyer --

5    it's kind of confusing, but I think my lawyer was one

6    of the people who was involved, somehow, with the

7    company that manufactured these homes and he was my

8    lawyer and he was advising me, you know, on the

9    purchase of the home and I have a feeling that he was

10   either -- got money out of it or was somehow --

11               MR. SCHECHTER:  Conflict of interest.

12               PROSPECTIVE JUROR:  Yes, just a feeling.

13   Something came up that I saw the name somewhere or

14   something like that.  I can't prove it.

15               MR. SCHECHTER:  Do you feel that generally

16   about my noble profession, sir?

17               PROSPECTIVE JUROR:  I don't have much

18   dealings with lawyers, so I don't --

19               THE COURT:  Mr. Butler, you're not going to

20   hold that against Mr. Schechter, that experience?

21               That's what he wants to ask.

22               PROSPECTIVE JUROR:  No.

23               As a matter of fact I'm not even sure.  I

24   don't have proof that the lawyer was involved, just

25   something I heard.

Proceedings                    278

1       MS. JOHNSON:  Or hold it against me, Judge.

2       MR. SCHECHTER:  All right, this is it in a

3   nutshell.

4       Now, you would agree, everyone, that

5   sometimes communication takes place in forms other than

6   verbal communication and what do I mean by that?

7       I think you touched on it, Ms. Williams --

8   Jacks.

9       Sometimes you will watch a person act in an

10  unconscious situation where they -- you see them

11  dancing or you see them celebrating or taking pictures

12  or something like that.

13      Would you agree that it's really hard, if not

14  impossible, to dance while you're angry?

15      I mean, you're pretty much er, er, er, (ph).

16  A little hard to do that.

17      Well, when you have -- let's say you saw a

18  person in a candid moment where that person was doing

19  something not realizing -- not under pressure, a person

20  was reacting to their surroundings, to other people,

21  and you saw something that contradicted what that

22  person said by his or her actions.

23      Would you agree that that is an important

24  thing to consider in evaluating whether a person is

25  truthful about what they say or accurate about what

ws

1    they say because the actions that you observed sort of

2    belie what they said?

3            Do you agree?

4            PROSPECTIVE JUROR:  Yes.

5            MR. SCHECHTER:  So that's what I'm saying.

6    If you see someone acting in such a way that doesn't

7    seem to jive with what they said, do I have the

8    assurance of each and every one of you that you will

9    think about that in evaluating whether you think that

10   person is telling the truth, lying, or maybe has

11   reasons to say what he or she said?

12           Do any of you have a problem with that?

13           Or a question about that?

14           PROSPECTIVE JUROR:  Sometimes people act

15   entirely different than what they're thinking.  Some

16   people dance when they're angry.

17           MR. SCHECHTER:  Anybody know a person dance

18   when they're angry?

19           PROSPECTIVE JUROR:  Maybe they're dancing to

20   work off the anger.

21           MR. SCHECHTER:  My kids think I can't dance,

22   but --

23           PROSPECTIVE JUROR:  Can I ask you a question

24   to make sure I understand what you're talking about?

25           Do you mean if somebody is charged with a

Proceedings                    280

1      crime of, you know, murdering his wife, if you see that

2      person is happier, acting in a way that doesn't show

3      grief, that's basically what you're talking about?

4                  MR. SCHECHTER:  That's one example.

5                  What about if I tell you -- I say,

6      "Mr. Paulin punched me in the face," and the next thing

7      you know Mr. Paulin and I are going out and having a

8      drink together right after I said that he punched me in

9      the face.

10                 Wouldn't you say that's a little strange?

11                 PROSPECTIVE JUROR:  Yes.

12                 MR. SCHECHTER:  So that's the type of thing

13     I'm saying.

14                 In other words, people sometimes react and in

15     those things that they do in candid moments it's sort

16     of a -- like a microscope as to what really happened in

17     the situation that they talk about.

18                 So do I have the assurance of each and every

19     one of you if you see conduct, if you observe that a

20     person may have reacted during a time where they say

21     they did something or something happened to them, that

22     you'll consider that in whether that person is actually

23     telling the truth about what they say happened?

24                 Anybody have a problem with that?

25                 PROSPECTIVE JUROR:  It's not important.  You

                                                          ws

Proceedings                    281

1     don't want me, anyway.

2                THE COURT:  All right, Mr. Schechter, thank

3     you very much.

4                MR. SCHECHTER:  Thank you, Judge.

5                THE COURT:  All right, prospective members,

6     what I'm going to ask you to do at this point, I'm

7     going to ask all of you take a step outside in the hall

8     for a moment while the attorneys consider their

9     selections.  I'm going to have you back in a few

10    minutes.

11               Those individuals that are seated out in the

12    back, if you would, please, kindly just step outside

13    and we'll have you back in a moment.

14               (Prospective jurors exit.)

15               (Pause in the proceedings.)

16               MR. SCHECHTER:  Ready.

17               THE COURT:  We have nine sworn.  We're going

18    to consider the first three.

19               People, you've got six peremptories left,

20    defendant three.

21               First three, People, for cause?

22               MS. JOHNSON:  Not for cause for the first

23    three.

24               MR. SCHECHTER:  I have Mr. Butler for cause,

25    your Honor.  He indicated that his attention would be

                                                          ws

Proceedings                           282

1      diverted because of time constraints and because he's

2      someone who thinks he's going to be distracted because

3      he's not able to get his act together.

4                  I think for that reason I'm going to ask

5      Mr. Butler be discharged for cause.

6                  MS. JOHNSON:  I'll consent to that.

7                  THE COURT:  Anyone else?

8                  People, peremptory, the first two?

9                  MS. JOHNSON:  No.

10                 THE COURT:  Defendant?

11                 MR. SCHECHTER:  One, Mr. Paulin.

12                 THE COURT:  Mr. Cowden is satisfactory?

13                 MR. SCHECHTER:  Yes.

14                 MS. JOHNSON:  Yes.

15                 THE COURT:  He's going to be Juror Number 10.

16                 Going to four and five, People, cause?

17                 MS. JOHNSON:  No.

18                 THE COURT:  Defendant cause?

19                 MR. SCHECHTER:  No.

20                 THE COURT:  People, peremptory?

21                 MS. JOHNSON:  I have six left?

22                 THE COURT:  Yes.

23                 MS. JOHNSON:  Ms. Torres.

24                 THE COURT:  Defendant, peremptory?

25                 MR. SCHECHTER:  Ms. Jacks, Williams-Jacks.

                                                    ws

Proceedings                    283

1           THE COURT:  All right, defendant, you have

2     one, People you have five left.

3           MR. SCHECHTER:  Ms. Schulman already

4     indicated she can't be fair and impartial.

5           MS. JOHNSON:  I'll consent to that.

6           THE COURT:  We're up to Juror Number 8,

7     Ms. Yoon, and --

8           MS. JOHNSON:  Juror Number 6, O'Donnell.

9           THE COURT:  Six and eight, People, cause?

10           MS. JOHNSON:  No.

11           THE COURT:  Defendant cause?

12           MR. SCHECHTER:  No, not for cause.

13           THE COURT:  Peremptory, People?

14           MS. JOHNSON:  No.

15           THE COURT:  Peremptory, defendant?

16           MR. SCHECHTER:  May I have one moment, Judge?

17           THE COURT:  Yes.

18           (Pause in the proceedings.)

19           MR. SCHECHTER:  No.

20           THE COURT:  All right, so, that means

21     Ms. O'Donnell is Juror Number 11, Ms. Yoon is

22     Number 12.  We have our jury.

23           Let's see if we can get two alternates.

24           Two peremptories for each seat.

25           Now, considering for the first alternate

                                              ws

Proceedings                284

1      seat, Ms. Giresi.

2                  MS. JOHNSON:  Challenge for cause.

3                  MR. SCHECHTER:  Yes, I agree.

4                  THE COURT:  That's granted.

5                  All right, Mr. Manfro for the first alternate

6      seat, People, cause?

7                  MS. JOHNSON:  No.

8                  THE COURT:  Defendant cause?

9                  MR. SCHECHTER:  No.

10                 THE COURT:  People peremptory?

11                 MS. JOHNSON:  No.

12                 MR. SCHECHTER:  Your Honor, what about Ms.

13     DiMaggio?

14                 THE COURT:  She went earlier on consent.

15                 MR. SCHECHTER:  Your Honor, I don't think we

16     have alternates yet, is that correct?

17                 THE COURT:  He's for the first alternate

18     seat.

19                 MR. SCHECHTER:  Nothing for cause.

20                 THE COURT:  We're up to peremptory.  We're

21     going to go seat by seat or juror by juror, if you

22     will, so Manfro is the only one being considered.

23                 MR. SCHECHTER:  I do.

24                 THE COURT:  Defendant has one peremptory left

25     for the first alternate.

Proceedings                    285

1           Ms. Quilty?

2           MS. JOHNSON:  No challenge.

3           THE COURT:  Defendant, no challenge for

4    cause?

5           MR. SCHECHTER:  No.

6           THE COURT:  People peremptory, Quilty?

7           MS. JOHNSON:  No.

8           MR. SCHECHTER:  Yes.

9           THE COURT:  So, defendant, you've exhausted

10   your challenges for the first alternate seat.

11           We're up to Ms. Hladsky --

12           MR. SCHECHTER:  Wait a second, your Honor,

13   I'm so sorry, I would like to go back and this is my

14   fault.

15           With respect to Ms. Quilty - I'm a little

16   tired - Ms. Quilty could not guarantee -- as a matter

17   of fact, she said she doesn't think she can be fair and

18   impartial.  She did say that.

19           THE COURT:  People, what's your position?

20           MS. JOHNSON:  Judge, I defer to your Honor on

21   that.  I believe she can be fair.

22           THE COURT:  I think she did say that, so

23   defendant still has one more peremptory left on the

24   first seat.

25           Thirteen, Hladsky?

                                                    ws

Proceedings                    286

1           MS. JOHNSON:  No challenge.

2           THE COURT:  Defendant, cause?

3           MR. SCHECHTER:  She said she can't be fair.

4  She said that at the beginning.  She was one of those

5  who raised her hands.

6           THE COURT:  People, is that your

7  recollection?

8           MS. JOHNSON:  That's fine, Judge.

9           THE COURT:  Finally, Mr. Hearn.

10          MS. JOHNSON:  No challenge.

11          MR. SCHECHTER:  No challenge.

12          THE COURT:  Either cause or peremptory?

13          MR. SCHECHTER:  Neither.

14          MS. JOHNSON:  No.

15          THE COURT:  Mr. Hearn will be our Seat

16  Number 1 alternate.

17              Let's get them in here.

18              (Panel of prospective jurors enter.)

19          THE COURT:  Can I see both counsel real

20  quick?

21              (Discussion held at the bench, off the

22  record.)

23              (Sidebar conference held as follows:)

24          THE COURT:  Both counsel agree and consent to

25  Ms. Torres.  I think she was struck by the People, but

                                                  ws

Proceedings                287

1    both sides agree that she could be alternate number

2    two.

3              MS. JOHNSON:  We agree.

4              MR. SCHECHTER:  We agree.

5              (Sidebar conference concludes.)

6              THE COURT:  All right, for those of you that

7    are in the jury box please give your kind attention to

8    my clerk and just pay attention to what he's about to

9    say.

10             THE CLERK:  The following jurors whose names

11   I call have been selected to be on this jury:

12             Juror Number 11 is Alexis O'Donnell, Juror

13   Number 12 is Jane Yoon, Alternate Juror Number 1 is

14   Dennis Hearn and Alternate Juror 2 is Michele Torres.

15             If your name has been called please remain in

16   your seat.

17             .  If your name has not been called you're

18   excused from this case and must return to central jury.

19             THE COURT:  All right, thank you very much,

20   ladies and gentlemen.  Please watch your step as you

21   step out of the jury box.

22             MS. JOHNSON:  Judge, I believe the clerk

23   forgot Number 10.

24             THE CLERK:  I'm sorry, Larry Cowden is juror

25   Number 10.

ws

Case 1:15-cv-01782-NGG   Document 8-14   Filed 08/31/15   Page 99 of 192 PageID #: 1107

1              PROSPECTIVE JUROR:  I should stay?

2              THE COURT:  Have a seat, Mr. Cowden.

3              Those of you that are in the back, I want to

4    thank you for being here this afternoon.  We do have

5    our jury so at this time you're excused from this case.

6              My officers are outside.  They'll tell you

7    what to do at this point.

8              But, again, thank you very much and at this

9    time those of you in the back can step outside.

10             (Prospective jurors exit.)

11             THE CLERK:  Are the remaining jurors

12   satisfactory to the People?

13             MS. JOHNSON:  Yes.

14             THE CLERK:  Are the remaining jurors

15   satisfactory to the defense?

16             MR. SCHECHTER:  Yes.

17             THE CLERK:  Will the selected jurors please

18   rise and raise your right hands?

19             (Jurors duly sworn.)

20             THE COURT:  All right, have a seat.

21             You do not have to come tomorrow.  We're

22   going to begin Monday morning first thing at 9:30 with

23   the opening statements from the People and defendant,

24   if he chooses to make one, and with the taking of

25   testimony.

ws

1        So at this time I'm going to excuse you for

2    the balance of the week.  Enjoy the rest of the week

3    and weekend.  We'll see you back here Monday morning,

4    9:30.  Kenny will tell you what to do as you step

5    outside, okay?

6              (Jurors exit.)

7              THE COURT:  I would like to provide both of

8    you with whatever -- some of the subpoenaed material

9    I've looked at so far.  I don't have any of the other

10   material.  I can give it to you.  You're welcome to

11   call my chambers.  You're welcome to come by here

12   tomorrow and pick up that material.  If you want to get

13   it now you can come pack to my chambers.  If you want

14   to come by at some point here tomorrow --

15             MR. SCHECHTER:  I can get it now, if you have

16   it, Judge.

17             THE COURT:  All right.

18             MS. JOHNSON:  I'll come get it tomorrow.

19             THE COURT:  You know what, Mr. Schechter, my

20   law secretary is kind of waiving me off.  Perhaps

21   there's some other stuff we haven't gone through yet,

22   so what I'll do is I'll contact your office tomorrow

23   and, you know, you can pick it up, have somebody pick

24   it up, for that matter, if you want.

25             MS. JOHNSON:  And, also, the rest of the

Proceedings                    290

1      Rosario material.

2                    MR. SCHECHTER:   Maybe Irwin Bly (ph) or

3      Hillary Bly.   They're my investigators.

4                    (Proceedings adjourned to Monday, May 11,

5      2009 at 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        ws

291

1  SUPREME COURT OF THE STATE OF NEW YORK

2  COUNTY OF NASSAU : CRIMINAL TERM PART 80

3  ----------------------------------------X
   THE PEOPLE OF THE STATE OF NEW YORK,      :   Indictment
4                                            :   No. 2415N/08
            -against-                        :
5                                            :
   HAROLD GOPAUL,                            :   SEX ABUSE 1
6                                            :
                        Defendant.           :   Trial
7  ----------------------------------------X

8                              May 11, 2009

9                              252 Old Country Road
                               Mineola, New York
10

11 B E F O R E:

12            HONORABLE JAMES P. McCORMACK,
                     Acting Supreme Court Justice
13

14 A P P E A R A N C E S:

15            (As previously noted.)

16            *      *      *      *      *

17            THE CLERK:  The case on trial, the People

18     against Harold Gopaul, Indictment 2415N of 2008.

19            Are the People ready?

20            MS. JOHNSON:  We're ready.

21            THE CLERK:  Defense counsel ready?

22            MR. SCHECHTER:  Defense ready.

23            THE COURT:  All right, before we begin with

24     opening statements and calling witnesses, is there any

25     applications either one of you want to make?

Proceedings                    292

1          MS. JOHNSON:  Yes, Judge.

2          Following pretrial hearings as well as

3     picking the jury, following the hearing where your

4     Honor had ruled that certain Molineaux evidence would

5     be admissible as well as the fact that the videotaped

6     statement and the two written statements were permitted

7     to be used by the People on our direct case without

8     redactions, the executives from the District Attorney's

9     Office made the decision on Friday at around 5:30 to

10    offer this defendant one count of sexual abuse in the

11    first degree, a Class D Felony, conditioned upon

12    probation, that would be in satisfaction of this

13    indictment, obviously with waiving his right to appeal

14    the plea and sentence and an order of protection on

15    behalf of the complainant.

16          At 5:30 on Friday I contacted Mr. Schechter

17    to advise him of this plea offer and actually my boss,

18    Mr. Antignani, spoke to Mr. Schechter on the phone and

19    advised him should defendant take that plea conditioned

20    upon probation and proceed to trial in Queens County on

21    that indictment and be convicted, the People would

22    consent to concurrent time to any sentence imposed by

23    Queens County, obviously, and vacate the plea to the

24    probationary sentence.

25          That offer was conveyed to counsel.

Proceedings                    293

1          That offer will no longer be standing once

2     the People begin opening statements and, should the

3     People get a conviction, we would ask that the

4     defendant be immediately remanded following a guilty --

5     following any verdict of guilty as to this trial.

6          I spoke to Jared Rosenblatt from the Queens

7     County DA's Office.  He indicated to me that that they

8     would not be offering probation, however, that their

9     case would not be going to trial in the near future.  I

10    relayed all this information to counsel and, you know,

11    the offer stands until openings begin.

12          MR. SCHECHTER:  May it please the Court.

13          Yes, I confirm that counsel, has, in fact,

14    communicated with me not only on Friday -- Friday

15    night, on Saturday morning as well.

16          I have had the opportunity Friday night to

17    communicate with my client.  I had communicated the

18    offer to him.  I told him that, "Since this is being

19    communicated to you on the telephone that you take the

20    weekend to think about what you want to do," and I've

21    explained to him the ramifications of the plea and that

22    Queens is not on board with the plea.  Queens

23    apparently does not want to offer him the same plea

24    offer.

25          My client and I have discussed this matter

                                                        ws

Proceedings                    294

1       this morning and he has indicated to me that he rejects

2       that plea offer.

3                    Is that true Mr. Gopaul?

4                    THE DEFENDANT:  Yes, your Honor.

5                    THE COURT:  All right, Mr. Gopaul, have

6       you -- I take it you've heard what your attorney just

7       said and you've heard what the People have said and I'm

8       sure Mr. Schechter spoke to you over the weekend and

9       essentially communicated what both attorneys have just

10      put on the record.

11                   Is that right?

12                   THE DEFENDANT:  He spoke on Friday.

13                   THE COURT:  On Friday?

14                   THE DEFENDANT:  Yeah.

15                   THE COURT:  And, just so you're clear with

16      regard to the plea offer that was -- is currently made,

17      I'm sure Mr. Schechter has told you, if not on Friday

18      or this morning, but I'm sure during the course of this

19      case, that you're facing upwards of seven years in jail

20      on each count --

21                   THE DEFENDANT:  Yes.

22                   THE COURT:  -- that you're facing here.

23                   THE DEFENDANT:  Yes, your Honor.

24                   THE COURT:  And that you're facing the

25      possibility of consecutive time.

                                                            ws

Proceedings                    295

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  You understand what that term

3         means?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Consecutive time?

6              THE DEFENDANT:  Yes.

7              THE COURT:  And that regardless of what the

8         People may recommend to the Court if there's a guilty

9         verdict in this case, I'm not bound by what the People

10        may recommend.

11             You understand that?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  So if the People came in here at

14        the time of sentence after a guilty verdict, if they

15        recommended probation or they recommended a sentence

16        concurrent with the sentence that may be imposed in

17        Queens County, that I am not bound by that.

18             You understand that?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  I could sentence you to anything

21        up to anything I think may be appropriate.

22             You understand that?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  Having said all that, is it your

25        wish at this time to still go forward with this trial?

                                                        ws

Proceedings                        296

1              THE DEFENDANT:  Yes, your Honor.

2              THE COURT:  Okay.

3              Do you have any questions of me or your

4      attorney before we move further?

5              MR. SCHECHTER:  Excuse me, your Honor.

6              (Defendant and counsel confer, off the

7      record.)

8              MR. SCHECHTER:  My client -- may I tell the

9      Court?

10             (Defendant and ounsel confer, off the

11     record.)

12             MR. SCHECHTER:  My client has communicated to

13     me and he has asked me to communicate to the Court his

14     concerns relative to not only the fact of the

15     registration requirements upon conviction, about the

16     fact that Family Court follows this and that he would

17     be under very serious constraints on what he is able to

18     do with his children, namely the two children he has

19     with his wife.  He's concerned he will not be able to

20     participate in PTA, he will not be able to participate

21     in taking them to playgrounds and things of that

22     nature, and I've explained to him that it's part of the

23     registration.  Those parameters are quite possible in

24     addition to Family Court.

25             So he's indicated to me that those are going

                                            ws

Proceedings                    297

1    into his reasoning as to why he does not want to take

2    this disposition.

3                THE COURT:  Okay.

4                MR. SCHECHTER:  Is that correct, Mr. Gopaul?

5                THE DEFENDANT:  Yes, your Honor.

6                THE COURT:  All right, so, at this point,

7    then, People, have you exchanged whatever Rosario

8    material needed to be exchanged?

9                MS. JOHNSON:  Yes, Judge.

10               There are some additional paperwork that I

11   turned over to counsel.  I gave the Court copies as

12   well of both the stuff I handed over this morning and

13   the stuff I handed over on Friday.

14               There was something -- your Honor, with

15   regard to your Honor's Molineaux ruling, your Honor

16   had indicated you would allow the People to inquire as

17   to the complainant regarding the incident, particularly

18   that occurred in the bathroom in their home involving

19   the oral sexual encounter.

20               THE COURT:  Yes.

21               MS. JOHNSON:  Just so your Honor knows, so

22   that there's no surprises, the incident regarding the

23   knife that happened in the home in Queens, although in

24   the Queens grand jury minutes it appears as though that

25   happened way before the Nassau County incidents

                                                    ws

Proceedings                        298

1      occurred, upon clarification with the complainant this

2      weekend the incident with the knife in Queens occurred

3      at the same time period that the Nassau incidents were

4      beginning.

5              So, just so your Honor knows, one of the

6      People's theories as to the implied force, not just the

7      express, but the implied, would be predicated upon that

8      particular incident involved in the bathroom where in

9      the grand jury minutes she indicates she pushed the

10     defendant away and attempted to resist him, but was

11     unable to.

12             MR. SCHECHTER:  Your Honor, that obviously

13     belies her sworn testimony.

14             Additionally, talking about propensity of

15     evidence, that certainly is a propensity offered --

16     proffered by the People.  Again, she's trying to guild

17     the lily by showing propensity toward this same

18     conduct.

19             There's no common plan or scheme so that's

20     not relevant under any Molineaux theory I know nor is

21     it relevant to intent with respect to allegedly what

22     happened in Nassau County.

23             MS. JOHNSON:  I'm just telling the Court so

24     when your Honor hears on the opening the People are

25     indicating why she is afraid of the defendant, we would

                                                        ws

Proceedings                    299

1      be referencing that incident and the force in that

2      particular incident that carried into Nassau County.

3                    MR. SCHECHTER:  Well, I --

4                    THE COURT:  Just hold on one second.

5                    And that's an incident that occurred, I

6      believe, behind the school or near school grounds in

7      Queens?

8                    MS. JOHNSON:  No, your Honor, it's the

9      incident that occurred in the bathroom that your Honor

10     was allowing us to elicit from the complainant.

11                   THE COURT:  That's the first incident that I

12     indicated I would allow.

13                   MS. JOHNSON:  We are using it not only as the

14     first incident, but also for the predicate force.

15                   The timing -- although the timing in the

16     grand jury minutes seems to appear that the threatening

17     with the knife occurred way before Nassau, I discussed

18     that with the complainant this weekend and there's no

19     dates in the grand jury minutes in Queens, but the

20     timing of the knife in Queens was while the Queens

21     (sic) actions were already beginning.

22                   So the same incident, your Honor, that is

23     allowing us to bring out with regards to how it began

24     would be the same incident that we would be using for

25     the predicate force.

Proceedings                300

1    THE COURT: All right, I'm just a little bit

2    confused and let me just step back a little bit.

3    On Friday I spoke to both of you in a

4    three-way conference call. I indicated to you in terms

5    of my Molineaux ruling I had looked at the Queens grand

6    jury minutes. I indicated that there would be

7    essentially, I think, three incidents that I would

8    allow the People to use that, in my view in looking at

9    the Queens grand jury minutes, predated the incidents

10   here that the defendant is charged with.

11   One, I indicated that I would allow the

12   People, by way of showing when the relationship changed

13   from a -- what the complainant described as a normal

14   father and daughter relationship when the -- when it

15   then changed to one in which it had become sexual in

16   nature and I think according to -- I'm looking at the

17   grand jury minutes. That was between May and August of

18   2005. That's an incident that I said I would allow.

19   MR. SCHECHTER: Excuse me, your Honor, just

20   for clarification, is your Honor saying that he is

21   permitting the District Attorney to go into the

22   incident involving the alleged use of the knife in the

23   kitchen?

24   THE COURT: Right. If you would let me

25   finish Mr. Schechter, then maybe it will become a

ws

1    little bit clearer.

2                    MR. SCHECHTER:   I'm sorry.

3                    THE COURT:   The incident I'm referring to is

4    an incident when she comes out of a shower and I think,

5    just so the record is clear, on Friday I actually gave

6    you page and lines of the grand jury minutes that I

7    would -- that I was referring to.  So I don't think --

8    there should not be any confusion on the part of either

9    one of you as to what I'm referring to.  That is one

10   incident.  That's the first incident, if you will, in

11   which the complainant talks about how this relationship

12   between her and her stepfather became one involving

13   sex.

14                    I then went on to another incident.  This is

15   an incident in which a knife was allegedly threatened

16   to be used in which the defendant allegedly told the

17   complainant he would try to cut off her finger.

18   According to the Queens grand jury minutes it appears

19   as though that takes place sometime in the beginning of

20   May of 2008 or in the month of May 2008 is perhaps a

21   better way to put it and that took place in the

22   vicinity of a school that she attended in Queens.

23                    And I also indicated that I would not allow

24   the People to introduce testimony when she testified in

25   Queens in which she claimed that the defendant had

Proceedings                    302

1    threatened to or showed her places where he would bury

2    her.

3              I then finally -- the third incident, is

4    really an incident in which -- and I think, People, you

5    indicated that it's actually mentioned in this Nassau

6    indictment as well, leading up to the point where she

7    then, according to the People's theory, has this prompt

8    outcry to her best friend in which she claimed the

9    defendant had picked, if you will, a date in which he

10   was going to have sexual intercourse with the

11   complainant.

12             And, again, through all of it I indicated the

13   pages that I was referring to and the lines.

14             Now, is there some confusion about that now

15   after going over this on Friday?

16             MS. JOHNSON:  There isn't, your Honor.

17             My point to bring it up to the Court is that

18   the incident as your Honor describes and what's in the

19   grand jury testimony at the school yard is May of 2008,

20   the time frame of this indictment.

21             In order to show that there was the threat of

22   force, your Honor was permitting us to get into a prior

23   incident between the defendant and the complainant.

24             The prior incident that we would be referring

25   to as to the beginning of the sexual encounter is that

Proceedings                    303

1      sexual encounter that occurs in the bathroom that your

2      Honor is letting us get into.

3                    My point is that we are using that incident

4      to not only show the beginning of the sexual encounter,

5      but that would be the incident we would be relying upon

6      to show the beginning of the force because it's before

7      May of 2008, before this instant indictment.

8                    THE COURT:  Well, then, is there something

9      that was not referenced in the Queens grand jury

10     minutes in which force was used or threatened in that

11     incident regarding the shower?

12                   Because as I read the Queens grand jury

13     minutes it really doesn't talk about any force being

14     used.

15                   MS. JOHNSON:  Well, Judge, in the minutes

16     when they talk about how -- when she testifies that he

17     would --

18                   THE COURT:  He would tell her be quiet if she

19     made any noise.

20                   MR. SCHECHTER:  He said sh, sh.

21                   THE COURT:  Is that what you're referring to

22     as the force?

23                   MS. JOHNSON:  "I would tell him to stop and

24     push him, he would continue.  He would pause and then

25     go back and do it again," the testimony where she tells

Proceedings                304

1     him to stop, pushes him, and, your Honor, there is

2     information that happened during that incident that is

3     not in the minutes such as her pushing him again, him

4     opening up her legs and that force, not a threat with a

5     knife, not a threat that he would kill her, but simply

6     telling her that -- her telling him to stop, him

7     continuing, him pushing her legs open, him picking her

8     up and putting her on the hamper and actually in the

9     minutes --

10         THE COURT:  Just so it's clear to the Court,

11    this is at the time when this relationship is now going

12    from what, quote unquote, is a normal father-daughter

13    relationship to one where sex is now being introduced.

14         MS. JOHNSON:  Yes, Judge, while she's in the

15    bathroom she tells him to stop, he touches her, he

16    actually picks her up, puts her on the hamper --

17         THE COURT:  That's in the grand jury minutes.

18         MS. JOHNSON:  Opens her legs, she tries to

19    close her legs, he still opens them.  That isn't as

20    detailed in the grand jury incident but the same

21    incident that your Honor is letting us go into to show

22    the change in the relationship.

23         MR. SCHECHTER:  Your Honor mentioned

24    something of a kitchen knife and I don't recall

25    anything of a kitchen knife in this period and she said

ws

Proceedings                          305

1     she wants to elicit testimony about a kitchen knife.

2             THE COURT:   I don't remember seeing anything

3     about a knife in this portion of the grand jury minutes

4     as well.

5             Is there something else that you're referring

6     to?

7             MS. JOHNSON:   I was referring to the knife

8     that occurs outside the school grounds, but that's

9     already post May 1st of 2008.

10            THE COURT:   All right, so at this point,

11    then, are you then withdrawing with respect to that

12    incident?

13            MS. JOHNSON:   No, I'm not, your Honor,

14    because this indictment includes June.  The incident

15    regarding the knife at the school grounds is, although

16    after the Nassau County conduct begins, but still while

17    it's going on.

18            THE COURT:   Let me ask you this.

19            With respect to your indictment here in

20    Nassau County does this -- is there an allegation of a

21    knife being used in the counts here in Nassau County?

22            MS. JOHNSON:   He does use the knife in Nassau

23    County.

24            THE COURT:   When?

25            MS. JOHNSON:   In the beginning of May 2008.

                                                        ws

Proceedings                    306

1              MR. SCHECHTER:  Kitchen knife or the knife in

2       the car?

3              Counsel, what are you alluding to?

4              MS. JOHNSON:  In the beginning of May in 2008

5       the knife that is recovered in the van is the knife

6       that he threatens her with in the van in Nassau County.

7              After that there is the threat that she

8       refers to in the Queens County grand jury minutes.

9       While the Nassau activity is still continuing that

10      occurs in the Queens school grounds.

11             THE COURT:  So why do you need the incident

12      that happened in Queens if it's subsequent to the

13      incident here in Nassau?

14             MS. JOHNSON:  It's not subsequent to the June

15      incidents, it's between the May and the June, so it's

16      while it's going on.

17             MR. SCHECHTER:  Again, we're dealing with

18      proclivity evidence and we're dealing with extremely

19      prejudicial material, Judge, that I'm asking that the

20      Court preclude.

21             THE COURT:  All right, I'm going to leave my

22      ruling as I indicated last week to both of you on

23      Friday.  I'm not going to modify it at this point.

24             Anything else we need to take up before we

25      bring the jury in?

                                                      ws

Proceedings                    307

1          MR. SCHECHTER:  Yes.

2              I had made oral argument to the Court during

3    the motion the Huntley and Mapp Hearings, and on

4    Page 393 to 394 I, according to the minutes, said so,

5    "While the Betts and Bennet cases are instructive with

6    regard to some of the things that you bring up, there

7    is, in my view, a rather significant distinction in the

8    way those cases are decided as opposed to what we're

9    dealing with here."

10             And then I say, "I respectfully disagree with

11   the Court in this sense."

12             And then I said the Court dealt with

13   uncharged crimes in those two cases.

14             If I did not -- if I said uncharged crimes I

15   meant charged crimes.  I thought I did say charged

16   crimes because that was the whole purpose of my

17   presenting the Betts and the Bennet cases to the Court.

18             THE COURT:  What page are you on?

19             MR. SCHECHTER:  Page 394, Judge, the third

20   paragraph down.  I just want the record to be clear.

21             THE COURT:  And at that point you're

22   referring to the two Court of Appeals cases?

23             MR. SCHECHTER:  Yes, the Court of Appeals

24   cases Betts and Bennet.  I was referring to charge and

25   not uncharged.

                                                    ws

Proceedings                    308

1              THE COURT:  I think if you did misspeak I'm

2     certain that you meant to use the word charged because

3     obviously those two cases refer to charged crimes.

4              All right, anything else, Mr. Schechter?

5              MR. SCHECHTER:  Not at this time, your Honor.

6              THE COURT:  All right, bring the jury.

7              (Jury enters.)

8              THE COURT:  Have a seat.

9              THE CLERK:  The case on trial, the People of

10    the State of New York against Harold Gopaul,

11    Indictment 2415N of 2008.

12              Are the People ready.

13              MS. JOHNSON:  We're ready.

14              THE CLERK:  Is the defense counsel ready?

15              MR. SCHECHTER:  Ready, your Honor.

16              THE CLERK:  Both counsel acknowledge jurors

17    are present and properly seated?

18              MS. JOHNSON:  Yes.

19              Good morning.

20              THE COURT:  Good morning, members of the

21    jury.  Welcome.  This is -- as I'm sure you figured

22    out, you're in a different courtroom.  This is Judge

23    McCormack's regular courtroom.

24              Just a couple of things I just want to point

25    out before I give you my preliminary instructions and

                                                    ws

Proceedings                  309

1    we begin to hear from the attorneys and the calling of

2    witnesses.

3            One thing I just want you to keep in mind, if

4    at any point in time during the course of the trial --

5    I try to take a break at least once in the morning,

6    once in the afternoon.  As I indicated initially, we

7    stop for lunch between 12:30 and 12:40.

8            If at any point in time anybody needs to use

9    the bathroom, please, don't hesitate.  I don't want

10   anybody to be, you know, sitting there uncomfortable.

11   Either get my attention, one of my court officer's

12   attention, my court reporter's attention, my clerk, I

13   don't care who, just don't be shy about that.  I don't

14   want anybody to be uncomfortable here.

15           We have, if you will, somewhat of a westerly

16   or southerly exposure.  Until the air conditioning gets

17   working sometime in the afternoon it can tend to get a

18   little bit tight, or close, if you will, in terms of

19   the ventilation.  So if anybody needs, at any point in

20   time, any type of a break to stretch or get some fresh

21   air, again, please just don't be hesitant about letting

22   me know, okay?

23           All right, at this time, members of the jury,

24   I want to welcome you again to the Nassau County Court.

25   We are about to begin the trial of this case concerning

                                                        ws

Proceedings                310

1    which you have heard some details during the process of

2    jury selection.

3             As the trial begins it is appropriate to make

4    a few observations concerning the orderly procedure of

5    the trial.  It is hoped that these observations may be

6    helpful, particularly to those of you who will be

7    serving as jurors in this court for the first time.

8    The comments and instructions that follow are designed

9    to acquaint you with the separate functions, duties and

10   responsibilities of the Court, counsel and jury and

11   give you a better understanding of how you, as jurors,

12   should conduct yourselves during the trial.

13            As you know, this is a criminal case which

14   has been brought by the People upon an indictment

15   accusing the defendant of the crimes of sexual abuse in

16   the first degree.

17            Please keep in mind that this indictment is

18   simply an accusation, a paper writing, and it is not,

19   in any way, evidence of the allegations it contains.

20   It is merely the device used to bring the charges

21   against the defendant.

22            The defendant has pled not guilty to this

23   indictment.

24            According to the law, the People have the

25   burden of proving beyond a reasonable doubt each and

Proceedings                    311

1    every element of the charges contained in the

2    indictment.

3               Defendant does not have to prove anything.

4    He is presumed to be innocent of the charges.

5               When I have completed these preliminary

6    instructions the case will begin with the statement by

7    the Assistant District Attorney as to what the People

8    intend to prove.  This is known as opening to the jury.

9               The law requires the People to make an

10   opening statement to enable the Court and the jury and

11   -- and you, the jury, to better understand the

12   testimony and evidence that will follow at trial.

13              On the other hand, the defendant's attorney

14   is not required by law to make an opening statement.

15   That is because the People have the burden of proving

16   the charges beyond a reasonable doubt.  Thus, defense

17   counsel may choose not to make an opening statement but

18   may, instead, wait to see if the People prove their

19   case.

20              If defense counsel chooses not to make an

21   opening statement you must not draw any inference from

22   this.  As I have indicated, the defense has the legal

23   right to choose not to open.

24              Bear in mind that the opening statements of

25   the Assistant District Attorney or defense counsel, if

                                                    ws

Proceedings                    312

1    any, are not evidence.

2            The evidence upon which you will base your

3    verdict will come to you only from the witness box or

4    in the form of photographs, documents or other exhibits

5    introduced and admitted into evidence during the trial.

6            Again, bear in mind the defendant has no

7    obligation to offer evidence.  The entire burden of

8    proof always remains on the People.

9            After all the witnesses have testified and

10   all the evidence has been heard and received each of

11   the attorneys will have the opportunity to argue orally

12   in support of their case.  These closing arguments are

13   known as summations and, like the opening statements,

14   are not to be considered by you to be evidence.

15           Under our system of law defense counsel will

16   sum up first and the Assistant District Attorney will

17   sum up last.

18           Following summations I will then instruct you

19   on the law that applies to these charges.  You, the

20   jury, will then retire to the jury room to deliberate

21   for the purpose of reaching your verdict.

22           This, in brief, ladies and gentlemen, is the

23   general outline of the trial.

24           Before we begin with the with the opening

25   statements there are certain legal principles which you

                                                        ws

Proceedings                313

1    should keep in mind throughout the trial.

2              You, members of the jury, are the sole judges

3    of the facts.  You and you alone will have the

4    responsibility to find and determine the facts.

5              On the other hand, when I instruct you on the

6    law either during or at the close of the trial you must

7    follow my instructions on the law exactly as I give

8    them to you without any hesitation or reservation, even

9    though you may disagree with them.

10             After the opening statements witnesses will

11   be called to the stand and after being sworn will be

12   examined and cross-examined.

13             The questioning of a witness by the lawyer

14   calling that witness is known as direct examination.

15   The questioning of that particular witness by the

16   lawyer on the opposite side is known as

17   cross-examination.

18             From time to time during the trial you will

19   hear the lawyers object to the asking of a particular

20   question.  That means that the lawyer making the

21   objection claims that the question is not a proper

22   question.  The Court must rule, as a matter of law, as

23   to whether it is or is not a proper question.

24             You must draw no inference from my rulings.

25             If I find under the rules of evidence that

                                                    ws

Proceedings                314

1    the question is a proper one I will say objection

2    overruled and the witness will then answer the

3    question.

4           However, if I find that the objection is

5    valid and the question is improper, I will then say

6    objection sustained and the witness will not be

7    permitted to answer the question.

8           When I so rule you cannot draw any inference

9    either from my ruling or the question itself.  It is

10   only a question without an answer.  Questions are never

11   evidence.  Only answers constitute evidence.

12   Therefore, no inference can be drawn from the mere

13   asking of the question.

14          Now, I suspect there may be times when a

15   witness will answer a question before the Court has

16   ruled on an objection.

17          In such event if I sustain the objection I

18   will direct the answer to be stricken.  It then becomes

19   your duty to strike it from your mind and disregard

20   both the question and the premature answer.

21          Do not resent the fact that the attorneys

22   make objections or motions during the course of the

23   trial.  That is their job.  You must not hold it

24   against either party when or if I rule against them.

25          Exhibits such as photographs, documents or

Proceedings                315

1      other tangible objects presented by either counsel

2      during the course of the trial first must be marked

3      solely for identification.  Such exhibits are not

4      evidence until and unless they are received into

5      evidence by the Court.

6              When reference is first made in the testimony

7      by a witness to a document, photograph or other

8      tangible object it will be marked with a number or a

9      letter of the alphabet so we can identify it and refer

10     to it.

11             Subsequently, if I find that such exhibit may

12     be received into evidence, it will then be marked into

13     evidence.  Then and only then does it become evidence

14     which you may consider during your deliberations.

15             There are specific rules of conduct which

16     will govern your -- govern your conduct, I should say,

17     during the trial.  Whenever during the course of this

18     trial the Court stands in recess or whenever during the

19     course of the trial you are asked to retire to the jury

20     room while Court and counsel discuss matters of law

21     which do not and must not concern you, you must observe

22     these specific rules of conduct.

23             In fairness to the People and the defendant

24     you must keep an open mind throughout the trial.  You

25     must reach your conclusions and your ultimate decisions

                                                           ws

Proceedings                    316

1     only after having heard all the evidence and my

2     instruction to you on the law and then only after

3     exchanging views and reasoning together with the other

4     members of the jury during your final deliberations.

5          Thus, you must not form or express an opinion

6     as to the guilt or innocence of the defendant until the

7     entire case has been submitted to you by the Court.

8          You must not, during the course of the trial,

9     converse amongst yourselves or with anyone else upon

10    any subject connected with this trial.  This simply

11    means that you must not discuss this case with anyone,

12    not even with your fellow jurors, nor permit anyone to

13    speak with you or in your presence about any subject

14    connected with this trial.

15         While it is a normal human tendency to

16    converse with people with whom one is thrown into

17    contact you must not, during the time you serve on this

18    jury, converse, whether in or out of the courtroom,

19    with any of the parties, their attorneys, any witness

20    or anyone else.

21         By this I mean you are not only to refrain

22    from conversing about the case, you are not to discuss

23    with any of these persons at all, even to pass the time

24    of day.  In no other way can everyone be assured of the

25    absolute impartiality they are entitled to expect from

ws

Proceedings                  317

1   you as jurors.

2          In the same vein you will undoubtedly notice

3   that the attorneys will not converse with you either,

4   not even to say hello, perhaps, in the hallways.  Do

5   not take this as rudeness on their part.  They are only

6   avoiding any possible appearance of impropriety.

7          Do not, at any time during the trial,

8   request, accept, agree to accept or discuss with any

9   person the receipt or acceptance of any payment or

10  benefit in return for supplying any information

11  concerning the trial.

12         You must promptly report directly to me any

13  incident within your knowledge involving any attempt by

14  any person improperly to influence you or any members

15  of the jury.

16         Do not visit or view the premises or place

17  where the charged crime was allegedly committed or any

18  other premises or place involved in this case.

19         And you must not use Internet, maps or Google

20  Earth or any other program or device to search for and

21  view any location discussed in the testimony.

22         Do not read, view or listen to any account or

23  discussions of the case reported by newspapers,

24  television radio the Internet or any other news media.

25         Do not attempt to research any fact, issue or

                                                    ws

Proceedings                          318

1    law related to this case, whether by discussion with
2    others, by research in a library or on the Internet or
3    by any other means or source.

4              In this age of instant electronic
5    communications and research I want to emphasize that in
6    addition to not conversing face to face with anyone
7    about the case, you must not communicate with anyone
8    about the case by any other means.  That includes by
9    telephone, text message, e-mail, Internet chat, chat
10   rooms, Internet blogs or any other networking sites
11   such as Facebook, My Space or Twitter.

12             You must not provide any information about
13   the case to anyone by any means whatsoever and that
14   includes posting of the information about the case or
15   what you are doing in the case or any device or
16   Internet site including blogs, chat rooms, social
17   networking sites or any other means.

18             You also must not Google or otherwise search
19   for any information about the case or the law which
20   applies to this case or the people involved in this
21   case, including the defendant, the witnesses, the
22   lawyers or myself.

23             Now, I want to discuss -- I want you to
24   understand why these rules are so important.
25             Our law does not permit jurors to converse

Proceedings                    319

1   with anyone else about the case or to permit anyone to

2   talk to them about the case because only jurors are

3   authorized to render a verdict.  Only you have been

4   found to be fair and only you have promised to be fair.

5   No one else has been so qualified.

6            Our law does not permit jurors to converse

7   among themselves about the case until the Court tells

8   them to begin deliberations because premature

9   discussions can lead to a premature final decision.

10           Ladies and gentlemen, after the opening

11  statements by the District Attorney and by defense

12  counsel, if any, the People will call their witnesses

13  and proceed to offer evidence and testimony in direct

14  proof of the People's case and, hence, the trial will

15  then commence.

16           The defendant, the attorneys, myself, would

17  all like to thank you, as well as the People, in

18  advance for assuming the important responsibility of

19  serving as jurors in this criminal case.

20           One final note.  All communications or

21  requests for information are to be addressed to the

22  Court and must be in writing, dated with the time of

23  day, signed by the foreperson, placed in an envelope

24  which will be provided to you and sealed.

25           You should then deliver the sealed envelope

ws

Opening - People                     320

1    to the court officer outside the jury room who will, in

2    turn, deliver it unopened to the Court.

3         At this time we'll begin with the opening

4    statements.

5         Ms. Johnson, if you would?

6         MS. JOHNSON:   Thank you, Judge.

7         "I touched her breasts.  I touched her

8    vagina.  I told her it's okay.  I told her I wanted to

9    be the one.  I told her it feels good," words spoken on

10   video by Harold Gopaul, the defendant in this case,

11   talking about his stepdaughter, Sana Awan, the little

12   girl he raised since she was three years old, talking

13   about how he wanted to be the one for her to lose her

14   virginity to.

15        The evidence will show in this case beyond a

16   reasonable doubt that in Nassau County, from May 1st

17   through May 14th, 2008, on May 14th, 2008, May 19th to

18   the 23rd, 2008, May 26th to the 30th, 2008, June 2nd to

19   the 6th, 2008, June 9th through the 13th, 2008,

20   June 19th through the 20th, 2008, that on those dates

21   in our county, Nassau County, this defendant, Harold

22   Gopaul, forcibly touched the breasts and the vagina of

23   his then 17-year-old stepdaughter Sana Awan in his work

24   van in an empty parking lot on Community Drive.

25        Who was this defendant to then 17-year-old

ws

1      Sana Awan?

2                   You will learn that in name he was her

3      stepfather, but he was the man who raised her since she

4      was just three years old out of diapers.  He was the

5      man she called dad.  He was the only man she called

6      dad.  He was the man who helped her with her homework,

7      took her to museums, took her to the park, took her to

8      the movies.  He was the father figure in her life.  He

9      was the man who married her mother and the man who had

10     two more children with Sana's mom.  He was the only

11     father figure in her life, a man she trusted, a man she

12     relied on.

13                  But the evidence will show that it was that

14     very trust that he violated.  It was that very trusting

15     relationship, that father-daughter relationship, that

16     he changed into one of sexual abuse, fear and threats.

17                  You will get to meet Sana Awan, now 18 years

18     old, and as humiliating and as embarrassing as it's

19     going to be to walk into this courtroom through that

20     door, you will meet her.

21                  You're going to learn that she's a straight-A

22     student who's already taking college classes, even

23     though she's a senior in high school.  She's already

24     been accepted to college next year, looking forward to

25     a career helping others.

1        But the Sana Awan of last year, just 17 years

2    old, on the outside looked the same, but she was a very

3    different teenager.  She was a teenager hiding a

4    humiliating and embarrassing secret.

5        She was hiding a secret that the man she

6    called dad, the defendant, would take her from her home

7    in Queens, bring her out to Nassau County and touch her

8    breasts and her vagina over and under her clothing,

9    kiss her on the mouth with his tongue, threaten her

10    with a knife and rub a vibrator over her vagina in his

11    work van in our county.  That was 17-year-old Sana.

12        The evidence will show how the defendant

13    changed that relationship with his stepdaughter and how

14    she became fearful and scared of him because Sana will

15    tell you that when she was 14 years old one morning in

16    her home in Bellerose, Queens, she was in the shower

17    getting ready for school and as she came out of the

18    shower the defendant stood in the bathroom.

19        She stood there with her towel on her and he

20    told her to remove her towel.  Sana will tell you how

21    he began to touch her breasts, touch her vagina and

22    look at this 14-year-old girl's developing body.

23        She told him no.  14-year-old Sana told him

24    no and tried to push him away, but her tiny frame, she

25    will tell you, wasn't strong enough for this man she

ws

1     called dad.

2            Sana will tell you how he picked up that tiny

3     body, put her on the hamper in the bathroom and stared

4     at her, stared at her developing breasts and her

5     vagina, but it didn't stop.

6            As she sat there on the hamper with her naked

7     body exposed she will tell you that the defendant

8     spread her legs open and as she tried to close them she

9     couldn't because she wasn't strong enough.  She will

10    tell you how he held her legs open, despite her telling

11    him no, despite her fighting him, despite her pushing

12    him, and this man she called dad put his mouth on her

13    vagina in that bathroom in their home and began to

14    perform oral sex on her, afraid to do anything.

15           She tried to fight him.  She tried to

16    continue to fight him, but he told her shush.

17           Mom was sleeping.  Brother and sister were

18    sleeping.  She had nowhere to go.  14-year-old

19    terrified Sana couldn't fight him off.

20           MR. SCHECHTER:  Judge, I'm going to object to

21    her opening as a summation.

22           THE COURT:  Are you going to object?

23           MR. SCHECHTER:  Yes.

24           THE COURT:  Just object.

25           Overruled.  Go ahead.

1           MS. JOHNSON:   14-year-old Sana couldn't fight
2      him off and the evidence will show that that fear
3      remained with her, that fear that even as she fought,
4      said no and pushed and couldn't resist, that fear
5      remained in her mind.
6           Sana is going to tell you why she was afraid
7      to tell anybody and in her teenage mind she was afraid
8      that it will break up her family, break up her mother's
9      marriage.  She was fearful for her brother and her
10     sister, who she cared for.
11          Sana will tell you that in the beginning of
12     May 2008 the defendant began to pick her up at school
13     in Queens in his work vehicle, in his work van, and
14     drive her out to an office building on Community Drive
15     in Nassau County where he was working.
16          But when they got to the parking lot in May,
17     in the beginning of May 2008, he didn't go into the
18     building and he didn't begin to go into work.
19          She will tell you as she sat in that front
20     passenger's seat her stepfather told her to come closer
21     and he began to kiss her.  He put his tongue in her
22     mouth and began to kiss this little girl who he raised
23     since the time she was three years old out of diapers.
24          Sana will tell you how she tried to push and
25     pull away and she told him no, but then-17 Sana

1      couldn't fight him back and as hard as she tried to

2      push away and clench her lips, he was still stronger

3      than her and he began to touch her breasts over and

4      under her clothing.  He began to touch her vagina, over

5      and under her clothing.

6              But the sight and the feel of this teenager's

7      growing and developing body still wasn't enough for

8      this stepfather, so he took a vibrator and rubbed it

9      over her vagina in that van and she still fought back.

10             He told her to lay on her back, put her head

11     on his lap and she pushed and she pulled and she tried

12     to get away, but with nobody around, nowhere to run,

13     nowhere to go and still fearful of this man, her

14     stepfather, she lay there helpless.

15             As the calendar days went, the months went,

16     the years went, that fear that he instilled in her

17     when she was just 14 years old remained with her and

18     crossed county lines into Nassau County and she never

19     forgot that and she was still afraid because she knew

20     when she tried to fight him she wouldn't win.

21             Sana will tell you how this didn't stop in

22     the beginning of May of 2008, it continued through May,

23     and she will tell you that in May she began to like

24     boys and had a boyfriend and it was at this time that

25     you will learn the defendant would pick her up from

1    school and it became more frequent, after he confronted

2    her with whether or not she had a boyfriend, more

3    frequent, parking that work van outside of her high

4    school to pick her up and bring her into our county.

5            And throughout May, throughout June, of 2008

6    he would bring her into that parking lot and each time

7    he would touch her breasts and he would touch her

8    vagina and throughout those months he would take that

9    vibrator that he left in his work van and rub it on top

10   of her vagina and despite her each time, every time,

11   telling him no and pulling and pushing away, he didn't

12   stop.

13           And her fear escalated because Sana will tell

14   you that as she kept pushing and pulling away from him

15   he escalated his threats and he took a knife that he

16   kept in his work van, showed it to Sana, showed her the

17   blade and told her, "Let me show you how serious I am,"

18   and threatened to cut her finger off.

19           Scared and frightened Sana, afraid to do

20   anything, knowing she couldn't resist him, lay there,

21   helpless.

22           It was that threat, that fear, that knife

23   that she saw, that stayed with her throughout May and

24   throughout June because physically resisting didn't

25   send a message to him, so he escalated his threats and

ws

1       that fear stayed with her.

2               And throughout May 2008, throughout June of

3       2008, she will tell you it didn't stop.

4               Ladies and gentlemen, today is May 11th,

5       2009.  Thursday is May 14th, 2009.  On Thursday it will

6       be one year from when this defendant made a promise to

7       his stepdaughter Sana Awan, a promise that he made to

8       her on May 14th, 2008, that she would be the one --

9       that he was going to be the one to take her virginity

10      from her and that on May 14th, 2008 he was going to

11      have sexual intercourse with her.

12              Sana will tell you that June 14th (sic), that

13      one Monday later, came and passed and, relieved, hoping

14      that he had forgotten that promise he made to her, she

15      thought she was safe.

16              But she will tell you that the whole family

17      was around that weekend at a funeral and in her mind,

18      hoping that he had forgotten that promise, she learned

19      he didn't because the defendant told her and reminded

20      her of that promise he made to his stepdaughter and he

21      told her, "On June 25th, 2008 that's the day," he told

22      her.  "That day we are going to have sexual

23      intercourse."

24              Sana knew she had to run away and she's going

25      to tell you that she packed her bags and hid her bag in

                                                    ws

1        her closet because she knew she had to get away before
2        June 25th, 2008, still afraid to tell anybody that she
3        was running away and what this defendant had been doing
4        to her.  She held onto that secret for just a little
5        while longer.

6               With her bags packed in her closet she knew
7        she had to leave before the 25th and she knew that she
8        couldn't wait until the day before in case she didn't
9        have the courage to do it and she knew she couldn't do
10       it over the weekend because he would be home.  So that
11       Monday, June 23rd, 2008, she said this is the day and
12       she was ready to run.

13              And Sana will tell you that it wasn't just
14       the fear for her family and for herself that she had
15       not told anybody up until this point, because she'll
16       tell you she was never very close with her mother, the
17       defendant's wife.  She wasn't comfortable confiding
18       with her mother and she was afraid her mother wouldn't
19       believe her.

20              You will learn that that fear was right.  Her
21       mother doesn't believe her, never even asked her what
22       happened, never consoled her, never brought her to
23       counseling, abandoned her.  Sana's own mother, her
24       biological mother, abandoned her, but she stood by her
25       man, the defendant, stood by him, to this day.  You'll

                                                        ws

Opening - People                    329

1     learn that, it will come as no surprise to you, why she

2     couldn't confide in her mother.

3              So on June 23rd, 2008 she called the person

4     she could trust the most, her best friend from high

5     school, Christine Alioto, and she called Christine and,

6     finally, for the first time, told her best friend what

7     had happened to her and that she planned to run.

8              You'll get to meet Christine Alioto, who

9     could tell from Sana's voice that something was wrong.

10    She heard fear and a fright in her best friend's voice

11    that she had never heard before and she knew she had to

12    do something so she immediately woke her mother, Denise

13    Alioto, and that mother knew she had to do something.

14             And you will meet Denise Alioto and she will

15    tell you how she went to pick Sana up and when they did

16    pick Sana up with her bag in her hand they saw the face

17    of a girl they had never seen before.  They saw fear in

18    her eyes.  She was shaking.  She was trembling and

19    could barely even speak.

20             But as terrified as she was, Denise Alioto

21    knew what she had to do and she brought Sana to the

22    105th Precinct in Bellerose near their home, the

23    105th Precinct of the New York City Police Department.

24    And as hard as it was for her, she walked through those

25    precinct doors and told police officers and detectives

                                                    ws

1    what happened.

2              You will get to meet Detective Schulman, the

3    lead detective assigned to this case from the

4    105th Precinct in Queens, and he will tell you how he

5    interviewed Sana, how he calmed her down, how she told

6    him what her stepfather had been doing to her, how she

7    told him about the knife, about the vibrators, about

8    the touching and the threats, about the van, about what

9    was happening in that parking lot on Community Drive.

10             But what Detective Schulman and Sana did not

11   know was that as she was telling him this information

12   the defendant walked through those doors of that

13   105th Precinct by himself.  You will learn that he came

14   to report Sana missing from his home.

15             Detective Schulman decided to see if the

16   defendant, Harold Gopaul, would be willing to talk to

17   him about what happened and without telling him,

18   without telling this defendant, the details of the

19   sexual allegations that Sana was making against her

20   stepfather, without telling him those details, you will

21   learn that the defendant decided and agreed to tell

22   Detective Schulman what was going on and you will see

23   with your own eyes, in his own handwriting, how he

24   admitted to what Sana had just told Detective Schulman

25   in private; that he had been touching her, he had been

1    touching her breasts and had been touching her vagina

2    in that parking lot on Community Drive, admitting to

3    the same conduct that Sana just disclosed

4    to Detective Schulman.

5           But there's more because the defendant agreed

6    to make a videotaped statement for you, the jury, to

7    see with your own eyes and hear his words with your own

8    ears.  You will get to see, in his own words, how he

9    describes touching Sana's breasts, touching her vagina,

10   bringing her to Community Drive.  You will get to see

11   and hear his own words describing his own behavior.

12          But it's not just his own words and it's not

13   just Sana and it's not just Denise Alioto and it's not

14   just Christine Alioto that you, the jury, will get to

15   see because Detective Schulman and officers from the

16   105th Precinct will tell you about the property and the

17   evidence that they recovered from the defendant's work

18   van that he drove Sana out to Nassau County in.

19          You will see one of the vibrators or

20   massagers that this defendant used on her vagina.  You

21   will see the knife that he used to threaten her with.

22          And I submit to you, ladies and gentlemen,

23   that after you have heard all the testimony, seen all

24   the physical evidence, heard his words about what he

25   did to Sana, you will be convinced beyond a reasonable

C. Alioto - People - direct          332

1      doubt that in May and June of 2008, on those school

2      days that he would drive her out to Community Drive, on

3      each and every one of those dates, this defendant,

4      Harold Gopaul, forcibly touched his 17-year-old

5      stepdaughter's breasts and vagina.

6             And you will be convinced beyond a reasonable

7      doubt that he is guilty of each and every count he is

8      charged with in the indictment.

9             Thank you.

10            THE COURT:  Ms. Johnson, thank you.

11            Mr. Schechter?

12            MR. SCHECHTER:  No opening, Judge.

13            THE COURT:  Okay, People, at this time call

14     your first witness?

15            MS. JOHNSON:  People call Christine Alioto.

16     C H R I S T I N E   A L I O T O, a witness called on behalf

17     of the People, having been first duly sworn by the

18     clerk of the Court, was examined and testified under

19     oath as follows:

20            COURT OFFICER:  Have a seat.

21            For the record, state your name, spell your

22     last name and the county in which you reside.

23            THE WITNESS:  Christine Alioto, A-l-i-o-t-o,

24     and I live in Queens County.

25            THE COURT:  All right, Ms. Alioto, I'm just

                                                      ws

1          going to ask you to kind of move that microphone a

2          little to the middle there and just speak in a nice

3          loud clear voice as if you're speaking to somebody in

4          the back of the courtroom, okay?

5                    MS. JOHNSON:  Thank you.

6     DIRECT EXAMINATION

7     BY MS. JOHNSON:

8          Q.   Good morning, Christine.

9          A.   Hi.

10         Q.   I'm just going to ask you to keep your voice up

11    really loud --

12         A.   Okay.

13         Q.   -- so we can hear you back here.

14         A.   Okay.

15         Q.   How old are you?

16         A.   Seventeen.

17         Q.   Who do you live with?

18         A.   My mother.

19         Q.   What is her name?

20         A.   Denise Alioto.

21         Q.   Are you going to school?

22         A.   Yes.

23         Q.   Where did you go to school?

24         A.   Queens High School of Teaching.

25         Q.   Is that a specialized school?

                                                      ws

1     A.   Yes, it's for teaching.

2     Q.   Are you graduating this year?

3     A.   Yes.

4     Q.   What are your plans after graduation?

5     A.   I'm going to be going to college starting in

6   August.

7     Q.   Have you already been accepted into college?

8     A.   Yes.

9     Q.   How are your grades in school this year?

10    A.   I'm on the honor roll right now.

11    Q.   I want to go back to 2008.

12    A.   Okay.

13    Q.   Where were you living in 2008?

14    A.   At my current residence.

15    Q.   Where is that located?

16    A.   88-27 Pontiac Street.

17    Q.   Is that in Queens?

18    A.   Yes.

19    Q.   Is that in Bellerose?

20    A.   Queens Village.

21    Q.   Who was living with you on that day?

22    A.   It was me and my mother.

23    Q.   Back in 2008 did you have a best friend?

24    A.   Yes.

25    Q.   What was her name?

C. Alioto - People - direct          335

1         A.    Sana Awan.

2         Q.    How did you meet Sana?

3         A.    I met her through school.  We had the same

4    classes.

5         Q.    Had you ever met Sana's family?

6         A.    Yes.

7         Q.    What members of her family had you met?

8         A.    I've met her mother, her stepfather, her brother

9    and her sister.

10        Q.    What's the name of her stepfather?

11        A.    Harold Gopaul.

12        Q.    If you saw her stepfather again would you

13   recognize that person?

14        A.    Yes.

15        Q.    Do you see that person in the courtroom today?

16        A.    Yes.

17        Q.    Can you please point to that person and identify

18   an item of clothing that he's wearing?

19        A.    He's wearing a suit with a white shirt and a red

20   tie.

21             MS. JOHNSON:  Your Honor, let the record

22        reflect the witness has identified the defendant,

23        Harold Gopaul.

24             THE COURT:  Well --

25             MS. JOHNSON:  I didn't see Mr. Schechter's

ws

C. Alioto - People - direct        336

1      tie.

2                    MR. SCHECHTER:  I'm wearing a red tie.

3                    THE COURT:  Mr. Schechter happens to be

4      wearing a dark suit and red tie as well.

5                    Could you indicate to the left or the right?

6                    THE WITNESS:  The man on the left.

7                    THE COURT:  The record will indicate the

8      identification of the defendant.

9      Q.    Can you tell us how Sana would refer to the

10     defendant?

11     A.    I believe she would refer to him as dad.

12     Q.    Is the defendant the only father figure you knew

13     Sana to have?

14     A.    Yes.

15     Q.    I want to go -- focus on May 2008.

16           In the beginning of May 2008 did you notice any

17     changes in your friend Sana?

18     A.    Yes.

19     Q.    What types of changes did you notice in her?

20     A.    She became very nervous.  She wasn't acting like

21     herself.  Usually she's very happy and kind of goes with the

22     flow, but I kind of started to see changes as to maybe

23     something was wrong.

24                    MR. SCHECHTER:  Judge, I'm going to object.

25           All this is speculation, talking about high school

                                                            ws

C. Alioto - People - direct        337

1      students.

2                    THE COURT:  I understand.  The objection is

3      overruled.

4          Q.   Was Sana acting different in the beginning of 2008

5      as you observed?

6          A.   Yes.

7          Q.   How was she acting differently?

8          A.   She was very nervous.

9          Q.   Was that nervousness different than you had known

10     Sana to be?

11         A.   Yes.

12         Q.   Were her -- if you know, were her activities

13     restricted towards the beginning of May of 2008?

14         A.   Yes.

15         Q.   How so?

16         A.   She had to go from school straight home every day

17     and she used to do things after school and she couldn't do

18     those things anymore.

19         Q.   What types of things was she no longer doing?

20         A.   She could no longer go to clubs that she wanted to

21     go to anymore, certain classes that she took after school

22     she couldn't no longer go to.

23         Q.   When you say clubs, are you referring to dance

24     clubs or school clubs?

25         A.   School clubs.

C. Alioto - People - direct          338

1      Q.   How would Sana go home from school beginning in

2   May of 2008?

3      A.   She was picked up by Mr. Gopaul every day.

4      Q.   Do you know how she was picked up by the

5   defendant?

6      A.   Yes.

7      Q.   How was she picked up?

8      A.   He would bring his truck to school to pick her up,

9   his work truck.

10     Q.   What did that truck look like?

11     A.   It was a white Ecolab truck.

12     Q.   Like a mini van or a truck?

13     A.   It was like -- it wasn't exactly a mini van.  I

14   would say a truck.

15     Q.   Beginning in the -- in May of 2008 was Sana being

16   picked up from school in the Ecolab truck more frequently or

17   less frequently?

18     A.   More frequently.

19     Q.   How often?

20     A.   It was every day.  I remember seeing the truck

21   every single day.

22     Q.   Where would the truck be?

23     A.   In the front -- usually in the -- closest to the

24   school building in the parking lot.

25     Q.   When would you see this truck?

C. Alioto - People - direct          339

1      A.    When we would depart from school.

2      Q.    I want to go back particularly to June 23rd, 2008.

3            Do you remember that day?

4      A.    Yes.

5      Q.    Who called you on June 23rd, 2008?

6      A.    Sana.

7      Q.    When did she call you?

8      A.    In the evening.

9      Q.    On your cell phone or at home?

10     A.    On my cell phone.

11     Q.    Without telling us -- well, that's withdrawn.

12           Did you speak to Sana?

13     A.    Yes.

14     Q.    Can you tell us, without telling us what she told

15     you, what was her tone on the phone with you?

16     A.    She was whispering and she was very nervous and

17     speaking very quickly.

18     Q.    How did that sound to you?

19     A.    It sounded like something was wrong.

20           MR. SCHECHTER:   Objection.

21           THE COURT:   Yeah, sustained.

22     Q.    When you say nervous, what was it about her voice

23     that led you to believe she was nervous?

24     A.    She was speaking very quickly and usually Sana is

25     not a very quick speaker.  She's very -- where you can

C. Alioto - People - direct        340

1   understand her.  She's very slow and has complete thoughts.
2   She wasn't having complete thoughts at that time, it was
3   just very mismatched.
4        Q.   Had you ever heard Sana speak in that way prior to
5   June 23rd, 2008?
6        A.   No.
7        Q.   And without telling us what she told you, can you
8   tell us the nature of what it was that she said to you?
9        A.   She --
10            MR. SCHECHTER:  Objection.
11            THE COURT:  Can I just see the both of you
12       real quick?
13            THE COURT:  If she could just have a seat
14       over there?
15            (Witness steps down.)
16            (Sidebar conference held as follows:)
17            THE COURT:  What are you going to elicit?
18            Is she your prompt outcry witness?
19            MS. JOHNSON:  Because your Honor -- per your
20       Honor's ruling, she is just prepped to say that she
21       reported that she was being sexually abused.  That was
22       it.
23            THE COURT:  Without getting into any of the
24       details?
25            MS. JOHNSON:  Absolutely not.  She's been

                                                         ws

C. Alioto - People - direct        341

1       prepped.

2                   MR. SCHECHTER:  She's eliciting hearsay, pure

3       and total hearsay.  She can elicit that from Sana.

4                   THE COURT:  It's hearsay, but obviously an

5       exception under prompt outcry rule.

6                   MS. JOHNSON:  And she knows that the next

7       question is, "Without telling us what she said, yes or

8       no, did she tell you who she was talking about," and

9       that's it, not the substance.

10                  THE COURT:  You have an objection?

11                  MR. SCHECHTER:  I do.

12                  (Sidebar conference concludes:)

13                  THE COURT:  All right, Ms. Alioto, you can

14      step back up.

15                  (Witness resumes the stand.)

16                  THE COURT:  Okay, Ms. Johnson.

17      Q.    Christine, without telling us what Sana told you,

18      can you tell us the nature of what she was saying?

19      A.    She was saying that she was being sexually abused.

20      Q.    And without telling us who she was talking about,

21      did she tell you who she was speaking of?

22      A.    Yes.

23      Q.    After she told you this information what did you

24      do?

25      A.    I immediately woke up my mother.

                                                        ws

1    Q.    Where did you and your mom go after you woke your

2    mom up?

3    A.    My mom and I picked her up and then from there we

4    went to the precinct.

5    Q.    Where did you pick Sana up?

6    A.    We picked her up at 238th on 88th Avenue.

7    Q.    Where is that?

8    A.    It's approximately six blocks from my house.

9    Q.    In Queens Village?

10   A.    In Queens Village.

11   Q.    What did Sana have with her?

12   A.    She had a duffle bag with her clothes in it.

13   Q.    Can you describe for us what her demeanor and her

14   emotional state was when you encountered her on the street?

15   A.    She was running so she was out of breath and she

16   was very panicked as if she couldn't run fast enough.

17              MR. SCHECHTER:  Objection.

18              THE COURT:  Yeah, sustained as to the last

19        part.

20   A.    She -- I don't know how else to describe, just the

21   look of pure terror on her face.

22   Q.    Had you ever seen Sana look that way before?

23   A.    No.

24   Q.    Was she running towards you?

25   A.    Yes.

C. Alioto - People - direct          343

1     Q.   You and your mom were in your car?

2     A.   Yes.

3     Q.   Did you ask Sana to come into the car with you and

4  your mom?

5     A.   Yes.

6     Q.   And on your way to the precinct what was Sana's

7  demeanor like in the car?

8     A.   She was very upset.

9     Q.   What was it about her that led you to believe that

10  she was upset?

11    A.   She started to cry and she couldn't get her

12  thoughts straight and I don't know how else to describe it.

13  It's -- it was -- I had never seen her before like that,

14  ever.  I've seen her nervous, I've seen her upset, but never

15  to the degree that she was that night.

16    Q.   Did you eventually make it to the 105th Precinct?

17    A.   Yes.

18    Q.   Did you go inside with your mom?

19    A.   Yes.

20    Q.   Did Sana go inside?

21    A.   Yes.

22    Q.   Did Sana go inside right away?

23    A.   My mom went in first to talk to an officer.  She

24  wanted to tell -- try to get a female officer because of the

25  sensitive subject and she was able to have an officer come

                                                        ws

C. Alioto - People - cross          344

1    out and they escorted all of us into the precinct.

2          Q.   Was this on the same day, on June 23rd?

3          A.   Yes.

4          Q.   Did there come a time after June 23rd, 2008 that

5    Sana came to live with you and your mom?

6          A.   Yes.

7          Q.   What was the relationship between -- and I'm

8    asking you what the title of the relationship was between

9    your mom and Sana?

10         A.   My mother was Sana's foster mother.

11              MS. JOHNSON:   I have no other questions for

12         this witness.

13              THE COURT:   Mr. Schechter?

14   CROSS-EXAMINATION

15   BY MR. SCHECHTER:

16         Q.   Good morning, Ms. Alioto.

17         A.   Good morning.

18         Q.   Ms. Alioto, Mr. Gopaul used to take Sana and you

19   to school together, did he not?

20         A.   Yes.

21         Q.   How often?

22         A.   I can't really say how often.  It was numerous

23   times.

24         Q.   More than once a week?

25         A.   Take me to school or home from school?

ws

C. Alioto - People - cross          345

1      Q.    Both.

2      A.    Maybe more than once a week.

3      Q.    More than twice a week?

4      A.    Yes, maybe more than twice.

5      Q.    More than three or four times a week?

6      A.    I don't believe so.

7      Q.    And he took you home as well?

8      A.    Yes.

9      Q.    And did he take some of Sana's other friends home,

10     too?

11     A.    I'm not sure of that.

12     Q.    And did he take other of Sana's friends to school?

13     A.    I don't know.

14     Q.    Did he pick you up at your house?

15     A.    There were a few times where, yes, he did pick me

16     up.

17     Q.    For how long a period of time did Harold Gopaul

18     pick you up and take you to school?

19     A.    I don't really know.

20     Q.    It would be since 2006?

21     A.    No.

22     Q.    2007?

23     A.    No.

24     Q.    Well, when did you first become Sana's best

25     friend?

1      A.    In the end of sophomore year, beginning of junior

2  year.

3      Q.    That would be 2006 to '7?

4      A.    '7 to '8.

5      Q.    And would you participate with Sana in the clubs

6  that she belonged to?

7      A.    Yes.

8      Q.    And prior to June, that day when you say you

9  received a phone call from Sana, had Sana told you anything

10  with respect to what you say she told you on that date on

11  June 23rd?

12      A.    Before June 23rd?

13      Q.    Yes.

14      A.    No.

15      Q.    Now, did your mother know Sana?

16      A.    Yes.

17      Q.    Did your mother know Harold Gopaul?

18      A.    She had met him, I believe, once.

19      Q.    As a matter of fact, you pretty much knew the

20  whole family?

21      A.    Yes.

22      Q.    And your uncle is a detective in the 105?

23      A.    No.

24      Q.    Your uncle -- is your uncle a police officer?

25      A.    Yes.

C. Alioto - People - cross          347

1       Q.   Where?

2       A.   In Maryland.

3       Q.   I see.  And did your mother know anybody at the

4    105?

5       A.   I don't know.

6       Q.   Did your mother tell you she knew anybody at the

7    105?

8       A.   No.

9       Q.   Now, are you still Sana's best friend?

10      A.   No.

11      Q.   There came a time when Sana left your home, is

12   that correct?

13      A.   Yes.

14      Q.   And is that because of an argument you and she had

15   together?

16      A.   A distinct argument, you mean?

17      Q.   Well, didn't you and she have a dispute or

18   argument about something?

19      A.   No.

20      Q.   She decided to leave your house purely on her own?

21      A.   It was that --

22      Q.   Yes or no?

23      A.   She was having problems with my mother.

24      Q.   I see.

25           Now, your mother received money from the state

C. Alioto - People - cross          348

1    when Sana came to live with her, did she not?

2         A.   I don't know.

3              MS. JOHNSON:   Objection.

4              THE COURT:   Yeah, sustained.

5         Q.   Well, as a foster mother -- isn't it a fact that

6    foster mothers receive a quantity of money from the state?

7              MS. JOHNSON:   Objection, if she even knows.

8              THE COURT:   Yeah, sustained.

9         Q.   If you know?

10        A.   I don't know.

11        Q.   Did your mother not try to move into Harold's

12   house?

13        A.   No.

14        Q.   Did she ever ask Sana's mother to be permitted to

15   move into the house with them?

16        A.   I don't believe so.

17        Q.   What was the dispute between Sana and your mother?

18        A.   I don't know.   That's my mom's --

19        Q.   Sorry?

20        A.   I don't know.

21        Q.   Were you close with your mom?

22        A.   Yes.

23        Q.   And Sana was your best friend at that time?

24        A.   Yes.

25        Q.   And you're telling this jury that your mother

C. Alioto - People - cross                349

1   never discussed what the reason for her dispute with Sana

2   was?

3         A.   That's my mom's business.  I don't --

4         Q.   Excuse me?

5         A.   That's my mom's problems with Sana, not mine.

6         Q.   Well, you're not answering my question.

7              MR. SCHECHTER:  Respectfully ask the Court to

8         direct the witness to answer my question.

9              THE COURT:  I think she has answered your

10        question.

11        Q.   Did your mother tell you what the basis of her

12   dispute with Sana was?

13        A.   No.

14        Q.   Now, there came a time when Sana had a boyfriend,

15   is that correct?

16        A.   Yes.

17        Q.   Now, Sana pretty much went from school to home,

18   would that be fair to say?

19        A.   Yes.

20        Q.   And her parents put a tight rein on her with

21   respect to her outside activities, wouldn't that be fair to

22   say?

23        A.   Yes.

24        Q.   As a matter of fact, Sana was an excellent

25   student?

C. Alioto - People - cross          350

1        A.   Yes.

2        Q.   And they were concerned about Sana's becoming

3   involved with a boy, isn't that a fact?

4        A.   Yes.

5        Q.   And Sana, around this time, did get a boyfriend,

6   isn't that true?

7        A.   Yes.

8        Q.   Was this boyfriend 21 years old?

9        A.   No.

10       Q.   How old was he?

11       A.   He was in high school with us.

12       Q.   Did Sana also have a relationship or a friendship

13   with a gentleman called Dude who was about 21?

14       A.   I don't know.

15       Q.   Well, you were her best friend.

16            Wouldn't she confide in you about having a

17   relationship with a boyfriend named Dude?

18       A.   She never told me anything about that.  I never

19   even heard that.

20       Q.   Did she talk to you about a relationship with her

21   boyfriend?

22       A.   Yes.

23       Q.   Did she say she had a crush on anyone else but

24   this boyfriend?

25       A.   No.

C. Alioto - People - cross          351

1      Q.   As a matter of fact, she would see this boyfriend

2    on the sly, wouldn't that be fair to say?

3      A.   We went to school together, so they saw each other

4    during school.

5      Q.   Did you know whether Sana saw this boy behind her

6    parent's back?

7      A.   I knew her parents were -- after they found out

8    that she had a boyfriend, Mr. Gopaul had said to me that her

9    parents were -- didn't want her to have a boyfriend.

10     Q.   And that was because they wanted her to

11   concentrate on school and college, isn't that true?

12          Isn't that what was told to you?

13     A.   Yeah.

14     Q.   And you were told that by Sana's mother, too,

15   weren't you?

16     A.   I don't remember her saying that.

17     Q.   You don't remember?

18     A.   No.

19     Q.   Do you know that Sana went to work with her dad

20   frequently?

21     A.   Yes.

22     Q.   And that was before 2008 as well, wasn't it?

23     A.   I believe so.

24     Q.   That was in 2007 and 2006, correct?

25     A.   I don't know.

1      Q.    And she loved her dad, didn't she?

2      A.    I think so.

3                  MR. SCHECHTER:  No more questions of the

4           witness, Judge.

5                  THE COURT:  Any redirect, Ms. Johnson?

6                  MS. JOHNSON:  No.

7                  THE COURT:  All right, Ms. Alioto, thank you

8           very much.  Just watch your step as you step off there,

9           okay?

10                      (Witness excused.)

11                 THE COURT:  All right, Ms. Johnson, your next

12          witness.

13                 MS. JOHNSON:  People call Denise Alioto.

14    D E N I S E   A L I O T O, a witness called on behalf of the

15          People, having been first duly sworn by the clerk of

16          the Court, was examined and testified under oath as

17          follows:

18                 COURT OFFICER:  Have a seat, please.

19                 For the record, state your name, spell your

20          last name and the county in which you reside.

21                 THE WITNESS:  Denise Alioto, A-l-i-o-t-o,

22          Queens County.

23                 THE COURT:  Okay, Ms. Alioto, if you could

24          just keep your voice nice and loud, speak into that

25          microphone so everybody can hear you.

D. Alioto - People - direct          353

1             Ms. Johnson?

2             MS. JOHNSON:  Thank you.

3    DIRECT EXAMINATION

4    BY MS. JOHNSON:

5        Q.  Good morning, Ms. Alioto.

6        A.  Good morning.

7        Q.  Just keep your voice up so everybody can hear you

8    back here.  If you need to, push your chair up or speak into

9    that microphone.

10            How long have you lived at the address in Queens?

11       A.  Two and a half years.

12       Q.  Who do you live with?

13       A.  My daughter Christine.

14            MR. SCHECHTER:  I can't hear.

15            THE COURT:  Her daughter Christine.

16       Q.  What do you do for a living?

17       A.  Medical claims.

18       Q.  How long have you done that?

19       A.  Eleven years.

20       Q.  Do you know a person by the name of Sana Awan?

21       A.  Yes.

22       Q.  How do you know that person?

23       A.  Christine's friend.

24       Q.  Christine your daughter?

25       A.  Right.

D. Alioto - People - direct        354

1      Q.    Do you know when they became friends?

2      A.    I believe junior year, two years ago.

3      Q.    High school junior?

4      A.    Yes.

5      Q.    Were they best friends?

6      A.    They were close.

7      Q.    Have you ever met any members of Sana's family?

8      A.    Yes.

9      Q.    Who have you met?

10     A.    The stepfather, Harold Gopaul, the mother, Jenny,

11  and her siblings.

12     Q.    Do you know how old her siblings are?

13     A.    I'm going to say about six and eight.

14     Q.    Ms. Alioto, I want to direct your attention to

15  June 23rd, 2008.

16           Do you remember that day?

17     A.    Yes.

18     Q.    And can you tell us what you were doing around

19  8:30 p.m. that evening?

20     A.    Sleeping.

21     Q.    What happened?

22     A.    My daughter woke me up to tell me there was a

23  phone call.

24           MR. SCHECHTER:  Objection.

25           THE COURT:  No, overruled.

ws

D. Alioto - People - direct          355

1              You can go on.

2        Q.    I'm sorry, your daughter woke you up?

3        A.    To tell me I had a phone call.

4        Q.    Can you tell us what your daughter's emotional

5    state was like when she woke you up?

6              MR. SCHECHTER:  Objection, relevance.

7              THE COURT:  No, I'll allow that.  Overruled.

8        Q.    What was your daughter's emotional state when she

9    woke you up?

10       A.    She was nervous, antsy, you know.

11       Q.    Did you get on the telephone?

12       A.    Yes.

13       Q.    And did you have a conversation on the phone?

14       A.    Yes.

15       Q.    After this conversation where did you go?

16       A.    I went to get Sana.

17       Q.    Who did you go with?

18       A.    My daughter.

19       Q.    How did you get there?

20       A.    I drove.

21       Q.    Where did you pick Sana up?

22       A.    88th Avenue and 238 Street.

23       Q.    How far is that from your house?

24       A.    Four blocks.

25       Q.    Do you know where Sana was living then?

                                                      ws

D. Alioto - People - direct          356

1      A.   Yes.

2      Q.   How far was that from her home?

3      A.   About five blocks.

4      Q.   Can you tell us what did Sana have with her when

5    you came to pick her up?

6      A.   A gym bag.

7      Q.   What was Sana's emotional state like when you

8    encountered her?

9      A.   She was very distraught.  She was afraid.  She was

10   quiet, just not herself.

11     Q.   Had you ever met Sana before that date?

12     A.   Yes.

13     Q.   Was that the way she acted and appeared on every

14   other day?

15     A.   Never.

16     Q.   Was she crying?

17     A.   No.

18     Q.   Was she able to speak?

19     A.   A little bit.  At first she didn't say anything,

20   she just rode in the car and then she opened up a little

21   bit.

22     Q.   When you say she opened up, what was the tone of

23   her voice as she was speaking?

24     A.   She was afraid.  You know, she's a kid.  She was

25   afraid.

D. Alioto - People - direct          357

1      Q.   Could you hear that in her voice?

2      A.   Of course.

3      Q.   Had you ever heard her speak like that before?

4      A.   Never.

5      Q.   Where did you and your daughter take Sana?

6      A.   I took her to Hillside Avenue and Springfield

7   Boulevard.  I had to make a phone call, because she's not my

8   child, and then I went to the 105th Precinct.

9      Q.   Is that the precinct closest to your home?

10     A.   Yes.

11     Q.   That's the New York City Police Department?

12     A.   Yes.

13     Q.   Did Sana's demeanor change at all in the car ride

14   from the corner to the precinct?

15     A.   You know, not much.  She was afraid.  She was

16   afraid.

17     Q.   When you got to the 105th Precinct did Sana get

18   out of the car?

19     A.   No.

20     Q.   What did she do?

21     A.   She was afraid to go in, so I went in and I spoke

22   to a police officer, female, and she came out and she talked

23   to Sana and then Sana got out of the car and went with her.

24     Q.   Where did you and your daughter go?

25     A.   In the precinct with Sana.

1      Q.   Did you speak to police officers and detectives

2   there?

3      A.   Did I?

4           Yes.

5      Q.   Yes?

6      A.   Um-hum.

7      Q.   Did there come a time, Ms. Alioto, after

8   June 24th, 2008 that Sana came to live in your home with you

9   and your daughter?

10     A.   Yes.

11     Q.   Do you recall when that began?

12     A.   She stayed with me two days prior to me having her

13  legally on July 3rd.

14     Q.   When you say legally, what does that mean?

15     A.   I became her foster mother.

16     Q.   Did you volunteer to become her foster mother?

17     A.   Sure, yeah.

18          MS. JOHNSON:   I have no other questions for

19     Ms. Alioto.

20          THE COURT:   Mr. Schechter?

21  CROSS-EXAMINATION

22  BY MR. SCHECHTER:

23     Q.   Ms. Alioto, good morning.

24     A.   Morning.

25     Q.   Sana no longer lives with you, is that true?

1      A.    That's true.

2      Q.    As a matter of fact, you and she had a dispute

3    which caused her to leave the house, isn't that true?

4      A.    A dispute?

5      Q.    Yes.

6      A.    I wouldn't say that.

7      Q.    You and she disagreed about something, obviously,

8    that was important to her, is that correct?

9      A.    No, you're wrong.  That's not correct.

10     Q.    Did Sana -- withdrawn.

11           Did you tell Sana to leave the house?

12     A.    Did I?

13     Q.    Yes.

14     A.    Absolutely not.

15     Q.    Did Sana voluntarily want to leave the house?

16     A.    No, she didn't -- she wanted to move on with her

17   life, but, no.

18     Q.    As a matter of fact, she had a boyfriend, isn't

19   that true?

20     A.    Yes.

21     Q.    And you were concerned that she was having this

22   relationship with the boyfriend, isn't that so?

23     A.    No, that's not so.

24     Q.    You permitted the boyfriend to visit your home?

25     A.    Yes, I did.

1      Q.   And you indicated you were a foster mother,

2   correct?

3      A.   Yes.

4      Q.   Did you apply for or receive benefits as a foster

5   mother from the state?

6      A.   Yes, did.

7              MS. JOHNSON:  Objection.

8              THE COURT:  I'll allow that.

9      Q.   How much did you receive?

10     A.   Twenty-three dollars a day.

11     Q.   As a matter of fact, you asked Jenny Gopaul to

12   volunteer to move in with the Gopaul's, isn't that true?

13     A.   Excuse me?

14     Q.   You heard my question.

15     A.   No --

16     Q.   You want me to repeat it?

17             THE COURT:  Wait.

18             If there's something you don't understand --

19             THE WITNESS:  I don't understand.

20             THE COURT:  You want to rephrase it?

21     Q.   Did you ask Jenny Gopaul to have you move in with

22   the family?

23     A.   Never would I ever do that.

24     Q.   As a matter of fact, you tried to hit the family

25   up for some money, didn't you?

D. Alioto - People - redirect          361

1    A.   Are you kidding me?

2         No.

3    Q.   No, I'm not kidding you.

4         When did Sana leave your house?

5    A.   February 20th.

6    Q.   Do you know with whom she resides?

7    A.   No.

8              THE COURT:  February 20th of this year?

9              THE WITNESS:  Of this year.

10   Q.   Didn't you care about with whom she was residing?

11   A.   I was her foster mother, okay, I cared.

12   Q.   Why didn't you ask her or find out where she was

13   residing?

14   A.   Because it's privileged information.  I'm not

15   supposed to know where she is.

16             MR. SCHECHTER:  I have no more questions of

17        this witness, Judge.

18             THE COURT:  Any redirect, Ms. Johnson?

19             MS. JOHNSON:  Yes, your Honor.

20   REDIRECT EXAMINATION

21   BY MS. JOHNSON:

22   Q.   Ms. Alioto, do you recall being asked questions by

23   the defense attorney as to why Sana is no longer living with

24   you?

25   A.   Yes.

ws

D. Alioto - People - redirect        362

1    Q.   Can you tell us why Sana is no longer living in

2    your home?

3    A.   Because the Gopauls were too close for comfort and

4    it was compromising my daughter's safety, so I made that

5    conscious decision, okay, to move my daughter's safety

6    first.

7    Q.   Why was it compromising your daughter's safety?

8    A.   Because Harold was around my block too much.  He

9    knew where I lived.  Sana had worked in a pharmacy.  They

10   were coming to her employment.  We're blocks from each other

11   as far as residence.

12   Q.   And when you say they were coming to her place of

13   employment, who's they?

14   A.   Jenny and Harold.

15   Q.   Jenny her mother?

16   A.   Yes.

17   Q.   And Harold the defendant?

18   A.   Right.

19   Q.   Was there an order of protection in place at that

20   time?

21   A.   Yes.

22   Q.   And what did that order of protection require the

23   defendant to do and not do?

24             MR. SCHECHTER:  Objection, objection.

25             THE COURT:  Yeah, sustained at this time.

ws

D. Alioto - People - recross          363

1     Q.   Did Sana want the defendant to be coming around
2     your home?
3                MR. SCHECHTER:   Objection to what Sana
4          wanted.
5                THE COURT:   No, I'll allow that, overruled.
6     Q.   Did Sana want the defendant coming around your
7     home?
8     A.   No.
9     Q.   Did she tell you that?
10    A.   Yes.
11    Q.   And what did she say to you?
12    A.   "He's going to get me."
13    Q.   Did she tell you that she wants the defendant
14    coming around her part-time job?
15    A.   No.
16    Q.   What did she tell you?
17    A.   "I'm afraid of him."
18    Q.   Did she tell you he was coming to her job?
19                MR. SCHECHTER:   Objection to what she told
20         her.   That's hearsay.
21                THE COURT:   Yeah, sustained.
22    Q.   Did Sana tell you she didn't want her mother
23    coming around?
24    A.   Yes.
25    Q.   What did she say to you?

ws

D. Alioto - People - recross        364

1           MR. SCHECHTER:  Objection.

2           THE COURT:  Yeah, sustained.

3      Q.   Did she tell you she was afraid of her stepfather?

4           MR. SCHECHTER:  Objection.

5      A.   Yeah.

6           THE COURT:  Sustained.

7           MS. JOHNSON:  I have nothing else.

8           THE COURT:  Any recross, Mr. Schechter?

9   RECROSS-EXAMINATION

10  BY MR. SCHECHTER:

11     Q.   Of course you made a report to the police, did you

12  not?

13     A.   Regarding what?

14     Q.   Concerning Mr. Gopaul's coming to your house.

15     A.   Did I make a report?

16     Q.   Yes.

17     A.   Sana made a report.

18     Q.   Did you make a report to the police?

19     A.   No, I didn't make a report to the police.  It was

20  Sana's order of protection, not mine.

21     Q.   So you did not make a report.

22          You owned the house.

23          Did you see Mr. Gopaul at your house?

24     A.   I don't own the house.  I'm a renter.

25     Q.   Did you see Mr. Gopaul at your house?

ws

D. Alioto - People - recross          365

1      A.    Yes, I have seen him at my house.

2      Q.    When?

3      A.    Numerous times on my block.

4      Q.    On your block?

5      A.    Yes.

6      Q.    At your house?

7      A.    On my block at the corner.

8      Q.    At your house, Ms. --

9      A.    Excuse me, but I never said he was at my house.  I

10     said he was on my block.

11     Q.    I believe you said he was at your house.

12     A.    Around my house.

13     Q.    As a matter of fact, he has two children that live

14     with Mrs. Gopaul on the block, isn't that true?

15     A.    He doesn't live on my block.

16     Q.    The two children with Mrs. Gopaul reside on that

17     block -- not on your block, but near you?

18     A.    Okay, not on my block.

19     Q.    Correct?

20     A.    Right.

21     Q.    So he has two children with Mrs. Gopaul that live

22     at the house, correct?

23     A.    As far as I know, yes.

24     Q.    Now, my investigator tried to talk to you, do you

25     recall that?

ws

D. Alioto - People - recross          366

1       A.    Absolutely.

2       Q.    And you refused to speak to him?

3       A.    I spoke to him.

4       Q.    Yes, and you called him and you were screaming at

5  him, weren't you?

6       A.    No, I wasn't screaming at him.  I was direct.

7       Q.    You said, "Don't ever try to contact me," correct?

8       A.    Yes.

9       Q.    What were you trying to hide?

10      A.    I'm not trying to hide anything.

11      Q.    Sana left that house because of you, not because

12  of anything else, isn't that a fact?

13      A.    No, that's really not a fact.

14      Q.    You had a relation with her, you had an argument

15  with her and that's why she left --

16      A.    No, we didn't have an argument.

17      Q.    So if your daughter testified to that she would be

18  lying, is that correct?

19              MS. JOHNSON:  Objection.

20              THE COURT:  Yeah, sustained.

21              MR. SCHECHTER:  No more questions.

22              THE COURT:  All right, Ms. Alioto, thank you

23      very much.  Just be careful as you step off.

24              THE WITNESS:  Thanks.

25              (Witness excused.)

                                                        ws

Hughes - People - direct                367

1              MS. JOHNSON:  Your Honor, I may need a

2       30-second --

3              THE COURT:  Yeah, let me just see both of

4       you?

5              (Discussion held at the bench, off the

6       record.)

7              THE COURT:  All right, members of the jury,

8       this looks to be about a good time to take our morning

9       break, as I indicated.  I'm going to try to get you

10      back here by 12 noon, so if you would just follow

11      Kenny.  Watch your step as you step out.

12             (Jury exits.)

13             (Recess taken in the proceedings.)

14             THE COURT:  Okay.

15             (Discussion held off the record.)

16             THE COURT:  Okay, let's bring them in.

17             (Jury enters.)

18             THE COURT:  All right, members of the jury,

19      we're ready to continue with our next witness.

20             Ms. Johnson?

21             MS. JOHNSON:  Your Honor, the People call

22      Brian Hughes.

23   B R I A N  H U G H E S, a witness called on behalf of the

24      People, having been first duly sworn by the clerk of

25      the court, was examined and testified under oath as

                                              ws

Hughes - People - direct          368

1      follows:

2                  COURT OFFICER:  Have a seat.

3                  For the record, state your name, spell your

4           last name and your place of employment.

5                  THE WITNESS:  Brian Hughes, H-u-g-h-e-s, and

6           I work for the Queens County District Attorney's

7           Office.

8                  Good afternoon.

9                  THE COURT:  Mr. Hughes, if you would, just

10          keep your voice up nice and loud.

11                 Ms. Johnson, whenever you're ready.

12                 MS. JOHNSON:  Thank you.

13     DIRECT EXAMINATION

14     BY MS. JOHNSON:

15          Q.   Good morning, Mr. Hughes.

16          A.   Good morning, Ms. Johnson.

17          Q.   How long have you worked for the Queens County

18     District Attorney's offers?

19          A.   It will be two years in July.

20          Q.   In what capacity do you work there?

21          A.   I'm an Assistant District Attorney.

22          Q.   What are your general duties as an Assistant

23     District Attorney with the Queens County DA's Office?

24          A.   I work in the domestic violence bureau.  I handle

25     a case load of approximately 150 cases and I also have

                                                        ws

1    duties in the special victim's bureau.

2        Q.    Is one of your duties in the special victim's

3    bureau to be on beeper duty?

4        A.    That is correct.

5        Q.    And can you tell us what that means?

6        A.    Approximately once every two to three weeks I'm on

7    24-hour call.  If there's a major crime of a sexual nature

8    that occurs in Queens County I'm notified and I can take --

9                    MR. SCHECHTER:  Objection.

10                   THE COURT:  Overruled, overruled.

11                   MR. SCHECHTER:  I have a motion.

12                   THE COURT:  All right, you want to step up,

13           then?

14                   (Witness steps down.)

15                   (Sidebar conference held as follows:)

16                   MR. SCHECHTER:  This was exactly what I was

17           trying to prevent.  The Assistant District Attorney has

18           just indicated that he is called in when there is a

19           major offense in Queens County, therefore raising the

20           inference to this jury that my client has been charged

21           in Queens County.  I'm asking that the jury be

22           withdrawn and a mistrial be declared.

23                   THE COURT:  All right, People?

24                   MS. JOHNSON:  Your Honor, it's not

25           appropriate for a mistrial, number one.

1           And, number two, he is saying that when a

2      crime occurs in Queens County those are his duties.

3           At no time did I ask him if a crime occurred

4      in Queens County. I'll just ask him if he responded to

5      the 105th, but a mistrial at this time is totally

6      inappropriate.

7           THE COURT: Yeah, at this point I don't think

8      a mistrial is in order.

9           Ms. Johnson, I just caution you to be careful

10     with your questioning.

11          In my opinion he was describing his duties.

12     I don't think the jury is going to draw an inference

13     that it pertains to your particular client, so the

14     mistrial request is denied.

15          MR. SCHECHTER: Exception.

16          (Sidebar conference concludes.)

17          (Witness resumes the stand.)

18          THE COURT: All right, Ms. Johnson.

19     Q.   Mr. Hughes, on June 23rd, 2008 where were you

20     working?

21     A.   I was working in Queens County and I was on the

22     beeper that I described before.

23     Q.   Were you employed as an Assistant District

24     Attorney for the Queens County DA's Office on that day?

25     A.   Yes, I was.

ws

1        Q.    Do you recall what day of the week June 23rd, 2008

2    was?

3        A.    Not off the top of my head, no.

4        Q.    Did there come a time on that day where you were

5    called to respond to the 105th Precinct of the New York City

6    Police Department?

7        A.    Yes.

8        Q.    Where is that precinct located?

9        A.    It's within Queens County.  It's on the eastern

10   section of the county.  The name of the neighborhood escapes

11   me currently.

12       Q.    Were you responding in your capacity as

13   prosecutor?

14       A.    Yes, I was.

15       Q.    Who did you respond with?

16       A.    I responded with Assistant District Attorney

17   Jared Rosenblatt and once I was there I met with a

18   Detective Shulman.

19       Q.    Did there come a time when you met with an

20   individual who had been taken into custody?

21       A.    Yes.

22       Q.    What was the name of that person?

23       A.    Harold Gopaul.

24       Q.    Do you see that individual in the courtroom today?

25       A.    Yes, he's somewhat obscured by the television.

                                                          ws

Case 1:15-cv-01782-NGG   Document 8-14   Filed 08/31/15   Page 184 of 192 PageID #: 1192

1    He's wearing -- it looks like a navy blue suit, white shirt
2    red tie.
3              MR. SCHECHTER:   Indicating Mr. Gopaul.
4              THE COURT:   Yes.
5         Q.   Mr. Hughes, can you tell us where did you first
6    encounter the defendant on June 23rd, 2008?
7         A.   That would be in the 105th Precinct.
8         Q.   Where in the 105th Precinct?
9         A.   In the detective squad area.
10        Q.   What was the purpose of you meeting with the
11   defendant, Harold Gopaul, on that day?
12        A.   Mr. Gopaul had indicated that he wanted to make a
13   statement.
14        Q.   In what form was that statement going to be taken?
15        A.   We wanted to take it on a videotape form.
16        Q.   Were you present for that entire videotaped
17   statement?
18        A.   Yes, for the entirety.
19        Q.   Who else was present?
20        A.   It was myself, Mr. Gopaul, Assistant District
21   Attorney Jared Rosenblatt and Detective Shulman.
22        Q.   Who was operating the video equipment?
23        A.   There was also another detective who actually was
24   involved who is employed by the District Attorney's Office
25   here in Queens, but I don't recall his name off the top of

ws

Hughes - People - direct                    373

1   my head.

2                   MS. JOHNSON:   I'm going to ask that this be

3       marked as People's Exhibit 1 for identification.

4                   THE COURT:   People's 1.

5                   (People's Exhibit 1 marked for

6       identification.)

7                   MS. JOHNSON:   Can I have it shown to the

8       witness please?

9                   (Shown to witness.)

10      Q.   Mr. Whoever, do you recognize People's 1?

11      A.   I do.

12      Q.   What do you recognize it to be?

13      A.   A copy of the video recording Mr. Gopaul made.

14      Q.   How do you know that?

15      A.   I viewed it earlier and, additionally, I've signed

16  it to indicate that it's the same tape.

17      Q.   When did you sign it?

18      A.   Right out in the hallway about five, six, minutes

19  ago.

20      Q.   When is the last time you viewed that tape?

21      A.   Approximately a half hour ago.

22      Q.   Where?

23      A.   The Nassau County District Attorney's Office, the

24  special victim's bureau.

25      Q.   Did you view the entirety of that tape?

                                                            ws

1      A.   I did.

2      Q.   Is that a fair and accurate and complete copy of

3  the videotape taken of your interview with this defendant on

4  June 23rd, 2008?

5      A.   It depicts the entirety of the conversation, yes.

6      Q.   Is there anything missing?

7      A.   No.

8      Q.   Is there anything added?

9      A.   No.

10     Q.   Is there -- was there any conversation between you

11  and the defendant outside of that videotape?

12     A.   No, there was not.

13     Q.   Have you had the opportunity to compare that copy

14  to the original?

15     A.   Yes.

16     Q.   And is it a complete copy?

17     A.   Yes, it is.

18          MS. JOHNSON:   Your Honor, at this time we

19      would ask that People's 1 for ID be marked into

20      evidence as People's 1 in evidence.

21          MR. SCHECHTER:   Voir dire?

22          THE COURT:   Yes.

23  VOIR DIRE EXAMINATION

24  BY MR. SCHECHTER:

25     Q.   Of your own knowledge, Mr. Hughes, do you know

ws

Case 1:15-cv-01782-NGG   Document 8-14   Filed 08/31/15   Page 187 of 192 PageID #: 1195

1    whether or not there was any conversation between

2    Detective Shulman and the defendant?

3         A.   I wasn't witness to any.

4         Q.   Do you know whether there was any conversation

5    between ADA Jared Rosenblatt and the defendant after this

6    was over?

7         A.   I was with Mr. Rosenblatt the entire time and I

8    never saw him talk to Mr. Gopaul.

9         Q.   Do you know if there was any conversation with

10   Police Officer Alfaro and Mr. Gopaul after that tape was

11   done?

12        A.   Not to my knowledge.

13        Q.   But you don't know of your own knowledge?

14        A.   Well, again, I never witnessed any such

15   conversation.

16        Q.   Do you know whether there was any conversation

17   between Mr. Gopaul and any other member of the precinct?

18        A.   Not to my knowledge, but, again, I wasn't

19   obviously watching every member of the precinct the entire

20   time.

21             MR. SCHECHTER:  Okay, I'm going to object on

22        the basis of the failure to know whether or not anybody

23        had talked to him in between the time that tape was

24        made and the time it was vouchered.

25             THE COURT:  All right, the tape will be

                                                      ws

Hughes - People - direct                 376

1     admitted over objection.

2                 If you will mark it, please?

3                 (People's Exhibit 1 received in evidence.)

4                 THE COURT:  Ms. Johnson, are you at the point

5     where you intend to play this tape?

6                 MS. JOHNSON:  I am, Judge.

7                 If you would like, I can ask him additional

8     questions and we can hold off.

9                 THE COURT:  Yes.

10    DIRECT EXAMINATION CONT'D

11    BY MS. JOHNSON:

12        Q.   Mr. Hughes, during the entirety of the time you

13    were with the defendant, Harold Gopaul, did he ever complain

14    of any physical injury to you?

15        A.   No, he did not.

16        Q.   Did you ever observe any injury on him?

17        A.   None.

18        Q.   Did he ever ask to receive medical attention?

19        A.   He didn't.

20        Q.   Did he ever ask to make a phone call?

21        A.   Nope.

22        Q.   Did he ever ask to speak to an attorney?

23        A.   He did not.

24        Q.   Did he ever indicate he no longer wished to speak

25    with you?

                                                        ws

1       A.   No.

2       Q.   Prior to speaking to the defendant did you or

3    Assistant District Attorney Jared Rosenblatt issue Miranda

4    warnings to Mr. Gopaul?

5       A.   Yes, I issued Miranda warnings.

6       Q.   And how did you issue them?

7       A.   I read them off our Miranda warnings sheet.  That

8    actual section of the conversation was videotaped.

9       Q.   And what was the defendant's response to you

10   asking him if he wished to waive his Miranda rights?

11      A.   He agreed to waive each of his Miranda rights

12   individually and then signed the piece of paper indicating

13   his waiver.

14      Q.   During the entirety of your contact with the

15   defendant was he ever handcuffed?

16      A.   Not during any time I saw him.

17      Q.   Was he offered a bottle of water?

18      A.   Yes, actually, Aquafina, as I recall.

19      Q.   Did you or any member of law enforcement,

20   including the detectives, police officers and the other

21   prosecutor, ever threaten Mr. Gopaul?

22      A.   Of course not.

23      Q.   Did you or any of the other members of law

24   enforcement ever make any promises to him?

25                MR. SCHECHTER:  Judge, how is this --

                                                    ws

Hughes - People - direct                378

1        THE COURT:  Mr. Schechter --

2        MR. SCHECHTER:  Objection.

3        THE COURT:  If you have an objection --

4        MR. SCHECHTER:  Yes.

5        THE COURT:  -- just say objection.

6        MR. SCHECHTER:  Objection.

7        '    THE COURT:  Overruled.

8    Q.   Did you or any other member of law enforcement

9    ever make any promises to the defendant?

10   A.   No.

11   Q.   Did you or any other members of law enforcement

12   ever use any physical force upon the defendant?

13   A.   Of course not.

14   Q.   Can you --

15        MR. SCHECHTER:  I'm going to object to that.

16        THE COURT:  All right, overruled.

17   Q.   Mr. Hughes, can you tell us, if you know, where

18   was Shulman's weapon while this videotape was being

19   conducted?

20   A.   I do not know.

21   Q.   Do you carry a weapon?

22   A.   No.

23   Q.   Did you have one on June 23rd, 2008?

24   A.   No.

25   Q.   Did Jared Rosenblatt?

ws

Hughes - People - direct                379

1     A.    No.

2     Q.    Did the videographer?

3     A.    No.

4              MS. JOHNSON:  Your Honor, this may be a time

5     where we would --

6              THE COURT:  All right, members of the jury,

7     I've been told we're at the point where the

8     videotape -- I believe the People may be seeking to

9     play it.  I've been told the videotape is a little over

10    half an hour in length, so rather than break my word to

11    you after I've been telling you since jury selection we

12    break at 12:30 and then go to 1 o'clock and have you

13    not happy with me, we'll break at this point for lunch

14    and picket it up at 2 o'clock.

15             Just a couple of admonitions I need to remind

16    you of.

17             One, don't speak amongst yourselves or anyone

18    else about the case.

19             Obviously, we just started, you heard some

20    testimony about the case.  Please don't form any

21    opinions.  Again, we're in the beginning of the case.

22    You haven't heard the entire case.  Obviously, you

23    haven't heard my instructions on the law.

24             And, please, don't view, visit, the crime --

25    the alleged crime scenes or what have been discussed so

                                              ws

Hughes - People - direct          380

1     far in terms of locations that you've heard at this

2     point.

3              So have a pleasant lunch.  We'll have you

4     back here at 2 o'clock with the playing of the

5     videotape.

6              (Jury exits.)

7              THE COURT:  Okay, 2 o'clock.

8              MR. SCHECHTER:  Your Honor?

9              THE COURT:  2 o'clock.

10             MR. SCHECHTER:  Could we leave our stuff

11    here?

12             THE COURT:  Yes.

13             (The luncheon recess was taken at this time.)

14             *     *     *     *     *

15             A F T E R N O O N  S E S S I O N

16             THE COURT:  May I see both of you?

17             (Discussion held at the bench, off the

18    record.)

19             THE COURT:  Mr. Schechter, you've indicated

20    that you wished to have, at your disposal, a DVD player

21    for purposes of cross-examining the complainant?

22             MR. SCHECHTER:  Yes.

23             THE COURT:  Ms. Johnson, you've been kind

24    enough to volunteer the services of your office with

25    that?

                                                      ws