1             MS. JOHNSON:  Judge, yes, the technical
 2    people are on their way.  I don't know how to use it,
 3    but we'll certainly provide it.
 4             MR. SCHECHTER:  Just so the Court
 5    understands, because I'm also a technological retard, I
 6    usually use my computer in my office where it's easy
 7    because I have a mouse because in this particular DVD,
 8    a copy of which counsel has been given, I have -- there
 9    are individual very short clips within it so you would
10    have to point and click to turn on this particular
11    little video within the video.  So I want to make sure
12    that this DVD has that capability.  I mean, I use my
13    computer so I guess it does.
14             THE COURT:  I mean, depending on how we
15    proceed, I would obviously -- my intention is probably
16    to take a break after her direct.  If you're able to
17    get your -- this machine running to the way you need it
18    to run, then we'll begin cross-examination, depending
19    upon what time we're looking at.
20             If not, I may just adjourn cross-examination
21    until tomorrow.
22             MS. JOHNSON:  I don't see us finishing her
23    direct today anyway.
24             THE COURT:  At this point I think it's
25    doubtful we're going to get to cross.

                                              ws

Case 1:15-cv-01782-NGG  Document 8-15  Filed 08/31/15  Page 2 of 209 PageID #: 1202

1        MR. SCHECHTER:  The reason I mention that is

2   because I will then ask my client -- I can't bring a

3   whole computer thing here, but maybe if you could bring

4   a computer or another DVD.  I don't have a portable DVD

5   here nor in my office, so --

6        THE COURT:  Whatever you want to bring in,

7   Mr. Schechter, that you feel is going to be user

8   friendly to yourself, you know, bring it in.

9        MR. SCHECHTER:  If counsel could at least,

10   before the end of the day, have that DVD brought in we

11   could see if we can get it to work.

12        MS. JOHNSON:  As soon as they get here I'll

13   have them --

14        THE COURT:  Or, if not, at the end of the day

15   you can go over to her office and see if it satisfies

16   your needs.

17        The other issue I want to just address, since

18   the complainant is going to be testifying, I've given

19   you both a sample, if you will, of a proposed Molineaux

20   charge that I intended to give the jury after her

21   direct testimony as well as in the final instructions

22   to the jury.

23        Mr. Schechter, I understand that obviously

24   you've had an objection to any of this evidence coming

25   in.

1          MR. SCHECHTER:  Yes.

2          THE COURT:  And I think that's obviously

3     quite clear.

4          The issue I have now is -- because at one

5     point during the course of my ruling with respect to

6     this pretrial ruling with respect to this evidence you

7     indicated that you would not be asking for such a

8     charge and if that was the case, obviously, I would not

9     do it over your objection.

10          Do you now wish for me to charge what I

11     proposed here?

12          MR. SCHECHTER:  Well, so that the record is

13     crystal clear, and I want every possible preservation

14     issue to be as minimal as possible, I still

15     vociferously object to this testimony going in.

16          As counsel even stated it during her opening

17     I objected to that as well, but since the Court has

18     already made a determination that this material is

19     going in, I think the only conceivable minimization of

20     that error would be, in the very least, this

21     prospective charge the Court was to give the jury with

22     the one proviso, and I would ask this be marked a Court

23     exhibit, of course --

24          THE COURT:  Yes.

25          MR. SCHECHTER:  -- that on the second

ws

1   paragraph, the third line down, the words in Nassau

2   County be deleted so that it would say commit any

3   crime, period.

4              So that the record is clear, again, over

5   objection that these -- that this information is being

6   presented before the jury, nevertheless the proposed

7   charge to the jury by the Court, if I should read it

8   into the record, I would rather not encumber it if I

9   don't have to --

10             THE COURT:  Well, the charge will be read --

11  it will be marked a Court exhibit.  It will be read to

12  the jury.  I don't think it's necessary to have to read

13  it into the record now.

14             If at some point I do not read the charge as

15  it appears currently, and I will grant your application

16  to excise the words in Nassau County, obviously bring

17  that to my attention.

18             But, just so it's clear, you are asking for

19  this charge, even though you're not -- obviously,

20  you're not waiving your objection to the testimony this

21  charge relates to.

22             MR. SCHECHTER:  I'm constrained to ask for

23  this charge, yes, Judge.

24             THE COURT:  And it's my intention to do it

25  both after Ms. Awan testifies as well as during the

ws

1     course of my closing instructions.

2              So we'll mark -- what I'm going to do is have

3     my law secretary take out the words in Nassau County

4     and we'll mark that as a Court exhibit.

5              MR. SCHECHTER:  Was that Court Exhibit 1,

6     your Honor?

7              THE COURT:  No, I think we may be up to 4.

8              (Pause in the proceedings.)

9              (Jury enters.)

10             THE COURT:  Okay, all right, have a seat.

11             Members of the jury, welcome back.  We --

12    this last couple of minutes or so we were just trying

13    to get this video and TV camera kind of set up so we

14    don't have any problems once we play it, but I think

15    we're ready to go.

16             Ms. Johnson?

17             MS. JOHNSON:  Yes, your Honor.  At this time

18    the People are going to play what's been marked in

19    evidence as People's Exhibit 1.

20             Judge, I'm just going to move my chair so --

21             THE COURT:  Yes.

22             Do you need Mr. Hughes to move at all?

23             MS. JOHNSON:  Not at this time.

24    Q.   Can you see, Mr. Hughes?

25    A.   Yeah.

Hughes - People - direct          386

1          THE COURT:  If you can't, if you want to move

2     over to that corner --

3          THE WITNESS:  Yes, I may just, thank you.

4          (Witness steps down.)

5          (People's Exhibit 1 published to the jury at

6     this time.)

7          (Witness resumes the stand.)

8          MS. JOHNSON:  Your Honor, I'm going to ask

9     that this be marked as People's Exhibit 2 for

10    identification?

11         THE COURT:  People's 2.

12         (People's Exhibit 2 marked for

13    identification.)

14    Q.   Mr. Hughes, if you could take a look at People's 2

15    for identification?

16         (Shown to witness.)

17    Q.   Do you recognize that?

18    A.   I do.

19    Q.   What do you recognize that to be?

20    A.   These are the Miranda warnings that were given to

21    Mr. Gopaul on the 24th of June, 2008.

22    Q.   How do you know that?

23    A.   Well, I recognize my handwriting and also I can

24    tell by the information on here that that's what this is.

25    Q.   Is that the Miranda card that is depicted in the

                                                    ws

Hughes - People - direct          387

1     video in People's Exhibit 1 in evidence?

2          A.    That's correct.

3          Q.    Is that the original?

4          A.    Yes, it is.

5          Q.    And is that in the same or substantially the same

6     condition it was back on June 24th, 2008?

7          A.    It's exactly the same.

8                     MS. JOHNSON:  Your Honor, at this time we

9          would ask that People's 2 be moved into evidence.

10                    THE COURT:  Show it to Mr. Schechter.

11                    MS. JOHNSON:  With the caveat, your Honor,

12         there is writing on the back of that document unrelated

13         to this matter.

14                    THE COURT:  Yes.

15                    (Shown to counsel.)

16                    THE COURT:  All right, so without objection,

17         People's 2 received in evidence.

18                    (People's Exhibit 2 received in evidence.)

19                    (Shown to witness. )

20         Q.    Mr. Hughes, if you could please take a look at

21    People's Exhibit 2?

22         A.    Yes.

23         Q.    If you could tell the jury whose handwriting

24    appears on that document and when referencing the

25    handwriting please tell us what you're referring to?

                                                          ws

Hughes - People - cross          388

1        A.   Sure.   Next to each of the numbers there's --

2    there appear initials.   Those are the initials by

3    Mr. Gopaul.

4             Where it says location and 105th Precinct as well

5    as date, that's my less-than-stellar handwriting.

6             And then defendant, Harold Gopaul, is Mr. Gopaul's

7    signature.

8             Where it says officer here, that's

9    Detective Shulman, and where it says witness, that's

10   ADA Rosenblatt's.

11       Q.   Can you tell us who wrote the word yes after each

12   Miranda question?

13       A.   That would be Mr. Gopaul.

14       Q.   Did you observe him write the word yes?

15       A.   I did observe it.   It was on the videotape.

16       Q.   And did you observe Mr. Gopaul, the defendant,

17   signing his name to that document?

18       A.   I did.

19             MS. JOHNSON:   Your Honor, just due to my own

20        technical difficulties, can I have that published to

21        the jury now?

22             THE COURT:   Yes -- the People's 2?

23             MS. JOHNSON:   Yes, please.

24             (People's Exhibit 2 published to the jury at

25        this time.)

ws

Hughes - People - cross          389

1                    THE COURT:  Okay.

2                    MS. JOHNSON:  Thank you, Judge.

3                    Your Honor, I have no other questions for

4        Mr. Hughes.

5                    THE COURT:  Mr. Schechter?

6    CROSS-EXAMINATION

7    BY MR. SCHECHTER:

8        Q.    Mr. Hughes, at what time did you get to the

9    105 Precinct on June 24th, 2008?

10       A.    I don't recall the specific time.  I would say it

11   was in the neighborhood of 4 o'clock.

12       Q.    So you were at the precinct over one hour prior to

13   speaking to Mr. Gopaul, is that correct?

14       A.    More or less.

15       Q.    And did you have occasion to speak to the

16   complaining witness at that time?

17       A.    I actually spoke to her at a couple of different

18   points.

19       Q.    And did you take any notes with respect to your

20   conversations with her?

21       A.    I memorialized anything about those conversations

22   in my District Attorney enhancement sheet.

23       Q.    In your what?

24       A.    My District Attorney enhancement sheet.

25       Q.    I see.  Has that been provided to counsel?

1        A.    It has.

2        Q.    And do you know how long Mr. Gopaul had been in

3    custody up to that point?

4        A.    I don't recall.

5        Q.    So that you don't know if Mr. Gopaul was already

6    in custody ten hours, nine hours, 12 hours?

7              You don't have any idea of your own knowledge, do

8    you?

9        A.    I don't of my own when Mr. Gopaul was put into

10   custody.

11       Q.    And do you have any idea when Mr. Gopaul's last

12   sleep was prior to your talking to him on this statement?

13       A.    I don't have any independent knowledge of that,

14   no.

15       Q.    And you didn't ask him that on the videotape, did

16   you?

17       A.    No, I did not.

18       Q.    Do you know when the last time Mr. Gopaul had

19   anything to eat prior to that statement?

20       A.    I don't, specifically, no.

21       Q.    And you did observe Mr. Gopaul as you were talking

22   to him, did you not?

23       A.    Yes, I did.

24       Q.    And you did notice that Mr. Gopaul's shirt was

25   widely spread apart, the lapels of Mr. Gopaul's shirt were

                                                          ws

1  spread wide apart, did you not?

2       A.   Yes, I believe his shirt was unbuttoned.

3       Q.   More than unbuttoned -- do you need to have your

4  recollection refreshed by looking --

5       A.   I recall that his shirt was open, the first two

6  buttons.

7       Q.   Fairly widespread apart?

8       A.   I don't know wide.  It looked like there were two

9  buttons on top.

10      Q.   Would you like to see it again to refresh your

11  recollection as to how wide his collar was spread part?

12      A.   If you would like me to.

13      Q.   If you would, just at the beginning?

14           MR. SCHECHTER:  Would you mind, counsel?

15           MS. JOHNSON:  I just have to rewind it.

16           THE COURT:  Yes.

17           MR. SCHECHTER:  Fine.

18      Q.   Now, Mr. Hughes, would you please step down so you

19  can get a better view?

20           MR. SCHECHTER:  I would like you to freeze

21      the shot when the focus is on Mr. Gopaul.

22      Q.   Could you please step down?

23      A.   Certainly.

24           THE COURT:  Please step down.

25           (Witness steps down.)

Hughes - People - cross          392

1          Q.    All right, thank you.

2                      (People's Exhibit 1 published at this time.)

3                      THE WITNESS:   Should I return?

4                      THE COURT:   No, I think he wants to ask you

5          some questions.

6          Q.    I direct your attention to the collar.   There's

7     one collar here to the right and another collar all the way

8     over here to the left.

9                Is that how he appeared to you when you first saw

10    him?

11         A.    That's how he appeared to me.

12         Q.    Do you know, to your own recollection, if that's

13    how he appeared when he first got to the 105 Precinct?

14         A.    I don't know how he appeared.

15                     THE COURT:   Mr. Schechter, do you have any

16         more questions?

17                     MR. SCHECHTER:   I have no more with respect

18         to that.

19                     THE COURT:   Why don't you come back to the

20         witness stand?

21                     THE WITNESS:   Thank you.

22                     (Witness resumes the stand.)

23         Q.    So you, of your own knowledge, have no idea

24    whether Detective Shulman caused his collar to look like

25    that by throwing him across the room, do you?

ws

1          MS. JOHNSON:  Objection.

2          THE COURT:  I'll allow it.

3     A.    I didn't see him when he arrived at the precinct.

4     Q.    And you don't know what, if anything, the other

5  police officers did when he first came into the precinct, do

6  you?

7     A.    Again, I wasn't there when he first arrived.

8     Q.    So that when you said on direct in response to the

9  District Attorney's question did anybody use physical

10  violence against Mr. Gopaul, you don't really know that of

11  your own knowledge do you?

12     A.    I didn't monitor Mr. Gopaul the entirety of the

13  time he was at the precinct or before that.

14          However, Mr. Gopaul never made any applications to

15  me that any physical violence was used and the officers

16  indicated no physical violence was used.

17     Q.    You're not answering my question.

18          I'm saying you, of your own knowledge, did not

19  view Mr. Gopaul when he first came into the precinct?

20     A.    As I explained, Mr. Schechter --

21     Q.    That's a yes or no, Mr. Hughes, and I'm sure

22  you're  aware of how to answer yes or no?

23     A.    I am.

24          I never saw any physical violence taken towards

25  Mr. Gopaul.

1        However, I did not see him the entire time he was

2   at the precinct.

3        Q.   Now, you were aware that Mr. Gopaul had made two

4   other statements, weren't you?

5        A.   I don't have independent recollection of that.

6        Q.   You said you spoke to Detective Shulman, did you

7   not?

8        A.   I did.

9        Q.   And prior to speaking to Mr. Gopaul when you spoke

10  to Detective Shulman Detective Shulman told you that

11  Mr. Gopaul made two other statements, did he not?

12       A.   I don't have an independent recollection of that.

13       Q.   How long a period of time did you speak to

14  Detective Shulman?

15       A.   I probably spoke to Detective Shulman, off and on,

16  for a period of maybe 15 to 20 minutes.

17       Q.   And he showed you no statement that Mr. Gopaul

18  made before that?

19       A.   As I said, I don't have an independent

20  recollection of that.

21       Q.   In your years as an Assistant DA, two years, have

22  you ever known any cases of police brutality?

23            MS. JOHNSON:  Objection.

24            THE COURT:  Yeah, sustained.

25       Q.   Have you ever prosecuted cases of police

ws

Hughes - People - cross                    395

1    brutality?

2                    MS. JOHNSON:  Objection.

3                    THE COURT:  Yeah, sustained.

4                    MR. SCHECHTER:  I would like these marked,

5         with the Court's permission, defendant's exhibits.  I

6         believe we are A,B,C and D, please?

7                    THE COURT:  Defendant's A through D.

8                    MR. SCHECHTER:  They're marked differently

9         from the other proceeding.

10                    May I approach?

11                    THE COURT:  Yes.

12                    These have already been marked A through D?

13                    MR. SCHECHTER:  No.

14                    COURT REPORTER:  I'll remark them, your

15        Honor.

16                    (Defendant's Exhibits A through D marked for

17        identification.)

18                    MR. SCHECHTER:  Respectfully ask they be

19        shown to the witness.

20                    (Shown to witness.)

21        Q.    Now, do you recognize those photographs?

22        A.    They appear to be photographs of the

23   105th Precinct.

24        Q.    Now, I direct your attention to Photographs B, C

25   and D.

                                                        ws

1      A.   Yes.

2      Q.   That wasn't the room where you had this video

3   taken of Mr. Gopaul, was it?

4      A.   It doesn't appear to be, no.

5      Q.   As a matter of fact, this is a much smaller room,

6   isn't that so?

7      A.   It does appear to be a smaller room.

8      Q.   Would you know in your experience as an Assistant

9   District Attorney if that's called the soften-them-up room

10  or the box?

11           MS. JOHNSON:   Objection.

12           THE COURT:   No, I'll allow that, if he knows.

13     A.   I actually haven't heard that term used.

14     Q.   Never heard that term used?

15     A.   I haven't.

16     Q.   You've never known police officers to soften up a

17  subject to get them to talk, have you?

18           MS. JOHNSON:   Objection.

19           THE COURT:   Sustained.

20           MR. SCHECHTER:   I have no more questions of

21       this witness, your Honor.

22           THE COURT:   Any redirect?

23           MS. JOHNSON:   Just two questions.

24  REDIRECT EXAMINATION

25  BY MS. JOHNSON:

ws

Case 1:15-cv-01782-NGG   Document 8-15   Filed 08/31/15   Page 17 of 209 PageID #: 1217

1     Q.   Mr. Hughes, you indicated -- you remember

2  Mr. Schechter asking you questions about speaking to Sana

3  Awan?

4     A.   Yes, I do.

5     Q.   Did you ever tell the defendant the details of

6  what Sana reported to you before that video was taken?

7     A.   No.

8     Q.   Did you ever show the defendant any statements

9  Sana gave you before that video was taken?

10    A.   No, I did not.

11    Q.   Did you ever tell the defendant any time periods

12 of which Sana reported to you before that video was taken?

13    A.   No, I did not.

14              MS. JOHNSON:   Nothing else.

15              THE COURT:   Anything else, Mr. Schechter?

16              MR. SCHECHTER:   If I could have just one

17       moment, Judge?

18              THE COURT:   Yes.

19              (Pause in the proceedings.)

20              THE COURT:   Ladies and gentlemen, while

21       Mr. Schechter is looking for something, I understand an

22       issue has come up with regard to jurors taking notes.

23       I don't know whether some or all of you made inquiry

24       with regard do that.

25              I just want to address it while we have a

ws

Hughes - People - redirect          398

1     moment.

2              In the first place, as I'm sure you've all

3     figured out, Wendy, our court reporter, is taking down

4     everything that's being said here and one of the

5     reasons I have, on occasion, depending on the length of

6     the trial, allowed jurors to take notes -- it's not

7     that it's completely prohibited, but I think under

8     these circumstances in this particular case, I don't

9     see it to be terribly necessary.

10             Let me just explain a couple of reasons why

11    taking notes has its, if you will, drawbacks or

12    disadvantages.

13             Number one, you, as the fact finder, if

14    you're busy taking down notes of what somebody says,

15    you don't have an opportunity to see the witness and

16    see their demeanor, how they're saying things, because

17    that's one of the things that you're asked to assess as

18    a juror.

19             Number two, perhaps most importantly, is the

20    danger that one of you may take down something and it's

21    not correct and then you've got -- the last thing we

22    want to have happen is have a jury deliberation where

23    someone may be basing their decision based upon a note

24    that they took that wasn't exactly accurate.

25             That's why we have a court reporter and it's

                                                        ws

1      important to keep in mind that during your

2      deliberations if at any point in time you request a

3      particular witness's testimony to be read back, if you

4      want a particular exhibit that's been introduced into

5      evidence, we'll be more than glad to do that, the

6      entirety of the witness's testimony or any portion

7      thereof.

8              So I don't want you to think that you don't

9      have the opportunity to revisit, if you will, during

10     your deliberations, what people are saying during the

11     course of the trial.

12             So I just want everybody to kind of be rest

13     assured about that.  I think it's more important for

14     you to listen to what they're saying, watch how they

15     say it and keep in mind that if there's some issue that

16     you are having some difficulty resolving, we've got

17     everything that's been said here.  So don't worry about

18     it.

19             Mr. Schechter?

20             MR. SCHECHTER:  Yes.

21             I would like this deem marked or have this

22     marked as Defendant's E for identification, please?

23             (Defendant's Exhibit E marked for

24     identification.)

25             MR. SCHECHTER:  Please show that to the

                                                    ws

1          witness.

2                    (Shown to witness.)

3      RECROSS-EXAMINATION

4      BY MR. SCHECHTER:

5          Q.   Now, are those your notes with respect to the

6      witness Sana Awan?

7          A.   No.

8                    MR. SCHECHTER:   Thank you.   No more

9          questions.

10                   THE COURT:   Mr. Hughes, thank you very much.

11         You're excused.   Just watch your step as you step off.

12                   THE WITNESS:   Thank you, your Honor.

13                   (Witness excused.)

14                   THE COURT:   People, your next witness?

15                   MS. JOHNSON:   Your Honor, at this time the

16         People call Sana Awan.

17     S A N A   A W A N, a witness called on behalf of the

18         People, having been first duly sworn by the clerk of

19         the Court, was examined and testified under oath as

20         follows:

21                   COURT OFFICER:   Have a seat.

22                   For the record, please state your name, spell

23         your first name, your last name and your county of

24         residence, just your county.

25                   THE WITNESS:   Sana Awan, S-a-n-a, A-w-a-n,

                                                              ws

Awan - People - direct                    401

1        and Queens County.

2                      THE COURT:  All right, Ms. Awan, I'm going to

3        ask you -- it's a small courtroom, but I need you to

4        keep your voice up as if you're talking to somebody

5        sitting in the back of the courtroom.  Okay, if you

6        need to move that mike closer, please do.

7                      THE COURT:  Ms. Johnson?

8                      MS. JOHNSON:  Thank you.

9    DIRECT EXAMINATION

10   BY MS. JOHNSON:

11       Q.   Sana, just keep your voice up so we can all hear

12   you back here.

13       A.   Okay.

14       Q.   How are you doing today?

15       A.   Okay.

16       Q.   How old are you?

17       A.   Eighteen.

18       Q.   When is your birthday?

19       A.   March 1st, 1991.

20       Q.   Are you going to school now?

21       A.   Yes.

22       Q.   Where are you going to school?

23       A.   Queens High School of Teaching.

24       Q.   What grade are you in?

25       A.   I'm in 12th grade.

ws

1        Q.   Are you graduating this year?

2        A.   Yes.

3        Q.   How are your grades?

4        A.   As and Bs.

5        Q.   Are you planning on going to college in the fall?

6        A.   Yes.

7        Q.   Have you been accepted already?

8        A.   Yes.

9        Q.   Are you okay telling us where you're going to

10   college in the fall?

11       A.   No.

12                 MR. SCHECHTER:  Objection to --

13                 THE COURT:  Yeah, sustained.  The question

14       and answer will be stricken.

15                 Have a seat, Mr. Schechter.

16                 MR. SCHECHTER:  I have a motion, Judge.

17                 THE COURT:  Come on up.

18                 (Witness steps down.)

19                 (Conference held at the bench as follows:)

20                 MR. SCHECHTER:  I think that's -- counsel

21       knew when she asked that question that was a highly

22       inflammatory question.  She is trying to raise the

23       impression to the jury my client is being allegedly

24       improper and I submit that is prosecutorial misconduct.

25       I ask for a mistrial.

                                                      ws

1            THE COURT: Do you want to respond to that?

2            MS. JOHNSON:  I asked the question.  She

3    wasn't comfortable answering it.  It's not appropriate

4    for a mistrial and your Honor struck the answer from

5    the record.

6            THE COURT:  Okay.  I mean, at this point I

7    don't see the prejudicial effect, if there is any, to

8    be of such a nature to require a mistrial.  If you

9    want, Mr. Schechter, I will repeat to the jury to

10   disregard the question and answer.

11           MR. SCHECHTER:  Might as well, Judge, but I

12   don't think any curative instruction will work.

13           (Sidebar conference concludes.)

14           THE COURT:  Ms. Awan, step back up.

15           (Witness resumes the stand.)

16           THE COURT:  Remember during my instructions I

17   said sometimes when an objection has been made a

18   witness gives an answer before I could say either

19   objection sustained or overruled?

20           In this case obviously the question and the

21   answer -- the objection was sustained, the answer is

22   stricken and I'm directing you to please totally

23   disregard the answer and keep it out of your minds.

24           MS. JOHNSON:  Thank you.

25   Q.   Sana, do you have any brothers and sisters?

Awan - People - direct          404

1      A.   Yes.

2      Q.   How old are they and what are their names?

3      A.   My sister's name is Kaitlin and she's nine and my

4   brother's name is Darien, he's eight.

5      Q.   I'm just going to ask you to keep your voice up.

6           THE COURT:   Ms. Awan, if you would, just keep

7      your voice up.   If you could move that microphone a

8      little bit closer to you, but just keep the volume of

9      your voice up a little bit.

10          Go ahead, Ms. Johnson.

11          MS. JOHNSON:   Thank you.

12     Q.   Sana, what is your mom's name?

13     A.   Merlin Ali Gopaul.

14     Q.   Is she your biological mother?

15     A.   Yes.

16     Q.   And is she the biological mother to your two

17   siblings?

18     A.   Yes.

19     Q.   Who is your mom married to?

20     A.   Harold Gopaul.

21     Q.   Is Harold Gopaul your stepfather?

22     A.   Yes.

23     Q.   Do you see Harold Gopaul in the courtroom today?

24     A.   Yes.

25     Q.   Can you please point to him and identify an item

ws

Awan - People - direct                    405

1     of clothing that he's wearing?

2          A.    He's wearing the suit.

3          Q.    You just have to be a little more specific.

4                MR. SCHECHTER:   I'll concede she's

5          identifying the defendant.

6                THE COURT:   All right, the record will

7          reflect that.

8                Go ahead.

9          Q.    Do you know when your mom married the defendant?

10         A.    I believe it was 1994?

11         Q.    How old were you?

12         A.    Three.

13         Q.    Did you have a relationship with your biological

14    father?

15         A.    Yes.

16         Q.    Who was the father figure in your life since the

17    time you were three years old?

18         A.    My stepfather.

19         Q.    Harold Gopaul?

20         A.    Yes.

21         Q.    Up until 2008 where were you living?

22         A.    With my parents.

23         Q.    And when you say your parents, who are you

24    referring to?

25         A.    My biological mother and my stepfather.

ws

1     Q.   Where were you living?

2     A.   You want the address?

3     Q.   Yes.

4     A.   242-10 89th Avenue, Bellerose, New York, 11426.

5     Q.   That's Queens?

6     A.   Yes.

7     Q.   Did your siblings live with you there?

8     A.   Yes.

9     Q.   Can you tell us what your relationship was like

10  with your stepfather as you were growing up?

11    A.   It was a normal father-daughter relationship.

12    Q.   What does that mean?

13    A.   Like -- can you be more specific?

14              MR. SCHECHTER:  Can't hear her, Judge.

15              THE COURT:  She said, "Can you be more

16       specific," a question directed at Ms. Johnson.

17    Q.   What types of things would you do with your

18  stepfather?

19    A.   Like, as a family we would go out to museums or

20  the park and we would spend the weekends together.

21    Q.   Did you consider him your father?

22              MR. SCHECHTER:  Objection.

23    A.   Yes.

24              THE COURT:  Overruled.  I'll allow that.

25    Q.   What did you call him?

                          Awan - People - direct            407

1          A.    Dad.

2          Q.    Was he somebody that you trusted?

3          A.    Yes.

4          Q.    Was he somebody that you looked up to?

5          A.    Yes.

6          Q.    Was he somebody that you relied upon as you were

7     growing up?

8          A.    Yes.

9          Q.    Can you tell us what your home life was like as

10    far as whether or not it was strict or lenient?

11         A.    Strict.

12         Q.    What do you mean by that?

13         A.    Like for school work they were -- made sure I did

14    all my work and I handed everything in on time.

15                    MR. SCHECHTER:  Judge, I'm sorry there's

16               noise outside.  I cannot hear the witness.

17                    MS. JOHNSON:  Could we turn up the mike?

18                    THE COURT:  I don't think it's so much the

19               mike --

20                    Ladies and gentlemen, I'm just going to close

21               this window here a little bit.

22                    All right, would you just give the last

23               answer back for Mr. Schechter?

24                    (Record read.)

25                    THE COURT:  Okay, Ms. Johnson.

                                                            ws

Case 1:15-cv-01782-NGG  Document 8-15  Filed 08/31/15  Page 28 of 209 PageID #: 1228

1      Q.    When you say they, who are you referring to would

2    make sure you had your homework and school work done on

3    time?

4      A.    Well, my parents, but mostly my stepfather.

5      Q.    What types of chores did you have around the home

6    while you were growing up?

7      A.    I helped do the housework, like dishes and clean

8    up.

9      Q.    Were you allowed to watch television?

10     A.    Sometimes.

11     Q.    What types of rules did your parents, and

12   specifically I'm referring to your stepfather Harold Gopaul,

13   what types of rules did they impose while you were growing

14   up?

15     A.    Like, I couldn't go out on school nights until I

16   finish all my work and that's it.

17     Q.    Were you able to see your friends?

18     A.    No.

19     Q.    Would you be able to go out on the weekends after

20   your homework was done?

21     A.    No.

22     Q.    What types of things would you do on the weekends

23   as a family?

24     A.    We would go shopping together and sometimes

25   church.

1      Q.   And would the defendant be with you?

2      A.   Yes.

3      Q.   And your mom and your brothers and sisters?

4      A.   Yes.

5      Q.   As you were growing up did you generally get along

6   with your stepfather?

7      A.   Yes.

8      Q.   Did you get along with your mother?

9      A.   Yes.

10      Q.   As you were growing up, and particularly in 2008,

11   can you tell us what your stepfather did for a living?

12      A.   He's an exterminator.

13      Q.   Would he -- withdrawn.

14           What type of vehicle did he drive for work?

15      A.   White Ecolab truck.

16      Q.   Can you explain or describe for us what that

17   looked like?

18      A.    It was like a pickup truck, but the back was

19   covered and it said Ecolab on it.

20      Q.   Can you describe what the inside of the vehicle

21   looked like?

22      A.    There was a driver's seat, passenger's seat and a

23   small, like, seat in the middle.

24      Q.   Any seats in the back?

25      A.   No.

1      Q.   How long did your stepfather have that ve -- that

2   Ecolab van?

3      A.   I think since 2005.

4      Q.   I want to talk to you a little bit about what your

5   relationship was like with your mom, your biological mother.

6           Was she around while you were growing up?

7      A.   Yes.

8      Q.   Did you have a good relationship with her?

9      A.   Somewhat.

10     Q.   And what do you mean by somewhat?

11     A.   Like, when I was younger I remember she was

12   usually in the hospital so I spent most of my day with my

13   stepfather.

14     Q.   Do you know why she was in the hospital?

15     A.   I think she was trying to have another kid, but

16   they never told me and she was like sick.

17              MR. SCHECHTER:  I can't hear.  Please ask the

18         witness to speak up.

19              THE COURT:  Yes, Ms. Awan, please keep your

20         voice -- it kind of trails off in the end.

21              Do you need the answer repeated?

22              MR. SCHECHTER:  Yes.

23              THE COURT:  If you would?

24              (Record read.)

25              THE COURT:  Go ahead, Ms. Johnson.

Awan - People - direct                411

1       Q.   Was she around the house or was she in the
2   hospital most of the time?
3       A.   In the hospital.
4       Q.   Who was primarily the parental figure in your home
5   while your mom was in the hospital?
6       A.   My stepfather.
7       Q.   As you were growing up did you feel as though you
8   could confide in your mother?
9       A.   No.
10      Q.   And did you feel as though you could talk to her
11  when you had problems?
12      A.   No.
13      Q.   Have you spoken to your mom about why you're here
14  today?
15      A.   No.
16      Q.   How come?
17      A.   Because I was too scared.
18               THE COURT:  All right, Ms. Awan, do you need
19          a minute or are you okay?
20               THE WITNESS:  I'm okay.
21               THE COURT:  All right, Ms. Johnson.
22      Q.   Did your mom ever ask you what happened?
23      A.   No.
24      Q.   Did she ever ask if you wanted to go to
25  counseling?

1      A.    No.

2      Q.    Is your mom still married?

3      A.    I think so.

4      Q.    Did your mom come to court with you today?

5      A.    No.

6                  MR. SCHECHTER:  I'm going to object.

7                  May I approach?

8                  It's a mischaracterization.

9                  THE COURT: The objection is overruled.

10                 MR. SCHECHTER:  I need to approach, your

11     Honor, to explain my objection.

12                 THE COURT:  Come on up.

13                 (Witness steps down.)

14                 (Sidebar conference  held as follows:)

15                 MR. SCHECHTER:  Counsel well knows that the

16     mother is not permitted to be in the presence of

17     Sana Awan and have any contact with her on this level

18     because there's an order of protection and when she

19     asked that question she forced the witness into a

20     mischaracterization.

21                 THE COURT:  Well, do you now want me to have

22     her ask about the order of protection?

23                 MR. SCHECHTER:  No, because now that makes it

24     even worse, it exacerbates it, so, I mean, she's doing

25     this -- these questions should not be asked.

                                                      ws

1          THE COURT:  Ms. Johnson, I'm just going to
2     warn you that if there are certain answers you know --
3     answers you know, unless you feel it's particularly
4     relevant to the elements you have to prove, I would be
5     careful where you go with some of it.
6               MS. JOHNSON:  Very good.
7               (Sidebar conference concludes.)
8               (Witness resumes the stand.)
9               THE COURT:  All right, Ms. Johnson, if you
10    would.
11    Q.   Sana, I want to talk to you a little bit about
12    when your relationship with your stepfather changed.
13          Did there come a time when your father-daughter
14    relationship changed to one of a sexual nature?
15    A.   Yes.
16    Q.   Who started that change?
17    A.   My stepfather.
18    Q.   I want to direct your attention to a particular
19    date back when you were 14 years old, okay, and I want to
20    direct your attention to an incident in the bathroom in your
21    home, okay?
22          Can you tell us where you were living when you
23    were 14 years old?
24    A.   At the Bellerose address.
25    Q.   Who was living with you?

ws

Awan - People - direct                414

1      A.   My mother and my stepfather and my brother and

2   sister.

3      Q.   What grade were you in back then?

4      A.   I was in -- freshman in high school, ninth grade.

5      Q.   Do you recall if you were taller or shorter than

6   you are today?

7      A.   Yes, shorter.

8      Q.   And were you heavier or lighter than you are

9   today?

10     A.   Lighter.

11     Q.   Do know approximately how much you weighed back

12   when you were 14 years old?

13     A.   About 90 pounds.

14     Q.   Ninety?

15          You have to use words.

16     A.   Yes.

17     Q.   I want to direct your attention back to when you

18   were 14.

19          Can you tell us, was your body changing?

20     A.   Yes.

21     Q.   How was your body changing?

22     A.   I hadn't hit puberty yet, so it was starting.

23     Q.   And when you say it was starting, what does that

24   mean?

25     A.   Like my breasts were developing and I started

Awan - People - direct                415

1    getting pubic hair.

2        Q.   I want to direct your attention to that particular

3    morning when you were 14 years old.

4            When you woke up did you go to the bathroom?

5        A.   Yes.

6        Q.   Who was home?

7        A.   My mom, my stepfather and my brother and sister.

8        Q.   What was your mom doing?

9        A.   She was sleeping.

10       Q.   What were your brother and sisters (sic) doing?

11       A.   Sleeping.

12       Q.   Approximately what time did you wake up that

13   morning?

14       A.   Around 5:30.

15       Q.   How come you got up so early?

16       A.   I had to wake up early in the morning so I can get

17   a ride with my stepfather and he usually left like around

18   6:45.

19       Q.   How many bathrooms are in your house -- were in

20   your house?

21       A.   One.

22       Q.   Is that the only place to shower?

23       A.   Yeah.

24       Q.   Did you take a shower that morning?

25       A.   Yes.

                                                        ws

Awan - People - direct                416

1        Q.   Can you tell us what happened in the bathroom when
2   you came out of the shower?
3        A.   I got out of the shower and my stepfather was in
4   the bathroom, too.
5        Q.   And I just want to stop you there for just one
6   moment.
7             What was he doing in the bathroom when you came
8   out of the shower?
9        A.   He was using the toilet.
10       Q.   Were you naked?
11       A.   Yes.
12       Q.   Tell us what happened?
13       A.   So I had my towel around me and he made me take it
14   off.
15       Q.   When you say he made you take it off, what did he
16   say to you?
17       A.   Like -- he didn't say anything, but he pulled it.
18       Q.   When you say he pulled it what was it -- what were
19   his actions?
20            What did he do?
21       A.   Like, he moved the towel off of me.
22       Q.   Did the entire towel come off?
23       A.   Yes.
24       Q.   What did he do with the towel?
25       A.   He hung it back up.

Awan - People - direct                417

1      Q.   What did he say?

2      A.   Nothing.

3      Q.   What did you say?

4      A.   Nothing.

5      Q.   What happened next?

6      A.   Then there was a hamper in the bathroom and he
7    made me sit on it.

8      Q.   When you say he made you sit on it what did he do?

9      A.   Like, he told me to go on top of it.

10     Q.   What were the words that he used?

11     A.   Come here.

12     Q.   And what did you say to him?

13     A.   I just looked at him.

14     Q.   Why?

15     A.   Because he told me to do it.

16     Q.   Were you naked?

17     A.   Yes.

18     Q.   What happened next?

19     A.   Then he made me open my legs.

20     Q.   When you say he made you open your legs what does
21   that mean?

22     A.   Like, he put his hands between my legs and held
23   it.

24     Q.   When you say he made you open your legs what did
25   he do with his hands?

ws

Awan - People - direct          418

1          A.    Put it on my thighs.

2          Q.    Were your legs open or were your legs closed?

3          A.    Opened.

4          Q.    How did your legs come open?

5          A.    He pushed them apart.

6          Q.    And when you say he pushed them apart did he use

7     one hand or two hands?

8          A.    Two hands.

9          Q.    Where were his hands on your body when he opened

10    your legs?

11         A.    On my thighs.

12         Q.    And --

13               MR. SCHECHTER:  Excuse me, your Honor, please

14         note my continuing objection to this line of inquiry.

15               THE COURT:  Yes, objection is noted.

16               Objection is overruled.

17               Go ahead.

18         Q.    Was he pushing on your legs or was he pulling on

19    your legs?

20         A.    Pushing.

21         Q.    How was he pushing?

22         A.    Pushing them apart.

23         Q.    Were you trying to close your legs?

24         A.    Yes.

25         Q.    How were you trying to close your legs?

ws

Awan - People - direct                419

1        A.    Putting them back together.

2        Q.    Were you able to put them back together?

3        A.    No.

4        Q.    How come?

5        A.    Because he's stronger than me.

6        Q.    Did he say anything to you at that time?

7        A.    Yes.

8        Q.    What did he say?

9        A.    Stop fighting.

10       Q.    What had you done just before he said to you stop

11   fighting?

12       A.    I was pushing his head away.

13       Q.    Where was his head?

14       A.    Between my legs.

15       Q.    When you were pushing his head away how did you do

16   that?

17       A.    With my hands.

18       Q.    Tell us how?

19       A.    Like pushing on his face.

20       Q.    With one hand or two hands?

21       A.    Two hands.

22       Q.    Were you able to push him away?

23       A.    No.

24       Q.    What was he doing that you weren't able to push

25   him away?

ws

Awan - People - direct                420

1        A.    He was -- I don't know how to say it.

2        Q.    You have to say it.

3        A.    He was performing oral.

4        Q.    When you say he was performing oral, what does

5   that mean?

6        A.    Like, his lips were on my vagina.

7        Q.    What was he saying to you?

8        A.    Nothing.

9        Q.    While you were pushing on him was he pushing back?

10       A.    Yes.

11       Q.    How was he pushing back?

12       A.    He was pushing his face and his hands on my legs.

13       Q.    Were you able to close your legs at that time?

14       A.    No.

15       Q.    Did you push with one hand or with two hands?

16       A.    Two hands.

17       Q.    What part of his mouth made contact with your

18   vagina?

19       A.    His tongue.

20       Q.    What about his lips?

21       A.    Yes.

22       Q.    Did he touch any other part of your body?

23       A.    Yes.

24       Q.    What else did he touch?

25       A.    My breasts.

                                                      ws

Awan - People - direct                421

1        Q.   What did he touch your breasts with?

2        A.   His hands.

3        Q.   Did he say anything to you while he was touching

4    your breast?

5        A.   No.

6        Q.   What were you doing as he touched your breasts?

7        A.   Trying to cover myself up.

8        Q.   What does that mean?

9        A.   Like pushing his hands away and covering with my

10   hands.

11       Q.   When you say you were pushing his hands away how

12   did you try to push his hands away?

13       A.   I tried to push his hands off with my hands.

14       Q.   Were you able to?

15       A.   No.

16       Q.   How come?

17       A.   Because he's stronger than me.

18       Q.   Did he push back?

19       A.   Yes.

20       Q.   Can you show us how you tried to cover your body?

21       A.   Like this (indicating).

22            MS. JOHNSON:   Your Honor, let the record

23       reflect the witness's hands are crossed over her

24       breasts.

25            THE COURT:   Yes.

ws

Awan - People - direct                    422

1       Q.    Did you ever tell him no?

2       A.    Yes.

3       Q.    What did -- what were your words to him?

4       A.    I told him to stop.

5       Q.    What did he say?

6       A.    He said behave.

7       Q.    Did he stop?

8       A.    No.

9       Q.    What did he do after you told him to stop?

10      A.    He kept doing it.

11      Q.    And when you say he kept doing it, what was he

12  doing in the bathroom?

13      A.    Touching me and performing oral.

14      Q.    And when you say touching you where was he

15  touching you?

16      A.    On my breasts.

17      Q.    And when you say performing oral, what does that

18  mean?

19      A.    Putting his lips to my vagina.

20              MR. SCHECHTER:  I can't hear her, Judge.

21              THE COURT:  Wendy?

22              (Record read.)

23      Q.    Sana, did you try to scream while you were in the

24  bathroom?

25      A.    Yes.

ws

Awan - People - direct                423

1        Q.    What did you do?

2        A.    I told him to stop and I tried to make noises.

3        Q.    When you say you tried to make noises what does

4    that mean?

5        A.    Like, I tried to make noise or like make fuss so

6    my mom would hear.

7        Q.    Why were you doing that?

8        A.    So she would come into the bathroom and he would

9    stop.

10       Q.    What did he say to you after you tried to make

11   noises?

12       A.    He told me to shush.

13       Q.    Were those his words?

14       A.    Yes.

15       Q.    How were you feeling when you were in the bathroom

16   with your stepfather?

17       A.    Scared.

18             MR. SCHECHTER:   Objection.

19             THE COURT:   Yeah, sustained.

20       Q.    Did there come a time in the bathroom when he

21   stopped?

22       A.    Yes.

23       Q.    What position were you in when he stopped?

24       A.    I was still sitting on the hamper.

25       Q.    Did you have any clothing on?

ws

Awan - People - direct                424

1      A.   No.

2      Q.   When did he stop?

3      A.   When he was done.

4      Q.   I'm sorry?

5           THE COURT:   I didn't hear it.

6           Wendy, what was the answer?

7           THE WITNESS:   When he was done.

8      Q.   Did he say anything to you when he stopped?

9      A.   No.

10     Q.   Did you hear anybody coming?

11     A.   No.

12     Q.   I want to now jump forward.  I want to talk about

13     May of 2008.

14          THE COURT:   All right, before we get there,

15     Ms. Johnson.

16          Members of the jury, this looks about a good

17     time to take our afternoon break before we pick it up

18     again, so just follow Chris as you step out.  Watch

19     your step as you step out.  We'll have you back here in

20     ten minutes.

21          (Jury exits.)

22          MS. JOHNSON:   Your Honor, your Honor had

23     sustained the objection when I had asked the witness

24     how she felt during the encounter in the bathroom.

25          THE COURT:   Yes.

ws

1          MS. JOHNSON:  My purpose for asking her that

2     was because that incident is the predicate for the

3     implied force, force being an element we have to prove

4     beyond a reasonable doubt.

5          Without this witness saying how she felt,

6     without her saying that she was in fear, how am I to

7     carry that fear over into the charges in the indictment

8     that we have to prove?

9          The force is neither -- is not just

10    expressed, but it's implied and it's that incident that

11    we're relying upon to show that fear.

12         THE COURT:  Well, I think you asked, in

13    rather excruciating detail, about how she was not

14    physically strong enough to resist the advances and

15    that, you know -- I think that's been developed.  You

16    could certainly argue it to the jury.

17         Her state -- I mean, look it, she could be

18    scared and there was never any force exhibited upon

19    her.  So I don't think that her saying she's scared is

20    necessarily evidence of such a nature that you need to

21    show in order to establish the element of force.

22         MS. JOHNSON:  I think I do because the way

23    the charge reads is what is in the victim's state of

24    mind and what the defendant put in her mind without her

25    saying what was in her mind.

ws

Awan - People - direct          426

1           Certainly I can argue it to the jury, but she

2      needs to be the one to say what was in her mind.

3           THE COURT:  I think at this point that the

4      circumstances surrounding this encounter were gone

5      into, as I said, in great detail and eliciting from her

6      that she was scared, I don't think is necessarily

7      relevant or probative to that element, so my ruling

8      stands.

9                (Jury enters.)

10               (Witness resumes the stand.)

11               (Pause in the proceedings.)

12          THE COURT:  Okay, all right, Ms. Johnson.

13          MS. JOHNSON:  Thank you.

14     Q.   Sana, when we left off before the break we were

15     talking about the beginning of May of 2008.

16          Can you tell us who were you living with on

17     May 1st, beginning then, in 2008?

18     A.   I was living at home with my stepfather, my

19     brother, my brother and my sister.

20     Q.   Was that the same home in Bellerose, Queens?

21     A.   Yes.

22     Q.   What grade were you in in May of 2008?

23     A.   Junior year, 11th grade.

24     Q.   High school?

25     A.   Yes.

Awan - People - direct                427

1       Q.   Can you tell us in May of 2008 did you have a
2   boyfriend?
3       A.   Yes.
4       Q.   Who was he?
5            You don't have to give us his name, but how did
6   you meet him?
7       A.   He was a peer in a math class.
8       Q.   You met him in high school?
9       A.   Yes.
10      Q.   Did you ever tell your parents about your
11  boyfriend?
12      A.   Yes.
13      Q.   You told your stepfather about your boyfriend?
14      A.   Yes.
15      Q.   Can you tell us how it came about that you told
16  your stepfather that you had a boyfriend?
17      A.   My stepfather used to pick me up after school and
18  a few times he saw us, like, walking out of the building
19  together.
20      Q.   What did he say to you when you walked out of the
21  building with your boyfriend?
22      A.   He asked me who that was.
23      Q.   What did you say?
24      A.   And at first I just said it's my friend and then
25  one day I just said it's my boyfriend.

                                                        ws

Case 1:15-cv-01782-NGG   Document 8-15   Filed 08/31/15   Page 48 of 209 PageID #: 1248

1      Q.   Did he ask you more than once who that boy was

2   that you were with?

3      A.   Yes.

4      Q.   What were his words?

5      A.   Who is that?

6      Q.   And you finally told him?

7      A.   Yeah.

8      Q.   What was the defendant's reaction to you telling

9   him that you had a boyfriend?

10     A.   He was upset.

11     Q.   How did he show you that he was upset?

12     A.   He started yelling.

13     Q.   What did he say?

14     A.   Well, I don't know his exact words, but, like,

15   they were telling me that I was too young to date and --

16     Q.   Was your stepfather -- did he tell you to stop

17   seeing your boyfriend?

18     A.   Yes.

19     Q.   At that time that he first asked you if you had a

20   boyfriend, was he picking you up at school?

21     A.   Yes.

22     Q.   Approximately how many times a week?

23     A.   Like twice a week.

24     Q.   After you told him that you had a boyfriend did he

25   impose any additional rules in your house?

ws

1          A.    Yes.

2          Q.    What were those rules?

3          A.    He dropped me off every morning and picked me up

4      every day and --

5          Q.    Were you allowed to continue with your regular

6      school activities?

7          A.    Yeah.

8          Q.    Were you allowed to go home by yourself after

9      school?

10         A.    No.

11         Q.    How many times a week did he pick you up after you

12     told him you had a boyfriend?

13         A.    Five.

14         Q.    Monday through Friday?

15         A.    Yes.

16         Q.    Is that every school day?

17         A.    Yes.

18         Q.    Now, let's talk about the first week in May of

19     2008 and I want to talk to you about the school days, the

20     Monday through Friday, okay?

21               How were you getting home -- withdrawn.

22               Who would pick you up from school?

23         A.    My stepfather.

24         Q.    What time would you be picked up from school?

25         A.    Around 4:30.

ws

Awan - People - direct          430

1        Q.   What time would school end?

2        A.   It was different times every day, but sometimes I

3   had after school, so --

4        Q.   What did you have after school?

5        A.   Like clubs.

6        Q.   What did he pick you up in, what type of vehicle?

7        A.   The Ecolab truck.

8        Q.   The one you told us about before?

9        A.   Yes.

10       Q.   What would he wear when he picked you up in that

11  Ecolab van?

12       A.   The uniform, the company uniform.

13       Q.   What did that uniform look like?

14       A.   It was blue -- the pants were navy blue and the

15  shirt was white and it had blue stripes on it.

16       Q.   Was there anything on that shirt that said Ecolab?

17       A.   Yes.

18       Q.   Where?

19       A.   I think it was on his left, on his chest.

20       Q.   Had you seen that outfit before?

21       A.   Yes.

22       Q.   Had you been into the van before May 1st of 2008?

23       A.   Yes.

24       Q.   Where did your stepfather take you that first week

25  in May when he picked you up from school?

1          A.    To an office building on Community Drive.

2          Q.    Why were you going there with him?

3          A.    He just took me there.

4          Q.    Were you going to work with him?

5          A.    Yes.

6          Q.    How did it come about that you began to come out

7     to Community Drive after school?

8          A.    Cause he had to work after he picked me up, so

9     instead of having to travel home he would pick me up and

10    take me to work with him.

11         Q.    Did he ask you to come to work with him?

12         A.    No, he told me to come.

13         Q.    When did he tell you that you were going to be

14    going to work with him, before May 1st or on May 1st?

15         A.    On May 1st.

16         Q.    Can you describe for us what that location looked

17    like on Community Drive that you went to that first week in

18    May?

19         A.    It was an office building and there are like black

20    windows all the way around.

21         Q.    Was that in Nassau County or Queens County?

22         A.    Nassau.

23         Q.    Where -- did you -- strike.

24               Where did you actually go in the vicinity of that

25    building?

Awan - People - direct          432

1        A.    The parking lot.

2        Q.    Who drove there?

3        A.    My stepfather.

4        Q.    Who else was in the van?

5        A.    Me.

6        Q.    Was there anybody in the parking lot when you got

7    there?

8        A.    There were cars, but nobody was walking.

9        Q.    Were there any other buildings around?

10       A.    No.

11       Q.    Focusing on that first week in May 2008, were you

12   bigger or smaller than you are today in height and weight?

13       A.    Smaller.

14       Q.    How much did you weigh in May of 2008, if you

15   know?

16       A.    Around 95.

17       Q.    Do you know how tall you were?

18       A.    Like five one.

19       Q.    Where did the defendant park the van at

20   Community Drive?

21       A.    There was a back, like -- all the way at the back

22   of the parking lot.

23       Q.    Were there cars around his van?

24       A.    I don't remember.

25             MR. SCHECHTER:  I didn't hear the answer,

Awan - People - direct                    433

1          Judge.

2                    THE COURT:   Yeah, just close the window.

3                    (Record read.)

4          Q.   Where were you sitting and where was he sitting

5     when the van was parked?

6          A.   He was in the driver's seat and I was in the

7     passenger's seat.

8          Q.   Can you tell us that first time when you were

9     brought out to Community Drive in that first week in

10    May 2008, tell us what happened in the van?

11         A.   Well, he parked and he told me to come over to the

12    middle part of the -- between the seats.

13         Q.   Are those the words that he used?

14         A.   He said come here.

15         Q.   And what did you do?

16         A.   I listened.

17         Q.   What happened next?

18         A.   Then he told me to kiss him.

19         Q.   What were the words that he used?

20         A.   He just did it.   I don't remember saying anything.

21                   MR. SCHECHTER:   I can't hear her again,

22         Judge.

23                   THE COURT:   Yeah, if you could just,

24         Ms. Awan -- if you could just keep your voice, keep

25         your volume up a little bit.

                                                              ws

Case 1:15-cv-01782-NGG   Document 8-15   Filed 08/31/15   Page 54 of 209 PageID #: 1254

1                    (Record read.)

2          Q.    When you say he just did it, what did he do?

3          A.    He put his hands behind my head and pulled my face

4    closer.

5          Q.    Closer to what?

6          A.    To his face.

7          Q.    What happened when he pulled your face closer to

8    his?

9          A.    Then he kissed me.

10         Q.    Where did he kiss you?

11         A.    On the lips.

12         Q.    What did you do when he began to kiss you on the

13   lips?

14         A.    I tried to pull away.

15         Q.    How did you try to pull away?

16         A.    Like, I pushed him off of me and --

17         Q.    What does that mean?

18               What did you do?

19         A.    Like, I pushed on his body and tried to turn my

20   head.

21         Q.    When you say you pushed on his body, did you use

22   one hand or two hands?

23         A.    Two hands.

24         Q.    Where did you push him?

25         A.    On his chest.

                                                              ws

1      Q.   Were you able to push him away?

2      A.   No.

3      Q.   Why not?

4      A.   Because he's stronger than me.

5      Q.   Did he push back?

6      A.   Yes.

7      Q.   What did he do?

8      A.   He pushed my hands off.

9      Q.   And what happened next?

10     A.   And he continued and --

11     Q.   He continued to do what?

12     A.   Kissing me.

13     Q.   How was he kissing you?

14     A.   With his lips and his tongue.

15     Q.   What was his tongue doing?

16     A.   It was inside my mouth.

17     Q.   Did he put his tongue in your mouth?

18     A.   Yes.

19     Q.   What did he say to you?

20     A.   Nothing.

21     Q.   What did you do when he put his tongue in your

22   mouth?

23     A.   I tried to close my mouth.

24     Q.   When you say you tried to close your mouth, what

25   does that mean?

ws

Awan - People - direct                    436

| | | |
|---|---|---|
| 1 | A. | Like to keep -- to stop him and, like -- |
| 2 | Q. | Did you press your lips together? |
| 3 | A. | Yeah. |
| 4 | Q. | Did you say anything? |
| 5 | A. | No. |
| 6 | Q. | Did he keep kissing you? |
| 7 | A. | Yes. |
| 8 | Q. | What's the next thing that happened? |
| 9 | A. | Then he started touching my breasts. |
| 10 | Q. | What was he touching your breasts with? |
| 11 | A. | His hands. |
| 12 | Q. | With one hand or two hands? |
| 13 | A. | Both -- sometimes both, sometimes one. |
| 14 | Q. | Was he touching you over or under your clothing? |
| 15 | A. | Both. |
| 16 | Q. | Was he -- were you wearing a bra? |
| 17 | A. | Yes. |
| 18 | Q. | Was he touching you over or under your bra? |
| 19 | A. | Under. |
| 20 | Q. | How did he get his hands under your bra? |
| 21 | A. | He lifted up my shirt. |
| 22 | Q. | What did he say to you? |
| 23 | A. | Nothing. |
| 24 | Q. | What were you doing as he was touching your |
| 25 | | breasts? |

ws

1          A.     Trying to push him off.

2          Q.     How were you doing that?

3          A.     Like, hitting his hand and pushing him.

4          Q.     What did your stepfather do after you hit his hand

5     and tried to push him?

6          A.     He told me to behave.

7          Q.     What did he do next?

8          A.     Then, when he was done with that, he told me to

9     lay down and put my head on his lap.

10         Q.     Did you?

11         A.     Yes.

12         Q.     How come?

13         A.     Because I was scared of him.

14         Q.     Why?

15         A.     Because I just did what he was told (sic).

16         Q.     Where did you put your head?

17         A.     On his lap.

18         Q.     What did he say?

19         A.     Then he told me to put my legs up on the

20    passenger's seat.

21         Q.     Did you?

22         A.     Yes.

23         Q.     Why?

24         A.     Because that's what he told me to do.

25         Q.     What did he do next?

ws

Awan - People - direct                    438

1          A.    Then he had a vibrator on his side of the car, so

2     he took it and put it between my legs.

3          Q.    When you say he put it between your legs, where

4     did he put it?

5          A.    On my vagina.

6          Q.    Over your clothes or under your clothes?

7          A.    Over.

8          Q.    Where did he get the vibrator from?

9          A.    It was like on the car door.

10         Q.    What did it look like?

11         A.    It was white.  It was like five inches long or

12    four.

13         Q.    Did he say anything to you when he took the

14    vibrator out?

15         A.    No.

16         Q.    Up until that point had he touched your vagina?

17         A.    No.

18         Q.    Did there come a point when he did touch your

19    vagina in the van?

20         A.    Yes.

21         Q.    How did that happen?

22         A.    After --

23         Q.    And I'm talking about that first week in May 2008?

24         A.    He just put his hand there, under my clothes.

25         Q.    How did his hand come underneath your clothes?

                                                           ws

Awan - People - direct          439

1     A.   He just put it there.

2     Q.   Did he unbutton your pants?

3     A.   Yes.

4     Q.   Did he put his hand under your pants?

5     A.   Yes.

6     Q.   Did he put his hand under your underwear?

7     A.   Yes.

8             MR. SCHECHTER:   Judge, the leading is -- I

9     understand the witness --

10            THE COURT:   Mr. Schechter, please, if you

11    have an objection, this is like the third time I've had

12    to say this to you, just say objection.

13            MR. SCHECHTER:   Objection.

14            THE COURT:   Sustained.

15    Q.   Sana, where did he touch you?

16    A.   Under my clothes.

17    Q.   Under what clothes?

18    A.   Under my underwear.

19    Q.   What was he touching you with?

20    A.   His hands.

21    Q.   Where on your body was he touching you?

22    A.   My vagina.

23    Q.   And what was he saying?

24    A.   He was talking about how wet I was.

25    Q.   Were those his words?

Awan - People - direct          440

1      A.    Yes.

2      Q.    How were you feeling?

3            MR. SCHECHTER:  Objection.

4            THE COURT:  Yeah, sustained.

5      Q.    Did you move?

6      A.    Yes.

7      Q.    How did you move?

8      A.    I tried to close my legs and pull his hand out.

9      Q.    How did you try to do that?

10     A.    Like, I was pulling on his hand and trying to,

11     like, move him.

12     Q.    Were you able to move his hand?

13     A.    No.

14     Q.    Did you say anything to him?

15     A.    I told him to stop.

16     Q.    Did he stop?

17     A.    No.

18           MS. JOHNSON:  Your Honor, should I continue?

19           THE COURT:  Are you moving on to another

20     area?

21           MS. JOHNSON:  Sort of, yeah.

22           THE COURT:  All right, members of the jury,

23     rather than kind of interrupt the next subject that the

24     Assistant is going to be go into, this probably looks

25     like as good a time as any to break.

ws

Awan - People - direct          441

1            As I told you during jury selection, I try to

2    break as close to 4:30 as possible, get you out of here

3    before the traffic starts exiting at Mineola, the

4    courthouse traffic.  At this point we're going to break

5    for today.

6            As I let you go please remember my

7    admonitions.  Please don't talk an amongst yourself

8    about anything about the case.

9            Please don't form any opinions, we're still

10   at the beginning of the case.

11           Please don't view or visit or access through

12   the media, Internet, any of the other web sites that I

13   referred to in my preliminary instructions, not only

14   tonight, but throughout the course of the trial.

15           So please get home safe.  We'll see you back

16   here tomorrow.  Chris will tell you where to report,

17   but we will be back here in my courtroom.  See you back

18   here at 9:30, okay?

19                   (Jury exits.)

20           THE COURT:  All right, Ms. Awan, you can step

21   down.  Wait outside.

22                   (Witness excused.)

23           THE COURT:  Just to expand, if you would,

24   Ms. Johnson, on your earlier -- before we began the

25   last series of questions, when you asked about allowing

1       to elicit your complainant's state of mind, as far as

2       my reading of the element of forcible compulsion, if

3       you look in the CJI, which I have in front of me, it

4       talks to forcible compulsion means to intentionally

5       compel either by the use of physical force or by

6       threat, expressed or implied, which places a person in

7       fear of immediate death or physical injury to himself

8       or herself.

9                Obviously, in the incident that you were

10      looking to elicit her state of mind, there didn't

11      appear to the Court to be any indicia, if you will, of

12      any threat made by the defendant that would cause the

13      issue of the testimony regarding her, meaning the

14      complainant's, state of mind to be relevant.

15               MS. JOHNSON:  And, your Honor, that's --

16               THE COURT:  And certainly, let me just add,

17      there also appeared to be a fair amount of evidence of

18      what could be reasonably inferred to be physical force

19      with regard to that incident.

20               MS. JOHNSON:  Yes, Judge, and the expanded

21      charge and the definition, which I was relying upon in

22      the CJI for the forcible compulsion, further reads that

23      in determining whether expressed or implied threats

24      amount to forcible compulsion, the jury's concern is

25      not what the defendant would have or could have done,

                                                        ws

Awan - People - direct            443

1   but, rather, what the victim, observing the defendant's

2   conduct, feared he would or might do if she did not

3   comply.

4           THE COURT:  Well, again, there's been -- at

5   least with regard to that incident, I'm only limiting

6   myself to that incident, there wasn't any testimony as

7   to what she feared he may or may not do if she did not

8   comply, so I'm I just wanted to kind of comment a

9   little bit further now that I have the benefit of the

10  instructions in front of me.

11          Does anybody need to take anything else up

12  before we break?

13          MR. SCHECHTER:  Not at this time, Judge.

14          THE COURT:  People, could you provide

15  tomorrow whatever DVD or electronic device

16  Mr. Schechter may need?

17          And, one final thing, if I could just --

18  Ms. Johnson and Mr. Schechter, I'm giving you a copy of

19  my proposed Molineaux charge, if you will.

20          Mr. Schechter, you'll notice I've excised

21  those words you asked, in Nassau County, out of it, and

22  I marked my copy as Court Exhibit Number 4.

23          MR. SCHECHTER:  Thank you, Your Honor.  I do

24  notice that.

25          THE COURT:  I do intend to charge that at the

                                                    ws

Awan - People - direct          444

1      conclusion of Ms. Awan's testimony and at my closing

2      instructions.

3                    (Shown to counsel.)

4                    THE COURT:   We'll see everybody back here

5      tomorrow morning.

6                    MS. JOHNSON:   Thank you.

7                    (Proceedings adjourned to Tuesday, May 12th,

8      2009 at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          ws

445

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NASSAU : CRIMINAL TERM PART 80

3   ------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,     :   Indictment
4                                            :   No. 2415N/08
              -against-                      :
5                                            :
    HAROLD GOPAUL,                           :   Sex Abuse 1
6                                            :
                      Defendant.             :   Trial
7   ------------------------------------------X

8                              May 12, 2009

9                              252 Old Country Road
                               Mineola, New York
10

11  B E F O R E:

12                HONORABLE JAMES P. McCORMACK,
                     Acting Supreme Court Justice
13

14
    A P P E A R A N C E S:
15

16                (As previously noted.)

17                *      *      *      *      *

18                (Jury enters.)

19                THE COURT:  We're about to continue.  We've

20      been trying to work on some technical issues with all

21      of these -- all this fancy equipment that we have here.

22      We still haven't resolved it completely.

23                One thing I'm happy to report is that after

24      you left here yesterday, my staff and myself kind of

25      worked on our microphones here.  We hopefully have

                                                          ws

446

1        amped up the volume, if you will, and hopefully there

2        won't be any issues with regard to completely hearing

3        the testimony.

4               But, please, if at any point in time,

5        particularly those jurors in the back, you can't hear

6        anybody, just raise your hand and just let me know.

7        Just please let me know.  Don't be concerned about

8        interrupting either the lawyers or the witness, okay.

9        It's more important that you hear the testimony than,

10       obviously, not to hear it.

11              And, again, just to touch upon the issue with

12       regard to the notes, I know one of you jurors sent me a

13       note here again this morning.

14              I appreciate your concerns with respect to

15       the note taking, but obviously now, since we began the

16       trial, I would be remiss if I now started to allow some

17       jurors to take notes.

18              But, again, anything that's said during the

19       course of this trial is preserved, there's a record of

20       it and you can certainly request any or all, as much of

21       the testimony you want, read back.

22              So, with that, I think we're ready to

23       proceed, Ms. Johnson?

24              MS. JOHNSON:   Should I have Ms. Awan come

25       back in?

ws

1              THE COURT:  Yes.

2              MS. JOHNSON:  Yes, she's outside.

3              (The witness, Sana Awan, having previously

4         been sworn, resumed the witness stand.)

5              THE CLERK:  You can have a seat.

6              You're reminded, Ms. Awan, that you're still

7         under oath.

8              THE COURT:  Ms. Awan, can you just move a

9         little bit close, get that microphone a little bit

10        centered, in the middle, if you would?

11             Again, just speak in a nice, slow, clear,

12        loud voice.

13             Okay, Ms. Johnson.

14             MS. JOHNSON:  Thank you.

15   DIRECT EXAMINATION CONT'D

16   BY MS. JOHNSON:

17        Q.   Good morning, Sana.

18             How are you today?

19        A.   Good.

20        Q.   Okay, like the Judge said, make sure you keep your

21   voice loud so everybody can hear you.

22        A.   Okay.

23        Q.   Can you tell us, in May and June of 2008 was your

24   mom working?

25        A.   No.

Awan - People - direct            448

1          Q.    What did she do for -- what did she do?

2                Was she a housewife?

3          A.    Yes.

4          Q.    Who was the person that supported your family?

5          A.    My stepfather.

6          Q.    Was he the only source of income, to your

7     knowledge, for your family in May and June of 2008?

8          A.    Yes.

9          Q.    I want to step back for just a moment back to the

10    incident that occurred in the bathroom when you were 14

11    years old for just a moment, okay?

12                And you told us yesterday that you were scared.

13                Can you tell us what was it that you were scared

14    of?

15         A.    I was scared that, like, if my mom had come in and

16    saw him doing anything, that, like, I would have been the

17    cause of them, you know, breaking up and then it would be

18    like my fault.  Like I was scared that I would mess up the

19    family.

20         Q.    Were you scared that you would have been --

21                MR. SCHECHTER:  Objection.

22                THE COURT:  Yeah, sustained as to the

23         leading.

24         Q.    Was there anything else that you were afraid of

25    back when you were 14 years old in the bathroom?

ws

Awan - People - direct                    449

1          MR. SCHECHTER:  Objection to the form of the

2     question.

3          THE COURT:  No, I'll allow that.  Overruled.

4     Q.   What else were you scared of?

5     A.   I was scared that he would hurt me.

6     Q.   And what was it that you were afraid he would do?

7     A.   Like, if I fought back I was scared that I would

8     get beat.

9     Q.   I want to go back, now, to May of 2008 where we

10    left off yesterday.

11         Did that incident in the bathroom have any impact

12    on your fear in May of 2008?

13         MR. SCHECHTER:  Objection.

14         THE COURT:  Yeah, sustained as to form.

15         Do you want to rephrase that?

16         MS. JOHNSON:  Sure.

17    Q.   What impact did that incident in the bathroom have

18    on you, if any, in 2008?

19         MR. SCHECHTER:  Objection.

20         THE COURT:  No, I'll allow that.  Overruled.

21         MR. SCHECHTER:  Exception, Judge?

22         THE COURT:  Yes.

23    Q.   You can answer.

24    A.   Can you rephrase it?

25    Q.   Sure.

Awan - People - direct          450

1           In May of 2008 did you remember what happened in

2    the bathroom?

3                   MR. SCHECHTER:  Objection.

4                   THE COURT:  Yeah, overruled.

5       A.    Yes.

6                   MR. SCHECHTER:  Exception, Judge?

7                   THE COURT:  Yes.

8       Q.    And what impact did that memory have on you in

9    May of 2008?

10      A.    I knew what he was capable of, so --

11                  MR. SCHECHTER:  Objection.

12                  THE COURT:  Yeah, sustained as to the last

13      answer.  Answer is stricken.

14      Q.    Are you able to answer that question --

15                  MR. SCHECHTER:  Objection.

16      Q.    In a different way --

17                  THE COURT:  Overruled.

18      Q.    Are you able to answer that question in a

19   different way?

20      A.    Yes.

21      Q.    What's your answer?

22      A.    Like, remembering what happened in the bathroom,

23   like I knew there was no point in fighting back, so I just

24   did what he said, otherwise --

25                  MS. JOHNSON:  Your Honor, I'm going to ask

ws

Awan - People - direct          451

1        that this be marked as the People's Exhibit, I believe

2        we're up to, 3 for identification, please.

3                    (People's Exhibit 3 marked for

4        identification.)

5                    MS. JOHNSON:  Can I have that shown to the

6        witness, please?

7                    (Shown to witness.)

8        Q.   Sana, do you recognize that?

9        A.   Yes.

10       Q.   What do you recognize that to be?

11       A.   The work vehicle.

12       Q.   What work vehicle?

13       A.   My stepfather's work vehicle.

14       Q.   The one you told us about yesterday?

15       A.   Yes.

16       Q.   Is that a fair and accurate picture of what it

17       looked like in May and June of 2008?

18       A.   Yes.

19                   MS. JOHNSON:  Your Honor, at this time we

20       would offer that into evidence as People's 3.

21                   MR. SCHECHTER:  Can I see it, please?

22                   THE COURT:  Show it to Mr. Schechter.

23                   (Shown to counsel.)

24                   MR. SCHECHTER:  No objection.

25                   THE COURT:  All right, so without objection,

ws

Awan - People - direct          452

1        People's 3 will be received in evidence.

2                (People's Exhibit 3 received in evidence.)

3                MS. JOHNSON:  Your Honor, I would like to

4        just publish that to the jury.

5                THE COURT:  Yes.

6                (People's Exhibit 3 published to the jury.)

7        Q.   Sana, can you see the scene?

8        A.   Yes.

9        Q.   Is that the van that your stepfather picked you up

10       from school in in May and June of 2008?

11       A.   Yes.

12       Q.   And is that the same van that you drove you out to

13       Nassau County in?

14       A.   Yes.

15       Q.   And the front of that van, is that the seat that

16       you were referring to that you were sitting in?

17       A.   Yes.

18       Q.   Okay.  Between May 1st and May 13th, 2008, did the

19       defendant drive you out to Nassau County on Community Drive

20       at least one time?

21       A.   Yes.

22       Q.   And the touching that you told us about yesterday,

23       did that occur at least one time during that time period?

24       A.   Yes.

25       Q.   Can you describe for us what the vibrators looked

                                                            ws

Awan - People - direct          453

1    like that he used on you in that time period from May 1st to

2    the 13th of 2008?

3         A.    It was like four to five inches long and it was

4    white.

5         Q.    What else did it look like?

6         A.    It was like cone shaped.

7              MR. SCHECHTER:  What is that?

8              THE COURT:  Cone shaped.

9              THE WITNESS:  Cone shaped, round.

10        Q.    Was there more than one vibrator that he used on

11   you in May and June of 2008?

12        A.    You mean in the car?

13        Q.    Correct.

14        A.    No, but there was another one.

15        Q.    I'm going to ask that this be marked as People's 4

16   for identification.

17              (People's Exhibit 4 marked for

18              identification.)

19              MS. JOHNSON:  I would like it opened.

20              I want the record to reflect that that bag

21        containing the property is sealed.

22              (People's Exhibit 4 was unsealed.)

23              THE COURT:  Okay.

24              Yeah, give her a pair of gloves.

25              THE COURT:  Are you asking for the item

ws

Awan - People - direct                454

1          itself to be marked?

2                      MS. JOHNSON:  I would, to make sure.

3                      (People's Exhibit 4 remarked for

4          identification.)

5                      MS. JOHNSON:  If I could have it shown to the

6          witness, please?

7                      (Shown to witness.)

8          Q.   Sana, could you take a look at what's been marked

9     as People's 1 (sic) for identification.

10              Do you recognize that?

11         A.   Yes.

12                      THE COURT:  People's 4.

13                      MS. JOHNSON:  I'm sorry, People's 4, your

14         Honor.

15         Q.   Do you recognize that?

16         A.   Yes.

17         Q.   What do you recognize that to be?

18         A.   It's the massager he had in the car.

19         Q.   Is that one of the massagers that he used on your

20    vagina?

21         A.   No.

22         Q.   What did the massager look like that he used on

23    your vagina?

24         A.   It was like this long, but it was just this part,

25    like round.

ws

Awan - People - direct                455

1        Q.   Have you ever seen that massager before?

2        A.   Yes.

3        Q.   Where have you seen it in Nassau County?

4        A.   In the car.

5        Q.   In that work van?

6        A.   Yes.

7        Q.   Is that in the same or substantially the same

8    condition it was in May and June of 2008?

9        A.   Yes.

10            MS. JOHNSON:   Your Honor, at this time we

11       would offer that into evidence.

12            MR. SCHECHTER:   May I have a voir dire?

13            THE COURT:   Yes.

14   VOIR DIRE EXAMINATION

15   BY MR. SCHECHTER:

16       Q.   Sana, where did you see that massager in the car?

17       A.   It was on the middle part between the seats.

18       Q.   Between the seats?

19            And when for the first time did you see that

20   massager?

21       A.   The beginning of May.

22       Q.   Did you see it before the beginning of May?

23       A.   Yes.

24       Q.   When before the beginning of May did you see that

25   massager?

1       A.   I'm not sure of an exact date, but it was in the

2   car before.

3       Q.   Would it be 2006, 2007, 2008?

4       A.   I'm not sure.

5       Q.   So it could have been in the car a long time then?

6       A.   Yes.

7       Q.   And was that the massager that your stepfather

8   used on his neck?

9       A.   I don't know.

10      Q.   Did you ever see him use that on his neck?

11      A.   No.

12      Q.   Did you ever hear him complain to you about his

13  neck hurting?

14      A.   No.

15           MR. SCHECHTER:   May I see that, please?

16           (Shown to counsel.)

17           MR. SCHECHTER:   No more questions at this

18       time, Judge.

19           THE COURT:   Any objection?

20           MR. SCHECHTER:   None.

21           THE COURT:   All right, so without objection,

22       People's 4 will be received in evidence.

23           (People's Exhibit 4 received in evidence.)

24  DIRECT EXAMINATION CONT'D

25  BY MS. JOHNSON:

ws

Awan - People - direct                457

1        Q.   Sana, between May 1st and May 13th, 2008 in
2    Nassau County did your stepfather ever make any threats
3    toward you?
4        A.   Yes.
5        Q.   Can you tell us what those threats were?
6        A.   He threatened to cut off my finger.
7        Q.   Where did that happen?
8        A.   In the car.
9        Q.   Can you tell us the circumstances of how it was
10   that he said that to you?
11       A.   I was fighting back when he was kissing me and
12   touching me and he got upset, so he said, "Give me your
13   finger and I'll show you how serious I am."
14       Q.   What did he show you?
15       A.   The knife that was in the car.
16       Q.   Did he say those words to you, "Let me show you
17   how serious I am," while he showed you the knife?
18       A.   Yes.
19       Q.   Was there a blade on the knife?
20       A.   Yes.
21       Q.   Did he show you the blade?
22       A.   Yes.
23                MS. JOHNSON:   Your Honor, I'm going to ask
24           that this be marked as People's 5 for identification.
25                THE COURT:   People's 5.

                                                          ws

1          MS. JOHNSON:  Your Honor, with the Court

2     officer's permission, obviously with the Court's

3     permission, if I could open that up?

4          THE COURT:  Yes.

5          MS. JOHNSON:  And let the record reflect that

6     that envelope is sealed.

7          THE COURT:  Yes.

8          COURT OFFICER:  Take it out?

9          MS. JOHNSON:  Please.  And, I'm sorry, if we

10    could just actually mark the exhibit?

11          (People's Exhibit 5 unsealed and marked for

12    identification.)

13          THE COURT:  Ms. Johnson?

14          MS. JOHNSON:  Is the Court going to permit

15    the People to have the tape taken off?

16          I know, that's up to your staff.

17          THE COURT:  If I could have it done without

18    my officer getting hurt.

19          (Pause in the proceedings.)

20          MS. JOHNSON:  Thank you.

21          If I could just have it shown to the witness?

22          (Shown to witness.)

23    Q.    Sana, do you recognize that?

24    A.    Yes.

25    Q.    What do you recognize that to be?

ws

Awan - People - direct          459

1          A.   The knife that was in the car.

2          Q.   Is that the knife that you were just referring to?

3          A.   Yes.

4          Q.   Is it in the same or substantially the same

5     condition it was in May and June of 2008?

6          A.   Yes.

7               MS. JOHNSON:  Your Honor, we would offer that

8          into evidence.

9               MR. SCHECHTER:  Voir dire?

10              THE COURT:  Yes.

11    VOIR DIRE EXAMINATION

12    BY MR. SCHECHTER:

13         Q.   Sana, you've seen that knife before May and June

14    of 2008, haven't you?

15         A.   No.

16         Q.   Huh?

17         A.   No.

18         Q.   You never saw that knife in the car before May or

19    June of 2008?

20         A.   No.

21              MR. SCHECHTER:  No more questions this time,

22         Judge.

23              THE COURT:  Any objection?

24              MR. SCHECHTER:  No.

25              THE COURT:  Without objection, People's 5

                                                    ws

Awan - People - direct          460

1          will be received in evidence.

2                    (People's Exhibit 5 received in evidence.)

3                    THE COURT:  Okay, Ms. Johnson.

4     DIRECT EXAMINATION CONT'D

5     BY MS. JOHNSON:

6          Q.   Sana, how was your stepfather holding the knife

7     when he said those words to you?

8          A.   Towards my finger.

9                    COURT OFFICER:  Do you want her to take it?

10                   THE COURT:  No.

11         Q.   Which part of the knife was facing towards your

12    finger?

13         A.   The blade.

14         Q.   And how close did the blade come to your finger?

15         A.   Like, an inch away.

16                   MS. JOHNSON:  That's enough with that.

17         Q.   Between May 1st and May 13th of 2008 did you ever

18    tell your mom what was going on?

19         A.   No.

20         Q.   Did you ever tell your best friend Christine?

21         A.   No.

22         Q.   Can you tell us during that time frame how did

23    your stepfather treat you when your family was around?

24         A.   He was nice, like normal.

25         Q.   Would you characterize it as a normal

                                                              ws

1    father-daughter relationship?

2         A.    Yes.

3         Q.    How would he treat you in public during that time

4    frame?

5         A.    Normal.

6         Q.    Would he ever mention the incidents in the van

7    while other family members were around?

8         A.    No.

9         Q.    Did he ever mention it in public?

10        A.    No.

11        Q.    Was it ever spoken about in front of family

12   members during that time period?

13        A.    No.

14        Q.    Throughout May and throughout June did he continue

15   to treat you, as you said, normal in the presence of other

16   family members?

17        A.    Yes.

18        Q.    And in public as well?

19        A.    Yes.

20        Q.    How did you act in public?

21        A.    Normal.

22        Q.    And would that be around family members as well?

23        A.    Yes.

24        Q.    Why?

25        A.    Because I didn't think -- I didn't let it bother

ws

Awan - People - direct            462

1   me in public.

2        Q.    Why not?

3        A.    Because I didn't want anyone to know.  I was

4   embarrassed.

5        Q.    I want to direct your attention to May 14th of

6   2008.

7              Do you remember that day?

8        A.    Yes.

9        Q.    Can you tell the jury what happened on May 14th,

10  2008 in Nassau County?

11       A.    He picked me up from school and then we drove out

12  to the Community Drive building and he made me kiss him and

13  was touching me and then when we were leaving to go home he

14  said --

15       Q.    I want to stop you for one second.

16             When you say he was touching you, where was he

17  touching you on that date?

18       A.    On my breast and my vagina.

19       Q.    And was this after he had threatened you with that

20  knife that's now in evidence?

21       A.    Yes.

22       Q.    It was after?

23       A.    Yes.

24       Q.    Tell us what he said to you on May 14th?

25       A.    He wanted me to have sex with him so he said to

1    pick a date -- well, he said in a week, in two weeks or in a

2    month.

3         Q.   Were those the words that he used?

4         A.   Yes.

5         Q.   Now, when you say he told you he wanted to have

6    sex with you, what was the words that your stepfather used

7    to you?

8         A.   I don't know his exact words, but he just said it.

9         Q.   What did you say to him?

10        A.   Well, he didn't ask, he just said in a week, in

11   two weeks or in a month, so I said a month.

12        Q.   Why did you say a month?

13        A.   Because I couldn't -- well, actually, I had said

14   no first, but then, like, he gave me the options and I knew

15   I couldn't say no because, I mean, he threatened me before,

16   so I just agreed to a month.

17        Q.   Why did you agree to the month?

18        A.   Because I was scared if I said no then he would

19   hurt me.

20        Q.   Did you tell your mom about what happened on

21   May 14th?

22        A.   No.

23        Q.   Did you tell your best friend Christine?

24        A.   No.

25        Q.   Other than touching your breasts and your vagina

                                                              ws

Awan - People - direct          464

1      on May 14th, 2008, did he use the vibrator on you?

2          A.   Yes.

3          Q.   Which vibrator did he use?

4          A.   The long one.

5          Q.   What did it look like?

6          A.   It was like four to five inches long, it was white

7      and like cylinder.

8          Q.   After June of 2008 did you see that vibrator

9      again?

10         A.   No.

11         Q.   Where did he get the vibrator from?

12         A.   He had it in a black bag and it was like on his

13     left, like the driver's door.

14         Q.   In the van?

15         A.   Yes.

16         Q.   The same Ecolab van that you indicated was

17     depicted in People's Exhibit 3 in evidence?

18         A.   Yes.

19         Q.   What did he do with the vibrator on that day?

20         A.   He turned it on and put it between my legs.

21         Q.   On your vagina?

22         A.   Yes.

23         Q.   What did you say to him?

24         A.   I told him to stop.

25         Q.   What did he do?

                                                        ws

Awan - People - direct                    465

1          A.   He continued.

2          Q.   Did you physically try to push him away?

3          A.   Yes.

4          Q.   And how did you do it on that day?

5          A.   I tried to push his hands away and close my legs.

6          Q.   What happened next?

7          A.   He told me to behave.

8          Q.   Were you able to close your legs?

9          A.   No.

10         Q.   How come?

11         A.   Because he is bigger than me and stronger.

12         Q.   Between May 1st and May 13th and May 14th, 2008,

13    where did your stepfather take you after Nassau County?

14         A.   We went home.

15         Q.   Did he ever take you to buy -- did he ever go buy

16    anything for you?

17         A.   Yeah.

18         Q.   Tell us about that.

19         A.   One time we went to Taco Bell after because, like,

20    I don't know if I could say this, like --

21         Q.   Did he tell you if he was going to take you to

22    Taco Bell?

23         A.   No, he asked me if I was hungry.

24         Q.   Did he offer to buy you any clothing?

25         A.   Yes.

1      Q.    And what did you say?

2      A.    Well, he asked me if I wanted new jeans and I

3    needed it anyway so I said yeah and then he said he would

4    buy me more because, like, I guess he was kind of making up

5    to me.

6                 MR. SCHECHTER:   Objection.

7                 THE COURT:   Yeah, sustained as to the last

8         part.

9      Q.    And would this offer to buy you clothing and buy

10   you Taco Bell occur after the incidents at Community Drive?

11     A.    Yes.

12     Q.    Did he offer that to you more than once?

13     A.    Yes.

14     Q.    I want to move now to May 19th to the 23rd of

15   2008.

16           Can you tell us what happened during that week in

17   Nassau County?

18     A.    He continued taking me out to Community Drive

19   after school and one time I went to work with him at this

20   mosaic place.

21     Q.    What happened during that week when you were

22   brought out to Community Drive?

23     A.    The same thing continued.

24     Q.    And when you say the same thing, just tell us

25   again what that is?

ws

Awan - People - direct                467

1       A.   He was kissing me and touching me and using the

2    vibrator on me.

3       Q.   And was he touching your breasts and your vagina?

4       A.   Yes.

5       Q.   And during that time period what would you do --

6    withdrawn.

7            During that time period did you ever physically

8    resist your stepfather?

9       A.   Yes.

10      Q.   And during that time period how did you do that?

11      A.   I tried to push him off still and told him to

12   stop.

13      Q.   What did he say to you after you told him to stop?

14      A.   He told me to behave.

15      Q.   Was this before or after when he threatened you

16   with the knife?

17      A.   Before.

18      Q.   Was May 14th -- excuse me, was May 19th to the

19   23rd, was that before or after he threatened you with the

20   knife in Nassau County?

21      A.   Oh, no, I thought you meant the events.

22           No, if you mean the date, yeah, it was during the

23   19th to the 23rd.

24      Q.   Did you tell your mom or your best friend what was

25   happening that week?

                                                              ws

Awan - People - direct                    468

1        A.    No.

2        Q.    How come?

3        A.    Well, I didn't tell my mom because, like, he was

4    our provider and, first, I didn't know if she would believe

5    me and then, if I told her, she would probably confront him

6    and she's not that much stronger than him anyway so, like, I

7    was scared he would probably just hit her and just --

8    nothing would change, it would just continue and I would get

9    in trouble for telling and he would call me a liar and then

10   my little brother and sister --

11       Q.    Were you worried about them?

12       A.    Yeah.

13       Q.    Are you okay?

14             THE COURT:   Ms. Johnson --

15       Q.    What were you afraid would happen to you if you

16   told your mom or your best friend?

17       A.    I was scared I would get in trouble by him and he

18   would beat me.

19       Q.    I want to move now to -- do you have water?

20       A.    Yeah.

21       Q.    -- to May 26th through the 30th of 2008.

22             Can you tell us what happened that week in

23   Nassau County?

24       A.    The same thing continued.

25       Q.    And did it happen at least one time between

                                                        ws

Awan - People - direct          469

1    May 19th through the 23rd?

2        A.    Yes.

3        Q.    Did it happen at least one time in Nassau County

4    between May 26th and the 30th?

5        A.    Yes.

6        Q.    And when you say the same thing, just briefly tell

7    us what that was?

8        A.    He was kissing me and touching me and using the

9    vibrator on me.

10       Q.    And when you say touching you what does that mean?

11       A.    Touching my breasts and vagina.

12       Q.    Did you tell him no during that time period?

13       A.    Yes.

14       Q.    What did you say to him and what did he say to

15   you?

16       A.    I told him to stop and he told me to behave.

17       Q.    I want to move forward to June 2nd to June 6th of

18   2008?

19              MR. SCHECHTER:   Which date?

20              THE COURT:   Pick a date.

21              MS. JOHNSON:   2nd through the 6th of 2008.

22              THE COURT:   Okay.

23       Q.    Do you recall that week?

24       A.    Yes.

25       Q.    What happened on that week in Nassau County?

Awan - People - direct           470

1       A.    The same thing continued.

2       Q.    And just tell us what that is?

3       A.    He was kissing me and touching me and using the

4    vibrator on me.  We went to the Community Drive.

5       Q.    And was he -- did he pick you up from school

6    during that week?

7       A.    Yes.

8       Q.    And when you say touching, what does that mean?

9       A.    Touching my breasts and vagina.

10      Q.    With his hands?

11      A.    Yes.

12      Q.    And over your clothing or under your clothing?

13      A.    Both.

14      Q.    And was he touching you over and under your

15   clothing also from -- at least once between May 26th through

16   May 30th of 2008?

17      A.    Yes.

18      Q.    Now let's go back to the June 2nd to June 6th.

19            Did you tell him no?

20      A.    Yes.

21      Q.    What did you say to him and what did he say to

22   you?

23      A.    I told him to stop and he continued to tell me to

24   behave and then he would threatened me with the knife, too.

25      Q.    When you say he would threaten you with the knife

                                                        WS

Awan - People - direct          471

1    too, did that threat happen again after May of 2008?

2         A.    Yes.

3         Q.    Did it happen again in Nassau County?

4         A.    Yes.

5         Q.    Tell us the circumstances of when that happened --

6    when that threat happened again in Nassau County?

7         A.    I was trying to fight him off.

8         Q.    What does that mean?

9         A.    Like, I was trying to push him away and telling

10   him to stop and, like, I would hit him or something and he

11   would just get mad and then he took out the knife and told

12   me to behave.

13        Q.    When you say he would get mad, what was it -- what

14   were his actions that led you to believe he was getting mad?

15        A.    Because he raised his voice and I knew he was mad.

16        Q.    What were you afraid would happen to you if you

17   didn't comply with what he told you?

18                  MR. SCHECHTER:   Objection.

19                  THE COURT:   No, I'll allow that.   Overruled.

20        A.    What?

21                  MR. SCHECHTER:   Exception, Judge.

22        Q.    What were you afraid would happen to you if you

23   didn't comply with what he told you?

24        A.    I thought he would kill me.

25        Q.    I want to move forward to June 9th through the

Awan - People - direct          472

1   13th of 2008.

2        Do you remember that week?

3   A.   Yes.

4   Q.   Can you tell us what happened that week in

5   Nassau County?

6   A.   The same thing continued on Community Drive.

7   Q.   And you have to tell us what you mean.

8   A.   Kissing me and touching me and using the vibrator

9   on me.

10  Q.   And when you say touching you, what does that

11  mean?

12  A.   Touching my breasts and vagina.

13  Q.   Over your clothing or under your clothing?

14  A.   Both.

15  Q.   And did it happen at least once during that week?

16  A.   Yes.

17  Q.   Did the defendant pick you up from school to bring

18  you out to Nassau County?

19  A.   Yes.

20  Q.   And did he continue to pick you up in that Ecolab

21  van?

22  A.   Yes.

23  Q.   Was this before or after he had threatened you

24  with the knife?

25  A.   After.

ws

Awan - People - direct          473

1        Q.   Did you tell your mom or your best friend that
2    week?
3        A.   No.
4        Q.   What were you afraid would happen to you that week
5    if you didn't comply with what he told you to do?
6        A.   I thought he would kill me.
7        Q.   Was the knife still in the van?
8        A.   Yes.
9        Q.   Were you able to see it?
10       A.   Yes.
11       Q.   Was the knife in the van throughout June of 2008?
12       A.   Yes.
13       Q.   Where was the knife that you were able to see it
14   when you were brought out to Nassau County?
15       A.   There was a little pocket under the radio and he
16   had it in there.
17       Q.   The second time that he threatened you with a
18   knife what did he say to you that time?
19       A.   He said, "I'll show you how serious I am."
20       Q.   Did he show you the knife again?
21       A.   Yes.
22       Q.   And did he point the blade at you?
23       A.   Yes.
24       Q.   I want to direct your attention to June 14th of
25   2008.

                                                      ws

Awan - People - direct          474

1           Can you tell us what happened on that day?

2       A.   Well, June 14th was a month from when I had

3   promised to have sex with him, which was May 14th, and I

4   think there was a funeral going on that week so we had just

5   come home after he picked me up so we didn't go out to

6   Community Drive.

7       Q.   Who was with you on that day, June 14th?

8       A.   All my family.

9       Q.   Was your mom around?

10      A.   Yes.

11      Q.   Your brothers and sisters?

12      A.   Yes.

13      Q.   On that date did your stepfather remind you of

14  that promise?

15           MR. SCHECHTER:  Objection to the leading,

16      your Honor.

17           THE COURT:  Yes, sustained.

18      Q.   On June 14th, 2008 did your stepfather say

19  anything to you?

20      A.   No.

21      Q.   What happened after the funeral on that day?

22      A.   We all went home.

23      Q.   I want to direct your attention -- I'm going to

24  withdraw that.

25           Did there come a time when there was another

ws

Case 1:15-cv-01782-NGG   Document 8-15   Filed 08/31/15   Page 95 of 209 PageID #: 1295

1    conversation about having sex?

2         A.    Yes.

3         Q.    When did that happen?

4         A.    June 19th.

5         Q.    I want to direct your attention from between

6    June 19th and the 20th of 2008.

7              Could you tell us what happened on that day

8    between those two days?

9         A.    Well, on the 19th he picked me up from school

10   again -- actually, no, I had regents that week, I think, so

11   I went to work with him again and then he said, "You

12   remember your promise?"

13        Q.    Were those the words that he used?

14        A.    Yeah.

15        Q.    Where were you when he said that to you?

16        A.    I was in the car with him.

17        Q.    On your way where?

18        A.    I think we were going home.

19        Q.    And when you say in the car you're referring to

20   that Ecolab van?

21        A.    Yes.

22        Q.    And what did you say to him after he told you

23   that?

24        A.    I said no and then he said, "You remember you

25   promised to have sex with me on the 14th," and --

ws

Awan - People - direct                476

1    Q.    What did you say to him?

2    A.    I just said yeah.

3          And then he said, "How long has it been?"

4          And I said five days.

5          And then he told me I have to keep my promise so

6    he told me to pick another day and he said, "When do you

7    want to do it?  Monday?  Tuesday?  Wednesday?"

8          And then I said Friday.

9    Q.    Why did you say Friday?

10   A.    Because it was the farthest away.

11   Q.    What were you afraid would happen on that Friday?

12          MR. SCHECHTER:  Objection to the leading.

13          THE COURT:  Yeah, sustained as to the

14   leading.

15   Q.    What was going to happen that Friday?

16          MR. SCHECHTER:  Objection.

17          THE COURT:  No, I'll allow that.  Overruled.

18   Q.    What did you expect to happen on that Friday?

19   A.    I was supposed to have sex with him.

20   Q.    Do you know what date that Friday was?

21   A.    The 27th.

22   Q.    Of what month?

23   A.    June.

24   Q.    And what happened on that Friday after he reminded

25   you of the promise?

ws

Awan - People - direct          477

1      A.   Nothing.  I wasn't there.  That's after --

2      Q.   Did anything happen on that Friday?

3      A.   No.

4      Q.   I'm going to direct your attention to the weekend

5   before June 23rd of 2008.

6           Do you remember that weekend?

7      A.   Yes.

8      Q.   And, could you tell us, did you do anything with

9   your personal belongings on that weekend?

10     A.   Yes.

11     Q.   What did you do?

12     A.   I packed a bag with all my clothes and I put it in

13  my closet and I hid it under, like, stuff on the floor.

14     Q.   Why did you do that?

15     A.   Because I wanted to run away before Friday.

16     Q.   Before Friday of the next week?

17     A.   Um-hum, yes.

18     Q.   And when you say Friday, is that the day that you

19  were supposed to have sex?

20     A.   Yeah.

21     Q.   Did you run away that Saturday?

22     A.   No.

23     Q.   Why not?

24     A.   Because that Saturday everyone was home and we

25  went to a fair.

1      Q.   Did you run away that Sunday?

2      A.   No.

3      Q.   Why not?

4      A.   Because everyone was still home and I didn't even

5   know where I was going, so I didn't leave.

6      Q.   Your mom was home?

7      A.   Yeah.

8      Q.   Was your stepfather home?

9      A.   Yes.

10     Q.   Was he home on Saturday and Sunday?

11     A.   Yes.

12     Q.   Were your brothers and sisters home?

13     A.   Yes.

14     Q.   Did you tell anybody before June 23rd, 2008 that

15   you were planning on running away from home?

16     A.   No.

17     Q.   Did there come a time throughout June that there

18   was another threat made to you?

19     A.   Before June?

20     Q.   Throughout June was there another threat?

21     A.   Yes.

22     Q.   And who made that threat to you?

23     A.   My stepfather.

24     Q.   When?

25          And you don't have to give us the exact date, you

                                                        ws

Awan - People - direct          479

1    can give us the month.

2        A.    In June.

3        Q.    And where did that threat happen?

4        A.    At home.

5        Q.    And what did he say to you?

6        A.    I mean, I don't remember his exact words, but --

7        Q.    What was the substance of it?

8        A.    Well, he took a kitchen knife and he told me to me

9    give me my finger (sic) -- give -- yeah.

10       Q.    What else did he say to you?

11       A.    He said he was going to show me how serious he

12   was.

13       Q.    Same as he had said before?

14       A.    Yeah.

15       Q.    I want to direct your attention to June 23rd 2008.

16             Do you remember what day of the week that was?

17       A.    A Monday.

18       Q.    What happened on that day?

19       A.    My dad went to work at night or -- he wasn't there

20   that night and my mom had a toothache so she went to sleep

21   early, around 8, and my brother and sister were asleep too,

22   and she had the ACs on so the doors were closed.

23       Q.    When you say -- air conditioning?

24       A.    AC, air conditioning.

25             And I was in my room and I knew that if I didn't

ws

Awan - People - direct          480

1   leave that night -- wait, I --

2                  MR. SCHECHTER:  Objection to what she knew.

3                  THE COURT:  Yeah, sustained as to the last

4        part.

5                  You can continue.

6        Q.    Why did you pick that night?

7        A.    Well, because when I had said the Friday that I

8   would promise to have sex with him he said that day wasn't

9   good and he told me Wednesday and so Monday night I knew

10  that if I didn't leave that night all I had left was Tuesday

11  and if everyone was home on Tuesday I couldn't leave and

12  then Wednesday was the day so I just decided I had to leave

13  that night.

14              So I waited for everyone to go to sleep and I took

15  my stuff and --

16       Q.    When you say your stuff, was that the stuff you

17  had packed and left in your closet?

18       A.    The bag that I had in my closet.

19              And I had nowhere to go so I called my friend

20  Christine because I thought maybe I could spend the night at

21  her house.

22       Q.    You called Christine on the telephone?

23       A.    Yeah.

24       Q.    You called her on June 23rd?

25       A.    Yeah.

Awan - People - direct                481

1      Q.   Did you have a conversation with her?

2           Don't tell us what it was, but did you have a

3   conversation with her?

4      A.   Yeah.

5      Q.   Did you tell her, without telling us what you

6   said --

7                MR. SCHECHTER:  Objection.  She's now leading

8           again.  I can hear it in her question, "Did you tell

9           her."

10               THE COURT:  Well, let me hear the rest of the

11          question.

12     Q.   Without telling us what you told her, did you tell

13  her why you were running away?

14     A.   Yes.

15     Q.   Did you speak to anybody else?

16     A.   Yes.

17     Q.   Who else did you speak with?

18     A.   Her mother.

19     Q.   And without telling us what you told Christine's

20  mother, did you tell her why you were running away?

21     A.   Yes.

22     Q.   Before you called -- withdrawn.

23          Was Christine the first person that you ever told

24  about why you were running away?

25     A.   Yes.

                                                        ws

Awan - People - direct          482

1      Q.   And was Christine the first person you ever told

2   about what was happening to you?

3      A.   Yes.

4      Q.   Christine's mom is Denise?

5      A.   Yes.

6      Q.   Where did you go after you spoke to Denise and

7   Christine on the telephone?

8      A.   Denise didn't want me to run away because she, you

9   know, was scared that I would get hurt.

10              MR. SCHECHTER:  Objection.

11              THE COURT:  Yeah, sustained.

12              Don't tell us what she may have said to you.

13      Q.   Just tell us where you went.

14      A.   I left the house and I started walking down a back

15   street.

16      Q.   Where did you walk towards?

17      A.   Towards Christine's house.

18      Q.   Where did they end up meeting you?

19      A.   They met me, like, three or four blocks away from

20   my house.

21      Q.   What did you have with you?

22      A.   I had my bag.

23      Q.   Where did Denise take you?

24      A.   We went to Hollywood Video on Hillside and then we

25   went to the precinct.

ws

Awan - People - direct                    483

1        Q.   Why did you go to Hollywood Video?

2        A.   Because she was calling her -- well, someone in

3   her family.  I guess she didn't know what to do because I'm

4   a --

5                   MR. SCHECHTER:  Objection.

6                   THE COURT:  Okay, sustained as to the last

7        part.

8                   Just tell us what you observed.

9        Q.   Did she ask you to get out of the car?

10       A.   No.   Christine and I went into Hollywood Video

11  while she was on the phone.

12       Q.   Where did they take you next?

13       A.   And then, when we came back, we went to the

14  precinct.

15       Q.   And when you say the precinct, is that

16  105th Precinct in Queens?

17       A.   Yes.

18       Q.   Who did you meet at the precinct as far as police

19  officers and detectives go?

20       A.   Well, first I came in and I met Officer Morris, I

21  think her name was, or Moore, and then I spoke to -- you

22  just want to know the officers?

23       Q.   Yes.  Did you meet with a detective?

24       A.   Yeah, and then I met Detective Shulman.  And --

25       Q.   Who stayed with you at the precinct?

Awan - People - direct                         484

1          A.    Denise and Christine.

2          Q.    Did you have the opportunity to speak to

3     Detective Shulman?

4          A.    Yes.

5          Q.    Did you tell him what had happened to you?

6          A.    Yes.

7          Q.    Did you tell him who was doing it to you?

8          A.    Yes.

9          Q.    Did you tell him about the knife?

10         A.    Yes.

11         Q.    Did you tell him about the vibrators?

12         A.    Yes.

13         Q.    Did you tell him about the threats?

14         A.    Yes.

15         Q.    Did you tell him about the van?

16         A.    Yes.

17         Q.    Did you tell him about Community Drive?

18         A.    Yes.

19         Q.    After you were at the precinct on June 23rd, 2008

20     did you go to the hospital?

21         A.    Yes.

22         Q.    Who took you there?

23         A.    They had an ambulance come and pick us up -- well,

24     me and my mom.

25         Q.    Your mom came to the precinct?

Awan - People - direct          485

1      A.    Yeah, at like 9 the next morning.

2      Q.    Did she stay with you?

3      A.    Yeah.

4      Q.    Did she stay with you at the hospital?

5      A.    Yeah.

6      Q.    Did you go back -- where did you go after the

7   hospital?

8      A.    I think we had gone back to the precinct.

9      Q.    Where was your mom?

10      A.    My mom was with me.

11      Q.    Did your mom stay with you at the precinct?

12      A.    Yeah.

13      Q.    Did there come a time when an officer, a female

14   officer, brought you outside the precinct?

15      A.    Yes.

16      Q.    Where did you go?

17      A.    We went outside to the back and the Ecolab truck

18   was there and we looked --

19      Q.    What did you see in the Ecolab truck?

20      A.    We looked into the window and I saw the knife in

21   the thing under the radio and it was --

22      Q.    When you say the knife, you're referring to the

23   knife that's already been marked into evidence?

24      A.    Yes.

25      Q.    And did you tell Officer Alfaro that you

ws

Awan - People - direct          486

1   recognized the knife?

2        A.   Yes.

3             MR. SCHECHTER:  Objection, it's not been

4        established that Officer Alfaro is the person she spoke

5        to.

6             THE COURT:  I'll overrule that.

7        Q.   Did you tell the female officer that you

8   recognized the knife?

9        A.   Yes.

10       Q.   And that's the same knife that we just saw?

11       A.   Yes.

12       Q.   What did she do?

13       A.   They didn't do anything.  They just said, "Okay,

14  are you sure," and I said yes.

15       Q.   What else did you see in the van?

16       A.   And I saw the folded vibrator on the seat, but I

17  didn't see the other one.

18       Q.   And when you say the other one, which is the one

19  you're referring to?

20       A.   The long white one.

21       Q.   And when you say the folded one, are you referring

22  to the one that's already been marked into evidence as

23  People's --

24       A.   Yeah.

25       Q.   -- 4?

                                                    ws

Awan - People - direct          487

1        A.    Yes.

2        Q.    Where was that in the van?

3        A.    It was on the middle seat.

4        Q.    When you were brought out to the van was this

5    before or after you spoke to Detective Shulman?

6        A.    After.

7        Q.    Between May -- between those time periods in May

8    of 2008 and June of 2008 did you ever consent to your

9    stepfather touching your breasts?

10       A.    No.

11       Q.    Did you ever consent to your stepfather touching

12   your vagina?

13       A.    No.

14       Q.    Who took you home from the precinct that day?

15       A.    Denise.

16       Q.    Where was your mom?

17       A.    I think she was with us.

18       Q.    When you got home who was there?

19       A.    I don't think anyone was there when I got home.

20   It was just -- oh, wait, no, Christine was home and my

21   brother and sister.

22       Q.    Did there come a time when other members of your

23   family came over that night?

24       A.    Yeah.

25       Q.    And who came over?

ws

Awan - People - direct                488

1       A.   Harold's sister.

2       Q.   Your stepfather's sister?

3       A.   Yeah.

4       Q.   Who else?

5       A.   Her husband, his other sister, his niece, his

6    other niece, his nephew.

7       Q.   Your stepfather's family came over to the home?

8       A.   Right.

9       Q.   What did your mom say to you at home that day?

10      A.   Nothing.

11      Q.   Did she ask you what happened?

12      A.   No.

13      Q.   Where did you go?

14      A.   I came in and I said hello to everyone and it was

15   just, like, an awkward silence so I went upstairs and then

16   when I came back down I went into the kitchen and I was

17   talking --

18      Q.   I'm just going to stop you there.

19           Who were you talking to?

20           Members of who's family?

21      A.   Harold's family.

22      Q.   Why did you go up to your bedroom?

23      A.   Because when I walked in someone said --

24           MR. SCHECHTER:  Objection.

25           THE COURT:  Yeah, don't tell us what anybody

                                                        ws

1          said.

2          A.    I started crying.

3          Q.    Why were you crying?

4                     MR. SCHECHTER:  Objection.

5                     What's the relevance here?

6                     THE COURT:  No, I'll allow it.  Overruled.

7          A.    Because when I came in someone said something and

8     I felt like I messed up everyone's life.

9          Q.    When you say someone said something was that

10    person a member of your stepfather's family?

11         A.    Yeah.

12         Q.    Who went upstairs with you?

13         A.    Christine.

14         Q.    Where was your mom?

15         A.    Downstairs.

16         Q.    What was the condition of your bedroom when you

17    left it on June 23rd, 2008 to meet Christine and her mom

18    Denise?

19         A.    Everything was where I left it.

20         Q.    What was the condition of your bedroom when you

21    came home from the precinct?

22         A.    Everything was relevantly (sic) where I left it.

23         Q.    Over the next day did there come a time -- over

24    the next couple of days did there come a time after the date

25    when you noticed that something was missing?

ws

Awan - People - direct          490

1        A.    Yes.

2        Q.    What was missing from your bedroom?

3        A.    My diary.

4        Q.    Did you give it to anybody?

5        A.    No.

6        Q.    Have you seen it since then?

7        A.    No.

8        Q.    Was there anything out of place in your bedroom

9    when you came home?

10       A.    It seemed like my room was searched because

11   everything was moved.

12             MR. SCHECHTER:   Objection, what seemed.

13             THE COURT:   No, overruled.

14       A.    Everything was moved.

15       Q.    When you say --

16             THE COURT:

17       Q.    Were your things in different positions than you

18   had left them when you left the home?

19       A.    Yes.

20       Q.    When did you notice that your diary was missing?

21       A.    When I saw everything was out of place, so I was

22   just looking to see what was taken and I remember I had

23   moved it to a certain spot and when I opened it it wasn't

24   there.

25             MS. JOHNSON:   Can I have a second?

ws

Awan - People - direct                491

1              THE COURT:  Yes.

2              (Pause in the proceedings.)

3              MS. JOHNSON:  Thank you.

4        Q.   Sana, did you go anywhere with your mom that

5   weekend?

6        A.   What weekend?

7        Q.   After the 23rd, a day or two later, did your mom

8   bring you anywhere?

9        A.   Yes.

10       Q.   Where did she take you?

11       A.   It was to a law office.

12       Q.   Did she tell you why you were going?

13       A.   No.

14       Q.   Was it the District Attorney's Office?

15       A.   Yes.

16       Q.   It was the District -- my office?

17       A.   It was 80-02 in Kew Gardens -- on Queens

18   Boulevard.

19       Q.   Who did you meet with?

20       A.   I don't remember his name.

21       Q.   Was it --

22              (Pause in the proceedings.)

23       Q.   Did you go to any other office that your mom

24   brought you to?

25       A.   No.

ws

Proceedings                    492

1      Q.   Sana, do you have a boyfriend now?

2      A.   Yes.

3      Q.   And you don't have to tell us his name.

4           Is that the same boyfriend you had back in May of

5      2008?

6      A.   Yes.

7      Q.   Sana, are you a virgin?

8      A.   Yes.

9           MS. JOHNSON:  I have no other questions.

10          THE COURT:  All right, members of the jury,

11     we're going to take a -- let's take our morning break

12     at this point, about ten minutes.  I'll have you back

13     here as soon as possible.  So just watch your step as

14     you step out.

15          (Jury exits.)

16          MR. SCHECHTER:  I would like to be heard on

17     the record, but out of the presence of the witness.

18          THE COURT:  Ms. Awan, if you could, just step

19     down and have a seat outside.

20          (Witness steps down.)

21          MR. SCHECHTER:  Your Honor, I respectfully --

22     I'm a little confused.

23          Why is it that defense counsel are not able,

24     in cases like this, to ask a witness if they're a

25     virgin, but prosecutors are able to ask their witness

                                                      ws

Proceedings                          493

1        the same question, whether they're virgins or not?

2                    It seems to me that that door has been opened

3        here.

4                    THE COURT:  Let me just stop you right there,

5        Mr. Schechter.

6                    It seems to me I didn't hear you object to

7        the question.

8                    MR. SCHECHTER:  I didn't because it's my

9        position she now opened the door to a whole line of

10       inquiry here.

11                   THE COURT:  Well, we'll hear more about what

12       you think that question allows, but is there any other

13       statement that you want to make?

14                   Is there an application you're making?

15                   MR. SCHECHTER:  I'm asking for a mistrial.  I

16       think that the witness was -- was drawn out of the

17       witness that she was at the DA's Office in Queens and I

18       also believe that too much of the Queens material was

19       gone into and I'm renewing my request for a mistrial as

20       well as renewing my objection with respect to all of

21       the matters that allegedly occurred in Queens County

22       which were elicited from this witness.

23                   THE COURT:  All right, well, again, we've

24       gone over this and I've made my ruling prior to the

25       trial beginning.  My ruling remains the same.

Proceedings                    494

1           Your mistrial application is denied.

2               Insofar as her testimony with regard to going

3       to the Queens County DA's Office, the last I checked,

4       80-02 Queens Boulevard is not the Queens County DA's

5       Office.

6               MR. SCHECHTER:  It is.  They have offices in

7       12-01 and 80-02.

8               MS. JOHNSON:  Judge, the answer that I was

9       expecting, which I obviously was not given, was that

10      she met with a representative from the defense

11      attorney's office.

12              THE COURT:  Right, I assumed that, so

13      obviously --

14              MS. JOHNSON:  Which is why I stopped my

15      inquiry.

16              THE COURT:  It seemed to me as though she

17      seemed to be confused which office as to, really, she

18      was in, for what it's worth.

19              So we'll -- let me just see the both of you

20      real quick up here.

21              (Discussion held at the bench, off the

22      record.)

23              (Recess in the proceedings.)

24              THE COURT:  All right, Mr. Schechter, the

25      jury is waiting outside.

                                              ws

Proceedings                    495

1        Before we (sic) come in I've given both of

2   you, and it's been marked as a Court exhibit, a copy of

3   my Molineaux charge which I'm prepared to give the jury

4   at this point since the testimony on direct has been

5   concluded or, if you wish, I can give it at the close

6   of her cross.

7        So what's your pleasure?

8            MR. SCHECHTER:  I would ask it be given at

9   the close.

10           THE COURT:  At the close of cross?

11           MR. SCHECHTER:  Yes, Judge.

12       But before we do that, I need to ask the

13  reporter about something before I resume -- begin my

14  cross, if I may.  I just need to ask the reporter to go

15  back to some testimony before I begin my cross.

16       Can I do that?

17           THE COURT:  I've got a jury waiting outside

18  in the hallway right now, so if you could just hold off

19  on that we'll take it up after lunch.

20           MS. JOHNSON:  And I assume none of the tapes

21  we're getting into because I haven't had a chance to

22  see them.

23           THE COURT:  And I've asked Mr. Schechter to

24  hold off on that until after lunch.

25           Mr. Schechter, just so that thing doesn't

                                                    ws

1        come falling over and crashing -- it looks like it

2        obscures the Da's vision as well.

3                    Ms. Johnson, are you ready?

4                    MS. JOHNSON:  Yes, Judge.

5                    (Jury enters.)

6                    THE COURT:  All right, members of the jury,

7        we're ready to resume.

8                    Mr. Schechter, if you would?

9                    MR. SCHECHTER:  Thank you, Judge.

10   CROSS-EXAMINATION

11   BY MR. SCHECHTER:

12        Q.   Hello, Sana.  Good morning.

13        A.   Hi.

14        Q.   Now, Sana, from 2005 through 2008 how frequently

15   would your stepfather, Harold Gopaul, drive you to school?

16        A.   About three to four times a week.

17        Q.   And that would be from 2005 to 2008, correct?

18        A.   Each year it was different because I got new

19   schedules, so the times that I had to be there changed.

20        Q.   Would your mother come with you?

21        A.   No.

22                    MR. SCHECHTER:  May I have a moment, Judge?

23                    THE COURT:  Yes.

24                    (Pause in the proceedings.)

25                    MR. SCHECHTER:  I'm sorry, Judge, I need a

ws

Awan - People - cross                497

1     moment.  I thought I had a sticker here.

2               (Pause in the proceedings.)

3     Q.   Did your mother pick you up from school?

4     A.   No.

5     Q.   In May of 2008 did your mother pick you up from

6     school?

7     A.   No.

8     Q.   Do you recall testifying at a proceeding before

9     this date in Queens County and do you recall being asked

10    this question --

11              MR. SCHECHTER:  Page DE24 or 62 on your

12         minutes.

13              MS. JOHNSON:  Page what?

14    Q.   "Question:  In May of 2008 I want to turn your

15         attention to when you were in school.  Did there come a

16         time when your mother came to pick up in May and you

17         were with a boy outside in school?

18              "Answer:  Yes."

19         Do you recall being asked that question and giving

20    that answer?

21    A.   No.

22    Q.   May I approach the witness?

23              THE COURT:  Yes.

24              (Shown to witness.)

25    A.   My mother?

Awan - People - cross          498

1     Q.   Now, once again, do you recall being asked that

2     question and giving that answer?

3     A.   No.

4     Q.   Sorry?

5     A.   No.

6              MR. SCHECHTER:   Counsel stipulate that those

7     answers and questions were given, properly stated?

8     A.   My mother didn't drive.

9              THE COURT:   Hold it.

10             I think, Mr. Schechter, you're addressing

11    yourself to Ms. Johnson.

12             MR. SCHECHTER:   I'm addressing myself to

13    Ms. Johnson.

14             MS. JOHNSON:   What lines?

15             MR. SCHECHTER:   17 through 21.

16             MS. JOHNSON:   I'll stipulate that that is the

17    question and the answer that was given on that

18    particular date.

19             MR. SCHECHTER:   Thank you.

20    Q.   Do you recall being asked this question:

21             "Question:   By the way, how often would your

22    mother come and pick you up from school?

23             "Answer:   Every time."

24             Do you recall being asked that question and giving

25    that answer?

Awan - People - cross                    499

1    A.   No.

2              MR. SCHECHTER:  May I show the witness her

3       testimony, approach the witness, Judge?

4              THE COURT:  Just give it to my officer.

5              MR. SCHECHTER:  Thank you.

6              (Shown to witness.)

7              THE WITNESS:  Can I say something?

8              THE COURT:  There's no question.  He's just

9       showing you that document and I believe Mr. Schechter

10      will have a question after that.

11   Q.   Yes.  Do you recall being asked that question and

12      giving that answer?

13   A.   No.

14             MR. SCHECHTER:  Will counsel stipulate that

15      that question was asked and that answer was given?

16             MS. JOHNSON:  Okay.

17             THE COURT:  Is that a yes?

18             MS. JOHNSON:  Yes, Judge.

19   Q.   Now, Sana, you're a pretty good student, are you

20      not?

21   A.   Yes.

22   Q.   Matter of fact, you go to school virtually every

23      day?

24   A.   Yes.

25   Q.   And I would say that your attendance in school,

                                                      ws

Awan - People - cross                    500

1    except for maybe a few cuts, was pretty regular, wouldn't

2    you agree?

3         A.   No, I didn't cut.

4              MR. SCHECHTER:  Just one moment, Judge.

5              (Pause in the proceedings.)

6         Q.   Well, Sana, going back to 2007, would it refresh

7    your recollection if I said that you cut --

8              MS. JOHNSON:  Objection.

9              THE COURT:  Yeah, could we hear the question

10        first?

11             MS. JOHNSON:  I'm sorry, Judge.

12        Q.   That you cut classes September 19th and

13   October 7th, October 7th and October 14th -- I apologize,

14   this is September 5th '08 through December 23rd, '08.

15             September 19th,'08, October 7th,'08,

16   October 14th,'08, October 10th,'08, October 7,'08 and

17   November 17?

18             Would that refresh your recollection?

19             MS. JOHNSON:  Objection.

20             THE COURT:  No, overruled.  I'll allow that.

21        A.   No.

22             MR. SCHECHTER:  May I approach the witness,

23        your Honor?

24             THE COURT:  Yes.  Just give whatever document

25        you want to show to my officer.

                                                          ws

Awan - People - cross                    501

1              (Shown to witness.)
2              MR. SCHECHTER:  May I ask another question
3      while she has that document?
4              THE COURT:  Once I know that she's had an
5      opportunity to look at it.
6              Have you seen it Ms. Awan?
7              THE WITNESS:  Um-hum.
8      Q.   Now, do you recognize those course numbers, Sana?
9      A.   Yes.
10     Q.   Now, you'll notice that it says cuts.
11          Did you cut those classes?
12     A.   No, I think one of the October dates was one of
13     the days that I had to go to court and, I mean, I don't
14     remember the exact dates, but they're not cuts, they're
15     excused.
16     Q.   Okay.
17             MR. SCHECHTER:  May I, officer?
18             (Shown to counsel.)
19     Q.   So you're pretty much a regular student, right?
20          I mean, a good student?
21     A.   Yes.
22     Q.   And you regularly attend class?
23     A.   Yes.
24     Q.   As a matter of fact, both Mr. Gopaul and your
25     mother made sure you attended class?

                                                    ws

Awan - People - cross                502

1      A.    Yes.

2      Q.    And they made sure you did your homework, correct?

3      A.    Yes.

4      Q.    And you've indicated already that you're a very,

5  very good student, is that true?

6      A.    Yes.

7      Q.    As a matter of fact, your grades for 2008-2009

8  were A minus in English, A for yearbook, whatever that is, A

9  minus in dear/ADV, B plus for teach port; B in leadership, B

10  in government, B plus in senior math, but C plus in phys ed.

11  That's the only thing you really didn't do well.

12          Would that be fair?

13      A.    That was first marking period, yes.

14      Q.    So you did very well there, right?

15      A.    Yes.

16      Q.    And for 2008 and 2009 the final grade was A in

17  English, A in yearbook, A minus in dear/ADV, whatever that

18  is, A plus in teach port, A minus in leadership, A plus in

19  government, B plus in psychology, A minus in senior math and

20  B plus in phys ed, you've improved in that, correct?

21      A.    Yes.

22      Q.    Okay.  That was 2008 to 2009.

23          And your attendance was very good then, no?

24      A.    Yes.

25      Q.    Okay.  Now, 2008, Term 1 -- incidentally, when

ws

1    does the first term in 2008 go to?

2              From when to when?

3         A.   First term is September to --

4         Q.   January or so?

5         A.   January or December.

6         Q.   Okay, now, in that time you got A, A -- I'm sorry

7    I should say for what. An A in English, an A in yearbook, A

8    minus in dear ADV, A plus in teach port, A minus in

9    leadership, A plus in government, B plus in psychology, A

10   minus in senior math and B plus in phys ed.

11             Do you remember those grades?

12        A.   Isn't that the second marking period of 2008?

13        Q.   Term 1.

14        A.   Could I see it?

15        Q.   Sure.

16             MR. SCHECHTER:  Okay, may I?

17             THE COURT:  Yes.

18             (Shown to witness.)

19        A.   These are the same grades from before.  These are

20   just the averages.

21        Q.   Why don't you --

22             MR. SCHECHTER:  May I have that marked for

23        identification, your, as Defendant's --

24             THE COURT:  Defendant's F for ID.

25             MR. SCHECHTER:  Thank you, Judge.

1                    (Defendant's Exhibit F marked for

2          identification.)

3                    (Shown to witness.)

4          Q.    Do you recognize that?

5                Is that document I gave you a transcript of your

6      grades?

7          A.    Yes.

8                    MR. SCHECHTER:  I offer that in evidence as

9                Defendant's F.

10                    If counsel wants, I will -- may I approach

11                counsel?

12                    (Shown to counsel.)

13                    MR. SCHECHTER:  Certification.

14                    (Shown to counsel.)

15                    THE COURT:  Any objection, Ms. Johnson?

16                    MS. JOHNSON:  No.

17                    MR. SCHECHTER:  Great.

18                    THE COURT:  Defendant's F will be received in

19          evidence.

20                    MR. SCHECHTER:  Thank you.

21                    MS. JOHNSON:  This page alone?

22                    MR. SCHECHTER:  Let the record reflect I've

23          shown counsel a certification of this part of the

24          records.

25          Q.    Sana, please look at that?

                                                        ws

Awan - People - cross                     505

1          COURT REPORTER:  I didn't mark it.

2               (Defendant's Exhibit F received in evidence.)

3               (Shown to witness.)

4     Q.    Sana, you have that in front of you?

5     A.    Yes.

6     Q.    Now, would you please read -- I've already read

7     the grades for 2008.

8               Did I read Term 1 or Term 2?

9               On the top.

10    A.    You read Term 1.

11    Q.    Okay, please read your grades for Term 2?

12    A.    That's of 2007.

13    Q.    All right.

14    A.    You want me to read 2007?

15    Q.    Yes.

16    A.    A minus in English, a pass in writing workshop, an

17    A in dear, B minus in global, B plus in math, B plus in

18    health, B plus in gym, passing in chemistry lab and A in

19    chemistry.

20    Q.    Okay, continue.  Please read the rest of your

21    grades to the jury and the year of when you had those

22    grades?

23    A.    Term 1 in 2007, A minus in English, A in writing,

24    B plus in dear, B minus in global, A minus in Math B, C plus

25    in health, A minus in gym, passing in chemistry lab, A minus

ws

1    in chemistry.

2         Q.   Keep going.

3         A.   Term 1 2006, A minus in English, passing in

4    writing, B minus in Spanish, B plus in dear, A minus in

5    global, B plus in math, B in gym, B minus in earth science.

6    B in theater.

7              Term 2 2005, B in English, B in science fiction, A

8    in dear, A minus in American history, B minus in Math B -- I

9    mean, Math A, C in gym, A plus in living environment.

10             And Term 1 of 2005, B minus in English, A in

11   science fiction, B plus in dear, A minus in American

12   history, A minus in Math A, A minus in gym and A minus in

13   living environment.

14        Q.   Is that it?

15        A.   You want my regents grades, too.

16        Q.   Sure.

17        A.   Global history is a 92, gym, I think, is a -- oh,

18   no, I'm not sure what class that is.  It says PH, 74.

19   English I got an 84, Math A 78.  I think it's living

20   environment 74, US history 85, living environment 85.

21        Q.   Thank you.

22             Now, your grades pretty much have gone up since

23   2005, gone between A and B minus, C -- your grades are

24   almost straight A by now, right?

25        A.   Yes.

1      Q.   Now, your parents, both your mother and

2   Mr. Gopaul, insisted that school come first, would that be

3   fair to say?

4        A.   Yes.

5        Q.   As a matter of fact, not only did they insist that

6   school come first, they did not let you go out with your

7   friends, isn't that correct?

8        A.   Yes.

9        Q.   Matter of fact, you had complained that your life

10  is a boredom, doldrums.  You complained that you had no

11  friends because you were forced to go in and study, isn't

12  that right?

13       A.   No.

14       Q.   That's not right?

15       A.   No.

16       Q.   The only activities you were able to do would be

17  school clubs and things of that nature, correct?

18       A.   Yes.

19       Q.   And you indicated that Harold had taken you to

20  school for quite a -- how many years?

21       A.   Since 2005.

22       Q.   Sorry?

23       A.   Since 2005.

24       Q.   Well, yeah --

25       A.   And even before that.

ws

Awan - People - cross                     508

1        Q.    So he took to you school regularly?

2        A.    Um-hum.

3        Q.    As a matter of fact, you used to look forward for

4   Harold taking you to school, correct?

5        A.    Yes.

6        Q.    And picking you up?

7              Did he pick you up as well?

8        A.    Sometimes.

9        Q.    Didn't he pick you up all the time?

10       A.    Sometimes.  On days I had late classes because I

11  have to take the bus and after school ended at 6 sometimes,

12  so I got a ride home.

13       Q.    You looked forward to him picking you up, did you

14  not?

15       A.    Yes.

16       Q.    As a matter of fact, you really loved your

17  stepfather, right?

18       A.    Yes.

19       Q.    Now, there came a time when you wrote poems, isn't

20  that right?

21       A.    Yes.

22       Q.    Let me ask you if this is your poem.  I'm

23  interested only in the first paragraph.

24             MS. JOHNSON:  I don't even know what he's

25       talking about, so I don't know what the first paragraph

                                                    ws

1          is.

2              Q.   Let me ask you if this is your poem.

3                      MR. SCHECHTER:   Let me have this marked for

4          identification as Defendant's G?

5                      THE COURT:   Defendant's G.

6                      (Defendant's Exhibit G marked for

7          identification.)

8                      (Shown to witness.)

9              Q.   You recognize that?

10             A.   Yes.

11             Q.   Now, I would like you to read the first four lines

12         of that poem?

13                     MS. JOHNSON:   Objection.

14                     THE COURT:   Yeah, sustained.

15             Q.   What is that you're looking at?

16             A.   It's a poem I had to do in English class and it

17         had to reflect who you are, so you have to talk about your

18         hobbies, things you like to do with your family, your

19         favorite foods, just things about you.

20             Q.   And when was that written?

21             A.   I think it was my sophomore or junior year.

22             Q.   Look at the book.  It says what date that was.

23             A.   There's no date.  Yeah, it's the "Where I'm From"

24         poem.

25                     THE COURT:   You have to speak up.

                                                        ws

1                THE WITNESS:  It's my "Where I'm From" poem,

2       so it's my sophomore year.

3       Q.    That's your writing?

4       A.    Yes.

5                MR. SCHECHTER:  I offer that in evidence as

6       Defendant's G.

7                THE COURT:  All right, show it to

8       Ms. Johnson.

9                (Shown to counsel.)

10               MS. JOHNSON:  Is he offering the entire book

11      or just that page?

12               MR. SCHECHTER:  Just that particular poem.

13               MS. JOHNSON:  Can I have a voir dire, please?

14               MR. SCHECHTER:  Sure.

15               THE COURT:  Yes.

16      VOIR DIRE EXAMINATION

17      BY MS. JOHNSON:

18      Q.    Sana, what is this book?

19      A.    It was just a journal I got for Christmas and when

20      we wrote poems in English -- we had a whole poem unit and we

21      had to write, like, various poems and I just liked them so I

22      copied them into my journal.

23      Q.    Where did you keep this book?

24      A.    In my room.

25      Q.    When is the last time you saw it?

ws

Awan - People - cross                511

1       A.    When I left my house.

2       Q.    Did you give this book to anybody?

3       A.    No.

4       Q.    Did you give it to the defense attorney?

5       A.    No.

6       Q.    Do you know how it got to him?

7       A.    I would say --

8       Q.    If you know?

9       A.    No, I don't know.

10              MS. JOHNSON:   We would object to this going

11      into evidence, both -- as hearsay.

12              MR. SCHECHTER:   It's not hearsay, Judge.

13              THE COURT:   Hold on.   Let me see both of you

14      real quick.

15              Ms. Awan, if you could just have a seat

16      there?

17              (Witness steps down.)

18              (Sidebar conference held as follows:)

19          MR. SCHECHTER:   I'm only concerned with the first

20      four lines, Judge.

21              (Shown to Court.)

22              MR. SCHECHTER:   I'm only concerned with the

23      first four lines.

24              MS. JOHNSON:   I want to see it, too.

25              (Pause in the proceedings.)

Awan - People - cross          512

1           THE COURT:  And she's testified as to when

2      this was done?

3           MR. SCHECHTER:  Sophomore year, 2006-2007.

4      It's between the time she was alleged to have had this

5      happened to her.

6           THE COURT:  The offer with respect to the

7      first four lines is what?

8           MR. SCHECHTER:  The fact that she was looking

9      forward to being in her father's van, this is contrary

10     to the fact that she was afraid of having her father in

11     the van with her.  She said she's looking forward to

12     sleeping in the back seat.

13          THE COURT:  Well, if it's sophomore year

14     isn't it all predating this incident?

15          MS. JOHNSON:  Yes, Judge.

16          MR. SCHECHTER:  She was allowed to go into

17     2005, what happened before, so am I, as she was

18     allowed.

19          THE COURT:  The offer is that it's

20     inconsistent with her not wanting to get into the van.

21          Obviously, it's at this point, none of these

22     allegations have occurred, so it, to me, would seem to

23     be, if you will, a mischaracterization under the

24     context in which you offer it.

25          MR. SCHECHTER:  Because if she's been saying

ws

Awan - People - cross            513

1    he's doing these things to her from 2005 onward, then

2    she wouldn't want to be in the back of the van

3    sleeping, she wouldn't trust him.  She went through all

4    of this horrible stuff and there she is in one of her

5    unguarded moments talking about looking forward to

6    sleeping in the van.

7                MS. JOHNSON:  But she's saying this in 2005.

8                MR. SCHECHTER:  No, 2006.

9                MS. JOHNSON:  It doesn't matter.  These

10   allegations are 2008.  There's no testimony about her

11   going into a van.

12              If he wants to confront her with it he can,

13   but to admit that in and, in fact, the only purpose

14   your Honor was letting us get into the other

15   information was to show -- was for the narrative and

16   for limited purposes.

17              He's offering this to impeach her with stuff

18   before the dates in the indictment and he hasn't even

19   confronted her with it.

20              THE COURT:  It seems to me, and correct me if

21   I'm wrong, but it seems to me the testimony is that it

22   isn't really until 2007 that she starts getting taken

23   out to Nassau County and obviously the indictment

24   speaks of 2008, a year ago.  This, to me, seems like

25   that all precedes the getting into the van.

                                                    ws

Awan - People - cross                514

1              MR. SCHECHTER:  But she has testified to,

2       over objection, permitted to testify to, sexual acts

3       that began before 2008 and I am allowed, if she was

4       terrorized to this degree as she was -- as counsel made

5       it seem, that she didn't want to be around her

6       stepfather, that belies what she's saying because that

7       is an indication that she's looking forward to --

8              MS. JOHNSON:  In 2005.

9              THE COURT:  You know what?

10             I'm going to allow it over the DA's

11      objection.

12             The only issue is how are we going to present

13      this to the jury?

14             MR. SCHECHTER:  I'm just going to ask her to

15      read the first four lines.

16             THE COURT:  And as far as the timing of this

17      or when it takes place you can explore on redirect

18      examination.

19             MS. JOHNSON:  Okay, very good.

20             (Sidebar conference concludes.)

21             THE COURT:  All right, Mr. Schechter, just so

22      the record is clear, you're offering from

23      Defendant's G, it's been marked up to now as

24      identification, you are offering the first four

25      lines --

                                                        ws

1            MR. SCHECHTER:  First four lines.

2            THE COURT:  -- of that particular passage

3       that's contained in that book?

4            MR. SCHECHTER:  Yes, your Honor.

5            THE COURT:  All right, so that will be

6       granted over objection.

7            THE WITNESS:  Can I say something, your

8       Honor?

9            THE COURT:  No, wait until the attorney asks

10      questions.

11              (Defendant's Exhibit G received in evidence.)

12            MR. SCHECHTER:  May I continue, your Honor?

13            THE COURT:  Yes.

14      Q.   Sana, would you please read the first four lines

15 in a loud voice?

16      A.   I am from the radio where my thoughts vacation to

17 a place without worry.  I am working nights with my dad and

18 sleeping on the hard back seat.

19      Q.   Thank you.

20      A.   Can I say something?

21            THE COURT:  No.  Just wait until a question

22      is posed or when the Assistant District Attorney

23      questions you.

24      Q.   Now, Sana, you've indicated that you, in 2005, you

25 sat -- you were put on a hamper by your father, is that

Awan - People - cross                516

1    correct?

2        A.   Yes.

3             MR. SCHECHTER:  I ask this photograph be

4        marked as Defendant's Exhibit H, please.

5             THE COURT:  Defendant's H.

6             (Defendant's Exhibit H marked for

7        identification.)

8             MR. SCHECHTER:  Please show that to the

9        witness.

10            (Shown to witness.)

11       Q.   Do you recognize that photograph, Sana?

12       A.   Yes.

13       Q.   What is that a photograph of?

14       A.   The bathroom.

15       Q.   And does that photograph accurately reflect the

16   bathroom -- how your bathroom looked in 2005?

17       A.   No.

18       Q.   What's different?

19       A.   We hadn't remodeled the bathroom yet and there was

20   a pink hamper where that white one is.  We replaced it with

21   the cupboard.

22       Q.   When?

23       A.   I'm not sure what year.

24            MR. SCHECHTER:  Can I have this marked,

25       please?

ws

Awan - People - cross                517

1               (Defendant's Exhibit I marked for

2          identification.)

3          Q.    Is that the item you classify as a hamper, Sana?

4          A.    No.

5          Q.    What does the hamper look like?

6          A.    It was pink and it was hard plastic and it had

7     like a crossing, like -- like in the front of it had like a

8     pattern and there was holes and just the top was flat and it

9     had a cover like a garbage bin.

10         Q.    Thank you.

11              Now, how many times have you been with your

12    stepfather to Community Drive from 2005 to 2008?

13         A.    About ten times.

14         Q.    And you told Detective Shulman and Detective Moran

15    that you thought it was 300 or 400 Community Drive, is that

16    correct?

17         A.    I said I wasn't sure what address, but when we had

18    passed, when I was on my way to the hospital, I saw it and I

19    think it said 300 or 400 so I told him after.

20         Q.    Well --

21              MR. SCHECHTER:  May I approach the witness?

22              THE COURT:  Yeah.

23              You want something marked, Mr. Schechter?

24              MR. SCHECHTER:  Yeah, I suppose we could have

25         this marked, deemed marked or have it marked, as

                                                           ws

1       Defendant's J.

2                    THE COURT:  All right, Defendant's J for ID.

3                    (Defendant's Exhibit J marked for

4       identification.)

5       Q.    Now, do you see that yellow marked area?

6       A.    Yes.

7       Q.    Does that refresh your recollection about whether

8       or not you told Detective Moran and Detective Shulman that

9       you believed it occurred at three or 400 Community Drive?

10      A.    Yes.

11                   MS. JOHNSON:  Objection, she didn't ask for

12           her recollection to be refreshed.

13                   THE COURT:  Yeah, sustained.

14      Q.    Do you know whether you told Detective Shulman or

15      Detective Moran whether or not this occurred -- you think it

16      was three or 400 Community Drive?

17      A.    Yes.

18      Q.    So that's what you told them, right?

19      A.    Yes.

20      Q.    Each one, correct?

21      A.    Yes.

22                   MR. SCHECHTER:  Thank you.

23                   May I have that back, please?

24                   (Shown to counsel.)

25      Q.    Now, your father has been -- that's a regular

                                                           ws

Awan - People - cross                    519

1    customer of your father, is it not?

2            That's a regular customer of your father, the area

3    in Community Drive, correct?

4        A.   I'm not sure.

5        Q.   Well, you ascertained later that the -- your

6    father -- your stepfather's customer is at 600 Community

7    Drive, would that be fair to say?

8        A.   No.

9        Q.   No?

10       A.   600 Community Drive?

11       Q.   Yes.

12       A.   I never said that.

13       Q.   Were you ever shown an aerial photograph of an

14   area?

15       A.   Yes.

16               MR. SCHECHTER:   Can I have a moment, Judge,

17       please?

18               (Pause in the proceedings.)

19               MR. SCHECHTER:   Could I have this marked,

20       please?

21               THE COURT:   Defendant's K.

22               (Defendant's Exhibit K marked for

23       identification.)

24       Q.   Now, do you recognize that photograph?

25               (Shown to witness.)

Awan - People - cross                    520

1          A.   It doesn't show the full building so I'm not sure
2     if this is it, the same building, but it had windows like
3     that.
4                    MR. SCHECHTER:   If I may?
5                    I would like this marked as Defendant's K.
6                    THE COURT:   L.
7                    (Defendant's Exhibit L marked for
8            identification.)
9                    (Shown to witness.)
10                   THE COURT:   Okay, she has Defendant's L.
11         Q.   Is that a better representation of the area?
12         A.   Yes.
13         Q.   And, if I told you that was 600 Community Drive,
14    would that refresh your recollection?
15         A.   I didn't know the address, but I knew it was on
16    Community Drive because that was the street we were driving
17    down.
18              The address is not posted on the building so there
19    was no way for me to know that anyway and from the parking
20    lot there is no writing on the building.
21                   MR. SCHECHTER:   Can I have this marked,
22           please, as Defendant's L?
23                   THE COURT:   It's M.
24                   MR. SCHECHTER:   I'm really behind the times
25           here.   L was the second photo.

                                                           ws

Awan - People - cross                521

1                    (Defendant's Exhibit M marked for

2            identification.)

3                    (Shown to witness.)

4        Q.    See that number?

5        A.    Yes.

6        Q.    Did you notice that number?

7        A.    No.

8        Q.    Ten times that you went to that area you never

9    noticed that number?

10       A.    What street is it on?

11             What street is that?

12       Q.    If I were to tell you it's on Community Drive --

13                   MS. JOHNSON:   Objection.  Objection.

14       Q.    -- would that refresh your recollection?

15                   THE COURT:   I'll allow that.

16       A.    I know it was on Community Drive, but I've never

17   seen the number so I wouldn't know and the entrance we would

18   always go through, there was bushes.

19             So if this is an entrance here, this is not the

20   one I entered from.

21                   THE COURT:   All right, so the point is you

22           don't recognize that photograph or at least what's

23           depicted there, the number?

24                   THE WITNESS:   Right.

25       Q.    When your father would go there would he go in to

                                                            ws

Awan - People - cross          522

1    sign in at the desk?

2         A.   No.

3         Q.   He wouldn't do that?

4         A.   No.

5                   MR. SCHECHTER:  If I may, please, one moment?

6                   (Pause in the proceedings.)

7                   MR. SCHECHTER:  Your Honor, I have a

8         certified business record which has been supplied to me

9         from 600 Community Drive.

10                  MS. JOHNSON:  I'm going to object to a speech

11        in front of the jury, Judge.

12                  THE COURT:  Yeah.

13                  Are you making an offer?

14                  MR. SCHECHTER:  I'm going to offer this.

15                  THE COURT:  Yes, so why don't you come up

16        with that?

17                  (Witness steps down.)

18                  (Sidebar conference held as follows:)

19                  (Shown to Court.)

20                  THE COURT:  Why don't you tell us what it is?

21                  MR. SCHECHTER:  That's a certified record of

22        a sign-in sheet from Community Drive from the business

23        that's located at 600 Community Drive where my client

24        had the service.  It's a certified record.  I have the

25        certification right there on the front.

Awan - People - cross          523

1               (Pause in the proceedings.)

2               THE COURT:  For what time period?

3               MR. SCHECHTER:  It's February to the end --

4       to June, before he got arrested, Judge.

5               THE COURT:  Okay.

6               MR. SCHECHTER:  I just brought the whole

7       thing in, the entire record that I received.

8               THE COURT:  It seems to cover dates in May --

9               MR. SCHECHTER:  Um-hum.

10              THE COURT:  -- and June.

11              There does appear to be different points in

12      time where the defendant signed in at this location.

13              Do you want to take a look at it, People?

14              MS. JOHNSON:  I want to know the offer of

15      proof as to this.

16              MR. SCHECHTER:  It's obviously got his

17      signing in on some of the dates charged in the

18      indictment.

19              MS. JOHNSON:  Is this alibi information or

20      what's the point?

21              MR. SCHECHTER:  She just testified that he

22      never signed in during this time and I'm showing that

23      he does sign in, that's the place where he signs in.

24              THE COURT:  Is there any indication that she

25      used to go inside into the building with him?

ws

1          MR. SCHECHTER:  No, she didn't.

2          THE COURT:  So she wouldn't know.

3          MR. SCHECHTER:  She said he never went in to

4     sign in.

5          MS. JOHNSON:  But I think we're putting the

6     cart before the horse.  He has to ask her did she go in

7     with him and see him sign.

8          I'm going to object to these going in anyway

9     without the proper foundation and --

10          MR. SCHECHTER:  It's a business record

11     certification.

12          MS. JOHNSON:  Yes, and you need -- my

13     understanding is that you need a witness for that and,

14     number two, he can't --

15          MR. SCHECHTER:  I tried to avoid

16     inconveniencing them.

17          MS. JOHNSON:  I've never seen them. I would

18     like to at least look through them.

19          So if she was never in the building to see

20     him sign in --

21          MR. SCHECHTER:  She just testified he never

22     left the cab of the vehicle to sign in.

23          MS. JOHNSON:  That's not what she said.

24          THE COURT:  Before we get to the issue of

25     relevancy, do you have any objection?

Awan - People - cross                    525

1                MS. JOHNSON:  I have an objection.
2                THE COURT:  To the foundation?
3                MS. JOHNSON:  Foundation, improper
4       impeachment and if there's anything in here, because
5       I'm seeing it for the first time, about May through
6       June of 2008.
7                     Is there anything in here that you're
8       offering for those dates?
9                MR. SCHECHTER:  Um-hum.  It's February
10      through June.  That's what they sent me.
11               MS. JOHNSON:  I'm going to object to them.
12               MR. SCHECHTER:  I don't care about February
13      through April.
14               THE COURT:  I'm going to sustain the
15      objection.  I think the People are at least entitled to
16      ask this person who did provide you with, you know,
17      these in written form that these seemingly meet the
18      business rule exception -- I think they're entitled, if
19      they're going to object, to at least have an
20      opportunity to --
21               MR. SCHECHTER:  I'll have to call them, okay.
22               MS. JOHNSON:  I'm going to ask for a copy,
23      too, so we don't waste any time.
24               THE COURT:  Yes.
25                    (Sidebar conference concludes.)

                                                    ws

1              (Witness resumes the stand.)

2         Q.   Now, Sana, as I -- as we discussed before, you

3    were a very good student and you're in school virtually

4    every day of the week, is that true?

5         A.   Yes.

6         Q.   Did you ever tell either your teacher or guidance

7    counselor or dean or anyone else of what was going on?

8         A.   No.

9         Q.   You had a favorite teacher, did you not?

10        A.   No.

11        Q.   You didn't have a favorite teacher?

12        A.   No.

13        Q.   Who was giving you recommendations?

14        A.   I had recommendations -- academically I had

15   favorite teachers -- well, not favorite teachers, but they

16   favored me and they'll write recommendations, but I didn't

17   have any teachers I trusted with my personal life.  I'm not

18   going to come up one day and start talking about what's

19   happening at home.

20        Q.   Well, Sana, you've testified in court to something

21   pretty terrible happening to you over a three-year period.

22             Would that be true?

23        A.   Yes.

24        Q.   And during that three-year period when this was

25   happening to you you never once, not once, told your mother?

Awan - People - cross                527

| 1 | A. | No. |

1    A.   No.

2    Q.   Told Christine?

3    A.   No.

4    Q.   Told school?

5    A.   No.

6    Q.   Told the dean?

7    A.   No.

8    Q.   As a matter of fact, Mr. Gopaul wasn't with you 24

9    hours, seven days a week, all the time, was he?

10   A.   No.

11   Q.   And you indicated earlier on your direct

12   examination, I think, that you had a boyfriend?

13   A.   Yes.

14   Q.   When did this relationship begin?

15   A.   Around April.

16   Q.   Of 2008?

17   A.   Yes.

18   Q.   And did your mom meet this boy?

19   A.   No.

20   Q.   Your mom never met this boy?

21   A.   No.

22             MR. SCHECHTER:  May I have a moment, Judge?

23             THE COURT:  Yes.

24             (Pause in the proceedings.)

25   A.   She's never met him.  She --

                                                    ws

Awan - People - cross          528

1      Q.    There's not a question.

2            Do you recall earlier I asked you a question, you

3      testified in a previous proceeding --

4                  MR. SCHECHTER:  Page 062, counsel.

5      Q.    "Question:  In May of 2008 I want to turn your

6      attention to when you were in school.  Did there come a

7      time when your mother came to pick up in May and you

8      were with a boy outside of your school?

9            "Answer:  Yes."

10           Do you recall telling that in a previous

11     proceeding?

12     A.    No.

13                 MR. SCHECHTER:  May I show it to the witness,

14     please?

15                 THE COURT:  Yes.

16                 (Shown to witness.)

17     A.    My mother was not the one that picked me up.

18     Q.    That's not the question, Sana.

19     A.    Then what's the question?

20     Q.    Did you say that in that proceeding?

21     A.    Evidently.

22     Q.    Yes or no?

23     A.    Yes.

24                 MR. SCHECHTER:  May I have that back, please?

25     Q.    Both your mother and Harold forbade you from

                                                          ws

1    having a boyfriend, isn't that true?

2         A.   No.

3         Q.   That's not true?

4         A.   They never told me that I couldn't have a

5    boyfriend and they never mentioned anything about dating.

6    So they never told me flat out, "You can't date."

7         Q.   They never told you that?

8         A.   No.

9         Q.   Did you ever express that you were afraid to bring

10   a male into the house because they were afraid it would be a

11   boyfriend?

12             Did you ever say those words?

13        A.   No.

14        Q.   Did you date?

15        A.   Yes.

16        Q.   With your parents permission?

17        A.   No.

18        Q.   Why, if they didn't object, did you not date with

19   their permission?

20        A.   Can you clarify?

21        Q.   Sure.  If you didn't have your parent's

22   permission -- but you went on dates anyway, is that correct?

23        A.   Well, I didn't go on dates.

24        Q.   You didn't go on dates?

25        A.   No.

                                              ws

Awan - People - cross                          530

1        Q.    Where did you go?

2        A.    We just spent a lot of time together.

3        Q.    Would this be at your house?

4        A.    No.

5        Q.    Did you bring him home?

6        A.    No.

7        Q.    But your parents never objected to your dating,

8    you're saying?

9        A.    They never told me before I said that I had a

10   boyfriend.

11       Q.    So after you said you had a boyfriend then they

12   forbade you from dating?

13       A.    Well --

14       Q.    It's a yes or no, Sana?

15       A.    No.

16       Q.    Did your mother tell you she did not want to you

17   go out?

18       A.    No.

19       Q.    Did Mr. Gopaul tell you he didn't want you to go

20   out?

21       A.    No.

22       Q.    Sana, you saw that knife in that van for a long

23   time before, didn't you?

24       A.    No.

25       Q.    You were in that van ten times.

                                                              ws

Awan - People - cross                531

1              You never saw that knife?

2         A.   Regarding what dates?

3         Q.   Sorry?

4         A.   Regarding what dates?

5         Q.   Any time prior to when you say Mr. Gopaul

6    threatened to cut your finger off?

7         A.   Only as of May 2008.

8         Q.   You never saw that before?

9         A.   No.

10        Q.   And you were in your father's van how long?

11        A.   Frequently.

12        Q.   Sorry?

13        A.   Frequently.

14             MR. SCHECHTER:  May I have a moment, Judge?

15             THE COURT:  Yes.

16             (Pause in the proceedings.)

17        Q.   Now, you say you didn't have a close relationship

18   with your mother?

19        A.   No.

20        Q.   You take videos of the family?

21        A.   Yes.

22        Q.   Frequently, is that correct?

23        A.   Around --

24        Q.   Sorry?

25             THE COURT:  She hasn't answered.

Awan - People - cross                    532

1        A.    Somewhat.

2        Q.    How often did you take videos?

3        A.    It wasn't on a regular basis, but when we went to

4   parties, any special occasions, if me and my sister were

5   playing around we made a video.

6        Q.    Now, there are times you went to family functions

7   that involved dancing, is that correct?

8        A.    Yes.

9        Q.    And you enjoyed dancing.  I believe, it may be

10  Indian or Trinidadian dancing?

11       A.    Yes.

12       Q.    And you did that frequently?

13       A.    Yes.

14       Q.    And you enjoyed dancing with your stepfather, too,

15  would that be correct?

16       A.    In what way?

17             Dancing, it's dancing separately.  It's not

18  dancing together like a waltz, it's dancing separately.

19       Q.    You enjoyed dancing with your stepfather?

20       A.    It wasn't necessarily with him.  We can all be on

21  the floor together, but --

22       Q.    Did you enjoy dancing with -- did you enjoy

23  watching your stepfather dance?

24       A.    No.  I mean, it's not an enjoyment, it's not a

25  hobby, you just watch someone dance.

                                                    ws

Awan - People - cross                    533

1       Q.   Did you take photos of him dancing?

2       A.   Yes.

3       Q.   Did you take videos of him dancing?

4       A.   Yes.

5       Q.   Did you take videos of him in the pool with

6   Darien?

7       A.   Oh, yeah.

8       Q.   Did you -- and you took videos of him with your

9   mother?

10      A.   Yes, family memories.

11      Q.   Now, when you went out to the van what, if

12  anything, did you see Police Officer Alfaro do?

13      A.   I was standing in front of her so I couldn't see

14  her do anything.

15          I know we walked out together and I believe

16  Detective Shulman was with us and then I looked into the

17  window and I saw the items, I pointed them out, and that was

18  it, we went back into the precinct.

19              MR. SCHECHTER:   May I have a moment, Judge?

20              THE COURT:   Yes.

21              (Pause in the proceedings.)

22              MR. SCHECHTER:   I would like these

23          photographs marked respectively.

24              (Defendant's Exhibits N through Q marked for

25          identification.)

1                    (Shown to witness.)

2         Q.   Sana, look at photo N.

3              What is that a picture of?

4         A.   My stepfather.

5         Q.   And who took that picture?

6         A.   I mean, I don't remember.  This is like a year

7    ago, so --

8         Q.   You don't remember if you took that picture?

9         A.   No.

10        Q.   Isn't it a fact that you took that picture?

11                  MS. JOHNSON:  She just said -- objection.

12                  MR. SCHECHTER:  This is cross-examination,

13             your Honor.

14                  THE COURT:  Wendy, what was the question

15             again?

16                  (Record read.)

17                  THE COURT:  All right, the objection is

18             overruled.

19                  Do you remember taking that picture,

20             Ms. Awan?

21                  THE WITNESS:  No.

22        Q.   You don't remember taking that picture, okay.

23             Look at O.

24        A.   Yes.

25        Q.   What's that a picture of?

                                                        ws

1      A.   My brother and sister were putting hair ties in my
2      stepfather's hair.
3           Q.   You remember that picture?
4           A.   Yes, I remember it, but I believe my mother took
5      this picture because they were all in the room together.
6           Q.   Your mother took that picture.
7                You didn't take that picture?
8           A.   I may have.
9                But what relevance does it have if I took a
10     picture?
11                    MR. SCHECHTER:   Objection, not responsive.
12                    THE COURT:   Yeah, the last portion is
13          stricken.
14                    Go ahead, Mr. Schechter.
15          Q.   So you may have taken that picture?
16          A.   Maybe.
17          Q.   P, look at P?
18          A.   Yes.
19          Q.   What is that a picture of?
20          A.   My brother and sister with their Halloween
21     costumes and a picture with their father in it.
22          Q.   Who took that picture?
23          A.   I may have taken it.
24          Q.   Thank you.
25                Now, Q, what's Q a picture of?

ws

Awan - People - cross          536

1        A.    My mother wanted us to take pictures --

2        Q.    What is this a picture of?

3        A.    A picture of me, my brother and sister in Ecolab

4   stuff.

5        Q.    And who took that picture?

6        A.    My mother.

7        Q.    And what is the purpose of that picture?

8        A.    It was for his Father's Day because --

9        Q.    Father's Day?

10       A.    Right.

11       Q.    And you gave that to him as a Father's Day card,

12  is that correct?

13             MS. JOHNSON:  Objection.

14       A.    I --

15             THE COURT:  Hold it.

16       A.    I didn't --

17             THE COURT:  Overruled.

18             Go ahead, you can answer.

19       A.    I didn't give it to him.  I mean, my mother wanted

20  to give him pictures of us in Ecolab.  It was her idea.

21  It's Father's Day, so we took pictures in his uniform.

22       Q.    You took pictures in the uniform with the other

23  children?

24       A.    Because my mother told me to take them --

25       Q.    And --

Awan - People - cross           537

1           THE COURT:  Mr. Schechter, would you allow
2       her to finish the answer, please?
3           A.   Because my mother told me to take them and print
4       them out and make a card out of it.
5           Q.   But you didn't want to do it?
6           A.   I didn't not want to.  He still was my father
7       so -- and my mother told me to do it.  I can't just --
8           Q.   Were you forced to take that picture?
9           A.   No.
10          Q.   Were you forced to give that to him as a Father's
11      Day card?
12          A.   No.
13          Q.   Is that the card that someone gives a father who
14      sexually abuses, Sana?
15              MS. JOHNSON:  Objection.
16              THE COURT:  Yeah, sustained.
17              All right, Mr. Schechter, I think this is a
18          good time to break for our luncheon break.  It looks
19          like it's 12:30, so just mark your spot.
20              All right, members of the jury, we're going
21          to take your lunch break.  Fortunately, the weather
22          looks like it's going to cooperate, hopefully, over the
23          next couple of days.
24              So as I let you go, please don't talk amongst
25          yourselves or with anyone else about the case.

                                                        ws

1          Please, please, do not form any opinions

2     about the case at this point and please don't view or

3     visit any of the areas testified to or described at

4     this particular time.

5          Okay, so watch your step as you step out.

6     Have a good lunch.  We'll see you back here at

7     2 o'clock.

8               (Jury exits.)

9          THE WITNESS:  Excuse me, am I allowed to

10    speak to my lawyer -- to the DA?

11         THE COURT:  Not at this point.

12         Just so the record is clear, Mr. Schechter,

13    Ms. Johnson, the witness has asked if she could speak

14    to Ms. Johnson.

15         Obviously, my direction is that she's not to

16    speak to Ms. Johnson about her testimony.

17         MR. SCHECHTER:  Not only is Ms. Johnson here,

18    but I believe Ms. Awan's Family Court lawyer is here.

19    I respectfully ask that this matter not be discussed

20    with the Family Court lawyer during the presence of

21    these proceedings.

22         THE COURT:  Well, I have no idea whether a

23    Family Court lawyer is here or not.

24         MR. SCHECHTER:  I do.

25         THE COURT:  Mr. Schechter, if you would allow

Awan - People - cross          539

1        me -- I'm directing you, Ms. Awan, not to speak about

2        your testimony concerning this case to anybody, whether

3        it's the DA or anybody else, okay?

4                    THE WITNESS:  Okay.

5                    THE COURT:  So you're excused for now.  We'll

6        see you back here at 2 o'clock.  You can wait outside

7        in the hall for the Assistant.

8                    MS. JOHNSON:  You can go to lunch.  I'll meet

9        you outside.  Just watch your step.

10                   THE WITNESS:  I have a question about, it's

11       not my testimony, it's just like about the evidence.

12                   THE COURT:  I can't discuss with you about

13       anything that's happening with respect to the trial, so

14       if you would, just step outside and just wait for

15       either Ms. Johnson or whoever else is waiting outside.

16                   (Witness steps down.)

17                   MS. JOHNSON:  Can I make sure somebody is

18       outside?

19                   THE COURT:  Mr. Schechter, in light of the

20       witness obviously acknowledging that she did dance with

21       her father -- her stepfather and others, I take it that

22       this DVD that you were looking to play, is it still

23       your intention to play it with this witness?

24                   MR. SCHECHTER:  Yes.

25                   THE COURT:  And for what reason?

                                                        ws

Awan - People - cross          540

1          MR. SCHECHTER:  The DVD is being used to show

2     that during the times that counsel has, in fact, said

3     that these acts were allegedly occurring, she not only

4     took -- she's dancing with her father, she's also

5     taking pictures.

6          I will explain to the Court which pictures

7     I'm showing; pictures of her brother swimming to her

8     father, concentrating on her father.  There are

9     pictures on here of her father and her mother with the

10     father and the mother and she's saying kiss them.

11          THE COURT:  All right, just tell them to wait

12     for a second.

13          MR. SCHECHTER:  Kiss them, kiss them,

14     pictures encouraging her father to dance.

15          There are pictures of her concentrating on

16     her mother, for her mother to dance.

17          She's testifying, basically, that her mother

18     is Simon Legre, she's testified she has no relationship

19     with her mother, she testified my client is this

20     horrible sexual pervert.

21          All of these pictures that are here are

22     designed to negate this picture that the complaining

23     witness, with the support of the District Attorney, has

24     painted of my client from the time she alleges to --

25     until the time where he is arrested.  These are videos

ws

1      that she took.

2                THE COURT:  Well, the fact that she may have

3      taken them -- my question to you is this.

4                She doesn't seem to deny these pictures being

5      taken of her, so I don't know what your offer is, at

6      least through her.  It certainly wouldn't sound to me

7      as though it's inconsistent with her testimony that you

8      presented to her as far as being in these videos or

9      perhaps taking the videos.  I don't even know whether

10     or not she acknowledged taking the videos.

11               MR. SCHECHTER:  Yes, she did.  The video

12     cannot be described.  The video, like a videotaped

13     confession, must be seen and I believe that this jury

14     is entitled to see during the time that this

15     complainant said she was abused.

16               THE COURT:  Well, I'm not questioning --

17               MR. SCHECHTER:  May I just finish?

18               THE COURT:  I'm not questioning whether or

19     not you're entitled to play it.

20               The question I have is whether or not it's

21     through this witness, that's my point, because it

22     doesn't seem at this point to be any type of

23     inconsistency with what she's testified to.

24               MR. SCHECHTER:  I can put these in evidence,

25     your Honor, through this witness.  It doesn't mean I

Awan - People - cross                542

1      cannot put them in evidence through the witness because

2      this evidence is evidence that basically belies her

3      direct testimony, testimony where she says she had no

4      relationship --

5                  THE COURT:  Well, let me ask you this.

6                  Assuming I allow you to put it in through

7      this witness, do you have -- have you identified

8      certain portions of these videos that you're going to

9      play?

10                 In other words, you know which ones you're

11     going to play?

12                 MR. SCHECHTER:  I do.

13                 THE COURT:  What I would ask you to do is

14     since Ms. Johnson, I take it, has not seen them up to

15     now --

16                 MS. JOHNSON:  I have not.

17                 MR. SCHECHTER:  I have provided her with a

18     copy, but apparently she says she could not properly

19     format it.

20                 THE COURT:  All right, well, regardless, I

21     think she's entitled to see it before it gets played

22     for the first time in the courtroom, so I'm going to

23     ask you over -- between now and the lunch hour, both of

24     you to please, you know, please get together and show

25     her.

1        MS. JOHNSON:  And, Judge, I obviously have

2   not seen them, but I anticipate my objection is going

3   to be that there is no probative value to them.

4        In fact, the witness testified on direct

5   examination when I asked her what her relationship was

6   like with the defendant in public around her family

7   members -- this is not proper impeachment.  She

8   acknowledged on direct and on cross that it was a

9   normal father-daughter relationship and, in fact, when

10  Mr. Schechter asked her did she dance with him and did

11  she make these videos she said yes.

12       So I am not quite clear what his offer of

13  proof is as to how it's relevant for this witness or

14  any witness, for that matter.

15       THE COURT:  Well, I obviously haven't seen

16  the video, so it's hard for me to make a ruling in a

17  vacuum.

18       At this point, Mr. Schechter, it doesn't

19  appear as though she's said anything in her testimony

20  that would be inconsistent with what you posed to her

21  in terms of either being in the video, taking the

22  videos --

23       MR. SCHECHTER:  Au contraire.  She has

24  characterized herself as being victimized by my client.

25  She has characterized herself as being in terror.  She

Awan - People - cross                544

1    was afraid my client was going to kill her.
2                    THE COURT:  Well, then --
3                    MR. SCHECHTER:  You're asking me a question.
4                    THE COURT:  Don't interrupt me.
5                    That begs the question, what time frame are
6         these videos taken?
7                    MR. SCHECHTER:  These videos are taken
8         between 2005 and 2008.
9                    THE COURT:  Well, then, is it -- the time
10        that she talks about being, if you will, afraid of the
11        defendant seems to be specifically during the period
12        of -- in 2008.
13                    MR. SCHECHTER:  No, your Honor, counsel was
14        very specific in her last direct examination, "Did you
15        remember the events of 2005 when you were victimized in
16        2008," and she said yes.
17                    So it was counsel's question that drew the
18        parallel that, in fact, she remained in error, that she
19        remembered this threat in 2005 which carried through to
20        2008.
21                    THE COURT:  I don't remember her testifying,
22        quite frankly, to any threat in 2005.
23                    In fact, when the People tried to elicit
24        whether or not she was scared regarding the incident
25        that she described as happening on the hamper in the

                                                          ws

1   house I sustained your objection because there was no

2   indication that there was any threat at that point.

3              MR. SCHECHTER:   There was testimony that at

4   the time that 2008 rolled around that this witness, in

5   fact, had remembered the antecedent threats or

6   activities of my client and was frightened.

7              That testimony, the reporter could find it,

8   Judge, it was towards -- it was in the second half of,

9   I think -- second half of 2008.

10             THE COURT:   2008 I don't really differ with

11  you because it's obviously at some point in 2008 that

12  she described being fearful of him and the knife being

13  produced.

14             What I'm looking to try to narrow down, if

15  you will, is if you can identify which of those videos,

16  and the witness can establish as to when those videos

17  or what portions of those videos in terms of the event

18  and the time and that's -- if it happens at or about

19  the time this witness has testified she may have been

20  fearful of your client, then I'll allow you to play it.

21             MR. SCHECHTER:   If the Court pleases, with

22  all due respect, I believe that the testimony of the

23  witness after being examined by the District Attorney

24  was that these -- that the threats and the violence and

25  the antecedent memories of 2005 carried through to

                                                      ws

Awan - People - cross          546

1      2008.  She made it a point to raise that testimony,

2      Judge.  She made it a point and it came into evidence.

3              If the reporter will read that back I'm sure

4      we'll see that that testimony came in.

5              MS. JOHNSON:  But -- and then the questions

6      to her were, "In that time frame when you were in

7      public and with your other members of your family,

8      including your mother, including your brothers and

9      sisters, how did defendant treat you," and she said,

10     she acknowledged, that it was a normal father-daughter

11     relationship.

12              So still, again, with his argument there is

13     no proper impeachment here.

14              MR. SCHECHTER:  She took these videos.

15              THE COURT:  Look, I'm not going to argue

16     about this throughout the lunch hour.  You have an idea

17     what I'm thinking about in terms of my ruling.  If it's

18     relevant in time to the events that she talks about in

19     2008, I'm inclined to allow it.

20              If there's anything, Mr. Schechter, you need

21     to go over with my stenographer I suggest you do it

22     before we begin.

23              (The luncheon recess was taken at this time.)

24              *       *       *       *       *

25

ws

Awan - People - cross          547

1              A F T E R N O O N  S E S S I O N

2                  THE COURT:  All right, Mr. Schechter, just to

3         clear up what I think may be a misconception on your

4         part with regard to the daily copy, my understanding is

5         and his understanding is that was an accommodation he

6         gave to you for the hearing only and that was because

7         you were going from hearing to trial, which is

8         obviously what we did.

9                  It's not his understanding and it's not my

10        understanding, nor was it my ruling, that you were

11        going to get, as retained counsel, daily copy pursuant

12        to County Law 18B.

13                 MR. SCHECHTER:  I thought that was, in fact,

14        the order.  That's why I had made no provisions with

15        the reporter, Judge.

16                 THE COURT:  Well, it strikes me a little bit

17        odd that you would not -- if you thought that was the

18        case you would have asked her for the minutes yesterday

19        and today.  Obviously, she didn't prepare them.  She

20        thought that it was only for the purposes of the

21        hearing, which she obviously provided to you.

22                 MR. SCHECHTER:  I wanted the minutes to Sana

23        Awan.  I didn't think the minutes with respect the

24        Aliotos were important.

25                 The fact is, yesterday I was busy running

                                                        ws

Awan - People - cross                548

1     around trying to get these things together.

2                As a matter of fact, today, when I got the

3     discovery material, I noticed that I now have to

4     subpoena Detective Moran and I have -- I'm trying to

5     get my investigator out here to serve a subpoena on the

6     Police Department and it's very difficult to get these

7     mechanics worked out, especially at the last minute.

8                Since I'm being placed in the position where

9     I cannot get daily copy I now have to see if my

10    client's family, some of whose members are in the

11    courtroom, can scrape together the money to pay the

12    reporter.

13               THE COURT:  That, obviously, as retained

14    counsel, is entirely your prerogative or your choice.

15    I'm not going to direct my stenographer to provide

16    daily copy.  If that's something she wishes to do at

17    your request, that's a business decision that she'll

18    make with you.

19               MR. SCHECHTER:  May I have a moment to talk

20    to the family?

21               THE COURT:  Yes.  But I want to get the jury

22    up here and I want to cover this stuff with this tape

23    as well.

24               MR. SCHECHTER:  Yes, Judge.

25               THE COURT:  The problem I'm having is this

                                                          ws

1   witness is on the witness stand.  You now seem to be

2   suggesting that you want to have these items to finish

3   your cross-examination.

4          I don't know how long your cross is going to

5   be and I'm not certainly trying to curtail you, by any

6   means, but, you know, I don't want to delay this trial

7   and have you come in tomorrow and say, "Well, I don't

8   have the minutes and I'm not prepared to finish the

9   cross-examination."

10          It seems to me that if there was any

11   misunderstanding on your part about whether or not you

12   were entitled to these, as you were during the hearing,

13   you would have raised it last Friday.

14          MR. SCHECHTER:  I had no misunderstanding.  I

15   thought that I was getting the minutes daily copy.

16          THE COURT:  The only one who apparently

17   thought that was you.

18          MR. SCHECHTER:  Maybe I didn't -- as far as

19   the order was concerned I did not realize that the

20   order only restricted it to the hearing.  It would make

21   no sense because I would need the daily copy for the

22   trial as well.

23          My client -- if I could have a moment, I can

24   ascertain if my client can now get the minutes

25   retained.

ws

1          Can you?

2          I need a moment, Judge.

3          (Pause in the proceedings.)

4          MR. SCHECHTER:  I'm informed that the family

5    is unable -- they don't have any more money to do daily

6    copy, Judge, but then I'm going to have to ask -- I

7    might need to ask the reporter to review certain things

8    that were said that might be in dispute.

9          THE COURT:  It's my understanding that she's

10   not allowed to do that unless I direct her to do that

11   for purposes that I may see necessary.

12          So insofar as these -- are they DVDs?

13          MR. SCHECHTER:  Yes.

14          THE COURT:  And I think, if I understood you

15   correctly when we closed this morning, your offer was

16   to show that these DVDs were either taken by Ms. Awan

17   or depict Ms. Awan --

18          MR. SCHECHTER:  Dancing.

19          THE COURT:  -- in situations, including

20   dancing, that you feel would be inconsistent with her

21   testimony insofar as her feeling threatened by your

22   client?

23          MR. SCHECHTER:  Feeling threatened by my

24   client, being in fear of my client, being endangered by

25   my client, as counsel has referenced throughout her

Awan - People - cross                    551

1      direct examination.

2              THE COURT:  Well, to me, and this is my

3      ruling, is that I will allow you to play portions,

4      provided that there's a foundation laid from the

5      witness or a witness, even if it's not Ms. Awan, that

6      these tapes are, or these instances that are captured

7      on these DVDs are, at the point in time when Ms. Awan

8      has testified to feeling threatened and feeling fearful

9      and feeling her life was in danger and as far as I'm

10     concerned she doesn't really testify to that until May

11     of 2008.

12             MR. SCHECHTER:  With all due respect to the

13     Court, your Honor, and I would ask the Court to ask the

14     court reporter to read back those portions of the

15     direct examination of the District Attorney in which

16     the District Attorney drew from the witness that at the

17     time that she was threatened with the knife in May and

18     the time the sexual acts were allegedly committed in

19     May and June of 2008, that she still felt threatened

20     from the earlier times that she had testified to and

21     that was a continuing threat.

22             The whole purpose of her testimony is to show

23     that she was under a continuing feeling of threat from

24     my client.  That was her purpose.

25             I asked the Court --

                                                    ws

1        THE COURT:  I'm going to reserve on your

2    application for now.

3        However, my ruling is that if there's

4    instances there that are from May and June of 2008 --

5        MR. SCHECHTER:  There are not.  I tell the

6    Court straight up, the dates of videos are on the

7    videos and the majority of them are from, I believe,

8    from what I saw, November through the early part of

9    2008, November 2007 through the early part of 2008.

10        The way I know that is because when you put

11   the -- first put the mouse on them the date pops out of

12   the video.

13        So this was during the period of time when

14   Sana Awan, according to the District Attorney and the

15   theory of her case and her opening, indicated that she

16   felt threatened continually from 2005 through 2008.

17   That was part of her theory of the case and that was

18   part of the testimony she drew out of Sana Awan and

19   therefore these videos are -- were taken by Sana Awan

20   herself and they were taken of her father, they were

21   taken of her father doing various things.  She's

22   dancing, she's laughing, she's having a very easy

23   repartee with her father during these tapes and they

24   certainly belie any feeling of being threatened

25   constantly or continually as the People have indicated.

Awan - People - cross          553

1       A person so threatened or so indicated would

2   not have those feelings for the person doing it.

3       THE COURT:  Do you want to be heard?

4       MS. JOHNSON:  Our objection is exactly what

5   it was before we had broken for lunch as to the fact

6   there is no probative value for this and, in fact, what

7   I was explicitly precluded from arguing was that she

8   was in a constant fear from 2005 through 2008.

9       What I was allowed to argue is that on a

10  particular date in 2005, it was that date that carried

11  over.

12      So contrary to what counsel said, if he's

13  going to want to put these in, then I should be

14  permitted to go into everything in those dates, all

15  those instances your Honor precluded us from bringing

16  out on direct examination, because exactly what your

17  Honor said was I was not to use, in fact, even the word

18  continued because that would open up the door to the

19  Queens incidents.

20      MR. SCHECHTER:  She just said so, from 2005

21  to 2008.

22      THE COURT:  Listen, I'm not going to hear any

23  more from either one of you.  I'm going to reserve my

24  decision with respect to it.

25      None of these here deal with May and June of

                                                    ws

Awan - People - cross                   554

1       2008?

2                   MR. SCHECHTER:  Not to the best of my

3       recollection when I first saw those.

4                   THE COURT:  So obviously at this time they're

5       not going to be played as far as the witness is

6       concerned.

7                   Wendy, I'm going to take a break at some

8       point.

9                   MR. SCHECHTER:  So that I --

10                  THE COURT:  Excuse me, Mr. Schechter.

11                  MR. SCHECHTER:  I'm sorry.

12                  THE COURT:  I want you to see if there's any

13      testimony that's -- in which the witness talks about

14      being threatened or feeling threatened at any point

15      from '05 up to May of '08, if there's any testimony in

16      the direct, okay?

17                  MR. SCHECHTER:  In the event I ask the

18      witness, "Did you feel threatened from 2005 up until

19      the time 2008," and she says yes, would that lay the

20      foundation for this testimony?

21                  If I ask it, assuming that the DA hasn't

22      asked it, but I believe she did --

23                  THE COURT:  I would say yes.

24                  I would also caution that if she does say yes

25      you're opening the door to Ms. Johnson eliciting from

                                                              ws

Awan - People - cross              555

1    her on redirect examination all of those instances,

2    however many there are, of her being threatened.  I

3    would think at that point then you've opened the door

4    to it.

5              MR. SCHECHTER:  Well, then, I would like, of

6    course, to see if Ms. Johnson had given reference to

7    that in the direct examination first.

8              (Recess in the proceedings.)

9              THE COURT:  This is portions of the testimony

10   that were elicited this morning by Ms. Johnson of

11   Ms. Sana Awan:

12              "Question:  I want to step back for just a

13        moment, back to the incident that occurred in the

14        bathroom when you were 14 years old for just a

15        moment, okay?  And you told us yesterday that you

16        were scared.  Can you tell us what it was that you

17        were scared of?

18              "Answer:  I was scared that, like, if my mom

19        had come in and saw him do anything that, like, I

20        would have been the cause of them, you know,

21        breaking up and then it would be like my fault.

22        Like I was scared that I would mess up the

23        family."

24              There's an objection as to the leading, which

25   I sustained.

                                                      ws

1              Next question:

2                   "Question:  Was there anything else that you

3              were afraid of back when you were 14 years old in

4              the bathroom?"

5                   Mr. Schechter objected to the form of the

6       question.  I allowed it.  It was overruled.

7                   "Question:  What else were you scared of?

8                   "Answer:  I was scared that he would hurt me.

9                   "Question:  And what was it that you were

10             afraid of he would do?

11                  "Answer:  Like, if I fought back I was scared

12             that I would get beat."

13                  So in light of that testimony I'm going to

14      allow the videotape to be played --

15                  MR. SCHECHTER:  DVD.

16                  THE COURT:  The DVD.

17                  Just give me one more moment.

18                  (Pause in the proceedings.)

19                  THE COURT:  All right, I'm going to allow it

20      in this context, Mr. Schechter.

21                  In the minutes that I have here I don't know

22      what time period that is.  Ms. Johnson may have

23      elicited that during the course of her direct, but

24      that's the only time that she -- and it's a specific

25      incident that she talks about being scared, so to the

1       extent that you can lay a foundation that some of this

2       material in these videos is in -- at or about or

3       shortly after the time that this incident took place, I

4       would allow it.

5                    MR. SCHECHTER:  I am proffering to the Court

6       that it's not within the vicinity of the place.

7                    I do believe there was other testimony, your,

8       to my recollection, I don't have, of course, the

9       minutes in front of me, but I believe there was other

10      testimony with respect to, and her opening statement to

11      the jury was, that this fear was continuing because she

12      had asked the witness, "He didn't threaten you all the

13      time, no, but you still were under fear with respect to

14      every time he touched your mouth," because not all of

15      the times when he, alleged by counsel -- not all of the

16      times when he supposedly did this to her was the force

17      used, but she hastens back to the memory of the force,

18      the antecedent force, so I do recall that that

19      testimony was made and I do recall that she had segued

20      from 2005 to the present.  I don't know.

21                   THE COURT:  Well, look it, my reporter has

22      been good enough to go back and provide us with these

23      minutes.  I've read them.  I've read them into the

24      record.

25                   It appears to me that the only reference to

                                                          ws

1   her being scared other than when she testified in May

2   and June of 2008, which, again, to the extent that

3   these DVDs cover that period of time, either before,

4   shortly before, May of 2008 or shortly after 2008 when

5   she said she had this fear instilled in her and these

6   DVDs would show her in a position or acted in a manner

7   that would be inconsistent with that, I would allow you

8   to do that.

9           To the extent that there's anything in those

10  DVDs that would be inconsistent with what I've just

11  read here regarding the incident that I believe is the

12  initial incident that the People led off in their

13  direct examination about what took place in the

14  bathroom, again, shortly before, shortly after that

15  context I would.

16          I'm not going to allow, you know, certain

17  snippets over a, you know, four, five even three-year

18  period that, you know, can't be put in context, are not

19  in context with what the witness has testified to.

20          They're just general tapes showing what the

21  complainant, quite frankly, has already testified to,

22  which is that she behaved and acted normally, according

23  to her, notwithstanding the fact that she was having

24  this type of relationship, allegedly, with your client.

25          MR. SCHECHTER:  All right, your Honor, I'm

ws

1    proffering to the Court what it is.  Based upon the

2    short time we have to review this here in court time,

3    the short time that I had to look at it before during

4    the break, I will tell the Court that, to the best of

5    my recollection, it reflects a period from November

6    through the mid part of possibly March of 2008.  That's

7    what these tapes show, 2007 late through the first

8    quarter of -- the end of 2007 through the first quarter

9    of 2008 and, as I said to the Court, I believe that

10   counsel's opening statement and counsel -- and maybe

11   it's not.

12             (Brief recess in the proceedings.)

13             THE COURT:  My reporter just pointed out some

14   other portions of the transcript that she gave me from

15   the witness's testimony earlier today and, again,

16   it's -- it refers to May of 2008, from the context that

17   I see it.  I mean, you have my ruling.

18             I think otherwise just to open up, if you

19   will, a whole other area that really, one, is not being

20   considered by the jury in terms of the charges in the

21   indictment itself and, two, in terms of my Molineaux

22   ruling, I tried to fashion a Molineaux ruling that was

23   rather restrictive in terms of what was going to come

24   out, and to the extent, although the jury is not

25   considering your client's guilt or innocence with

1       respect to some of these instances in Queens, if there

2       was something that was on these videos that was

3       testified to that is inconsistent in terms of her

4       behavior, if you will, I would certainly allow to you

5       do it.

6               But it sounds to me as though these incidents

7       that are on these DVDs which you're looking to play are

8       periods of time that are far removed, if you will, from

9       the incident that the District Attorney led off with

10      and the instances that are contained in this

11      indictment.

12              MR. SCHECHTER:  I appreciate the Court -- I'm

13      obviously going to have to abide by the Court's ruling

14      and except to same.

15              I just want to please make the record crystal

16      clear that the videos that I intended to show the jury

17      were videos of Sana taking videos of my client,

18      concentrating on my client to the exclusion of other

19      people in a room, including my client dancing, videos

20      of my client kissing Sana's mother at the encouragement

21      of Sana, Sana laughing and enjoying herself with my

22      client, photos of Sana taking a video of my client in

23      his car on the way up to a trip while my client is

24      singing and Sana is laughing and taking a picture of my

25      client.  There's a video of my client in a resort and

1     Sana is taking a picture of him at the resort and

2     kibitzing with him in a friendly and laughing and

3     jovial way at the resort.

4              It is the position of the defendant, your

5     Honor, that these videos are offered to try to show

6     that contrary to what Ms. Johnson had opened up with to

7     the jury and had at least implied through her questions

8     to Sana, that Sana was operating on a basis of

9     continual fear on the part of the defendant.

10              As such, it is respectfully submitted that

11     aside from the error that I respectfully believe was

12     committed by allowing her to draw out the testimony

13     respecting that May 2005 incident testified to by Sana,

14     she had specifically gone out of her way to communicate

15     to this jury that Sana, from 2005 to 2008 was, in fact,

16     operating under a basis of fear with respect to my

17     client.

18              The fact that she did not -- was not

19     permitted to offer any evidence of the other alleged

20     acts of sexual abuse between 2006 and 2008 is of no

21     moment simply because my client, in his confession,

22     which the Court, over objection, allowed to be played

23     to the jury in its entirety, had, in fact, communicated

24     to the jury, through his confession, that he had sexual

25     contact with Sana from 2006 through 2008.

1            The period overlapping this --

2            THE COURT:  Mr. Schechter, please, is there a

3    point where you're going to --

4            MR. SCHECHTER:  Yes, yes.

5            Since the District Attorney was permitted,

6    over objection, to at least put this video in evidence,

7    these videos that I want to play for the Court at least

8    belie the notion that Sana was forced into a sexual,

9    forced into a sexual, relationship; that however impure

10   and however, perhaps, meretricious the relationship

11   was, it was not forced.

12           THE COURT:  And I'm not going to get into a

13   tit for tat here, but, in the first place, the record

14   should reflect that what Mr. Schechter has just

15   described is perhaps, and I don't know, because there's

16   no record, if you will, I take his offer as a

17   good-faith offer, but there's certainly no testimony to

18   say what is in these DVDs.

19           It sounds to me as though it's an editorial

20   that you're giving as to what these DVDs or what these

21   pictures are going to show, number one.

22           Number two, in your characterization of them

23   I notice that you failed to say what periods of time

24   these DVDs cover.

25           So, to complete the record, would you tell us

                                                    ws

1    what periods of time that these items that you're

2    looking to show cover?

3                  MR. SCHECHTER:  As I recall, your Honor, late

4    2007 to the first quarter 2008.

5                  THE COURT:  Could you give us the month of

6    what that period of time is?

7                  MR. SCHECHTER:  I would be guessing.  If I

8    could see them, actually, on -- because what happens,

9    your Honor, is when you first flash on the specific

10   item in the icon the date comes up and that's how --

11                 THE COURT:  Well, let me ask you this.

12                 In terms of the indictment in this case which

13   talks about May of -- May 1st of 2008, what is the

14   period of time that's on those DVDs that is close to

15   that date?

16                 MR. SCHECHTER:  None that I can recall.

17                 THE COURT:  Okay, all right, let's get the

18   jury.

19                 (Witness resumes the stand.)

20                 (Jury enters.)

21                 THE COURT:  All right, I owe you an apology.

22   I know I had you kind of locked downstairs.

23                 When we broke at 12:30, believe me, we had

24   every intention of picking up promptly at 2, but, as

25   often happens in any trial, not just this one, legal

                                                      ws

1     issues come up.

2              As I said to you during my preliminary

3     discussions, any type of legal discussions are usually

4     done out of the presence of the jury.

5              Sometimes we can resolve things quickly,

6     sometimes we can't.  Sometimes we have to take a look

7     back at the record, which is what happened here, and

8     try to get a better handle on what it is that we were

9     trying to hash out and I try to do it -- I don't want

10    to have you up here and then downstairs for 15 minutes

11    and then come back up.

12             So this way we can get it out of the way in

13    one continuous period and hopefully we can just, while

14    we're in the courtroom, use the time as productively as

15    possible.

16             So at this point I think we're ready to

17    continue with the cross.

18             If you would, Mr. Schechter?

19             MR. SCHECHTER:  Yes.

20    CROSS-EXAMINATION CONT'D

21    BY MR. SCHECHTER:

22    Q.   Sana, do you recall on July 22nd, 2008 having a

23    conversation with a detective from Nassau County?

24    A.   Yes.

25    Q.   And you remember that detective's name?

Awan - People - cross          565

1        Would that be Detective Moran?

2        A.    Yes.

3        Q.    And do you remember when you first sat down with

4    him on July he took a statement from you?

5        He was writing on a piece of paper while he was

6    talking to you, do you recall?

7        A.    Yes.

8        Q.    Isn't it a fact that you told Detective Moran that

9    Harold always had a knife in his truck?

10        Didn't you tell him that?

11        A.    No.

12            MR. SCHECHTER:  May I approach the witness,

13        your Honor?

14            THE COURT:  Yes.

15            You want something marked?

16            MR. SCHECHTER:  Yes, Judge, Defendant's R for

17        identification.

18            THE COURT:  Defendant's R for ID.

19            (Defendant's Exhibit R marked for

20        identification.)

21            (Shown to witness.)

22        Q.    Now, look, please, at the first two lines at the

23    detective's notes.

24        Now, does that refresh your recollection as to you

25    telling the detective the defendant always had a knife in

ws

Awan - People - cross          566

1    his car?

2         A.   I can't read it.  He said he --

3              MS. JOHNSON:  Judge.

4              THE COURT:  If you can't read it, Ms. Awan,

5         just tell the attorney.

6              If you can read it, just read it silently to

7         yourself and if there's any questions, Mr. Schechter

8         will ask you.

9              (Pause in the proceedings.)

10        A.   Okay, what was your question?

11        Q.   Not only did you tell Detective Moran that Harold

12   always had a knife in his car, you never told

13   Detective Moran you were threatened with that knife, did

14   you?

15             MS. JOHNSON:  Objection, it's a

16        mischaracterization of the statement.

17             MR. SCHECHTER:  Statement speaks for itself.

18             THE COURT:  Well, the only problem,

19        Mr. Schechter, it's not in evidence, so it can't speak

20        for itself.

21             MR. SCHECHTER:  That's true.

22        A.   He never --

23             THE COURT:  Hold on.  I'm going to overrule

24        it.

25             You can answer that.

1      A.    Okay, well, he said -- he asked me -- all right,

2   we were talking about May 14th and he never gave me a

3   specific date and I said always meaning as of May because I

4   was already talking about May.  I wasn't talking about --

5      Q.    Always, since May?

6      A.    Well, okay, we were talking about May in the

7   conversation and, yes, I shouldn't have used always.

8      Q.    But you used always.  That's what you told him,

9   always, right?

10           You didn't say, "Well, since May he had the

11   knife -- I saw the knife in the car," you said always,

12   right?

13      A.    Yes.

14      Q.    Okay.  And in that statement you never told him

15   that you were threatened with a knife, did you?

16                MS. JOHNSON:  Objection.  It's a

17           mischaracterization of the statement.

18                THE COURT:  You have an objection?

19                MS. JOHNSON:  Sorry.

20                THE COURT:  Yeah, sustained.

21                MS. JOHNSON:  Sorry, Judge.

22                THE WITNESS:  Do I answer?

23                THE COURT:  No.

24      Q.    Isn't it a fact you never told him about being

25   threatened with a knife in this interview on July 22nd,

Awan - People - cross                568

1     2008?

2                    MS. JOHNSON:  Objection, objection.

3                    THE COURT:  Let me just see the both of you

4          with the reporter, please?

5                    (Witness steps down.)

6                    (Shown to Court.)

7                    (Sidebar conference held as follows:)

8                    THE COURT:  Mr. Schechter, what is it that

9          you're looking for from this witness?

10                   MR. SCHECHTER:  In this statement she says he

11         always had a knife in his truck, but she never ever

12         tells, there's nothing in that statement -- not only is

13         there nothing in that statement about force being used,

14         when the they originally drew up the complaint they did

15         it as a B misdemeanor, so that's consistent with the

16         fact that she never told them that force was used.

17                   MS. JOHNSON:  That's totally inconsistent.

18                   In fact, her 32B --

19                   THE COURT:  In the first place, this is his

20         notes, I'm assuming, of his conversation with her.

21                   MR. SCHECHTER:  Yes, but those are his notes.

22                   THE COURT:  Well, that's -- that may be a

23         question to ask -- who is this?

24                   MR. SCHECHTER:  Detective Moran.

25                   MS. JOHNSON:  Right.

ws

1          THE COURT:  This isn't a written statement of

2     hers.

3          MR. SCHECHTER:  This is a work record of her

4     conversation with him.

5          THE COURT:  I have no problem with you

6     telling her, "Did you ever tell Detective Moran this,

7     this and this," and whatever her answer is, that's what

8     her answer is.

9          If you want -- depending on whether or not

10    it's something that's not collateral, if you want to

11    call Detective Moran to say that, "When you interviewed

12    her did she say something differently," I have no

13    problem, but to ask her about Detective Moran's

14    notes --

15         MS. JOHNSON:  That still is disingenuous

16    because the written statement she gives has all that

17    information in her own words, so it's disingenuous to

18    argue to the jury she never said that when she has it

19    in her statement.

20         MR. SCHECHTER:  That's not true because it

21    was originally drawn up as a misdemeanor for a reason.

22         THE COURT:  What's drawn up?

23         MR. SCHECHTER:  There's a Nassau County

24    departmental form where they determine what the charge

25    is and the first one is 130.55, which is sex abuse as a

                                                          ws

Awan - People - cross                570

1    B misdemeanor, no force used, so that's obviously

2    something that was drawn up at the beginning of this

3    matter.  130.55 was the original charge.

4              THE COURT:  Moran is a Queens detective?

5              MR. SCHECHTER:  Nassau.

6              It's not collateral.

7              THE COURT:  Look, if there's something in

8    here that's, you know, different than what she's been

9    asked so far, obviously in redirect examination you can

10   explore, but I'm just telling you, that's not a written

11   statement of hers.  You can't give this to her and say,

12   "Did you tell Detective Moran?"

13             MR. SCHECHTER:  Right, but I can ask her if

14   this refreshes her recollection if she told Detective

15   Moran.

16             THE COURT:  That's not a document that she

17   prepared.

18             How is she going to say that's going to

19   refresh her recollection?

20             MR. SCHECHTER:  Any document in the whole

21   world, and according to Richardson on evidence, can

22   refresh a witness's recollection.

23             THE COURT:  You can ask her whether or not

24   she told Detective Moran this, this and this and

25   depending on what her answer is if you want to show her

                                                  ws

Awan - People - cross                571

1    that and ask her if that refreshes her recollection,

2    that's one thing.

3                I don't want you to ask, "Didn't you tell

4    Detective Moran this," based upon something that's his

5    notes.

6                MR. SCHECHTER:  I respectfully disagree, but

7    I abide by your Honor's rulings.  I believe Richardson

8    on evidence proscribes her using written statements.

9                THE COURT:  She's not allowed to

10   rehabilitate?

11               MR. SCHECHTER:  Not unless I represent this

12   is recent fabrication, which I'm not.

13               The only time you can offer prior consistent

14   statements is if I have alleged a recent fabrication

15   and I have not alleged it.

16               MS. JOHNSON:  How is he before this jury

17   arguing this knowing very well in her own words in her

18   own statement --

19               THE COURT:  We'll take it step by step.

20               (Sidebar conference concludes.)

21               THE COURT:  Ms. Awan, if you would?

22               (Witness resumes the stand.)

23   Q.   Isn't it a fact in your original statement to

24   Detective Moran you never mentioned that you were forced?

25               MS. JOHNSON:  Objection.

                                                      ws

Awan - People - cross          572

1              THE COURT:  Just read the question back

2         again, please?

3                    (Record read.)

4              THE COURT:  Yeah, sustained.

5              MR. SCHECHTER:  Respectfully except, Judge.

6              THE COURT:  Yes.

7              Just so we're clear, Mr. Schechter, that's

8         based upon Defendant's R, am I correct?

9              MR. SCHECHTER:  Yes, your Honor.

10             THE COURT:  For ID?

11             MR. SCHECHTER:  Yes.

12        Q.   Isn't it a fact you really weren't scared of

13   Mr. Gopaul, Sana, you were scared only for the welfare of

14   your family; that you thought if your parents -- if your

15   mother found out that you and Mr. Gopaul were intimate that

16   there would be a divorce?

17             Isn't that what your true concern was?

18             MS. JOHNSON:  Objection, your Honor, I'm just

19        going to ask if we can clarify the time frame.

20             THE COURT:  I'll allow it.

21             You can answer that.

22        A.   Wait, can you just repeat it one more time?

23             You said --

24        Q.   Hum?

25        A.   Can you repeat what you said?

Awan - People - cross                 573

1        Q.   Yes.   Isn't it a fact that you never were

2   threatened by Harold Gopaul and the only reason you did not

3   tell anyone that you and Mr. Gopaul were intimate was

4   because you were afraid it would break up the marriage of

5   your parents and your mother would not be able to

6   financially support the family?

7        A.   No.

8        Q.   Do you recall testifying in the grand jury,

9   Page 075:

10              "Question:  You never directly told anyone?

11              "Answer:  No.

12              "Question:  How come?

13              "Answer:  Because I was scared.  Because he was

14         the only one working in the family.  I knew if my mom

15         left him they would have financial problems.  I have a

16         little brother and sister.  I was worried about that.

17         And then I didn't know if he -- if she would believe me

18         and then I'm pretty sure she would have talked to him,

19         they could have gotten me into trouble, so he could

20         just continue doing it."

21              Do you remember using those words?

22        A.   Yes.

23        Q.   So the concern, your only concern, was that your

24   parents would be getting divorced, is that correct?

25                   MS. JOHNSON:  Objection.

                                                        ws

Awan - People - cross                    574

1          THE COURT:  No, I'll allow that.

2          You can answer that.

3     A.    No, because they didn't ask me what -- if that was

4     my only concern.  They said your concerns.

5     Q.    The bathroom door the District Attorney alluded to

6     on direct examination, that was always open, wasn't it?

7     A.    No.

8     Q.    Was it locked?

9     A.    No, you said open, not unlocked.

10    Q.    Okay, then let me correct that.

11          Was it always unlocked?

12    A.    Yes.

13    Q.    And there was another bathroom in the basement,

14    no?

15    A.    Yes, but we didn't --

16    Q.    That's yes or no.

17          And sometimes there would be more than one person

18    in the bathroom doing different things because that was the

19    most handy bathroom for everybody to use, isn't that

20    correct?

21    A.    Yes.

22          MR. SCHECHTER:  I have no more questions of

23       the witness at this time, Judge.

24          THE COURT:  All right.

25          Ms. Johnson, any redirect?

                                                    ws

1          MS. JOHNSON:  Just quickly.

2    REDIRECT EXAMINATION

3    BY MS. JOHNSON:

4         Q.    Sana, did you have the opportunity to speak to

5    Detective Moran from the Nassau County special victim's

6    squad?

7         A.    Yes.

8         Q.    And did you tell him everything that you told

9    Detective Shulman?

10        A.    No.

11        Q.    Did you tell him more information than what you

12   told Detective Shulman?

13        A.    No.

14        Q.    Did you tell him what happened in May and June of

15   2008 in Nassau County?

16             Did you tell Detective Moran what happened in May

17   and June of 2008 in Nassau County?

18        A.    Some of it.

19             MS. JOHNSON:  Nothing else.

20             THE COURT:  Anything, Mr. Schechter?

21             Any recross?

22             MR. SCHECHTER:  No, Judge.

23             THE COURT:  All right, Ms. Awan, I want to

24   thank you very much.  You may step down.  I want you to

25   watch yourself as you step off.

ws

Proceedings                    576

1          MS. JOHNSON:  Your Honor, can I step out to

2     excuse her for the day?

3               THE COURT:  Yes.

4               (Witness excused.)

5               (Pause in the proceedings.)

6               MR. SCHECHTER:  Your Honor, I need to

7     approach for a very brief moment, please.

8               THE COURT:  Yes, come on up.

9               Do you need this on the record?

10              MR. SCHECHTER:  No.

11              (Discussion held at the bench, off the

12     record.)

13              THE COURT:  All right, members of the jury,

14     before we begin with the next witness I just want to --

15     this is an instruction on the law that is particularly

16     relevant at this time.  I would like you to pay close

17     attention to it.  It deals with the testimony you've

18     just heard and I'm going to give this to you again at

19     the close of the case, but I think it's important that

20     you hear it now.

21              There is testimony in this case that on

22     another occasion the defendant engaged in conduct with

23     Sana Awan in Queens County.

24              You must not conclude or infer from that

25     testimony that the defendant had a propensity or

ws

Proceedings                577

1    predisposition to commit any crime.

2              You may consider that testimony only to

3    permit you to evaluate the believability and accuracy

4    of the witness's testimony as it may relate to the

5    elements of forcible compulsion and intent and I shall

6    define that for you at the end of the case.

7              Again, that testimony was not offered and

8    must not be considered by you for the purpose of

9    proffering that the defendant had a propensity or

10   predisposition to commit the crimes charged in this

11   case.

12             It was offered as evidence for your

13   consideration on the question of forcible compulsion

14   and intent.

15             If you find the evidence believable and

16   accurate you may consider it for that limited purpose

17   and for no other, okay?

18             So, with that, at this point, Ms. Johnson, if

19   you would, please?

20             MS. JOHNSON:  Your Honor, the People call

21   Police Officer Celica Alfaro.

22   C E L I C A  A L F A R O, a witness called on behalf of the

23   People, having been first duly sworn by the clerk of

24   the Court, was examined and testified under oath as

25   follows:

Alfaro - People - direct          578

1          COURT OFFICER:  Officer, I'm going to need

2     you to state your name, spell your last name, your

3     shield number and command.

4          THE WITNESS:  Officer Alfaro, A-l-f-a-r-o.

5     Shield number is 8865 from the 105 Precinct, Queens

6     South.

7          COURT OFFICER:  Have a seat, thank you.

8          THE COURT:  Officer Alfaro, if you would,

9     just if you can kindly keep that microphone relatively

10    close to you and just speak in a nice clear and slow

11    voice.

12         Ms. Johnson, whenever you're ready.

13         MS. JOHNSON:  Thank you.

14   DIRECT EXAMINATION

15   BY MS. JOHNSON:

16    Q.    Good afternoon, Officer Alfaro.

17    A.    Good afternoon.

18    Q.    Where are you currently assigned?

19    A.    To the 105 Precinct.

20    Q.    What Police Department?

21    A.    NYPD.

22    Q.    New York City Police Department?

23    A.    Yes.

24    Q.    How long have you worked at the 105 Precinct?

25    A.    Approximately eight years.

Alfaro - People - direct                579

1        Q.    How long have you been employed by the New York

2    City Police Department?

3        A.    Eight years.

4        Q.    Do you usually wear a uniform for work?

5        A.    Yes.

6        Q.    Can you tell us what is the location of the 105th

7    precinct in Queens County?

8        A.    92-08 222nd Street, Queens Village, New York,

9    11428.

10       Q.    What are your general duties as an officer

11   assigned to the 105 Precinct?

12       A.    Patrol.

13              THE COURT:    Can you hear her back there?

14              THE JUROR:    Not too well.

15              THE COURT:    You just have to keep your voice

16       up a little bit higher, officer.

17       Q.    Officer Alfaro, I'm going to direct your attention

18   to June 24th, 2008.

19              Were you working that day?

20       A.    Yes.

21       Q.    In what capacity were you working?

22       A.    Patrol, in a sector.

23       Q.    Were you working in uniform or plainclothes?

24       A.    Uniform.

25       Q.    On June 24th, 2008 did there come a time when you

                                                                ws

Case 1:15-cv-01782-NGG Document 8-15 Filed 08/31/15 Page 200 of 209 PageID #: 1400

1    received an assignment?

2          A.    Yes.

3          Q.    Who gave you that assignment?

4          A.    My sergeant.

5          Q.    And what was the nature of the assignment that you

6    were given?

7          A.    To make an arrest.

8          Q.    Of who?

9          A.    Mr. Gopaul.

10         Q.    Harold Gopaul?

11         A.    Yes.

12         Q.    Do you see that person in the courtroom today?

13         A.    Yes.

14         Q.    Can you identify an item of clothing and point?

15         A.    He's wearing a red tie over there.

16               THE COURT:    All right, indicating the

17         defendant.

18         Q.    Did you, in fact, insist -- assist in the arrest

19    of the defendant, Harold Gopaul?

20         A.    Yes.

21         Q.    Did there come a time on June 24th, 2008 that you

22    met with a female complainant?

23         A.    Yes.

24         Q.    And was that a woman by the name of Sana Awan?

25         A.    Yes.

ws

Alfaro - People - direct            581

1       Q.    Where did you meet with her?

2       A.    At the 105 Precinct.

3       Q.    Did there come a time when you brought Sana Awan

4    some place other than inside the precinct?

5       A.    Yes, just outside the precinct.

6       Q.    Was that before or after she had met with

7    Detective Shulman?

8       A.    After.

9       Q.    Where did you bring Sana?

10      A.    To a work vehicle.

11      Q.    Where was that vehicle located?

12      A.    On the side of the 105 Precinct.

13      Q.    What did that vehicle look like?

14      A.    It was a white vehicle with an Ecolab lettering on

15   it.

16      Q.    I'm going to show you what's already been marked

17   into evidence as People's Exhibit Number 3.

18                (Shown to witness.)

19      Q.    Do you recognize that?

20      A.    Yes.

21      Q.    What is that?

22      A.    An Ecolab vehicle.

23      Q.    Is that the same vehicle you saw outside the

24   105 Precinct on June 24th, 2008?

25      A.    Yes.

ws

Alfaro - People - direct                582

1                   (Shown to counsel.)

2        Q.   Did Sana identify any items in that vehicle?

3        A.   Yes.

4        Q.   What did she identify?

5        A.   A massager and a mini meat clever.

6        Q.   What did you do after she identified those items?

7        A.   I took it into custody and vouchered it.

8        Q.   When you say you took it into custody and

9    vouchered it what does that mean?

10       A.   I vouchered it for arrest evidence.

11       Q.   Did you bag it?

12       A.   Yes.

13       Q.   And what was the purpose of that?

14       A.   For evidence.

15       Q.   Did you seal the bag?

16       A.   Yes.

17       Q.   Where in the vehicle was both the massager and the

18   knife recovered from?

19       A.   The mini meat cleaver was in the middle console

20   and the massager was inside the vehicle.

21       Q.   I'm going to show you what's already been marked

22   into evidence as People's Exhibit 4.

23                  (Shown to witness.)

24       Q.   Do you recognize both the bag and the contents?

25       A.   Yes.

ws

Case 1:15-cv-01782-NGG Document 8-15 Filed 08/31/15 Page 203 of 209 PageID #: 1403

1       Q.    What do you recognize it to be?

2       A.    The massager that I vouchered inside the vehicle.

3    That was inside the vehicle.

4       Q.    The one you just described?

5       A.    Yes.

6       Q.    I'm going to show you what's already been marked

7    as People's Exhibit 5 in evidence.

8                      (Shown to witness.)

9       Q.    If you could take a look at that?

10              Do you recognize that, Officer Alfaro?

11      A.    Yes.

12      Q.    What do you recognize that to be?

13      A.    The mini meat cleaver that I vouchered that was

14   inside the vehicle.

15      Q.    The one you previously -- you just described to us

16   recovering from that Ecolab van on June 24th, 2008?

17      A.    Yes.

18                  MS. JOHNSON:   Thank you.

19                  COURT OFFICER:   Could she take the gloves

20      off?

21                  MS. JOHNSON:   Yes, thank you.

22      Q.    Officer Alfaro, did you have the opportunity to

23   observe the defendant on June 24th, 2008?

24      A.    Yes.

25      Q.    Did you observe any injuries on his body?

Case 1:15-cv-01782-NGG Document 8-15 Filed 08/31/15 Page 204 of 209 PageID #: 1404

1       A.    No.

2       Q.    Did he complain of any injuries?

3       A.    No.

4       Q.    Did he ask for any medical attention?

5       A.    No.

6       Q.    Did he indicate he was in any pain?

7       A.    No.

8             MS. JOHNSON:  I have no other questions for

9       Officer Alfaro.

10            THE COURT:  Mr. Schechter?

11      CROSS-EXAMINATION

12      BY MR SCHECHTER:

13      Q.    Officer Alfaro, good afternoon.

14      A.    Good afternoon.

15      Q.    What was your tour of duty on June 24th, 2008?

16      A.    11:15 p.m. to 0750 a.m.

17      Q.    And you're a uniform officer, are you not?

18      A.    Yes.

19      Q.    Okay, and you got to duty 11:15?

20      A.    Yes.

21      Q.    And approximately at what time did -- were you

22      asked by your sergeant to participate in an arrest?

23      A.    I don't recall.

24      Q.    I'm sorry?

25      A.    I don't recall.

ws

Alfaro - People - cross          585

1       Q.      Well, were you on patrol --

2       A.      Yes.

3       Q.      So you were on patrol at that point, is that

4    correct?

5       A.      Yes.

6       Q.      And you said assist, assist in arrest.

7               Was Mr. Gopaul resisting arrest?

8       A.      No.

9       Q.      Was he acting violent?

10      A.      I was already on patrol.

11      Q.      Sorry?

12      A.      I was on patrol.

13      Q.      Well, you told the jury that you assisted in his

14   arrest.

15              Well assist in his arrest means there were other

16   officers involved in his arrest, correct?

17      A.      I processed the arrest.

18      Q.      Well, what other officers were involved in his

19   arrest?

20      A.      I don't recall.

21      Q.      Well, when you assist somebody you normally assist

22   somebody, is that correct, officer?

23              MS. JOHNSON:   Objection.

24              THE COURT:   Yeah, sustained as to form.

25      Q.      Officer, how long have you been a police officer?

ws

1      A.   Approximately eight years.

2      Q.   And in the eight years you know when the word --

3   what the word assist means, don't you?

4      A.   Yes.

5      Q.   And the word assist means that you participated

6   with other people in arresting Mr. Gopaul, is that correct?

7      A.   Yes.

8      Q.   I ask you again, do you have anything that you can

9   recall that would refresh your recollection about with whom

10  you participated in the arrest of Mr. Gopaul?

11     A.   I didn't do the initial arrest.

12     Q.   Well, I'm a little confused.

13          Didn't you just tell the jury that you placed him

14  under arrest?

15     A.   I was the arresting officer.

16     Q.   Well, if you were the arresting officer then who

17  placed him under arrest?

18     A.   I don't recall.

19     Q.   Well, why would you be the arresting officer if

20  you didn't place him under arrest?

21     A.   Because there was an open 61 on him.

22     Q.   Well, he was already in custody when you got to

23  the precinct, wasn't he?

24     A.   Yes.

25     Q.   And he was already upstairs, was he not?

                                                    ws

1      A.   Yes.

2      Q.   And he obviously was in contact with other police

3   officers before you placed him under arrest, isn't that so?

4      A.   I wasn't there.  I was on patrol.

5      Q.   Officer, the man is in the precinct in a room

6   upstairs.

7           Is it your testimony you have no knowledge of

8   whether other officers were in his presence during the time

9   he was in the precinct?

10     A.   Yes.

11     Q.   Now, officer, going back a little bit,

12   approximately what time did you place Mr. Gopaul under

13   arrest?

14               THE WITNESS:  I would like to refresh my

15        memory?

16               May I look at it in my memo book?

17     Q.   Please.

18     A.   I'm looking at my memo book.

19     Q.   I'm sorry?

20     A.   I'm looking at my memo book.

21     Q.   Okay.

22     A.   Approximately --

23     Q.   Please don't read from it, just refresh --

24     A.   Approximately 0455.

25     Q.   That's 4:55 in the evening, correct?

                                                      ws

Alfaro - People - cross          588

1        A.    In the morning.

2        Q.    In the morning.

3              And you did not know what time Mr. Gopaul had

4     gotten to the precinct, do you, of your knowledge?

5        A.    No.  No.

6        Q.    Now, now after you processed Mr. Gopaul or, as you

7     say, placed him under arrest, even though he was already

8     under arrest, did you speak to the complainant?

9        A.    Yes.

10       Q.    Did you speak to the complainant before you placed

11    him under arrest or after?

12       A.    After.

13       Q.    If you were the arresting officer why didn't you

14    speak to the complainant before you placed him under arrest?

15       A.    Could you rephrase the question?

16       Q.    Yes.

17             If you were the arresting officer why didn't you

18    speak to him -- speak to the complainant before you placed

19    him under arrest?

20       A.    Because there was an open complaint report.

21       Q.    But he was already in custody, officer, so

22    obviously some other officer had placed him under arrest,

23    isn't that true?

24       A.    Yes.

25       Q.    So there was no longer an open 61, was there?

ws

Alfaro - People - cross                    589

1          A.    No.

2          Q.    So what you just testified to is not really

3    accurate, is it?

4          A.    Yes.

5          Q.    Now, officer, when you placed him under arrest

6    where was he?

7          A.    He was up in the squad.

8          Q.    Now, in your memo book you told us you started

9    work 11:15 a.m.?

10               MS. JOHNSON:   Objection, as to the form.

11               MR. SCHECHTER:   I'll rephrase the question.

12         Q.    You told us you began work 11:15 a.m., correct?

13         A.    No, 11:15 p.m.

14         Q.    P.m., my bad.  11:15 p.m.

15               And you were scheduled to work until when?

16         A.    7:50 a.m.

17         Q.    8 in the morning, basically, correct?

18         A.    Yes.

19         Q.    Now, the next entry in your memo book is from

20   2124, is that correct?

21               MS. JOHNSON:   Objection.

22               THE COURT:   Yeah, sustained as to form,

23         unless you want to offer her memo book.

24         Q.    How long were you working on this case?

25         A.    Until 2250.

ws