Alfaro - People - cross                    590

1        Q.   2250, that would be 10:50 p.m.?

2        A.   Yes.

3        Q.   And that means that you billed the City of New

4    York Police Department for two days of overtime, correct?

5                 MS. JOHNSON:   Objection, she doesn't bill

6            anybody -- sorry, sorry.

7                 MR SCHECHTER:   I'll rephrase the question.

8                 THE COURT:   Yeah, please.

9        Q.   You applied for how much overtime on this arrest?

10                MS. JOHNSON:   Objection.

11                THE COURT:   I'll allow it.

12                If you know.

13                (Pause in the proceedings.)

14       Q.   How much overtime do you apply for in this arrest?

15       A.   I'm trying to figure it out.   Hold on.

16       Q.   I'm sorry, go ahead.

17       A.   Possibly 15 hours.

18       Q.   Fifteen hours.

19            Now, overtime means you're paid two times your

20   normal rate of pay, is that correct?

21       A.   Time and a half.

22       Q.   Time and a half.

23            And notwithstanding Detective Shulman had already

24   had Mr. Gopaul in custody, you became the arresting officer

25   and you worked on -- with him for the better part of how

                         Alfaro - People - cross              591

1     many hours?

2          A.    Don't recall.

3          Q.    Well, you just told us from 4:45 through -- in the

4     morning until 11:50 at night, correct?

5          A.    Yes.

6          Q.    And that was well beyond your scheduled ending

7     tour time, correct?

8          A.    Yes.

9          Q.    While you were doing this what was

10    Detective Shulman doing?

11              MS. JOHNSON:  Objection.

12         Q.    If you know?

13              THE COURT:  No, I'll allow it.

14         A.    Don't recall.

15         Q.    Well, Detective Shulman had interrogated my

16    client, hadn't he?

17              MS. JOHNSON:  Objection.

18         Q.    If you know?

19              THE COURT:  Overruled.

20              You could answer that.

21         A.    Don't recall.

22         Q.    Didn't you have a conversation with

23    Detective Shulman when you got to the precinct?

24         A.    Yes.

25         Q.    Didn't you ask him what he did?

                                                              ws

Alfaro - People - cross                    592

1      A.   Yeah, he interviewed the complainant.

2      Q.   Did he also interview Mr. Gopaul?

3      A.   Yes.

4      Q.   So he had a conversation with both?

5      A.   Yes.

6      Q.   Now, as part of your duties you fill out a

7  complaint report, is that correct?

8      A.   No -- as part of my duty, yes.

9      Q.   And in this case you had filled out a Omniform

10  System complaint, is that correct?

11     A.   No.

12     Q.   You had not?

13     A.   No.

14     Q.   Did you prepare it?

15     A.   No.

16     Q.   Who prepared it?

17     A.   I have to look at my notes.

18     Q.   Please.

19     A.   It would be Officer Morris.

20     Q.   Officer Morris prepared the Omniform System

21  complaint form?

22     A.   Yes.

23     Q.   Was it based on information you provided him?

24          MS. JOHNSON:  Objection.

25          THE COURT:  I'll allow that.

                                                        ws

Alfaro - People - cross          593

1            Can you answer that?

2       A.   Can you rephrase the question?

3       Q.   Was the information that he put on the form based

4    upon information you provided him?

5            MS. JOHNSON:  Objection.

6            THE COURT:  Yeah, same ruling, overruled.

7       A.   Yes, and interviewing the complainant.

8       Q.   Correct?

9            MR. SCHECHTER:  I would like this marked as

10   Defendant's S, please, for identification.

11           THE COURT:  Defendant's S.

12           (Defendant's Exhibit S marked for

13   identification.)

14      Q.   Now, before we get to this form, why didn't you

15   prepare this document?

16      A.   Because I wasn't on tour at that time.

17      Q.   It was prepared after you were off tour?

18      A.   Prior to my tour.

19      Q.   So what were you doing for 16 hours?

20      A.   What time?

21           What date?

22      Q.   From 0445 through 2250 of the next day -- night?

23      A.   I was preparing the arrest booking sheet, the

24   vouchering and waiting on the ADA, riding ADA.

25      Q.   The ADA arrived not much longer after the time you

                                                    ws

1    got to the precinct, right?

2         A.    I don't recall.

3         Q.    Well, while you were waiting for the DA wasn't

4    Detective Shulman waiting for the DA, too?

5         A.    Yes.

6         Q.    Why did the two of you have to wait for the DA?

7         A.    Because I was the arresting officer.

8         Q.    Are you saying you did not prepare this document,

9    you gave this to another officer to prepare, but you told

10   him what to put in, is that correct?

11        A.    I didn't prepare the document.

12        Q.    But you provided the information that went into

13   the preparation of that document, correct?

14        A.    I reviewed the complaint report and also

15   re-interviewed the complainant prior to me starting my

16   on-line booking sheet.

17        Q.    You reviewed the document and re-interviewed the

18   complainant.

19             Now, did you tell Officer Morris that Mr. Gopaul

20   should be charged with a misdemeanor, sexual abuse?

21             MS. JOHNSON:   Objection.   Move to strike all

22        that, Judge.

23             THE COURT:   Yeah, sustained.

24             MR SCHECHTER:   Please show that to the

25        witness.

                                             ws

Alfaro - People - cross          595

1                    (Shown to witness.)

2          Q.    Now, look on the top there.

3                Did you tell Officer Morris to charge

4    Mr. Gopaul --

5                    MS. JOHNSON:  Objection.

6          Q.    -- with misdemeanor sexual abuse?

7                    MS. JOHNSON:  Objection.

8                    THE COURT:  Yeah, objection sustained.

9                    MS. JOHNSON:  Move to strike that, your

10         Honor.

11                   THE COURT:  There's no answer, so there's

12         nothing to be stricken.

13                   MR. SCHECHTER:  May I have that back, please?

14                   (Shown to counsel.)

15         Q.    So what you're saying to this jury is you spent

16   from 4:45 in the morning until the next night, over 16

17   hours, waiting for the DA and preparing some forms, but not

18   this form, is that correct?

19         A.    Yes.

20         Q.    This form was prepared by another officer?

21         A.    Yes.

22         Q.    And on what basis did the other officer prepare

23   this form?

24                   MS. JOHNSON:  Objection.

25                   THE COURT:  Yeah, sustained.

Alfaro - People - cross                596

1       Q.   Now, there came a time when the District Attorney

2    sent two representatives to the precinct, is that correct?

3       A.   Yes.

4       Q.   And you observed that, did you not?

5       A.   Yes.

6       Q.   And you observed that from outside the room, is

7    that correct?

8       A.   Yes.

9       Q.   Detective Shulman was inside the room?

10      A.   Yes.

11      Q.   What were you doing outside the room?

12      A.   Awaiting until they were finished.

13      Q.   So the City of New York was paying the detective

14   to sit there and you to sit there to wait for the same

15   prisoner?

16              MS. JOHNSON:   Objection.

17              THE COURT:   Yeah, sustained.

18      Q.   Police officers threw Mr. Gopaul around, didn't

19   they, when he first came into the precinct?

20              MS. JOHNSON:   Objection.

21              THE COURT:   No, I'll allow that, if she

22      knows.

23      A.   I was out in the field.

24      Q.   Did you examine Mr. Gopaul's arms and legs?

25      A.   No.

ws

Alfaro - People - cross                597

1       Q.   Well, do you know what time Mr. Gopaul surrendered

2   to the precinct?

3       A.   No.

4                 MR SCHECHTER:   Can I have a moment, Judge?

5                 THE COURT:   Yes.

6                 (Pause in the proceedings.)

7       Q.   When you went to the vehicle with Sana Awan, was

8   anyone else with you?

9       A.   I don't recall.

10      Q.   Now, how many of these arrests do you participate

11  in?

12                MS. JOHNSON:   Objection.

13                THE COURT:   Yeah, sustained.

14      Q.   How many sexual abuse arrests have you done within

15  the past year?

16                MS. JOHNSON:   Objection.

17                THE COURT:   I'll allow it.

18      A.   I don't recall.

19      Q.   More than one?

20      A.   I don't recall.

21      Q.   How many arrests do you participate in where the

22  complainant comes to the car and points a knife out to you?

23                How many of those do you participate in, officer?

24                MS. JOHNSON:   Objection.

25                THE COURT:   Yeah, sustained.

ws

Alfaro - People - cross                598

1      Q.   Officer, you don't know because you're trying to

2   protect Detective Shulman, isn't that correct?

3              MS. JOHNSON:   Objection.

4              THE COURT:   No, I'll allow that.

5      A.   Can you rephrase the question?

6      Q.   Your absence of knowledge is because you want to

7   protect Detective Shulman?

8      A.   No.

9      Q.   Wouldn't you know who was with you when you made

10  an identification of an object?

11             Isn't that part of your job?

12             MS. JOHNSON:   Objection.

13             THE COURT:   Yeah, sustained.

14     Q.   You've been a police officer eight years?

15     A.   Yes.

16     Q.   In the eight years you've had academy training,

17  you've had training on the job and you've made arrests, have

18  you not?

19     A.   Yes.

20     Q.   You filled out these on-line booking forms, you're

21  used to testifying in court, are you not?

22     A.   Yes.

23     Q.   All right, now, when you testify in court as a

24  trained police officer you're trained to have an

25  observation, right?

ws

1           You're trained to be observant?

2      A.   Yes.

3      Q.   Now, I'm asking you relying on the use of your

4    training.

5           Was Detective Shulman with you when you went to

6    the car?

7      A.   I don't recall.

8      Q.   Did you have the keys to the car with you when you

9    went to the car?

10     A.   I don't recall.

11     Q.   You have a difficult memory situation there,

12   officer --

13          THE COURT:  Mr. Schechter, please, if you

14      could refrain and restrain yourself a little bit.

15          MR SCHECHTER:  I have no more questions of

16      this officer, your Honor.

17          THE COURT:  Okay.

18          Ms. Johnson, any redirect?

19          MS. JOHNSON:  No thank you, Judge.

20          THE COURT:  All right, Officer Alfaro, watch

21      your step as you step off.

22          Can I just see both attorneys real quick?

23          (Witness excused.)

24          MS. JOHNSON:  Yes, your Honor.

25          (Discussion held at the bench, off the

                                                    ws

Proceedings                          600

1       record.)

2                  THE COURT:  All right, some good news.  Good

3       news is you're going home early today.  We've kind of

4       run out of witnesses.

5                  I've been discussing with the attorneys

6       scheduling.

7                  Now, it -- as I'm sure all of you figured out

8       by now, we have moved -- been moving along,

9       notwithstanding some of our delays, pretty quickly and

10      it's anticipated that at this point the People are

11      going to be calling one more witness at which time

12      they're going to rest.  That's going to take place

13      tomorrow.

14                 The defendant, should he choose to put on a

15      case, will more than likely start tomorrow.  Tomorrow,

16      I think, is Wednesday.  So it appears - and I have my

17      fingers crossed, I know you can't see me, but I

18      actually have my fingers crossed under my robes s right

19      now - it appears as though I might be able to get this

20      case to you by the end of the week.

21                 Now, it could be Thursday, could be Friday,

22      we have to see what happens.  So obviously when I say

23      we'll get the case to you, summations, my charge and

24      obviously you'll begin your deliberations.  So we are

25      significantly ahead of schedule, so that's also a bit

                                                          ws

Proceedings                    601

1     of good news.

2              But I just want to caution that, you know,

3     jury deliberations have their own life, if you will,

4     and I certainly don't want anyone to feel by any means

5     that there's any kind of pressure or any kind of rush

6     for -- to conclude your deliberations, so it's very

7     important, it's -- I want you to take this, obviously,

8     extremely seriously, as I'm sure you will.

9              So -- but at least at this point I feel

10    relatively confident that by the end of this week I'll

11    be giving this case for you to decide.  So just -- I

12    think it's doubtful at this point, unless deliberations

13    extend, and it's been known to happen, jury

14    deliberations sometimes can go over the course of a

15    couple of days, but I'm clearly, at this point, I think

16    that you should have the case by the end of this week

17    and, again, hopefully we'll -- I'll be able to live up

18    to my word, if you will.

19             So, at this point I'm going to let you go for

20    the evening.

21             Again, as I let you go, just remember my

22    admonitions.

23             Please don't talk amongst yourselves or with

24    anyone else about the case.

25             Please don't form any opinions.

Proceedings                          602

1              Please don't do any research on line or

2       through any other means or mechanism.

3              Please don't view or visit any of the areas

4       described.

5              Get home safe.  We'll see you back here

6       tomorrow at 9:30.

7              (Jury exits.)

8              MR. SCHECHTER:  Judge, the Police Department

9       refused to accept the subpoena.  They wanted 24-hour

10      notice.  They didn't like the fact I changed the date

11      to today, so they're giving me a hard time about

12      honoring my subpoena for Detective Moran for tomorrow.

13             THE COURT:  Can I see you for a minute?

14             MS. JOHNSON:  Sure.

15             (Discussion held at the bench, off the

16      record.)

17             MR. SCHECHTER:  I would like the record to

18      reflect that it was based upon the Court's ruling to me

19      regarding the videotape that I intended to put into

20      evidence that the Court would, in the event I put it

21      into evidence, the Court would then permit the District

22      Attorney to go into those other charged acts that the

23      Court had limited her from putting into evidence.  It's

24      for that reason that I did not put these videos into

25      evidence because I felt constrained that if I did so

                                                          ws

Proceedings                    603

1    then all of the other charged crimes would be in,

2    Judge.  I have to make the record clear.

3                 THE COURT:  But you seem to have a way of --

4    and I want to be careful with what I'm going to say,

5    but, you seem to have a kind of creative view of what

6    has transpired with respect to some of my rulings.

7                 And I want to respond to it because I, quite

8    frankly, am starting to think that you're

9    misrepresenting things.

10                Number one, whether or not the People would

11   be allowed to engage or get into on redirect

12   examination things with respect to matters that I had

13   precluded based upon my Sandoval ruling, I didn't say

14   that that was definitely going to happen.

15                And, quite frankly, I'm sure you can

16   appreciate it's very difficult for me to make such a

17   ruling when I haven't even seen what was in the video

18   that you wanted to show.

19                So that has to be made clear that whatever

20   your reasons are, your reasons are, but certainly I

21   don't want to be misrepresented.  I'll speak for

22   myself.

23                I just said to you that to the extent should

24   I allow any of that material to be played by you, that

25   it could possibly open the door to the DA, and I think

Proceedings                    604

1    I said this, to the DA eliciting material that I had

2    heretofore precluded in my Sandoval ruling.

3              So I don't want it to be represented that I

4    had already made that determination.  I couldn't have

5    made that determination because I don't know what was

6    on the DVDs or the videos.

7              MR SCHECHTER:  I volunteered to show it.  I

8    showed it to counsel.  I'll show it to the Court

9    because I haven't rested yet.  I still could either

10   recall Sana Awan or perhaps get them in through another

11   way, but the fact is I would be delighted to show them

12   to the Court.  I thought I did so orally.

13             But your Honor is correct.  There's no way

14   that the Court could possibly get, from a verbal

15   description of what's in the video, unless the Court

16   sees what's in the video and I was trying to make that

17   known to the Court.

18             The videos are little vignettes, they take

19   maybe ten to 20 seconds, and there are maybe six of

20   them, that's all, and they're very short and I only

21   wanted to -- I still will show the Court, we have them

22   here.  I would like to show the Court so that the

23   record is clear what it is so that we understand the

24   basis for the ruling and so that the record has no

25   ambiguity and all and I do apologize if the Court

Proceedings                    605

1      thinks I misrepresented its position.  It was not my

2      intention.

3                  I was under the impression based upon what

4      your Honor had said that were I to put these in

5      evidence I might be opening the door to the inclusion

6      of the other charged acts and I certainly didn't want

7      to do that.

8                  However, that said, I would like to play them

9      for the Court so that the Court could see what they

10     contain.

11                 THE COURT:  Well, again, going back to what

12     we discussed before while Ms. Awan was still on the

13     witness stand, it' my impression, and correct me if I'm

14     acting under a misimpression, that these vignettes, as

15     you've characterized them, cover periods in 2006, 2007

16     and you indicated that it was the last quarter of 2007

17     into the first --

18                 MR SCHECHTER:  No, your Honor, I said, I

19     believe, November or the end of 2007 to the first

20     quarter of 2008.  I believe the last one was somewhere

21     around March, if I can recall, and the reason why I

22     wanted them put into evidence is because the People

23     have, in their opening statements and additionally

24     through the testimony of Sana Awan, have represented

25     that the fear that she had was continual from May

                                                         ws

Proceedings                    606

1       through -- rather, from 2005 through June of 2008 and

2       it was on that basis I wanted to show someone under

3       this kind of fear and terror, these videos certainly

4       belie that fear, that continual fear that counsel

5       wanted to demonstrate to the jury, and that's the

6       purpose that I wanted to show them.

7                   THE COURT:   Well, at the risk of beating a

8       dead horse, as the expression goes, as I indicated, if

9       these videos were depicting the complainant at a time

10      that was subsequent, if you will, and I even said

11      before, either the acts in Queens that I allowed the

12      People to elicit and what's contained in the

13      indictment, which I certainly would think you would be

14      entitled to because she did make reference to being

15      threatened during the period of time in May and June of

16      2008, I would certainly allow you to do that and it

17      sounds from what you're telling me is that these

18      vignettes, the latest they go to in 2008 -- that they

19      don't cover anything in 2005, 2006, 2007.

20                  MR SCHECHTER:   Well, they do, the last part.

21                  THE COURT:   The last part of 2007 and you

22      indicate that they go back as far as almost recent to

23      the indictment as March of 2008.

24                  MR SCHECHTER:   I believe, if I can recall,

25      that was approximately when the last one was.

                                                        ws

Proceedings                    607

1              THE COURT:  Well, I am -- what I will do --

2       as far as I'm concerned, my ruling stands,

3       Mr. Schechter.

4              Now that I've got the minutes, I did look at

5       them before I ruled on -- made my ruling earlier.

6       Other than the incidents in May and June of 2008, I

7       don't really think that there has been testimony where

8       Sana Awan talks about being in fear for her physical

9       safety and, in essence, the DVDs or the items that you

10      want to play for the jury seem to cover a period of

11      time that really there's been no testimony about at

12      this point.

13             I mean, there's been no testimony in the end

14      of 2007 and in 2008 it picks up in May, so you're

15      basically asking me to have the jury see snippets of

16      encounters that she had with your client and her family

17      that at a period of time that really is either not

18      relevant in the Molineaux application and certainly not

19      relevant in terms of the indictment.

20             MR. SCHECHTER:  Well, your Honor, our

21      positions are clear and your ruling is clear and I can

22      just only except.  That's why I wanted to play them for

23      the Court so the Court could see the way the

24      complaining witness was reacting to her stepfather at

25      times when she alleges she was, in fact, abused and --

                                                          ws

Proceedings                     608

1              THE COURT:  Well, would you agree with me the

2        only time she alleged -- the only time -- that

3        testimony was elicited about the abuse was in I think

4        '05.

5              MR SCHECHTER:  I believe, if I recall, your

6        Honor, there was another question counsel asked

7        concerning kitchen knife and I don't believe that was

8        in 2005.  I believe that was in 2008 that she was

9        threatened with a kitchen knife.  Counsel did extract

10        that information from her.

11              THE COURT:  When in 2008?

12              MR SCHECHTER:  I don't recall, your Honor.  I

13        don't recall.  I would have to look at the minutes.

14              THE COURT:  All right, and it sounded as

15        though -- at some point in afternoon it sounded as

16        though you were going to be ordering the minutes.

17              MR SCHECHTER:  Yes, I am.

18              THE COURT:  All right, so when you get those

19        minutes, if there's something you want to point out to

20        me I will certainly reconsider and let you renew your

21        application.  I'll certainly take a look at what I have

22        at this point.

23              MR SCHECHTER:  Okay, your Honor, thank you.

24                  Anything else we need to take up?

25                  MS. JOHNSON:  No.

                                                    ws

Proceedings                    609

1              THE COURT:   You'll make sure Detective

2    Shulman is here tomorrow?

3              MS. JOHNSON:  Yes, Judge.

4              MR SCHECHTER:  Thank you, Judge.

5              (Proceedings adjourned to Wednesday,

6    May 13th, 2009 at 9:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    ws

610

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF NASSAU : CRIMINAL TERM PART 80

 3    ------------------------------------------X
      THE PEOPLE OF THE STATE OF NEW YORK,      :   Indictment
 4                                              :   No. 2415N/09
                    -against-                   :
 5                                              :
      HAROLD GOPAUL,                            :   Sex Abuse 1
 6                                              :
                          Defendant.           :   Trial
 7    ------------------------------------------X

 8                                    May 13, 2009

 9                                    252 Old Country Road
                                      Mineola, New York
10

11    B E F O R E:

12                HONORABLE JAMES P. McCORMACK,
                            Acting Supreme Court Justice
13

14
      A P P E A R A N C E S:
15

16                (As previously noted.)

17                   *      *      *      *      *

18                THE COURT:   The record should reflect that

19         myself and counsel have had a conference back in my

20         chambers.

21                   What I brought to both counsel's attention is

22         information that was imparted to me at one point that

23         yesterday afternoon that one of our sworn jurors, it's

24         believed to be Juror Number 8, had made a comment to

25         the officer as the jurors were assembling to come
```

ws

1      upstairs, to him only, and according to my officer not

2      in the presence of any other jurors, a comment along

3      the lines that, "Why don't we just take this person and

4      shoot him, or, "Take this guy and shoot him."

5              I'm assuming that this juror was making

6      reference to the defendant.

7              My court officer said, "Please don't say

8      anything further, don't discuss it with me," and then

9      at some point yesterday brought it to my attention.

10             I've advised both counsel that what I intend

11     to do is ask this juror to come back here.  I want to

12     ask him as to whether or not he's formed a final

13     opinion about the case at this point without having the

14     benefit of either hearing the defense case, summations

15     or my instructions on the law and I want to also ask

16     him if he's formed a bias, if you will, a prejudice at

17     this point, that he feels he can no longer sit in this

18     particular case.

19             I'll ask him as to whether or not he's

20     discussed the evidence that's been testified to and

21     that's been introduced at this point with his fellow

22     jurors and, depending upon his answers, I'll make

23     further inquiry, if necessary.

24             MR. SCHECHTER:  Your Honor, respectfully

25     request, since this man has apparently vocalized very

                                                        ws

1    extreme views concerning my -- apparently my client,
2    because he's the only one here being judged at this
3    point, that Mr. Casesa's opinion might have affected
4    the entire jury, thus, notwithstanding any of his
5    answers, that the jurors be polled to see if he
6    discussed any of his opinions with them because I don't
7    expect Mr. Casesa to come in here and admit he engaged
8    in that kind of conduct.
9           THE COURT:  Well, you're assuming that he's
10   discussed the evidence with his -- with the other
11   jurors.
12          As I indicated a moment ago, I'm certainly
13   intending to ask him that question and, depending upon
14   his response, I'll take what other steps are necessary.
15          But I'm not going to, at your request, at
16   this point start poling the jurors as to whether or not
17   he has discussed the evidence with them at this point
18   without having the benefit of hearing from him.
19          Artie, if you would ask Chris, if he's with
20   the jury, ask him to come up with all of his
21   belongings.
22          MR. SCHECHTER:  I would like the record to
23   reflect, your Honor, that my client has, in fact,
24   executed an Antommarchi waiver and this conference is
25   being held in your Honor's chambers.

613

1           My client has been informed by me the purpose

2      of this conference, so it's not as if my client has not

3      been informed as to what's going on.

4           THE COURT:  Okay.

5           (Juror enters.)

6           THE COURT:  Hi, Mr. Casesa, come on in.

7           It is Mr. Casesa, right?

8           THE JUROR:  Yes.

9           THE COURT:  Come on in, relax.

10          Mr. Casesa, I brought you up here because it

11     came to my attention yesterday that you had made a

12     comment to one of my officers about --

13          THE JUROR:  Oh, I'm sorry.

14          THE COURT:  Let me just finish, that, you

15     know, made a comment that -- and I'm not trying to put

16     words in your mouth, but something about, "Why don't we

17     just take this person out and shoot him," or words to

18     that effect.

19          THE JUROR:  It was stupid on my side.  Sorry.

20          THE COURT:  And I take it by that that you

21     did say that, that that was something --

22          MS. JOHNSON:  I did, out of outrage or

23     something --

24          THE COURT:  Look, it's not uncommon for

25     people to, you know, form certain tentative opinions.

                                                    ws

614

1           Obviously, we're concerned that you've formed

2      a final opinion about the case without having heard the

3      defendant's case, if they decide to put one on, without

4      hearing the summations and the instructions on the law

5      and I'm obviously very concerned about that.

6           Have you come to a final conclusion at this

7      point?

8           THE JUROR:  No, no.

9           THE COURT:  All right.  Now, my other concern

10     is have you discussed the evidence at this point in the

11     case with other jurors?

12          THE JUROR:  No.

13          THE COURT:  Or have you made similar comments

14     to other jurors?

15          THE JUROR:  No, no.

16          THE COURT:  That's another concern of mine.

17          Okay, all right, and you're telling me the

18     truth?

19          THE JUROR:  Yeah, sure.

20          THE COURT:  All right, and you feel at this

21     point that you could be fair and impartial to both

22     sides?

23          THE JUROR:  I would like to hear the rest of

24     it, the defense, to make up my mind, but that was

25     just -- I don't know why that came out.  I don't even

1       know why.

2                    THE COURT:  All right, look, again, we're all

3       human, as I said to you during jury selection, and if I

4       recall correctly during jury selection I know that

5       you -- and I don't know if it was you, but you'll tell

6       me if it wasn't, that you had said -- you may have been

7       asked by one of the attorneys as to whether or not you

8       could be fair and impartial if you heard certain

9       emotional testimony.

10                   THE JUROR:  I did.  That was me, yes.

11                   THE COURT:  And you seemed to be concerned

12      about that.

13                   THE JUROR:  Little bit.  But now it's, you

14      know, I hear more things and, you know, it's like --

15                   THE COURT:  Okay.  Why don't you do me a

16      favor, Mr. Casesa, just have a seat in the courtroom.

17      I need to discuss some things with the attorneys and

18      then I'll have you back, okay?

19                   THE JUROR:  Sure.  Thank you.

20                   THE COURT:  Just follow my officer outside.

21                   (Juror exits.)

22                   THE COURT:  Mr. Schechter, what's your

23      pleasure?

24                   MR. SCHECHTER:  First of all, I would like

25      him excused and replaced by an alternate.

1           But, secondly, I would respectfully ask the

2    Court make inquiry of the entire jury to see if, in

3    fact, they were infected with this man's comments,

4    notwithstanding his representations that he did not

5    discuss either his opinions or the evidence with the

6    other jurors.  I am concerned that he might have

7    infected the other jurors and perhaps tainted them in

8    some way because of his apparently extreme opinions.

9           THE COURT:  Well, I think the record should

10   reflect that rather than denying making the statement,

11   Mr. Casesa was actually fairly candid and readily

12   acknowledged the fact that he did say that.

13           I then asked him whether or not he expressed

14   any opinion about the evidence with fellow jurors.  He

15   said no.

16           I then asked him if he expressed any similar

17   comments to the jurors and, again, he said no and I

18   asked him a third time if he was telling me the truth

19   and he said he was.

20           The officer that he made the comment to is

21   here, Mr. Kenneth Gordon, and, Ken, I believe that when

22   he made that comment to you there was no other jurors.

23           COURT OFFICER:  There was nobody around.  He

24   was separate and apart from everybody.

25           THE COURT:  So, People?

                                                          ws

1          MS. JOHNSON:  We consent to having him

2     excused and replaced with the alternate.

3          THE COURT:  Do we know who our first

4     alternate is?

5          THE CLERK:  It would be Dennis Hearn.

6          THE COURT:  Just so the record is clear, I'm

7     going to grant your application, Mr. Schechter.  I'll

8     excuse Mr. Casesa with our thanks.

9          I'm not going to grant the second part of

10    your application to conduct an inquiry of the remainder

11    of the jury.  I think the record is pretty clear that

12    he has not made such comments to them.

13          MR. SCHECHTER:  Please note my exception.

14          THE COURT:  And at this point I don't see the

15    necessity to do this at this point.

16          People, you are consenting to the defendant's

17    application with respect to excusing Mr. Casesa?

18          MS. JOHNSON:  We consent to that, yes.

19          THE COURT:  All right, so -- off the record.

20          MR. SCHECHTER:  Would the Court please direct

21    Mr. Casesa to have no other contact with the other

22    jurors?

23          THE COURT:  He's got all of his stuff.

24    That's why I asked him to come up here with everything.

25          Kenny, if you would just ask him not to go

618

1       downstairs and that -- what would he do, just report to

2       central jury?

3                    THE CLERK:  He doesn't have to.  He could

4       just go home, if he wants.

5                    COURT OFFICER:  I'll walk him down out the

6       door, Judge.

7                    THE COURT:  All right, let's bring him back.

8                    (Juror enters.)

9                    THE COURT:  Mr. Casesa, out of an abundance

10      of caution, and I want to first of all thank you for

11      your candor, I think it's probably best, at this point,

12      that I excuse you from the case and, again, with my

13      thanks and I just think at this point it's probably

14      best.

15                   I know you said that you felt that you could

16      still remain to be fair and impartial, but obviously,

17      you know, the comment or -- the comment is one that

18      obviously concerns the parties in the case and that's

19      why we pick alternates.

20                   So I don't want you to think that because of

21      it the trial is not going to go on, it is, and -- but I

22      want to thank you and what I'm going to ask you to

23      do -- you're excused at this point.  You can leave.  My

24      officer will, you know, tell you where to go.

25                   I think you brought up all your belongings

                                                            ws

619

1     from downstairs?

2                    THE JUROR:  Yeah.

3                    THE COURT:  And, again, you'll get the

4     benefit of enjoying this beautiful day more than us.

5                    So thank you very much and I appreciate your

6     service.

7                    THE JUROR:  Okay, thank you.  Bye-bye.  Have

8     a good day.

9                    (Juror excused.)

10                   THE COURT:  All right, we'll replace

11    Mr. Casesa with Mr. Hearn and if either of you want I

12    would just direct the jury that they may notice that

13    there's one of our alternates has replaced the seated

14    juror, they're not to speculate upon why or draw any

15    conclusions or inferences, if you want.  If you don't

16    want me to, I won't.

17                   MR. SCHECHTER:  I think that that instruction

18    would be good.

19                   MS. JOHNSON:  I have no problem with that.

20                   (Conference in chambers concludes.)

21                   (Pause the proceedings.)

22                   (Jury enters.)

23                   THE CLERK:  Case on trial, People of the

24    State of New York against Harold Gopaul,

25    Indictment 2415N of 2008.

620

1               Are both counsel ready to proceed?

2               MS. JOHNSON:  Ready.

3               THE COURT:  All right, good morning, members

4       of the jury.

5               You'll obviously notice that, Mr. Hearn, you

6       have now, as our first alternate, have now been seated

7       as Juror Number 8.

8               I don't want anybody to speculate, obviously,

9       why prior Juror Number 8 has been excused.  I don't

10      want anybody to speculate.  It's of no moment or no

11      concern to you and you should not draw any inference

12      over the fact that one of our sworn jurors has been

13      replaced by an alternate.

14              So at this point we're ready to proceed.

15              Ms. Johnson, if you would?

16              MS. JOHNSON:  Your Honor, People call

17      Detective Lennard Shulman.

18              THE COURT:  Detective Shulman.

19  L E O N A R D   S H U L M A N, a witness called on behalf of

20      the People, having been first duly sworn by the

21      clerk of the Court, was examined and testified under

22      oath as follows:

23              COURT OFFICER:  Okay, have a seat please.

24              For the record, state your name, spell your

25      last name, your shield number, your rank and command.

Shulman - People - direct          621

1              THE WITNESS:  Detective Lennard Shulman,

2        L-e-n-n-a-r-d, S-h-u-l-m-a-n, Shield 6387, assigned to

3        the 105 Precinct detective squad of the New York City

4        Police Department.

5              THE COURT:  Ms. Johnson?

6              MS. JOHNSON:  Thank you.

7    DIRECT EXAMINATION

8    BY MS. JOHNSON

9        Q.   Good morning, Detective Shulman.

10       A.   Good morning.

11       Q.   How long have you been employed by the New York

12   City Police Department?

13       A.   Approximately the last 15-1/2.

14       Q.   Throughout the last 15-1/2 years could you tell us

15   the nature of the assignments you've worked and appointments

16   you worked in?

17       A.   October of 1993 I was assigned as a probationary

18   police officer to the Police Academy.

19             On March of '94 I graduated the Police Academy and

20   was assigned to the 104 Patrol Precinct as a uniformed

21   officer.

22             In November of 1997 I was assigned to a city-wide

23   anti-crime unit as a police officer.

24             In June of 1999 I was promoted to detective

25   specialist within the same unit.

1       In April of 2002 I was promoted to detective

2  investigator and assigned to the 105 Precinct detective

3  squad as a case investigator and February of '08 my

4  assignment was changed to homicide and shooting investigator

5  and in March of '08 I was promoted to second grade

6  detective.

7       Q.   What is your current title?

8       A.   Detective second grade assigned as a homicide

9  investigator in the 105 Precinct detective squad.

10      Q.   And what are your general duties in that capacity

11 while assigned to the 105?

12      A.   Primarily to investigate homicide and shooting

13 cases and to also investigate any other cases that are

14 referred to my office.

15      Q.   Where is the 105 located?

16      A.   In Queens County in Queens Village.

17      Q.   I'm going to direct your attention to June 23rd,

18 2008.

19           Were you working that day?

20      A.   Yes, I was.

21      Q.   Where were you working?

22      A.   I was assigned to the 105 Precinct detective

23 squad.

24      Q.   As a detective?

25      A.   Yes.

ws

Shulman - People - direct        623

1       Q.    What were your general responsibilities as a

2   detective on that particular day?

3       A.    Again, I was assigned as a homicide investigator

4   and overall investigator to assist with any cases coming

5   into my office.

6       Q.    Did that include interviewing victims of crimes?

7       A.    Yes, it did.

8       Q.    And processing paperwork?

9       A.    Yes, it did.

10      Q.    Did there come a time on June 23rd, 2008 that you

11  were assigned to a particular investigation?

12      A.    On the morning of June 21st -- 24th, about 2:30 in

13  the morning, I was contacted by the detective bureau,

14  Queens, and informed that there was --

15            MR. SCHECHTER:  Objection.

16            THE COURT:  Yeah, just don't tell us what

17       they said.

18      Q.    What was your tour that day?

19      A.    I was working a 1627, which would be 4:27 p.m., on

20  the afternoon of June 23rd of '08 and I was working until

21  0100, 1 a.m., on the morning of the 24th.

22      Q.    Without telling us the details of what you were

23  informed, what was the nature of the case that you were

24  assigned to?

25      A.    It was a sexual allegation involving a 17-year-old

                                                            ws

Shulman - People - direct          624

1     female complainant and an allegation against her stepfather.

2          Q.    What was the name of that complainant?

3          A.    Sana Awan.

4          Q.    And who was the subject of that investigation?

5          A.    Her stepfather, Harold Gopaul.

6          Q.    Do you see that individual in the courtroom today?

7                     THE WITNESS:  Can I move, your Honor?

8                     THE COURT:  Yes.

9                     (Witness steps down.)

10                    MR. SCHECHTER:  Acknowledging Mr. Gopaul.

11                    THE COURT:  All right, can you see

12         Mr. Gopaul, detective?

13                    THE WITNESS:  Yes, I do.

14                    THE COURT:  The record will reflect that

15         identification.

16                    (Witness resumes the stand.)

17         Q.    Detective, throughout the course of your tour on

18    June 23rd into the 24th on 2008, did there come a time that

19    you came in contact with this woman Sana Awan?

20         A.    Yes, there did.

21         Q.    Can you tell us the circumstances of your contact

22    with her?

23         A.    I initially had spoken to an ACS case worker that

24    was in the precinct investigating the same matter and after

25    concluding my conversation with the ACS worker I spoke to

                                                              ws

Shulman - People - direct          625

1    Ms. Sana Awan up in an interview room in the 105 Precinct

2    detective squad.

3         Q.   What was her emotional state at the time you first

4    encountered Ms. Awan?

5         A.   She seemed very scared, seemingly emotional.  She

6    had some injuries to both of her arms, like welt marks on

7    both arms.

8         Q.   What was it about her that led you to believe that

9    she was scared or upset?

10        A.   Her demeanor and her physical actions.

11        Q.   Did you have the opportunity to actually interview

12   Sana?

13        A.   I did.

14        Q.   And was that done in private?

15        A.   Yes, it was.

16        Q.   Can you tell us the nature of what she reported to

17   you?

18             MR. SCHECHTER:  Objection.

19             THE COURT:  Yes, sustained.

20        Q.   Did she make a complaint to you?

21             MR. SCHECHTER:  Objection, trying to get

22        around hearsay, Judge.

23             THE COURT:  Yeah, allow it to the extent of a

24        yes or no without getting into the details of it.

25        Q.   Did she inform you why she was at the precinct?

                                                            ws

Shulman - People - direct          626

1        A.   Yes, she did.

2        Q.   Did she -- without telling us what she said did

3   she tell you the details of why she was at the precinct?

4        A.   She did, yes.

5        Q.   And did she tell you who she was referring to?

6        A.   Yes, she did.

7        Q.   Without telling us what she said did she describe

8   certain physical objects to you?

9                MR. SCHECHTER:  Judge, at this point I got to

10        object.

11                THE COURT:  Just, please, say objection.

12                MR. SCHECHTER:  Objection.

13                THE COURT:  Yeah, I'm going to sustain that.

14        Q.   Did she give you details -- without telling us

15   what they were, did she give you details about what she was

16   reporting?

17                MR. SCHECHTER:  Objection.

18                THE COURT:  Yeah, overruled.

19                That's a yes or no.

20        A.   Yes.

21        Q.   Detective, did you memorialize your interview with

22   Ms. Awan in writing?

23        A.   Yes.

24        Q.   And did you memorialize -- without telling us what

25   she said, did you memorialize the details of what she told

                                                        ws

Shulman - People - direct          627

1    you in writing?

2        A.    Yes.

3        Q.    Did there come a time while you were interviewing

4    Ms. Awan that the defendant came into the police precinct?

5        A.    Yes.

6        Q.    How were you notified about that?

7        A.    Sergeant O'Hagan of the 105 Precinct contacted me

8    and informed me that Mr. Harold Gopaul had come into the

9    precinct and was taken into custody.

10       Q.    Where were you when he informed you of that?

11       A.    I was in my office.

12       Q.    Where was Ms. Awan?

13       A.    She was in my office in an interview room.

14       Q.    Did there come a time when you did have contact

15   with the defendant?

16       A.    Yes.

17       Q.    Can you tell us when that happened?

18       A.    That was June 24th at approximately 5:10 in the

19   morning.

20       Q.    Was that before or after you had interviewed

21   Ms. Awan?

22       A.    I had spoken to Ms. Awan prior to that and

23   subsequent to that I interviewed her again.

24       Q.    Was it before or after she told you why she was --

25             MR. SCHECHTER:  Objection, once again.

ws

Shulman - People - direct          628

1        THE COURT:  All right, Mr. Schechter.  I
2    can't make a ruling unless I hear the entire question.
3        MR. SCHECHTER:  Well, your Honor, I would
4    like to be heard on the record then, if I could, so --
5        THE COURT:  All right, come on up here.
6        COURT OFFICER:  Detective, step down, please.
7        (Witness steps down.)
8        (Sidebar conference held as follows:)
9        MR. SCHECHTER:  Ms. Johnson is attempting to
10   engage in not only getting in indirectly hearsay
11   information, but she's engaging in improper bolstering
12   of Ms. Awan's testimony through this officer and that,
13   I respectfully submit, is improper and all of that line
14   of questioning with respect to his communications with
15   Sana Awan at this point is further designed to do the
16   very same thing and I haven't asked for a mistrial yet,
17   but if it keeps going I will, Judge.
18       MS. JOHNSON:  Your Honor, what I was going to
19   ask him was whether or not he spoke to defendant before
20   or after he spoke to Sana Awan about why she was at the
21   precinct.
22       It's absolutely relevant that he spoke to her
23   before and she gave these details before he ever spoke
24   to the defendant, especially when he's saying these
25   statements were coerced.

                                                      ws

1            MR. SCHECHTER:  She already elicited that.

2            THE COURT:  All right, look, I'll allow you

3       to ask questions regarding his interaction.

4            I'm not going to allow you to get out in some

5       indirect fashion the content of what she says.

6            MS. JOHNSON:  Judge, my point --

7            THE COURT:  I mean, for a number of reasons.

8            MS. JOHNSON:  My purpose is for the timing of

9       it, but, even so, counsel has made it quite clear

10      through his cross-examination of the victim that she

11      didn't disclose certain information to the detectives

12      so I believe it absolutely is relevant that she told

13      him those details.

14           Obviously, I respect your Honor's ruling, but

15      the fact she told him those details goes absolutely to

16      the voluntariness of his statement and the fact --

17           THE COURT:  You can ask him whether or not --

18      whether or not before speaking to the defendant he had

19      interviewed Sana Awan.

20           MR. SCHECHTER:  She already asked that.

21           THE COURT:  I think that's already been

22      established.

23           MR. SCHECHTER:  As far as what I'm doing, I

24      never alleged that what she told Detective Shulman --

25      it was only as to Moran, so what I counsel is doing is

                                                      ws

Shulman - People - direct        630

1       improper.

2                THE COURT:  I think it's clear he spoke to

3       the complainant before the interviews.

4                Is that what you're looking to establish?

5                MS. JOHNSON:  Not what the details were, but

6       she gave him the details of her complaint before he

7       spoke to the defendant and that's my exact question.

8                THE COURT:  And you just asked him, "Did you

9       take a written statement from her?  Did you memorialize

10      your conversations with her."

11               MS. JOHNSON:  But then he said he wasn't done

12      interviewing her, he went back, so I just wanted to

13      make it clear that he had almost completely interviewed

14      her about the details before he spoke to the defendant.

15               THE COURT:  I mean, I'll allow it just as

16      long as it doesn't start getting to the point where the

17      details become apparent.

18               MS. JOHNSON:  That's my last question.

19               MR. SCHECHTER:  That's what she's doing.  I

20      think we reached that point and that's why I made my

21      objection.

22               MS. JOHNSON:  I'll preface by saying without

23      saying any details.

24               THE COURT:  I'll make my rulings.

25               (Sidebar conference concludes.)

Shulman - People - direct          631

1                    (Witness resumes the stand.)

2                    THE COURT:  Ms. Johnson, do you want to

3          rephrase or repeat the question?

4                    MS. JOHNSON:  Yes, Judge.

5          Q.    Detective Shulman, without telling us what anybody

6     told you, did you have a detailed interview with Sana before

7     you met with the defendant?

8          A.    I did.

9          Q.    Can you tell the jury where it was that you first

10    came into contact with the defendant?

11         A.    In an interview room inside the 105 Precinct

12    detective squad.

13         Q.    Can you describe for us what that interview room

14    looked like?

15         A.    I'm going to guesstimate that maybe it's nine or

16    ten feet wide by maybe, you know, ten feet deep.  There's a

17    couple of chairs and a table in the room in between the

18    chairs.

19         Q.    And why was it that the defendant was in that

20    room?

21         A.    My other interview room was occupied by Ms. Awan.

22         Q.    Were they kept separate the entire time?

23         A.    Yes.

24         Q.    Who was in the room with the defendant when you

25    first encountered him?

                                                          ws

Shulman - People - direct          632

1       A.    He was in the room by himself and there was one of

2  the patrol officers from downstairs was securing the door.

3       Q.    Was he handcuffed?

4       A.    No, he was not.

5       Q.    What was he wearing?

6       A.    He was wearing some sort of bluish uniform that

7  had Ecolab patches on his arms.

8       Q.    What was he doing?

9       A.    He was just sitting in a chair at a table.

10      Q.    Was he sleeping?

11      A.    No.

12      Q.    When you went into that room where was your

13  weapon?

14      A.    It was locked up and secured in my office outside

15  of the interview room.

16      Q.    Why?

17      A.    Because I was going to interview a prisoner and

18  it's protocol not to have a weapon on you when you interview

19  a prisoner.

20      Q.    Is that Police Department procedure?

21      A.    Yes.

22      Q.    When you went into the room to speak to the

23  defendant what was -- what did you say to him?

24      A.    I introduced myself to him.  I indicated to him

25  that I was conducting an investigation involving his

ws

Shulman - People - direct          633

1    daughter Sana Awan and that before I questioned him I needed

2    to read him Miranda warnings.

3          Q.    What was his response to you?

4          A.    He acknowledged that I was going to read him

5    something and then, you know, I proceeded to read Miranda

6    warnings to him.

7                MS. JOHNSON:   Your Honor, I'm going to ask

8          this be marked as People's 6 for identification

9          purposes.

10               THE COURT:   People's 6 for ID.

11               (People's Exhibit 6 marked for

12         identification.)

13               (Shown to witness.)

14         Q.    Detective, if you could take a look at People's 6

15   for identification.

16               Do you recognize that?

17         A.    Yes, I do.

18         Q.    What do you recognize it to be?

19         A.    It's the original copy of the Miranda warnings

20   that I used to read the Miranda warnings to Mr. Gopaul on

21   the morning of June 24th of '08.

22         Q.    How do you know that?

23         A.    My handwriting appears on it as well as my

24   signature and the shield number that I affixed upon it.

25         Q.    Is that the original?

ws

Shulman - People - direct          634

1          A.    This is the original.

2          Q.    And is it in the same or substantially the same

3    condition as it was on June 23rd 2008 -- 23rd into the 24th

4    2008?

5          A.    Yes.

6                MS. JOHNSON:   Your Honor, at this time we

7          offer People's 6 into evidence.

8                THE COURT:   Show it to Mr. Schechter.

9                (Shown to counsel.)

10               MR. SCHECHTER:   May I have a voir dire?

11               THE COURT:   Yes.

12   VOIR DIRE EXAMINATION

13   BY MR. SCHECHTER:

14         Q.    Detective Shulman, I notice on this piece of paper

15   there's a word yes and initials next to it.

16               Who wrote the yes?

17         A.    I did.

18         Q.    And who wrote the initials?

19         A.    Mr. Gopaul.

20         Q.    Isn't it a fact that those yeses were put on this

21   form prior to you going into the room?

22         A.    Absolutely not.

23               MR. SCHECHTER:   I'm going to object to this

24         document, your Honor.

25               THE COURT:   All right, over objection, the

                                                              ws

Shulman - People - direct          635

1    People's 6 will be received in evidence.

2                (People's Exhibit 6 received in evidence.)

3                (Shown to witness.)

4                MS. JOHNSON:  Your Honor, I'm going to be

5    utilizing the overhead.  I don't know, with the Court's

6    permission and the officers, if the detective could

7    step down if he can't see it from there?

8                THE COURT:  So why don't you give that,

9    detective, to my officer?

10               You want to use the overhead?

11               MS. JOHNSON:  Yes, Judge.

12               THE COURT:  All right, detective, why don't

13   you just step down and maybe you could stand so you're

14   not blocking the jury.

15               (Witness steps down.)

16               THE COURT:  Just right where you are.

17               If you need, Detective Shulman, to get closer

18   to that overhead projector you could just kind of move

19   closer back.

20               I don't know what questions Ms. Johnson is

21   going to ask, but I'm assuming at some point she's

22   going to ask you to make reference to that document.

23   DIRECT EXAMINATION CONT'D

24   BY MS. JOHNSON:

25        Q.    Detective, if you could take a look at People's 6

                                                        ws

Shulman - People - direct          636

1      in evidence that's on projector?

2              Could you read for this jury how it was that you

3      read Miranda warnings to the defendant on June 24th, 2008

4      and include his responses to your questions?

5          A.    Okay.   I just said to Mr. Gopaul, "I'm going to

6      read to you Miranda warnings.   I need for to you answer

7      clearly yes or no, you understand the questions I'm asking

8      you."

9              I then said, "Question 1.   You have the right to

10     remain silent and refuse to answer questions.   Do you

11     understand?"

12             Mr. Gopaul replied yes.   I wrote his yes answer.

13             I then said, "Question Number 2.   Anything you do

14     say may be used against you in a court of law.   Do you

15     understand?"

16             Mr. Gopaul answered yes.   I wrote his answer yes

17     down.

18             I said, "Question Number 3.   You have the right to

19     consult an attorney before speaking to the police and to

20     have an attorney present during any questioning now or in

21     the future.   Do you understand?

22             Mr. Gopaul replied yes.   I wrote his yes answer.

23             "Question 4.   If you cannot afford an attorney one

24     will be provided for you without cost.   Do you understand?"

25             Mr. Gopaul replied yes and I wrote his yes answer.

ws

Shulman - People - direct          637

1        I said, "Question 5.  If you do not have an

2   attorney available you have the right to remain silent until

3   you have an opportunity to consult with one.  Do you

4   understand?"

5        Mr. Gopaul replied yes and I wrote his yes answer

6   on the paper.

7        "Question 6.  Now that I have advised you of your

8   rights are you willing to answer questions?"

9        Mr. Gopaul replied yes at that time and I wrote

10  his yes answer down at that time.

11       Q.   Can you tell us what this 0510 on the top right

12  hand corner is?

13       A.   I wrote the time down as being 5:10 a.m. as the

14  time I was starting to read the Miranda warnings to

15  Mr. Gopaul.

16       Q.   And can you tell us on the bottom of that exhibit

17  who -- can you tell us who put those markings on the bottom

18  of that card, including the defendant's name, the signature,

19  the date, the times and your information?

20            THE WITNESS:  If I could just for one moment,

21       to complete my answer from the previous question, your

22       Honor?

23            THE COURT:  Yes.

24            THE WITNESS:  After completing all six

25       questions and Mr. Gopaul answering yes to all six

ws

Shulman - People - direct          638

1    questions, I then said, "I would like you to read it

2    and make sure that your answers to these questions --

3    read it yourself."

4              I handed the piece of paper to Mr. Gopaul.

5    He said each question holding the paper up to himself.

6    He then indicated each of his answers were yes and that

7    he still wanted to speak to me.

8              I then said to Mr. Gopaul, "If those are your

9    answers, if you could please initial those as your

10   answers and if you could place your printed name and

11   signed name on the bottom that you're affirming that

12   you've been read these rights."

13             Mr. Gopaul placed his initials next to each

14   yes answer I had written.  He then printed and signed

15   his name on the lower portion.

16             Upon that completion I did then sign my name

17   and place my shield number next to my name as witness

18   and then I did note the date and time that the warnings

19   were completed being read and signed.

20   Q.   Is that what that 0515 means?

21   A.   Yes, as indicating it's 5:15 in the morning.

22   Q.   You can have a seat.

23             (Witness resumes the stand.)

24   Q.   Detective Shulman, did you observe the defendant

25   look at that piece of paper prior to him signing it?

ws

Shulman - People - direct          639

1          A.   Yes, I did.

2          Q.   Did you observe him mark his signature on that

3     document?

4          A.   Yes, I did.

5          Q.   At any time did the defendant indicate to you that

6     he no longer wished to speak with you?

7          A.   No, he did not.

8          Q.   At any time did he indicate he wished to speak to

9     an attorney?

10         A.   No, he did not.

11         Q.   At any time or -- was any physical force used upon

12    him?

13         A.   No, it was not.

14         Q.   Were any promises made to him?

15         A.   No.

16         Q.   Were his answers in English?

17         A.   Yes.

18         Q.   Did -- at any point did he indicate he did not

19    understand you?

20         A.   No, he did not.

21         Q.   At any point did he indicate to you he had a

22    question for you?

23         A.   No, he did not.

24         Q.   At the time that these Miranda warnings were being

25    issued to the defendant did he ever complain of pain?

Shulman - People - direct          640

1        A.    No.

2        Q.    Did he ever ask to receive medical attention?

3        A.    No.

4        Q.    Did you ever observe any injuries on him?

5        A.    No, I did not.

6        Q.    After People's 6 in evidence was issued to this

7    defendant can you tell us what was the next conversation you

8    had with him?

9        A.    I then said to Mr. Gopaul that I also had -- that

10   the investigation concerned something to do with the vehicle

11   he was in possession with and his home and that I was going

12   to ask him -- I was going to need him to waive and give me

13   consent to search both the vehicle and the home.

14       Q.    Was this before or after he signed that Miranda

15   card?

16       A.    After.

17              MS. JOHNSON:  Your Honor, I would ask that

18          this be marked as People's 7 for identification

19          purposes.

20              THE COURT:  People's 7.

21              (People's Exhibit 7 marked for

22          identification.)

23              THE COURT:  Okay.

24       Q.    Detective, if you could take a look at People's 7

25   for identification.

                                                        ws

Shulman - People - direct          641

1                    (Shown to witness.)

2          Q.    Do you recognize that?

3          A.    I do.

4          Q.    What do you recognize it to be?

5          A.    It is a consent form that I filled in some

6     information and then read to Mr. Gopaul when asking him to

7     consent to search the vehicle that he was the legal

8     custodian of at the time.

9          Q.    How do you know that?

10         A.    My handwriting appears on the top on the portions

11    that I filled in and after Mr. Gopaul said he acknowledged

12    what I was reading to him, he did print and sign his name on

13    the bottom.

14              He did date -- he did place the date and time and

15    then I did affix my signature and my shield number as

16    witness to his signature.

17         Q.    Is that the original?

18         A.    Yes, it is.

19         Q.    Is it in the same or substantially the same

20    condition it was on June 24th, 2008?

21         A.    Yes, it is.

22              MS. JOHNSON:   Your Honor, we offer People's 7

23         into evidence.

24              MR. SCHECHTER:   May I see the document,

25         please, your Honor?

ws

Shulman - People - direct          642

1            THE COURT:  Yes.

2                 (Shown to counsel.)

3            MR. SCHECHTER:  May I have a voir dire?

4            THE COURT:  Yes.

5   VOIR DIRE EXAMINATION

6   BY MR. SCHECHTER:

7       Q.   Now, Detective Shulman, this document was executed

8   subsequent to the Miranda warnings, is that correct?

9       A.   Yes.

10            MR. SCHECHTER:  On that basis I'm going to

11       object to this document, Judge.

12            THE COURT:  All right, over objection,

13       People's 7 will be received in evidence.

14            (People's Exhibit 7 received in evidence.)

15      Q.   Detective Shulman, subsequent means after, right?

16      A.   That's correct.

17            MS. JOHNSON:  I'm going to ask to put that on

18       the projector again.

19            THE COURT:  Do you need him to step down

20       again?

21            MS. JOHNSON:  It's up to the detective if he

22       can see or he can't see.

23            THE COURT:  I don't think he's going to see

24       it from where he's sitting.

25            MS. JOHNSON:  With the Court's permission --

                                              ws

Shulman - People - direct          643

1         THE COURT:  Detective, why don't you just
2      step down here like you did before --
3            (Witness steps down.)
4      Q.   Detective Shulman, can you tell the members of the
5   jury what is depicted on People's 7 in evidence and how it
6   was that the defendant was advised of his rights with that
7   consent form?
8      A.   Okay, I had a pre-printed consent form that is
9   used in the regular course of police business.
10           I wrote in Mr. Gopaul's name in my handwriting.  I
11   wrote in the vehicle information on the vehicle that I was
12   informed that he was using and that he was in possession of.
13           After filling in some of those blanks I then said
14   to Mr. Gopaul, "I'm going to read you a consent form to
15   search your vehicle and I read, you know, 'I, Harold Gopaul,
16   am the owner/legal custodian of a 2006 Dodge Ram
17   model vehicle bearing license plate number 22726J, as in
18   John, V, as in Victor," I believe it says, and, "'VIN number
19   1D, as in David, 7H, as in Henry, A, as in Adam, A -- '"
20           THE WITNESS:  I'm having a hard time reading
21      it on this screen, your Honor?
22           THE COURT:  Yes, why don't you just pick it
23      up?
24           Members of the jury, all of these exhibits
25      that are received in evidence, just so you know, will

                                                    ws

1       be available to you during your deliberations, so I

2       don't want you to think that you won't be able to see

3       it, touch it, so.

4               Go ahead, detective.

5       A.    Again, VIN number 1D, as in David, 7H, as in

6    Henry, A, as in Adam, 16N, as in Nancy, X, as in x-ray, 6J,

7    as in John, 220067.

8       Q.    Will you be able to see the rest?

9       A.    Yeah, I just couldn't read those particular

10   numbers.

11      Q.    And what did you advise the defendant?

12      A.    Okay, "Which is currently located at the side of

13   the 105 Precinct."

14              I then said to Mr. Gopaul, "I have been duly

15   advised of my rights to one, refuse such consent; two,

16   require that a search warrant be obtained prior to any

17   search; three, that if I do consent to a search any evidence

18   found as a result of such search can and will be used

19   against me in any criminal proceeding; four, that I may

20   withdraw my consent to search any time prior to this

21   conclusion."

22              I then read, "I knowingly, intelligently and

23   voluntarily waive my above rights and consent and authorize

24   Detective," and I wrote my name, "Shulman or his duly

25   authorized agent of the New York City Police Department to

1    conduct said search."

2         Q.    And what happened after you read that to the

3    defendant?

4         A.    Okay, Mr. Gopaul then verbally said to me that he

5    consented to me searching the vehicle.

6              I then said, "I would like to you read this

7    yourself so that you understand what I just read to you and

8    that you are voluntarily waiving your rights to me."

9              I handed the piece of paper to Mr. Gopaul and he

10   read the piece of paper, after which he again said, "Yes, I

11   consent."

12             I then said, "If you could please print and sign

13   your name on the lower portion," which he then did write the

14   date and time that he was signing it and then I signed my

15   signature and placed my shield number as witness.

16        Q.    It was the defendant that wrote the date and the

17   time?

18        A.    That is correct.

19        Q.    And you observed that?

20        A.    Yes, I did.

21        Q.    You also observed him put his name and his

22   signature on there?

23        A.    Yes, I did.

24        Q.    You can have a seat.

25             (Witness resumes the stand.)

ws

1    Q.   Detective Shulman, at any time while the defendant

2   was being asked to consent to search his vehicle did he ask

3   to speak to an attorney?

4    A.   No.

5    Q.   At any time did he indicate to you he no longer

6   wished to speak with you?

7    A.   No.

8    Q.   Did he ever indicate to you he no longer wished to

9   consent for you to search his vehicle?

10    A.   No.

11    Q.   At any time did you make any promises to him

12   during that period of time?

13    A.   No, I did not.

14    Q.   Any physical force used upon him?

15    A.   No.

16    Q.   Was he handcuffed?

17    A.   No, he was not.

18    Q.   Where was your gun?

19    A.   It was still locked up and secured out in my

20   office.

21    Q.   After that form was signed by the defendant what

22   did you do next?

23    A.   Actually, I believe prior to that form I had read

24   Mr. Gopaul a consent to search his home.

25            MS. JOHNSON:  Your Honor, I would ask that

ws

1      this be marked as People's Exhibit 8 for

2      identification.

3              (People's Exhibit 8 marked for

4      identification.)

5      Q.    Detective Shulman, do you recognize

6  People's 8 for identification?

7      A.    I do.

8      Q.    What do you recognize it to be?

9      A.    It is the original consent to search form that I

10  prepared on June 24th of '08 that I read to Mr. Gopaul that

11  he waived -- giving consent to search his home.

12     Q.    How do you know that that's it?

13     A.    My handwriting appears on the boxes that I filled

14  in.  I observed Mr. Gopaul sign his name and I also affixed

15  my signature and shield number as witness after it was

16  complete.

17     Q.    Is that the original?

18     A.    This is the original.

19     Q.    And is it in the same or substantially the same

20  condition it was on June 24th, 2008?

21     A.    Yes, it is.

22              MS. JOHNSON:  Your Honor, I would offer

23     People's 8 into evidence.

24              MR. SCHECHTER:  May I have a look at that?

25              THE COURT:  Yes.

ws

Shulman - People - direct        648

1                    (Shown to counsel.)

2                    MR. SCHECHTER:  May I have a voir dire?

3                    THE COURT:  Yes.

4     VOIR DIRE EXAMINATION

5     BY MR. SCHECHTER:

6          Q.   Detective Shulman, was this paper executed after

7     the original Miranda warnings were issued?

8          A.   Yes.

9                    MR. SCHECHTER:  Respectfully object, your

10         Honor.

11                   THE COURT:  Over objection, People's 8 will

12         be received in evidence.

13                   (People's Exhibit 8 received in evidence.)

14                   THE COURT:  Okay, Ms. Johnson.

15    DIRECT EXAMINATION CONT'D

16    BY MS. JOHNSON:

17         Q.   I'm sorry, I'm going to have to ask you to step

18    down again.

19                   (Witness steps down.)

20         Q.   Detective, I'm putting on the overhead People's 8

21    in evidence.

22              Can you tell the members of the jury how it was

23    that you read those warnings to the defendant on June 24th,

24    2008, including his responses both verbal and written?

25         A.   Okay, I stated to Mr. Gopaul that I was going to

                                                            ws

Shulman - People - direct          649

1   read him a pre-printed consent form and asking his consent

2   to search his home in regards to my investigation.

3           I then wrote in his name and his home address and

4   then I read to him, after filling in those blanks in my

5   handwriting, "I, Harold Gopaul, having been requested to

6   consent to a search of my home, located at 242-10 89th

7   Avenue, Bellerose, New York, 11426, and having been duly

8   advised of my Constitutional rights to:  A, refuse such

9   consent; B, to require that a search warrant be obtained

10  prior to any search; C, that if I do consent to a search any

11  evidence found as a result of such search can and will be

12  used against me in any civil or criminal proceedings."

13      Q.    Can you see?

14      A.    Move it down a little bit.

15      Q.    Good?

16      A.    Good.

17          "D, that I may consult with an attorney of my

18  choosing before or during the search; and that, E, I may

19  withdraw my consent to a search at any time prior to prior

20  to its conclusion."

21          I then read, "After having been advised of my

22  Constitutional rights I hereby knowingly, intelligently and

23  voluntarily waive my above rights and consent to search.  I

24  authorize," I then wrote in my handwriting,

25  "Detective Shulman or authorized representative of the

                                                        ws

Shulman - People - direct          650

1     NYPD," and I then read, "to conduct a complete search of the
2     above-described location, premise, residence, apartment."
3              Mr. Gopaul indicated that he was willing to
4     consent to that search.
5              I then handed him the piece of paper and again
6     asked him if he would read it and be sure that he understood
7     what it said and that if he still wanted to give consent or
8     not.
9              Mr. Gopaul read over the piece of paper and again
10    affirmed that he was giving consent to me.
11             I then asked him to place his signature on the
12    bottom portion of the consent form.
13             Mr. Gopaul then signed his name.  He then wrote
14    the date and time.  He then wrote where we were and then I
15    signed my name and affixed my shield number as witness to
16    his affirmation of consent.
17        Q.   Whose handwriting is that 105 detective squad in?
18        A.   Mr. Gopaul's.
19        Q.   And whose handwriting is the date and the time,
20    5:20, 6/24/2008?
21        A.   Mr. Gopaul's.
22        Q.   And did you observe him write that?
23        A.   Yes, I did.
24        Q.   Was that form executed before or after the vehicle
25    consent form and if you need to look at them --

                                                            ws

Case 1:15-cv-01782-NGG   Document 8-16   Filed 08/31/15   Page 62 of 202 PageID #: 1471

1        A.    It was after Miranda, but before the vehicle.

2        Q.    At any time did the defendant indicate to you he

3    wished to withdraw that consent?

4        A.    No.

5        Q.    At any time did he indicate to you he wished to

6    speak to an attorney?

7        A.    No.

8        Q.    Was any physical force used upon him?

9        A.    No.

10       Q.    Any threats made to him?

11       A.    No.

12       Q.    Any promises?

13       A.    No.

14       Q.    Where was your weapon?

15       A.    It was still locked up outside of the interview

16   room, outside in my office.

17       Q.    At any time did the defendant indicate he didn't

18   understand what you were asking him?

19       A.    No, he did not.

20       Q.    And, I'm sorry, I don't know if I asked you, did

21   he ever ask to speak to an attorney?

22       A.    No, he did not.

23       Q.    After that form, People's 8, was executed what did

24   you do next?

25       A.    At that point I needed to take a break to do

ws

1   something else.  I subsequently came back into the interview

2   room.

3        Q.   When you say you went back into the interview

4   room, which interview room?

5        A.   After that -- those consent forms and the Miranda

6   forms, I went and did other duties.  I had some other

7   conversation with Ms. Awan and then I subsequently went back

8   into the interview room where Mr. Gopaul was waiting.

9        Q.   When you went back into the interview room what

10  was the defendant doing?

11       A.   He was sitting in a chair at a table.  He was

12  awake and looked up when I walked into the room.

13       Q.   Who was with him?

14       A.   He was by himself.

15       Q.   Was he handcuffed?

16       A.   No, he was not.

17       Q.   Where was your weapon?

18       A.   It was still locked up and secured outside my

19  office.

20       Q.   What did you say to the defendant when you came

21  back into the interview room?

22       A.   When I came back into the interview room I said to

23  Mr. Gopaul that if he knows why he was here and why he was

24  under arrest.

25       Q.   What was his response to you?

Case 1:15-cv-01782-NGG   Document 8-16   Filed 08/31/15   Page 64 of 202 PageID #: 1473

1       A.   His response is that he had a dispute with his

2   daughter on the past Saturday and he slapped her.

3       Q.   What did you say to him after he made that

4   statement to you?

5       A.   I asked him if he would be willing to make a

6   written statement in regards to what had transpired with his

7   daughter.

8            He said yes.

9            I then handed him a notepad and a pen and I asked

10  him to put his name and address and the date and time on the

11  top and to write down what he wanted to write down about

12  what had occurred.

13      Q.   That was a blank piece of paper you handed him?

14      A.   Yes, it was.

15           MS. JOHNSON:   Your Honor, I'm going to ask

16       this be marked as People's Exhibit 8 --

17           THE COURT:   9.

18           MS. JOHNSON:   -- 9 for identification.

19           (People's Exhibit 9 marked for

20       identification.)

21      Q.   Detective, will you take a look at People's 9 for

22  identification?

23           (Shown to witness.)

24      Q.   Do you recognize that?

25      A.   Yes, I do.

ws

Shulman - People - direct          654

1        Q.    What do you recognize that to be?

2        A.    It is the original copy of one of the written

3   statements that Mr. Harold Gopaul wrote in my presence

4   while -- on June 24th, '08 in the interview room at the

5   105 Precinct detective squad.

6        Q.    How do you know that?

7        A.    I witnessed it being written and upon its

8   completion I affixed my signature along with my shield

9   number and I noted the date and time that it was complete.

10       Q.    That's the original?

11       A.    This is the original.

12       Q.    Is it in the same or substantially the same

13  condition it was on June 24th, 2008?

14       A.    Yes, it is.

15              MS. JOHNSON:    Your Honor, at this time we

16       would offer People's 9 into evidence.

17              MR. SCHECHTER:    May I look at the document,

18       please, your Honor?

19                   (Shown to counsel.)

20              MR. SCHECHTER:    May I have a voir dire?

21              THE COURT:    Yes.

22  VOIR DIRE EXAMINATION

23  BY MR. SCHECHTER:

24       Q.    Officer, was this document extracted from the

25  defendant after you advised him of his Miranda warnings?

                                                          ws

1       A.    I don't think that I like the word extract.

2       Q.    All right --

3       A.    This statement was written after the Miranda

4    warnings were issued and waived.

5                   MR. SCHECHTER:  Objection, your Honor.

6                   THE COURT:  All right, over objection,

7       People's 9 will be received in evidence.

8                   (People's Exhibit 9 received in evidence.)

9                   MS. JOHNSON:  Your Honor, with the Court's

10      permission, I'm going to ask that be displayed on the

11      overhead.

12                  If we can mark for ID an exact duplicate I'll

13      show it to counsel so he can read along better.

14                  THE COURT:  What is it that you want to mark?

15                  MS. JOHNSON:  Just for ID.  I would like the

16      detective to read from it, but I don't believe he's

17      going to be able to read that well from the overhead.

18                  THE COURT:  Just show what you want him to

19      read from to Mr. Schechter.

20                  (Shown to counsel.)

21                  MR. SCHECHTER:  No problem, no problem.

22                  THE COURT:  No objection to marking the copy

23      what, People's 10 for ID?

24                  MS. JOHNSON:  Sure.

25                  THE COURT:  Is that what you want?

                                                            ws

Shulman - People - direct          656

1              MS. JOHNSON:  Yes.

2                  (People's Exhibit 10 marked for

3          identification.)

4                  (Shown to witness.)

5              THE COURT:  All right, Ms. Johnson.

6      Q.   Detective Shulman, if you could take a look at

7    People's 9 in evidence?

8              Can you read that for the members of the jury?

9              THE COURT:  Well, he's got People's 10.

10     Q.   I'm sorry, People's 10?

11             THE COURT:  Which you've indicated is a

12         photocopy of People's 9 in evidence that's on the

13         projector.

14             MS. JOHNSON:  Yes, your Honor, and I've shown

15         a copy to counsel.

16             THE COURT:  All right.

17             Do you want the detective to read it?

18             MS. JOHNSON:  Yes, please.

19     A.   Okay, upon being given a blank notepad and a pen,

20   Mr. Gopaul wrote his name, his address, his phone numbers

21   and the date and time on the top.

22             He wrote, Harold Gopaul --

23     Q.   You can continue?

24     A.   -- 242-10 89th Avenue, Bellerose, New York, 11426.

25   He wrote a phone number of 718-470-0899.  He then wrote cell

ws

1  and the number 917-392-8334.  Mr. Gopaul wrote the date

2  6/24/08 and wrote the time 6:25 a.m.

3           Mr. Gopaul then wrote, "Saturday 6/22/08 my family

4  had gone to St. Gregory fair to have some fun.  My eldest

5  daughter was in line for a ride called Zipper.  After about

6  20 or 25 minutes my daughter and friend time came.  There

7  was a single lad in front of the line.  The operator told

8  the kid two people need to go on one basket, so her friend

9  decided to go with the kid so my daughter will have to wait

10  for the other ride and only if she got a partner.

11          "Previous to going to the fair my wife very bad

12  pain on a root canal she did few years ago and was ready to

13  leave the fair.  She was also having problems to speak.  So

14  I called my daughter out the line because I thought it was

15  not fair to wait another 20 or 25 minutes for a ride knowing

16  her mother was in pain.  After calling my daughter out the

17  line she was really upset.  When we went home my daughter

18  started to argue and I thought it was wrong and I put a few

19  slaps on her as a little discipline.  Sunday everything was

20  okay.  We all work in the backyard putting up a fence.  I

21  left my house on Monday day, 6/23," looks like '06, "4:30

22  a.m. and return about 2:30 a.m. Tuesday after work and my

23  daughter was missing and back door of the house was open.  I

24  came -- " he signed Harold Gopaul on the bottom and wrote to

25  be continued on second page.

1        On the second page Mr. Gopaul wrote his name on

2    the top and dated it 6/24/08 and continued to write, " -- to

3    the district precinct and I was held and search.  Also, I

4    was read to me and ask to sign three sets of documents.

5    Also, to write this report.  I was read my rights and was

6    asked to what had happened with my daughter."

7        After Mr. Gopaul had written this statement I

8    asked him to read it over, if there was any corrections he

9    wanted to make or any additions or changes he needed to make

10   to the document, and he looked it over.

11       On Page 1, up on the top where he had indicated

12   the date, he scribbled over a 2 indicating a 1, that he was

13   saying the date was 6/21.

14       There was a few other spots that he didn't like

15   what it said and he put a little scribble mark on it, that

16   he didn't like the word, and then after he had made a couple

17   of corrections that he didn't like he indicated that the

18   statement was correct as to what he wanted to say.

19       I then asked Mr. Gopaul if he could sign the end

20   of the statement.  He signed his name.  I then did sign my

21   name and place my shield and I did write the date and time

22   as indicating when this statement was complete.

23       Q.    Is that what we see here on Page 2, detective?

24             You have an exact duplicate.

25       A.    Oh, yes.

Shulman - People - direct          659

1        Q.    Is there any handwriting on those two pages in
2    evidence that are not the defendant's?
3        A.    Yes.
4        Q.    What?
5        A.    On Page 2 there is my signature, my shield number
6    and my writing of the date and time and on Page 1 is all the
7    defendant's handwriting.
8        Q.    Other than that, is there anything else that
9    you've marked on those two pages?
10       A.    No.
11       Q.    Thank you.
12             Prior to the defendant making that written
13   statement did you tell him the details of what Sana informed
14   you of?
15             MR. SCHECHTER:   Objection.
16             THE COURT:   No, overruled, I'll allow it.
17             MR. SCHECHTER:   Exception, Judge.
18             THE COURT:   That's a yes or no.
19       A.    No.
20       Q.    Did you show the defendant, prior to him making
21   that statement, any paperwork that -- involving your
22   interview with the complainant?
23       A.    No.
24       Q.    After the defendant made that two-page statement
25   what did you do next -- I'm going to withdraw that for one

                                                              ws

Shulman - People - direct            660

1    second.

2              While he was writing that at any time did he ask

3    to speak to an attorney?

4         A.   No.

5         Q.   At any time did you use any physical force on him?

6         A.   No.

7         Q.   At any time did he indicate he no longer wished to

8    speak to you?

9         A.   No, he did not.

10        Q.   At any time did he indicate he wanted medical

11   attention?

12        A.   No, he did not.

13        Q.   At any time did he indicate that he wanted to go

14   to the hospital?

15        A.   No, he did not.

16        Q.   Did you observe any injuries on him?

17        A.   I did not.

18        Q.   Did anybody else come into the room?

19        A.   No.

20        Q.   Where was your weapon?

21        A.   It was still locked up in my office.

22        Q.   Did there come a time when the defendant asked to

23   use the bathroom?

24        A.   Yes.

25        Q.   Was that at this point or later on?

                                                        ws

1      A.   At the completion of that statement Mr. Gopaul

2  asked me if he could use the restroom.  I told him, "Yes,

3  give me one second."  I came and took my paperwork out of

4  the office.

5          I came into the -- back into the interview room.

6  I handcuffed him.  I brought him to the restroom.  When he

7  was in the restroom the handcuffs were taken off so he could

8  do what he needed to do.

9          When he was done and he washed his hands, the

10 handcuffs were placed back on and Mr. Gopaul was brought

11 back into the interview room where the handcuffs were taken

12 off again and he sat down in a chair.

13     Q.   What happened at that point?

14     A.   At that point I took a break.

15     Q.   Where did you go?

16     A.   I -- various other duties in my office.

17     Q.   Did there come a time when you came back to the

18 room where the defendant was?

19     A.   There did.

20     Q.   What was he doing?

21     A.   He was sitting in a chair leaning on the table.

22 He was awake.  He looked up when I walked in the room.

23     Q.   Was he wearing -- did he have handcuffs on?

24     A.   He did not.

25     Q.   Where was your weapon when you came back into the

                                                          ws

1     room?

2          A.     It was still locked up in my office.

3          Q.     Between the time you left and you came back did

4     you have any further conversation with Sana?

5          A.     I believe I did, yes.

6          Q.     Was that a further interview of her?

7          A.     Yes.

8          Q.     When you came back into the room what did you say

9     to defendant?

10         A.     I came in.  I said, "You know, your daughter Sana

11    is making an allegation that there's some inappropriate

12    behavior involving you."

13         Q.     Were those the words that you used, inappropriate

14    behavior?

15         A.     I believe so.

16         Q.     Did you -- I'm sorry, continue?

17         A.     And I wasn't going to tell him what they were, but

18    if he wanted to make a statement on it, that he could.

19         Q.     Did you tell him -- did you tell the defendant you

20    weren't going to tell him any other information?

21         A.     Yes.

22              MR. SCHECHTER:  Objection to the leading,

23         your Honor.

24              THE COURT:  Well, I'll allow it.  Overruled.

25         A.     I did tell him that I wasn't going to tell him

                                                          ws

1   what the nature of the allegation was.

2          Q.    Did you show him any paperwork?

3          A.    I did not.

4          Q.    Did you tell him the details?

5          A.    No, I did not.

6          Q.    What happened next?

7          A.    Mr. Gopaul said he wanted to say something about

8   it.  He felt bad about it and he wanted to make a statement.

9                I then said, you know, "Would you be willing to

10  make a written statement about whatever you want to tell

11  me," and he indicated yes.

12         Q.    What did you provide him with?

13         A.    I then provided him with a blank notepad and a

14  pen.  I asked if he would, you know, write his name and

15  address and the date and time on the top and then write what

16  he wanted to write on the paper.

17         Q.    Was this before or after the Miranda card had been

18  signed?

19         A.    It was after.

20         Q.    Was this before or after the consent forms had

21  been executed?

22         A.    After.

23         Q.    And was it before or after the statement that

24  happened at the fair that's already in evidence?

25         A.    After.

ws

Shulman - People - direct          664

1          MS. JOHNSON:  Your Honor, I'm going to ask

2     that this be marked as People's 11 for identification.

3          THE COURT:  11 for ID.

4          (People's Exhibit 11 marked for

5     identification.)

6          (Shown to witness.)

7     Q.   Detective, could you take a look at People's 11

8  for identification?

9          MR. SCHECHTER:  May I look at the document,

10     please?

11          THE COURT:  Well, let's see if she offers it

12     in evidence.

13     Q.   Do you recognize that?

14     A.   I do.

15     Q.   What do you recognize it to be?

16     A.   It is the original written statement written by

17  Mr. Harold Gopaul on June 24th of 8 -- of '08 in my

18  presence.

19     Q.   How do you know that?

20     A.   It was prepared in my presence and upon its

21  completion I did affix my signature and my shield number and

22  I did note the date and time in my handwriting as witness.

23     Q.   Is it in the same or substantially the same

24  condition it was on June 24th of 2008?

25     A.   Yes.

ws

Shulman - People - direct          665

1        Q.    And that's the original?

2        A.    This is the original.

3              MS. JOHNSON:  Your Honor, we would offer that

4        into evidence.

5              THE COURT:  All right, show it to

6        Mr. Schechter.

7              (Shown to counsel.)

8              MR. SCHECHTER:  May I have a voir dire,

9        Judge?

10             THE COURT:  Yes.

11   VOIR DIRE EXAMINATION

12   BY MR. SCHECHTER:

13       Q.    Detective Shulman, this document was obtained from

14   Mr. Gopaul approximately three and a half hours from the

15   time you advised him of his rights?

16             Would you like the document back?

17       A.    If I could just take a look at it real quick?

18             I think it was probably about two and a half hours

19   after the Miranda warnings, if I believe the time on it.

20             THE COURT:  Do you want him to look at it?

21       Q.    Let me ask this.  Maybe it will make it easier.

22             Were the Miranda warnings administered at

23   5:10 a.m.?

24       A.    Yes.

25       Q.    And if this document says 8:30 a.m., would that

                                                              ws

Shulman - People - direct                666

1    refresh your recollection about this being done three and a
2    half hours, or thereabouts, after the Miranda warnings were
3    administered?
4        A.    I believe 8:30 is when that document, I believe,
5    is complete, not when it started.
6        Q.    When it's completed?
7        A.    I believe that Mr. Gopaul, around 7:25 --
8        Q.    Objection, that's not what I asked you.
9               THE COURT:    Just rephrase the question.
10       Q.    This document was completed at 8:30 a.m. in the
11   morning, correct?
12       A.    Yes.
13       Q.    And that's over three and a half hours after you
14   had Mr. Gopaul execute a Miranda warning?
15              MS. JOHNSON:    Objection, your Honor, as to
16          the voir dire aspect.
17              THE COURT:    Yeah, sustained.
18              MR. SCHECHTER:    I'm going to object to this
19          document, your Honor, for the same reasons I objected
20          to everything else.
21              THE COURT:    All right, over objection,
22          People's 11 will be received in evidence.
23              (People's Exhibit 11 received in evidence.)
24              MS. JOHNSON:    If I could have that shown
25          to -- you know what, Judge?

                                                          ws

Shulman - People - direct          667

1              If I can, I'll show Mr. Schechter, I have an

2      exact duplicate, just so he can read it.

3                   (Shown to counsel.)

4                   MS. JOHNSON:  Your Honor, I would ask this be

5      marked as People's 12 for identification.

6                   THE COURT:  All right, People's 12 will be

7      marked for ID as a photocopy of People's 11 in

8      evidence.

9                   (People's Exhibit 12 marked for

10     identification.)

11                  MR. SCHECHTER:  We're marking People's 12?

12                  THE COURT:  For ID as a photocopy of People's

13     11 in evidence.

14                  MR. SCHECHTER:  Okay.

15                  (Shown to witness.)

16     DIRECT EXAMINATION CONT'D

17     BY MS. JOHNSON:

18         Q.   Detective Shulman, if you can tell us -- if you

19     can read for us what's been marked into evidence as

20     People's 12 from your copy -- did I mess that up?

21              People's 11 in evidence, but you're reading from

22     People's 12.

23                  THE COURT:  People's 12, which is a photocopy

24     of People's 11 in evidence.

25         A.   Okay, Mr. Gopaul wrote Harold Gopaul,

                                                            ws

1    242-10 89th Avenue, Bellerose, New York, 11426.  He wrote

2    the date as 6/24/08 and he wrote the time as 7:30 a.m.

3            Mr. Gopaul then wrote, "I, Harold Gopaul, is

4    writing of this of my own free will.  The accusation that

5    was made toward me and my daughter, it started about the end

6    of 2006 where we both got into a relationship where I would

7    touch her vagina and breast and she would touch my penis and

8    we would both kiss.  It happened about five or six times

9    total, once at 400 Community Drive and in our home.  I want

10   you to know I wish it had never happened.  I am a

11   hard-working husband and father.  I work sometimes 80 to 95

12   hours per week to keep my family together.  I admit what

13   happened was very, very wrong.  Also admit I need help.

14   Something happened that should never have happened.  I am

15   very sorry.  I will accept any help I can get.  I don't want

16   to be away from my family.  My daughter, Sana Awan, is the

17   person I am talking about."

18           After Mr. Gopaul wrote this I asked him to read it

19   over and see if there was any corrections he wished to make

20   or anything he wanted to add to the story that, you know,

21   that he hadn't previously written.

22           He indicated that the story was accurate as to

23   what he wanted it to say.  He then signed his name at the

24   end of his statement.

25           I then signed my name and placed my shield number

                                                          ws

Shulman - People - direct        669

1    and I wrote the date and time at the completion of the

2    statement.

3         Q.    Detective, at any time did the defendant indicate

4    to you that he wanted to speak to an attorney?

5         A.    No, he did not.

6              MS. JOHNSON:   Can I just get that exhibit

7         back?

8              (Shown to counsel.)

9         Q.    At any time did he indicate to you that he no

10   longer wished to speak with you?

11        A.    No, he did not.

12        Q.    Was any physical force used upon him while he was

13   writing that statement?

14        A.    No, it was not.

15        Q.    Any threats made of him?

16        A.    No, they were not.

17        Q.    Any promises?

18        A.    No.

19        Q.    Where was your weapon?

20        A.    It was still locked up out in my office.

21        Q.    Is there any part, other than signature in that

22   document, that is not in the defendant's handwriting?

23        A.    The date and time, but other than that, no.

24        Q.    Did you tell the defendant what information to put

25   in that statement?

1        A.    I did not.

2        Q.    Detective Shulman, what happened after the

3    defendant made that statement?

4        A.    I -- upon completion of that statement I then did

5    immediately offer a verbal question to him.  I asked him if

6    he had vibrators in his car or in his house, to which

7    Mr. Gopaul replied that he has two vibrators in his house

8    and a body massager in his car, but that the body massager

9    is for his own personal use and he hadn't used it on his

10   daughter.

11       Q.    Was that conversation memorialized in any way?

12       A.    It was.

13       Q.    How?

14       A.    After that question was asked and his answer was

15   given I then wrote on a blank piece of paper, indicating

16   what the question I had read to him was and what his answer

17   was.

18            I then showed that to Mr. Gopaul and he affirmed

19   that what I had written as the question and answer were

20   accurate as to the question and answer that had just

21   occurred.

22            He drew a picture on the corner of the paper as to

23   what the vibrators in the house he was describing looked

24   like.

25       Q.    Who drew that picture?

ws

Shulman - People - direct          671

1       A.    Mr. Gopaul.

2             I then wrote underneath that that it was his

3       picture, that it was his depiction, his drawing, in my

4       handwriting indicating that he had drawn it.

5             I then had him look at it again; that the question

6       and the answer and what I had written underneath the drawing

7       that he made, that it was accurate to what had transpired

8       and Mr. Gopaul indicated yes, it was.

9             I then asked him to sign the document and then I

10      signed the document as witness.

11                  MS. JOHNSON:  Your Honor, I'm going to ask

12            that this be marked as People's 12 for identification.

13                  THE COURT:  13.

14                  MS. JOHNSON:  13, I'm sorry.  I can't count

15            today.

16                  THE COURT:  13 for ID.

17                  (People's Exhibit 13 marked for

18            identification.)

19                  (Shown to witness.)

20      Q.    Detective, if you could take a look at that?

21            Do you recognize it?

22      A.    I do.

23      Q.    What do you recognize it to be?

24      A.    It is the original copy of the question and answer

25      that I wrote in regards to my conversation with Mr. Gopaul.

                                                        ws

Shulman - People - direct                672

1        Q.   As well as the picture you just told us about?

2        A.   That's correct.

3        Q.   How do you know that that's what you describe it

4    to be and that's the original?

5        A.   The question and answer are written in my

6    handwriting.  I wrote it.  I was present when Mr. Gopaul

7    viewed it and signed it and I also placed my signature and

8    shield number as witness to what was written on the paper.

9        Q.   Is that in the same or substantially the same

10   condition it was on June 24th, 2008?

11       A.   Yes.

12                 MS. JOHNSON:  Your Honor, at this time we

13            would offer that into evidence.

14                 MR. SCHECHTER:  May I see it?

15                 THE COURT:  Yes.

16                 (Shown to counsel.)

17                 MR. SCHECHTER:  May I have a voir dire?

18                 THE COURT:  Yes.

19   VOIR DIRE EXAMINATION

20   BY MR. SCHECHTER:

21       Q.   Was this statement made after the initial

22   admonition of rights at 5:10 a.m. in the morning?

23       A.   This statement was after the Miranda warnings were

24   asked and waived by Mr. Gopaul, yes.

25                 MR. SCHECHTER:  Same objection, Judge.

                                                      ws

Shulman - People - direct          673

1                    THE COURT:  All right, over objection,

2          People's 13 will be received in evidence.

3                         (People's Exhibit 13 received in evidence.)

4                    MS. JOHNSON:  Will you mark this 14?

5                    THE COURT:  People, you're asking for another

6          photocopy to be marked?

7                    MS. JOHNSON:  Yes, your Honor, I've provided

8          a copy to Mr. Schechter as well.

9                    THE COURT:  People's 14 for ID only as a

10         photocopy of People's 13 in evidence.

11                        (People's Exhibit 14 marked for

12         identification.)

13         Q.    Detective Shulman, can you take a look at the

14    identification document before you?

15                    MS. JOHNSON:  And I provided People's 13 in

16         evidence on the overhead.

17         Q.    Detective, can you read for us what's indicated in

18    that document?

19         A.    I wrote the time as 0830 hours on 6/24 of '08.  I

20    wrote Q, as indicative of question, "Do you have any

21    vibrators in the car?"

22              I wrote A for the answer that was responded, "He

23    states he has multiple vibrators in the house.  Two are

24    white and look the same.  They are in a cabinet in the

25    bedroom at the house.  He has a white fold-up massager in

                                                          ws

Shulman - People - direct          674

1    the car that he uses for his neck.  He claims never to have
2    used it on his daughter."
3              On the left top corner there's a picture that
4    Mr. Gopaul is describing the vibrators that he's describing
5    and I drew an arrow pointing from what I was writing towards
6    the picture and I wrote, "Subject drew this picture as shape
7    of white vibrators."
8         Q.   Did you observe the defendant draw that picture?
9         A.   I did.
10        Q.   At any time did he indicate he wanted to make any
11   chances to that photograph -- to that picture?
12        A.   No.
13        Q.   At any time did he ask to speak to an attorney?
14        A.   No.
15        Q.   At any time was any physical force used upon him?
16        A.   No.
17        Q.   Where was your gun?
18        A.   It was still locked up out in my office.
19        Q.   At any time did he indicate he no longer wished to
20   speak with you?
21        A.   No, he did not.
22        Q.   Did you observe any injuries upon him?
23        A.   No.
24        Q.   Did he ask for medical attention?
25        A.   No.

ws

Shulman - People - direct          675

1       Q.    Did he complain of pain?

2       A.    No.

3       Q.    Thank you.

4                   (Shown to counsel.)

5       Q.    Were any promises made to him?

6       A.    No.

7       Q.    Detective Shulman, after that document was

8  executed in the presence of the defendant and after he made

9  that -- he drew that picture, what did you do next?

10      A.    After that was drawn and the things were written I

11  asked him to review it; that it was accurate for the

12  question and the answer that had transpired and the picture

13  he drew and the comment I made in regards to the picture he

14  drew.

15                  Mr. Gopaul indicated to me it was accurate.

16                  I then asked him to sign his name and then I

17  signed my name as witness to that.

18      Q.    Was that the end of your contact with the

19  defendant?

20      A.    No.

21      Q.    What happened next?

22      A.    At that point I took a break.  I had various other

23  duties to perform in regards to the investigation.

24                  At some point in time I came back into that same

25  interview room sometime, you know, later in the day and I

ws

1    asked Mr. Gopaul if he would be interested in making a

2    videotaped statement in the presence of the Queens District

3    Attorney's Office and Mr. Gopaul said that he wouldn't have

4    any problem with that and he would be willing to do that.

5         Q.   Was this after or before all those statements were

6    signed by the defendant?

7         A.   After.

8         Q.   And was it before or after that Miranda card was

9    signed by him?

10        A.   After.

11        Q.   Did there come a time when the Assistant District

12   Attorneys came to the precinct?

13        A.   Yes.

14        Q.   And when they came what did the defendant say and

15   where did you bring him?

16        A.   Mr. Gopaul at that point was brought into a larger

17   interview room in my office where a videographer from the

18   Queens DA's Office had come and was setting up to film, you

19   know, the videotaped statement.

20        Q.   Up until that point did you ever show the

21   defendant any statements that Sana had given to you?

22        A.   No, I had not.

23        Q.   Did you give him any of the details of what she

24   had told you?

25        A.   I had not.

                                                           ws

Shulman - People - direct          677

1        Q.   Did you tell him the questions that the prosecutor

2    was going to be asking him on video?

3        A.   I did not.

4        Q.   Were you present for that video?

5        A.   Yes, I was.

6        Q.   Were you present for the entirety of it?

7        A.   Yes, I was.

8        Q.   At any time did the defendant indicate he wanted

9    to speak to an attorney?

10       A.   He did not.

11       Q.   At any time did he indicate he did not want to

12   speak to the prosecutors?

13       A.   He did not.

14       Q.   Did he complain of any injury?

15       A.   No, he did not.

16       Q.   Were any promises made to him?

17       A.   No, they were not.

18       Q.   Where was your gun?

19       A.   It was still locked up outside in my office.

20       Q.   Did the prosecutors have any weapons with them?

21       A.   No, they did not.

22       Q.   Was any physical force used upon the defendant?

23       A.   No, it was not.

24       Q.   Detective, over the course of your career with the

25   New York City Police Department have you had occasions where

ws

Shulman - People - direct          678

1  subjects in custody have not given you written confessions?

2      A.  Yes, I have.

3      Q.  And have you had occasions throughout the course

4  of your career where subjects have not given you videotaped

5  confessions?

6      A.  More often than not, video statements are not made

7  in most cases.

8      Q.  Have you had occasions over the course of your

9  career where written confessions are given you, but video

10  confessions are not?

11             MR. SCHECHTER:  I'm going to object, Judge.

12             THE COURT:  Yeah, I'm going to sustain at

13      this point.

14      Q.  After that videotape was taken did you have any

15  further contact with the defendant?

16      A.  Very briefly when he was being brought out of my

17  office and then court proceedings.

18      Q.  I'm referring to any additional substantive

19  conversations with him other than movement of where he was

20  going?

21      A.  No.

22      Q.  Did you ever tell the defendant what information

23  to provide?

24             MR. SCHECHTER:  I'm just going to object now

25      to the constant leading.

ws

1          THE COURT:  All right, Mr. Schechter, please.

2          MR. SCHECHTER:  Objection.

3          THE COURT:  You have an objection?

4          MR. SCHECHTER:  To form.

5          THE COURT:  All right, rephrase.

6     Q.   What, if anything, did you tell the defendant to

7     say on that video confession?

8     A.   I didn't tell him to say anything.

9     Q.   What did you tell him was going to happen when the

10    prosecutors came to the 105?

11    A.   I let him know that they were going to, you know,

12    probably read him Miranda and ask him if he wanted to tell

13    his story in the presence of the video camera.

14    Q.   Was any other information given to him?

15    A.   No.

16          MS. JOHNSON:  I have no other questions for

17          Detective Shulman.

18          THE COURT:  All right, how is everybody

19          doing?

20          Do you need a break to stretch, use the

21          facilities?

22          I see some heads shaking, some hands going

23          up.

24          Okay, we're going to take our morning break.

25          We'll be back here in ten minutes.  Just follow Kenny

ws

Shulman - People - cross            680

1      out the door.  Watch your step.

2                  (Jury exits.)

3                  (Recess taken in the proceedings.)

4                  (Witness resumes the stand.)

5                  THE COURT:  Just, on the record,

6      Mr. Schechter, this morning my law secretary received a

7      package of what she believes to be approximately 30

8      documents from ACS.

9                  She's been -- we've been, actually, both of

10     us, going through them.

11                 I'm providing you and Ms. Johnson copies of

12     those items that we think would be relevant to the

13     allegations that are here.

14                 The first two pages that I gave you with a

15     staple on them are actually consecutive pages because

16     it continues on from a Page 7 to Page 8.  It's

17     essentially what appears to be the interview conducted

18     at the 105th Precinct by CPS.

19                 (Shown to counsel.)

20                 THE COURT:  And then the third page that I

21     provided is -- they're all entitled investigation

22     progress notes.

23                 The third page is what I would deem to be a

24     further or another account by the complainant of the

25     allegations.

1               So I'm providing them to both of you at this

2       point.  There's still a number of more pages that we're

3       attempting to go through as quickly as possible.

4                     (Jury enters.)

5                     THE COURT:  Okay, members of the jury, we're

6           ready to continue.

7                     Mr. Schechter?

8                     MR. SCHECHTER:  Shall I begin, your Honor?

9                     THE COURT:  Yes.

10      CROSS-EXAMINATION

11      BY MR. SCHECHTER:

12          Q.   Detective Shulman, you're 37 years of age, is that

13      correct?

14          A.   Yes, your Honor -- yes.

15          Q.   Thank you very much, but I'm not quite there.

16               Now, I'm going to ask you, before you became a

17      police officer you were a security guard in Maryland?

18          A.   Yes.

19          Q.   And as a security guard in Maryland did you guard

20      payroll, did you work in a mall?

21               Where did you work?

22          A.   I had several different assignments of which would

23      be strip malls, shopping centers and some residential

24      communities.

25          Q.   Got it.

Shulman - People - cross          682

1              And you're a native New Yorker, is that correct?

2         A.    That is correct.

3         Q.    Now, you've indicated on direct examination you

4    were promoted to detective second grade, correct?

5         A.    Correct.

6         Q.    And your specific duties, you enhance arrests,

7    isn't that so?

8                   MS. JOHNSON:   Objection.

9                   THE COURT:   Yeah, I'll sustain as to form.

10        Q.    Did you ever tell the grand jury that you enhance

11   arrests?

12        A.    I don't know if I said that or not.

13        Q.    Well, do you know what the term enhance arrests

14   means?

15        A.    Yes.

16        Q.    Hum?

17        A.    Yes.

18        Q.    Isn't it a fact that you were the detective at the

19   105 Precinct charged with enhancing arrests?

20              Isn't that so?

21        A.    Not specifically, no.

22        Q.    Is that one of your duties, to enhance arrests?

23        A.    It's one of my many duties, yes.

24        Q.    And enhancing arrests requires you to obtain

25   confessions, does it not?

ws

Shulman - People - cross          683

1       A.   No, it does not.

2       Q.   Now, on the night in question, detective, you were

3    working a -- what tour was that, 4 to 1, sorry?

4       A.   4:27 p.m. on June 23rd to 1 a.m. June 24th.

5       Q.   Okay.  Now, your tour ended at 1 o'clock, is that

6    correct?

7       A.   My scheduled tour.

8       Q.   Your scheduled tour ended at 1 o'clock.

9            You were first informed that the complaining

10   witness was at the precinct at 2:30, yes or no?

11      A.   Yes.

12      Q.   What were you doing from 1 to 2:30 at the precinct

13   if your tour ended at 1 o'clock?

14      A.   I was working on other investigations.  I don't

15   know specifically what case I was working on.

16      Q.   Did you apply for overtime from 1 to 2:30?

17      A.   It doesn't work like that.

18      Q.   Well, did you stay at the precinct from 1 to 2:30?

19           What investigation were you working on?

20      A.   I don't know specifically what I was working on.

21      Q.   Now, in the course of your duties you maintain a

22   memo book, is that correct?

23      A.   Yes.

24      Q.   And in the memo book as part of Police Department

25   protocol you're required to basically outline the important

ws

Shulman - People - cross          684

1    parts of your tour, would that be fair to say?

2         A.   Depends on your assignment as to whether or not

3    that is necessary.

4              MR. SCHECHTER:   May I have this, please,

5         marked as Defendant's Exhibit T for identification?

6              THE COURT:   Defendant's T.

7              MR. SCHECHTER:   T.

8              (Defendant's Exhibit T marked for

9         identification.)

10        Q.   Now, officer, you were working on a homicide

11   investigation, weren't you?

12        A.   Pardon me?

13        Q.   You were working on a homicide investigation that

14   day, weren't you?

15        A.   I don't know specifically --

16        Q.   Sorry?

17        A.   I don't know specifically what I was working on.

18        Q.   As a matter of fact, you wrote in your memo

19   book --

20             MS. JOHNSON:   Objection.

21             THE COURT:   No -- well, just continue the

22        question.

23        Q.   You wrote in your memo book that for every hour

24   from 4 through the next day you were working on a homicide

25   investigation, is that true?

                                                      ws

Shulman - People - cross                685

1                    MS. JOHNSON:  Objection.

2                    THE COURT:  No, I'll allow that.

3                    You can answer that.

4        A.    That's not --

5        Q.    Yes or no?

6        A.    No.

7        Q.    May I have that, please?

8        A.    I mean --

9                    THE COURT:  All right, just hand the exhibit

10       back.

11                   MR. SCHECHTER:  Thank you.

12                   (Shown to counsel.)

13       Q.    Now, in your memo book you indicate on Monday,

14   June 23rd,'08 your tour was 4:27 through 0100, would that be

15   fair to say?

16                   MS. JOHNSON:  Objection.

17                   THE COURT:  Yeah, sustained.

18       Q.    Is this a record kept by you in the ordinary

19   course of business of the New York City Police Department?

20       A.    Yes.

21       Q.    And is it in the ordinary course of business of

22   the New York City Police Department to maintain and keep

23   this record?

24       A.    Yes.

25                   THE COURT:  Mr. Schechter --

ws

Shulman - People - cross            686

1      Q.   Is it your duty --

2                  THE COURT:  Mr. Schechter, could we have some

3      testimony as to what it is you have in your hand,

4      because I don't think it's been established yet?

5                  MR. SCHECHTER:  Oh, I'm sorry, Judge.

6      Detective Lennard Shulman's memo book for date opened

7      January 4, '06.

8                  THE COURT:  Detective, is Defendant's T for

9      identification, a copy -- photocopy of a page or pages

10     of your memo book?

11                 THE WITNESS:  Yes, your Honor.

12                 THE COURT:  All right, go ahead.

13     Q.   And were you under a duty as part of your duties

14     in the Police Department to maintain this memo book -- oh,

15     you have the original with you?

16                 THE COURT:  Yes?

17                 THE WITNESS:  Yes, your Honor.

18     Q.   And --

19                 THE COURT:  Well, yes, that's your original

20     memo book.

21                 I think you got a question pending.

22                 MR. SCHECHTER:  Yes.

23     Q.   Are the entries in this memo book close in time to

24     when the events they portrayed occurred?

25     A.   Again, it depends on what your assignment is in

                                                          ws

1    the Police Department as to what gets documented in your

2    memo book and what doesn't.

3                    MR. SCHECHTER:  Not responsive to my

4         question, your Honor.

5                    THE COURT:  No, I think it is.

6         Q.    Do the events portrayed in this memo book

7    accurately reflect the time when they are entered, yes or

8    no?

9         A.    Some entries do, some entries may have some sort

10   of lag.

11        Q.    As a general rule, this memo book, the entries

12   that you put in here are right approximately when the events

13   occurred, is that correct?

14        A.    As a generalization, yes.

15        Q.    And you were the only one to make these entries in

16   this memo book except when your sergeant signs off on it,

17   correct?

18        A.    Correct.

19                   MR. SCHECHTER:  I offer this, your Honor, in

20        evidence as Defense Exhibit T as a business record.

21                   THE COURT:  People?

22                   MS. JOHNSON:  We object to the foundation and

23        other grounds.

24                   THE COURT:  Yeah, let me -- Mr. Schechter,

25        let me see you with the DA?

                                                              ws

1          COURT OFFICER:  Step down, please?

2          (Witness steps down.)

3          (Sidebar conference held as follows:)

4          MR. SCHECHTER:  He answered all the right

5     questions and it was a predicate -- the foundation was

6     properly laid, your Honor.  It's a business record.

7          (Shown to Court.)

8          THE COURT:  It wasn't exactly that.

9          People?

10          MS. JOHNSON:  Judge, in fact, it's not kept

11     at -- or he said it's not kept at or about and it

12     doesn't contain all of the actions that he took and it

13     is not a complete record of what he did during the

14     course of the day, exactly what is required for a

15     business record to come into evidence.

16          THE COURT:  All the actions -- that's not one

17     of the criteria for the business record exception.

18          MS. JOHNSON:  My point being that he

19     indicated it was not a complete and accurate copy of

20     the events because there are items that are not there.

21          MR. SCHECHTER:  That does not affect

22     admissibility.

23          THE COURT:  I think he said that these times,

24     as a general rule, are generally entered in there,

25     these times and events, at or about the time it takes

Shulman - People - cross          689

1    place and that he has an obligation to do it.

2                MR. SCHECHTER:  Doesn't affect admissibility.

3                THE COURT:  It's a little --

4                MS. JOHNSON:  I would also ask what's the

5    offer of proof of the probative value?

6                MR. SCHECHTER:  None of your business.

7                MS. JOHNSON:  Excuse me?

8                MR. SCHECHTER:  None of your business.

9                THE COURT:  The problem, Ms. Johnson, is that

10   as a business record exception there is an element of

11   relevance, but not as much as an offer that is not a

12   business record exception.

13               Over objection, I'm going to allow it as T in

14   evidence.

15               MS. JOHNSON:  Our objection is based on

16   foundation as well as the contents of being hearsay.

17               THE COURT:  Yes.

18               (Sidebar conference concludes.)

19               THE COURT:  Members of the jury,

20   Defendant's T will be received in evidence over

21   objection.

22               (Defendant's Exhibit T received in evidence.)

23               MR. SCHECHTER:  May I have the document,

24   please?

25               (Shown to counsel.)

                                                        ws

Shulman - People - cross          690

1        Q.   Now, officer, you have the original of this

2    document, do you not, in your possession?

3        A.   Yes.

4        Q.   It's right before you, correct?

5        A.   Yes.

6        Q.   Now, please turn to the entries for June 23

7    through June 25.

8             You have them before you?

9        A.   Yes.

10       Q.   Now, officer, on June 23 you were working a

11   4:27 p.m. to 1 a.m. tour, would that be fair to say?

12       A.   Yes.

13       Q.   And you noted in your memo book assisting homicide

14   investigation right under that notation, isn't that true?

15            Yes or no?

16       A.   No.

17       Q.   What does, A-S-S-H-O-M-I-N-V, mean?

18       A.   It's my way of writing that my assignment is

19   homicide investigator every day.

20       Q.   Well, you've indicated to the jury that you do

21   more than homicide investigations, you're called upon by the

22   precinct to have many other responsibilities, including

23   investigating whatever comes into the precinct?

24            Didn't you tell the jury that on direct

25   examination?

ws

1      A.    I don't know if that was my testimony

2   specifically, but I do many things.

3      Q.    So you don't just do a homicide investigation, you

4   do many things, correct?

5      A.    I do many things, yes.   I'm --

6      Q.    And then 0800, that's 8 in the morning, that's the

7   next entry on -- that's the first entry on the 23rd, would

8   that be fair to say?

9            Is that the sergeant's signature?

10           Please read.

11     A.    Ask me again what point you're pointing to,

12   please?

13     Q.    Yes, 0800?

14     A.    Okay.

15     Q.    Whose signature is that?

16     A.    My signature.

17     Q.    Okay, now, look at Tuesday, June 24th.

18           You were working an 8 a.m. to 4:33 p.m. tour, is

19   that correct?

20     A.    Correct.

21     Q.    And, once again, you have right under that

22   A-S-S-H-O-M-I-N-V?

23           That's A-S-S-H-O-M-I-N-V, correct?

24     A.    Correct.

25     Q.    And that's the 24th, is that correct?

Shulman - People - cross            692

1          A.    Correct.

2          Q.    The next entry is 2133 and that's your signature

3     again, is that correct?

4          A.    Yes, it is.

5          Q.    Anywhere within your memo book from between

6     June 23 and June 24 did you have any notation whatsoever

7     about what you did with Mr. Gopaul, yes or no, on your memo

8     book?

9          A.    I have DD5s that I prepared in that time frame.

10               MR. SCHECHTER:  Objection, not responsive.

11               THE COURT:  If you can't answer yes or no,

12          just tell the attorney you can't answer yes or no.

13               Can you answer that question?

14               THE WITNESS:  I can't answer that yes or no

15          like that, your Honor.

16               THE COURT:  Okay.

17         Q.    You've read the entries between June 23 and

18    June 24, they're right in front of you, correct?

19         A.    Correct.

20         Q.    There are no entries regarding Harold Gopaul in

21    your memo book, are there?

22         A.    In my memo book, no.

23         Q.    Officer --

24               THE COURT:  I think it's detective.

25         Q.    I'm sorry, detective.

ws

Shulman - People - cross                    693

1          Detective, at 2:30 you were informed that the
2    complainant was in the office -- was in the police precinct,
3    correct?
4          A.   Correct.
5          Q.   Now, incidentally, what is the difference between
6    precinct and squad?
7          A.   Well, the precinct is, one, a physical structure
8    and is an indicative title of a patrol precinct.
9          Q.   Right?
10         A.   And a detective squad is assigned to the detective
11   bureau that could be housed anywhere.
12         Q.   So that when a detective is asked, "What's your
13   command," he would, in your case, say the 105 squad, would
14   that be fair to say?
15         A.   The 105th detective squad, yes.
16         Q.   Average person wouldn't know 105 squad, would that
17   be fair to say?
18              MS. JOHNSON:  Objection.
19              THE COURT:  Yeah, sustained.
20         Q.   Now, taking the chronology of where you were,
21   detective, at 2:30 you were informed that Sana Awan was in
22   the precinct, yes or no?
23         A.   Yes.
24         Q.   And you went up to speak to Sana Awan, is that
25   correct?

                                                        ws

Shulman - People - cross          694

1        A.   No.

2        Q.   What -- where did you go?

3        A.   I remained in my office and at some point in time

4   Ms. Awan was brought up to my office to be interviewed.

5        Q.   Do you remember what time that was?

6        A.   I believe it was approximately 3:10 or 3:20 in the

7   morning.

8        Q.   And as you were interviewing Sana Awan at 3:20 in

9   the morning you were informed that Mr. Gopaul was in the

10  precinct, is that correct?

11       A.   Not at 3:20 in the morning I wasn't.

12       Q.   When were you informed that Harold Gopaul was in

13  the precinct?

14       A.   Somewhere between 4:45 a.m. and 5 a.m.

15       Q.   So, therefore, you were talking to Sana Awan from

16  approximately, would it be, 2:30 or 3 a.m. -- I'm sorry, I

17  didn't remember when you first spoke to her?

18       A.   To whom?

19       Q.   Sana Awan?

20       A.   I believe it was about 3:10 or 20 in the morning.

21       Q.   So from 3:10 until quarter to 5 in the morning,

22  more or less, you were speaking to Sana Awan, would that be

23  fair to say?

24       A.   On and off.

25       Q.   Well, what were you doing in the off times?

                                                         ws

1       A.    Looking into other things, possibly taking a

2   minute to collect myself.

3       Q.    And Sana Awan was in the room with you, correct?

4       A.    Part of the time.

5       Q.    Now, you were informed by Sergeant O'Hagan, as you

6   testified on direct examination, that Mr. -- that he had

7   assisted in the apprehension of Mr. Gopaul, correct?

8       A.    I don't know if that's what my testimony was on

9   direct, but Sergeant O'Hagan did indicate to me that he

10  and -- that Mr. Gopaul was taken into custody and that he

11  was there when it occurred.

12      Q.    Did he tell you that he was -- that he assisted in

13  the apprehension of Mr. Gopaul?

14      A.    I don't know if those were his exact words or not.

15      Q.    Did he tell you, more or less, that he recognized

16  Mr. Gopaul's name and that he assisted in the apprehension

17  of Mr. Gopaul?

18      A.    Again, I don't know if he said assisted, but he

19  did indicate that he had recognized Mr. Gopaul's name and an

20  Ecolab uniform he was wearing when he came into the

21  precinct.

22                  MR. SCHECHTER:   I ask that this be marked as

23          Defendant's U, please, for identification.

24                  THE COURT:   Defendant's U.

25

                                                            ws

Shulman - People - cross                696

1                  (Defendant's Exhibit U marked for
2           identification.)
3                  (Shown to witness.)
4      Q.    Now, do you recognize that document, yes or no?
5                  THE WITNESS:  I can't answer that
6           specifically just with a yes or no.
7                  THE COURT:  You can't answer yes or no?
8                  THE WITNESS:  I can answer yes or no with
9           something added to it.
10                 THE COURT:  Just tell Mr. Schechter you can't
11          answer yes or no.
12     A.    I cannot answer yes or no like that.
13     Q.    Are you telling this jury you cannot answer yes or
14     no whether you recognize this document?
15     A.    That's not what I'm saying.
16     Q.    Do you recognize that document, yes or no?
17                 THE COURT:  Do you recognize the document?
18                 THE WITNESS:  I recognize it as appearing to
19          be a copy of a partial document.
20     Q.    Now, looking at the line that I put yellow on,
21     does that refresh your recollection that Detective O'Hagan
22     (sic) told you that he assisted in the apprehension of
23     Mr. Gopaul?
24                 MS. JOHNSON:  Objection.
25                 THE COURT:  All right, the objection is

                                                        ws

Shulman - People - cross          697

1     overruled.

2             That's a yes or no.

3             Detective, would you just take a look at that

4     document?

5             After you look at it if you can answer

6     Mr. Schechter's question?

7     A.    Yes.

8     Q.    Okay.

9             MR. SCHECHTER:   May I have that back, please?

10            (Shown to counsel.)

11    Q.    Detective O'Hagan (sic), in fact --

12    A.    Sergeant O'Hagan.

13    Q.    I'm sorry, Sergeant O'Hagan, in fact, assisted in

14    the apprehension of Mr. Gopaul, correct, yes or no?

15    A.    I wasn't present, so I can only go by what I

16    was --

17    Q.    Told?

18    A.    Yes.

19    Q.    By him?

20    A.    Yes.

21    Q.    Mr. Gopaul, to the best of your knowledge,

22    surrendered to the precinct -- didn't surrender, came to the

23    precinct voluntarily, is that correct?

24    A.    To my knowledge.

25    Q.    And how tall and how much does he weigh, if you

1    know, if you can estimate?

2         A.    I don't know specifically.

3                   MS. JOHNSON:   What date?

4                   Objection.

5                   THE COURT:   Assume --

6         Q.    On June 24, if you recall?

7         A.    I don't know specifically.

8         Q.    Now, you knew at the time that your first contact

9    was made with Mr. Gopaul that he was already under arrest,

10   isn't that so?

11        A.    Yes.

12        Q.    And he had been arrested by one or more other

13   police officers, is that correct?

14        A.    Yes.

15        Q.    How many police officers placed Mr. Gopaul under

16   arrest?

17        A.    I don't know.

18        Q.    Now, he was in the precinct itself when he was

19   placed under arrest?

20        A.    I have to say I don't know.

21        Q.    To the best -- based upon your investigation he

22   was in the precinct when he was placed under arrest, is that

23   correct?

24                   MS. JOHNSON:   Objection.

25                   THE COURT:   No, I'll allow it.

1              If you know.

2         A.   I believe, but I wasn't there.

3         Q.   Now, he was never charged with resisting arrest,

4    was he?

5         A.   I don't believe so, no.

6         Q.   Matter of fact, he was unhandcuffed, according to

7    you, in the room, right?

8         A.   Correct.

9         Q.   So there's no reason to assist in the apprehension

10   of Mr. Gopaul, was there?

11        A.   I can't answer that.

12        Q.   Do you know which officer placed Mr. Gopaul

13   physically under arrest?

14        A.   I don't.

15        Q.   But some other officer did, correct?

16        A.   Somebody did.  I don't know specifically who.

17        Q.   Why wasn't that police officer placed --

18   withdrawn.

19             Why wasn't that police officer credited with the

20   arrest of Mr. Gopaul?

21        A.   I don't know.

22        Q.   Police Officer Alfaro was taken off of her radio

23   motor patrol and told that she's going to take credit for

24   the arrest, correct?

25        A.   Yes.

ws

Shulman - People - cross          700

1      Q.   Why?

2      A.   I don't know.  That's a formal course of business

3  with the Police Department.

4      Q.   Isn't it to shield the officers that did place him

5  under arrest from charges that they assaulted him and

6  manhandled him when he was placed under arrest?

7               Isn't that the reason?

8                    MS. JOHNSON:  Objection.

9                    THE COURT:  No, I'll allow it.

10                   You can answer that.

11     A.   I don't believe so.  It's a normal course of

12  business within the Police Department for people to be

13  assigned arrests that they weren't necessarily an

14  apprehending officer on.

15     Q.   So it's in the normal course of business of the

16  Police Department to allow a police officer to get 16 hours

17  of overtime to put their name on the sheet as the arresting

18  officer rather than have an officer who is already on patrol

19  to process the arrest, is that what you're telling this

20  jury?

21                   MS. JOHNSON:  Objection.

22                   THE COURT:  Yeah, sustained.

23     Q.   Now, when you first saw Mr. Gopaul he was in the

24  room, you're saying, the interrogation room?

25     A.   He was in an interview room.

ws

Shulman - People - cross          701

1          Q.   Is that room commonly referred to in the
2      105 Precinct as the box?
3          A.   I don't know that I would say commonly, but I've
4      heard it called the box.
5                   MR. SCHECHTER:  I ask that --
6          A.   Not just that room, but interview rooms --
7          Q.   I don't believe there's a question in front of you
8      now, officer.
9                   THE COURT:  All right, do you want to mark
10            something, Mr. Schechter?
11                   MR. SCHECHTER:  Yes, Judge, Exhibits --
12                   THE COURT:  V, I think.
13                   MR. SCHECHTER:  V, W, X, Y.
14                   (Defendant's Exhibits V through Y marked for
15            identification.)
16                   (Shown to witness.)
17          Q.   Now, please take a look at those photographs,
18      officer.
19               Now, Photograph V, does that fairly and accurately
20      portray the outside of the 105 Precinct on June 24th, 2008?
21          A.   The front entranceway, absent of foliage, yes.
22                   MR. SCHECHTER:  I offer that as
23            Defendant's Exhibit V in evidence, please?
24                   THE COURT:  All right.
25                   MS. JOHNSON:  Can I see it, Judge, or do we

                                                              ws

1        want to go through all of them first?

2                    THE COURT:  Let me ask you, Mr. Schechter,

3        are you going to be offering all of these?

4                    MR. SCHECHTER:  I will.

5                    THE COURT:  Would you show Ms. Johnson all of

6        them, see if she has any objection to them?

7                    (Shown to counsel.)

8                    MS. JOHNSON:  Your Honor, as long as these

9        are fair and accurate pictures of what is depicted in

10       the photograph as it looked on June 24th, 2008, if that

11       testimony is elicited I have no objection.

12                   THE COURT:  All right, do you want to ask

13       those questions, then?

14                   MR. SCHECHTER:  She asked them for me.

15       Q.   Are they fair and accurate representations of the

16       box on June 24th, 2008?

17                   (Shown to witness.)

18                   THE COURT:  Just, if you would, detective, go

19       through the remaining few pictures, just indicate what

20       exhibit letter they are and just tell us what they

21       depict and whether or not they fairly and accurately

22       depict those areas, I'm assuming, in the 105th Precinct

23       on or about June 24th, 2008.

24       A.   In regards to Exhibit, I believe it's, W, the door

25       itself is indicative of what it probably would have looked

                                                          ws

1    like on that day, although there's some signage on the door.

2              THE WITNESS:  I don't know if it was or

3      wasn't on the door on June 24th, your Honor.

4              THE COURT:  Other than that, it fairly and

5      accurately depicts that area in the precinct?

6              THE WITNESS:  Yeah, I would say so.

7              THE COURT:  X?

8              THE WITNESS:  And, again, I don't know if

9      those are the specific chairs that are in the room, but

10     the table and the general space or that part of the

11     space that's shown in the photograph would be fairly

12     accurate.

13              And --

14              MS. JOHNSON:  Your Honor, could we just have

15     the microphone put on?

16              THE COURT:  It is on.

17              MS. JOHNSON:  Sorry.

18              THE COURT:  And the last, Y?

19              THE WITNESS:  Y, again, for the portion of

20     the room that it shows, I would believe it's probably

21     fairly close.

22              THE COURT:  All right, do you have any

23     objection, People?

24              MS. JOHNSON:  No.

25              THE COURT:  All right, so V through Y will be

1        received in evidence.

2                    MR. SCHECHTER:  Thank you.

3                    THE COURT:  Just let us mark it.

4                    MR. SCHECHTER:  I would like them passed to

5        the jury, please.

6                    THE COURT:  All right, we'll do that and then

7        we're going to break for lunch.  After Wendy marks it

8        just give them to the jury.

9                    MR. SCHECHTER:  Can I ask a question while

10       she's doing that?

11                   THE COURT:  No.

12                   (Defendant's Exhibits V through Y received in

13       evidence.)

14                   THE COURT:  Do you have a question before it

15       goes to the jury?

16                   MR. SCHECHTER:  Yes.

17                   THE COURT:  Please, Mr. Schechter.

18       Q.   What does the word complainant mean?

19       A.   Someone who is offering up they're --

20       Q.   A victim?

21       A.   Victim or some sort of reporter of a crime.

22       Q.   Now, that room -- you're at the 105th Precinct

23       every day?

24            That's your house where you go every day for the

25       last nine years?

Shulman - People - cross          705

1       A.    Seven years.

2       Q.    Seven years.

3             So you're familiar with the precinct and the parts

4       of the precinct, is that correct?

5       A.    Some parts.

6       Q.    Now, you interviewed -- you indicated that the

7       video picture was taken in a much larger room in another

8       part of the precinct, correct?

9       A.    Slightly larger.

10      Q.    Slightly larger, okay.

11            Now, he's not a complainant, is he?

12            I'm referring to Mr. Gopaul.  He was not a

13      complainant, correct?

14      A.    No.

15      Q.    That room is for interviews of complainants, isn't

16      it?

17      A.    Not always.

18                  MS. JOHNSON:  Objection.

19                  THE COURT:  Yeah, sustained.

20      Q.    Now, officer, on direct testimony you said that

21      the room was eight or nine by ten, do you recall that?

22      A.    I believe --

23      Q.    You remember that testimony?

24      A.    I believe I was estimating at the time, but, yes.

25      Q.    Right.  Now, the rooms dimensions haven't changed,

                                                          ws

1   have they?

2        A.   Pardon me?

3        Q.   The dimensions of the rooms haven't changed?

4        A.   No.

5        Q.   They're pretty much what they were, right --

6        A.   Yes.

7        Q.   -- on June 24th?

8             And you recall testifying at the hearing on

9   April 30th, 2009?

10            You remember you told the Judge on that date that

11  the room was approximately ten by eight, not ten by nine?

12            Do you recall that?

13       A.   I don't know what my specific measurements were,

14  but ten by eight or ten by nine or nine by ten, I think, are

15  the same, as far as speculative sizes go.

16       Q.   Well, would you like your recollection refreshed

17  whether you told the Judge it was eight by ten?

18            In other words, you minimized the size of the room

19  to the Judge -- to the jury, but not to the Judge?

20                 MS. JOHNSON:  Objection.

21                 THE COURT:  Yeah, sustained.

22                 MR. SCHECHTER:  Withdrawn.

23       Q.   Now --

24                 THE COURT:  All right, Mr. Schechter, you're

25       going to go on to a different area?

Shulman - People - cross          707

1              MR. SCHECHTER:  I'm sorry?

2              THE COURT:  You're going on to a different

3       area?

4              MR. SCHECHTER:  I shall, but in the meantime

5       I suppose we could have the jury look at them.

6              THE COURT:  So let's have the jury look at

7       these and then we can break for lunch.

8              MR. SCHECHTER:  Thank you.

9              (Defendant's Exhibits V through Y published

10      to the jury.)

11             COURT OFFICER:  Okay, Judge.

12             THE COURT:  All right, members of the jury,

13      we're going to break at this time for lunch.  We're

14      going to pick it up at 2 o'clock.

15             Please remember my admonitions.

16             Please do not discuss the case amongst

17      yourselves or with anybody else.

18             Please don't form any opinions about the

19      case.  Please keep an open mind.

20             Please don't view or visit or access any

21      means to research this case or view any -- view or

22      visit any of the areas described.

23             Have a good lunch.  We'll see you back at 2.

24             (Jury exits.)

25             THE COURT:  Okay, detective, you can step

                                                    ws

Shulman - People - cross          708

1      outside.  See you at 2 o'clock.

2                (Witness steps down.)

3                THE COURT:  All right, we'll see everybody

4      back at 2 o'clock.

5                (The luncheon recess was taken at this time.)

6                *     *     *     *     *

7                A F T E R N O O N   S E S S I O N

8                (Witness resumes the stand.)

9                THE COURT:  Just give me an idea of what you

10     want to talk about because I don't want them to stand

11     out there.

12               MR. SCHECHTER:  I just want to make my offer

13     regarding the videotapes that I made before I had

14     counsel's opening statement.

15               I wish to make reference to it with respect

16     to my application.

17               Now, Page 6 --

18               THE COURT:  Let me do this -- are they

19     outside?

20               MR. SCHECHTER:  It's pretty short.

21               COURT OFFICER:  One is missing, Number 7.

22               MR. SCHECHTER:  Counsel says, firstly, on

23     Page 5, she says, "14-year-old Sana couldn't fight him

24     off and the evidence will show that fear remained with

25     her, that fear that even as she fought, said no and

                                                      ws

1    pushed and couldn't resist, that fear remained in her

2    mind."

3              Counsel then states on Page 7, "As the

4    calendar days went, the months went, the years went,

5    that fear that he instilled in her when she was just 14

6    years old remained with her and crossed county lines

7    into Nassau County and she never forgot that she was

8    still afraid because she knew when she tried to fight

9    him she wouldn't win."

10             That was in her opening statement, Judge, so

11   I respectfully --

12             THE COURT:  It's not evidence, so -- but what

13   I'll do is I'll -- I don't want to truncate it, if you

14   will.  I'll take it up when the People rest and then we

15   can renew it.

16             Other than that, we're ready.

17             Do you have Detective Moran here?

18             MS. JOHNSON:  I told him to come outside at

19   2:30.

20             (Pause in the proceedings.)

21             (Jury enters.)

22             THE COURT:  All right, members of the jury,

23   we're ready to continue with cross-examination.

24             Mr. Schechter?

25

Shulman - People - cross                710

1    CROSS-EXAMINATION CONT'D

2    BY MR. SCHECHTER:

3        Q.   Detective Matth -- Detective Shulman, do you know

4    who Detective Matthews is?

5        A.   Yes.

6        Q.   Who is he?

7        A.   He's the detective assigned to the Detective

8    Borough of Queens.

9        Q.   And is he assigned to your precinct?

10       A.   No, he's assigned to the Detective Borough of

11   Queens.

12       Q.   Now, let me ask you this, when you first spoke to

13   Sana Awan she told you that this alleged abuse occurred at

14   three or 400 Community Drive, is that correct?

15       A.   At some point in time in my conversation with her

16   she indicated that there was an incident at 400 Community

17   Drive.

18       Q.   And that was before you spoke to Mr. Gopaul,

19   correct?

20       A.   No.

21       Q.   It was after you spoke to Mr. Gopaul?

22       A.   Yes.

23       Q.   And when did you have that conversation with her?

24       A.   Ms. Awan had been sent to the hospital to have a

25   checkup done to make sure she was okay.  She was taken in an

ws

1    ambulance and upon her return from the hospital she

2    indicated to me that while she was on the way to the

3    hospital she saw the building and that the address was

4    400 Community Drive.

5         Q.   She told you that on her own?

6         A.   Yes.

7         Q.   Now, how tall are you?

8         A.   I'm about five ten.

9         Q.   How much do you weigh?

10        A.   About 250 or so, 260.

11        Q.   Do you know how tall Harold Gopaul was and how

12   much he weighed on June 24th, 2008?

13        A.   Not exactly.

14             MR. SCHECHTER:   With the permission of the

15        Court, your Honor, I would like the jury to see the

16        first part of the video when they flash on Mr. Gopaul.

17             THE COURT:   Yes.

18             Ms. Johnson?

19             MS. JOHNSON:   If I can figure out how to

20        change the wires, of course.

21             (Pause in the proceedings.)

22             THE COURT:   Do you want the volume,

23        Mr. Schechter?

24             MR. SCHECHTER:   No.

25             MS. JOHNSON:   I'm going to rewind it to the

ws

1        beginning.

2                        MR. SCHECHTER:  I don't want the volume.  I

3        just want the part where it focuses in on Mr. Gopaul.

4                        THE COURT:  In the beginning?

5                        MR. SCHECHTER:  Yes.

6                        (Pause in the proceedings.)

7                        MR. SCHECHTER:  We don't need the volume.  I

8        just want the picture.

9                        MS. JOHNSON:  Tell me where you want it.

10                       MR. SCHECHTER:  Stop -- no, not yet.

11                       (Pause in the proceedings.)

12                       MR. SCHECHTER:  Now stop.

13                       (People's Exhibit 1 published at this time.)

14       Q.    Detective Shulman --

15                       MR. SCHECHTER:  With the Court's permission,

16       could Detective Shulman get off the witness stand?

17                       THE COURT:  Yeah, just watch your step as you

18       step over.

19                       MS. JOHNSON:  Do you want me to stay here?

20                       THE COURT:  If you would.

21                       MS. JOHNSON:  I don't know if everybody can

22       see.

23                       THE COURT:  Do you want the detective to

24       point out something?

25                       MR. SCHECHTER:  No, I'll point it out.

                                                                    ws

Shulman - People - cross          713

1          Q.    Detective Shulman, you'll notice Mr. Gopaul's

2    collar and you'll notice the sides of the collar are one

3    side all the way to the left and the other side all the way

4    to the right.

5          Did you grab Mr. Gopaul's collar, both hands, grab

6    forward and shove him into the wall and bring him back to

7    you?

8          A.    Absolutely not.

9          Q.    Could you please explain to the jury how the

10   collar became that stretched out?

11         A.    I can't account for Mr. Gopaul's clothing.  Maybe

12   he unbuttoned his shirt, I don't know.

13         Q.    Was he that way when he came into the room?

14         A.    He's sitting in a chair looking like a normal

15   person with a shirt on.

16               THE COURT:  Mr. Schechter, you want him to

17         look at that anymore?

18               MR. SCHECHTER:  Yes, yes, I want him to look

19         at that.

20         Q.    Was his shirt like that when he came into the

21   room, Detective Shulman?

22         A.    I don't know if his shirt was buttoned or

23   unbuttoned.

24         Q.    Well, you're a trained police officer, are you

25   not?

                                                          ws

Shulman - People - cross                714

1       A.   Well, like any other human being I have a
2   recollection.
3       Q.   Are you a trained police officer, yes or no?
4       A.   Trained in what?
5       Q.   Trained in making observations?
6       A.   To some degree, yes.
7       Q.   To some degree?
8            Well, you're a detective now for over seven years
9   or nine years, right?
10      A.   Yes.
11      Q.   And you didn't get to be a detective because
12  you're not an observant police officer, is that correct?
13      A.   I would think not.
14      Q.   Can you tell this jury whether his collar looked
15  like that when he first -- when you first came into the
16  room?
17      A.   And, again, I don't know if his collar was opened
18  or not opened when I first came into the room and spoke to
19  him.
20            THE COURT:   Mr. Schechter, in terms -- when
21        you say into the room, are you talking about --
22            MR. SCHECHTER:   I'm talking into the
23        interrogation room, not this room.
24            THE COURT:   When the detective initially sees
25        him?

                                                      ws

Shulman - People - cross          715

1          MR. SCHECHTER:  When the detective initially
2     saw him, yes.
3     Q.   When you first saw him was his collar like that?
4     A.   Again, when I first walked into the interview room
5     to speak to Mr. Gopaul I don't know if his collar was open
6     or not.
7     Q.   Now, are you familiar with the enhanced
8     interrogation techniques that the United States Army
9     indulges in?
10          Are you familiar with that particular skill that
11     the U.S. Army trains --
12          MS. JOHNSON:  Objection.
13          THE COURT:  Yeah, sustained.
14     Q.   You know that it's called enhanced interrogation,
15     do you not?
16          MS. JOHNSON:  Objection.
17          THE COURT:  Yeah, sustained.
18     Q.   Are you familiar with the Reid style of
19     interrogation, R-e-i-d?
20     A.   No, I'm not.
21     Q.   Okay.
22          MR. SCHECHTER:  Thank you.  Please close that
23     and I ask --
24     Q.   You can go back to the stand.
25          THE COURT:  You can shut that off,

ws

Proceedings                    716

1       Ms. Johnson.

2                   (Witness resumes the stand.)

3                   MR. SCHECHTER:  I have no more questions of

4       the detective, your Honor.

5                   THE COURT:  Okay.

6                   Ms. Johnson, any redirect?

7                   MS. JOHNSON:  No, your Honor.

8                   THE COURT:  All right, detective, thank you

9       very much.  You can step down.  Watch your step as you

10      step off.

11                  THE WITNESS:  Thank you, your Honor.

12                  (Witness excused.)

13                  MS. JOHNSON:  Can I step out for a second?

14                  THE COURT:  Yes.

15                  MS. JOHNSON:  Okay.

16                  (Pause in the proceedings.)

17                  THE COURT:  Is he down the hall?

18                  MS. JOHNSON:  I didn't see him.

19                  COURT OFFICER:  2:30 you told him.

20                  THE COURT:  He's not there now?

21                  COURT OFFICER:  No.

22                  THE COURT:  Members of the jury, our next

23      witness is expected to arrive at 2:30, so by our clock,

24      it's a little fast, but it appears that we're close to

25      it, but rather than having you sit here and everybody

                                                          ws

Proceedings                    717

1    looking at each other, why don't you take an unexpected
2    break, if you will, and I'll have you back here as soon
3    as this witness is here.  I apologize.  Figure you got
4    ten minutes.
5                (Jury exits.)
6                MR. SCHECHTER:  Your Honor, I understand
7    Detective Shulman was just speaking to one of the
8    jurors.
9                THE COURT:  Look it, I didn't see anybody.
10               MR. SCHECHTER:  My client observed it.  He
11   just told me right out there as the jurors were filing
12   out Detective Shulman was either nodding or
13   communicating to a juror.
14               I would like Detective Shulman brought back
15   in, please.
16               THE COURT:  Is he out there, please?
17               THE CLERK:  Yes.
18               MS. JOHNSON:  I think he was talking to
19   Detective Moran.
20               (Witness enters.)
21               THE COURT:  Detective, if you could just take
22   a seat?
23               THE WITNESS:  Over here?
24               THE COURT:  Yeah, back on the stand.
25               (Witness resumes the stand.)

Proceedings                718

1          THE COURT:  Detective, as you were, I

2     guess -- you were waiting outside after you just

3     finished testifying?

4          THE WITNESS:  Yes, your Honor.

5          THE COURT:  Did you have any discussion with

6     any jurors as they entered or left the courtroom?

7          THE WITNESS:  No, your Honor.

8          MR. SCHECHTER:  Did any juror nod to him or

9     in any way make contact and make any gestures

10    whatsoever?

11          Or did you do it to him?

12          THE COURT:  No, you're not going to ask the

13    questions, Mr. Schechter.

14          MR. SCHECHTER:  I'm sorry.

15          THE COURT:  Was there any communication,

16    verbal or nonverbal, between you and a juror?

17          THE WITNESS:  No.

18          THE COURT:  All right, thank you very much.

19    Step down.

20          (Witness excused.)

21          THE COURT:  All right.

22          MS. JOHNSON:  I'm going to call and see if

23    he's --

24          THE COURT:  Hopefully --

25          MS. JOHNSON:  He's always on time.

                                                ws

Proceedings                 719

1            THE COURT:  Don't go too far because I want

2       to discuss, while we have some free time, this issue

3       with regard to these videos.

4            (Pause in the proceedings.)

5            THE COURT:  While we have a few moments I

6       would like to pick up, Mr. Schechter, what you were

7       raising before the jury came up and that was you're

8       renewing, which I said I would allow to you do from

9       yesterday, the issue with regard to certain DVDs or --

10      that you had in which you claim certain events were

11      captured by way of DVD videography regarding certain

12      family functions between your client and the

13      complainant.

14            Is there something in the record that you

15      also want to refer to other than the opening statement

16      that you mentioned a moment ago?

17            MR. SCHECHTER:  No, your Honor.  I believe it

18      was in the opening statement.

19            Let me have one moment, however.

20            (Pause in the proceedings.)

21            MR. SCHECHTER:  Counsel asks on Page 58:

22            "Question:  And when for the first time did

23      you see that massager?

24            "Answer:  The beginning of May.

25            "Question:  Did you see it before the

ws

Proceedings                    720

1       beginning of May?

2                  "Answer:  Yes.

3                  "Question:  When before the beginning of May

4       did you see that massager?

5                  "Answer:  I'm not sure of an exact date, but

6       it was in the car before.

7                  "Question:  Would it be 2006, 2007, 2008?

8                  "Answer:  I'm not sure."

9                  If I can go on --

10                 THE COURT:  That's the massager she says was

11      not used against her, if I recall.

12                 MR. SCHECHTER:  Yes.

13                 Question Page 51:

14                 "Question:  Was there anything else that you

15      were afraid of back when you were 14 years old in the

16      bathroom?

17                 "MR. SCHECHTER:  Objection to form.

18                 "THE COURT:  No, I'll allow it overruled.

19                 "Question:  What else were you scared of?

20                 "Answer:  I was scared that he would hurt me.

21                 "Question:  And what is it that you were

22      afraid he would do?

23                 "Answer:  Like, if I fought back I was scared

24      I would get beat."

25                 THE COURT:  And --

Proceedings                    721

1                MR. SCHECHTER:  Question Page 51:

2                "Question:  Did the incident in the bathroom

3       have any impact on your fear in May of 2008?

4                "MR. SCHECHTER:  Objection.

5                "THE COURT:  Sustained.  Rephrase.

6                "Question:  What impact did the incident in

7       the bathroom have you on you, if any, in 2008?

8                "MR. SCHECHTER:  Objection.

9                "THE COURT:  Overruled.

10               "MR. SCHECHTER:  Exception.

11               "THE COURT:  Yes.

12               "Question:  You can answer.

13               "Answer:  Can you rephrase it?

14               "Question:  Sure.  In May of 2008 did you

15      remember what happened in the bathroom?

16               "MR. SCHECHTER:  Objection.

17               "THE COURT:  Yeah, overruled.

18               "Answer:  Yes.

19               MR. SCHECHTER:  Exception, Judge.

20               "THE COURT:  Yes."

21               Page 53 -- well, I have to go back to

22      Page 52, I'm sorry, because it refers back to 52:

23               "Question:  And what impact did that memory

24      have on you in May of 2008?

25               "Answer:  I knew what he was capable of,

                                                      ws

Proceedings                    722

1     so --
2                    "MR. SCHECHTER:  Objection.
3                    "THE COURT:  Yeah, sustained.  The answer is
4          stricken.
5                    "Question:  Are you able to answer that
6          question --
7                    "MR. SCHECHTER:  Objection.
8                    "Question:  -- in a different way?
9                    "THE COURT:  Overruled."
10                   Page 53:
11                   "Question:  Are you able to answer that
12         question in a different way?
13                   "Answer:  Yes.
14                   "Question:  What's your answer?
15                   "Answer:  Like, remembering what happened in
16         the bathroom, like I knew there was no point in
17         fighting back so I just did what he said, otherwise --
18                   "MS. JOHNSON:  Your Honor, I'm going to ask
19         this be marked and show it to the witness."
20                   This is on Page 53.
21                   THE COURT:  Right, I have those pages,
22         although it's a different page number than I have.
23                   Well, let me just say this.
24                   In the first instance, in this Court's view,
25         it's my understanding that you're proffering these

                                                        ws

Proceedings                    723

1      tapes -- and, by the way, they depict events, I think

2      you indicated yesterday, in either late 2007 or the --

3      up to March of 2008?

4              MR. SCHECHTER:   To the best of my knowledge

5      and recollection.

6              THE COURT:   So obviously here with regard

7      to -- and, just so it's also clear, I haven't seen the

8      tapes, but from what you've represented it's

9      essentially the complainant in this case, if you will,

10     Ms. Awan herself, taking videos or photos of your

11     client and other people, is that right?

12             MR. SCHECHTER:   Yes, mostly my client, but my

13     client sometimes with other people, sometimes of my

14     client exclusively.

15             THE COURT:   And there's no videos of the

16     complainant and your client in there, in these videos?

17             MR. SCHECHTER:   Well, there is one where

18     she's dancing and I think either my client or

19     Mrs. Gopaul is taking the video.  However, I do not

20     believe that that would be one of the ones that I would

21     be offering.

22             THE COURT:   All right, so, in essence, it's

23     videos that you believe she's taking of your client.

24             MR. SCHECHTER:   Yes -- well, I know she's

25     taking them.  She admitted she took videos.

                                                        ws

Proceedings                724

1        THE COURT:  I don't even know whether she did

2    or didn't on the witness stand.  I don't know how far

3    she got with it.

4        And I take it from your proffer is that this

5    is -- this, you believe, her shooting, if you will, or

6    taking shots with a video camera of your client, in

7    your words, focusing in on him --

8        MR. SCHECHTER:  There's more than that, your

9    Honor.

10       Not only is she taking videos of my client,

11   but she's laughing, teasing, prodding, poking, showing

12   that she is very much amused and fond of my client in

13   what she says during the tape in the video pictures.

14   It's obvious that she's keyed into my client in a very

15   favorable way, not being threatened, not being forced,

16   not being under any duress, during the time when she

17   says, "I had this constant memory when this occurred in

18   2004 and this was recurring and always in my mind until

19   2008."

20       Counsel was able to draw that out from her.

21       THE COURT:  I have to differ from you as far

22   as what she drew out and what she may be able to argue

23   to the jury.

24       As far as I'm concerned, her testimony

25   regarding the event in '04, the initial event I allowed

Proceedings                    725

1    her to elicit, as far as this Court is concerned deals

2    with an element of force as she described it in which

3    she claimed that she couldn't resist, physically, your

4    client.

5              I know what Ms. Johnson maybe would have

6    liked to elicit, but in terms of the testimony that I

7    have, I'm not sure that that is what was elicited.

8              Essentially, she said -- "What were you

9    scared of," she's asked.

10             MR. SCHECHTER:  Page, your Honor?

11             THE COURT:  Mine is Page 4, but it says, "I

12   was scared, like, that if my mom came -- " I read this

13   in the record yesterday, "I was scared that if my mom

14   came in and saw him doing anything that I would cause

15   them, you know, the breakup of their family.  Like, I

16   was scared I would mess up the family."

17             That's not talking about fear of your client.

18   So that's one answer that came out.

19             She does say that, "I was scared he would

20   hurt me," at the time of the incident based upon her

21   physically being unable to resist him.  That's on the

22   following page.

23             MR. SCHECHTER:  Hopefully, the record is

24   clear, your Honor.

25             Is 53 the official court page, official page

                                                    ws

Proceedings                726

1       of the transcript, or is 4?

2                   THE COURT:  Whatever page it is, I'm reading

3       from the transcript that I have.  I mean, the

4       pagination may be off, but it's not different than what

5       you have.  I certainly trust it.

6                   MR. SCHECHTER:  I can certainly show this to

7       your Honor if your Honor wishes to read what I read

8       into the record.

9                   THE COURT:  I'm not saying that you're

10      misrepresenting what's read in the record, but, again,

11      I don't think that the videos in themselves are -- can

12      be characterized as prior inconsistent statements,

13      obviously, number one, because they're not statements

14      of Ms. Awan, so that's clearly not the case.

15                  Number two, the time in which these videos

16      are taken are clearly many years after this incident in

17      '04 that she testified to.  I quite frankly think she

18      only referred to being scared, one, of not being able

19      to physically resist him at the time and, two, that she

20      was scared of the breakup of her family if she was to

21      reveal this to anybody.

22                  So, in terms of a context, a time context,

23      you're saying that these instances refer to a period of

24      time that is not contained in the indictment, is not

25      contained in terms of part of the testimony that was

                                                           ws

Proceedings                          727

1      elicited as part of the Molineaux application and I

2      really don't think that it's proper impeachment of this

3      witness.  It doesn't -- it's not videos where she's

4      shown to be affectionate, for example, with your client

5      at or about the times of the indictment or at or about

6      the time of the incident in May that are depicted in

7      there.

8                  In fact, from what you're telling me,

9      Ms. Awan is not depicted in it at all.

10                 MR. SCHECHTER:  Ms. Awan is the photographer.

11                 THE COURT:  I understand that and I'm basing

12     my decision based on your representation.  I didn't see

13     it.

14                 MR. SCHECHTER:  I offered to play it to the

15     Court.

16                 THE COURT:  I'm taking what you're telling me

17     is accurate.  So I don't know if me seeing it

18     necessarily is going to change my ruling.  I'm assuming

19     that what you're telling me is accurate and that's what

20     I'm basing my decision on.

21                 So for those reasons I don't really think

22     that it would be admissible as some type of either

23     prior inconsistent statement or inconsistent with what

24     she's really testified to.

25                 I mean, we have to keep in mind that she said

ws

Proceedings                728

1    throughout her testimony that when she was in public,

2    which these are videos of her -- not her, but videos of

3    your client with other people around, that her

4    demeanor, her behavior, her interaction with your

5    client and the family -- and her family and others was

6    normal.

7         In other words, there was nothing about it

8    that was any, you know, different than what she said

9    took place between you and your client -- I should say

10   her and your client privately.

11        So, again, I don't think it's inconsistent

12   with what she's testified to either in a statement

13   or -- one, or, two, in terms of showing some type of

14   demeanor that's inconsistent with what she's testified

15   to as to how she behaved during --

16        MR. SCHECHTER:  I think your Honor is

17   unintentionally mischaracterizing that statement.

18        I think Ms. Awan said that in public my

19   client was with the family, he was normal, however he

20   conducts himself with the family, not she.  She was not

21   referring to how she conducted herself.  She was

22   referring to how he conducted himself when he was in

23   public and with the family, not how she did.  And I'm

24   entitled to draw whatever inferences that I can draw.

25        Certainly if I -- from these videos -- and,

1        again, I had offered to play them to the Court

2        yesterday, I offer to play them at any time the Court

3        wishes.  From these videos it's not just the video of

4        Sana taking pictures of my client, focusing on him,

5        concentrating on him, it's her statements when she's

6        doing it, her laughter, her joyous demeanor, how she's

7        interacting with my client, during the period of time

8        when counsel was able to draw out, as I read into the

9        record, that she was somehow under this cloud of fear

10       from that event in 2004 all the way until 2008.  This

11       was -- it's clear and it's unequivocal, those were the

12       words that she used to try to draw out the fear and the

13       reason she tried to do that is because she was afraid

14       that Sana did not every time she was allegedly abused

15       have force used against her so she wanted to try to

16       draw out to the jury, apparently, that she was under

17       this cloud of fright.

18               THE COURT:  Let me just kind of assuage your

19       concerns in this sense.

20               The People are not going to be able to argue,

21       based upon what I've seen during the testimony, there's

22       some kind of cloud of fear that went on.  I understand

23       what the DA, the Assistant, said in her statement.  As

24       far as I'm concerned there hasn't been developed an

25       adequate record to make those assertions in her closing

ws

Proceedings                              730

1       arguments.

2               As far as I'm concerned, her testimony

3       regarding this incident in '04 -- 04, '05, really is --

4       talks about an element of force that was used at that

5       time and the next discussion about her really being in

6       fear of the defendant concerns the times in May and

7       June of' 08 which is what this jury is going to be

8       considering in this indictment.

9               MR. SCHECHTER:  Your Honor, I respectfully

10      submit that that's like trying to unring a bell.  All

11      of this stuff was put before the jury, in her opening

12      statement --

13              THE COURT:  Her opening statement is not

14      evidence.

15              MR. SCHECHTER:  May I please continue, Judge?

16              THE COURT:  Yes.

17              MR. SCHECHTER:  In her opening statement

18      followed by the questions I read into the record as an

19      exclamation point.

20              The fact is, she backed it up with the

21      questions to this witness and the questions that the

22      Court permitted the witness to answer do permit a

23      reference back.

24              The fact that the Court might now, sua

25      sponte, limit counsel's summation to that -- to not

                                                        ws

Proceedings                    731

1       include that, as I said, you got 12 jurors here, it's

2       like unringing a bell and my client cannot have been

3       otherwise been prejudiced by the introduction ab initio

4       of that material as I objected to in the beginning.

5       I'm only trying to negate this cloud of fear argument

6       she put before the jury.

7                   THE COURT:  Again, I seem to say things,

8       Mr. Schechter, and you seem to not be listening to what

9       I'm saying.

10                  Cloud of fear is not going to be a word -- if

11      it does get used, if there's an objection, it will be

12      sustained, as far as from '04 to '07 and -- from '04,

13      this incident that was testified to, until the incident

14      that this jury is considering in terms of the

15      indictment.

16                  Whether or not you want to elicit these tapes

17      if you feel that it's some part of your defense case,

18      that's a separate issue.

19                  And whether or not you want to seek to use

20      them for some other reason, you're not for closed from

21      doing that.

22                  But at this point I've made my ruling.  You

23      have the reasons for my ruling and at this point I'm

24      not going to modify it at this point.

25                  MR. SCHECHTER:  Please note my exception.

                                                            ws

Proceedings                     732

1           And, further, I just need to be heard

2      again --

3           THE COURT:  Mr. Schechter, I think you've

4      been heard -- you made a record.  You've now excepted.

5      I have a jury that's waiting.  I told them ten minutes

6      ago they would be here so, please, I don't want to --

7      if it's something that's short, to the point, please.

8           MR. SCHECHTER:  It's very short.

9           The only conceivable way that that could come

10     in is for my client to waive his Constitutional right

11     to testify.

12          THE COURT:  That's absolutely incorrect and

13     that's a misrepresentation on your part.

14          Okay, let's go.

15          (Brief recess taken in the proceedings.)

16          (Jury enters.)

17          THE COURT:  All right, we're ready to

18     proceed.

19          People, your next witness?

20          MS. JOHNSON:  Your Honor, the People call

21     detective Edward Moran.

22     E D M O N D   M O R A N, a witness called on behalf of the

23     People, having been first duly sworn by the clerk of

24     the Court, was examined and testified under oath as

25     follows:

                                              ws

Moran - People - direct          733

1          COURT OFFICER:  You could take a state.

2                For the record, state your name, spell your

3      last name, shield number, rank and command.

4                THE WITNESS:  Edmond Moran, M-o-r-a-n, Shield

5      Number 827, Nassau County Police Department, special

6      victim's squad.

7                THE COURT:  Ms. Johnson?

8                MS. JOHNSON:  Thank you.

9      DIRECT EXAMINATION

10     BY MS. JOHNSON:

11          Q.   Good afternoon, Detective Moran.

12          A.   Good afternoon.

13          Q.   How long have you been employed by the Nassau

14     County Police Department?

15          A.   About 22-1/2.

16          Q.   Can you tell the members of the jury, over those

17     22 years where have you been -- what assignments have you

18     been assigned to?

19          A.   The first nine years I was in patrol, in uniform

20     patrol, and then I spent two and a half years as a detective

21     in the 8th Squad and then for the last 11 years I've been in

22     special victim's squad.

23          Q.   What types of cases do you handle as a detective

24     assigned to the special victim's squad?

25          A.   The special victim's squad, we handle cases of

ws

1   sexual abuse, rapes and sodomies, victims both male and

2   female of all different ages.

3        Q.   Were you in -- a detective assigned to the special

4   victim's squad back in 2008?

5        A.   Yes.

6        Q.   And were you assigned there back on July 22nd,

7   2008?

8        A.   Yes.

9        Q.   Did there come a time when you met with a victim?

10       A.   Yes.

11       Q.   What was her name?

12       A.   Anna -- Sana Awan, A-w-a-n.

13       Q.   Sana Awan?

14       A.   Sana Awan, yes.

15       Q.   What was the reason you met with Sana Awan?

16       A.   Earlier, a few weeks earlier, I was notified by

17   New York City Police Department that they had --

18                MR. SCHECHTER:  Objection.

19                THE COURT:  Yeah, just you were notified by

20       New York City Police Department?

21                THE WITNESS:  Yes.

22                THE COURT:  All right, go ahead.

23       Q.   Were you going to be handling a Nassau County case

24   involving Sana Awan?

25       A.   Yes.

ws

Moran - People - direct          735

1        Q.    And were you the detective in Nassau County
2    assigned to that case?
3        A.    Yes.
4        Q.    Did you have the opportunity to actually interview
5    Sana Awan?
6        A.    Yes, I did.
7        Q.    When you interviewed Ms. Awan what periods of time
8    were the substance of your interview of her?
9        A.    I was investigating incidents that occurred in the
10   month of May and June of 2008.
11       Q.    In Nassau County?
12       A.    That's correct.
13       Q.    When you spoke to Ms. Awan did you advise her what
14   time period you were going to be speaking with her about?
15       A.    Yes.
16       Q.    When you spoke to Ms. Awan did you advise her --
17            MR. SCHECHTER:  Objection to the leading,
18       your Honor.
19            THE COURT:  Yeah, sustained.
20       Q.    Did you tell Ms. Awan --
21            MR. SCHECHTER:  Objection to the form of the
22       question.
23            THE COURT:  All right, Mr. Schechter, please,
24       I've said this to both of you, if you'll let each other
25       finish the question before you object?

ws

Moran - People - direct          736

1                Would you finish, please?

2        Q.   Did you tell Ms. Awan what you were going to be

3    speaking with her about?

4                MR. SCHECHTER:  Objection.

5                THE COURT:  Yeah, overruled.

6        A.   Yes.

7        Q.   Did there come a time when you took a statement

8    from her?

9        A.   Yes.

10       Q.   And was that a verbal or written statement?

11       A.   The interview was verbal, of course, and the

12   statement was typed -- written -- the statement was a

13   two-page typed statement.

14       Q.   What was the purpose of that?

15       A.   To memorialize the interview, our discussion,

16   about what she states has happened to her and she reads it

17   and signs it.

18       Q.   Was that, in fact, done in this particular case?

19       A.   Yes.

20       Q.   And when you say interview, what happens during --

21   what happened during the interview process?

22       A.   In any of my cases the person making the

23   allegations would be sitting --

24                MR. SCHECHTER:  Objection to what happens in

25          many of his cases, Judge, we're talking about this

                                                    ws

Moran - People - direct          737

1        case.

2                    THE COURT:   Could you just tell us what

3        happened in this case?

4        A.    What happened in this case, the person making the

5        allegation sits in a room with me and we discuss what

6        happened.  I ask questions.  They answer questions and we go

7        into detail.

8        Q.    In this case did you take notes during your

9        interview with Ms. Awan?

10       A.    Yes, I did.

11       Q.    What was the purpose of that?

12       A.    The immediate interview with her I ask her

13       questions about what happened so we both know what we're

14       talking about and I make an outline and just take notes of

15       what we're talking about prior to the actual typed

16       statement, which is more details.

17       Q.    When you say outline what does that mean?

18       A.    It's my way of just taking notes during an

19       interview to refresh my memory as to what we're talking

20       about so that there is an order and a sequence and I don't

21       forget things.

22       Q.    Are those notes the actual verbatim statement of

23       the complainant?

24       A.    Yes, it's -- it's -- we speak and I write it down,

25       yes.

                                                              ws

Moran - People - direct          738

1    Q.   Is it a complete statement?

2    A.   No, it's not.

3              MS. JOHNSON:  Your Honor, I'm going to ask

4    for what's been marked as Defendant's Exhibit R for

5    identification purposes?

6              THE COURT:  Defendant's R?

7              MS. JOHNSON:  Yes, I would ask for that.

8              MR. SCHECHTER:  I have to find it, Judge.

9              May I have some time?

10             I have to look.

11             THE COURT:  Yes.

12             (Pause in the proceedings.)

13             MR. SCHECHTER:  I would have gotten it if

14   counsel had informed me in advance.  I'm going to need

15   a few minutes to get it, Judge.

16             THE COURT:  Let me ask you, Ms. Johnson, do

17   you have a copy yourself of what's previously been

18   marked Defendant's R?

19             MS. JOHNSON:  I believe I do and, in fact, I

20   believe Detective Moran may have the original with him

21   as we speak.

22             THE COURT:  All right, so, if you have a

23   copy --

24             MS. JOHNSON:  I think I do.

25             THE COURT:  -- show it to Mr. Schechter and

1        we'll mark that a People's exhibit.

2                    MS. JOHNSON:  Your Honor, with the Court's

3        permission, if Detective Moran could produce an

4        original of his handwritten notes from his case jacket?

5                    THE COURT:  All right, detective -- his notes

6        or what you believe to be Defendant's R?

7                    MS. JOHNSON:  I believe that is

8        Defendant's R.

9                    THE COURT:  The notes?

10                   MS. JOHNSON:  Correct.

11                   THE COURT:  Detective, do you have your notes

12       of your conversation with Ms. Awan?

13                   THE WITNESS:  I do.

14                   MS. JOHNSON:  The overview notes.

15                   THE COURT:  We'll mark them.

16                   (Shown to counsel.)

17                   MR. SCHECHTER:  Oh, I have that.

18                   THE COURT:  People's -- we'll mark that

19       People's 15 for identification.

20                   MS. JOHNSON:  Do you have that?

21                   MR. SCHECHTER:  Um-hum.

22                   MS. JOHNSON:  I'll take that.

23                   THE COURT:  This is Defendant's R,

24       Ms. Johnson?

25                   MS. JOHNSON:  Yes, it is.  I'm going to

Moran - People - direct                  740

1          return the original to the detective.

2                    (Shown to witness.)

3          Q.    Detective Moran, could you take a look at

4     Defendant's R for identification?

5          A.    Yes.

6          Q.    Do you recognize that?

7          A.    Yes, I do.

8          Q.    What is it?

9          A.    These are the -- this is the outline of the notes

10    I've taken during the interview with Sana Awan.

11         Q.    And when you say overview, you're referring to --

12         A.    Interview, I said.

13         Q.    Is that the statement that Sana Awan made to you

14    that you referred to as the two-page statement?

15         A.    No, it's not.

16                    MS. JOHNSON:  Your Honor, I would ask this be

17         marked as People's --

18                    THE COURT:  15.

19                    MS. JOHNSON:  -- 15 for identification.

20                    MR. SCHECHTER:  Objection, going to ask for a

21         sidebar.

22                    THE COURT:  Well, let's mark the item and see

23         where Ms. Johnson goes with it.

24                    (People's Exhibit 15 marked for

25         identification.)

                                                        ws

Moran - People - direct                741

1                    (Shown to witness.)

2         Q.    Detective Moran if you could take a look at

3    People's 15 for identification purposes?

4         A.    Yes.

5         Q.    Do you recognize that?

6         A.    Yes, I do.

7         Q.    What do you recognize it to be?

8         A.    This is the two-page statement --

9                    MR. SCHECHTER:  Objection, sidebar,

10   application.

11                   THE COURT:  No, your objection is overruled.

12                   MR. SCHECHTER:  Sorry, overruled, Judge?

13                   THE COURT:  Yeah, overruled.

14        Q.    Detective, do you recognize it?

15        A.    Yes.

16        Q.    What is it?

17        A.    This is a two-page typed statement of Sana Awan.

18        Q.    Is that the complete statement that you took from

19   Sana Awan?

20        A.    It is.

21        Q.    Can you tell us how it was that you went from one

22   page of handwritten notes to a two-page statement?

23        A.    Yes, the handwritten notes are a guideline during

24   the interview and as I do the interview I ask them -- ask

25   her to elaborate on different points and when she tells me

ws

Moran - People - direct          742

1    what happened I type it.

2         Q.   And is that what is depicted in that two-page

3    statement?

4         A.   Yes.

5         Q.   Were you present when -- withdrawn.

6              Did you observe Ms. Awan sign that two-page

7    statement?

8         A.   I did.

9         Q.   Did she make any corrections on it?

10        A.   No, she did not.

11        Q.   Did she indicate it was an accurate statement of

12   what she reported to you?

13        A.   Yes.

14              MS. JOHNSON:  Your Honor, we would offer that

15         into evidence.

16              MR. SCHECHTER:  Objection.

17              THE COURT:  All right, come on up, both of

18         you.

19              COURT OFFICER:  Detective, step down, please,

20         over here.

21              (Witness steps down.)

22              (Sidebar conference held as follows:)

23              MR. SCHECHTER:  I raised this objection

24         before, as the Court recalls --

25              THE COURT:  What's your offer on this?

                                                      ws

Moran - People - direct          743

1          MS. JOHNSON:  Yes, your Honor.

2          When Ms. Awan was asked to identify Detective

3    Moran's notes counsel implied before the jury that she

4    eliminated certain things from his handwritten notes

5    indicating that there was a recent fabrication of her

6    testimony.

7          THE COURT:  She eliminated certain --

8          MS. JOHNSON:  From her statement to Detective

9    Moran because in Detective Moran's handwritten notes

10   things about the knife and things about the massager

11   were not there.

12         He confronted her about that, tried to

13   impeach her with somebody else's handwritten notes,

14   fully knowing that there was a two-page statement from

15   her where she indicated all of that.

16         MR. SCHECHTER:  I'm entitled to go into what

17   I get in discovery.  It was his initial notes, an

18   inexperienced detective, and he omitted any mention of

19   a force.

20         As a matter of fact, I believe they

21   originally drew it up as a misdemeanor, B misdemeanor,

22   sexual abuse, that's how incomplete his notes were.

23         This is not a recent fabrication.  Counsel is

24   mistaken about my -- I never claimed a recent

25   fabrication.

                                                      ws

1        She is trying to get in a prior consistent

2     statement which is improperly bolstering, violates the

3     CPL and improper and prejudice to my client to the

4     point I believe would require a mistrial.

5        MS. JOHNSON:  He tried to impeach her by

6     omission, which is exactly what he is not permitted to

7     do, by indicating there were things missing from her

8     statement knowing full well there are things in her

9     statement --

10        MR. SCHECHTER:  I respectfully disagree with

11     counsel on that.

12        THE COURT:  I think it's pretty clear,

13     Mr. Schechter, that you did ask questions about

14     Detective Moran's notes, but I also think you

15     established that it was Detective Moran's notes, not

16     any statement that she made.

17        Would I be correct in that?

18        MS. JOHNSON:  Yes.

19        However, I don't think it was clarified

20     that -- I think it was left open that she omitted to

21     say things to Detective Moran based on those

22     handwritten notes because she was not confronted with

23     her statement, she was confronted improperly with

24     somebody else's notes.

25        MR. SCHECHTER:  I dispute counsel's

Moran - People - direct          745

1     represent --

2                    THE COURT:  I certainly think you can argue

3     that she was never confronted with any statement she

4     made of hers in which she claimed to have omitted

5     anything.  That you can certainly say.

6                    MS. JOHNSON:  Then if your Honor --

7                    THE COURT:  But, I tell you what, I'm not

8     going to allow her written statement to come in here

9     based upon the record that I have in front of me that I

10    think it's, quite frankly, I think it's clearly

11    bolstering.

12                   How far Mr. Schechter may have pursued it, I

13    don't think -- the difficulty I have is trying to

14    identify what it was that he may have elicited from her

15    that he claimed wasn't there that is in here.

16                   MS. JOHNSON:  Would your Honor please permit

17    me, if you're not going to permit me to put that in, to

18    inquire of the detective whether or not she told him

19    those factors which counsel tried to indicate that she

20    did not say to him.

21                   MR. SCHECHTER:  That's hearsay.

22                   THE COURT:  What other factors did he ask

23    Ms. Awan that are not in this statement?

24                   MS. JOHNSON:  About the knife, about the

25    vibrator and if she was in fear and it's exactly in

ws

 1        that statement.

 2                  THE COURT:  I think it's pretty clear,

 3        Mr. Schechter, you did ask her about those.

 4                  MR. SCHECHTER:  I merely asked her if she

 5        told the officer, made the statement attributed to the

 6        officer, and whether she omitted mentioning that

 7        statement --

 8                  THE COURT:  No, wait a minute, you gave her

 9        the notes.

10                  MR. SCHECHTER:  His statement.

11                  THE COURT:  Not his statement, his notes.

12                  MR. SCHECHTER:  His notes.

13                  THE COURT:  And then you asked her isn't it

14        true that X isn't in there and X isn't in there and X

15        isn't in there?

16                  In other words, that this isn't in there,

17        that isn't in there.

18                  MR. SCHECHTER:  I don't think I was that

19        particular.

20                  MS. JOHNSON:  We have the minutes.

21                  THE COURT:  Give me the minutes.

22                  (Shown to Court.)

23                  (Pause in the proceedings.)

24                  MR. SCHECHTER:  I think you had limited me --

25                  THE COURT:  Let me finish.

                                                        ws

1                    (Pause in the proceedings.)

2                    THE COURT:  All right, could I see the both

3          of you?

4                    (Sidebar conference continues as follows:)

5                    It appears to me after a lot of colloquy

6          going back and forth you, Mr. Schechter, asked the

7          question, "And in that statement you never told him

8          that you were threatened with a knife, did you?"

9                    You object, I sustained it.

10                    Next question.

11                    "Question:  Isn't it a fact you never told

12          him about being threatened with a knife in this

13          interview on July 22nd?"

14                    There's an objection and then there's an

15          extended bench conference about what I was trying to

16          say you could or could not do, given the fact it was

17          Detective Moran's notes as opposed to any statement by

18          her.

19                    MR. SCHECHTER:  Right.

20                    THE COURT:  You wanted to refresh her

21          recollection.  I basically said to you I don't want you

22          to ask, "Didn't you tell Detective Moran this," based

23          upon something that's his notes.

24                    You disagreed.  You cited Richardson's.  Then

25          you say -- this is Mr. Schechter, "Not unless I

1    represent this is a recent fabrication, which I'm not."

2              And then the next question, "Isn't it a fact

3    that in your original statement to Detective Moran you

4    never mentioned that you were forced?"

5              That's the question.  There was an objection.

6    I asked you to read back the question.  I sustained the

7    objection.

8              And then I said, "Just so we're clear,

9    Mr. Schechter, that's based upon Defendant's R, am I

10   correct," because at the time I didn't know what

11   Defendant's R was or what you had in your hand.

12             You said, "Yes, your Honor.

13             "THE COURT:  For ID?

14             "Mr. Schechter:  Yes."

15             And then it goes on to ask about, "Isn't it a

16   fact you were really scared of Mr. Gopaul -- you

17   weren't scared of Mr. Gopaul, you were scared of the

18   welfare of your family?"

19             MR. SCHECHTER:  That has nothing to do with

20   this.

21             THE COURT:  And he's not referring to

22   Defendant's R.

23             So the objection is sustained.

24             MR. SCHECHTER:  Thank you, your Honor.

25             (Sidebar conference concludes.)

ws

Moran - People - cross          749

1              THE COURT:  All right, detective, you could

2         resume the stand.

3                   (Witness resumes the stand.)

4              MR. SCHECHTER:  Instruction to the jury?

5              THE COURT:  Pardon?

6              MR. SCHECHTER:  Could the Court instruct the

7         jury?

8              THE COURT:  Members of the jury, I apologize

9         for the delay.  As you could tell, we were looking at

10        some transcripts here, but the objection raised by the

11        defendant is sustained.

12             MS. JOHNSON:  I have nothing else for

13        Detective Moran.

14             THE COURT:  Mr. Schechter?

15   CROSS-EXAMINATION

16   BY MR. SCHECHTER:

17        Q.   Detective Moran, do you have your original

18   complaint report for July 22?

19             Do you have documents, July 22 interview with the

20   complainant?

21        A.   I have the case report.

22        Q.   May I see it, please?

23        A.   Yeah.

24                  (Shown to counsel.)

25             MS. JOHNSON:  Could we please have it marked,

                                                            ws

Moran - People - cross                    750

1          your Honor?

2                    THE COURT:  Only if Mr. Schechter wants it

3          marked.

4                    MR. SCHECHTER:  Give me a second, please.

5                    (Pause in the proceedings.)

6                    MR. SCHECHTER:  I have this.  I'm returning

7          this to the detective.

8                    (Shown to witness.)

9          Q.   Now, detective, how long is it that you've been a

10    detective?

11         A.   Since 1995, so about 13 years.

12         Q.   And you've been a police officer for a

13    considerable period of time before that, isn't that correct?

14         A.   Yes.

15         Q.   And as a detective you understand, of course, your

16    first interview with a complainant is very important, do you

17    not?

18         A.   Yes.

19         Q.   As such, in your interview it is imperative for

20    you to note down the very important parts of the elements of

21    what she says is a crime, isn't that true?

22                    MS. JOHNSON:  Objection.

23                    MR. SCHECHTER:  I'll rephrase the question.

24                    THE COURT:  Yes.

25         Q.   It's important to get the material parts of what

                                                            ws

1    she says happened to her down on paper, isn't that true?

2         A.   Yes.

3         Q.   And especially true when you do write notes is to

4    obtain information concerning force, is that true?

5              MS. JOHNSON:  Objection.

6              THE COURT:  I'll sustain it as to form.

7              MR. SCHECHTER:  Okay.

8         Q.   Would you say that whether or not a complainant

9    has been subjected to force is something which is a material

10   part of a statement that you believe is important to obtain

11   from the complainant, correct?

12        A.   Are you referring to any case or this case?

13        Q.   Any case involving forceful sexual abuse?

14        A.   Yes.

15        Q.   But you didn't do that on July 22, did you?

16        A.   I didn't do what?

17        Q.   You did not write down in your July 22 notes

18   anything with respect to a knife being used against

19   Ms. Awan, did you?

20        A.   I believe I did.

21        Q.   In your July 22 notes?

22        A.   I believe so.

23             Can I check?

24             MR. SCHECHTER:  Let me see -- counsel, do you

25        have that document, please, R?

ws

Moran - People - cross              752

1                MS. JOHNSON:  No.

2        A.    It's still up here.

3        Q.    Please look at Exhibit R.

4              Are those your notes?

5        A.    Yes.

6        Q.    All right, now, would you please tell me where in

7   your notes you say that Mr. Gopaul forced her to have sex

8   with him with a knife?

9                MS. JOHNSON:  Objection.

10               THE COURT:  No, I'll allow that.

11       A.    That wasn't the allegation.  The allegation was

12   the fear.

13       Q.    So she never told you on July 22 that she was

14   threatened with a knife, is that your testimony?

15       A.    She did.

16       Q.    But you didn't put that down in your notes, did

17   you?

18       A.    It's not in the notes it's --

19       Q.    It's not in your notes?

20       A.    Correct.

21               MR. SCHECHTER:  May I have a moment, Judge?

22               THE COURT:  Yes.

23               (Pause in the proceedings.)

24       Q.    Matter of fact you treated this as a sex abuse --

25   as a misdemeanor, didn't you?

                                                    ws

Moran - People - cross          753

1            MS. JOHNSON:  Objection.

2            THE COURT:  Yeah, sustained.

3       Q.   Matter of fact, she told you he always had a knife

4  in the truck, didn't she?

5            MS. JOHNSON:  Objection.

6            THE COURT:  Yeah, sustained.

7            MR. SCHECHTER:  Your Honor --

8            THE COURT:  Yes.

9            MR. SCHECHTER:  May I approach as to the --

10           THE COURT:  Yes, come on up.

11           (Witness steps down.)

12           (Sidebar conference held as follows:)

13           MR. SCHECHTER:  May I ask why you're

14      sustaining an objection to what's in his statement?

15           He says in his transcribed statement that he

16      always had a knife in his truck.

17           THE COURT:  You're asking him about something

18      somebody said out of court.  It's a hearsay statement.

19           MR. SCHECHTER:  No, it's an admission as to

20      the complainant.  It's not a hearsay statement, Judge.

21      It's an inconsistent statement of the complainant where

22      she testified that she didn't see -- she didn't see it

23      before May.  Here she tells him he always had the knife

24      in the truck.

25           THE COURT:  All right, you're referring to

                                                          ws

Moran - People - cross                754

1      her notes or the written statement?

2                  MR. SCHECHTER:  His notes.

3                  THE COURT:  Can I see it?

4                  MR. SCHECHTER:  Sure.

5                  (Shown to Court.)

6                  THE COURT:  I think you asked her the one

7      thing that you did establish was that she testified she

8      didn't say -- you did establish that.

9                  MR. SCHECHTER:  I want to make sure that I

10     established it just -- I'm not sure if I did or not,

11     there's so many objections.

12                 THE COURT:  To me it's still a hearsay

13     statement of the witness, so the fact that she's the

14     complainant really is of no moment in my view and I

15     think she testified when you crossed her on this that

16     she said that in the statement.

17                 MR. SCHECHTER:  I believe it's an

18     inconsistent statement.  As such, it's admissible, your

19     Honor, because it's an admission, otherwise no

20     inconsistent statement would be admissible.

21                 THE COURT:  I think you established the

22     inconsistency through the person who made the

23     inconsistent statement.

24                 MR. SCHECHTER:  As long as you allow me to

25     mention that to the jury I have no problem with that.

1           MS. JOHNSON:  Well, actually, when he
2      confronted her with it she clarified that she was
3      talking about May and June.  So when he questions her
4      about whether or not he always had a knife she said the
5      first time she saw it was in May, not outside of the
6      times charged in the indictment.
7           So she never said that he always has it as in
8      always and forever, she testified as to May in June.
9           Either way, it's improper impeachment, you
10     can't impeach detective with her testimony.
11          MR. SCHECHTER:  Who says I'm impeaching him?
12          THE COURT:  I don't think she said that that
13     was not there or that she -- she may have tried to
14     qualify, but clearly she said yeah.  That's in his
15     notes.
16          MR. SCHECHTER:  As long as that's conceded
17     and I can use that on summation that's fine.
18          THE COURT:  I would think you would be
19     entitled to.
20          MR. SCHECHTER:  I'm just concerned if there
21     is a readback and there's a qualification it won't be
22     there.  She clearly says in the statement he always had
23     a knife in the truck, Judge.
24          MS. JOHNSON:  That is mischaracterizing this
25     testimony.

1              This detective is only talking to her about

2      May and June of 2008 in Nassau County and exactly what

3      she said is that she didn't see the knife in the van

4      before May of 2008.

5              THE COURT:  Just so there's no doubt about it

6      I'm going to allow Mr. Schechter to ask the question,

7      you can explore it on redirect examination, as to what

8      time period is referred to.

9              MS. JOHNSON:  Okay.

10             (Sidebar conference concludes.)

11             THE COURT:  All right, detective.

12             (Witness resumes the stand.)

13      Q.    Detective, in your notes of July 22, 2008, there's

14  nothing at all mentioned about fear, is there?

15             Please look at your notes?

16      A.    Correct.

17      Q.    And she told you he always had a knife in the

18  truck, correct?

19      A.    Yes.

20      Q.    That's what you wrote down?

21      A.    Correct.

22      Q.    She didn't tell you -- withdrawn.

23             Now, there came a time when you investigated where

24  you believed the actual location of the alleged sexual

25  assault took place, is that correct?

1          A.    Yes.

2          Q.    And you later ascertained that to be -- withdrawn.

3                And you later ascertained that Mr. Gopaul, in

4    fact, worked at 600 Community Drive not 400 Community Drive,

5    is that true?

6          A.    Repeat the question?

7          Q.    Yes.

8                Did you later ascertain that the address was 600

9    Community Drive, not 400 Community Drive?

10         A.    The place of occurrence?

11         Q.    The alleged place of occurrence?

12         A.    Yes, 600 Community Drive.

13         Q.    And you did that by the complainant pointing that

14   out to you?

15         A.    Yes.

16         Q.    Okay, and you took pictures of that area, no?

17         A.    Yes.

18         Q.    Did she indicate where within Community Drive, 600

19   Community Drive, the alleged assault took place?

20         A.    She did.

21         Q.    And did she say it was in the vicinity of the

22   security office?

23         A.    She said that it was in the back parking lot

24   behind the building.

25         Q.    When you went there was it on a weekday?

ws

Moran - People - cross          758

1          A.    A weekday, yes.

2          Q.    A lot of cars there, no?

3          A.    Reasonable.

4          Q.    Sorry?

5          A.    Just a reasonable amount of cars.

6          Q.    What day were you there?

7          A.    I don't recall the exact date.  It was prior to

8    the July 22nd interview.

9          Q.    You remember what day of the week it was?

10         A.    No, I'm sorry.

11         Q.    But it was during the week, correct?

12         A.    Yes.  I don't work weekends.

13         Q.    Okay.  Do you have a calendar with you, detective?

14         A.    Not for 2008.

15                MR. SCHECHTER:  I would like these marked, if

16         the Court pleases, as Defendant's Z --

17                THE COURT:  Let's go from Z to double A.

18                MR. SCHECHTER:  Z, AA, BB.

19                (Defendant's Exhibits Z, AA and BB marked for

20         identification.)

21                THE COURT:  Okay, Mr. Schechter.

22                (Shown to witness.)

23         Q.    Detective, would you please look at those

24    photographs?

25                Do those photographs represent the parking lot at

ws

Moran - People - cross                759

1    600 Community Drive?

2        A.    I don't see a building number on it, but there are

3    two or three buildings up there that have the same shape and

4    similar design.

5        Q.    But May 6, 2009, would you agree that is a

6    weekday?

7              Do you need a calendar to refresh your

8    recollection?

9        A.    I have a 2009 calendar.

10       Q.    Okay.

11       A.    Yes.

12       Q.    Okay, and you would agree it's very hard to get a

13   picture of 600 Old -- and at the same time get the picture

14   of the parking lot, you would agree?

15       A.    Say that again?

16       Q.    It's difficult to get a picture of 600 --

17   withdrawn.

18             There is a 600 in the front, a big 600 number, no?

19       A.    Correct.

20       Q.    And you have a picture of that with you, correct?

21       A.    Yes, yes.

22       Q.    Would you please take that out?

23             (Witness complies.)

24       Q.    Okay, now would you please examine your picture

25   and tell me if you can ascertain if that picture -- that is

                                                          ws

Moran - People - cross          760

1    600 Community Drive, correct?

2        A.   Yes.

3        Q.   And aside from that one number there's no other

4    indicia or marking of 600 Community Drive in the parking

5    lot, correct?

6        A.   Correct.

7        Q.   Okay.  Now, you look at those photographs.

8             Those photographs show a very full parking lot,

9    correct?

10       A.   Yes.

11       Q.   And that's on a week day of 2009, correct?

12       A.   Yes.

13       Q.   Do you have any reason to believe that would be

14   different in June 2008?

15            MS. JOHNSON:  Objection.

16            THE COURT:  I'll allow it.

17            You can answer that.

18       A.   Depending on the hour of the day --

19       Q.   Right.

20       A.   -- I think it would be different.

21       Q.   You ascertained that Mr. Gopaul has one of his

22   customers at 600 Old Country Road -- I'm sorry,

23   600 Community Drive, correct?

24       A.   Yes.

25       Q.   And that has been over a long period of time, is

ws

1    that right?

2         A.   I believe so.

3         Q.   So presumably Mr. Gopaul would know 600 Community

4    Drive is where he has a client, would that be right?

5                   MS. JOHNSON:  Objection.

6                   THE COURT:  Yeah, sustained.

7                   MR. SCHECHTER:  No more questions of the

8         officer, Judge.

9                   THE COURT:  Any redirect?

10                   MS. JOHNSON:  Briefly, Judge.

11   REDIRECT EXAMINATION

12   BY MS. JOHNSON:

13        Q.   Detective Moran, do you recall being asked

14   questions on cross-examination by the defense attorney about

15   whether or not Sana Awan told that you she was in fear?

16        A.   Yes.

17        Q.   And do you recall answering Mr. Schechter's

18   question that she did indicate to you that she was in fear?

19        A.   Yes.

20        Q.   Did you memorialize that anywhere?

21        A.   Yes.

22        Q.   Where did you memorialize that?

23        A.   In the two-page typed statement.

24        Q.   Whose two-page typed statement?

25        A.   Anna -- I'm sorry, Sana Awan.

                                                        ws

Moran - People - redirect          762

1       Q.   Do you recall being asked by Mr. Schechter on

2    cross-examination whether or not Ms. Awan indicated that

3    there were always knives in the defendant's vehicle?

4       A.   Yes.

5       Q.   And do you recall indicating that she did indicate

6    that there was --

7              MR. SCHECHTER:   Judge, she is leading the

8         witness.

9              THE COURT:   Mr. Schechter, please.

10              MR. SCHECHTER:   Objection, objection.

11              THE COURT:   Can I have the question read

12         back?

13              (Record read.)

14              THE COURT:   All right, can I have the rest of

15         the question, for the umpteenth time, before there's an

16         objection?

17       Q.   Detective Moran, do you recall being asked by

18    Mr. Schechter whether or not Ms. Awan told you that there

19    were always knives in the defendant's van?

20              Do you recall being asked that question?

21       A.   Yes.

22       Q.   And do you recall what your answer was?

23       A.   Yes.

24       Q.   What was your answer?

25       A.   That -- I don't recall the exact words, but I

ws

Moran - People - redirect          763

1   think the answer was yes.

2        Q.   And what period of time was the focus of your

3   interview involving Ms. Awan?

4        A.   May and June of 2008.

5        Q.   Was that the only period of time that you spoke to

6   Ms. Awan about?

7        A.   Yes.

8        Q.   And was the substance of her statement to you

9   involving solely May and June of 2008?

10              MR. SCHECHTER:  Objection, that calls for  --

11              THE COURT:  All right, Mr. Schechter, again,

12       you have an objection?

13              MR. SCHECHTER:  Objection.

14              THE COURT:  All right, overruled.

15              MR. SCHECHTER:  May I have a sidebar with

16       respect to the specifics of my objection, Judge?

17              THE COURT:  Come on up.

18              (Witness steps down.)

19              (Sidebar conference held as follows:)

20              MR. SCHECHTER:  When I make objections I'm

21       used to giving a reason for my objections, but --

22       that's why I'm here.

23              THE COURT:  I don't understand at this point

24       because I'm sure you've gathered that I don't take well

25       to speaking objections or speeches during objections.

                                                    ws

Moran - People - redirect          764

1        MR. SCHECHTER:  It's not experience because I
2   was just trying to put a ground.
3        The counsel's question is -- can only require
4   the officer to be clairvoyant as to the operation of
5   Sana Awan's mind.
6        He wrote down there were always knives in the
7   car.  He did not ask her in May and June.  She did not
8   say in May and June there were knives in the car.  She
9   said there were always knives in the car.  That's what
10  she said to him.
11       THE COURT:  She can certainly ask him what
12  the focus of his investigation was.
13       MR. SCHECHTER:  Absolutely.
14       However, she cannot ask him if she was
15  thinking that May --
16       THE COURT:  I agree with you.
17       MR. SCHECHTER:  That's what the nature of her
18  question was.
19       THE COURT:  What I would ask you to do,
20  Ms. Johnson, is rephrase your question.
21       MS. JOHNSON:  Sure.
22       THE COURT:  Just so you understand, if you're
23  going to ask him about what she was thinking --
24       MS. JOHNSON:  I understand.
25            (Sidebar conference concludes.)

ws

Moran - People - redirect          765

1              THE COURT:  All right, you can rephrase the

2        question.

3              MS. JOHNSON:  Yes.

4        Q.   Detective Moran, when you were speaking to

5   Ms. Awan were you only speaking of May and June of 2008?

6        A.   Yes.

7        Q.   And was that the subject of your interview with

8   her, those two months alone?

9        A.   Yes.

10             MS. JOHNSON:  Nothing else.

11             THE COURT:  Recross?

12             MR. SCHECHTER:  Nothing further.

13             THE COURT:  All right, detective, thank you

14        very much.

15             (Witness excused.)

16             MS. JOHNSON:  Can I excuse him?

17             THE COURT:  Yes, detective, you're excused.

18        I did it for you.

19             People?

20             MS. JOHNSON:  Your Honor, at this time the

21        People rest.

22             THE COURT:  All right, members of the jury,

23        this is a point in time when myself and the attorneys

24        have some legal discussion.

25             I'm not going to let you go just yet.  I am

ws

1    going to excuse you for a little bit while we discuss

2    things that normally come at this point in a criminal

3    trial.

4              So you're going to have a little bit of a

5    recess and I'll have you back here as soon as possible.

6              (Jury exits.)

7              THE COURT:  All right, Mr. Schechter, at the

8    close of the People's case?

9              MR. SCHECHTER:  At the end of the People's

10   case, your Honor, the defendant moves for -- to dismiss

11   the indictment on the grounds that the People have

12   failed to prove a prima facie case.

13             THE COURT:  People?

14             MS. JOHNSON:  Your Honor, we would oppose

15   that application.

16             In the light most favorable to the People

17   there is sufficient evidence in the light most

18   favorable to the People that we have proven each and

19   every element of each charged offense beyond a

20   reasonable doubt.

21             THE COURT:  All right, at this time the

22   application for a trial order of dismissal is denied.

23             MR. SCHECHTER:  Prima facie case?

24             That was just based on the prima facie case.

25             THE COURT:  Yes.

Moran - People - redirect                767

1         MR. SCHECHTER:  Do the People rest?

2         MS. JOHNSON:  Yes, we rested in front of the

3    jury.

4         MR. SCHECHTER:  Okay, they did.  The motion,

5    that encompasses both, okay.

6         Just so the record is clear, so that the

7    Court's determination or the Court's order is that the

8    motion to dismiss based upon the People failing to

9    prove a prima facie case and the motion of the

10   defendant that the People have failed to prove their

11   case beyond a reasonable doubt are being considered

12   together and therefore the Court is denying both

13   motions?

14            THE COURT:  No.

15            Are you putting on a case?

16            Because I don't think we get to the issue of

17   beyond a reasonable doubt until --

18            MR. SCHECHTER:  Defendant rests.

19            THE COURT:  Do you want -- I think we

20   should -- well, what I'm going to do is have you do

21   that in front of the jury, obviously.

22            All right, do you want to expand now that you

23   have rested as well?

24            MR. SCHECHTER:  I have rested, Judge.

25            THE COURT:  But in terms of expanding on your

                                                      ws

Moran - People - redirect          768

1     motion?

2          MR. SCHECHTER:  Yes, I would like the record

3     to reflect, your Honor, that with respect to

4     Mr. Gopaul's testifying, that I have had a full and

5     complete opportunity to speak with him about the pros

6     and cons of his testifying.  It has been discussed with

7     him fully and completely and it has been discussed with

8     him in the presence of his wife and his sister.  We

9     have discussed the pros and cons of same.

10          Mr. Gopaul has decided that it is in his

11     interests, and as such we are -- he is not going to

12     testify.

13          Is that correct, Mr. Gopaul?

14          THE DEFENDANT:  Yes, it is.

15          THE COURT:  And as far as your motion, I just

16     assumed -- I didn't know what your position was as far

17     as whether or not you were putting on a case, your

18     motion to dismiss encompasses both prima facie and at

19     this point, now having rested, beyond a reasonable

20     doubt?

21          MR. SCHECHTER:  It does, Judge.

22          THE COURT:  And, People, I believe you

23     responded --

24          MS. JOHNSON:  Premature --

25          THE COURT:  -- perhaps unwittingly, with

                                                    ws

1    regard to your opposition and on both prima facie case
2    at this particular time as well as at the close of the
3    defendant -- well, the defendant now resting, the
4    motions to dismiss are denied in all respects.
5              MR. SCHECHTER:  Respectfully except.
6              THE COURT:  All right, let's get the jury up,
7    let them go.  We're going to have a charge conference
8    and we'll have summations in the morning.
9              MR. SCHECHTER:  Fine.
10             MS. JOHNSON:  Your Honor, I have spoken to
11   executives in my office and there was an indication of
12   possibly the People requesting lesser included charges
13   to be submitted to the jury.
14             My executive just walked out, so I just want
15   to confirm with her, but we can deal with that after.
16             THE COURT:  Okay, I'll allow you to speak to
17   whoever.
18             (Pause in the proceedings.)
19             MS. JOHNSON:  I'll have to get back to
20   whoever.
21             (Jury enters.)
22             THE COURT:  People having rested,
23   Mr. Schechter, does the defendant intend to put on a
24   case?
25             MR. SCHECHTER:  We rest, Judge.

ws

1          THE COURT:  Okay, all right, ladies and

2    gentlemen, it's moving even quicker than I said it was

3    yesterday.

4          We are at the stage where there would be

5    summations by both counsel and then my instructions on

6    the law and you'll then retire to for deliberations.

7          Obviously we're not going to do that today,

8    so therefore I'm going to let you go for today.

9    Tomorrow we'll have summations, my charge.

10         There's some further legal issues that I need

11   to take up with both counsel which I'm going to try to

12   cover after I let you go.

13         Just bear in mind, tomorrow one of the first

14   things that will happen is we're going to take a lunch

15   order from you in the morning, so plan on having lunch,

16   courtesy of the Nassau County court system, tomorrow.

17         And then we're going to have you up here, as

18   soon as we can get everybody together, for summations.

19         As I told you during jury selection, there is

20   no longer any sequestration so don't come here with a

21   duffle bag and think you're going to get a night in a

22   hotel on us, you're just going to get lunch tomorrow.

23         So as I let you go, please, at this very late

24   moment, even though the evidence, if you will, is in,

25   please, it's extremely important that you not form any

ws

1     opinion at this point.  Keep an open mind.  You still

2     haven't heard the defendant's and the People's closing

3     arguments.  You haven't heard my instructions on the

4     law.  So please don't speak amongst yourselves or with

5     anybody else about the case.

6              Please don't view or visit any of the areas

7     you've heard described and my admonition about not

8     accessing things on the computer also still applies.

9     So get home safe.  We will see you back here tomorrow

10    morning at the same time, okay?

11              (Jury exits.)

12              THE COURT:  All right, what I would ask both

13    Mr. Schechter and yourself, Ms. Johnson, if you would

14    just come back with my law secretary, hopefully we can

15    cover the charge and get it out of the way.

16              MS. JOHNSON:  Let me make a quick call,

17    confirm, and then I'll come back to chambers.

18              (Proceedings adjourned to Thursday, May 14,

19    2009 at 9:30 a.m.)

20

21

22

23

24

25

ws

772

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NASSAU : CRIMINAL TERM PART 80

3   ------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,      :   Indictment
4                                             :   No. 2415N/08
              -against-                       :
5                                             :
    HAROLD GOPAUL,                            :   SEX ABUSE 1
6                                             :
                      Defendant.              :   Trial
7   ------------------------------------------X

8                                 May 14, 2009

9                                 252 Old Country Road
                                  Mineola, New York
10

11  B E F O R E:

12              HONORABLE JAMES P. McCORMACK,
                      Acting Supreme Court Justice
13

14  A P P E A R A N C E S:

15              (As previously noted.)

16              *       *       *       *       *

17              THE CLERK:  Case on trial, the People of the

18      State of New York against Harold Gopaul,

19      Indictment 2415n of 2008.

20              Are the People ready?

21              MS. JOHNSON:  We are ready.

22              THE CLERK:  Defense counsel ready?

23              MR. SCHECHTER:  Yes.

24              THE COURT:  Before we bring the jury down for

25      summations and charge I think the record should reflect

                                              ws

Proceedings                          773

1     that we had a charge conference yesterday in my

2     chambers and I just want to put our understanding of

3     what's going to be charged.

4              As I indicated to you, Mr. Schechter,

5     obviously I'm going to be giving a prompt outcry

6     charge.  I showed it to you yesterday.

7              MR. SCHECHTER:  Yes.

8              THE COURT:  You indicated to me you wanted a

9     charge with respect to motive.

10             MR. SCHECHTER:  Yes.

11             THE COURT:  However, you did not want a

12    charge of interest or lack of interest.

13             MR. SCHECHTER:  Is that going with the

14    charge -- that part of that charge defendant is

15    interested as a matter of law that I'm asking not be

16    included?

17             THE COURT:  No, it just deals with witnesses.

18             MR. SCHECHTER:  Does it also include a

19    charge, Judge, I'm asking, if the defendant is an

20    interested witness?

21             THE COURT:  No.

22             MR. SCHECHTER:  It does not.  As long as that

23    statement is not made to the jury, yes, I want it

24    excluded.

25             THE COURT:  You want it excluded?

                                                    ws

Proceedings                    774

1          MR. SCHECHTER:  Yes.

2          THE COURT:  Well, it doesn't have anything

3     with respect to the defendant.

4          MR. SCHECHTER:  Then you changed my mind.  I

5     thought that might have been included.  If that's

6     excluded I want that charge included because interest

7     is something that might be an element of this case,

8     interest.

9          THE COURT:  So I'll give that.

10         Inconsistent statements you asked for.  I

11    would have given it.

12         People you wanted consistency, I'll give

13    that.

14         Defendant not testifying.

15         MR. SCHECHTER:  Yes.

16         THE COURT:  I am going to give the falsus en

17    uno.

18         I am giving police testimony.

19         I am going to give the Molineaux charge.

20    It's identical to the one I gave after Ms. Awan

21    testified.

22         With regard to the issue of statements,

23    Mr. Schechter, you wanted a charge with regard to

24    custodial statements, which I will give, Miranda

25    rights, which I am giving, traditional involuntariness,

                                              ws

Proceedings                          775

1    which I am giving, and the expanded charge on

2    traditional voluntariness as well as delay in

3    arraignment.

4              MS. JOHNSON:   Which, your Honor, we had

5    opposed yesterday back in chambers.

6              THE COURT:   Okay.

7              I think in terms of preliminary charges and

8    charges that are particular to this case, I also give

9    the indictment is not evidence charge.

10             I do give credibility factors.

11             Sentence, they're not to consider or

12   speculate as to matter of sentence.

13             Insofar as the lesser included, yesterday

14   both the People and the defendant had requested a

15   charge of sexual abuse in the third degree and that's

16   130.55 of the Penal Law as a lesser included of sex

17   abuse in the first degree, which is what the indictment

18   charges here, which is 130.65, Subdivision 1.

19             In looking at the -- both of those charges,

20   and specifically the elements of both of those charges,

21   they are, in fact, identical in terms of the elements,

22   particularly as it pertains to the issue of forcible

23   compulsion.   There is actually no distinction between

24   either one.

25             So in thinking with respect to whether or not

Proceedings                    776

1        there is a reasonable view of the evidence that the

2        defendant committed the lesser charge while committing

3        the greater, the Court -- in this Court's view, and I'm

4        guided by a case called the People versus Discala,

5        D-i-s-c-a-l-a, that's 45 N.Y.2d, Page 38, as well as

6        another Court of Appeals case, People versus Eboli,

7        E-b-o-l-i, that's 34 N.Y.2d 281.

8                In the Discala case, although it deals with

9        the element -- or the crimes, I should say, of

10       coercion, both of the elements, the greater and the

11       lesser included, were, as in this case, identical and I

12       think in an analogous situation the crime of sex abuse

13       in the third degree in this particular instance

14       reflects what, in this Court's view, is a -- as a

15       misdemeanor, what I would perceive, and the Court of

16       Appeals indicated in Discala, "is a safety valve

17       feature that was reserved and enacted by the

18       legislature for an unusual factual situation."

19               And specifically I think it applies in this

20       case as well.  "The rationale," I'm quoting from the

21       case, "for this approach is that it would indeed be an

22       exceptional case where the method of coercion is by

23       threat of personal or property injury while at the same

24       time the heinous quality is lacking," and I think in

25       this particular instance you have a situation where the

                                                              ws

1   elements are identical to each other and I don't think

2   there's a reasonable view of the evidence in this case

3   that would warrant a charge of sex abuse in the third

4   degree as the lesser included offense.

5          I think in this particular case the

6   prosecution has opted, if you will, to charge the sex

7   abuse in the first degree based upon the -- what they

8   believe to be the rather aggravating or heinous nature

9   of the element of force or forcible compulsion and I

10  think in this case to submit both of these charges to

11  the jury is going to force them to speculate as to

12  which charge to choose from and, clearly, if the

13  elements are identical, which they are, as in any

14  lesser included offense the jury is always asked or

15  directed not to consider the lesser unless they find

16  the defendant not guilty of the greater.

17         As the elements are identical here, I do not

18  believe that if the jury was to find the defendant not

19  guilty of the greater, that they could find him guilty

20  of the lesser when, in fact, the elements are the same.

21         In this Court's view it would seem to be --

22  well, would amount to be a repugnant verdict, should

23  that happen, and I think the sex abuse in the third

24  degree is reserved for, as in the Discala case, those

25  unusual factual situations that the legislature has

ws

Proceedings                    778

1    deemed to be not as heinous in terms of the nature of

2    the force in a sex abuse one situation and reserve that

3    particular charge for those situations that are,

4    perhaps, less serious in terms of the element of force.

5              I know, Mr. Schechter, you had indicated a

6    moment ago that, in your view, obviously, you are

7    requesting this, but as the elements are exactly the

8    same between the two, if it's your theory that there

9    is -- that this was not an act done by force, clearly

10   the jury would, if they make that finding, would have

11   to acquit your client whether it was sex abuse in the

12   first degree or sex abuse in the third degree and I

13   think under these situations, given what I've seen in

14   these two Court of Appeals cases, as the Court in the

15   Discala case said, "The jury should not be permitted to

16   choose between the crime charged and some lesser crime

17   where the evidence essential to support a verdict of

18   guilt of the lesser necessarily proves guilt of the

19   greater as well."

20             And in the Discala case the Court of Appeals

21   found that it was not error to charge the lesser

22   charge, although it was dealing with the issue of

23   coercion.  It was the same type of situation where the

24   elements of the greater and the lesser were identical

25   and I think in these -- under these facts of this

                                                    ws

Proceedings                          779

1    particular case, again, I think to submit the lesser on
2    all of these 14 counts, which, I believe, are all the
3    same elements of sex abuse in the first degree, is
4    going to lead to speculation on the part of the jury
5    and I don't think that there's a reasonable view of the
6    evidence that the lesser charge, if you will, which
7    obviously has the element of force, is warranted in
8    this particular case.
9            People, you want to be heard with respect to
10   that?
11           MS. JOHNSON:  Yes, Judge.
12           Your Honor, we have had the opportunity to
13   review both those cases, both Discala and Eboli, which
14   your Honor has referenced.
15           The People also have the opportunity to read
16   the McKinney's commentaries, specifically under the
17   category of lack of consent, and the commentaries say
18   to People versus Roberts, which we've provided to the
19   Court and counsel, that People versus Roberts at
20   134 A.D.2D 856, where the court unanimously reversed on
21   the law and a new trial was granted where the court
22   indicated, "the court erred in refusing defendant's
23   request to charge sex abuse in the third degree as a
24   lesser included offense of sexual abuse in the first
25   degree."

Proceedings                    780

1          The court reasons, "It is impossible to

2     commit sexual abuse in the first degree by forcible

3     compulsion without concomitantly and by the same

4     conduct committing sexual abuse in the third degree

5     since sexual contact accomplished by forcible

6     compulsion is, by definition, without the victim's

7     consent.

8          "Since there is a reasonable view of the

9     evidence that the defendant touched the victim without

10    her consent, but not by forcible compulsion, the Court

11    should have granted defendant's request to charge."

12         Your Honor, in this case, where there is

13    evidence that, first, the victim states no to the

14    defendant and, in fact on his video confession he

15    states that at first she indicated no, it's our

16    position that in that light, if the jury does not

17    believe that there was that element of physical force,

18    either through the implied or expressed threats or

19    through his physical self forcing upon her, it would

20    not be an inconsistent verdict for them to find that

21    she said no, but there was no physical force and that

22    therefore the jury should be asked -- allowed to

23    consider the sexual abuse in the third degree charge

24    relying on People versus Roberts.

25         THE COURT:  Mr. Schechter?

Proceedings                    781

1          MR. SCHECHTER:   May it please the Court, this

2      is rather unusual in the fact that both the prosecutor

3      and I both agree and the fact pattern that counsel has

4      just alluded to I raised in our conference regarding

5      the inclusion of the lesser included crime of sexual

6      abuse in the third degree.

7          I should like to say, your Honor, with all

8      due respect, I think the Court is misapplying the cases

9      that were cited for the following reasons.

10         Firstly, with respect to coercion, the

11     elements of coercion and the elements of sexual abuse

12     are totally different and while the analogy with

13     respect to the inclusion or non-inclusion of lesser

14     included crimes depends on the facts of the case, the

15     facts of this case are quite different.

16         As a matter of fact, as I referred to the

17     Court inside, cited in Discala, I'm referring to, as

18     the Court said, 45 N.Y.2d at 38, on Page 3 of the

19     opinion in the second paragraph it says, "Since the

20     statutory definition for the felony crime sets forth as

21     one of its elements that a person is guilty of coercion

22     in the first degree when he commits the crime of

23     coercion in the second degree, Penal Law 135.65, in

24     this case it was impossible to commit the first degree

25     offense without concomitantly committing, by the same

                                                        ws

Proceedings                          782

1      conduct, the second degree crime.  Therefore, it
2      follows that the misdemeanor of coercion is a lesser
3      included offense of felony coercion and should be
4      charged, if requested if there is a reasonable view of
5      the evidence which would support a finding that the
6      defendant committed such lesser offense, but did not
7      commit the greater practice."

8              And, continuing, I'm sorry, on the top of
9      Page 3 it says, "In other words, it is not for the
10     trial judge to speculate -- " not the jury, "It is not
11     for the trial judge to speculate as to what would be
12     the ultimate finding of the jury.  The court simply
13     determines if there is a reasonable view of the facts
14     which would support a conviction of the lesser crime
15     but not the greater."

16             And here's the crucial element, "The evidence
17     must be viewed in the light most favorable to the
18     defendant," and that's quoted in the opinion that the
19     Court cited, People v. Discala.

20             THE COURT:  Let me just ask, Mr. Schechter, I
21     assume that your theory is going to be that there
22     was -- this was not a forcible act on the part of your
23     client.

24             MR. SCHECHTER:  I am going to argue that and,
25     in the alternative, that if there was, it was minimum

                                                        ws

Proceedings                    783

1      overcoming of the resistance.

2                And, let me say, we all have heard within the

3      last --

4                THE COURT:  Well, if the elements of force

5      are forcible compulsion, and, again, they are identical

6      in sex abuse three and sex abuse one, under this

7      subdivision --

8                MR. SCHECHTER:  I respectfully disagree.

9                THE COURT:  Well, if you want I can show you

10     the charge.  I don't know if you bothered to take a

11     look at it, but the elements, I can tell you right now,

12     are identical and both of them obviously have and

13     element of -- the element of forcible compulsion in

14     them and the elements of forcible compulsion are

15     identical, they're both the same.  I don't think that

16     there's a reasonable view of the evidence, base upon

17     your theory that there was no force, that the jury

18     could find sex abuse in the third degree and not find

19     the greater offense of sex abuse in the first degree.

20               MR. SCHECHTER:  With all due respect, the

21     Court is not permitting me to continue.

22               THE COURT:  Oh, I'm going to permit you to

23     continue, I'm just trying to make a point.

24               MR. SCHECHTER:  Because I am completely able

25     and permitted to argue alternative theories to the

                                                         ws

Proceedings                                         784

1   jury, as it is my privilege and my legal right to do so

2   and I intend to do so.

3           However, as counsel stated, looking at the

4   evidence most favorable to the defendant, when

5   Mr. Gopaul was on that videotape he was asked

6   specifically by, I think it was Mr. Hughes, although

7   Mr. Jarred Rosenblatt, who is in the courtroom during

8   these arguments and I'll refer to that later, asked the

9   defendant, "Well, did she agree to the -- to your

10  advances," and the defendant, in sum and substance, and

11  I hope if this matter does go up on appeal that the

12  Appellate Division and so on will view the videotape so

13  they could see what was said or hear what was said

14  because since it's a videotape it's not something that

15  becomes a Court exhibit except the actual artifact.

16          The defendant said on the videotape in

17  response to the question, "Did she agree -- " in sum

18  and substance, "Did she agree to your sexual advances,"

19  and the defendant says, in sum and substance, "Well,

20  not at first.  She said no at first but then I said

21  okay, okay."

22          THE COURT:  Implying that it was consensual.

23          MR. SCHECHTER:  Well, that was the

24  defendant's bent, but the words could be interpreted

25  and in these days, 2009, where we have been

                                                    ws

Proceedings                    785

1        indoctrinated over the last --
2                    THE COURT:  Mr. Schechter, don't give me an
3        anthropology.
4                    MR. SCHECHTER:  I'm not, I'm going by way of
5        analogy.
6                    THE COURT:  Just make your point, if you
7        will.
8                    MR. SCHECHTER:  I will .  No is no.  We've
9        been hearing that time and time again, no is no.
10                   So if the complaining witness had said, "No,
11       I don't want to," theoretically, that's a question of
12       fact whether the jury -- well, she really meant no, did
13       not mean no, if she said, "No, please don't do it," and
14       he says, "It's okay, it's okay," a possible view of the
15       evidence, a reasonable view of the evidence, could be
16       that while the force does not rise to the level of sex
17       abuse in the first degree certainly, under those
18       circumstances, sexual abuse in the third degree could
19       be contemplated and I think that's why these instances
20       are relatively fact specific, especially since the
21       Court has cited these cases which deal with coercion
22       and not with sexual abuse in the third degree.
23                   Prosecution has already cited a case directly
24       on point in sexual --
25                   THE COURT:  Let me just interrupt you by

                                                              ws

Proceedings                    786

1    saying that the case that the prosecutor cited, if you

2    notice, had no elucidation, if you will, of the facts

3    regarding what the Court's decision was.

4              MR. SCHECHTER:  Mine is fact specific,

5    however, Judge, and we have his own words on the

6    videotape.  It's in evidence and it's got to be

7    interpreted in the light most favorable to the

8    defendant and that is my proffer.

9              THE COURT:  And you're correct in that the --

10   it has to be viewed, should be viewed, in the light

11   most favorable to the defendant, but I think under

12   these circumstances in taking that approach that there

13   is no reasonable view of the evidence in this instance,

14   given the evidence that the Court and this jury has

15   heard, that would support that this is one of those, to

16   use your words, no-means-no type of situations.

17             This is not a case where you have an isolated

18   incident of sexual contact between an alleged victim

19   and a defendant.  This is one that's been charged as a

20   pattern, if you will, over a period of two months.

21             You're free to argue whatever theory you

22   think is -- the evidence allows, but I think under

23   these circumstances to submit these lesser counts to

24   the jury is really going to lead to unnecessary

25   speculation on their part, particularly as the elements

                                                      ws

Proceedings                    787

1     are identical.

2              So for those reasons I'm not going to charge

3     it.

4              One last thing I want to take up before we

5     begin summations.

6              MR. SCHECHTER:  I respectfully except to your

7     Honor's ruling each, and every part of your Honor's

8     ruling, for the reasons stated and for the reasons that

9     are contained in those cases.

10             THE COURT:  Okay.

11             With regard to the issue of forcible

12    compulsion as it's going to be charged, it gets to

13    Subdivision 2, it reads, "By a threat expressed or

14    implied which places a person in fear of immediate

15    death or physical injury to himself or herself or

16    another person."

17             It goes on to state, "Or in fear that he or

18    she or another person will immediately be kidnapped."

19             That second part, Mr. Schechter, or in fear

20    that he or she or another person will be immediately

21    kidnapped --

22             MR. SCHECHTER:  I want that out, Judge.

23             THE COURT:  You asked that that be excluded,

24    is that right?

25             MR. SCHECHTER:  Yes, yes.

ws

Proceedings                    788

1              THE COURT:  And I will do that.

2              Anything else we need to take up?

3              MS. JOHNSON:  I would just ask for a couple

4      of minutes after counsel's summation.

5              THE COURT:  Yes.

6              (Jury enters.)

7              THE COURT:  All right, members of the jury,

8      good morning, welcome back.

9              We're about to hear from both counsel their

10     summations which will then be followed by my

11     instructions on the law.

12             Members of the jury, you will now hear

13     summations of the lawyers.

14             Following the summations I will instruct you

15     on the law and you will begin your deliberations.

16             Under our law defense counsel will sum up

17     first and the prosecutor must follow.  The lawyers may

18     not speak to you after that.

19             Summations provide each lawyer an opportunity

20     to review the evidence and submit for your

21     consideration the facts, inferences and conclusions

22     that they contend may properly be drawn from the

23     evidence.

24             If you find that a lawyer has accurately

25     summarized and analyzed the evidence and if you find

                                                         ws

1    that the inferences and conclusions the lawyer asked

2    you to draw from that evidence are reasonable, logical

3    and consistent with the evidence, then you may adopt

4    those inferences and conclusions.

5              Members of the jury, bear in mind the

6    following points:

7              First, you are the finders of the fact and it

8    is for you and you alone to determine the facts from

9    the evidence you find to be truthful and accurate.

10             Thus, whatever the lawyers say and however

11   they say it, you should remember that what the lawyers

12   say is simply argument submitted for your

13   consideration.

14             Second, remember the lawyers are not

15   witnesses in this case so if a lawyer asserts as fact

16   something that is not based on the evidence you must

17   disregard it.

18             Remember, nothing the lawyers say at any time

19   is evidence so nothing the lawyers say in their

20   summations is evidence.

21             You have heard the evidence and you must

22   decide this case on the evidence as you find it and the

23   law as I explain it.

24             Third, during the summations one lawyer's

25   recollection of the evidence may, in good faith, differ

ws

Proceedings                    790

1       from the recollection of the other lawyer's or from

2       your own recollection and the lawyers will undoubtedly

3       differ with each other on the conclusions to be drawn

4       from the evidence.

5               If your recollection, understanding and

6       evaluation of the evidence -- I should say it is your

7       recollection, understanding and evaluation of the

8       evidence that controls, regardless of what the lawyers

9       say or have said about the evidence.

10              You and you alone are the judges of the facts

11      in this case.

12              If during your deliberations you need to have

13      your recollection of the testimony refreshed you may

14      have all or any portion of the testimony read back to

15      you.

16              Fourth, remember under our law I am

17      responsible for explaining the law, not the lawyers.

18              Now, prior to summation the lawyers were

19      permitted to read instructions on the law that I will

20      deliver to you after their summations and the lawyers

21      are permitted to refer briefly to portions of those

22      instructions in their summations if they wish.

23              However, even though a lawyer may refer to

24      portions of those instructions you must listen

25      carefully to all the instructions that I will give you

                                                        ws

Proceedings                791

1    after the summations.

2             If you think there is any difference between

3    what the lawyers may have said and what I say the law

4    is, your sworn duty as jurors is to follow my

5    instructions on the law as you have promised me you

6    would do.

7             First, if during the summations I sustain an

8    objection to a comment of a lawyer, that comment will

9    be stricken from the record and you must disregard it

10   as if it were never said.

11            If I overrule an objection the comment will

12   stand.

13            Whether I sustain or overrule an objection or

14   on my own indicate that a comment must be disregarded,

15   my ruling indicates only that the comment does or does

16   not violate one of the rules set forth for the lawyers

17   following summations.

18            It is not an attempt to indicate that I have

19   an opinion on what is said or about the facts of the

20   case or whether the defendant is guilty or not guilty.

21            Remember, under our law you and you alone

22   judge what facts, if any, are proven and whether the

23   defendant is guilty or not guilty, not I and not the

24   lawyers.

25            At this time we'll turn to the summations.

                                                    ws